Nos. 22-2967, 22-3025, and 22-3042

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES, LLC

*Plaintiffs-Appellants at 22-2967*
*Plaintiffs-Cross-Appellees at 22-3025 and*
*22-3042*

v.

ADAM POTTER,

*Defendant-Appellee at 22-2967*
*Defendant-Cross-Appellee at 22-3025*
*Defendant-Cross-Appellant at 22-3042*

and

BUSINESS INSURANCE HOLDINGS INC

*Defendant-Appellee at 22-296*
*Defendant-Cross-Appellant at 22-3025*
*Defendant-Cross-Appellee at 22-3042*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE, THE HONORABLE RICHARD G. ANDREWS
DISTRICT COURT NO. 1:19-CV-01600-RGA-JLH

**APPENDIX**
**VOLUME II OF VI (App.36-App.534)**

D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
 (215) 988-2700 (telephone)
 (215) 988-2757 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

*Attorneys for Plaintiffs-Appellants/Plaintiffs-Cross-*
*Appellees The American Institute for Chartered*
*Property Casualty Underwriters and The Institutes, LLC*

# APPENDIX TABLE OF CONTENTS

## VOLUME I

Notice of Appeal of Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC
October 19, 2022 ...................................................................................App.1

Defendant Business Insurance Holdings, Inc.'s Notice of Appeal
October 27, 2022 ...................................................................................App.3

Notice of Appeal of Defendant, Adam Potter
October 28, 2022 ...................................................................................App.4

Final Judgement
September 29, 2022 ...............................................................................App.6

Permanent Injunction
September 29, 2022 ...............................................................................App.8

Trial Opinion
September 15, 2022 .............................................................................App.10

## VOLUME II

Amended and Supplemental Complaint
March 27, 2020 ...................................................................................App.36

Report and Recommendation
February 8, 2021 .................................................................................App.75

Memorandum Order
March 26, 2021 ...................................................................................App.99

Order
March 26, 2021 .................................................................................App.106

Adam Potter's Answer With Affirmative Defenses to Plaintiffs' Amended and Supplemental Complaint
April 16, 2021 ...................................................................................App.109

Answer and Cross-Claim of Defendant Business Insurance Holdings, Inc.
April 16, 2021 ...................................................................................App.157

Stipulated Dismissal Without Prejudice of Cross-Claim No. 1
    December 7, 2021 ................................................................................. App.215

Stipulated Dismissal Without Prejudice of Cross-Claim No. 1 [Entered]
    December 7, 2021 ................................................................................. App.217

Memorandum Opinion
    January 4, 2022 ................................................................................... App.219

Order
    January 4, 2022 ................................................................................... App.225

Adam Potter's Answer With Affirmative Defenses to Business Insurance Holdings
    Inc.'s Cross-Claims
    January 18, 2022 ................................................................................. App.226

Business Insurance Holdings, Inc.'s Concise Statement of Material Facts in
    Support of Summary Judgment Motion
    February 11, 2022 ............................................................................... App.234

Plaintiffs' Motion for Partial Summary Judgment
    February 11, 2022 ............................................................................... App.244

Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for
    Partial Summary Judgment
    February 11, 2022 ............................................................................... App.248

Adam Potter's Motion for Summary Judgment on Plaintiffs' Amended and
    Supplemental Complaint
    February 11, 2022 ............................................................................... App.259

Adam Potter's Motion for Summary Judgment on Business Insurance Holdings,
    Inc.'s Cross-Claims
    February 11, 2022 ............................................................................... App.263

Motion to Exclude Testimony of Plaintiffs' Expert Under Federal Rule of Civil
    Procedure 702
    February 22, 2022 ............................................................................... App.266

Defendant Adam Potter's Daubert Motion to Exclude Testimony and Report of
    Christine S. Meyer, Ph. D.
    February 22, 2022 ............................................................................... App.267

Plaintiffs' Reponse to Bih's Statement of Undisputed Material Facts
    March 4, 2022 ..................................................................................App.269

Appendix of Exhibits to Plaintiffs' Reponse to Defendant Business Insurance
    Holdings, Inc.'s Statement of Undisputed Material Facts
    March 4, 2022 ..................................................................................App.281

Plaintiffs' Reponse to Defendant Adam Potter's Statement of Undisputed Material
    Facts
    March 4, 2022 ..................................................................................App.397

Appendix of Exhibits to Plaintiffs' Reponse to Defendant Adam Potters Statement
    of Undisputed Material Facts
    March 4, 2022 ..................................................................................App.413

## VOLUME III

Adam Potter's Response to Plaintiffs' Statement of Facts Submitted in Support of
    Their Motion for Partial Summary Judgment
    March 4, 2022 ..................................................................................App.535

Declaration of Counsel Submitted in Support of Adam Potter's Answering Brief in
    Opposition to Plaintiffs' Motion for Partial Summary Judgment
    March 4, 2022 ..................................................................................App.562

Adam Potter's Response to Business Insurance Holdings, Inc.'s Counterstatement
    of Facts Submitted in Opposition to Potter's Motion for Partial Summary
    Judgment
    March 18, 2022 ..................................................................................App.582

Supplemental Declaration of Counsel Submitted in Further Support of Adam
    Potter's Motion for Summary Judgment on Business Insurance Holdings,
    Inc.'s Cross-Claims
    March 18, 2022 ..................................................................................App.592

Memorandum Order
    May 6, 2022 ..................................................................................App.598

Memorandum
    May 13, 2022 ..................................................................................App.603

Order
    May 13, 2022 ..................................................................................App.613

Memorandum
    May 13, 2022 ..................................................................App.614

Order
    May 13, 2022 ..................................................................App.625

Adam Potter's Motion for Partial Reconsideration of The Court's May 13, 2022
    Order Granting in Part and Denying in Part Summary Judgment As to
    Plaintiffs' Amended and Supplemental Complaint
    May 23, 2022 ..................................................................App.626

[Proposed] Final Pretrial Order
    May 24, 2022 ..................................................................App.630

Order After Pretrial Conference
    June 2, 2022 ...................................................................App.794

Order After Pretrial Conference
    June 6, 2022 ...................................................................App.796

Offer of Proof of Plaintiffs The American Institutes for Chartered Casualty
    Property Underwriters and The Institutes LLC
    June 13, 2022 .................................................................App.799

Plaintiffs' Motion for Clarification Or Partial Reconsideration on The Court's June
    6, 2022, Order Ruling on Business Insurance Holdings, Inc.'s Motion in
    Limine No . 1
    June 14, 2022 .................................................................App.827

Order
    June 24, 2022 .................................................................App.829

Order
    June 27, 2022 .................................................................App.831

Pretrial Conference Transcript
    May 27, 202 ...................................................................App.833

Opening Post-Trial Brief of Plaintiffs The American Institute for Chartered
    Property Casualty Underwriters and The Institutes, LLC
    July 15, 2022 ..................................................................App.916

Answering Post-Trial Brief of Defendant Business Insurance Holdings, Inc.
July 29, 2022 .......................................................................App.955

Defendant Adam Potter's Brief in Support of The Entry of Judgment in His Favor
and in Opposition to Plaintiffs' Post-Trial Brief
July 29, 2022 .......................................................................App.994

## **VOLUME IV**

Business Insurance Holding Inc's Post-Trial Brief As to Its Cross-Claim Against
Adam Potter
July 29, 2022 .....................................................................App.1035

Defendant Adam Potter's Brief in Support of The Entry of Judgment in His Favor
and in Opposition to Business Insurance Holdings, Inc.'s Post-Trial Brief
August 5, 2022 ...................................................................App.1044

Reply in Support of Post-Trial Brief of Plaintiffs The American Institute for
Chartered Property Casualty Underwriters and The Institutes, LLC
August 5, 2022 ...................................................................App.1054

Trial Transcript Volume I
June 27, 2022 .....................................................................App.1077

## **VOLUME V**

Trial Transcript Volume II
June 28, 2022 .....................................................................App.1451

Trial Transcript, Volume III
June 29, 2022 .....................................................................App.1765

## **VOLUME VI**

Plaintiff's Trial Exhibit 11 ...........................................................App.2091

Plaintiff's Trial Exhibit 12 ...........................................................App.2107

Plaintiff's Trial Exhibit 13 ...........................................................App.2136

Plaintiff's Trial Exhibit 14 ...........................................................App.2186

Plaintiff's Trial Exhibit 18 ...........................................................App.2290

Plaintiff's Trial Exhibit 26................................................................App.2317

Plaintiff's Trial Exhibit 27................................................................App.2319

Plaintiff's Trial Exhibit 45................................................................App.2322

Plaintiff's Trial Exhibit 52................................................................App.2325

Plaintiff's Trial Exhibit 86................................................................App.2331

Plaintiff's Trial Exhibit 90................................................................App.2332

Plaintiff's Trial Exhibit 102..............................................................App.2333

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:19-cv-01600-CFC |
| v. | ) ) | |
| Adam Potter, PBIH, LLC, and Business Insurance Holdings, Inc. | ) ) ) | |
| Defendants. | ) | |

## AMENDED AND SUPPLEMENTAL COMPLAINT

## PRELIMINARY STATEMENT

Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC (collectively, "The Institutes"), by and through their counsel, bring this action against Defendants Adam Potter ("Potter"), PBIH, LLC f/k/a Business Insurance Holdings, LLC ("PBIH"), and Business Insurance Holdings, Inc. ("BIH") (collectively, "Defendants"). The Institutes are non-profit entities that purchased certain businesses from Defendant Potter and now commence this action to remedy Defendants' breaches of the restrictive covenants set forth in an asset purchase agreement as more fully defined below. As such, The Institutes bring this action for: (1) breach of contract; (2) tortious interference with prospective economic relations; (3) unjust enrichment; and (4) declaratory relief.

## THE PARTIES

1.      Plaintiff, The American Institute for Chartered Property Casualty Underwriters, is a Pennsylvania non-profit corporation with its principal place of business in Pennsylvania.

2.      Plaintiff, The Institutes, LLC, is a Pennsylvania limited liability company with its principal place of business at 720 Providence Road, Malvern, Pennsylvania. The Institutes, LLC, is a wholly-owned subsidiary of The American Institute for Chartered Property Casualty Underwriters, which is its sole member.

3.      Upon information and belief, Defendant Potter is a citizen of the State of Connecticut and resides at 7 Nawthorne Road, Old Greenwich, Connecticut, 06870-2115.

4.      Upon information and belief, Defendant PBIH is a Florida limited liability company with its principal place of business in Illinois, and its sole member is Defendant Potter.

5.      Upon information and belief, Defendant BIH is a Florida corporation with its principal place of business in Illinois, and was formerly known as C&E MGMT and Planning, Inc.

App.37

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C §

1332 because there is complete diversity of citizenship among the parties and the

amount in controversy, on information and belief, exceeds $75,000.

7.      This Court also has personal jurisdiction over the defendants because

the contract at issue (defined below) contains a choice of law and jurisdiction

provision, wherein the parties expressly agreed that any disputes thereunder must

be brought in the state and federal courts of Delaware. For this reason, venue is

also proper in this Court.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS
### The Asset Purchase Agreement

8.      The Institutes are a leading provider of professional education

activities related to risk management and property-casualty insurance, serving the

educational, networking, research, and training needs of risk management and

insurance professionals and the general public throughout the country.

9.      On or about June 1, 2018, The Institutes entered into an Asset

Purchase Agreement ("the Purchase Agreement") with Claims Pages, LLC, a

Florida limited liability company ("CP"); C&E MGMT and Planning, Inc., a

Florida corporation ("C&E"); CLM Group, Inc., a Florida corporation ("CLM");

Defendant Potter; and Moxie HC, LLC, a Florida limited liability company ("Moxie").

10.    At the time of the Purchase Agreement, Moxie owned 100% of the membership interests in CP and 100% of the issued and outstanding capital stock of CLM. Defendant Potter owned 100% of the issued and outstanding capital stock of C&E.

11.    At the time of the Purchase Agreement, upon information and belief, Defendant Potter owned all of the membership interests of Defendant PBIH either directly or through C&E.

12.    According to the records of the State of Florida, following the sale, on or about June 7, 2018, C&E amended its name to Business Insurance Holdings, Inc. (Defendant BIH).

13.    The Purchase Agreement defines The Institutes as "the Buyer" and CP, CLM, and C&E as "the Sellers." The Purchase Agreement further defines the "Selling Parties" to include CLM, CP, and C&E, together with Defendant Potter and Moxie.

14.    The Institutes paid Defendant Potter $17,329,098 at the time of closing and paid an additional $2,655,049 in accordance with the terms of the Purchase Agreement, as the purchase price for substantially all of the assets of CP, C&E, and CLM.

15.     At the time of the agreement, CP was engaged in the business of providing reference information for insurance claims adjusters.

16.     At the time of the agreement, C&E was engaged in the business of identifying and securing conference and event locations, hotel contracts, and outside locations.

17.     At the time of the agreement, CLM was engaged in the business of operating as a national trade association for the insurance claims and litigation management industries.

18.     After the close of the Purchase Agreement, The Institutes assumed control of all of the operations of CLM and, currently, CLM is only used as a trade name. For ease of reference throughout the Complaint, references to CLM shall refer to the trade name of the organization as operated by The Institutes.

19.     As more fully described in the Purchase Agreement, "the CLM Business" is defined as follows:

> A professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies. CLM offers the following products and services:

1.    Claims College creates and teaches courses for the College's eleven specialty schools; issues certificates, and CCP/ACP designations.

2.    Litigation Management Institute (LMI) is a certification program for Certified Litigation Management Professional (CLMP), and will also be offering a second designation titled LMI2 as an advanced course.

3.    CLM Tracker tracks and renews adjuster's continuing education and licenses, including an auto-renewal function.

4.    Universal Claims Certificate (UCC) is scheduled to launch on July 1, 2018.  The UCC was developed with the most stringent requirements and regulations for each state. The UCC includes a pre-certification course and examination. Mandatory pre-licensing courses and exams will be waived for states that recognize the UCC. Registration and payment of state fees will be managed by a single, centralized system that connects to state systems.

5.    Annual Conference is an annual event for professionals in the claims and litigation management industries, featuring educational sessions and networking.

6.    Specialty Conferences including: Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI, and Chief Claims Officer Summit.

7.    Magazines including (both digital and print formats): CLM Magazine, clmmag, theclm.org, Professional Times Magazine, and Construction

6

Claims Magazine

8.    <u>Chapter Events</u> Local networking and educational events are held around the country each year. These events are provided at no cost to the attendees and offer a combination of an educational session and a networking event

9.    <u>Webinars Hosts</u> webinar topics, ranging from Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals

10.   <u>Training Sessions</u> Hands-on training sessions all approved for adjuster CE credits

11.   <u>CLM Wiki</u> Repository of valuable claims handling resources organized by state, including claims and legal resources, and construction rip and tear cases.

20.    As indicated on its website at all times relevant, CLM's Fellows and Members "represent a wide variety of corporations, insurance companies, third party administrators, industry service providers and law firms." Its Fellows are "industry professionals who participate in claims and litigation management (corporate counsel; risk, claims and litigation managers; adjusters and service providers; etc.)." Its Members "are outside defense counsel."

21.    Accordingly, the CLM community and its target audience include, without limitation, individuals involved in all facets of risk management and insurance, from risk managers to claims handlers to outside counsel to brokers.

App.42

22.     The CLM Business as defined in the Purchase Agreement includes

various products and services ranging from an annual conference to various other

conferences offered throughout the year. The definition of the CLM Business is not

limited to any specific topics or segments within the claims and litigation

management industries.

23.     Collectively, the businesses of CP, C&E, and CLM are defined in the

Purchase Agreement as the "Sellers' Businesses."

24.     Section 6.12(a) of the Purchase Agreement prohibits the Selling

Parties, which includes Defendant Potter and C&E (which later became Defendant

BIH, and requires them to prevent all "Affiliates" from conducting any activities

that are competitive with any of the Sellers' Businesses conducted as of the

Closing Date for a period of five years following the Closing Date. (Section

6.12(a) is hereinafter referred to as "the Non-Compete"). "Affiliates" are defined in

Appendix A of the Asset Purchase Agreement to mean "with respect to any

Person, any Person directly or indirectly controlling, controlled by, or under

common control with, such other Person."

25.     In full, Section 6.12(a) provides:

> During the period beginning on the Closing Date and
> ending the fifth (5th) anniversary of the Closing Date (the
> "Non-Compete Period"), each Selling Party covenants
> and agrees not to, and shall cause its Affiliates not to,
> directly or indirectly, and anywhere in the United States,
> conduct, manage, operate, engage in or have an

ownership interest in any business or enterprise engaged
in any activities that are otherwise competitive with any
of the Sellers' Businesses as conducted as of the Closing
Date, except that during the Non-Compete Period any
Selling Party, or any other party listed on Schedule 6.12,
may undertake the activities set forth on <u>Schedule 6.12</u>
attached hereto (collectively, the "<u>Permitted Activities</u>").

26.    Thus, except as specifically covered by Schedule 6.12, Defendants

Potter and BIH, and any of their affiliated companies, are prohibited during the

five year Non-Compete Period from engaging in any activities that compete with

the CLM Business, with the exception of certain enumerated "Permitted

Activities."

27.    Schedule 6.12 of the Asset Purchase Agreement defines the

"Permitted Activities." These activities define the limited activities that may be

conducted by the business operations of "Business Insurance Holdings, LLC,"

which was an Affiliate of Potter and/or C&E, without violating the Non-Compete.

28.    Schedule 6.12 defines the business of Business Insurance Holdings,

LLC as:

a news and information source for executives concerned
about risk and the impact on their business, including risk
managers, insurers, brokers and other providers of
insurance products and services. Business Insurance
delivers in-depth analysis on new and emerging risks,
case studies of successful programs, market intelligence
on trends, and guidance on how to capitalize on
opportunities and overcome challenges. Business
Insurance covers core risk management and insurance
areas such as property/casualty insurance, captive

insurance and other alternative risk transfer vehicles, and
enterprise risk management.

29.     The Schedule further delineates the specific products and services that

Business Insurance provides and that The Institutes agreed would fall within the

definition of Permitted Activities. Such products and services include various

magazines, websites, webinars, e-newsletters and alerts, a Women to Watch

Foundation, and a Diversity and Inclusion Institute.

30.     The Schedule of Permitted Activities also expressly limits the events

offered by Business Insurance as of the Closing Date, as follows:

> Events and Award Programs as follows:
> 1.    World Captive Forum
> 2.    U.S. Insurance Awards
> 3.    Break Out Awards
> 4.    Innovation Awards
> 5.    Risk Management Roundtable: invitation
> only   roundtable meeting of senior-level risk
> managers to discuss hot topics), and
> 6.    Women to Watch (EMEA and USA).

31.     As set forth in Schedule 6.12, Business Insurance's defined business

as of the Closing Date does not include conferences or seminars on industry-

specific topics, such as cannabis or intellectual property, nor any conferences

relating to claims and litigation management, as the parties agreed that Defendants

would not engage and would cause their Affiliates not to engage in any such

activities during the Non-Compete Period.

10

32.    To further protect The Institutes, Defendant Potter agreed that

Business Insurance would not conduct any activity (such as a conference)

enumerated as a "Permitted Activity" if that event was focused on claims and

litigation management professionals. Specifically, Schedule 6.12 provides that:

> on or after the Closing Date, none of the Selling Parties is
> permitted to, and each shall cause its Affiliates not to
> (and the following are excluded from Permitted
> Activities):
>
> 1.    Work/create/develop/offer/promote
>       educational content related to claims and
>       litigation management, unless in partnership
>       with CLM and CP.
> 2.    Produce live delivery, such as events,
>       networking, seminars, award programs, and
>       conferences targeted to claims and litigation
>       management professionals.
> 3.    Undertake any involvement with
>       newsletters, publications, emails,
>       communication, sponsorships, research
>       papers with cannot directly be targeted for
>       claims and litigation professionals.
> 4.    Target or create information that relates to
>       the CP business.

33.    Therefore, read together, under the entire Purchase Agreement,

Defendants  could engage and could permit their Affiliates to engage in a

Permitted Activity only if the content did not relate to claims and litigation

management and he did not target claims and litigation management professionals.

For example, they could still conduct the five conferences listed under "Events and

Awards Programs," so long as those conferences did not target or include content related to claims and litigation management professionals.

34.    These exceptions for claims and litigation management content and professionals apply only to the Permitted Activities.

35.    These exceptions do not apply to the main Non-Compete in Section 6.12(a) of the Purchase Agreement.

36.    Thus, if Defendant Potter provided educational content at a conference on cannabis, for example, while he owned CLM, Section 6.12(a) prohibits him from providing educational content or holding a similar conference after the Closing Data because such activity is not allowed as a delineated Permitted Activity under Schedule 6.12.

37.    Accordingly, when Schedule 6.12 is read in conjunction with the Non-Compete provision in Section 6.12(a) of the Purchase Agreement, Defendants are prohibited from offering or promoting and prohibited from allowing their Affiliates to offer or promote any educational content that extends beyond the offerings provided by Business Insurance as of the Closing Date and that competes with the CLM Business of offering events and conferences to claims and litigation management professionals.

38.    At some point, Business Insurance Holdings, LLC changed its name to PBIH, LLC and/or PBIH, LLC is the successor-in-interest to Business Insurance

Holdings, LLC. In either event, it is equally bound to the terms of the Non-

Compete.

39.    In addition to the Non-Compete, Section 6.12(b) of the Purchase

Agreement also contains a covenant against solicitation of Sellers' customers or

other business relations (Section 6.12(b) is hereinafter defined as "the Non-

Solicitation").

40.    Specifically, Section 6.12(b) provides as follows:

> With the exception of Permitted Activities, during the
> Non-Compete Period, each Selling Party shall not, and
> shall cause its Affiliates not to, directly or indirectly, call-
> on, solicit or induce, or attempt to solicit or induce, any
> customer or other business relation of Buyer for the
> provision of products or services related to any of
> Sellers' Businesses or in any other manner that would
> otherwise interfere with the business relationship
> between Buyer and its customers and other business
> relations.

41.    As discussed further below, upon information and belief, Defendants

have violated the Non-Solicitation by calling upon at least one significant sponsor

of the CLM Business for purposes of sponsoring the C&H Conference.

## **Defendants' Breach of the Non-Compete Provision**

42.    Before entering into the Purchase Agreement, Business Insurance was

not in the business of offering and promoting conferences relating to claims and

litigation management, and its business was limited to those activities enumerated in Schedule 6.12.

43.     To accommodate Defendant Potter's request to continue operating Business Insurance, The Institutes agreed to allow Defendants to engage in those Permitted Activities specifically enumerated on Schedule 6.12 during the Non-Compete Period. Those Permitted Activities do not include conferences that are not delineated specifically.

44.     Schedule 6.12 further provides that if Defendants choose to engage in any of the enumerated Permitted Activities, they could only do so subject to the strict limitation that they are not related to claims and litigation management and are not directed toward claims and litigation management professionals.

45.     In the time that has transpired since entering into the Purchase Agreement, it has become clear that Defendant Potter never intended to limit Business Insurance's activities under the terms of the Non-Compete. Rather, it appears that he is using his knowledge of the industry, and leveraging the experience he gained while he owned Sellers' Businesses, to build Business Insurance as an alternative and competitor to CLM, in direct contravention of the Non-Compete.

46.    In or around late July 2019, The Institutes became aware that
Defendants were was offering, promoting and producing claims and litigation
management conferences that directly violated the Purchase Agreement.

47.    Specifically, The Institutes learned that Defendants were offering and
actively promoting a Cannabis & Hemp Conference ("the C&H Conference") and
an Intellectual Property Conference ("the IP Conference") (collectively, "the BI
Conferences"), scheduled for October 24-25, 2019 and October 24, 2019,
respectively, at the New York Marriott Marquis, as described more fully on its
website (*see* https://www.businessinsurance.com/section/events).

48.    These conferences are not identified as Permitted Activities under
Schedule 6.12.

49.    The C&H Conference was described as a "new conference centered
on cannabis insurance and risk management" for insurance and cannabis industry
professionals "grappling with complex coverage and liability issues."

50.    Upon information and belief, as of the filing of this lawsuit in August
2019, the C&H Conference had approximately 200 registrants and on-line
registration was closed.

51.    The IP Conference was described as an exploration of "business
exposure" resulting from intellectual property that aims to educate insurance
professionals about "risk management and insurance strategies to protect

intellectual property assets" and identify "established and new insurance

protections" available to insurance professionals.

52.    The BI Conferences are a clear breach of Defendants' obligations

under the Non-Compete, as set forth more fully below.

53.    Immediately upon learning of the BI Conferences, The Institutes sent

Defendant Potter a letter on July 29, 2019, notifying him that the conferences

constituted a breach of the Purchase Agreement and demanding that they be

cancelled by July 31, 2019.

54.    Defendants refused to cancel the conferences in dispute.

55.    The Institutes sent a follow up letter to Defendant Potter on August

12, 2019, and repeated their demand that he cancel the BI Conferences by August

15, 2019.

56.    Defendant Potter responded to the August 12, 2019 letter on August

20, 2019, in a letter which reaffirmed Defendants' refusal to cancel the conferences

and offered the following purported compromises that did nothing to alleviate their

breach of the Non-Compete: (1) Defendants added a statement on the landing page

for the C&H Conference, stating that "This Conference was not developed and is

not intended for claims and litigation management professionals"; (2) Defendants

modified one of the session titles for the C&H Conference to indicate that it does

not address claims; and (3) Defendants would not knowingly allow any claims and litigation management professionals to attend the conference.

57.    These minor, semantic revisions did not change the fact that the BI Conferences are in direct contravention of the Non-Compete, as set forth in the following paragraphs.

### The BI Conferences Focus on Topics Related to Sellers' Businesses as of Closing

58.    As an initial matter, as set forth above, any conference offered by Defendants that competes with Sellers' Businesses or is not included in the enumerated Permitted Activities is a violation of the Non-Compete.

59.    However, Defendants' conduct is even more egregious because the BI Conferences clearly focus on issues that were within the Sellers' Businesses on the Closing Date of the Purchase Agreement.

60.    Specifically, the BI Conferences focus on topics that have been addressed by CLM and that relate directly to – and therefore compete directly with – the CLM Business.

61.    A core feature of the CLM Business is to provide educational conferences and other live delivery events, for the benefit of its member community, which consists of corporate counsel, risk managers, claims managers,

litigation managers, adjusters, brokers, service providers, and defense counsel, as well as other industry professionals.

62.     Schedule A to the Purchase Agreement more fully describes the CLM Business as "a professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies."

63.     Although Schedule A provides examples of some of CLM's offerings, it does not limit the CLM Business to any specific topic.

64.     The broad definition of the CLM Business was intentional, as CLM offers conferences on a wide range of topics, as indicated by a review of CLM's conference archives.

65.     For example, at CLM's 2015 Annual Conference, a panel of CEOs presented on the current state of the insurance industry, the latest product innovations, and their views on the future; it was not limited by any specific topic.

66.     Also in 2015, CLM organized panels to present on trending topics ranging from 3D printing and emerging technologies to the transportation of

hazardous commodities, as well as more traditional topics, such as managing risk in contract drafting and health care-related risks and trends.

67.    Accordingly, given the broad nature of the CLM Business and the types of education it offers to its member community, any conference offered by Defendants that relates in any way to the business conducted by the Selling Businesses before the Closing Date violates the Non-Compete.

68.    For instance, during a 2015 Medical Legal Summit, CLM developed and presented a session entitled "Marijuana in Workers' Compensation – Medical and Legal Challenges" and described the session as a discussion about "new and evolving difficulties" posed by the "legalization of both medical and recreational marijuana."

69.    During its 2016 Annual Conference, CLM offered a session titled "Municipal Law – Clearing the Smoke on Medical Marijuana in Employment," which addressed issues arising with the legalization of marijuana around the country.

70.    CLM offered at least eight other presentations between 2014 and 2017 addressing cannabis-related topics.

71.    In fact, in May 2018 – just weeks before the Purchase Agreement was finalized – CLM and Business Insurance jointly offered a Workers Compensation

Conference which featured a session titled, "Discussions and Trends Around Workers Compensation and Medical Marijuana."

72.     Therefore, Defendants were clearly aware that CLM programs regularly and for several years included cannabis-related topics.

73.     Further, fully aware of Business Insurance's involvement in the May 2018 conference, Defendant Potter voluntarily relinquished the right to continue offering cannabis-related conferences by agreeing to the Non-Compete, for which he was paid handsomely.

74.     The description of the C&H Conference on the Business Insurance website states, "[w]ith medical marijuana legal in 32 states and D.C. and recreational marijuana legal in 12 U.S. jurisdictions," the C&H Conference aims to examine the risks to the insurance industry resulting from the legalization of marijuana. Further, it provides that "the rise of cannabis as an alternative pain medication will have significant implications for the workers compensation sector."

75.     Accordingly, the C&H Conference is a clear breach of the Non-Compete since the topic of insurance risk related to marijuana had been addressed by CLM prior to the Closing Date.

**The Non-Compete Prohibits Defendants from Conducting Conferences on So-Called Pre-Loss Issues**

76.     Before entering into the Purchase Agreement, CLM regularly discussed and presented on "pre-loss" issues at its conferences and other events.

77.     For example, a 2015 CLM presentation about cybersecurity explained the "steps businesses, law firms and the insurance industry must take to . . . avoid cyber liability."

78.     Another 2015 CLM presentation at its Retail, Restaurant & Hospitality Conference focused on tips for identifying risks and preventing losses at major entertainment and marketing events.

79.     During the 2016 Annual Conference, CLM again offered a session on avoiding cyber liability called the "Cyber-Attack Preparedness Toolbox."

80.     At CLM's 2016 Midwest Conference, it offered a session titled "Whistle While You Work: How to Prevent Activity Leading to Whistleblowing Actions and Protect the Healthcare Organization."

81.     Designing programs and presenting on such "pre-loss" risk avoidance and loss prevention techniques evidences CLM's longstanding appreciation of "pre-loss" issues as a core function of every claims and litigation management professional's responsibilities.

82.     Therefore, the Non-Compete clearly prohibits Defendants from conducting conferences on so-called "pre-loss" issues.

**Defendants' *Ad Hoc* Efforts to Change the Description of the C&H Conference did not Change the Fact that the Conference Violated the Non-Compete**

83.    When The Institutes placed Defendants on notice of their breach of the Non-Compete, both of the agendas for the BI Conferences included sessions focused on claims, confirming that the conferences offer claims and litigation management content.

84.    For instance, the C&H Conference originally promoted a session on "Cannabis Claims: A Peek Down the Rabbit Hole" to be delivered by a Claims Manager and Claims Supervisor.

85.    Similarly, the IP Conference promoted a session titled "Innovation Track Session: Claims." Another IP Conference session is titled "General Session: Mitigation," which would appear to relate to post-claim and litigation management issues.

86.    In an attempt to hide this obvious breach, and only after The Institutes placed them on notice, Defendants changed the title of the claims session in the C&H Conference to: "Cannabis Exposure: A Peek Down the Rabbit Hole." A comparison of the description of the session as it appeared originally and as it appears now quickly reveals the transparency of Defendants' attempt to hide their true intentions and conference content.

87.    As originally promoted, the Cannabis claims session was described on

the Business Insurance website as follows:

> The cannabis claims experience is often difficult to
> evaluate due to rapidly emerging risks in a highly
> regulated industry and lack of access to significant data.
> This panel of experienced cannabis claims professionals
> will attempt to shed light on the type, frequency and
> severity of cannabis claims to date, and what these claims
> will look like in the future.

88.    In response to The Institutes' objections, the Cannabis "exposure"

session was changed on the Business Insurance website to:

> The cannabis exposure is often difficult to evaluate due
> to rapidly emerging risks in a highly regulated industry
> and lack of access to significant data. This panel of
> experienced cannabis professionals will attempt to shed
> light on the various cannabis exposures to date, and how
> these will involve [sic] in the future.

89.    As is clear, it is essentially the same session, addressing the same

topic, and appealing to the same target audience. Simply substituting "exposure"

for "claim" and referring amorphously to "professionals" does not change the

substance of the presentation.

90.    Upon information and belief, the majority of registrants for the C&H

Conference signed up before Defendants made these changes to the conference

description.

91.    No corresponding change was ever made to the IP Conference

sessions, which still constitutes a blatant violation of the Non-Compete.

92.    Accordingly, the BI Conferences violate the Non-Compete.

## **Defendants' Breach of the Non-Solicitation Provision**

93.    The website for the C&H Conference lists as the event's "founding partner" a major law firm that is also a significant sponsor of the CLM Business, a fact well known to Defendant Potter.

94.    Upon information and belief, Defendant Potter contacted the law firm and solicited and/or induced it to serve as the founding partner of the conference.

95.    Such contact is a direct violation of the non-solicitation restrictions in Section 6.12(b) of the Purchase Agreement.

96.    When considered in conjunction with the violations of the Non-Compete as detailed above, it becomes abundantly clear that Defendant Potter is deliberately attempting to compete with the CLM Business through his ownership of Business Insurance.

## **Defendant Potter Sold Business Insurance to Beacon International**

97.    In late August 2019, around the time that The Institutes were demanding that Defendants cancel the BI Conferences, Defendant Potter quickly negotiated the sale of BIH to Beacon International Group, Inc. ("Beacon International").

98.    Beacon International is owned and operated by Stephen Acunto, Sr. and Carole Acunto ("the Acuntos").

99.    Negotiations over the sale occurred over a very short period of time and, upon information and belief, Defendant Potter expressed a sense of urgency to complete the deal as quickly as possible.

100.   In exchange for his equity ownership in BIH, Defendant Potter received an initial payment plus a deferred payment.

101.   This deferred payment was based on the total revenues collected by BIH as of December 31, 2019.

102.   As a result, Defendant Potter had a strong financial incentive to remain involved with Business Insurance to ensure that it maximized its 2019 revenues and, therefore, his deferred payment.

103.   Not surprisingly, Potter stayed involved with Business Insurance after the sale.

104.   As explained in a press release announcing the sale, Beacon International planned to greatly expand the scope of conferences run by Business Insurance.

105.   The press release states that Business Insurance's "***growing annual conference*** schedule draws national audiences to destinations across the country for one and two day programs such as its annual Innovation Awards, Women to

Watch Awards (in New York and London), Insurance Diversity and Inclusion, and emerging areas such as the implications of cannabis, wildfires, the impact of AI, and cyber security." (emphasis added).

106.   The press release further states "additional conferences and editorial introductions are planned for 2020."

107.   Because Defendant Potter had a substantial, continuing financial interest in BIH, he stayed involved with and helped to build the business.

108.   Further, the Acuntos and Beacon International did not have significant experience (if any) running conferences for claims and litigation management professionals.

109.   They therefore must have relied on Defendant Potter's experience and expertise to help them operate and grow this side of the business.

110.   One example of Defendant Potter's continued involvement in the company involves a former Business Insurance employee, Jeremy Campbell ("Campbell").

111.   At Business Insurance, Campbell was involved in selling sponsorships to conferences.

112.   On or around September 24, 2019, Campbell gave notice that he accepted a position with CLM and would be leaving Business Insurance in two weeks.

113.   Defendant Potter actively tried to convince Campbell to stay with Business Insurance.

114.   First, Defendant Potter told Campbell that "we" (Potter and Business Insurance) were developing more events and that Campbell would have a lot more selling opportunities with Business Insurance moving forward.

115.   On or about September 30, 2019, after it became clear that Campbell was leaving the company, Business Insurance attempted to enforce a non-compete agreement against him. This is a direct admission that Defendants considered CLM to be a competing organization.

116.   In fact, a Business Insurance employee advised Campbell that CLM would be viewed as a competitor of Business Insurance going forward and that Business Insurance intended to add conferences and other events to its agenda.

117.   Upon information and belief, after the sale, Defendant Potter was also involved in obtaining a keynote speaker for Business Insurance's "Women to Watch" conference, and he developed a new compensation plan for Business Insurance.

118.   Therefore, despite having sold BIH to Beacon International, Defendant Potter remained actively engaged in activities that competed directly with CLM.

119.   Defendant Potter's continuing involvement with Business Insurance is a direct violation of the Non-Compete.

120.   In addition, by providing any assistance to Business Insurance, Defendant Potter has directly violated the Non-Compete.

**Defendants Continue to Compete with CLM Through a New Entity**

121.   Defendant Potter leveraged his relationship with Beacon International to assist in the formation of a new entity to compete with CLM.

122.   Through Defendant Potter, Business Insurance has become connected with a direct competitor, The Claims Xchange, Inc. ("ClaimsX").

123.   ClaimsX competes directly against CLM.

124.   ClaimsX's mission statement states: "The claimsXchange connects innovative and collaborative professionals who share a passion for advancing the claims industry."

125.   ClaimsX's website indicates that its membership includes claims professionals, risk professionals, corporate counsel, defense attorneys, and service providers.

126.   In addition, ClaimsX scheduled events throughout 2020 and beyond that are targeted to professionals in the same space as CLM's conferences.

127.   Based on its Mission Statement and conference schedule, it is clear that ClaimsX is direct competitor to CLM.

128.   ClaimsX was started by Defendant Potter's sister, Sydney Posner ("Posner").

129.   Upon information and belief, Defendant Potter connected ClaimsX with Business Insurance.

130.   Even though the Acuntos did not know, and had no prior affiliation with Posner, they initially joined the ClaimsX advisory board (although they are no longer on the board).

131.   When it was first created, ClaimsX's website proclaimed that it was it was "powered" by CINN (part of the Beacon International Group) and was "promoted" by Business Insurance.

132.   ClaimsX's current website indicates that Business Insurance is a "strategic partner."

133.   While ClaimsX was building this alliance with Beacon International-owned entities, Potter was still connected with BIH and working to insure that he could secure a financial windfall under the terms of the agreement of sale with the Acuntos.

134.   Posner formerly worked for CLM, and was terminated by CLM on September 20, 2019 for misconduct.

135.   Upon information and belief, before CLM terminated Posner, she began working on forming a new business to compete with CLM. The Institutes

believe and therefore aver that Defendant Potter worked with her to help create this new venture.

136.    After her termination for misconduct, Posner improperly accessed a copy of CLM's entire file-share database containing hundreds of files containing CLM's proprietary, confidential, and trade-secret information.

137.    Her misconduct is being addressed in another lawsuit pending in the U.S. District Court for the Eastern District of Pennsylvania, captioned *The American Institute For Chartered Property Casualty Underwriters d/b/a The Institutes, et al. v. Sydney Posner, et al.*, Civil Action No. 2:19-cv-05369-NIQA.

138.    The Institutes believe and therefore aver that Posner's actions were deliberate and that she copied these documents for the purpose of setting up an organization that would compete directly with CLM, and that she would do so with the advice and assistance of Defendant Potter. Posner solicited several clients, vendors, and/or members of the CLM to join her "Advisory Board" and, upon information and belief, continues to solicit more.

139.    In this sense, it is clear that Defendant Potter has his proverbial fingerprints all over his sister's efforts to compete with CLM.

140.    Defendant Potter's activities in helping to create, promote, support and otherwise further the interests of ClaimsX as a direct competitor to CLM is a direct violation of the Non-Compete.

141.    Defendant Potter, through his association with Business Insurance and his direct assistance with ClaimsX, is actively competing against CLM.

142.    This activity is all the more egregious and a direct violation of the Non-Compete given that, upon information and belief, Defendant Potter remained actively involved in the day-to-day operations of Business Insurance and has assisted Business Insurance in developing the programming that competes with CLM.

143.    Potter's involvement with Business Insurance and ClaimsX is a direct violation of the Non-Compete.

## **Remedies Available Under the Purchase Agreement**

144.    Section 6.12(d) of the Purchase Agreement provides:

> Each Selling Party [including Defendant Potter] acknowledges and agrees that the provisions of this Section 6.12 are reasonable and necessary to protect the legitimate business interests of [The Institutes] and its investment in the Acquired Assets.  Each Selling Party shall not contest that [The Institutes'] remedies at law for any breach or threat of breach by any Selling Party or any of its affiliates of the provisions of this Section 6.12 will be inadequate, and that [The Institutes] shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Section 6.12, without proving actual damages, and to enforce specifically such terms and provisions, in addition to any other remedy to which [The Institutes] may be entitled at law or equity. . . .

145.    Section 9.2(a) of the Purchase Agreement gives The Institutes the right to indemnification from Defendants, including the recovery of any and all Losses, such as attorneys' fees and any expenses and costs incurred by The Institutes in connection with enforcing their rights thereunder.

146.    Section 10.3 of the Purchase Agreement provides that the Purchase Agreement "shall be governed by and construed in accordance with the laws of the State of Delaware, and the Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts located in New Castle County, Delaware for resolution of any disputes hereunder . . . ."

147.    As a direct result of Defendants' conduct in violation of the restrictive covenants, The Institutes face future losses of customers and sponsors, loss of good will, loss of revenues, and dilution and confusion in the marketplace.

148.    Further, The Institutes have incurred costs and retained counsel to investigate and remedy Defendants' conduct.

149.    Defendants' actions reflect their blatant disregard for contractual and legal obligations and evinces intent to continue with these violations.

150.    The Institutes will suffer immediate and irreparable harm if Defendants' actions are not temporarily, preliminarily, and/or permanently enjoined.

# COUNT I
## Breach of Contract

151.   The Institutes repeat, reallege, and incorporate by reference the prior allegations of this Amended Complaint, as if fully set forth herein.

152.   The Institutes and Defendant Potter entered into the Purchase Agreement with the express understanding that The Institutes, through CLM, would continue to offer conferences directed towards claims and litigation management professionals, and that Defendants would not compete with the CLM businesses for a period of five years after closing.

153.   In organizing and promoting the BI Conferences, Defendants have breached the restrictive covenants of the Purchase Agreement.

154.   Defendant Potter's actions on behalf of, and continued involvement with, Business Insurance, constitute of a violation of the Non-Compete.

155.   The involvement of Business Insurance, as an affiliate of Defendant Potter, in the operations of ClaimsX constitute a violation of the Non-Compete.

156.   Defendant BIH is contractually bound in its own right to adhere to the terms of the Purchase Agreement, especially given that it was formerly known as C&E, and a signatory to the agreement. Therefore, all of the actions of BIH in furtherance of competition with CLM constitute breaches of contract.

157.   As the direct and proximate result of Defendants' conduct as aforesaid, The Institutes have suffered and, if Defendants' conduct is not stopped,

will continue to suffer, immediate and irreparable injury and significant damages in an amount to be proven at trial, which upon information and belief will be far in excess of $75,000.

158.    Because The Institutes' remedy at law is inadequate, The Institutes seek, in addition to damages, preliminary, and permanent injunctive relief to recover and protect their legitimate business interests.

159.    The Institutes are further entitled to injunctive relief against Defendants and all those acting in concert or participation with them, remedying their past improper conduct, and preventing such conduct in the future.

160.    The Institutes will suffer immediate and irreparable harm if the requested injunctive relief is not granted.

161.    The Institutes' business is reliant on their business reputation and ability to maintain and grow their member community in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

162.    The Institutes have a substantial likelihood of success on the merits because of Defendants' blatant and willful violation of the restrictive covenants of the Purchase Agreement.

163.    The Institutes have been damaged by all of the foregoing, and are entitled to their damages, in an amount to be determined at trial.

## COUNT II
## Tortious Interference

164.   The Institutes repeat, reallege, and incorporate by reference the prior allegations of this Amended Complaint, as if fully set forth herein.

165.   Defendants were and are aware of the business relationships between The Institutes and their customers and sponsors, and in particular, the strong relationship that CLM has developed with its constituent claims and litigation management professionals.

166.   The Institutes have a reasonable expectation that CLM's business relationships will continue and that they will continue to be the leading provider of educational services to their target market.

167.   By virtue of their attempt to offer conferences that directly compete with CLM's past, current, and future offerings, Defendants have knowingly and intentionally interfered with CLM's existing and prospective contractual and business relationships.

168.   By developing conferences and assisting in the operations of ClaimsX, Defendants have knowingly and intentionally interfered with CLM's existing and prospective contractual and business relationships.

169.   The interference by Defendants with CLM's existing and prospective business relationships was and is not legally justified.

170.    The interference with CLM's existing and prospective business and contractual relationships is continuing and intentional and has proximately resulted and/or will proximately result in damage to CLM, including the loss of its customers and sponsors, sales income, and damage to business reputation and good will and other damages, which up on information and belief will be far in excess of $75,000.

171.    Unless Defendants are restrained and enjoined from unlawfully interfering with CLM's business relationships, Plaintiffs will suffer immediate and irreparable harm for which there is no adequate remedy at law.

## COUNT III
## Unjust Enrichment

172.    The Institutes repeat, reallege, and incorporate by reference the prior allegations of this Amended Complaint, as if fully set forth herein.

173.    By using their knowledge of the claims and litigation management industry, and particularly the knowledge gained by Defendant Potter through his association with the Sellers' Businesses, Defendants have unfairly gained a competitive advantage over Plaintiffs.

174.    As a result of their conduct, Defendants have been unjustly enriched at the expense of Plaintiffs.

175.    As a direct and proximate result of Defendants' unjust enrichment,

Plaintiffs have suffered and will continue to suffer damages.

## COUNT IV
## Declaratory Relief

176.    The Institutes repeat, reallege, and incorporate by reference the prior

allegations of this Amended Complaint, as if fully set forth herein.

177.    The Institutes paid Defendant Potter $19,234,147 in accordance with

the terms of the Purchase Agreement.

178.    However, as all parties to the Purchase Agreement have an implied

duty of good faith and fair dealing, the payments to Defendant Potter were not

warranted while he has been in breach of the restrictive covenants of the Purchase

Agreement.

179.    Accordingly, as a result of Defendant Potter's violation of the

restrictive covenants, The Institutes seek a declaration that Defendant Potter has

violated the terms of the Agreement and that they are entitled to an offset of the

sums paid under the Agreement in an amount equal to the damages caused by

Defendant Potter's conduct, which upon information and belief will be far in

excess of $75,000.

## REQUEST FOR RELIEF

WHEREFORE, having alleged this Amended Complaint against Defendants, The Institutes pray that the Court award the following relief:

(a)    Temporary, preliminary, and permanent orders requiring Defendants and all those persons and entities acting in concert and participation with them to refrain from presenting any further conferences or other offerings that compete with Sellers' Businesses in violation of the terms of the Purchase Agreement;

(b)    Temporary, preliminary, and permanent relief ordering Defendants, under penalty of perjury, to identify in writing all individuals and/or entities with whom they have engaged to present any other conferences or other offerings that might be considered as competing with any of Sellers' Businesses;

(c)    Judgment against Defendants for damages in excess of $75,000 for their breach of the restrictive covenants in the Purchase Agreement, said amount to be proven at trial;

(d)    Judgment against Defendants for damages in excess of $75,000 for their tortious interference, said amount to be proven at trial;

(e)    Judgment against Defendants for damages in excess of $75,000 for their unjust enrichment, said amount to be proven at trial;

(f)    A declaration that Defendant Potter has violated the terms of the Purchase Agreement; and

(g)    Such other and further relief as this Court deems just and equitable.

COZEN O'CONNOR

By: */s/ Barry Klayman*          
Barry M. Klayman, Esq. (DE 3676)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: 302-295-2035
Fax: 215-701-2209
E-mail: bklayman@cozen.com

David J. Walton, Esq. (*admitted pro hac vice*)
Matthew J. Siegel, Esq. (*admitted pro hac vice*)
Cozen O'Connor
1650 Market Street
Suite 2800
Philadelphia, PA 19103
dwalton@cozen.com
msiegel@cozen.com

*Attorneys for Plaintiffs*

DATED: March 20, 2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE AMERICAN INSTITUTE FOR | ) | |
| CHARTERED PROPERTY CASUALTY | ) | |
| UNDERWRITERS, and | ) | |
| THE INSTITUTES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 19-1600-CFC-SRF |
| | ) | |
| v. | ) | |
| | ) | |
| ADAM POTTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

### I.   INTRODUCTION

Presently before the court in this breach of contract case are a joint motion to dismiss for

failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil

Procedure 12(b)(6) filed by defendants PBIH, LLC ("PBIH") and Adam Potter ("Potter,"

together with PBIH, "Moving Defendants") (D.I. 51),[1] and a separate motion to dismiss for

failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil

Procedure 12(b)(6) filed by defendant Business Insurance Holdings, Inc. ("BIH").[2]  (D.I. 65)

For the following reasons, the court recommends GRANTING-IN-PART and DENYING-IN-

---

[1] Moving Defendants seek dismissal of the entire amended complaint as to PBIH.  (D.I. 51)
However, Moving Defendants seek dismissal of only Counts III and IV as to Potter.  (*Id.*)  Count
IV is a claim for declaratory relief only against Potter.  (D.I. 48 at ¶¶ 176–79; D.I. 51; D.I. 52)
Accordingly, Counts I and II of the amended complaint survive and are unaffected by Potter's
motion.  The briefing for the pending motion is as follows: Moving Defendants' opening brief
(D.I. 52), Plaintiffs' answering brief (D.I. 54), and Moving Defendants' reply brief (D.I. 59).
[2] BIH seeks dismissal of all Counts against it in the amended complaint—Counts I, II, and III.
(D.I. 65)  The briefing for the pending motion is as follows: Defendant's opening brief (D.I. 66),
Plaintiffs' answering brief (D.I. 71), and Defendant's reply brief (D.I. 73).  Moving Defendants
also filed a "Response" in support of BIH's motion.  (D.I. 70)

PART Moving Defendants' motion and GRANTING-IN-PART and DENYING-IN-PART

BIH's motion.

## II.    BACKGROUND[3]

### a.   Procedural History

On August 28, 2019, plaintiffs The American Institute for Chartered Property Casualty

Underwriters ("AICPCU") and The Institutes, LLC ("Institutes," together with AICPCU,

"Plaintiffs") initiated this action by filing a complaint against defendants Potter and Business

Insurance Holdings, LLC.  (D.I. 1)  On March 27, 2020, Plaintiffs filed an unopposed motion for

leave to file an amended and supplemental complaint (the "amended complaint"), which the

court so ordered.  (D.I. 46)  On the same date, Plaintiffs filed the amended complaint, which,

*inter alia*, added BIH as a defendant in this case.  (D.I. 48)

### b.   The Parties

AICPCU is a Pennsylvania non-profit corporation with its principal place of business in

Pennsylvania.  (D.I. 48 at ¶ 1)  Institutes is a Pennsylvania limited liability company with its

principal place of business in Pennsylvania.  (*Id.* at ¶ 2)  Both provide nationwide educational

services on risk management and property-casualty insurance topics directed to insurance

professionals and the general public.  (*Id.* at ¶ 8)

Potter is a citizen of and resides in Connecticut.  (*Id.* at ¶ 3)  PBIH is a Florida limited

liability company with its principal place of business in Illinois, and Potter is its only member.

(*Id.* at ¶ 4)  BIH was formerly known as C&E MGMT and Planning, Inc. and is a Florida

---

[3] The facts in this section are based upon allegations in the amended complaint, which the court
accepts as true for the purposes of the present motion to dismiss.  *See Umland v. Planco Fin.
Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

corporation with its principal place of business in Illinois.  (*Id.* at ¶ 5)  The court refers to Potter,

PBIH, and BIH collectively as "Defendants."  (*See* D.I. 48 at 1)

   **c.  Facts**

   This action stems from the alleged breach of the non-compete and non-solicitation

provisions ("restrictive covenants") of an Asset Purchase Agreement ("the APA").[4]  (*Id.* at ¶¶

151–79)  On or about June 1, 2018, Plaintiffs entered into the APA with Claims Pages, LLC

("CP"), C&E MGMT and Planning, Inc. ("C&E"), CLM Group, Inc. ("CLM"), Potter, and

Moxie HC, LLC ("Moxie").  (*Id.* at ¶ 9)  At the time, Moxie owned CP and CLM, and Potter

owned C&E.[5]  (*Id.* at ¶ 10)  In addition, Potter owned PBIH, either directly or through C&E.  (*Id.*

at ¶ 11)  On June 7, 2018, C&E changed its name to Business Insurance Holdings, Inc.[6]  (*Id.* at ¶

12)

   Pursuant to the APA, Plaintiffs paid Potter $17,329,098 at closing along with an

additional $2,655,049 for substantially all of the assets of CP, C&E, and CLM.  (*Id.* at ¶ 14)  In

relevant part, the APA contains the following non-compete and non-solicitation clauses:

   (a) During the period beginning on the Closing Date and ending the fifth (5th)
   anniversary of the Closing Date (the "Non-Compete Period"), each Selling Party[7]

---

[4] The amended complaint incorporates the APA by reference.  (D.I. 48)  The APA has been
separately filed with the court.  (D.I. 53, Ex. A; D.I. 67, Ex. 1)
[5] CP provided information as a reference source for insurance claims adjusters; C&E identified
and secured conference and event locations, hotel contracts, and outside locations as a service;
and CLM operated a national insurance claim and litigation management professional trade
association.  (D.I. 48 at ¶¶ 15–17)
[6] Business Insurance Holdings, Inc. ("BIH"), formerly C&E, is a named defendant in this case.
(D.I. 48)
[7] The APA defines the term "Selling Parties" as "the Companies, Adam Potter and Moxie."  (D.I.
67, Ex. 1 at 46)  "[T]he Companies" are CP, C&E, and CLM.  (*Id.* at 1)  On or about June 7,
2018, C&E changed its name to BIH.  (D.I. 48 at ¶¶ 5, 9, 12)  In August 2019, Potter sold BIH to
Beacon International Group, Inc. ("Beacon").  (*Id.* at ¶¶ 97–98)

3

covenants and agrees not to, and shall cause its Affiliates[8] not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the "Permitted Activities").

(b) With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

(D.I. 53, Ex. A at § 6.12(a)–(b)).  As of the closing date, the APA defines CLM's business to include "various products and services ranging from an annual conference to various other conferences offered throughout the year . . . not limited to any specific topics or segments within the claims and litigation management industries."[9]  (*Id.* at ¶ 22)  However, Schedule 6.12 of the APA defines the "Permitted Activities" carved out for PBIH within its business defined as follows:

> [A] news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services. Business Insurance delivers in-depth analysis on new and emerging risks, case studies of successful programs, market intelligence on trends, and guidance on how to capitalize on opportunities and overcome challenges. Business Insurance covers core risk management and insurance areas such as property/casualty insurance, captive insurance and other alternative risk transfer vehicles, and enterprise risk management.

---

[8] The APA defines "Affiliate" to mean "with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person."  (D.I. 48 at ¶ 24; D.I. 67, Ex. 1 at 38)

[9] Since the close of the APA, Plaintiffs have used CLM only as a trade name.  (D.I. 48 at ¶ 18)

(*Id.* at ¶ 28)  Schedule 6.12 also expressly permits PBIH to conduct a limited number of events.[10]

(*Id.* at ¶¶ 29–30)

Before the parties entered into the APA in June of 2018, "Business Insurance"[11] did not

offer or promote conferences related to claims and litigation management.  (*Id.* at ¶ 42)  In July

2019, Plaintiffs learned that Defendants were promoting a Cannabis & Hemp Conference ("the

C&H Conference") and an Intellectual Property Conference ("the IP Conference" and, together

with the C&H Conference, "the BI Conferences"), both of which were scheduled to occur in

October 2019.  (*Id.* at ¶¶ 46–47)  Neither conference was listed as a "Permitted Activity" in

Schedule 6.12.  (*Id.* at ¶ 48)  The C&H Conference was described as a "new conference centered

on cannabis insurance and risk management" for insurance and cannabis industry professionals

"grappling with complex coverage and liability issues."  (*Id.* at ¶ 49)  When this lawsuit was

filed in August of 2019, approximately 200 individuals had registered to attend the C&H

Conference.  (*Id.* at ¶ 50)  The IP Conference was described as an exploration of "business

exposure" resulting from intellectual property that aims to educate insurance professionals about

"risk management and insurance strategies to protect intellectual property assets" and identify

"established and new insurance protections" available to insurance professionals.  (*Id.* at ¶ 51)

---

[10] Permitted events include: "(1) World Captive Forum, (2) U.S. Insurance Awards, (3) Break Out Awards, (4) Innovation Awards, (5) Risk Management Roundtable: invitation only roundtable meeting of senior-level risk managers to discuss hot topics), and (6) Women to Watch (EMEA and USA)."  (D.I. 48 at ¶¶ 29–30)  However, Schedule 6.12 prohibits the "Selling Parties" from engaging in the following activities: (1) "Work/create/develop/offer/promote educational content related to claims and litigation management, unless in partnership with CLM and CP;" (2) "Produce live delivery, such as events, networking, seminars, award programs, and conferences targeted to claims and litigation management professionals;" (3) Undertake any involvement with newsletters, publications, emails, communication, sponsorships, research papers with cannot directly be targeted for claims and litigation professionals;" and (4) "Target or create information that relates to the CP business."  (*Id.* at ¶ 32)
[11] "Business Insurance" is not a defined term or entity in the amended complaint.  (D.I. 48)

After learning of the BI Conferences, Plaintiffs sent a letter to Potter on July 29, 2019, in which Plaintiffs demanded cancellation and notified Potter that the BI Conferences constituted a breach of the APA.  (*Id.* at ¶ 53)  On August 12, 2019, Plaintiffs repeated their demand in a follow up letter to Potter.  (*Id.* at ¶ 55)  In response to both letters, Defendants refused to cancel the events.  (*Id.* at ¶¶ 54, 56)  Instead, Potter offered three concessions to alleviate Plaintiffs' concerns:

> (1) Defendants added a statement on the landing page for the C&H Conference, stating that "This Conference was not developed and is not intended for claims and litigation management professionals"; (2) Defendants modified one of the session titles for the C&H Conference to indicate that it does not address claims; and (3) Defendants would not knowingly allow any claims and litigation management professionals to attend the conference.

(*Id.* at ¶ 56)

In August 2019, Potter sold BIH to Beacon International Group, Inc. ("Beacon"),[12] which is owned and operated by Stephen Acunto, Sr., and Carole Acunto (collectively, "the Acuntos"). (*Id.* at ¶¶ 97–98)  A press release announcing the sale highlighted "Business Insurance's growing annual conference schedule."  (*Id.* at ¶ 105) (internal quotations and emphasis omitted)  After the sale, Potter remained active within BIH.  (*Id.* at ¶¶ 107, 110–16)

Potter's sister, Sydney Posner ("Posner"),[13] started The Claims Xchange, Inc. ("ClaimsX"), which directly competes with CLM.  (*Id.* at ¶¶ 123, 128)  Posner worked for CLM until she was terminated for misconduct on September 20, 2019.  (*Id.* at ¶ 134)  Before her termination, and with Potter's help, Posner began working to establish ClaimsX to compete with

---

[12] BIH avers that Beacon's proper name is Beacon Intercontinental Group, Inc.  (D.I. 66 at 1 n.2)
[13] Plaintiffs have initiated a separate lawsuit against Posner in the United States District Court of the Eastern District of Pennsylvania for her alleged misconduct, *The American Institute For Chartered Property Casualty Underwriters d/b/a The Institutes, et al. v. Sydney Posner, et al.*, Civil Action No. 2:19-cv-05369-NIQA.  (D.I. 48 at ¶ 137)

CLM.  (*Id.* at ¶¶ 135, 138)  ClaimsX "connects innovative and collaborative professionals who share a passion for advancing the claims industry."  (*Id.* at ¶ 124)  ClaimX's "membership includes claims professionals, risk professionals, corporate counsel, defense attorneys, and service providers."  (*Id.* at ¶ 125)  In addition, ClaimsX has become one of Business Insurance's strategic partners and has "scheduled events throughout 2020 and beyond" targeting the same professionals as CLM.  (*Id.* at ¶¶ 126, 129, 131–32)

## III.    LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff.  *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *See Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555–56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks

omitted).  This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

## IV.    DISCUSSION

### a.  PBIH

The court first addresses the motion to dismiss Plaintiffs' breach of contract, tortious interference, and unjust enrichment claims against PBIH.  PBIH advances several arguments as to why the court should dismiss Plaintiffs' claims against it.  (D.I. 52)  The court recommends that all counts should be dismissed as to PBIH because the Plaintiffs fail to plead any substantive claims against PBIH individually.  (D.I. 48 at ¶¶ 4, 11, 38)  Only three substantive allegations in the amended complaint mention PBIH individually.  (*Id.*)  None of those three[14] relate to any of the elements[15] required to plead claims of breach of contract, tortious interference, or unjust enrichment.  (*See id.*)

---

[14] The three allegations are: "Upon information and belief, Defendant PBIH is a Florida limited liability company with its principal place of business in Illinois, and its sole member is Defendant Potter."  (D.I. 48 at ¶ 4)  "At the time of the Purchase Agreement, upon information and belief, Defendant Potter owned all of the membership interests of Defendant PBIH either directly or through C&E."  (*Id.* at ¶ 11)  "At some point, Business Insurance Holdings, LLC changed its name to PBIH, LLC and/or PBIH, LLC is the successor-in-interest to Business Insurance Holdings, LLC. In either event, it is equally bound to the terms of the Non-Compete."  (*Id.* at ¶ 38)

[15] The required elements for each of Plaintiffs' causes of action are discussed, *infra*.  *See* sections IV.b–d, *infra*.

8

In response, Plaintiffs argue that the amended complaint does not "simply group[] PBIH together with its co-defendants." (D.I. 54 at 11) Instead, without citing a specific allegation, Plaintiffs generally assert that the amended complaint "specifically allege[s] each defendants' involvement." (*Id.* at 12) Plaintiffs acknowledge that the amended complaint "frequently refer[s] to defendants collectively;" however, they argue such collective referral is "grounded in the allegations that they were acting together." (*Id.*) Plaintiffs fail to direct the court to any factual allegation in the complaint plausibly stating that PBIH acted in concert with any co-defendant to satisfy any element of any claim in issue. Nor did Plaintiffs cite any facially plausible factual allegation in the amended complaint indicating individual conduct by PBIH that would satisfy any element of the causes of action at issue.

Moreover, a complaint will not survive a Rule 12(b)(6) motion if it "combine[s] allegations against multiple defendants" in a manner that fails to provide each defendant with adequate notice of the basis for the underlying claims against them. *See T-Jat Sys. 2006 Ltd. v. Expedia, Inc. (DE)*, C.A. No. 16-581-RGA-MPT, 2017 WL 896988, at *7 (D. Del. Mar. 7, 2017); *Adverio Pharma GmbH v. Alembic Pharms. Ltd.*, C.A. No. 18-073-LPS, 2019 WL 581618, at *6 (D. Del. Feb. 13, 2019). Under the heading, "Preliminary Statement," the amended complaint identifies the various defendants in this case as follows: Plaintiffs "bring this action against Defendants Adam Potter ('Potter'), PBIH, LLC f/k/a Business Insurance Holdings, LLC ('PBIH'), and Business Insurance Holdings, Inc. ('BIH') (collectively, 'Defendants')." (D.I. 48 at 1) Thereafter, the amended complaint frequently refers to "Business Insurance" without ever defining it. (*See, e.g.*, *id.* at ¶¶ 42, 45, 96) Referring to an undefined "Business Insurance" is ambiguous in this case because the abbreviated names used to identify two co-defendants, BIH and PBIH, both include "Business Insurance." (D.I. 48 at 1) The amended

complaint also refers to "Defendants" generally at various points without identifying which entity is responsible for the relevant conduct.  (*See, e.g., id.* at ¶¶ 54, 59, 165, 168)  Because of the ambiguity resulting from the failure to define "Business Insurance" and the generalized group pleading of conduct by "Defendants," the amended complaint fails to provide notice to PBIH of the basis for the underlying claims against it.  *See T-Jat*, 2017 WL 896988, at *7; *Adverio*, 2019 WL 581618, at *6 ("[A]llegations lumping multiple defendants together without providing allegations of individual conduct are frequently (as here) insufficient to satisfy the notice pleading standard.").  Therefore, the court recommends granting PBIH's motion to dismiss Counts I, II, and III of the amended complaint against it.

### b.  Count I – Breach of Contract Against BIH

"To state a claim for breach of contract under Delaware law,[16] a plaintiff must allege facts sufficient to enable a defendant to plausibly infer: (1) the existence of a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff."  *Tendyne Holdings, Inc. v. Abbott Vascular, Inc.*, C.A. No. 18-1070-CFC, 2019 WL 2717857, at *2 (D. Del. Jun. 28, 2019) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

BIH advances several arguments as to why the court should dismiss Plaintiffs' breach of contract claim against it.  First, BIH argues that Plaintiffs' breach of contract claim against it should be dismissed because it is not a party or otherwise subject to the APA while it is under

---

[16] The APA contains a State of Delaware choice of law provision.  (D.I. 67, Ex. 1 at § 10.3)  BIH notes that the parties have cited Delaware law as governing the disputes in this litigation, but also highlights that Plaintiffs are located in Pennsylvania.  (D.I. 66 at 15 n.10)  However, choice of law disputes, if any exist in this case, are not ripe for decision by the court on this motion.

Beacon's ownership.[17]  (D.I. 66 at 3–6, 10)  C&E was a "Selling Party" subject to the restrictive

covenants at issue.  (D.I. 67, Ex. 1 at § 6.12; D.I. 48 at ¶ 13)  After the APA was executed, C&E

changed its name to BIH.  (D.I. 48 at ¶¶ 5, 9, 12)  BIH does not dispute that its name change did

not extinguish its obligations under the APA's restrictive covenants.  (11/17/20 Tr. at 18:14–18)

Instead, BIH argues that its obligations under the APA ceased fifteen months after the APA was

executed when Potter relinquished his control over BIH by selling it to Beacon via a Stock

Purchase Agreement ("the SPA").  (*Id.* at 18:19–21:20)  However, BIH's argument is a factual

dispute that ignores allegations in the amended complaint.  (*See* D.I. 48 at ¶¶ 97–120)  For

example, the amended complaint alleges that Potter "stayed involved with [BIH] and helped to

build the business" after BIH was sold to Beacon.  (D.I. 48 at ¶ 107)  BIH's reliance on disputed

facts fails at this stage to warrant dismissal of all or a portion of Plaintiffs' breach of contract

claims against it.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.*, 1991

WL 138431, at *2 (Del. Super. Ct. July 15, 1991) (quoting *Bankers Life & Cas. Co. v. Kirtley*,

338 F.2d 1006, 1013 (8th Cir. 1964) ("Neither a change in name of a corporation nor a change in

its stock or stockholders ordinarily will affect its rights and obligations.").

      BIH also argues that the amended complaint lacks factual allegations of breach and

damages.  (D.I. 66 at 10–14)  With respect to breach, BIH argues that the C&H Conference

complies with the APA because "the C&H Conference . . . excluded any 'claims and litigation

management professionals.'"  (D.I. 66 at 12 (quoting D.I. 48 at ¶ 56))  BIH argues that it cured

any violation of the non-compete by limiting the attendees, which impermissibly calls for the

---

[17] BIH also argues that it does not meet the APA's definition of "Affiliate."  (D.I. 66 at 3–6)
Plaintiffs concede in their answering brief that they "are not attempting to argue that BIH is an
'Affiliate' of Potter."  (D.I. 71 at 3)  Therefore, the court focuses its analysis on whether BIH is
bound by the APA as a "Selling Party."  (*See* D.I. 66 at 4)

court to make a factual finding against Plaintiffs at the pleading stage.  (*See id.* at 12–13)

Contrary to BIH's argument, the amended complaint contains plausible factual allegations

demonstrating that the C&H Conference targeted insurance professionals and addressed topics

"centered on cannabis insurance and risk management" in direct competition with CLM, a

"Seller's Business" under the APA.  (D.I. 48 at ¶¶ 46–50)  The amended complaint defines

CLM's pre-APA business as "provid[ing] educational conferences and other live delivery events,

for the benefit of its member community, which consists of corporate counsel, risk managers,

claims managers, litigation managers, adjusters, brokers, service providers, and defense counsel,

as well as other industry professionals." (*Id.* at ¶ 61)  In addition, between 2014 and 2017, CLM

offered at least eight cannabis-related presentations.  (*Id.* at ¶ 70)  BIH also argues that the

amended complaint lacks any factual allegations indicating its involvement with ClaimsX.  (D.I.

66 at 14)  BIH's argument ignores factual allegations in the amended complaint, namely: BIH's

owners served as members of the ClaimsX board, and ClaimsX is "promoted by" and is a

"strategic partner" of Business Insurance.  (D.I. 48 at ¶¶ 130–32)  Accepting these plausible

factual allegations as true, the amended complaint states a breach of the APA.

   With respect to damages, BIH argues that the amended complaint lacks factual

allegations to state a breach of contract claim.  (D.I. 66 at 13–14; D.I. 73 at 7–8)  In response,

Plaintiffs argue (1) the APA permits Plaintiffs to seek injunction relief without alleging actual

damages;[18] and (2) Plaintiffs have sufficiently alleged that BIH caused them injury.  (D.I. 71 at

12–15)  The APA states in relevant part as follows:

---

[18] Plaintiffs cite several cases that, they argue, support such a contention: *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019); *Brace Indus. Contracting, Inc. v. Peterson Enter., Inc.*, 2015 WL 5097240, at *2 (Del. Ch. Aug. 28, 2015); *TP Group–CI, Inc. v. Vetecnik*, C.A. No. 16-623-RGA, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016).

12

> Each Selling Party shall not contest that Buyer's remedies at law for any breach or threat of breach by any Selling Party or any of its affiliates of the provisions of this <u>Section 6.12</u> will be inadequate, and that Buyer shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this <u>Section 6.12</u>, without proving actual damages, and to enforce specifically such terms and provisions, in addition to any other remedy to which Buyer may be entitled at law or equity.

(D.I. 67, Ex. 1 at § 6.12(d))  The amended complaint seeks both injunctive and legal relief as a result of BIH's alleged breach of the APA.  (D.I. 48 at 38)  Plaintiffs' "need not allege an exact monetary figure in order to sufficiently plead that [they] suffered damages from the breach of contract."  *See Weyerhaeuser Co. v. Domtar Corp.*, C.A. No. 14-024-SLR, 61 F. Supp. 3d 445, 453 (D. Del. 2014) (citing *VLIW Tech.*, 840 A.2d at 613).  However, Plaintiffs must do more than state, in conclusory fashion, that they have been damaged.  *See Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (citing *Nichols v. Bennett Detective & Protective Agency, Inc.*, 245 F. App'x 224, 231 (3d Cir. 2007)).

The amended complaint contains facially plausible allegations of Plaintiffs' damages resulting from BIH's alleged breach of the APA.  (D.I. 48 at ¶¶ 147–49)  For example, the amended complaint states that "[a]s a direct result of Defendants' conduct in violation of the restrictive covenants, [Plaintiffs] face future losses of customers and sponsors, loss of good will, loss of revenues, and dilution and confusion in the marketplace."  (*Id.* at ¶ 147)  The amended complaint also states that, as a result of BIH's alleged breach, Plaintiffs have been forced to retain counsel and incur costs to "investigate and remedy Defendants' conduct."  (*Id.* at ¶ 148)  BIH challenges these allegations only on the basis that they are "conclusory."  (D.I. 66 at 13–14)  However, considering the facially plausible breaches alleged with respect to the C&H Conference and BIH's involvement with ClaimsX, and the allegations that Plaintiffs sustained commercial losses as a result (D.I. 48 at ¶¶ 147–48), the amended complaint plausibly alleges

that Plaintiffs have suffered an injury connected to BIH's alleged breach of the APA.  *Cf.*

*Hydrogen Master Rights*, 228 F. Supp. 3d at 333 (dismissing a breach of contract claim based on

insufficient damages allegations where the plaintiff had merely alleged that "[it] ha[d] been

damaged").

In sum, the court finds that the amended complaint contains sufficient plausible factual

allegations to state a breach of contract claim against BIH.  Therefore, the court recommends

denying BIH's motion to dismiss Count I of the amended complaint against it.

### c.  Count II – Tortious Interference Against BIH

To plead a tortious interference claim, a plaintiff must allege "(1) the existence of a valid

business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part

of the interferer; (3) intentional interference which induces or causes a breach or termination of

the relationship or expectancy; and (4) resulting damages to the party whose relationship or

expectancy has been disrupted."  *See Truinject Corp. v. Nestle Skin Health, S.A.*, C.A. No. 19-

592-LPS-JLH, 2020 WL 70981, at *16 (D. Del. Jan. 7, 2020), *report and recommendation*

*adopted*, 2020 WL 1270916 (D. Del. Mar. 17, 2020) (quoting *Enzo Life Sci., Inc. v. Digene*

*Corp.*, 295 F. Supp. 2d 424, 429 (D. Del. 2003)).

As a preliminary matter, the parties dispute the level of specificity required to

successfully plead tortious interference.  (D.I. 66 at 16; D.I. 71 at 15–17; D.I. 73 at 9–10)  As

Plaintiffs argue, they do "not need to identify the prospective business relationship with which

the defendant tortiously interfered" to survive a motion to dismiss. [19]  *See Dynamis Therapeutics,*

---

[19] BIH argues that the authorities Plaintiffs rely on for such a proposition, like *Corning Inc. v.*
*SRU Biosystems*, 292 F. Supp. 2d 583 (D. Del. 2003) and *Abbot Labs v. Teva Pharms. USA, Inc.*,
432 F. Supp. 2d 408 (D. Del. 2006), are unavailing because those cases predate *Twombly* and
*Iqbal*.  (D.I. 73 at 10 n.2)  However, the court does not rely on *Corning* or *Abbot Labs*; the court
relies on *Dynamis*, a post *Twombly/Iqbal* district court case.  *Dynamis*, 2010 WL 3834405, at *5

14

*Inc. v. Alberto-Culver Int'l Inc.*, C.A. No. 09-773-GMS, 2010 WL 3834405, at *5 (D. Del. Sept. 24, 2010) (citing *Enzo*, 295 F. Supp. 2d at 429–30). Instead, Plaintiffs must allege factual allegations that plausibly "'establish some basis of a bona fide expectancy' of [their] relationship with a third party." *See Truinject*, 2020 WL 70981, at *16 (quoting *World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, 2015 WL 6772638, at *7 (Del. Super. Ct. Nov. 2, 2015)). Plaintiffs must also "allege that the third party 'was prepared to enter into a business relationship but was dissuaded from doing so by the defendant.'" *Id.* (quoting *GWO Litig. Trust v. Sprint Sols., Inc.*, 2018 WL 5309477, at *12 (Del. Super. Ct. Oct. 25, 2018)).

BIH argues that the court should dismiss the tortious interference claim against it because the amended complaint fails to identify Plaintiffs' potential customers that BIH interfered with in holding the C&H Conference.[20] (D.I. 66 at 14–17) In response, Plaintiffs argue that they are not required to "identify any actual customers" to state a claim for tortious interference. (D.I. 71 at 15–17)

---

(citing *Enzo*, 295 F. Supp. 2d at 429–30) BIH also erroneously argues that *Orthopaedic Associates of S. Delaware, P.A. v. Pfaff*, 2018 WL 822020, at *2 (Del. Super. Feb. 9, 2018), a Delaware Superior Court case applying a state law pleading standard to a tortious interference claim, articulates the pleading standard the court should apply here. (D.I. 66 at 16; D.I. 73 at 9–10) *Orthopaedic Associates* incorporated the holding of this district court in *Gunn*, a case in which the district court was stating the legal standard for tortious interference at the summary judgment stage, not the Rule 12(b)(6) stage. *See Orthopaedic Associates*, 2018 WL 822020, at *2 (quoting *U.S. Nat'l Bank Ass'n v. Gunn*, C.A. No. 11-1155-RGA, 23 F. Supp. 3d 426, 436 (D. Del. 2014)) ("[A] plaintiff 'must identify a specific party who was prepared to enter into a business relationship [with the plaintiff] but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm.'"). Therefore, the court does not apply the standard articulated in *Gunn* to the present motion to dismiss. *See Enzo*, 295 F. Supp. 2d at 429–30 (noting that differences exist between the pleading standard and the summary judgment standard for tortious interference claims).

[20] BIH also argues that its involvement in the C&H Conference was justified for reasons already described; mainly, BIH rehashes its view that it has not breached the APA. (D.I. 66 at 17) For the reasons described in section IV.b., *supra*, BIH's argument fails.

No attempt has been made by Plaintiffs to plead the elements of a claim for tortious interference.  The amended complaint does not contain plausible factual allegations stating Plaintiffs' "basis of a bona fide expectancy" or that some third party "was prepared to enter into a business relationship but was dissuaded from doing so by [BIH]."  *See Truinject*, 2020 WL 70981, at *16.  The amended complaint contains conclusory allegations that Plaintiffs "have a reasonable expectation that CLM's business relationships will continue and that they will continue to be the leading provider of educational services to their target market."  (D.I. 48 at ¶ 166)  The amended complaint concludes that "Defendants have knowingly and intentionally interfered with CLM's existing and prospective contractual and business relationship" based on "their attempt to offer conferences that directly compete with CLM's past, current, and future offerings."  (*Id.* at ¶ 167)  The amended complaint recites conclusions but lacks factual allegations of any actions by BIH to dissuade a potential customer from entering into a business relationship with Plaintiffs.  Therefore, the court recommends dismissing Count II of the amended complaint against BIH.  *See Truinject*, 2020 WL 70981, at *17 (recommending dismissal of a tortious interference claim because "the Amended Complaint . . . fail[ed] to allege facts suggesting that the [defendants] dissuaded any third parties from doing business with [the plaintiff]").

### d.  Count III – Unjust Enrichment

"The elements of unjust enrichment under Delaware law are: '(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.'"  *Well Thrive Ltd. v. Semileds Corp.*, C.A. No. 17-794-MN, 2020 WL 7490109, at *9 (D. Del. Dec. 21, 2020) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).  "In evaluating a party's claim for an equitable

remedy based on unjust enrichment, however, 'courts inquire at the threshold as to whether a contract already governs the parties' relationship.'" *Id.* (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012)).  "It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim." *Id.* (quoting *Vichi,*, 62 A.3d at 58)  However, if a contract does not govern the relationship between the parties, "under Federal Rule of Civil Procedure 8(e), a plaintiff is permitted to plead [unjust enrichment] in the alternative." *MIG Investments LLC v. Aetrex Worldwide, Inc.*, C.A. No. 11-039-LPS, 852 F. Supp. 2d 493, 513 (D. Del. 2012) (citing *Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*, 295 F. Supp. 2d 430, 438 (D. Del. 2003)).

### i. Potter

Moving Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because it impermissibly overlaps with Plaintiffs' breach of contract claim.  (D.I. 52 at 17–20)  In response, Plaintiffs argue the amended complaint properly alleges unjust enrichment in the alternative.  (D.I. 54 at 14–18)

Plaintiffs unjust enrichment claim against Potter fails if the APA "governs the relationship between parties that gives rise to the unjust enrichment claim." *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 891 (Del. Ch. 2009); *see also Moon Express, Inc. v. Intuitive Machs., LLC*, C.A. No. 16-344-LPS-CJB, 2017 WL 4217335, at *9 (D. Del. Sept. 22, 2017), *report and recommendation adopted,* 2017 WL 11554232 (D. Del. Oct. 30, 2017).  Plaintiffs argue that their unjust enrichment claim against Potter extends beyond the scope of the APA because it addresses conduct—misappropriation of trade secrets, for example—that the law deems unfair regardless of whether a contract exists between the parties.  (D.I. 54 at 16–17)

Plaintiffs cite *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405 (Del. Ch. Dec. 22, 2010) to support this argument.  (*Id.*)  In *Narrowstep*, the court found that the plaintiff had pleaded enough plausible facts "to infer that the [contracts at issue] and other documents incorporated in them d[id] not comprehensively govern the relationship between the parties with respect to at least the exchange of equipment so as to preclude [the plaintiff] from pleading unjust enrichment as an alternative remedial theory."  *Id.* at *16.  Unlike *Narrowstep*, the amended complaint lacks facially plausible allegations that the APA did not "comprehensively govern the relationship" between Plaintiffs and Potter.  *See id.*

Plaintiffs argue that the amended complaint alleges that "Potter is assisting Sydney Posner[21] in the development of a competitive business that is using trade secret and highly confidential information misappropriated from Plaintiffs."  (D.I. 54 at 17)  However, Plaintiffs' factual, non-conclusory allegations of trade secret and confidential information misappropriation relate to only Posner, a non-party to this litigation.  (D.I. 48 at ¶¶ 136, 138–39)  The amended complaint lacks non-conclusory allegations that Potter misappropriated Plaintiffs' trade secrets or violated any extra-contractual legal obligation.  *Cf. Narrowstep*, 2010 WL 5422405, at *16–17 (finding the complaint alleged sufficient facts to state a claim for unjust enrichment where the plaintiff had alleged "misuse of its confidential information" in a fraud claim, which extended beyond the contract at issue).  Accordingly, the court recommends granting Moving Defendants' motion and dismissing Count III with respect to Potter. [22]  *See id.* (noting that "a right to plead

---

[21] Sydney Posner ("Posner") is Potter's sister.  (D.I. 48 at ¶ 128)
[22] In their reply brief, Moving Defendants also argue that the amended complaint lacks allegations that Potter was enriched by Posner's alleged misappropriations.  (D.I. 59 at 10) Moving Defendants' argument on this point with respect to Potter could have been raised in their opening brief and is, therefore, inappropriately made for the first time in their reply brief and not considered by the court.  *Progressive Sterilization, LLC v. Turbett Surgical LLC*, C.A. No. 19-

alternative theories does not obviate the obligation to provide factual support for each theory")

(quoting *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL

264088, at *8 (Del. Ch. Feb. 3, 2009)).

### ii.  BIH

BIH argues, and the court agrees, that Plaintiffs' unjust enrichment claim against it

should be dismissed because the amended complaint lacks factual allegations of the elements

required to state such a claim.  (D.I. 66 at 17–21)  Plaintiffs argue that the "crux" of their claim is

"that it is fundamentally unfair to allow BIH to retain profits generated from its competition

against [P]laintiffs and involvement with ClaimsX, which competes with the businesses

Plaintiffs paid nearly $20 million to acquire, and with which BIH agreed not to compete."  (D.I.

71 at 20)  Plaintiffs cite several allegations in the complaint to support this contention.  (*See* D.I.

48 at ¶¶ 14, 37, 122–33, 136, 173–75)  However, none of those paragraphs in the amended

complaint, nor any other paragraph in the amended complaint, contains a plausible factual

allegation regarding an enrichment by BIH related to Plaintiffs' impoverishment beyond a

conclusory allegation that "Defendants have unfairly gained a competitive advantage over

Plaintiffs."  (*Id.* at ¶ 173)

Plaintiffs also argue their unjust enrichment claim should survive because the amended

complaint states that BIH unlawfully benefitted from Plaintiffs' trade secrets and confidential

information.  (D.I. 71 at 19–20)  Plaintiffs' argument fails, however, because no allegation in the

amended complaint states that BIH used Plaintiffs' trade secrets or confidential information to

unfairly compete.  (D.I. 48)  As already stated, the amended complaint alleges that Posner, a

---

627-CFC, 2020 WL 3071951, at *2 (D. Del. June 10, 2020) (citing *In re Fosamax (Alendronate

Sodium) Prods. Liab. Litig (No. II)*, 751 F.3d 150, 157 (3d Cir. 2014)).

non-party to this litigation, and not BIH, "improperly accessed a copy of CLM's entire file-share

database containing hundreds of files containing CLM's proprietary, confidential, and trade-

secret information." (*Id.* at ¶ 136)  Therefore, the court recommends granting BIH's motion and

dismissing Count III against it.

### e.  Count IV – Declaratory Relief Against Potter[23]

"A declaratory judgment is appropriate where it will: '(1) clarify and settle legal relations

in issue and (2) terminate and afford greater relief from the uncertainty, insecurity, and

controversy giving rise to present action.'" *Well Thrive*, 2020 WL 7490109, at *9 (D. Del. Dec.

21, 2020) (quoting *Delaware State Univ. Student Housing Found. v. Ambling Mgmt. Co.*, 556 F.

Supp. 2d 367, 374 (D. Del. 2008).  "The real value of the judicial pronouncement . . . is in the

settling of some dispute which affects the behavior of the defendant towards the plaintiff." *Id.*

(quoting *Delaware State*, 556 F. Supp. 2d at 374) (emphasis omitted).  "A declaration

interpreting contractual relationships when the relief sought could affect present behavior of the

contracting parties is an appropriate claim for declaratory relief." *Id.* (citing *Delaware State*, 556

F. Supp. 2d at 374).

Moving Defendants argue that Count IV of the amended complaint should be dismissed

because it impermissibly seeks a declaration regarding Potter's past conduct.  (D.I. 52 at 7–8,

20–21)  In response, Plaintiffs first argue that Count IV of the amended complaint seeks

appropriate relief.  (D.I. 54 at 18–21)

---

[23] Count IV seeks declaratory relief against Potter only.  (D.I. 48 at ¶ 179)  Neither the amended
complaint nor Plaintiffs' answering brief cites the federal Declaratory Judgment Act, 28 U.S.C.
§§ 2201–2202.  (D.I. 48; D.I. 54)  The parties did not discuss the elements required to
successfully state a claim for declaratory relief.  (D.I. 52; D.I. 54; D.I. 59)

Moving Defendants cite several authorities[24] supporting the proposition that a plaintiff may not request declaratory relief based solely on past conduct.  (D.I. 52 at 20–21)  Plaintiffs argue that the authorities Moving Defendants cite are not dispositive of the issue before the court because they addressed isolated incidents of alleged constitutional rights violations.  (D.I. 54 at 19)  Although some of the relevant authorities arose in the context of alleged constitutional rights violations, none limited their respective statements regarding the scope of permissible declaratory relief solely to constitutional rights issues.  *See O'Callaghan v. Hon. X*, 661 F. App'x 179, 182 (3d Cir. 2016) (citing *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1266 (10th Cir. 2004)); *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (citing *Gruntal & Co., Inc. v. Steinberg*, 837 F. Supp. 85, 89 (D.N.J. 1993)); *In re Noble*, C.A. No. 18-111-RGA, 2018 WL 2012903, at *2 (D. Del. Apr. 30, 2018); *see also Swain v. Wilmington Trust, N.A.*, C.A. No. 17-71-RGA, 2018 WL 934598, at *4 (D. Del. Feb. 16, 2018) (dismissing claim for declaratory relief after concluding that the plaintiffs lacked standing to pursue such relief because they "did not adequately allege 'a real and immediate threat of future injury'" and because "[s]peculation, by itself, is not sufficient"); *Benson v. Amguard Ins. Co.*, C.A. No. 16-196-LPS, 2017 WL 2672078, at *3 (D. Del. June 21, 2017) (quoting *Corliss*, 200 F. App'x at 84) ("[A] declaratory judgment is inappropriate when it is brought solely to adjudicate past conduct.") (internal quotations and alterations omitted).

The purpose of a declaratory judgment is "to define the legal rights and obligations of the named parties in anticipation of future conduct, not to proclaim their liability for past actions."

---

[24] *O'Callaghan v. Hon. X*, 661 F. App'x 179, 182 (3d Cir. 2016); *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006); *In re Noble*, C.A. No. 18-111-RGA, 2018 WL 2012903, at *2 (D. Del. Apr. 30, 2018) ("Asking a court to proclaim that one's rights were violated is not a proper basis for declaratory relief.").

*O'Callaghan*, 661 F. App'x at 182 (citing *Utah Animal Rights Coal.*, 371 F.3d at 1266); *Corliss*,

200 F. App'x at 84 (citing *Gruntal*, 837 F. Supp. at 89) ("Declaratory judgment is inappropriate

solely to adjudicate past conduct."); *see also In re Noble*, 2018 WL 2012903, at *2 ("Asking a

court to proclaim that one's rights were violated is not a proper basis for declaratory relief.").

Accordingly, Plaintiffs may not seek declaratory relief based on Potter's past conduct alone.  *See*

*Benson*, 2017 WL 2672078, at *3 (quoting *Corliss*, 200 F. App'x at 84).  The amended

complaint states the relevant scope of relief sought as follows:

> [Plaintiffs] seek a declaration that Defendant Potter has violated the terms of the
> Agreement and that they are entitled to an offset of the sums paid under the
> Agreement in an amount equal to the damages caused by Defendant Potter's
> conduct, which upon information and belief will be far in excess of $75,000.

(D.I. 48 at ¶ 179)  The amended complaint's prayer for relief seeks "[a] declaration that

Defendant Potter has violated the terms of the [APA]."  (*Id.* at 38)  Plaintiffs argue that the

amended complaint "seeks to prevent Defendants from unfairly competing *in the future*."  (D.I.

54 at 20) (emphasis in original).  The amended complaint states that "Defendants' actions reflect

their blatant disregard for contractual and legal obligations and evinces intent to continue with

these violations."  (D.I. 48 at ¶ 149)  Plaintiffs also note that the restrictive covenants in APA

extend until June 2023.  *See Well Thrive*, 2020 WL 7490109, *9 (citing *Delaware State*, 556 F.

Supp. 2d at 374) ("A declaration interpreting contractual relationships when the relief sought

could affect present behavior of the contracting parties is an appropriate claim for declaratory

relief.").  Construing the facially plausible allegations in the amended complaint in Plaintiffs'

favor, the amended complaint contains sufficient allegations that Potter's allegedly breaching

conduct "continues or is likely to continue in the future."  *See Benson*, 2017 WL 2672078, at *4.

Therefore, the court recommends denying Potter's motion to dismiss Count IV of the amended

complaint.

## V.    CONCLUSION

For the foregoing reasons, the court recommends GRANTING-IN-PART and DENYING-IN-PART Moving Defendants' motion to dismiss for failure to state a claim (D.I. 51) and GRANTING-IN-PART and DENYING-IN-PART BIH's motion to dismiss for failure to state a claim (D.I. 65) as follows:

1) GRANTING Moving Defendants' motion and dismissing Counts I, II, and III of the amended complaint against PBIH without prejudice;

2) DENYING BIH's motion with respect to Count I of the amended complaint;

3) GRANTING BIH'S motion with respect to Counts II and III of the amended complaint without prejudice;

4) GRANTING Moving Defendants' motion and dismissing Count III of the amended complaint against Potter without prejudice; and

5) DENYING Moving Defendants' motion with respect Count IV of the amended complaint.

Following the expiration of the objections period and in the event the District Court adopts the recommendation to allow amendment, the court recommends that the District Court thereafter permit Plaintiffs ten (10) days to file an amended complaint.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right

to de novo review in the District Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1

(3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

     The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: February 8, 2021

                                      Sherry R. Fallon
                                   United States Magistrate Judge

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUE FOR  )
CHARTERED PROPERTY  )
CASUALTY UNDERWRITERS  )
AND THE INSTITUTES, LLC,  )
                                      )
           Plaintiff,  )
                                        )
          v.  )       Civil Action No. 19-1600-CFC
                                        )
ADAM POTTER , PBIH, LLC and  )
BUSINESS INSURANCE  )
HOLDINGS, INC.,  )
                                        )
        Defendants.  )

## <u>MEMORANDUM ORDER</u>

Pending before me are objections (D.I. 128) filed by Defendant Business

Insurance Holdings, Inc. (BIH) to the Magistrate Judge's February 8, 2021 Report

and Recommendation (D.I. 126).  The Magistrate Judge recommended in the

Report and Recommendation that I grant in part and deny in part BIH's motion to

dismiss the Amended Complaint.  D.I. 126 at 23.  Specifically, she recommended

that I grant BIH's motion to dismiss Counts II and III of the Amended Complaint

and deny BIH's motion to dismiss Count I.  BIH objects to the Magistrate Judge's

recommendation that I deny BIH's motion to dismiss Count I.

The Magistrate Judge had the authority to make her recommendation under 28 U.S.C. § 636(b)(1)(B). I review her recommendation de novo. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

Count I is a contract claim. Plaintiffs allege that BIH and its co-defendants breached a noncompete provision in an Asset Purchase Agreement (APA). BIH is a corporation. When it executed the APA in 2018, BIH had another name—C&E MGMT and Planning, Inc. (C&E). The APA required C&E to change its name after the APA closed, D.I. 53 at 31, and C&E changed its name to BIH before Plaintiffs filed this suit.

The APA explicitly states that its noncompete restrictions apply to "each Selling Party." D.I. 53 at 32. Under the express terms of the APA, BIH (i.e., C&E) and Defendant Adam Potter, who owned BIH when the APA was executed, are each a Selling Party. D.I. 53 at 5, 44, 51. A little over a year after the APA was executed, Potter sold BIH to its current owner, Beacon Intercontinental Group.

In its opening brief filed in support of its motion to dismiss, BIH argued that it "is not a party to the APA" and that "[t]he APA says what it says." D.I. 66 at 1. In BIH's words: "'Selling Party' is defined to include only 'the *Companies*, Adam Potter, and [another entity not relevant to Defendant's motion to dismiss]" and

2

"[n]owhere does the APA define 'Companies' to include successor entities[] or 'renamed' entities." D.I. 66 at 4 (emphasis in original).

In response to this argument, Plaintiffs stated: "The proposition that a party cannot obviate its contractual obligations by merely changing its name hardly needs citation." D.I. 71 at 8. Plaintiffs then gave a list of numerous citations for Delaware cases that flatly reject what Plaintiffs fairly characterized as BIH's "remarkable suggestion" that a company can avoid its contractual obligations by changing its name. D.I. 71 at 8–9. (Delaware law governs the APA.)

In its reply brief, BIH (not surprisingly) changed tack. It conceded that "changing its corporate name did not eliminate its duties under the APA," D.I. 73 at 1; and it argued that, notwithstanding the fact that the APA explicitly defines BIH as a "Selling Party" and explicitly says that the noncompete restriction apply to "each Selling Party," the "context" of the APA showed that BIH is not subject to the noncompete provision because BIH is no longer controlled by Potter. In BIH's words:

> Read in the context of the entire APA, which contains granular detail about the post-transaction activities of Potter but few details about post-transaction activities of [BIH and two other Potter-controlled companies designated as Sellers in the APA], the non-compete provisions were written to prevent Potter from competing with Plaintiffs in an area of the market where the APA

3

> recognized that he still intended to actively participate,
> either directly or through entities that he might control.

D.I. 73 at 4.  According to BIH, the APA "reflects the reality that the competitor

with which Plaintiffs were concerned was Potter and the various corporate entities

he controlled," D.I. 73 at 1–2, and, "read in that context," the noncompete

provision does not apply to BIH since it is no longer controlled by Potter, D.I. 73 at

6–7.

     BIH also argued in support of its motion to dismiss that the Amended

Complaint lacked factual allegations from which it could plausibly be inferred

either that BIH violated a noncompete restriction of the APA or that Plaintiffs

suffered any damages because of BIH's alleged conduct.  D.I. 66 at 13–14.

     In analyzing the merits of BIH's contention that it is not a party to the APA

the Magistrate Judge did not address Plaintiffs' argument that the express language

of the APA subjected BIH to the APA's noncompete restrictions.  Instead, the

Magistrate Judge focused solely on BIH's argument that BIH is not subject to the

noncompete restrictions because it is no longer controlled by Potter.  The

Magistrate Judge found that this "argument is a factual dispute that ignores

allegations [of Potter's control] in the amended complaint."  D.I. 126 at 11.  The

Magistrate Judge also found that the Amended Complaint alleged facts that

4

plausibly imply that BIH breached its contractual obligations and caused Plaintiffs

damages.  D.I. 126 at 11–13.  Based on these findings, the Magistrate Judge

recommended that I deny BIH's motion to dismiss Count I.  D.I. 126 at 23.

BIH makes two objections to the Magistrate Judge's recommendation.  It

argues first that "the Magistrate Judge erred as a matter of law in concluding that

the non-compete and non-solicitation provisions of the APA applied to BIH after

its sale to Beacon Intercontinental Group in August, 2019."  D.I. 128 at 1–2.

According to BIH, "the plain language of the APA is sufficient to determine that

th[e] [noncompete] provisions [of the APA] did not apply to BIH after August,

2019" and therefore the Magistrate Judge never should have "found that there were

disputed facts with respect to whether the APA applied to BIH."  D.I. 128 at 2.

I agree with BIH that the Magistrate Judge should have considered and

applied the plain language of the APA.  But the plain language of the APA makes

clear that its noncompete restrictions *do* apply to BIH.  BIH had it right in its

opening brief filed in support of its motion to dismiss: "The APA says what it

says."  D.I. 66 at 1.  Indeed, it's hard to see how the APA could be clearer.  It

explicitly says that BIH (i.e., C&E) is a "Selling Party" and it explicitly says that

the noncompete restrictions apply to "each Selling Party."  Nothing in the APA

5

says or suggests in any way that BIH's status as a Selling Party is contingent on either the makeup of its ownership or its relationship with Potter.

The clear and unambiguous language of the APA puts an end to the matter. Under Delaware law, "[w]hen the contract is clear and unambiguous, [the court] will give effect to the plain-meaning of the contract's terms and provisions without resort to extrinsic evidence." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (internal quotation marks and citation omitted). The clear and unambiguous language of the APA provides that BIH is subject to the noncompete restrictions of the APA.

BIH's second objection is that "the Magistrate Judge erred in allowing Plaintiffs' contract claim to stand even though the Plaintiffs failed to allege damages in anything other than a conclusory fashion." D.I. 128 at 2. I agree, however, with the Magistrate Judge's findings that the allegations in the Amended Complaint plausibly imply that Plaintiffs have been damaged by BIH's alleged contractual breaches. Plaintiffs allege, for example, that BIH's conduct has caused them to incur legal fees, investigative costs, and losses of revenue, customers, and sponsors, and to suffer from confusion in the marketplace. D.I. 48 ¶¶ 147–49.

NOW THEREFORE, at Wilmington this Twenty-sixth day of March in 2021, it is HEREBY ORDERED that:

6

1.  BIH's objections to the Magistrate Judge's Report and Recommendation
    (D.I. 128) are OVERRULED;

2.  The recommended disposition of the Report and Recommendation (D.I.
    126) is ADOPTED;

3.  BIH's motion to dismiss (D.I. 65) is GRANTED IN PART AND
    DENIED IN PART;

4.  Counts II and III against BIH are DISMISSED without prejudice; and

5.  Should Plaintiffs wish to further amend their complaint against BIH, they
    must do so no later than April 9, 2021.

                                    _____
                                    United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE AMERICAN INSTITUE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS AND THE INSTITUTES, LLC, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 19-1600-CFC |
| ADAM POTTER , PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

ORDER

Pending before me are objections (D.I. 127) filed by Defendants Adam

Potter and PBIH, LLC to the Magistrate Judge's February 8, 2021 Report and

Recommendation (D.I. 126).  Defendants object to the Magistrate Judge's

recommendation that I dismiss without prejudice and with leave to amend all

counts alleged against PBIH in the Amended Complaint and Count III against

Potter.  Defendants argue that the Counts in question should have been dismissed

*with* prejudice; and they fault the Magistrate Judge for *sua sponte* granting in the

absence of a request by Plaintiffs another opportunity to amend its claims.

Defendants' motion, however, was the first attack on the sufficiency of the pleadings in this case; and granting *sua sponte* leave to amend is not an abuse of the wide discretion the Court is afforded under Rule 15 to allow for the amendment of pleadings.

NOW THEREFORE, at Wilmington this Twenty-sixth day of March in 2021, it is HEREBY ORDERED that:

1. Defendants' objections to the Magistrate Judge's Report and Recommendation (D.I. 127) are OVERRULED;

2. The recommended disposition of the Report and Recommendation (D.I. 126) is ADOPTED;

3. Defendants' motion to dismiss (D.I. 51) is GRANTED IN PART AND DENIED IN PART;

4. Counts I, II and III against Defendant PBIH, LLC are DISMISSED without prejudice;

5. Count III against Defendant Adam Potter is DISMISSED without prejudice; and

6. Should Plaintiffs wish to further amend their complaint, they must do so

no later than April 9, 2021.

_____
United States District Judge

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC, | : : : : : | <u>CIVIL ACTION</u> |
| Plaintiffs, | : : | NO. 1:19-cv-1600-CFC |
| v. | : : : | |
| ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | : : : : | |
| Defendants. | : : | |

## ADAM POTTER'S ANSWER WITH AFFIRMATIVE DEFENSES TO PLAINTIFFS' AMENDED AND SUPPLEMENTAL COMPLAINT

Defendant, Adam Potter ("**Potter**"), by and through his undersigned counsel, hereby submits this answer with affirmative defenses to the Amended and Supplemental Complaint filed by Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC (collectively, "**Plaintiffs**"), and states as follows:

### RESPONSE TO PRELIMINARY STATEMENT

Denied.  Insofar as the allegations contained in this paragraph appear to summarize the contents of Plaintiffs' Amended and Supplemental Complaint, no response is required.  Potter denies that he has violated the law or damaged Plaintiffs in any way.  Potter further denies that Plaintiffs are entitled to any of the

1

relief they seek.  By way of further response, on February 8, 2021, the Honorable

Sherry R. Fallon, U.S.M.J. issued a report recommending the dismissal without

prejudice of Plaintiffs' Amended and Supplemental Complaint against PBIH, LLC

in its entirety, as well as the dismissal without prejudice of Plaintiffs' unjust

enrichment claim (Count III) against Potter.  D.I. 126.  Judge Fallon's report also

recommended permitting Plaintiffs leave to further amend.  *See id.*  On March 26,

2021, the Honorable Colm F. Connolly, U.S.D.J. entered an order adopting Judge

Fallon's report, dismissing without prejudice Plaintiffs' Amended and

Supplemental Complaint against PBIH, LLC in its entirety, and dismissing without

prejudice Plaintiffs' unjust enrichment claim (Count III) against Potter.  D.I. 138.

Judge Connolly granted Plaintiffs leave until April 9, 2021 to further amend their

Amended and Supplemental Complaint.  *See id.*  Plaintiffs did not do so.  As a

result, Plaintiffs' Amended and Supplemental Complaint as to PBIH, LLC, as well

as Plaintiffs' unjust enrichment claim (Count III) against Potter, have been

dismissed and are no longer pending.

### THE PARTIES

1.     Denied.  After reasonable investigation, Potter is without sufficient

knowledge or information to form a belief as to the truth of the matter(s) asserted

in this paragraph and, therefore, same are denied.  All other allegations contained

in this paragraph, express or implied, are denied.

2.     Denied. After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied. All other allegations contained in this paragraph, express or implied, are denied.

3.     Admitted in part and denied in part. It is admitted only that Potter is a resident of the State of Connecticut. All other allegations in this paragraph, express or implied, are denied.

4.     Denied. PBIH, LLC has been dismissed as a defendant in this case.

5.     Admitted in part and denied in part. It is admitted only that Defendant, Business Insurance Holdings, Inc. is incorporated under the laws of the State of Florida and that it was formerly known as "C&E MGMT and Planning, Inc." All other allegations in this paragraph, express or implied, are denied.

### JURISDICTION AND VENUE

6.     Denied. The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied. To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations. All other allegations in this paragraph, express or implied, are denied.

7.     Denied. The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied. To the

extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations in this paragraph, express or implied, are denied.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

8.    Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.

9.    Admitted in part and denied in part.  It is admitted only that Plaintiffs, Claims Pages, LLC, C&E MGMT and Planning, Inc., CLM Group, Inc., Potter and Moxie HC, LLC entered into an asset purchase agreement dated June 1, 2018 ("**APA**"), which is a writing that speaks for itself.  Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations in this paragraph, express or implied, are denied.

10.    Admitted.

11.    Denied.

12.    Admitted in part and denied in part.  It is admitted only that Defendant, Business Insurance Holdings, Inc. was formerly known as "C&E MGMT and Planning, Inc."  After reasonable investigation, Potter is without sufficient knowledge or information as to the referenced "records of the State of

Florida" to form a belief as to the truth of the remaining matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

13.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

14.   Admitted in part and denied in part.  It is admitted only that Plaintiffs have paid Potter $18,079,098 and an additional $1,905,049 in connection with the APA.  All other allegations in this paragraph, express or implied, are denied

15.   Admitted that, as of closing on the APA, Claims Pages, LLC was engaged in the business of providing reference information for insurance claims adjusters.

16.   Admitted that, as of closing on the APA, C&E MGMT and Planning, Inc. was engaged in the business of identifying and securing conference and event locations, hotel contracts and outside locations, among other business activities.

17.     Admitted that, as of closing on the APA, CLM Group, Inc. was engaged in the business of operating as a national trade association for the claims and litigation management industries.

18.     Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.

19.     Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

20.     Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.

21.     Denied.

6

22.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

23.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

24.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

25.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is

required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

26.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

27.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

8

28.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

29.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

30.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

31.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is

required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

32.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

33.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

App.118

34.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

35.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

36.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the

extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

37.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

38.   Denied.  PBIH, LLC has been dismissed as a defendant in this case.

39.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that

purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.    All other allegations contained in this paragraph, express or implied, are denied.

40.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.    All other allegations contained in this paragraph, express or implied, are denied.

41.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

42.    Denied.

43.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent

with its terms.    All other allegations contained in this paragraph, express or implied, are denied.

44.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.    All other allegations contained in this paragraph, express or implied, are denied.

45.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

46.    Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

47.    Denied.

48.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is

required. To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms. All other allegations contained in this paragraph, express or implied, are denied.

49.     Denied. The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required. To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms. All other allegations contained in this paragraph, express or implied, are denied.

50.     Denied. After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied. All other allegations contained in this paragraph, express or implied, are denied.

51.     Denied. The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required. To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms. All other allegations contained in this paragraph, express or implied, are denied.

52.     Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

53.     Admitted in part and denied in part.  It is admitted only that Plaintiffs, through counsel, sent Potter a letter dated July 29, 2019, which is a writing that speaks for itself.  Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

54.     Admitted in part and denied in part.  Upon information and belief, it is admitted only that the Cannabis and Hemp Conference and the Intellectual Property Conference had not been cancelled at the time.  All other allegations in this paragraph, express or implied, are denied.

55.     Admitted in part and denied in part.  It is admitted only that Plaintiffs, through counsel, sent Potter a letter dated August 12, 2019, which is a writing that speaks for itself.  Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

56.    Admitted in part and denied in part.  It is admitted only that Potter, through counsel, sent Plaintiffs' counsel a letter dated August 20, 2019, which is a writing that speaks for itself.  Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

57.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

58.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

App.125

59.     Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

60.     Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

61.     Denied.

62.     Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent

with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

63.     Denied.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

64.     Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

65.     Admitted.

66.     Admitted.

67.     Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter

denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms. All other allegations contained in this paragraph, express or implied, are denied.

68.   Admitted in part and denied in part. It is admitted only that the referenced session was entitled "Marijuana in Workers' Compensation – Medical and Legal Challenges." All other allegations contained in this paragraph, express or implied, are denied.

69.   Admitted in part and denied in part. It is admitted only that the referenced session was entitled "Municipal Law – Clearing the Smoke on Medical Marijuana in Employment." All other allegations contained in this paragraph, express or implied, are denied.

70.   Denied. After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied. All other allegations contained in this paragraph, express or implied, are denied.

71.   Admitted in part and denied in part. It is admitted only that the referenced session was entitled "Discussions and Trends Around Workers Compensation and Medical Marijuana." All other allegations contained in this paragraph, express or implied, are denied.

72.   Denied.

73.     Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

74.     Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

75.     Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

76.     Denied.

77.     Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  The allegations in this paragraph

also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

78.    Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

79.    Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or

are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

80.    Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

81.    Denied.

82.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

83.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent

with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

84.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

85.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

86.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

87.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

88.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

89.    Denied.

90.    Denied.

91.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.  By way of further response, the Intellectual Property Conference never occurred.

92.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

93.    Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

94.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

95.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

96.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

97.    Admitted in part and denied in part.  It is admitted only that Potter sold his 100% ownership in Business Insurance Holdings, Inc. to Beacon Intercontinental Group, Inc. in or around September 2019.  All other allegations in this paragraph, express or implied, are denied.

98.    Admitted in part and denied in part.  Upon information and belief, it is admitted only Beacon Intercontinental Group, Inc. is owned and operated by Stephen Acunto, IV and Carole Acunto.  All other allegations in this paragraph, express or implied, are denied.

99.    Denied.

100.    Admitted in part and denied in part.  It is admitted only that Potter received a payment from Beacon Intercontinental Group, Inc. in connection with the sale of Business Insurance Holdings, Inc. at or around closing on the transaction.  All other allegations in this paragraph, express or implied, are denied.

101.   Denied.

102.   Denied.

103.   Denied.

104.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

105.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

106. Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent

with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

107.  Denied.

108.  Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

109.  Denied.

110.  Denied.

111.  Admitted in part and denied in part.  It is admitted only that Jeremy Campbell was involved in selling conference sponsorships while employed at Business Insurance Holdings, Inc.  All other allegations, express or implied are denied.

112.  Admitted in part and denied in part.  Upon information and belief, it is admitted that Jeremy Campbell gave notice in or about September 2019 that he would be leaving Business Insurance Holdings, Inc.  All other allegations in this paragraph, express or implied are denied.

113.  Denied.

114.  Denied.

115.  Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

116.  Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

117.  Denied.

118.  Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

119.  Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

120.  Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

121.  Denied.

122.  Denied.

123.  Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations because, after reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph.  All other allegations contained in this paragraph, express or implied, are denied.

124.  Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

125.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

126.   Denied.   After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

127.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

128.  Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

129.  Denied.

130.  Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

131.  Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

132.  Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent

with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

133.   Denied.

134.   Admitted in part and denied in part.  It is admitted only that Sydney Posner is a former employee of the CLM Group, Inc.  All other allegations in this paragraph, express or implied, are denied.

135.   Denied.  It is expressly denied that "Defendant Potter worked with [Sydney Posner] to help create this new venture."  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the remaining matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

136.   Denied.  After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

137.   Admitted in part and denied in part.  It is admitted only that a lawsuit captioned "*The American Institute For Chartered Property Casualty Underwriters d/b/a The Institutes, et al. v. Sydney Posner, et al.*, Civil Action No. 2:19-cv-05369-NIQA" is pending in the United States District Court for the Eastern

34

District of Pennsylvania.    All other allegations in this paragraph, express or implied, are denied.

138.   Denied.   After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.   All other allegations contained in this paragraph, express or implied, are denied.

139.   Denied.

140.   Denied.   The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.   To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.   All other allegations contained in this paragraph, express or implied, are denied.

141.   Denied.   The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.   To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.   All other allegations contained in this paragraph, express or implied, are denied.

142.   Denied.   The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.   To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

143.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

144.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

145.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or

are otherwise inconsistent with its terms.  All other allegations contained in this paragraph, express or implied, are denied.

146.   Denied.  The allegations in this paragraph also cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

147.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

148.   Denied.   After reasonable investigation, Potter is without sufficient knowledge or information to form a belief as to the truth of the matter(s) asserted in this paragraph and, therefore, same are denied.  All other allegations contained in this paragraph, express or implied, are denied.

149.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

150.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

## COUNT I
### Breach of Contract

151.   Potter incorporates all of his foregoing responses as if fully restated herein.

152.   Denied.  The allegations in this paragraph cite to and purport to rely on a written document, which speaks for itself and to which no response is required.  To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms.   All other allegations contained in this paragraph, express or implied, are denied.

153.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

154.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

155.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

156.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

157.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations. All other allegations contained in this paragraph, express or implied, are denied.

158. Denied. The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied. To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations. All other allegations contained in this paragraph, express or implied, are denied.

159. Denied. The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied. To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations. All other allegations contained in this paragraph, express or implied, are denied.

160. Denied. The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied. To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations. All other allegations contained in this paragraph, express or implied, are denied.

161. Denied. The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied. To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

162.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

163.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

## COUNT II
## Tortious Interference

164.   Potter incorporates all of his foregoing responses as if fully restated herein.

165.   Denied.

166.   Denied.

167.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

168.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

169.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

170.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

171.   Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact,

Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

## COUNT III
### Unjust Enrichment

172.  Denied.  The Court dismissed Count III (unjust enrichment) in its entirety as to all defendants. *See* D.I. 138.  Therefore, this paragraph does not require a response.

173.  Denied.  The Court dismissed Count III (unjust enrichment) in its entirety as to all defendants. *See* D.I. 138.  Therefore, this paragraph does not require a response.

174.  Denied.  The Court dismissed Count III (unjust enrichment) in its entirety as to all defendants. *See* D.I. 138.  Therefore, this paragraph does not require a response.

175.  Denied.  The Court dismissed Count III (unjust enrichment) in its entirety as to all defendants. *See* D.I. 138.  Therefore, this paragraph does not require a response.

## COUNT IV
### Declaratory Relief

176.  Potter incorporates all of his foregoing responses as if fully restated herein.

43

177.    Admitted in part and denied in part.  It is admitted only that Plaintiffs have paid Potter $18,079,098 and an additional $1,905,049 in connection with the APA.  All other allegations in this paragraph, express or implied, are denied

178.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

179.    Denied.  The allegations in this paragraph set forth legal conclusions to which no response is required and, thus, all such allegations are denied.  To the extent that that this paragraph could be construed to contain allegations of fact, Potter denies all such factual allegations.  All other allegations contained in this paragraph, express or implied, are denied.

## REQUEST FOR RELIEF

WHEREFORE, Potter requests that Plaintiffs' Amended and Supplemental Complaint be dismissed with prejudice, and for all other such relief which the Court deems just and equitable.

## AFFIRMATIVE DEFENSES

Potter asserts the following affirmative defenses to Plaintiffs' claims pleaded in the Amended and Supplemental Complaint.  By doing so, Potter does not

App.152

knowingly or intentionally waive any affirmative defense that may now be, or later become, applicable to this case.  Potter reserves the right to supplement the following affirmative defenses during the course of this case, and/or as discovery and investigation continues, up to and including trial.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim or claims upon which relief can be granted or upon which recovery can be awarded.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' purported claims and/or relief sought therein are barred and/or limited, in whole or in part, by the APA and its terms.

## THIRD AFFIRMATIVE DEFENSE

Potter never breached the APA.  Rather, Potter acted consistently with the APA and its terms at all times relevant hereto.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' purported claims are unenforceable, in whole or in part, by public policy.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' purported claims are barred, in whole or in part, by the parol evidence rule.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' purported claims and/or relief sought are barred, in whole or in part, by the economic loss doctrine.

## SEVENTH AFFIRMATIVE DEFENSE

Potter acted in a lawful and justifiable manner at all times relevant hereto.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' purported claims and/or relief sought are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs have not suffered any damages and are otherwise not entitled to the relief they seek.

## TENTH AFFIRMATIVE DEFENSE

To the extent that Plaintiffs have suffered alleged damages, said damages being specifically denied, Plaintiffs have failed to take all necessary and reasonably steps to mitigate such damages.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' alleged damages are too speculative in nature.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' purported declaratory relief claim is barred, in whole or in part, because Plaintiffs' have an adequate remedy at law.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' purported tortious interference claim is barred, in whole or in part, because it is duplicative of Plaintiffs' breach of contract claim.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' purported claims are barred, in whole or in part, because of their own actions and/or inactions.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' purported claims are barred, in whole or in part, by the doctrine of laches.

App.155

**FOX ROTHSCHILD LLP**

*/s/ Seth Niederman*
Seth Niederman (#4588)
Katelyn M. Crawford (#6591)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com
KCrawford@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
RTintner@foxrothschild.com
NBuchter@foxrothschild.com

*Attorneys for Defendants, Adam Potter
and PBIH, LLC*

Dated: April 16, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC, | C.A. No. 19-1600-CFC |
| Plaintiffs, | |
| v. | |
| ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | |
| Defendants. | |

## ANSWER AND CROSS-CLAIM OF DEFENDANT BUSINESS INSURANCE HOLDINGS, INC.

Defendant Business Insurance Holdings, Inc. responds to the Amended and Supplemental Complaint and asserts Cross-Claims against defendant Adam Potter as follows:

1.    Plaintiff, The American Institute for Chartered Property Casualty Underwriters, is a Pennsylvania non-profit corporation with its principal place of business in Pennsylvania.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

2.    Plaintiff, The Institutes, LLC, is a Pennsylvania limited liability company with its principal place of business at 720 Providence Road, Malvern,

Pennsylvania. The Institutes, LLC, is a wholly-owned subsidiary of The American Institute for Chartered Property Casualty Underwriters, which is its sole member.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

3.      Upon information and belief, Defendant Potter is a citizen of the State of Connecticut and resides at 7 Nawthorne Road, Old Greenwich, Connecticut, 06870-2115.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

4.      Upon information and belief, Defendant PBIH is a Florida limited liability company with its principal place of business in Illinois, and its sole member is Defendant Potter.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

5.      Upon information and belief, Defendant BIH is a Florida corporation with its principal place of business in Illinois, and was formerly known as C&E MGMT and Planning, Inc.

**RESPONSE: BIH admits it was incorporated under the laws of the state of Florida, but denies all remaining allegations in this paragraph.**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy, on information and belief, exceeds $75,000.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

7.      This Court also has personal jurisdiction over the defendants because the contract at issue (defined below) contains a choice of law and jurisdiction provision, wherein the parties expressly agreed that any disputes thereunder must be brought in the state and federal courts of Delaware. For this reason, venue is also proper in this Court.

**RESPONSE: Admitted that the Court has personal jurisdiction over BIH.**

8.      The Institutes are a leading provider of professional education activities related to risk management and property-casualty insurance, serving the educational, networking, research, and training needs of risk management and insurance professionals and the general public throughout the country.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

9.      On or about June 1, 2018, The Institutes entered into an Asset Purchase Agreement ("the Purchase Agreement") with Claims Pages, LLC, a Florida limited liability company ("CP"); C&E MGMT and Planning, Inc., a Florida corporation ("C&E"); CLM Group, Inc., a Florida corporation ("CLM"); Defendant Potter; and Moxie HC, LLC, a Florida limited liability company ("Moxie").

**RESPONSE: Admitted**

10.    At the time of the Purchase Agreement, Moxie owned 100% of the membership interests in CP and 100% of the issued and outstanding capital stock of CLM. Defendant Potter owned 100% of the issued and outstanding capital stock of C&E.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

11.    At the time of the Purchase Agreement, upon information and belief, Defendant Potter owned all of the membership interests of Defendant PBIH either directly or through C&E.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

12.    According to the records of the State of Florida, following the sale, on or about June 7, 2018, C&E amended its name to Business Insurance Holdings, Inc. (Defendant BIH).

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

13.    The Purchase Agreement defines The Institutes as "the Buyer" and CP, CLM, and C&E as "the Sellers." The Purchase Agreement further defines the "Selling Parties" to include CLM, CP, and C&E, together with Defendant Potter and Moxie.

4

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself.**

14.    The Institutes paid Defendant Potter $17,329,098 at the time of closing and paid an additional $2,655,049 in accordance with the terms of the Purchase Agreement, as the purchase price for substantially all of the assets of CP, C&E, and CLM.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

15.    At the time of the agreement, CP was engaged in the business of providing reference information for insurance claims adjusters.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

16.    At the time of the agreement, C&E was engaged in the business of identifying and securing conference and event locations, hotel contracts, and outside locations.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

17.    At the time of the agreement, CLM was engaged in the business of operating as a national trade association for the insurance claims and litigation management industries.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph**

18.    After the close of the Purchase Agreement, The Institutes assumed control of all of the operations of CLM and, currently, CLM is only used as a trade name. For ease of reference throughout the Complaint, references to CLM shall refer to the trade name of the organization as operated by The Institutes.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

19.    As more fully described in the Purchase Agreement, "the CLM Business" is defined as follows:

> A professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies. CLM offers the following products and services:
>
> 1.    Claims College creates and teaches courses for the College's eleven specialty schools; issues certificates, and CCP/ACP designations.
>
> 2.    Litigation Management Institute (LMI) is a certification program for Certified Litigation Management Professional (CLMP), and will also be offering a second designation titled LMI2 as an advanced course.
>
> 3.    CLM Tracker tracks and renews adjuster's continuing education and licenses, including an auto-renewal function.
>
> 4.    Universal Claims Certificate (UCC) is scheduled to launch on July 1, 2018. The UCC was developed with the most stringent requirements and regulations for each state. The UCC includes a pre-

certification course and examination.  Mandatory pre-licensing courses and exams will be waived for states that recognize the UCC. Registration and payment of state fees will be managed by a single, centralized system that connects to state systems.

5.    Annual Conference is an annual event for professionals in the claims and litigation management industries, featuring educational sessions and networking.

6.    Specialty Conferences including: Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI, and Chief Claims Officer Summit.

7.    Magazines including (both digital and print formats): CLM Magazine, clmmag, theclm.org, Professional Times Magazine, and Construction Claims Magazine.

8.    Chapter Events Local networking and educational events are held around the country each year. These events are provided at no cost to the attendees and offer a combination of an educational session and a networking event.

9.    Webinars Hosts webinar topics, ranging from Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals.

10.    Training Sessions Hands-on training sessions all approved for adjuster CE credits.

11.    CLM Wiki Repository of valuable claims handling resources organized by state, including claims and legal resources, and construction rip and tear cases.

**RESPONSE: Admitted that the Purchase Agreement includes definitions.  BIH refers the Court to the Purchase Agreement, which speaks for itself.**

20.    As indicated on its website at all times relevant, CLM's Fellows and

Members "represent a wide variety of corporations, insurance companies, third

party administrators, industry service providers and law firms." Its Fellows are "industry professionals who participate in claims and litigation management (corporate counsel; risk, claims and litigation managers; adjusters and service providers; etc.)." Its Members "are outside defense counsel."

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself.**

21.   Accordingly, the CLM community and its target audience include, without limitation, individuals involved in all facets of risk management and insurance, from risk managers to claims handlers to outside counsel to brokers.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 21 of the Complaint or that Paragraph 21 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

22.   The CLM Business as defined in the Purchase Agreement includes various products and services ranging from an annual conference to various other conferences offered throughout the year. The definition of the CLM Business is not limited to any specific topics or segments within the claims and litigation management industries.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 22 of the Complaint or that Paragraph 22 of the**

**Complaint represents an accurate legal interpretation of the Purchase Agreement.**

23.    Collectively, the businesses of CP, C&E, and CLM are defined in the Purchase Agreement as the "Sellers' Businesses."

**RESPONSE:  Admitted  that  the  Purchase  Agreement  includes definitions.  BIH refers the Court to the Purchase Agreement, which speaks for itself.**

24.    Section 6.12(a) of the Purchase Agreement prohibits the Selling Parties, which includes Defendant Potter and C&E (which later became Defendant BIH, and requires them to prevent all "Affiliates" from conducting any activities that are competitive with any of the Sellers' Businesses conducted as of the Closing Date for a period of five years following the Closing Date. (Section 6.12(a) is hereinafter referred to as "the Non-Compete"). "Affiliates" are defined in Appendix A of the Asset Purchase Agreement to mean "with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person."

**RESPONSE: Denied that this paragraph accurately describes the legal effect of the Purchase Agreement.**

25.    In full, Section 6.12(a) provides:

During the period beginning on the Closing Date and ending the fifth (5th) anniversary of the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive

with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on Schedule 6.12  attached hereto (collectively, the "Permitted Activities").

**RESPONSE: Admitted that the Purchase Agreement includes a Section 6.12(a).  BIH refers the Court to the Purchase Agreement and, in particular, Section 6.12(a), which speaks for itself.**

26.    Thus, except as specifically covered by Schedule 6.12, Defendants Potter and BIH, and any of their affiliated companies, are prohibited during the five year Non-Compete Period from engaging in any activities that compete with the CLM Business, with the exception of certain enumerated "Permitted Activities."

**RESPONSE: Denied that this paragraph accurately describes the legal effect of the Purchase Agreement.**

27.    Schedule 6.12 of the Asset Purchase Agreement defines the "Permitted Activities." These activities define the limited activities that may be conducted by the business operations of "Business Insurance Holdings, LLC," which was an Affiliate of Potter and/or C&E, without violating the Non-Compete.

**RESPONSE: Admitted that the Purchase Agreement includes definitions.  BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 27 of the Complaint or that Paragraph 27 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

28.    Schedule 6.12 defines the business of Business Insurance Holdings, LLC as:

a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services. Business Insurance delivers in-depth analysis on new and emerging risks, case studies of successful programs, market intelligence on trends, and guidance on how to capitalize on opportunities and overcome challenges. Business Insurance covers core risk management and insurance areas such as property/casualty insurance, captive insurance and other alternative risk transfer vehicles, and enterprise risk management.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself.**

29.    The Schedule further delineates the specific products and services that Business Insurance provides and that The Institutes agreed would fall within the definition of Permitted Activities. Such products and services include various magazines, websites, webinars, e-newsletters and alerts, a Women to Watch Foundation, and a Diversity and Inclusion Institute.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 29 of the Complaint or that Paragraph 29 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

30.    The Schedule of Permitted Activities also expressly limits the events offered by Business Insurance as of the Closing Date, as follows:

Events and Award Programs as follows:
1.    World Captive Forum
2.    U.S. Insurance Awards
3.    Break Out Awards

4.    Innovation Awards
5.    Risk Management Roundtable: invitation only roundtable meeting of senior-level risk managers to discuss hot topics), and
6.    Women to Watch (EMEA and USA).

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 30 of the Complaint or that Paragraph 30 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

31.    As set forth in Schedule 6.12, Business Insurance's defined business as of the Closing Date does not include conferences or seminars on industry-specific topics, such as cannabis or intellectual property, nor any conferences relating to claims and litigation management, as the parties agreed that Defendants would not engage and would cause their Affiliates not to engage in any such activities during the Non-Compete Period.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 31 of the Complaint or that Paragraph 31 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

32.    To further protect The Institutes, Defendant Potter agreed that Business Insurance would not conduct any activity (such as a conference) enumerated as a "Permitted Activity" if that event was focused on claims and litigation management professionals. Specifically, Schedule 6.12 provides that:

on or after the Closing Date, none of the Selling Parties is permitted to, and each shall cause its Affiliates not to (and the following are excluded from Permitted Activities):

1.  Work/create/develop/offer/promote educational content related to claims and litigation management, unless in partnership with CLM and CP.
2.  Produce live delivery, such as events, networking, seminars, award programs, and conferences targeted to claims and litigation management professionals.
3.  Undertake any involvement with newsletters, publications, emails, communication, sponsorships, research papers with cannot directly be targeted for claims and litigation professionals.
4.  Target or create information that relates to the CP business.

**RESPONSE:  Admitted that the Purchase Agreement includes definitions.  BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 32 of the Complaint or that Paragraph 32 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

33.    Therefore, read together, under the entire Purchase Agreement, Defendants could engage and could permit their Affiliates to engage in a Permitted Activity only if the content did not relate to claims and litigation management and he did not target claims and litigation management professionals. For example, they could still conduct the five conferences listed under "Events and Awards Programs," so long as those conferences did not target or include content related to claims and litigation management professionals.

**RESPONSE:  Admitted that the Purchase Agreement includes definitions.  BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 33 of the Complaint or that Paragraph 33 of the**

Complaint represents an accurate legal interpretation of the Purchase Agreement.

34.     These exceptions for claims and litigation management content and professionals apply only to the Permitted Activities.

**RESPONSE: BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 34 of the Complaint or that Paragraph 34 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

35.     These exceptions do not apply to the main Non-Compete in Section 6.12(a) of the Purchase Agreement.

**RESPONSE: BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 35 of the Complaint or that Paragraph 35 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

36.     Thus, if Defendant Potter provided educational content at a conference on cannabis, for example, while he owned CLM, Section 6.12(a) prohibits him from providing educational content or holding a similar conference after the Closing Data because such activity is not allowed as a delineated Permitted Activity under Schedule 6.12.

**RESPONSE: Admitted that the Purchase Agreement includes definitions.  BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 36 of the Complaint or that Paragraph 36 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

37.    Accordingly, when Schedule 6.12 is read in conjunction with the Non-Compete provision in Section 6.12(a) of the Purchase Agreement, Defendants are prohibited from offering or promoting and prohibited from allowing their Affiliates to offer or promote any educational content that extends beyond the offerings provided by Business Insurance as of the Closing Date and that competes with the CLM Business of offering events and conferences to claims and litigation management professionals.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 37 of the Complaint or that Paragraph 37 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

38.    At some point, Business Insurance Holdings, LLC changed its name to PBIH, LLC and/or PBIH, LLC is the successor-in-interest to Business Insurance Holdings, LLC. In either event, it is equally bound to the terms of the Non-Compete.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

39.    In addition to the Non-Compete, Section 6.12(b) of the Purchase Agreement also contains a covenant against solicitation of Sellers' customers or other business relations (Section 6.12(b) is hereinafter defined as "the Non-Solicitation").

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself.**

40.    Specifically, Section 6.12(b) provides as follows:

With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself.**

41.    As discussed further below, upon information and belief, Defendants have violated the Non-Solicitation by calling upon at least one significant sponsor of the CLM Business for purposes of sponsoring the C&H Conference.

**RESPONSE: BIH lacks sufficient information to admit or deny that it has contacted a "significant sponsor of the CLM Business." Denied that BIH has violated the Non-Solicitation Clause or any other clause of the Purchase Agreement.**

42.    Before entering into the Purchase Agreement, Business Insurance was not in the business of offering and promoting conferences relating to claims and litigation management, and its business was limited to those activities enumerated in Schedule 6.12.

**RESPONSE: It is impossible to determine what is alleged in Paragraph 42 because Paragraph 42 does not specify which entity currently or formerly**

**known as "Business Insurance" it is referring to.  To the extent this paragraph refers to BIH, it is denied.**

43.    To accommodate Defendant Potter's request to continue operating Business Insurance, The Institutes agreed to allow Defendants to engage in those Permitted Activities specifically enumerated on Schedule 6.12 during the Non-Compete Period. Those Permitted Activities do not include conferences that are not delineated specifically.

**RESPONSE:  BIH lacks sufficient information to determine why any other party agreed to any particular language in the Purchase Agreement.  BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 43 of the Complaint or that Paragraph 43 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

44.    Schedule 6.12 further provides that if Defendants choose to engage in any of the enumerated Permitted Activities, they could only do so subject to the strict limitation that they are not related to claims and litigation management and are not directed toward claims and litigation management professionals.

**RESPONSE: BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 44 of the Complaint or that Paragraph 44 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

45.    In the time that has transpired since entering into the Purchase Agreement, it has become clear that Defendant Potter never intended to limit Business Insurance's activities under the terms of the Non-Compete. Rather, it

appears that he is using his knowledge of the industry, and leveraging the experience he gained while he owned Sellers' Businesses, to build Business Insurance as an alternative and competitor to CLM, in direct contravention of the Non-Compete.

**RESPONSE: It is impossible to determine what is alleged in Paragraph 45 because Paragraph 45 does not specify which entity currently or formerly known as "Business Insurance" it is referring to.  To the extent this paragraph refers to BIH, it is denied.**

46.    In or around late July 2019, The Institutes became aware that Defendants were was offering, promoting and producing claims and litigation management conferences that directly violated the Purchase Agreement.

**RESPONSE: Denied that BIH has offered, promoted, or produced any conference that violates the Purchase Agreement.**

47.    Specifically, The Institutes learned that Defendants were offering and actively promoting a Cannabis & Hemp Conference ("the C&H Conference") and an Intellectual Property Conference ("the IP Conference") (collectively, "the BI Conferences"), scheduled for October 24-25, 2019 and October 24, 2019, respectively, at the New York Marriott Marquis, as described more fully on its website (*see* https://www.businessinsurance.com/section/events).

**RESPONSE: Admitted that BIH planned a Cannabis and Hemp Conference and an Intellectual Property Conference for October, 2019.  Denied that either of these planned conferences violated any term of the Purchase Agreement.  Denied that the Intellectual Property Conference was ever held.**

48.     These conferences are not identified as Permitted Activities under Schedule 6.12.

**RESPONSE: BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 48 of the Complaint or that Paragraph 48 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

49.     The C&H Conference was described as a "new conference centered on cannabis insurance and risk management" for insurance and cannabis industry professionals "grappling with complex coverage and liability issues."

**RESPONSE: BIH refers the Court to the promotional materials for the C&H Conference, and denies that Paragraph 49 of the Complaint is a full or accurate representation of the Conference.**

50.     Upon information and belief, as of the filing of this lawsuit in August 2019, the C&H Conference had approximately 200 registrants and on-line registration was closed.

**RESPONSE:   Admitted that approximately 200 people attended the C&H conference in October, 2019.**

51.     The IP Conference was described as an exploration of "business exposure" resulting from intellectual property that aims to educate insurance professionals about "risk management and insurance strategies to protect intellectual property assets" and identify "established and new insurance protections" available to insurance professionals.

**RESPONSE: BIH refers the Court to the promotional materials for the IP Conference, and denies that Paragraph 51 of the Complaint is a full or accurate representation of the planned Conference.   Denied that the IP Conference was ever held.**

52.    The BI Conferences are a clear breach of Defendants' obligations under the Non-Compete, as set forth more fully below.

**RESPONSE: Denied.**

53.    Immediately upon learning of the BI Conferences, The Institutes sent Defendant Potter a letter on July 29, 2019, notifying him that the conferences constituted a breach of the Purchase Agreement and demanding that they be cancelled by July 31, 2019.

**RESPONSE:  Admitted that The Institutes sent defendant Potter a letter on July 29, 2019, which letter speaks for itself.**

54.    Defendants refused to cancel the conferences in dispute.

**RESPONSE:  Admitted that defendant BIH held a cannabis conference in October, 2019.   Denied that defendant BIH held an IP Conference in October, 2019.**

55.    The Institutes sent a follow up letter to Defendant Potter on August 12, 2019, and repeated their demand that he cancel the BI Conferences by August 15, 2019.

**RESPONSE:  Admitted that The Institutes sent defendant Potter a letter on August 12, 2019, which letter speaks for itself.**

56.    Defendant Potter responded to the August 12, 2019 letter on August 20, 2019, in a letter which reaffirmed Defendants' refusal to cancel the conferences and

offered the following purported compromises that did nothing to alleviate their breach of the Non-Compete: (1) Defendants added a statement on the landing page for the C&H Conference, stating that "This Conference was not developed and is not intended for claims and litigation management professionals"; (2) Defendants modified one of the session titles for the C&H Conference to indicate that it does not address claims; and (3) Defendants would not knowingly allow any claims and litigation management professionals to attend the conference.

**RESPONSE: Admitted that defendant Potter sent a letter on August 20, 2019, which letter speaks for itself.**

57.    These minor, semantic revisions did not change the fact that the BI Conferences are in direct contravention of the Non-Compete, as set forth in the following paragraphs.

**RESPONSE: Denied.**

58.    As an initial matter, as set forth above, any conference offered by Defendants that competes with Sellers' Businesses or is not included in the enumerated Permitted Activities is a violation of the Non-Compete.

**RESPONSE: Denied.**

59.    However, Defendants' conduct is even more egregious because the BI Conferences clearly focus on issues that were within the Sellers' Businesses on the Closing Date of the Purchase Agreement.

**RESPONSE:  Denied that either of the planned "BI Conferences" violated any terms of the Purchase Agreement.**

60.    Specifically, the BI Conferences focus on topics that have been addressed by CLM and that relate directly to – and therefore compete directly with – the CLM Business.

**RESPONSE:  Denied that either of the planned "BI Conferences" violated any terms of the Purchase Agreement.**

61.    A core feature of the CLM Business is to provide educational conferences and other live delivery events, for the benefit of its member community, which consists of corporate counsel, risk managers, claims managers, litigation managers, adjusters, brokers, service providers, and defense counsel, as well as other industry professionals.

**RESPONSE: BIH lacks sufficient information to admit or deny the "core features" of the CLM Business.  Denied that either of the planned "BI Conferences" violated any terms of the Purchase Agreement.**

62.    Schedule A to the Purchase Agreement more fully describes the CLM Business as "a professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies."

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that Paragraph 62 of the Complaint represents an accurate legal interpretation of the Purchase Agreement or contains all relevant language from the Purchase Agreement.**

63.    Although Schedule A provides examples of some of CLM's offerings,

it does not limit the CLM Business to any specific topic.

**RESPONSE: Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 63 of the Complaint or that Paragraph 63 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

64.    The broad definition of the CLM Business was intentional, as CLM

offers conferences on a wide range of topics, as indicated by a review of CLM's

conference archives.

**RESPONSE: BIH does not have sufficient information to admit or deny the plaintiff's motives in signing the Purchase Agreement. Admitted that the Purchase Agreement includes definitions. BIH refers the Court to the Purchase Agreement, which speaks for itself. Denied that the Purchase Agreement contains the specific language recited in Paragraph 64 of the Complaint or that Paragraph 64 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

65.    For example, at CLM's 2015 Annual Conference, a panel of CEOs

presented on the current state of the insurance industry, the latest product innovations,

and their views on the future; it was not limited by any specific topic.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

66.     Also in 2015, CLM organized panels to present on trending topics ranging from 3D printing and emerging technologies to the transportation of hazardous commodities, as well as more traditional topics, such as managing risk in contract drafting and health care-related risks and trends.

**RESPONSE:   BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

67.     Accordingly, given the broad nature of the CLM Business and the types of education it offers to its member community, any conference offered by Defendants that relates in any way to the business conducted by the Selling Businesses before the Closing Date violates the Non-Compete.

**RESPONSE: Denied.**

68.     For instance, during a 2015 Medical Legal Summit, CLM developed and presented a session entitled "Marijuana in Workers' Compensation – Medical and Legal Challenges" and described the session as a discussion about "new and evolving difficulties" posed by the "legalization of both medical and recreational marijuana."

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

69.     During its 2016 Annual Conference, CLM offered a session titled "Municipal Law – Clearing the Smoke on Medical Marijuana in Employment," which addressed issues arising with the legalization of marijuana around the country.

App.180

**RESPONSE:  BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

70.    CLM offered at least eight other presentations between 2014 and 2017 addressing cannabis-related topics.

**RESPONSE:  BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

71.    In fact, in May 2018 – just weeks before the Purchase Agreement was finalized – CLM and Business Insurance jointly offered a Workers Compensation Conference which featured a session titled, "Discussions and Trends Around Workers Compensation and Medical Marijuana."

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

72.    Therefore, Defendants were clearly aware that CLM programs regularly and for several years included cannabis-related topics.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

73.    Further, fully aware of Business Insurance's involvement in the May 2018 conference, Defendant Potter voluntarily relinquished the right to continue offering cannabis-related conferences by agreeing to the Non-Compete, for which he was paid handsomely.

**RESPONSE:    Denied that Paragraph 73 is an accurate legal interpretation of the Purchase Agreement.**

74.    The description of the C&H Conference on the Business Insurance website states, "[w]ith medical marijuana legal in 32 states and D.C. and recreational marijuana legal in 12 U.S. jurisdictions," the C&H Conference aims to examine the risks to the insurance industry resulting from the legalization of marijuana. Further, it provides that "the rise of cannabis as an alternative pain medication will have significant implications for the workers compensation sector."

**RESPONSE: BIH refers to the Court to the web site in question, and denies that Paragraph 74 of the Complaint is a full or accurate representation of the planned Conference.**

75.    Accordingly, the C&H Conference is a clear breach of the Non-Compete since the topic of insurance risk related to marijuana had been addressed by CLM prior to the Closing Date.

**RESPONSE: Denied that the C&H Conference violated any term of the Purchase Agreement.**

76.    Before entering into the Purchase Agreement, CLM regularly discussed and presented on "pre-loss" issues at its conferences and other events.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

77.    For example, a 2015 CLM presentation about cybersecurity explained the "steps businesses, law firms and the insurance industry must take to . . . avoid cyber liability."

App.182

**RESPONSE:  BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

78.    Another 2015 CLM presentation at its Retail, Restaurant & Hospitality Conference focused on tips for identifying risks and preventing losses at major entertainment and marketing events.

**RESPONSE:  BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

79.    During the 2016 Annual Conference, CLM again offered a session on avoiding cyber liability called the "Cyber-Attack Preparedness Toolbox."

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

80.    At CLM's 2016 Midwest Conference, it offered a session titled "Whistle While You Work: How to Prevent Activity Leading to Whistleblowing Actions and Protect the Healthcare Organization."

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

81.    Designing programs and presenting on such "pre-loss" risk avoidance and loss prevention techniques evidences CLM's longstanding appreciation of "pre-loss" issues as a core function of every claims and litigation management professional's responsibilities.

**RESPONSE: BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

82.    Therefore, the Non-Compete clearly prohibits Defendants from conducting conferences on so-called "pre-loss" issues.

**RESPONSE: Denied.**

83.    When The Institutes placed Defendants on notice of their breach of the Non-Compete, both of the agendas for the BI Conferences included sessions focused on claims, confirming that the conferences offer claims and litigation management content.

**RESPONSE:  Denied that either of the BI Conferences breached the Purchase Agreement.  Denied that Paragraph 83 is a full or accurate description of the planned agendas for either of the BI Conferences.**

84.    For instance, the C&H Conference originally promoted a session on "Cannabis Claims: A Peek Down the Rabbit Hole" to be delivered by a Claims Manager and Claims Supervisor.

**RESPONSE: The C&H Conference materials speak for themselves. Denied that Paragraph 84 is a full or accurate representation of the C&H Conference.**

85.    Similarly, the IP Conference promoted a session titled "Innovation Track Session: Claims." Another IP Conference session is titled "General Session: Mitigation," which would appear to relate to post-claim and litigation management issues.

**RESPONSE: The planned IP Conference materials speak for themselves. Denied that Paragraph 85 is a full or accurate representation of the planned IPO Conference.  Denied that the IP Conference was ever held.**

86.    In an attempt to hide this obvious breach, and only after The Institutes

placed them on notice, Defendants changed the title of the claims session in the C&H

Conference to: "Cannabis Exposure: A Peek Down the Rabbit Hole." A comparison

of the description of the session as it appeared originally and as it appears now

quickly reveals the transparency of Defendants' attempt to hide their true intentions

and conference content.

**RESPONSE: The C&H Conference materials speak for themselves. Denied that Paragraph 86 is a full or accurate representation of the C&H Conference.  All other allegations in this paragraph are denied.**

87.    As originally promoted, the Cannabis claims session was described on

the Business Insurance website as follows:

> The cannabis claims experience is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis claims professionals will attempt to shed light on the type, frequency and severity of cannabis claims to date, and what these claims will look like in the future.

**RESPONSE: The C&H Conference materials speak for themselves. Denied that Paragraph 87 is a full or accurate representation of the C&H Conference.**

88.    In response to The Institutes' objections, the Cannabis "exposure"

session was changed on the Business Insurance website to:

> The cannabis exposure is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis professionals will

attempt to shed light on the various cannabis exposures to date, and how
these will involve [sic] in the future.

**RESPONSE: The C&H Conference materials speak for themselves.
Denied that Paragraph 88 is a full or accurate representation of the C&H
Conference.**

89.     As is clear, it is essentially the same session, addressing the same topic,

and appealing to the same target audience. Simply substituting "exposure" for

"claim" and referring amorphously to "professionals" does not change the substance

of the presentation.

**RESPONSE: The C&H Conference materials speak for themselves.
Denied that Paragraph 89 is a full or accurate representation of the C&H
Conference.  The remainder of this paragraph is a conclusion of law to which
no response is needed.  To the extent that a response is required, the allegations
in this paragraph are denied.**

90.     Upon information and belief, the majority of registrants for the C&H

Conference signed up before Defendants made these changes to the conference

description.

**RESPONSE: Admitted that 100 or more persons had registered for the
C&H Conference by the end of August, 2019.  BIH lacks sufficient information
to admit or deny the remaining allegations of this paragraph.**

91.     No corresponding change was ever made to the IP Conference sessions,

which still constitutes a blatant violation of the Non-Compete.

**RESPONSE:  Denied.**

92.     Accordingly, the BI Conferences violate the Non-Compete.

App.186

**RESPONSE:  Denied.**

93.    The website for the C&H Conference lists as the event's "founding partner" a major law firm that is also a significant sponsor of the CLM Business, a fact well known to Defendant Potter.

**RESPONSE:  The C&H Conference web site speaks for itself.  BIH lacks sufficient information to admit or deny knowledge of either CLM or defendant Potter.  Denied that any sponsorships if the C&H Conference violated any term of the Purchase Agreement.**

94.    Upon information and belief, Defendant Potter contacted the law firm and solicited and/or induced it to serve as the founding partner of the conference.

**RESPONSE:  This allegation is directed to a defendant other than BIH, and no response is therefore required.  BIH lacks sufficient information to admit or deny Mr. Potter's actions.**

95.    Such contact is a direct violation of the non-solicitation restrictions in Section 6.12(b) of the Purchase Agreement.

**RESPONSE:    Denied that contact with any sponsor of the C&H Conference violated any term of the Purchase Agreement.**

96.    When considered in conjunction with the violations of the Non-Compete as detailed above, it becomes abundantly clear that Defendant Potter is deliberately attempting to compete with the CLM Business through his ownership of Business Insurance.

**RESPONSE:  Denied that BIH has violated any term of the Purchase Agreement.**

97.    In late August 2019, around the time that The Institutes were demanding that Defendants cancel the BI Conferences, Defendant Potter quickly negotiated the sale of BIH to Beacon International Group, Inc. ("Beacon International").

**RESPONSE:  Denied.**

98.    Beacon International is owned and operated by Stephen Acunto, Sr. and Carole Acunto ("the Acuntos").

**RESPONSE:  Denied.**

99.    Negotiations over the sale occurred over a very short period of time and, upon information and belief, Defendant Potter expressed a sense of urgency to complete the deal as quickly as possible.

**RESPONSE:  Denied.**

100.   In exchange for his equity ownership in BIH, Defendant Potter received an initial payment plus a deferred payment.

**RESPONSE:   Admitted that Potter received an initial payment.  All remaining allegations in this paragraph are denied.**

101.   This deferred payment was based on the total revenues collected by BIH as of December 31, 2019.

**RESPONSE:  The sale agreement between Beacon Intercontinental and Potter speaks for itself.**

102.   As a result, Defendant Potter had a strong financial incentive to remain involved with Business Insurance to ensure that it maximized its 2019 revenues and, therefore, his deferred payment.

**RESPONSE:  The sale agreement between Beacon Intercontinental and Potter speaks for itself.  BIH lacks sufficient information to admit or deny Mr. Potter's motivations.**

103.   Not surprisingly, Potter stayed involved with Business Insurance after the sale.

**RESPONSE:   BIH lacks sufficient information to admit or deny this allegation because the term "stayed involved" is vague and ambiguous.  To the extent an answer is required, the allegations in this paragraph are denied.**

104.   As explained in a press release announcing the sale, Beacon International planned to greatly expand the scope of conferences run by Business Insurance.

**RESPONSE:  Denied.  Additionally, the press release in question speaks for itself.**

105.   The press release states that Business Insurance's "***growing annual conference*** schedule draws national audiences to destinations across the country for one and two day programs such as its annual Innovation Awards, Women to Watch Awards (in New York and London), Insurance Diversity and Inclusion, and emerging areas such as the implications of cannabis, wildfires, the impact of AI, and cyber security." (emphasis added).

**RESPONSE:  The press release in question speaks for itself.  BIH denies that Paragraph 105 fully or accurately describes the press release issued in connection with the sale of BIH to Beacon Intercontinental.**

106.   The press release further states "additional conferences and editorial introductions are planned for 2020."

**RESPONSE:  The press release in question speaks for itself.  BIH denies that Paragraph 106 fully or accurately describes the press release issued in connection with the sale of BIH to Beacon Intercontinental.**

107.   Because Defendant Potter had a substantial, continuing financial interest in BIH, he stayed involved with and helped to build the business.

**RESPONSE:   BIH cannot admit or deny this paragraph because the terms "substantial, continuing financial interest" and "stayed involved" are unclear and undefined.  To the extent a response is required, Paragraph 107 is denied.**

108.   Further, the Acuntos and Beacon International did not have significant experience (if any) running conferences for claims and litigation management professionals.

**RESPONSE:  BIH cannot admit or deny this paragraph because the term "significant experience" is unclear and undefined.  To the extent a response is required, Paragraph 108 is denied.**

109.   They therefore must have relied on Defendant Potter's experience and expertise to help them operate and grow this side of the business.

**RESPONSE: Denied.**

110.   One example of Defendant Potter's continued involvement in the company involves a former Business Insurance employee, Jeremy Campbell ("Campbell").

**RESPONSE:  Denied.**

111.   At Business Insurance, Campbell was involved in selling sponsorships to conferences.

**RESPONSE:  Admitted.**

112.   On or around September 24, 2019, Campbell gave notice that he accepted a position with CLM and would be leaving Business Insurance in two weeks.

**RESPONSE:  Admitted that Mr. Campbell gave notice to BIH that he would be taking a position with CLM.  All remaining allegations in this paragraph are denied.**

113.   Defendant Potter actively tried to convince Campbell to stay with Business Insurance.

**RESPONSE:   BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

114.   First, Defendant Potter told Campbell that "we" (Potter and Business Insurance) were developing more events and that Campbell would have a lot more selling opportunities with Business Insurance moving forward.

**RESPONSE:   BIH lacks sufficient knowledge to admit or deny the allegations in this paragraph.**

115.   On or about September 30, 2019, after it became clear that Campbell was leaving the company, Business Insurance attempted to enforce a non-compete agreement against him. This is a direct admission that Defendants considered CLM to be a competing organization.

**RESPONSE:  Denied.**

116.   In fact, a Business Insurance employee advised Campbell that CLM would be viewed as a competitor of Business Insurance going forward and that Business Insurance intended to add conferences and other events to its agenda.

**RESPONSE:   BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

117.   Upon information and belief, after the sale, Defendant Potter was also involved in obtaining a keynote speaker for Business Insurance's "Women to Watch" conference, and he developed a new compensation plan for Business Insurance.

**RESPONSE:  BIH lacks sufficient information to admit or deny Potter's involvement in obtaining speakers for conferences.   The remainder of this Paragraph is denied.**

118.   Therefore, despite having sold BIH to Beacon International, Defendant Potter remained actively engaged in activities that competed directly with CLM.

**RESPONSE:  Denied.**

119.   Defendant Potter's continuing involvement with Business Insurance is

a direct violation of the Non-Compete.

**RESPONSE:  Denied that Mr. Potter had any continuing involvement with BIH that violated, directly or indirectly, the Non-Compete, or that BIH was involved with any action that violated, directly or indirectly, the Non-Compete.**

120.   In addition, by providing any assistance to Business Insurance,

Defendant Potter has directly violated the Non-Compete.

**RESPONSE:  Denied that Paragraph 120 is an accurate interpretation of the Purchase Agreement.**

121.   Defendant Potter leveraged his relationship with Beacon International

to assist in the formation of a new entity to compete with CLM.

**RESPONSE:  Admitted that Mr. Potter asked Mr. Acunto to speak to Sydney Posner about the creation of The Claims Xchange, Inc.  The remaining allegations in this paragraph are denied.**

122.   Through Defendant Potter, Business Insurance has become connected

with a direct competitor, The Claims Xchange, Inc. ("ClaimsX").

**RESPONSE:  Admitted that arms-length commercial interactions have taken place between BIH and ClaimsX.  The remaining allegations in this paragraph are denied.**

123.   ClaimsX competes directly against CLM.

**RESPONSE:   BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

App.193

124.   ClaimsX's mission statement states: "The claimsXchange connects innovative and collaborative professionals who share a passion for advancing the claims industry."

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph**.

125.   ClaimsX's website indicates that its membership includes claims professionals, risk professionals, corporate counsel, defense attorneys, and service providers.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

126.   In addition, ClaimsX scheduled events throughout 2020 and beyond that are targeted to professionals in the same space as CLM's conferences.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

127.   Based on its Mission Statement and conference schedule, it is clear that ClaimsX is direct competitor to CLM.

**RESPONSE:  BIH lacks sufficient information to admit or deny this allegation.**

128.   ClaimsX was started by Defendant Potter's sister, Sydney Posner ("Posner").

**RESPONSE:  Admitted.**

129. Upon information and belief, Defendant Potter connected ClaimsX with Business Insurance.

**RESPONSE: Admitted that Potter introduced Sydney Posner to Stephen Acunto. The remaining allegations in this paragraph are denied.**

130. Even though the Acuntos did not know, and had no prior affiliation with Posner, they initially joined the ClaimsX advisory board (although they are no longer on the board).

**RESPONSE: Admitted that Stephen Acunto Sr. was initially a member of the ClaimsX Advisory Board for a very abbreviated period. Admitted that the Acuntos have no current affiliation with ClaimsX. The remaining allegations in this paragraph are denied.**

131. When it was first created, ClaimsX's website proclaimed that it was it was "powered" by CINN (part of the Beacon International Group) and was "promoted" by Business Insurance.

**RESPONSE: BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

132. ClaimsX's current website indicates that Business Insurance is a "strategic partner."

**RESPONSE: BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

133. While ClaimsX was building this alliance with Beacon International-owned entities, Potter was still connected with BIH and working to insure that he

could secure a financial windfall under the terms of the agreement of sale with the

Acuntos.

**RESPONSE: BIH lacks sufficient information to admit or deny Potter's activities or motives. Denied that any interaction between BIH and ClaimsX violated any term of the Purchase Agreement and all remaining allegations in this paragraph are denied.**

134.    Posner formerly worked for CLM, and was terminated by CLM on

September 20, 2019 for misconduct.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

135.    Upon information and belief, before CLM terminated Posner, she began

working on forming a new business to compete with CLM. The Institutes believe and

therefore aver that Defendant Potter worked with her to help create this new venture.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

136.    After her termination for misconduct, Posner improperly accessed a

copy of CLM's entire file-share database containing hundreds of files containing

CLM's proprietary, confidential, and trade-secret information.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

137.    Her misconduct is being addressed in another lawsuit pending in the

U.S. District Court for the Eastern District of Pennsylvania, captioned *The American*

*Institute For Chartered Property Casualty Underwriters d/b/a The Institutes, et al.*

*v. Sydney Posner, et al.*, Civil Action No. 2:19-cv-05369-NIQA.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

138.  The Institutes believe and therefore aver that Posner's actions were deliberate and that she copied these documents for the purpose of setting up an organization that would compete directly with CLM, and that she would do so with the advice and assistance of Defendant Potter. Posner solicited several clients, vendors, and/or members of the CLM to join her "Advisory Board" and, upon information and belief, continues to solicit more.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

139.  In this sense, it is clear that Defendant Potter has his proverbial fingerprints all over his sister's efforts to compete with CLM.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

140.  Defendant Potter's activities in helping to create, promote, support and otherwise further the interests of ClaimsX as a direct competitor to CLM is a direct violation of the Non-Compete.

**RESPONSE:  BIH lacks sufficient information to admit or deny the allegations in this paragraph.**

App.197

141.    Defendant Potter, through his association with Business Insurance and

his direct assistance with ClaimsX, is actively competing against CLM.

**RESPONSE:  Denied that Potter has any involvement with BIH.  BIH
lacks sufficient information to admit or deny the remaining allegations in this
paragraph.**

142.    This activity is all the more egregious and a direct violation of the Non-

Compete given that, upon information and belief, Defendant Potter remained

actively involved in the day-to-day operations of Business Insurance and has assisted

Business Insurance in developing the programming that competes with CLM.

**RESPONSE:  Denied that BIH is engaged in any activity that violates any
term of the Purchase Agreement.  Denied that Potter has any involvement with
BIH.  BIH lacks sufficient information to admit or deny Potter's activities.**

143.    Potter's involvement with Business Insurance and ClaimsX is a direct

violation of the Non-Compete.

**RESPONSE:  Denied that BIH is engaged in any activity that violates any
term of the Purchase Agreement.  Denied that Potter has any involvement with
BIH.  BIH lacks sufficient information to admit or deny Potter's activities.**

144.    Section 6.12(d) of the Purchase Agreement provides:

Each Selling Party [including Defendant Potter] acknowledges and
agrees that the provisions of this Section 6.12 are reasonable and
necessary to protect the legitimate business interests of [The Institutes]
and its investment in the Acquired Assets. Each Selling Party shall not
contest that [The Institutes'] remedies at law for any breach or threat of
breach by any Selling Party or any of its affiliates of the provisions of
this Section 6.12 will be inadequate, and that [The Institutes] shall be
entitled to seek an injunction or injunctions to prevent breaches of the
provisions of this Section 6.12, without proving actual damages, and to

enforce specifically such terms and provisions, in addition to any other remedy to which [The Institutes] may be entitled at law or equity. . . .

**RESPONSE:  The Purchase Agreement speaks for itself.  Denied that Paragraph 144 is a full recitation of the Purchase Agreement.**

145.   Section 9.2(a) of the Purchase Agreement gives The Institutes the right to indemnification from Defendants, including the recovery of any and all Losses, such as attorneys' fees and any expenses and costs incurred by The Institutes in connection with enforcing their rights thereunder.

**RESPONSE:  The Purchase Agreement speaks for itself.  Denied that Paragraph 145 is a full or accurate recitation of the Purchase Agreement.**

146.   Section 10.3 of the Purchase Agreement provides that the Purchase Agreement "shall be governed by and construed in accordance with the laws of the State of Delaware, and the Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts located in New Castle County, Delaware for resolution of any disputes hereunder . . . ."

**RESPONSE:  The Purchase Agreement speaks for itself.  Denied that Paragraph 146 is a full recitation of the Purchase Agreement.**

147.   As a direct result of Defendants' conduct in violation of the restrictive covenants, The Institutes face future losses of customers and sponsors, loss of good will, loss of revenues, and dilution and confusion in the marketplace.

**RESPONSE:  Denied that BIH has violated any term of the Purchase Agreement.  Denied that plaintiffs have suffered any legally recognized losses as a result of any acts by BIH.**

148.    Further, The Institutes have incurred costs and retained counsel to investigate and remedy Defendants' conduct.

**RESPONSE:  Denied that BIH has violated any term of the Purchase Agreement.  Denied that plaintiffs have suffered any legally recognized losses as a result of any acts by BIH.**

149.    Defendants' actions reflect their blatant disregard for contractual and legal obligations and evinces intent to continue with these violations.

**RESPONSE:  Denied as to BIH.**

150.    The Institutes will suffer immediate and irreparable harm if Defendants' actions are not temporarily, preliminarily, and/or permanently enjoined.

**RESPONSE:  Denied as to BIH.  Denied that plaintiffs have suffered any legally recognized losses as a result of any acts by BIH.**

## COUNT I
### Breach of Contract

151.    The Institutes repeat, reallege, and incorporate by reference the prior allegations of this Amended Complaint, as if fully set forth herein.

**RESPONSE:  BIH incorporates by reference all of its previous responses.**

152.    The Institutes and Defendant Potter entered into the Purchase Agreement with the express understanding that The Institutes, through CLM, would continue to offer conferences directed towards claims and litigation management professionals, and that Defendants would not compete with the CLM businesses for a period of five years after closing.

App.200

**RESPONSE: BIH refers the Court to the Purchase Agreement, which speaks for itself.  Denied that the Purchase Agreement contains the specific language recited in Paragraph 152 of the Complaint or that Paragraph 152 of the Complaint represents an accurate legal interpretation of the Purchase Agreement.**

153.   In organizing and promoting the BI Conferences, Defendants have breached the restrictive covenants of the Purchase Agreement.

**RESPONSE:  Denied as to BIH.**

154.   Defendant Potter's actions on behalf of, and continued involvement with, Business Insurance, constitute of a violation of the Non-Compete.

**RESPONSE:  Denied that defendant Potter took any actions on behalf of BIH after his sale of the company.  The remaining allegations of this paragraph are denied.**

155.   The involvement of Business Insurance, as an affiliate of Defendant Potter, in the operations of ClaimsX constitute a violation of the Non-Compete.

**RESPONSE:  Denied that BIH is an affiliate of defendant Potter.  Denied that any actions of BIH in connection with ClaimsX have violated the Purchase Agreement.**

156.   Defendant BIH is contractually bound in its own right to adhere to the terms of the Purchase Agreement, especially given that it was formerly known as C&E, and a signatory to the agreement. Therefore, all of the actions of BIH in furtherance of competition with CLM constitute breaches of contract.

**RESPONSE:   Admitted that the Court has determined that BIH is subject to the non-compete terms of the Purchase Agreement.  The remaining allegations of this paragraph are denied.**

157.    As the direct and proximate result of Defendants' conduct as aforesaid, The Institutes have suffered and, if Defendants' conduct is not stopped, will continue to suffer, immediate and irreparable injury and significant damages in an amount to be proven at trial, which upon information and belief will be far in excess of $75,000.

**RESPONSE:  Denied that BIH has violated any term of the Purchase Agreement.  Denied that plaintiffs have suffered any legally recognized loss as a result of any action by BIH.**

158.    Because The Institutes' remedy at law is inadequate, The Institutes seek, in addition to damages, preliminary, and permanent injunctive relief to recover and protect their legitimate business interests.

**RESPONSE:  Denied that plaintiffs are entitled to any legal or equitable remedy.**

159.    The Institutes are further entitled to injunctive relief against Defendants and all those acting in concert or participation with them, remedying their past improper conduct, and preventing such conduct in the future.

**RESPONSE:  Denied that plaintiffs are entitled to any legal or equitable remedy.**

160.    The Institutes will suffer immediate and irreparable harm if the requested injunctive relief is not granted.

**RESPONSE:  Denied as to BIH.**

App.202

161.   The Institutes' business is reliant on their business reputation and ability to maintain and grow their member community in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

**RESPONSE:  Denied that the plaintiffs will suffer any legally recognized harm absent injunctive relief.  BIH lacks sufficient information to admit or deny the remainder of Paragraph 161.**

162.   The Institutes have a substantial likelihood of success on the merits because of Defendants' blatant and willful violation of the restrictive covenants of the Purchase Agreement.

**RESPONSE:  Denied as to BIH.**

163.   The Institutes have been damaged by all of the foregoing, and are entitled to their damages, in an amount to be determined at trial.

**RESPONSE:  Denied as to BIH.  Denied that plaintiffs have suffered any legally recognized losses as a result of any acts by BIH.**

## COUNT II
### Tortious Interference

164.   The Institutes repeat, reallege, and incorporate by reference the prior allegations of this Amended Complaint, as if fully set forth herein.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

165.   Defendants were and are aware of the business relationships between The Institutes and their customers and sponsors, and in particular, the strong

App.203

relationship that CLM has developed with its constituent claims and litigation

management professionals.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

166.   The Institutes have a reasonable expectation that CLM's business

relationships will continue and that they will continue to be the leading provider of

educational services to their target market.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

167.   By virtue of their attempt to offer conferences that directly compete

with CLM's past, current, and future offerings, Defendants have knowingly and

intentionally interfered with CLM's existing and prospective contractual and

business relationships.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

168.   By developing conferences and assisting in the operations of ClaimsX,

Defendants have knowingly and intentionally interfered with CLM's existing and

prospective contractual and business relationships.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

169.   The interference by Defendants with CLM's existing and prospective

business relationships was and is not legally justified.

**RESPONSE:  No response is required to this allegation as it has been
dismissed by the Court.  Insofar as a response is required, all allegations of this
paragraph are denied.**

170.   The interference with CLM's existing and prospective business and

contractual relationships is continuing and intentional and has proximately resulted

and/or will proximately result in damage to CLM, including the loss of its customers

and sponsors, sales income, and damage to business reputation and good will and

other damages, which up on information and belief will be far in excess of $75,000.

**RESPONSE:  No response is required to this allegation as it has been
dismissed by the Court.  Insofar as a response is required, all allegations of this
paragraph are denied.**

171.   Unless Defendants are restrained and enjoined from unlawfully

interfering with CLM's business relationships, Plaintiffs will suffer immediate and

irreparable harm for which there is no adequate remedy at law.

**RESPONSE:  No response is required to this allegation as it has been
dismissed by the Court.  Insofar as a response is required, all allegations of this
paragraph are denied.**

**COUNT III**
**Unjust Enrichment**

172.   The Institutes repeat, reallege, and incorporate by reference the prior

allegations of this Amended Complaint, as if fully set forth herein.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

173.  By using their knowledge of the claims and litigation management industry, and particularly the knowledge gained by Defendant Potter through his association with the Sellers' Businesses, Defendants have unfairly gained a competitive advantage over Plaintiffs.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

174.  As a result of their conduct, Defendants have been unjustly enriched at the expense of Plaintiffs.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

175.  As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered and will continue to suffer damages.

**RESPONSE:  No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

## COUNT IV
### Declaratory Relief

176.  The Institutes repeat, reallege, and incorporate by reference the prior allegations of this Amended Complaint, as if fully set forth herein.

App.206

**RESPONSE:   No response is required to this allegation as it is not directed to defendant BIH.  Insofar as a response is required, all allegations of this paragraph are denied.**

177.   The Institutes paid Defendant Potter $19,234,147 in accordance with the terms of the Purchase Agreement.

**RESPONSE:   No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

178.   However, as all parties to the Purchase Agreement have an implied duty of good faith and fair dealing, the payments to Defendant Potter were not warranted while he has been in breach of the restrictive covenants of the Purchase Agreement.

**RESPONSE:   No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

179.   Accordingly, as a result of Defendant Potter's violation of the restrictive covenants, The Institutes seek a declaration that Defendant Potter has violated the terms of the Agreement and that they are entitled to an offset of the sums paid under the Agreement in an amount equal to the damages caused by Defendant Potter's conduct, which upon information and belief will be far in excess of $75,000.

**RESPONSE:   No response is required to this allegation as it has been dismissed by the Court.  Insofar as a response is required, all allegations of this paragraph are denied.**

## <u>FIRST AFFIRMATIVE DEFENSE</u>

Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by principles of waiver.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate their damages.

## FOURTH AFFIRMATIVE DEFENSE

Any and all affirmative defenses which may be asserted during discovery of this case are hereby asserted and incorporated herein.

## CROSS-CLAIM NO. 1 AGAINST DEFENDANT POTTER
### (Indemnification)

1.      BIH denies that it is liable to the Plaintiffs in any respect.  However, in the event that it is found liable to the Plaintiffs, BIH cross-claims against defendant Potter on the grounds that he has contractually indemnified BIH with respect to all disputes arising from the BI Conferences.

2.      On September 1, 2019, Potter sold BIH to Beacon Intercontinental Group.  In connection with that sale, Potter indemnified Beacon Intercontinental Group and its Affiliates with respect to any disputes arising from the BI Conferences.

3.      By virtue of the September 1, 2019 sale agreement between Potter and Beacon Intercontinental, BIH became an Affiliate of Beacon Intercontinental and is therefore entitled to indemnification under the sale agreement.  (The September 1, 2019 sale agreement between Potter and Beacon Intercontinental is referred to herein

App.208

as the "Sale Agreement" in order to distinguish it from the Purchase Agreement between The Plaintiffs and entities owned by Potter.)

4.    Independently of its status as an Affiliate, because Beacon Intercontinental Group owns BIH as a result of the September 1 2019 sale, BIH is a third party beneficiary of the sale agreement between Beacon Intercontinental Group and Potter.

5.    Potter has a contractual duty to indemnify BIH for any costs, expenses, or damages associated with this litigation or the acts leading to this litigation.

## CROSS-CLAIM NO. 2 AGAINST DEFENDANT POTTER
### (Negligent Management and Operation of BIH by Potter)

6.    BIH reincorporates the allegations from its prior cross-claim and reasserts them.

7.    Prior to his sale of BIH to Beacon Intercontinental, Potter was the owner of BIH and owed a duty of care to BIH in the exercise of his responsibilities.

8.    Potter made specific representations to the Plaintiffs with respect to steps he would take to ensure that the BI conferences complied with the Purchase Agreement.

9.    To the extent that Potter failed to cause BIH to take all of the steps that he indicated he would take to ensure that the C&H conference complied with the Purchase Agreement, he negligently failed to fulfill his duty of care with respect to BIH.

App.209

10.    To the extent that Potter's failure to take all of the steps that he indicated he would take to ensure that the C&H conference complied with the Purchase Agreement, BIH has been injured by the costs involved in its dispute with the Plaintiffs and this litigation.

## CROSS-CLAIM NO. 3 AGAINST DEFENDANT POTTER
### (Fraud)

11.    BIH reincorporates the allegations from its prior cross-claims and reasserts them.

12.    BIH denies that it is liable to the Plaintiffs in any respect.  However, in the event that it is found liable to the Plaintiffs, BIH cross-claims against defendant Potter on the grounds that he fraudulently induced BIH to (a) continue with the C&H Conference and (b) permit its directors, officers, and/or employees to have involvement with ClaimsX.

13.    Potter repeatedly represented to the Acuntos, both before and after Beacon Intercontinental's purchase of BIH, that the non-compete provision of the Purchase Agreement with the Plaintiffs applied only to Potter personally, not to BIH, the Acuntos, or Beacon Intercontinental.  Potter made this representation in writing in his sale agreement with Beacon Intercontinental Group, and repeated it in conversations with Stephen Acunto Sr. after this litigation was filed.

14.    Potter also represented to BIH after he sold it to Beacon Intercontinental (a) that he had taken steps to ensure that the C&H conference complied with the non-

compete provision of the Purchase Agreement even though the non-compete did not apply to BIH, and (b) that directors and officers of BIH were permitted to be involved with the creation of ClaimsX under the provisions of the Purchase Agreement.

15.   To the extent that Potter did not properly represent the terms of the Purchase Agreement, and to the extent that he misrepresented steps he had taken to ensure that the C&H conference complied with the non-compete provision of the Purchase Agreement, Potter knew that his representations were not accurate, and intended for BIH to rely on his representations in holding the C&H conference and working with ClaimsX.

16.   To the extent that BIH is subject to any damages as a result of any actions taken with respect to the BI Conferences or ClaimsX, those damages are direct result of its reliance on Potter's representations.

### CROSS-CLAIM NO. 4 AGAINST DEFENDANT POTTER
### (Negligent Misrepresentation)

17.   BIH reincorporates the allegations from its prior cross-claims and reasserts them.

18.   BIH denies that it is liable to the Plaintiffs in any respect.  However, in the event that it is found liable to the Plaintiffs, BIH cross-claims against defendant Potter on the grounds that he negligently misrepresented BIH's legal responsibilities to BIH following his sale of BIH to Beacon Intercontinental.

19.    Potter repeatedly represented to the Acuntos after Beacon Intercontinental's purchase of BIH that the non-compete provision of the Purchase Agreement with the Plaintiffs applied only to Potter personally, not to BIH, the Acuntos, or Beacon Intercontinental.

20.    Potter also represented to BIH after he sold BIH to Beacon Intercontinental (a) that he had taken steps to ensure that the C&H conference complied with the non-compete provision of the Purchase Agreement even though the non-compete did not apply to BIH, and (b) that directors and officers of BIH were permitted to be involved with the creation of ClaimsX under the provisions of the Purchase Agreement.

21.    Following his sale of BIH to Beacon Intercontinental, Potter stood in a position of trust with BIH with respect to the meaning of the Purchase Agreement, as he had personally negotiated the Purchase Agreement and had been the point of contact with the Plaintiffs regarding any issues or disputes regarding the Purchase Agreement prior to his sale of BIH.

22.    To the extent that Potter did not properly represent the terms of the Purchase Agreement, and to the extent that he misrepresented steps he had taken to ensure that the C&H conference complied with the non-compete provision of the Purchase Agreement, Potter intended for BIH to rely on his representations in

holding the C&H conference and working with ClaimsX, and failed to exercise reasonable care in ensuring that his representations were accurate.

23.    To the extent that BIH is subject to any damages as a result of any actions taken with respect to the BI Conferences or ClaimsX, those damages are direct result of its reliance on Potter's representations.

## CROSS-CLAIM NO. 5 AGAINST DEFENDANT POTTER
### (Tortious Interference with Contractual Relationship)

24.    BIH reincorporates the allegations from its prior cross-claims and reasserts them.

25.    BIH denies that it is liable to the Plaintiffs in any respect.  However, in the event that it is found liable to the Plaintiffs with respect to any matters involving ClaimsX, BIH cross-claims against defendant Potter on the grounds that Potter knowingly and tortiously interfered for the benefit of his sister with an existing business relationship between BIH and the Plaintiffs by providing BIH with incorrect information regarding BIH's legal obligations with respect to ClaimsX, thereby damaging BIH's business relationship with the Plaintiffs.

26.    Potter directly requested that the Acuntos assist Sydney Posner with the creation of ClaimsX, and specifically told the Acuntos that providing such assistance was consistent with the Purchase Agreement.

27.    To the extent that Potter's advice to and requests of the Acuntos caused them to take any actions in violation of the Purchase Agreement, Potter's advice to and requests of the Acuntos were wrongful.

28.    To the degree that BIH is considered to be bound by the Purchase Agreement, BIH has an ongoing contractual relationship with the Plaintiffs for the duration of any terms in that Purchase Agreement.

29.    To the degree that any actions taken by BIH violated the Purchase Agreement and have damaged the contractual relationship between the Plaintiffs and BIH, Potter caused that damage through his advice and requests and is liable for it.

WHEREFORE, BIH demands judgment in its favor and, to the extent applicable, against Co-Defendant Adam Potter, along with attorney's fees and costs of this action and any other relief the Court deems just and proper.

                                                                 **DLA PIPER LLP (US)**

**OF COUNSEL:**                                          */s/ Draft*
Christopher Oprison (admitted *pro hac vice*)    Matthew P. Denn (DE Bar No. 2985)
DLA PIPER LLP (US)                              1201 North Market Street, Suite 2100
200 South Biscayne Boulevard, Suite 2500        Wilmington, DE 19801-1147
Miami, Florida 33131                            Telephone: 302.468.5700
Telephone: 305.423.8522                         Facsimile: 302.394.2341
Facsimile: 305.675.6366                         matthew.denn@dlapiper.com
chris.oprison@dlapiper.com

                                                *Attorneys for Defendant Business*
                                                *Insurance Holdings, Inc.*

DATED: April 16, 2021

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC.,<br><br>        Defendants. | Civil Action No. 1:19-1600-CFC |

## <u>STIPULATED DISMISSAL WITHOUT PREJUDICE OF CROSS-CLAIM NO. 1</u>

It is hereby stipulated by and between Defendant Adam Potter ("Potter") and Defendant Business Insurance Holdings, Inc. ("BIH"), through their undersigned counsel, and subject to approval of the Court, that:

1.     Cross-Claim #1 asserted by BIH against Potter (D.I. 146, pp. 53-53) is dismissed without prejudice from the above-captioned matter, and shall be litigated in the action captioned *Adam Potter v. Beacon Intercontinental Group, Inc., et al.*, Case No. 1:20-cv-04599 (JGK)(OTW) currently pending in the United States District Court for the Southern District of New York, along with all other issues raised in that action.

2.     Neither BIH nor Potter waives any rights or defenses by agreeing to this stipulation – any and all such rights or defenses held by BIH or Potter being fully and completely reserved.

**[Signatures on Next Page]**

1

Dated: December 7, 2021

**FOX ROTHSCHILD LLP**

*/s/ Seth A. Niederman*
Seth A. Niederman (DE Bar No. 4588)
Katelyn M. Crawford (DE Bar No. 6591)
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE 19899-2323
302.622.4238
sniederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (admitted *pro hac vice*)
Nathan M. Buchter (admitted *pro hac vice*)
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
rtinter@foxrothschild.com
nbuchter@foxrothschild.com

*Attorneys for Defendant Adam Potter*

**DLA PIPER LLP (US)**

*/s/ Matthew P. Denn*
Matthew P. Denn (DE Bar No. 2985)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
302.468.5700
302.394.2341 (Fax)
matthew.denn@dlapiper.com

**OF COUNSEL:**

Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
305.423.8522
305.675.6366 (Fax)
chris.oprison@dlapiper.com

*Attorneys for Defendant Business Insurance
Holdings, Inc.*

SO ORDERED this _____ day of _____ 2021.

_____
The Honorable Colm F. Connolly
United States District Court Judge

App.216

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC, | |
| Plaintiffs, | Civil Action No. 1:19-1600-CFC |
| v. | |
| ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | |
| Defendants. | |

## STIPULATED DISMISSAL WITHOUT PREJUDICE OF CROSS-CLAIM NO. 1

It is hereby stipulated by and between Defendant Adam Potter ("Potter") and Defendant Business Insurance Holdings, Inc. ("BIH"), through their undersigned counsel, and subject to approval of the Court, that:

1.      Cross-Claim #1 asserted by BIH against Potter (D.I. 146, pp. 53-53) is dismissed without prejudice from the above-captioned matter, and shall be litigated in the action captioned *Adam Potter v. Beacon Intercontinental Group, Inc., et al.*, Case No. 1:20-cv-04599 (JGK)(OTW) currently pending in the United States District Court for the Southern District of New York, along with all other issues raised in that action.

2.      Neither BIH nor Potter waives any rights or defenses by agreeing to this stipulation – any and all such rights or defenses held by BIH or Potter being fully and completely reserved.


**[Signatures on Next Page]**


1

App.217

Dated: December 7, 2021

**FOX ROTHSCHILD LLP**

*/s/ Seth A. Niederman*
Seth A. Niederman (DE Bar No. 4588)
Katelyn M. Crawford (DE Bar No. 6591)
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE 19899-2323
302.622.4238
sniederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (admitted *pro hac vice*)
Nathan M. Buchter (admitted *pro hac vice*)
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
rtinter@foxrothschild.com
nbuchter@foxrothschild.com

*Attorneys for Defendant Adam Potter*

**DLA PIPER LLP (US)**

*/s/ Matthew P. Denn*
Matthew P. Denn (DE Bar No. 2985)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
302.468.5700
302.394.2341 (Fax)
matthew.denn@dlapiper.com

**OF COUNSEL:**

Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
305.423.8522
305.675.6366 (Fax)
chris.oprison@dlapiper.com

*Attorneys for Defendant Business Insurance Holdings, Inc.*

SO ORDERED this 7th day of December 2021.

_____
The Honorable Colm F. Connolly
United States District Court Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

              Plaintiffs,

          v.

ADAM POTTER, PBIH, LLC, and
BUSINESS INSURANCE HOLDINGS,
INC.,

              Defendants.

Civil Action No. 19-1600-RGA

---

## MEMORANDUM OPINION

Matthew P. Denn, DLA PIPER LLP, Wilmington, DE; Christopher Oprison, DLA PIPER LLP, Miami, FL,

     *Counsel for Cross-Claim Plaintiff Business Insurance Holdings, Inc.*

Seth Niederman, Katelyn M. Crawford, FOX ROTHSCHILD LLP, Wilmington, DE; Robert S. Tintner, Nathan M. Buchter, FOX ROTHSCHILD LLP, Philadelphia, PA,

     *Counsel for Cross-Claim Defendant Adam Potter.*

January 4, 2022

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Plaintiffs The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC (collectively, "Plaintiffs") filed this breach of contract case against Defendants Adam Potter, Business Insurance Holdings, Inc. ("BIH"), and PBIH, LLC (collectively, "Defendants"). D.I. 48. BIH asserted five cross-claims against Potter. D.I. 146 at 52–58. Pending before me is Potter's motion to dismiss Cross-Claim Count V (tortious interference with contractual relationship). D.I. 157. The parties have stipulated to dismiss the other cross-claim that was at issue in the motion to dismiss. D.I. 221.

## I.   BACKGROUND

In considering Potter's motion, I accept as true all factual allegations in BIH's Answer and Cross-Claim, D.I. 146, and view those facts in the light most favorable to BIH as the claimant. *See Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003).

In June 2018, Plaintiffs entered into an Asset Purchase Agreement with BIH (known as C&E MGMT and Planning, Inc. at that time) and Potter, the then-owner of C&E. D.I. 48 at ¶¶ 9, 10. Plaintiffs allege that Defendants violated the non-compete and non-solicitation provisions of the Asset Purchase Agreement. *Id.* at ¶¶ 151–179. BIH alleges in its Cross-Claim Count V for Tortious Interference with Contractual Relationship that Potter interfered with a business relationship between BIH and Plaintiffs when Potter provided "incorrect information" to BIH "regarding BIH's legal obligations." D.I. 146 at 57 ¶ 25. Specifically, BIH alleges that Potter represented to BIH that its directors and officers could be involved in the creation of ClaimsX under the Asset Purchase Agreement. *Id.* at 54–56 ¶¶ 14, 20. BIH also alleges that Potter asked the Acuntos (officers of the corporation that bought BIH) to assist his sister, Sydney Posner, with

the creation of ClaimsX. *Id.* at 57 ¶ 26. Thus, Potter is liable for any damage his actions caused to the business relationship between Plaintiffs and BIH. *Id.* at 58 ¶ 29.

## II.    LEGAL STANDARD

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but the complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). When deciding a Rule 12(b)(6) motion, the Court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    DISCUSSION

"Delaware courts follow Section 766 of the Restatement (Second) of Torts in assessing a tortious interference claim. To prevail, [the claimant] must show that: (1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury." *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (cleaned up). Potter argues that BIH has failed to state a claim because BIH must allege that

2

Potter caused or induced a third person to breach a contract that the third person had with BIH,

but, instead, BIH alleged that Potter caused BIH to violate its obligations owed to Plaintiffs. D.I.

158 at 17–18. BIH responds that its claim arises under Section 766A. D.I. 166 at 7. This

section provides:

> One who intentionally and improperly interferes with the performance of a contract
> (except a contract to marry) between another and a third person, by preventing the other
> from performing the contract or causing his performance to be more expensive or
> burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A (1979).

Potter argues that Delaware courts do not recognize Section 766A claims. D.I. 169 at 7.

Although the Delaware Court of Chancery did acknowledge, "The cause of action outlined in

Section 766A is less widely adopted, and has never formally been recognized by Delaware

courts," it did not outright reject Section 766A. *Chapter 7 Tr. Constantino Flores v. Strauss

Water Ltd.*, 2016 WL 5243950, at *10 (Del. Ch. Sept. 22, 2016) (footnote omitted). Rather, the

Court of Chancery explained that a previous Delaware court "merely determined that 'Delaware

would not reject Section 766A,'" and concluded, "The same holds true" for it. *Id.* at *10 n.53.

And although the Delaware courts have not formally adopted Section 766A, the Superior Court

did indicate a willingness to consider the cause of action. *See Allen Fam. Foods, Inc. v. Capitol

Carbonic Corp.*, 2011 WL 1205138, at *5 (Del. Super. Ct. Mar. 31, 2011) ("[T]he Court finds

the views of those judges who have endorsed Section 766A as a valid expansion of the law of

tortious interference of contract to be most persuasive."). Given the Delaware courts' apparent

willingness to entertain this cause of action, I decline to find that a claim cannot be brought

under Section 766A.

Potter argues that, even if Delaware courts would permit a cause of action arising from

Section 766A, BIH has failed to sufficiently allege a claim. D.I. 169 at 6. Potter explains that

3

Section 766A "requires specific allegations that the defendant prevented the plaintiff's

performance under a third-party contract, which in turn prevented the plaintiff from securing a

third party's performance under that same agreement." *Id.* at 9. BIH has alleged only, "Potter

prevented BIH from performing its potential obligations owed to Plaintiffs under the Purchase

Agreement." *Id.* Thus, Potter argues that BIH failed to allege that "BIH was unable to obtain

Plaintiffs' performance under the Purchase Agreement . . . ." *Id.*

> A Delaware court explained:

> Section 766A is intended to address situations where "the plaintiff is unable to obtain
> performance of the contract by the third person because he has been prevented from
> performing his part of the contract and thus from assuring himself of receiving the
> performance by the third person."

*Allen Fam. Foods*, 2011 WL 1205138, at *6 (quoting Restatement (Second) of Torts § 766A

cmt. c). Here, BIH has alleged that Potter interfered with BIH's performance of its own

contractual obligations when he "directly requested that the Acuntos assist Sydney Posner with

the creation of ClaimsX, and specifically told the Acuntos that providing such assistance was

consistent with the Purchase Agreement." D.I. 146 at 57 ¶ 26; *see also id.* at 57 ¶ 27 ("To the

extent that Potter's advice to and requests of the Acuntos caused them to take any actions in

violation of the Purchase Agreement, Potter's advice to and requests of the Acuntos were

wrongful.").

But Section 766A also requires that BIH allege that it was unable to obtain Plaintiffs'

performance as a result of Potter's interference. *See Johnson v. Gov't Emps. Ins. Co.*, 2014 WL

1266832, at *5 (D. Del. Mar. 26, 2014) (granting defendant's summary judgment motion when

"Plaintiff has made no showing that any harm alleged from the breach of contract . . . impacted

the performance owed to the Plaintiff" as required for a Section 766A claim), *aff'd sub nom.

Johnson v. GEICO Cas. Co.*, 672 F. App'x 150 (3d Cir. 2016). BIH has failed to make an

4

allegation of this sort. At best, BIH makes general allegations about damage to a business relationship with Plaintiffs. D.I. 148 at 57 ¶ 25 ("Potter knowingly and tortiously interfered for the benefit of his sister with an existing business relationship between BIH and the Plaintiffs . . . thereby damaging BIH's business relationship with the Plaintiffs."); *id.* at 58 ¶ 29 ("To the degree that any actions taken by BIH violated the Purchase Agreement and have damaged the contractual relationship between the Plaintiffs and BIH, Potter caused that damage through his advice and requests and is liable for it."). At no point does BIH allege that it could not obtain Plaintiffs' performance as a result of BIH's inability to perform. Therefore, BIH has failed to allege sufficient facts for each element of a Section 766A claim, and I will dismiss it.

Potter also makes the argument that a party cannot be liable for breach of a contract and tortious interference with that same contract. D.I. 158 at 19. Because I will dismiss the claim for failure to allege facts for each element of the claim, I do not need to resolve the issue of whether Potter, as a party to the contract, can also be liable for tortious inference.

IV.    **CONCLUSION**

For the reasons stated above, I will grant Potter's motion to dismiss.

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

               Plaintiffs,

           v.

ADAM POTTER, PBIH, LLC, and
BUSINESS INSURANCE HOLDINGS,
INC.,

               Defendants.

Civil Action No. 19-1600-RGA

## ORDER

At Wilmington this _____ day of January 2022:

For the reasons set forth in the Memorandum Opinion issued this day, **IT IS HEREBY**

**ORDERED** that Adam Potter's Motion to Dismiss Certain Counts in Business Insurance

Holdings, Inc.'s Cross-Claim or Alternatively, Sever and Transfer Count I of the Cross-Claim

and Dismiss Count V of the Cross-Claim (D.I. 157) is **GRANTED**. Cross-Claim Count V is

**DISMISSED.**

UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC, | : : : : : | <u>CIVIL ACTION</u> |
| Plaintiffs, | : : | NO. 1:19-cv-1600-RGA |
| v. | : : | |
| ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | : : : : | |
| Defendants. | : : | |

## ADAM POTTER'S ANSWER WITH AFFIRMATIVE DEFENSES TO BUSINESS INSURANCE HOLDINGS INC.'S CROSS-CLAIMS

Defendant Adam Potter ("Potter"), by and through his undersigned counsel, hereby submits this answer with affirmative defenses to the Cross-Claims filed by Defendant Business Insurance Holdings, Inc. ("BIH"), and states as follows:

## CROSS-CLAIM NO. 1 AGAINST DEFENDANT POTTER
## (Indemnification)

1.    Denied.    Potter and BIH stipulated to the dismissal of Count I (indemnification) of BIH's Cross-Claim. *See* D.I. 221. Therefore, this paragraph does not require a response.

2.    Denied.    Potter and BIH stipulated to the dismissal of Count I (indemnification) of BIH's Cross-Claim. *See* D.I. 221. Therefore, this paragraph does not require a response.

1

3.     Denied.   Potter and BIH stipulated to the dismissal of Count I (indemnification) of BIH's Cross-Claim. *See* D.I. 221.  Therefore, this paragraph does not require a response.

4.     Denied.   Potter and BIH stipulated to the dismissal of Count I (indemnification) of BIH's Cross-Claim. *See* D.I. 221.  Therefore, this paragraph does not require a response.

5.     Denied.   Potter and BIH stipulated to the dismissal of Count I (indemnification) of BIH's Cross-Claim. *See* D.I. 221.  Therefore, this paragraph does not require a response.

## CROSS-CLAIM NO. 2 AGAINST DEFENDANT POTTER
### (Negligent Management and Operation of BIH by Potter)

6.     Potter incorporates all of his foregoing responses as if fully restated herein.

7.     Admitted in part; denied in part.  It is admitted that Potter sold BIH to Beacon Intercontinental Group, Inc., and that Potter owned BIH prior to that sale. The remainder of this paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

8.     Denied as stated.  Potter informed Plaintiffs (through counsel) that certain steps were taken in connection with the planned Cannabis & Hemp Conference in 2019 as part of a compromise proposal to avoid litigation – not "to

ensure" compliance with the Purchase Agreement, but as a gesture of good faith to resolve Plaintiffs' concerns at the time. All other allegations in this paragraph, express or implied, are denied.

9.    Denied. This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied. All other allegations in this paragraph, express or implied, are denied.

10.    Denied.

## CROSS-CLAIM NO. 3 AGAINST DEFENDANT POTTER
### (Fraud)

11.    Potter incorporates all of his foregoing responses as if fully restated herein.

12.    Denied. This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied. All other allegations in this paragraph, express or implied, are denied.

13.    Denied. This paragraph cites to and purports to rely on a written document ("the sale agreement with Beacon Intercontinental Group"), which speaks for itself and to which no response is required. To the extent that a response is required, Potter denies all allegations that purport to paraphrase or recharacterize that writing, or are otherwise inconsistent with its terms. All other allegations in this paragraph, express or implied, are denied. By way of further response, BIH had legal counsel that could have or should have made any determinations and/or

recommendations with respect to the application of the Purchase Agreement's non-compete provision to BIH.

14.     Denied.  By way of further response, BIH had legal counsel that could have or should have made any determinations and/or recommendations with respect to the application of the Purchase Agreement's provisions to BIH.

15.     Denied.  This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

16.     Denied.  This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

## CROSS-CLAIM NO. 4 AGAINST DEFENDANT POTTER
### (Negligent Misrepresentation)

17.     Potter incorporates all of his foregoing responses as if fully restated herein.

18.     Denied.  This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

19.     Denied.  By way of further response, BIH had legal counsel that could have or should have made any determinations and/or recommendations with respect to the application of the Purchase Agreement's non-compete provision to BIH.

4

20.     Denied.  By way of further response, BIH had legal counsel that could have or should have made any determinations and/or recommendations with respect to the application of the Purchase Agreement's provisions to BIH.

21.     Denied.  This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

22.     Denied.  This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

23.     Denied.  This paragraph sets forth a legal conclusion to which no response is required and, thus, is denied.  All other allegations in this paragraph, express or implied, are denied.

## CROSS-CLAIM NO. 5 AGAINST DEFENDANT POTTER
### (Tortious Interference with Contractual Relationship)

24.     Denied.  The Court dismissed Count V (Tortious Interference with Contractual Relationship) of BIH's Cross-Claim.  *See* D.I. 224.  Therefore, this paragraph does not require a response.

25.     Denied.  The Court dismissed Count V (Tortious Interference with Contractual Relationship) of BIH's Cross-Claim.  *See* D.I. 224.  Therefore, this paragraph does not require a response.

26.     Denied.  The Court dismissed Count V (Tortious Interference with

Contractual Relationship) of BIH's Cross-Claim. *See* D.I. 224. Therefore, this paragraph does not require a response.

27. Denied. The Court dismissed Count V (Tortious Interference with Contractual Relationship) of BIH's Cross-Claim. *See* D.I. 224. Therefore, this paragraph does not require a response.

28. Denied. The Court dismissed Count V (Tortious Interference with Contractual Relationship) of BIH's Cross-Claim. *See* D.I. 224. Therefore, this paragraph does not require a response.

29. Denied. The Court dismissed Count V (Tortious Interference with Contractual Relationship) of BIH's Cross-Claim. *See* D.I. 224. Therefore, this paragraph does not require a response.

## REQUEST FOR RELIEF

WHEREFORE, Potter requests that BIH's Cross-Claims be dismissed with prejudice, and for all other such relief which the Court deems just and equitable.

## AFFIRMATIVE DEFENSES

Potter asserts the following affirmative defenses to BIH's Cross-Claims. By doing so, Potter does not knowingly or intentionally waive any affirmative defense that may now be, or later become, applicable to this case. Potter reserves the right to supplement the following affirmative defenses during the course of this case, and/or as discovery and investigation continues, up to and including trial.

## FIRST AFFIRMATIVE DEFENSE

BIH fails to state a claim or claims upon which relief can be granted or upon which recovery can be awarded.

## SECOND AFFIRMATIVE DEFENSE

Potter acted reasonably and in good faith at all times relevant hereto.

## THIRD AFFIRMATIVE DEFENSE

Potter acted in a lawful and justifiable manner at all times relevant hereto.

## FOURTH AFFIRMATIVE DEFENSE

BIH's Cross-Claims are barred, in whole or in part, because of its own actions and/or inactions, or those actions and/or inactions of BIH's principals, officers, owners, agents, or representatives.

## FIFTH AFFIRMATIVE DEFENSE

BIH's Cross-Claims are barred, in whole or in part, by the doctrines of waiver, ratification, and/or estoppel.

## SIXTH AFFIRMATIVE DEFENSE

To the extent that BIH has suffered alleged damages, said damages being specifically denied, BIH has failed to mitigate such damages.

## SEVENTH AFFIRMATIVE DEFENSE

BIH's Cross-Claims are barred, in whole or in part, by the business judgment rule.

## EIGHTH AFFIRMATIVE DEFENSE

BIH's Cross-Claims are barred, in whole or in part, because it assumed a known risk.

## NINTH AFFIRMATIVE DEFENSE

At all relevant times hereto, BIH had relied on legal counsel in determining the applicability of the Purchase Agreement's non-compete provision to BIH.

## TENTH AFFIRMATIVE DEFENSE

There is no basis for any of BIH's Cross-Claims because there was no breach of the Purchase Agreement's non-compete provision.

**FOX ROTHSCHILD LLP**

*/s/ Seth Niederman*
Seth Niederman (#4588)
Katelyn M. Crawford (#6591)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com
KCrawford@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
RTintner@foxrothschild.com
NBuchter@foxrothschild.com

Dated: January 18, 2022                    *Attorneys for Defendant Adam Potter*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE
INSTITUTES, LLC,

          Plaintiffs,

   v.

ADAM POTTER, PBIH, LLC and
BUSINESS INSURANCE HOLDINGS,
INC.,

          Defendants.

C.A. No. 1:19-cv-01600- RGA-JLH

**BUSINESS INSURANCE HOLDINGS, INC.'S CONCISE
STATEMENT OF MATERIAL FACTS IN SUPPORT
OF SUMMARY JUDGMENT MOTION**

1.    On April 13, 2018, The Institutes sent defendant Adam Potter a draft purchase agreement that contained a non-compete provision that prohibited post-transaction competition with specified businesses of the selling entities, but left those terms undefined.[1]

2.    A subsequent May 11, 2018, proposed draft of the contract demonstrates that Mr. Potter responded to the Institutes by proposing to prohibit the

---

[1] Ex. 1 at Institutes-6328, Institutes-6358, Institutes-6376

sellers from "businesses that provide substantially all services, reference information or resources that are materially geared towards claims professionals…."[2]

3.    The Institutes rejected this formulation, reiterated the model from its earlier draft, and added an additional provision indicating that even forbidden businesses could be carved out of the non-compete if they were included on a schedule of "Permitted Activities."  No "Permitted Activities" schedule appears to have been generated at the time of this draft.[3]

4.    Mr. Potter responded on May 16, 2018 by proposing that the non-compete specifically exclude the activities of a number of entities, including Business Insurance Holdings LLC.[4]

5.    The Institutes rejected this approach and made a counterproposal.[5]  The May 21, 2018 draft APA proposed by The Institutes once again returned to the original language that prohibited the sellers from being engaged in activities that were competitive with the "Sellers' Businesses."[6] The May 21, 2018 draft contained a proposed description of CLM's business.[7]

_____

[2] Ex. 2 at Institutes-1, Institutes-36, Institutes-48 (showing Mr. Potter's proposed changes in red)
[3] *Id.*
[4] Exhibit 3 at Institutes-156, Institutes-170
[5] Exhibit 4
[6] Id. at Institutes-714
[7] Id. at Institutes 735

6.     The Institutes' May 21, 2018 draft of the APA also contains a draft of the "Permitted Activities" schedule.  This Institutes' version of the "Permitted Activities" schedule listed the same specific businesses that Mr. Potter had identified in his previous draft as "excluded businesses," but proposed to limit the "Permitted Activities" for those companies to a specified list of activities, and asked Mr. Potter to fill in the description of the activities according to the following guidelines:

> Set forth below are the business operations of the foregoing entities that could be considered similar to the activities of Sellers' Businesses, and Buyer hereby agrees to accept them as Permitted Activities.  [Please describe any activities that Seller believes will be competitive.  Buyer does not believe there should be any competitive activity post-closing. If there is any concern that some activities may be deemed competitive, we would like to understand what they are so that Buyer can approve them prior to closing.][8]

7.     In a May 22, 2018 draft, Mr. Potter responded by expanding "Permitted Activities" to include any activities on the date of closing of the four enumerated companies, but with none of the specific operations requested by The Institutes.[9]

8.     Ms. Horowitz emailed Mr. Potter on May 24, requesting more details on some of Potter's existing businesses.  She stated that "We would also want it clearly defined that you will not solicit claims and litigation professionals."[10]  After

---

[8] Id. at Institutes-740 (brackets in original)
[9] Exhibit 5 at Institutes-943
[10] Exhibit 6 at Institutes-7608

App.236

an additional exchange about how Business Insurance's businesses should be defined, Ms. Horowitz proposed the following on May 24 (emphasis added):

> "Hi Adam,
>
> What if we said what you have, plus what we already said.
>
> You will not be allowed to:
>
> Work/create/develop/offer promote etc on educational content related to claims and litigation management (unless you are partnered or working with CLM/Claims Pages)
>
> You will not produce live delivery, such as events and conferences related to claims and litigation management professionals, *a general industry is ok – like Women to Watch which is general to insurance.*
>
> *We are okay if you are creating general industry related newsletters, as an example, that claims and litigation professional may be an audience for, but you can't specifically target them….*"[11]

9.    The next day, The Institutes sent Mr. Potter a proposed revision to his May 22 proposed "Permitted Activities" schedule, the language of which is similar to Ms. Horowitz's email from the prior day, but without her explanation as to what her proposed language would still permit Mr. Potter to do.[12]  This May 22 language from The Institutes is virtually the same as the language that finally appeared in the APA.[13]

---

[11] Id. at Institutes-7606 (emphasis added)
[12] Exhibit 7 at Institutes-1077, Institutes-1166-1167
[13] Exhibit 9 at Institutes-7986, Institutes 8228-8229

10.    In addition to the description of the CLM Business in the contract, Anne

Blume, the CEO of CLM, confirmed that CLM's mission is educating claims and

litigation professionals.[14]  Ms. Blume also testified that CLM is dedicated to meeting

the professional development needs of the claims and litigation management

industries.[15]

11.    Katie Kett, a former BIH employee responsible for organizing

conferences and events, testified as follows when asked to describe BIH's audience:

"I would say the primary target is risk managers and enterprise risk managers, also

the greater commercial insurance industry, including insurance carriers, agents,

brokers and other service providers like legal, like attorneys or third party

administrators."[16]

12.    Documents produced by The Institutes and used by The Institutes as

deposition exhibits showing the advertisements for the C&H conference do not

mention claims or litigation management professionals as a target audience.[17]  There

was a panel relating to cannabis claims at the C&H conference.  Katie Kett, who

organized the C&H conference, testified that the claims session had been added to

_____

[14] Exhibit 10 (Anne Blume May 27, 2021 Deposition) at 176.
[15] Id.
[16] Ex. 11 (Katie Kett Deposition) at 21
[17] Exhibit 8.  Documents in Exhibit 8 with bates numbers were produced by The
Institutes in discovery, documents without bates numbers were used by the Institutes
as a deposition exhibit.

the C&H conference at the recommendation of an advisory committee member whose "thinking was that the brokers and insurers would like to understand how claims are handled as well, not – and not specifically claims professionals necessarily."[18]  When pressed about whether a discussion of claims "would be more narrowly tailored towards claims professionals," Ms. Kett disagreed: "I mean not necessarily.  I think – as – we were just trying to collaborate to find  -- to come up with a topic that would be of interest to everyone attending the conference, not just claims professionals."[19]  Ms. Kett also testified that the list for advertising the conference was simply BIH's existing database, along with lists that sponsors gave to BIH.  She testified that outside counsel were removed from the mailing list due to an exclusivity agreement with a law firm that was a sponsor of the event.[20]

13.    The Institutes notified Mr. Potter that it considered the upcoming conference to be a violation of the APA in July, 2019, and in response Mr. Potter posted a statement on the "landing page" for the conference stating that it was not developed and was not intended for claims or litigation management professionals.[21]

---

[18] Ex. 11 at 69-70
[19] Ex. 11 at 70-71
[20] Ex. 11  at 49-51
[21] Complaint at ¶¶ 53, 56

14.    The Institutes has admitted that it is not aware of any person who has chosen not to attend a CLM or Institutes event because of any action of BIH.[22]  The Institutes admits that it cannot identify a single customer (individual or entity) that it lost as a result of the C&H Conference.[23]  In fact, Ms. Blume testified that she was not aware of a single claims professional who actually attended the C&H Conference.[24]  The Institutes has agreed that neither it nor CLM changed any content they were offering as a result of any actions by BIH, and that they have not changed any planned events, speakers, or anything about their offerings to members or the broader public as a result of any action by BIH.[25]  The Plaintiffs admit that they cannot identify any sponsors or potential sponsors that they have lost as a result of any alleged violation of the APA,[26]  and although the Plaintiffs allege that one of their sponsors reduced its level of sponsorship for future CLM events as a result of the C&H Conference, the Plaintiffs admit that they have no evidence that the C&H Conference was the reason for that sponsor's reduced level of sponsorship.[27]  Ms.

---

[22] Ex. 12 (Anne Blume 30(b)(6) Deposition) at 41.  Ms. Blume was designated by the Plaintiffs as a Rule 30(b)(6) corporate representative for this deposition.
[23] Ex. 13 (Peter Miller 30(b)(6) Deposition at 40 – 42.  Mr. Miller was designated by The Plaintiffs as a Rule 30(b)(6) corporate representative for this deposition.
[24] Exhibit 10 at p. 168
[25] Exhibit 12 at p. 41
[26] Exhibit 13 at 50 - 51
[27] Exhibit 13 at 47-49

App.240

Blume agreed that CLM's financial trends were all positive in 2019 and 2020 up to the point of the pandemic.[28]

15.    Mr. Acunto offered unrebutted testimony during his deposition that the statement on the ClaimsX web site that BIH was a "strategic partner" of ClaimsX was inaccurate[29], and The Institutes admits that it has no reason to believe that BIH or the Acuntos individually have had any involvement with ClaimsX since the Acuntos left ClaimsX's board of directors just months after they joined.[30]

16.    The Institutes has stipulated that it is not seeking any damages arising from the loss of any members of its or CLM's boards or advisory boards (D.I. 196), and The Institutes' Rule 30(b)(6) witness stated that "Claims Exchange doesn't seem to be doing much, if anything, any more.[31]  Ms. Blume testified that she attempted to stay aware of what ClaimsX was doing, and that she was not aware of anything ClaimsX had done since its creation other than a tree lighting ceremony and some webinars.[32]  With respect to the webinars, Ms. Blume was not aware of any individual who had attended any ClaimsX webinar.[33]  More broadly, the Institutes 30(b)(6) witness with respect to damages identified only two sponsors that it claimed

_____

[28] Exhibit 10 at 191
[29] Exhibit 14 (Stephen Acunto Deposition) at 186-187
[30] Exhibit 13 at 57
[31] Exhibit 12 at 63.
[32] Exhibit 10 at 205-206
[33] Exhibit 10 at 206

to have reduced support of CLM as a result of any violation of the APA by BIH, but the same witness admitted that he had no facts upon which to base his assumption that the sponsors' drop in support was the result of any action by BIH.[34]  The witness stated on behalf of the Plaintiffs that he was not aware of any sponsor that The Institutes or CLM had lost because of any action by BIH.[35]

17.    With respect to all of the allegations in the Complaint against BIH, The Institutes concedes that other than sending a cease and desist letter relating to the C&H Conference and filing the pending litigation, it made no efforts to mitigate any of its damages that it alleges to have incurred.[36]  CLM CEO Anne Blume testified that The Institutes did not seek a preliminary injunction from this Court, even though one was requested in the Complaint, because it did not think an injunction would likely be granted.[37]

18.    When asked if the non-compete clause of the APA would prevent the defendants from starting a dog walking business, CLM CEO Anne Blume initially testified that that she would need to look at the contract again because she did not know if a dog walking business would fall within the parameters of the non-compete clause.[38]  (Ms. Blume later concluded that it would be permitted.)  Ms. Blume stated

---

[34] Exhibit 13 at 44-46
[35] Exhibit 13 at 50
[36] Exhibit 12 at 59-60
[37] Exhibit 10 at 122
[38] Exhibit 10 at 100

that she did not understand and could not answer a question as to whether conferences in stress management or business-community relations would violate the non-compete clause.[39]

19.    The Plaintiffs' 30(b)(6) witness initially testified on behalf of the Plaintiffs that there were no acts by BIH beyond those alleged in the Complaint that The Institutes alleged to be violations of the APA, but then amended her answer after a deposition break to mention three other online events.  The Plaintiffs have never amended their Complaint to add any other alleged violations.[40]

Dated: February 11, 2022

**DLA PIPER LLP (US)**

**OF COUNSEL:**
Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: 305.423.8522
Facsimile: 305.675.6366
chris.oprison@dlapiper.com

*/s/ Matthew P. Denn*
Matthew P. Denn (DE Bar No. 2985)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
Telephone: 302.468.5700
Facsimile: 302.394.2341
matthew.denn@dlapiper.com

*Attorneys for Defendant Business Insurance Holdings, Inc.*

---

[39] Exhibit 10 at 202
[40] Exhibit 12 at 79-86

App.243

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) |
| | ) Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) |
| v. | ) ) |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) |
| Defendants. | ) ) |

## <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiffs, The American Institute for Chartered Property Casualty

Underwriters and The Institutes, LLC (collectively, "the Institutes" or "Plaintiffs"),

by and through their counsel, respectfully move for partial summary judgment

against Defendants, Adam Potter and Business Insurance Holdings, Inc. ("BIH")

(collectively, "Defendants") pursuant to Fed. R. Civ. P. 56, and, in support thereof,

state as follows:

1.      Plaintiffs move for summary judgment on Count I of the Amended

and Supplemental Complaint (Breach of Contract), on the grounds that this Court

has previously found that the non-compete restrictions in the parties' Asset

Purchase Agreement dated June 1, 2018 ("the APA") are clear and unambiguous

and apply to "each Selling Party," which includes both Potter and BIH.

2.      Defendants violated the terms of the Non-Compete by hosting one conference in October 2019 that clearly competed with Plaintiffs' offerings.

3.      BIH has since held additional webinars and conferences, and plans to hold additional events, that compete with Plaintiffs' offerings and therefore constitute ongoing violations of the Non-Compete.

4.      The terms of the APA are clear and unambiguous and Delaware courts will give effect to the plain-meaning of its terms without resorting to extrinsic evidence. Moreover, the scope and duration of the Non-Compete are reasonable and were supported by adequate consideration.

5.      Monetary damages alone will be insufficient to fully compensate Plaintiffs for Defendants past and future violations of the Non-Compete and, therefore, they are entitled to a declaration that Defendants are in breach of the APA and/or a permanent injunction enjoining BIH from engaging in any future conduct in violation of the APA.

Plaintiffs incorporate herein their Memorandum of Law, the Statement of Undisputed Material Facts in Support of their Motion, and all exhibits and declarations cited therein.

WHEREFORE, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment on liability, and enter a permanent injunction prohibiting BIH from proceeding with conferences and events within

2

App.245

the scope of the restrictive covenants for five years, and/or a declaratory judgment

that conferences and seminars BIH intends to conduct are prohibited by the

restrictive covenants, together with any other relief as the Court deems just and

proper.


Dated:  February 11, 2022

>  /s/  *Barry Klayman*
>  Barry M. Klayman, Esq. (#3676)
>  COZEN O'CONNOR
>  1201 North Market Street, Suite 1001
>  Wilmington, DE 19801
>  Tel: (302) 295-2035
>  Fax: (215) 701-2209
>  Email: bklayman@cozen.com
>  **Attorneys for Plaintiffs, The American
>  Institute for Chartered Property Casualty
>  Underwriters and The Institutes, LLC**

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
RHayes@cozen.com
MSiegel@cozen.com

LEGAL\56380324\1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) |
| | ) |
| Defendants. | ) ) |

Civ. A. No. 1:19-cv-01600-RGA-JLH

## [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

AND NOW, this ____ day of _____, 2022, upon consideration of

Plaintiffs' Motion for Partial Summary Judgment and any opposition thereto, it is

hereby ORDERED AND DECREED that said Motion is GRANTED and a

permanent injunction is hereby entered against Defendants prohibiting them from

proceeding with conferences and events within the scope of the restrictive

covenant contained in the Asset Purchase Agreement dated June 1, 2018, for a

period of five (5) years from the date hereof.

BY THE COURT:

_____

J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) |
| | ) |
| Defendants. | ) ) |

Civ. A. No. 1:19-cv-01600-RGA-JLH

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

February 11, 2022

Plaintiffs, The American Institute for Chartered Property Casualty Underwriters ("AICPCU") and The Institutes, LLC ("The Institutes") (collectively, "The Institutes" or "Plaintiffs"), submit this Statement of Undisputed Material Facts in support of their Motion for Partial Summary Judgment.

### The Asset Purchase Agreement

1.      On or about June 1, 2018, The Institutes entered into the Asset Purchase Agreement ("APA") with Claims Pages, LLC, ("CP"), C&E MGMT and Planning, Inc., ("C&E"), CLM Group, Inc., ("CLM Group" or "CLM"), Adam Potter, and Moxie HC, LLC, ("Moxie"), to acquire substantially all of the assets of the CLM Group.  See, **Exhibit "A**."

2.      The APA defines The Institutes as "the Buyer" and CP, CLM, and C&E as "the Sellers."  The APA further defines the "Selling Parties" to include CLM, CP, and C&E, together with Potter and Moxie.  Ex. A, p. 1.

3.      The Institutes paid $17,329,098.00 for the CLM Group assets.  Ex. A, Section 2.2 at p. 6.

4.      Pursuant to the APA, the Institutes made subsequent payments in the amount of $2,655,049.00.  Ex. A, Sections 2.3 – 2.4 at pp. 6-9.

5.      Section 6.12(a) of the APA prohibits the Selling Parties from conducting any activities that are competitive with any of the Sellers' Businesses

2

conducted as of the closing date for a period of five years following the closing date.  Ex. A, p. 28.

6.      The APA provides that the Selling Parties can engage in certain Permitted Activities during the Non-Compete Period.  "Permitted Activities" are specifically defined, in relevant part, as certain business operations of BIH, owned at the time by Potter.  See APA, Schedule 6.12, attached as **Exhibit "B.**"

7.      Schedule 6.12 delineates the products and services that BIH provides. The Schedule lists the events and awards programs offered by BIH, which are limited to the following: World Captive Forum, U.S. Insurance Awards, Break Out Awards, Innovation Awards, Risk Management Roundtable, and Women to Watch. Ex. B.

8.      As set forth in Schedule 6.12, BIH's defined business does not include public conferences or seminars on industry-specific topics, nor conferences relating to claims and litigation management, as the parties did not contemplate that BIH would be engaged in any such activities during the Non-Compete Period. Ex. B.

9.      Schedule 6.12 identifies activities that BIH could engage in, and conversely, the activities that BIH could not engage in during the Non-Compete period.  Ex. B.

LEGAL\56331211\1

10.     The definition of Permitted Activities expressly excludes offering and promoting educational content related to claims and litigation management, as well as producing events and conferences with a target audience that includes claims and litigation management professionals.  Ex. B.

11.     Potter also owned Business Insurance Holding, LLC ("Business Insurance Holdings"), which was not included within the sale.  In negotiating the APA, Potter sought to exempt Business Insurance Holdings from the restrictive covenants completely.  The Institutes refused to do so and insisted on specifying in the APA what activities Business Insurance Holdings could engage in after the acquisition.  Potter Dep. 14:16-24 attached as **Exhibit "C."**

### Defendants' Breach of the Non-Compete Provision

12.     Prior to entering into the APA, BIH was not in the business of offering and promoting conferences relating to claims and litigation management.  Ex, C, Potter Dep. at 48:6-21.  Kenner Dep. at 21:23-25 attached as **Exhibit "D."**

13.     In or around late July 2019, The Institutes became aware that BIH was offering and promoting claims and litigation management conferences in direct violation of the Non-Compete provision.  Ex. C, Potter Dep. at 121:19-21; 138:3-5.

14.     The Institutes learned that BIH was offering and promoting a Cannabis & Hemp Conference ("the C&H Conference") and an Intellectual Property Conference ("the IP Conference") (collectively, "the BIH Conferences"),

4

scheduled for the end of October, 2019, as described on its website S*ee*

www.businessinsurance.com/section/events).  Kett Dep. at 118–119:21, attached as

**Exhibit "E:"**  Ex. 14 to Kett Dep., attached as **Exhibit "F**."

15.    Potter and BIH described the C&H Conference as a "new conference

centered on cannabis insurance and risk management" for insurance and cannabis

industry professionals "grappling with complex coverage and liability issues."

They described the IP Conference as an exploration of "business exposure"

resulting from intellectual property that aims to educate insurance professionals

about "risk management and insurance strategies to protect intellectual property

assets" and identify "established and new insurance protections" available to

insurance professionals.  See, Ex. F.

16.    On July 29, 2019, upon learning of the BIH Conferences, The

Institutes sent Potter a letter notifying him that the BIH Conferences constituted a

breach of the APA and demanding that they be cancelled by July 31, 2019.  Ex. C,

Potter Dep. at 121:19-21; 138:3-5.

17.    On August 12, 2019, Plaintiffs again asked Potter to cancel the

conferences.  Ex. C, Potter Dep. (Ex. BIH 51 at 149:3-10).

18.    On September 1, 2019, Potter sold BIH to Beacon Intercontinental

Group, Inc. ("Beacon").  See, Potter Dep., Ex. Potter-5, attached as **Exhibit "G**."

**The BIH Conferences Competed with CLM's Business and its Prior Offerings**

19.    The BIH Conferences focused on topics that were directly related to

the Sellers' Businesses as of the time of the closing of the APA.  The BIH

Conferences focused on topics that had been addressed by CLM and that related

directly to – and therefore competed directly with – CLM's Business.  Ex. D,

Kenner Dep. at pp. 53:3-25; 54:14-23; 55:8-12.

20.    Schedule A to the APA describes CLM's Business as:

> "a professional association in the insurance industry with
> more than 45,000   professionals in the claims resolutions
> and litigation management industries,  offering different
> types of memberships, with local chapters across the
> United States. CLM members benefit from events,
> continuing education and a wide variety of industry
> resources, including a job board, media kits, on-line
> training program for new hires and dispute resolution
> program for insurance companies."

Schedule A to the APA, attached as **Exhibit "H".**

21.    Although Schedule A provides examples of CLM's offerings, it does

not limit the CLM Business to any specific topic.  _Id._

22.    The broad definition of CLM's Business was intentional, as CLM

offers conferences on a wide range of topics focused on claims and litigation

management matters, as indicated by a review of CLM's conference archives.  Ex.

C, Potter Dep. at 7:6-25; 8:3-24.

LEGAL\56331211\1

23.     The BIH Conferences clearly addressed topics that have been addressed by CLM.  See, Ex. H, and Plaintiffs' Response to Request 2 of Defendants' First Request for Production of Documents attached as **Exhibit "I."**

24.     A description of the C&H Conference on BIH's website stated the C&H Conference aims to examine the risks to the insurance industry resulting from the legalization of marijuana.  See, Ex. F.

25.     The APA does not distinguish between pre-loss and post-loss issues.  Ex. A.

26.     As defined in the APA, the CLM Business focuses broadly on claims and litigation management and offers its members educational content in the form of, among other things, specialty conferences and webinars.  Ex. F.

27.     The definition of "Permitted Activities" in Schedule 6.12 to the APA, which sets forth the specific activities that can be undertaken without violating the Non-Compete, makes no reference to, or distinction between, "pre-loss" issues and claims or litigation management.  Ex. B.

28.     Prior to entering into the APA, CLM regularly discussed and presented on "pre-loss" issues at its conferences and other events.  Ex. C, Potter Dep. 153-158.

LEGAL\56331211\1

### The BIH Conferences Offer Educational
### Content Related to Claims and Litigation Management

29.     The BIH Conferences, on their respective websites, say that they

focus on emerging issues, risk management solutions, and aim to provide thought

leadership on these topics.  Ex. F.

30.     At the time that The Institutes placed Potter on notice of their breach

of the Non-Compete, the agendas for the BIH Conferences included sessions

focused on claims.  See, www.businessinsurance.com/section/events. Ex. F.

31.     As originally promoted, the Cannabis claims session was described on

BIH's website as follows:

> This panel of experienced cannabis claims professionals
> will attempt to shed light on the type, frequency and
> severity of cannabis claims to date, and what these claims
> will look like in the future (emphasis added).

Ex. C, Potter Dep. at 87:3-25; 88:2-25.  *See also*, Ex. 15 to Potter Dep., attached as

**Exhibit "J**."

32.     In response to The Institutes' objections, the Cannabis "exposure"

session was then modified on BIH's website as:

> The cannabis exposure is often difficult to evaluate due
> to rapidly emerging risks in a highly regulated industry
> and lack of access to significant data.  This panel of
> experienced cannabis claims professionals will attempt to shed
> light on the various cannabis exposures to date, and how
> these will involve in the future (emphasis added).

Ex. C, Potter Dep. at 88:2-25.

LEGAL\56331211\1

33.     The substance of the conference was not modified as shown by the slides utilized during the C&H Conference.  Ex. D, Kenner Dep. at 103:7 – 104:23; Ex. E, Kett Dep. at 124:6 – 126:22.

34.     BIH also offered a special price to claims professionals for the C&H Conference.  Ex. E, Kett Dep. at 163:5 – 166:17.

### The BIH Held and is Planning to Hold Additional Webinars and Conferences that Violate the Non-Compete

35.     Since Potter sold BIH to Beacon, BIH has held, and plans to hold, additional specialty conferences and webinars.  Ex. D, Kenner Dep. at 116:18 – 129:16.

36.     The BIH Conferences have designated certain sessions that clearly target claims professionals.  Ex. D, Kenner Dep. at 53:20 – 55:12.

37.     From April 2021 to May 2021, BIH held a "Cannabis Update" webinar series, with one entire session devoted to Cannabis claims.  Ex. D, Kenner Dep. at 117: 14-21, 118:3-4, Kenner Exhibit 15.  Ex. 15 to Kenner Dep. is attached as **Exhibit "K."**

38.     In July, 2021, BIH held a virtual Long-Term Care Conference in partnership with the law firm that was the exclusive sponsor of the C&H Conference which included sessions that related to claims and litigation management and targeted professionals in those industries.  As a result of these types of BIH conferences, Plaintiffs lost sponsorships for their conferences.  Ex. D,

9

Kenner Dep. at 120: 3-24; Miller Dep. at 44:19-25 – 48:24, attached as **Exhibit "L."**

39.     In July, 2021, BIH held a cybersecurity webinar that discussed how companies should respond if their systems were compromised by a ransomware attack, which BIH indicated sounded like a "post-loss" claims related concern.  Ex. D, Kenner Dep. at 126:13-15, 128:17-21.

40.     BIH intends on planning conferences on long-term care, Ex. D, Kenner Dep. at 121:4-12, intellectual property, Kenner Dep. at 123:5-16, and cybersecurity, Kenner Dep. at 124:9 - 125:16.

41.     The press release (dated 9/4/19), announcing Beacon's acquisition of BIH from Potter touted BIH's "growing annual conference schedule" which would include "the implications of cannabis, wild fires, the impact of AI, and cybersecurity."  The press release is attached as **Exhibit "M."**

<u>**Remedies Available Under the APA**</u>

42.     In Section 6.12(d) of the APA, Potter and BIH acknowledged that the provisions of the Non-Compete "are reasonable and necessary to protect the legitimate business interests of [The Institutes] and its investment in the Acquired Assets." They agreed not to contest that The Institutes' remedies at law for any breach of the Non-Compete "will be inadequate, and that [The Institutes] shall be

entitled to seek an injunction or injunctions to prevent breaches of the provisions of

this Section 6.12, without proving actual damages." Ex. A at p. 29.

Respectfully submitted,

/s/  *Barry Klayman*
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American*
*Institute for Chartered Property Casualty*
*Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

February 11, 2022

LEGAL\56331211\1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) | |
| | ) | |
| Defendants. | ) | |

**ADAM POTTER'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' AMENDED AND SUPPLEMENTAL COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 56(a), Defendant, Adam Potter ("Potter"), by and through his undersigned counsel, respectfully moves this Court for an order, substantially in the form provided herewith, granting summary judgment in his favor, and against Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("Plaintiffs"), as to all remaining claims or causes of action asserted, and relief sought, by Plaintiffs against Potter in the Amended and Supplemental Complaint, D.I. 48 (the "Motion"). In support of the Motion, Potter relies on an Omnibus Statement of Undisputed Material Facts, Memorandum of Law, and Exhibits. A proposed form of Order has also been submitted.

WHEREFORE, Potter respectfully request that this Court grant the Motion in its entirety and enter his proposed form of Order granting him summary judgment on all counts or causes of action asserted, and relief sought, by Plaintiffs against Potter in the Amended and Supplemental Complaint, D.I. 48.

<div style="margin-left:40%">

**FOX ROTHSCHILD LLP**

*/s/ Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
sniederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

</div>

Dated: February 11, 2022          *Attorneys for Defendant Adam Potter*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER

AND NOW, this _____ day of _____, 2022, upon

consideration of the Motion for Summary Judgment filed by Defendant Adam Potter

("Potter") as to all remaining claims or causes of action asserted, and relief sought,

by Plaintiffs The American Institute for Chartered Property Casualty Underwriters

and The Institutes, LLC against Potter in the Amended and Supplemental Complaint,

D.I. 48 (the "Motion"), and any opposition thereto, it is hereby ORDERED that the

Motion is GRANTED in its entirety.  Summary Judgment is hereby ENTERED in

favor of Defendant Adam Potter, and against Plaintiffs, The American Institute for

Chartered Property Casualty Underwriters and The Institutes, LLC, as to all

remaining claims or causes of action asserted, and relief sought, by Plaintiffs The

American Institute for Chartered Property Casualty Underwriters and The Institutes,

LLC against Potter in the Amended and Supplemental Complaint, D.I. 48.

BY THE COURT:

_____

                                                                    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ADAM POTTER'S MOTION FOR SUMMARY JUDGMENT
ON BUSINESS INSURANCE HOLDINGS, INC.'S CROSS-CLAIMS**

Pursuant to Federal Rule of Civil Procedure 56(a), Defendant Adam Potter ("Potter"), by and through his undersigned counsel, respectfully moves this Court for an order, substantially in the form provided herewith, granting summary judgment in his favor, and against Defendant, Business Insurance Holdings, Inc. ("BIH"), as to all remaining claims or causes of action asserted, and relief sought, by BIH against Potter in the Cross-Claims, D.I. 146, pp. 52-58 (the "Motion"). In support of the Motion, Potter relies on an Omnibus Statement of Undisputed Material Facts, Memorandum of Law, and Exhibits. A proposed form of Order has also been submitted.

WHEREFORE, Potter respectfully request that this Court grant the Motion in its entirety and enter his proposed form of Order granting him summary judgment

1

on all counts or causes of action asserted, and relief sought, by BIH against Potter in

the Cross-Claims, D.I. 146, pp. 52-58.

<div align="center"></div>

**FOX ROTHSCHILD LLP**

*/s/  Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
sniederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: February 11, 2022          *Attorneys for Defendant Adam Potter*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

The American Institute for Chartered )
Property Casualty Underwriters and ) Civil Action No. 1:19-cv-01600-RGA
The Institutes, LLC, )
                                    )
                    Plaintiffs, )
                                    )
        v. )
                                    )
Adam  Potter,  PBIH,  LLC  and )
Business Insurance Holdings, Inc., )
                                    )
                    Defendants. )
                                    )

## **[PROPOSED] ORDER**

AND NOW, this _____ day of _____, 2022, upon

consideration of the Motion for Summary Judgment filed by Defendant Adam Potter

("Potter") as to all remaining claims or causes of action asserted, and relief sought,

by Defendant, Business Insurance Holdings, Inc. against Potter in the Cross-Claims,

D.I. 146, pp. 52-58 (the "Motion"), and any opposition thereto, it is hereby

ORDERED that the Motion is GRANTED in its entirety.  Summary Judgment is

hereby ENTERED in favor of Defendant Adam Potter, and against Defendant,

Business Insurance Holdings, Inc., as to all remaining claims or causes of action

asserted, and relief sought, by Defendant, Business Insurance Holdings, Inc. against

Potter in the Cross-Claims, D.I. 146, pp. 52-58.

BY THE COURT:

_____
                                    J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC, | C.A. No. 1:19-cv-01600- RGA-JLH |
| Plaintiffs, | |
| v. | |
| ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | |
| Defendants. | |

**MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT
UNDER FEDERAL RULE OF CIVIL PROCEDURE 702**

Pursuant to Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993), Defendant Business Insurance Holdings moves that this Court exclude the testimony of Plaintiffs' Expert Dr. Christine Meyer.  The grounds for this motion are contained in the Opening Brief filed contemporaneously with this motion.

Dated: February 22, 2022

**OF COUNSEL:**
Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131
305.423.8522
305.675.6366 (Fax)
chris.oprison@dlapiper.com

**DLA PIPER LLP (US)**

*/s/ Matthew P. Denn*
Matthew P. Denn (DE Bar No. 2985)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
302.468.5700
302.394.2341 (Fax)
matthew.denn@dlapiper.com

*Attorneys for Defendant Business Insurance Holdings, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) | |

**DEFENDANT ADAM POTTER'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY AND REPORT OF CHRISTINE S. MEYER, PH. D.**

Defendant Adam Potter, through his undersigned counsel, respectfully moves this Court for entry of an order, substantially in the form provided herewith, granting Defendant Potter's *Daubert* Motion To Exclude Testimony And Report Of Christine S. Meyer, Ph. D. (the "*Daubert* Motion")  In support of the *Daubert* Motion, Potter relies on Memorandum of Law and Exhibits filed herewith.  A proposed form of Order has also been submitted.

WHEREFORE, Defendant Adam Potter respectfully requests that this Court grant the *Daubert* Motion and enter his proposed form of Order excluding the testimony and report of Plaintiffs' damages expert, Christine S. Meyer, Ph.D.

1

**FOX ROTHSCHILD LLP**

*/s/  Seth A. Niederman*
Seth A. Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
sniederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

*Attorneys for Defendant Adam Potter*

Dated: February 22, 2022

App.268

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' REPONSE TO BIH'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103

March 4, 2022

Plaintiffs, The American Institute for Chartered Property Casualty Underwriters ("AICPCU") and The Institutes, LLC ("The Institutes") (collectively, "The Institutes" or "Plaintiffs"), respond to the Concise Statement of Material Facts in Support Summary Judgment Motion filed by Defendant BIH, Inc., as follows:

1.      Admitted. By way of further response, the final terms of the APA are clear and unambiguous and BIH has not established any ambiguity that would warrant the introduction of extrinsic evidence. Therefore, The Institutes deny that the drafting history of the APA, or the non-compete in particular, is relevant or admissible.

2.      Admitted. By way of further response, *see* response to ¶ 1.

3.      Admitted. By way of further response, *see* response to ¶ 1.

4.      Admitted. By way of further response, *see* response to ¶ 1.

5.      Admitted. By way of further response, *see* response to ¶ 1.

6.      Admitted. By way of further response, *see* response to ¶ 1. Moreover, as indicated in the cited document, The Institutes asked Mr. Potter to specifically describe the activities of Business Insurance Holdings, LLC, that might be deemed competitive with Sellers' Businesses. Thus, it was Mr. Potter himself who provided the precise description of the business operations of Business Insurance.

7.  Admitted. By way of further response, *see* response to ¶ 1.

8.  Admitted. By way of further response, *see* response to ¶ 1.

9.  Admitted. By way of further response, *see* response to ¶ 1.

10.  Admitted in part; denied in part. It is admitted that Ms. Blume testified as stated in ¶ 10. It is denied, however, that CLM's mission is as narrowly defined as stated by BIH or that CLM is solely dedicated to meeting the professional development needs of claims and litigation management professionals. As Ms. Blume further testified, CLM is "one of the largest, if not the largest, trade association in the insurance space bringing together insurance carriers, TPAs [third-party administrators], risk managers, claim managers, corporate counsel, defense lawyers, service providers, really -- insurance brokers, the stakeholders in the claims and litigation management space for education, training, and networking." *See* Blume 5/27/21 Tr., attached hereto as **Exhibit A**, at 43:8-16. She further testified that CLM has "brokers that are very strong participants." *See id.* at 214:6-7.  Mr. Potter similarly testified that CLM's business involved risk managers and outside counsel and Plaintiffs' sponsors and advertisers were entities that provided services to the insurance industry.  Potter 6/16/21 Tr., attached hereto as **Exhibit B**, at 35:16-36:18; 38:24-39:7; 42:3-10.

11.  Admitted. By way of further answer, Ms. Kett explained that "a third-party administrator is a company that primarily focuses on administering claims

either for – in-house for a company or in conjunction with another insurance company." *See* Kett Tr., attached hereto as **Exhibit C**,  at 21:22-22:2. She further agreed that a TPA is involved in handling insurance claims. *See id.* at 57:2-7. Thus, according to Ms. Kett, BIH's audience includes professionals who are involved in claims and litigation management.

12.      Admitted in part; denied in part. It is admitted that Ms. Kett testified as stated in ¶ 12. It is denied that her testimony was as limited as suggested by BIH. By way of further answer, Ms. Kett testified that registration for the C&H Conference included a specific price for insurance claims professionals, and that claims professionals were a part of BIH's audience. *See* Ex. C, Kett Tr. at 59:20-61:1; 76:9-78-7. She further testified that the topic on cannabis claims would appeal to claims professionals, among others. *See id.* at 71:3-8. With respect to the advertising for the conference, Ms. Kett testified that in addition to using BIH's existing database, BIH used the marketing list provided by the Wilson Elser law firm, which was the exclusive legal sponsor. *See id.* at 73:20-24; 182:2-15. In fact, Ms. Kett said that Wilson Elser is "definitely" involved in claims and litigation management. *See id.* at 89:1-6. Therefore, it is clear that BIH, working with a claims and litigation management professional, marketed the conference to an audience that it knew would include individuals in the claims and litigation

management profession, and advertised that at least one session would be specifically devoted to claims.

13.     Admitted. By way of further answer, Ms. Kett testified that she believed the statement Mr. Potter added to the landing page did not make sense and that it was "a conflict with having a claims-related session saying that the conference is not meant for claims professionals." *See id.* at 88:2-19. This was particularly true because the advisory board for the conference included claims professionals. *See id.* at 88:21-24. Moreover, she testified that nobody at BIH took any steps to ensure that claims and litigation management professionals were excluded from the conference, even after it was determined that several claims professionals had already signed up at the time the statement was added, and despite the fact that the claims session itself featured a panel of individuals from the claims and litigation management industries. *See id.* at 89:23-90:14; 94:2-99:6. Finally, the claims session was not modified in substance, and the materials from the session specifically referred to cannabis claims. *See* Ex. F to Plaintiffs' SOF.

14.     Admitted in part; denied in part. Although Plaintiffs have not identified particular customers or sponsors that have ceased all membership and/or sponsorship of CLM, Plaintiffs have identified sponsors who have reduced their sponsorship levels since the C&H Conference. *See* Miller Tr., attached hereto as **Exhibit D**, at 44:19-45:8. Although Ms. Blume was unaware of a claims

professional who attended the C&H Conference, Mr. Miller testified that more than

15 individuals and 40 companies that were CLM members or sponsors attended the

conference. *See id.* at 38:22-39:4. He further testified that sponsorship of one

conference will impact the amount of money a company can spend on another

conference, which can lead to a reduction of spending on CLM events. *See id.* at

42:16-44:3. As an example, Mr. Miller testified that although Wilson Elser still

sponsors CLM events, they do so to a lesser extent. *See id.* at 48:3-7.  Adam Potter

similarly testified that companies that sponsor or advertise events with CLM are

constrained by finite budgets.  *See* Ex. B, Potter Tr., at 40:3-7.

15.    Admitted in part; denied in part. It is admitted that Mr. Acunto so

testified and that The Institutes have no reason to believe the Acuntos have any

current involvement with ClaimsX. It is denied that there was no affiliation

between the two entities. As stated by BIH's Keith Kenner, Mr. Acunto told him

that he wanted to help ClaimsX and offer free Business Insurance subscriptions to

people who would be interested in joining ClaimsX. *See* Kenner Tr., attached

hereto as **Exhibit E**,  at 136:8-19. Ms. Kett testified that the initial ClaimsX

website said that the company was "powered" by Business Insurance. *See id.* at

147:5-148:1. Thus, even if their involvement with ClaimsX was brief, it is clear

that the Acuntos, together with BIH, aided in the formation and initial promotion of

ClaimsX, in violation of the non-compete.

16.    Admitted in part; denied in part. It is admitted that The Institutes are not seeking damages for the loss of board members. It is further admitted that Ms. Blume testified as indicated regarding ClaimsX. It is denied that the testimony regarding damages was as limited as suggested by BIH. To the contrary, Mr. Miller testified that he could think of no other reason for the loss of the two identified entities other than competition from BIH. Moreover, he explained with respect to Wilson Elser that although it continues to sponsor CLM events, it does so to a lesser extent than it did before its involvement at BIH events. More to the point, although he could not identify customers or sponsors that have ceased all membership and/or sponsorship of CLM, Mr. Miller explained that sponsorship of one conference will impact the amount of money a company can spend on another conference, which can lead to a reduction of spending on CLM events. *See* Ex. D, Miller Tr. at 42:16-51:10.

17.    Admitted in part; denied in part. It is admitted that The Institutes sent a cease and desist letter and did not seek an injunction. It is denied that they took no other action to mitigate their damages. To the contrary, in addition to the initial cease and desist letter, The Institutes sent Mr. Potter another letter in which they detailed their objections to BI Conferences. *See* Plaintiffs' SOF at 16-17. And, upon learning that Potter sold BIH, they sent a letter to Mr. Acunto to advise him of the litigation. *See* Acunto Tr., attached hereto as **Exhibit F**, at 240:16-246:5.

App.275

Nonetheless, Defendants not only forged ahead with the C&H Conference, but BIH doubled down and planned additional conferences and claimed they were not even bound by the terms of the non-compete. BIH cannot claim that The Institutes failed to mitigate their damages when it is BIH itself that forced The Institutes to litigate the threshold question as to the applicability of the agreement to BIH and continues to argue that its additional conferences and webinars are permitted under the terms of the APA.

18.    Admitted in part; denied in part. It is admitted that Ms. Blume testified that a dog-walking business would not violate the non-compete. It is denied that she was unable to answer a question as to whether conferences in stress management or business-community relations would violate the non-compete. To the contrary, to answer the question Ms. Blume referred counsel to the specific terms of the non-compete itself, which provides that the Selling Parties could not be involved in any activities that are otherwise competitive with the Sellers' Businesses. *See* Ex. A, Blume 5/27/21 Tr. at 202:11-204:13. That counsel was not satisfied with this straightforward response to his hypothetical is not grounds to suggest that Ms. Blume could not answer the question.

19.    Admitted in part; denied in part. It is admitted that Ms. Blume so testified, but The Institutes deny any insinuation that Ms. Blume learned information on a deposition break that caused her to amend her testimony. To the

App.276

contrary, Ms. Blume testified that her earlier testimony was limited to the
conferences referenced in the complaint, because those conferences were the only
events scheduled at the time the complaint was filed. She added that since the
filing of the complaint, BIH has held additional conferences and webinars that The
Institutes believe violate the non-compete. *See* Blume 8/26/21 Tr., attached hereto
as **Exhibit G**, at 83:13-86:24. Moreover, although The Institutes have not further
amended their complaint, the relief they seek included prospective relief, based on
their belief that Defendants' competitive conduct would continue into the future, as
it has.

### COUNTERSTATEMENT OF MATERIAL FACTS

1.     Beacon Intercontinental Group Inc., which acquired BIH, filed
counterclaims against Potter in the Southern District of New York, asserting that
Potter failed to advise them that BIH was bound by the restrictive covenants in
Section 6.12 of the APA and, had the buyers been aware of that fact, they would not
have purchased BIH for the agreed-upon price.  *See* Counterclaims of BIH in *Potter
v. Beacon Intercontinental Grp., Inc., et al.*, No. 1:20-cv-4599 (S.D.N.Y.), attached
hereto as **Exhibit H**,  ¶¶ 138-186.

Respectfully submitted,

/s/  *Barry Klayman*
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com

*Attorneys for Plaintiffs, The American
Institute for Chartered Property Casualty
Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

March 4, 2022

App.278

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE,**
**FONT AND WORD LIMITATIONS**

Plaintiffs' Response in Opposition to Business Insurance Holdings, Inc.'s Statement of Undisputed Material Facts and Counterstatement of Material Facts complies with the type and font requirement and word limitation set forth in this Court's Scheduling Order, as amended, because it has been prepared in Times New Roman 14-point font using Microsoft Word 2016 and contains 1,863 words, excluding the title page and signature block.

*Signature on following page.*

/s/  *Barry Klayman*

Barry M. Klayman, Esq. (#3676)

**COZEN O'CONNOR**

1201 North Market Street, Suite 1001

Wilmington, DE 19801

Tel: (302) 295-2035

Fax: (215) 701-2209

Email: bklayman@cozen.com

*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:

Robert W. Hayes (Admitted Pro Hac Vice)

Matthew J. Siegel (Admitted Pro Hac Vice)

COZEN O'CONNOR

1650 Market Street, Suite 2800

Philadelphia, PA  19103

RHayes@cozen.com

MSiegel@cozen.com

DATED: March 4, 2022

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## APPENDIX OF EXHIBITS TO PLAINTIFFS' REPONSE TO DEFENDANT BUSINESS INSURANCE HOLDINGS, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
RHayes@cozen.com
MSiegel@cozen.com

## TABLE OF CONTENTS

| Exhibit | |
|---|---|
| | |
| Exhibit A | Anne Blume Deposition (5/27/21) Transcript Pages |
| Exhibit B | Adam Potter Deposition Transcript Pages |
| Exhibit C | Katie Kett Deposition Transcript Pages |
| Exhibit D | Peter Miller Deposition Transcript Pages |
| Exhibit E | Keith Kenner Deposition Transcript Pages |
| Exhibit F | Steve Acunto, Sr. Deposition Transcript Pages |
| Exhibit G | Anne Blume Deposition (8/26/21) Transcript Pages |
| Exhibit H | Counterclaims of BIH in Potter v. Beacon Intercontinental Group, et al., No. 1:20-cv-4599 (S.D.N.Y.) |

# Exhibit A

## Anne Blume Deposition (5/27/21) Transcript Pages

ANNE BLUME
CHARTERED PROPERTY V ADAM POTTER

May 27, 2021
1–4

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2
 3         CIVIL ACTION NO.:  1:19-cv-01600-CFC
 3
 4   THE AMERICAN INSTITUTE FOR
     CHARTERED PROPERTY CASUALTY
 5   UNDERWRITERS and THE INSTITUTES,
 6         Plaintiffs,
 7     -vs-
 8   ADAM POTER, PBIH, LLC, and
     BUSINESS INSURANCE HOLDINGS, INC.,
 9
            Defendants.
10   _____/
11
12
                    Esquire Deposition Solutions
13                  Remote Proceeding
                    Zoom Videoconference
14
                    Thursday, May 27, 2021
15                  10:03 a.m.
16
17
18
19
20
21        DEPOSITION OF ANNE BLUME,
21
22     Taken before Matthew J. Haas, Notary
22   Public in and for the State of Florida at Large,
23   pursuant to Notice of Taking Deposition in the
24   above cause.
25
```

**Page 2**

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3     COZEN O'CONNOR
       One Liberty Place
 4     1650 Market Street
       Suite 2800
 5     Philadelphia, Pennsylvania 19103
       (215)665-2094
 6     Rhayes@cozen.com
       BY: ROBERT HAYES, ESQUIRE
 7
       THE INSTITUTES
 8     720 Providence Road
       Suite 100
 9     Malvern, Pennsylvania 19355
       (800) 644-2101
10     BY: LINDA HOHN, ESQUIRE (In-house counsel)
11   ON BEHALF OF ADAM POTTER:
12     FOX ROTHSCHILD, LLP
       2000 Market Street
13     20th Floor
       Philadelphia, Pennsylvania 19103
14     (215) 299-2766
       Rtintner@foxrothschild.com
15     BY:  ROBERT S. TINTNER, ESQUIRE
       NATE BUCHTER, ESQUIRE
16
     ON BEHALF OF PBIH, BUSINESS INSURANCE HOLDINGS:
17
       DLA PIPER LLP (US)
18     1201 North Market Street
       Suite 2100
19     Wilmington, Delaware 19801
       (302) 468-5629
20     Matthew.denn@dlapiper.com
       BY:  MATTHEW DENN, ESQUIRE
21
22   ALSO PRESENT:
23     Adam Potter
       Staci Hudson, DLA Piper
24     Don Savoy, Videographer
25
```

**Page 3**

```
 1              I N D E X
 2
     WITNESS              EXAMINATION BY       PAGE
 3
     Anne Blume          Mr. Tintner           6
 4                       Mr. Denn            170
                         Mr. Hayes           216
 5
 6          E X H I B I T S
 7   BLUME
     EXHIBITS:    DESCRIPTION:              PAGE:
 8
     EXHIBIT 1 - Schedule 6.12, "Permitted Activities,"   83
 9   of the Asset Purchase Agreement
10   EXHIBIT 2 - Asset Purchase Agreement     88
11   EXHIBIT 3 - Email from BI Events to Anne Blume,    101
     dated 7-19-19
12   RE:  Register Now for the Business Insurance
     Cannibis & Hemp Conference
13
     EXHIBIT 4 - Business Insurance 2019 Cannabis   111
14   Conference agenda web page
15   EXHIBIT 5 - Email from Katherine Horowitz to   123
     Anne Blume, dated 7-22-19
16   RE:  Register Now for the Business Insurance
     Cannibis & Hemp Conference
17
     EXHIBIT 6 - The Institutes' initial complaint   126
18
     EXHIBIT 7 - Amended supplemental complaint   139
19
20   EXHIBIT 8 - Plaintiffs' responses to defendants'   147
     first set of interrogatories
21   EXHIBIT 9 - Email from Ian Stewart to Anne Blume,   166
     Dated 7-26-19
22   RE:  Screenshot 2019-07-25 at 9.23.26 PM
23
24
25
```

**Page 4**

```
 1   BIH
     EXHIBITS:    DESCRIPTION:              PAGE:
 2
     EXHIBIT 7 - CLM financial projections for   187
 3   year 2019
 4   EXHIBIT 22 - CLM statement of activities   188
     for the 12 months ending calendar
 5   years 2018 and 2019
 6
 7
     MARKED QUESTION:
 8
     1 - Page 24, Line 25
 9   2 - Page 32, Line 3
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



800.211.DEPO (3376)
EsquireSolutions.com

ANNE BLUME                                                 May 27, 2021
CHARTERED PROPERTY V ADAM POTTER                           41—44

Page 41
1 to take that or me?
2        THE VIDEOGRAPHER:  I think that
3 maybe if Anne, if that office did a
4 disconnect and reconnect, it might work
5 better, her connection.
6        MR. TINTNER:  Why don't we go off
7 the record and take a break so she can do
8 that.
9        THE VIDEOGRAPHER:  We're going off
10 the record at 11 a.m.
11       (Thereupon, a break was taken.)
12       THE VIDEOGRAPHER:  We're back on the
13 record at 11:07 a.m.
14       MR. TINTNER:  Could you read the
15 last question back, I apologize.  Could the
16 court reporter read the last question back.
17       (Thereupon, the record was read as
18 requested.)
19       MR. TINTNER:  You did, so you don't
20 need to repeat that.
21 BY MR. TINTNER:
22    Q.   How long have you served as the CEO
23 of The CLM?
24    A.   Since October 8th of 2018.
25    Q.   Okay.  And you're leaving The CLM?

Page 42
1    A.   Yes, yes.
2    Q.   Is that correct?
3    A.   I'm retiring.
4    Q.   You're retiring.  Okay.
5    A.   Yes.
6    Q.   And when are you retiring?
7    A.   I start part-time on June 1st and
8 until there's the next CEO in place, and I make a
9 smooth transition.
10   Q.   Have they begun the search committee
11 for the new CEO?
12   A.   I don't know.
13   Q.   Was this a voluntary retirement on
14 your part?
15   A.   Yes.
16   Q.   Okay.  So your decision to retire
17 has nothing to do with the performance of The CLM
18 from a financial standpoint?
19   A.   That's correct, no, all personal.
20   Q.   Okay.  Is your part-time status, are
21 you going to stay on part-time only until the new
22 CEO is hired or do you intend to work part-time
23 for some extended period of time?
24   A.   I will do whatever The Institutes
25 and the new CEO want me to do, whether that's

Page 43
1 duck out quickly or stay on for a period of time,
2 I'm happy to do that.  There really hasn't been
3 any parameters put on it.
4    Q.   Okay.  We've been throwing around
5 "The CLM" and talking about it.  Can you -- as
6 the current CEO, can you describe what The CLM
7 does, please.
8    A.   Certainly.  Yeah, we are one of the
9 largest, if not the largest, trade association in
10 the insurance space bringing together insurance
11 carriers, TPAs, risk managers, claim managers,
12 corporate counsel, defense lawyers, service
13 providers, really -- insurance brokers, the
14 stakeholders in the claims and litigation
15 management space for education, training, and
16 networking.
17   Q.   And do you have members?
18   A.   Yes.
19   Q.   Is that how the organization works?
20   A.   Yes, yes.
21   Q.   And can you describe who the members
22 are?
23   A.   Members are outside counsel,
24 lawyers.
25   Q.   Okay.  And do you have sponsors?

Page 44
1    A.   We do.
2    Q.   And who are the sponsors in general?
3 I'm not asking who they are specifically.
4    A.   Some are law firms, some are service
5 providers, you know, your copy services, expert
6 witnesses, that sort of thing.
7    Q.   Okay.  And does The CLM also have
8 customers?
9    A.   I don't know what you mean.
10   Q.   Okay.  You don't use that term of
11 art, "customers," to describe any group that
12 participate with The CLM?
13   A.   In certain context we will refer to
14 customers, but it's pretty contextual.
15   Q.   Well, give me a context in which you
16 would use the term of art "customers."
17   A.   Well, I would talk about our
18 customers in terms of who the advertisers are in
19 our publications and newsletters.  I would talk
20 about them as customers.
21   Q.   Okay.  Now, what is -- can you
22 describe what The Institutes is?
23   A.   I don't know what you mean.
24   Q.   The entity The Institutes, which is
25 one of the plaintiffs in this case, can you



ANNE BLUME                                                    May 27, 2021
CHARTERED PROPERTY V ADAM POTTER                             201–204

Page 201

1  conducted of the closing date is events,
2  continuing education, and a wide variety of
3  industry resources.  Did I read that correctly?
4      A.  Yes.
5      Q.  So your reading of that section was
6  that anyone subject to the noncompete couldn't be
7  involved in events, continuing education, and a
8  wide variety of industry resources unless it was
9  specifically permitted by the permitted
10 activities schedule?
11     A.  There's a lot of words in that
12 question.  The noncompete allowed the Business
13 Insurance business as it is to -- that existed on
14 the date -- on the closing date to continue, you
15 know, but not grow or be modified to get into
16 certain other areas within five years.
17        So there was five years of, you
18 know, what it says here at Paragraph 6.12(a) and
19 then there were certain activities that were
20 permitted, provided, however, and then those
21 points below that clarify the permitted
22 activities.  That was my review anyway.
23     Q.  Was it your opinion based on this
24 memo that any event, continuing education, or
25 other industry resource was prohibited unless it

Page 202

1  was strictly permitted by the activity schedule?
2      A.  I think you're reading it a little
3  more broadly, but I pretty much said the same
4  thing four or five times now, you know, Business
5  Insurance could continue the business of Business
6  Insurance that existed on the closing date, and
7  the permitted activities are kind of a
8  description of the Business Insurance activities,
9  and there's a Subject 2 or "provided however,"
10 I think, are the words under that.
11     Q.  So Mr. Tintner used the example of a
12 dog walking event, and I think that you said that
13 you didn't think that that would be prohibited by
14 the noncompete; is that correct?
15     A.  Because it's not otherwise
16 competitive.  Do you see where it says in 6.12(a)
17 about the fifth line down, "that are otherwise
18 competitive with any of the seller's businesses."
19     Q.  So using the analysis that you
20 provided in this memo, if BIH wanted to have an
21 event that was targeted at the insurance industry
22 that didn't involve insurance, for example,
23 stress management or business community
24 relations, would those be permitted events?
25        MR. HAYES:  Object to the form.

Page 203

1        THE WITNESS:  Yeah, I can't
2      answer -- I can't answer that question.
3  BY MR. DENN:
4      Q.  Why is that?
5      A.  I don't understand it.
6      Q.  Is it your understanding of the
7  noncompete that if BIH were to have an event that
8  was targeted at the insurance industry but did
9  not specifically involve insurance, such as
10 stress management for insurance industry
11 professionals, that that would violate the
12 noncompete?
13        MR. HAYES:  Object to the form.
14        THE WITNESS:  It's not a permitted
15      activity.
16 BY MR. DENN:
17     Q.  So that would violate --
18     A.  Business Insurance had the right to
19 continue the business as it existed on the
20 closing date.
21     Q.  So your interpretation of the
22 noncompete was that any activity that Business
23 Insurance wasn't specifically already involved in
24 on the closing date could not be engaged in going
25 forward?

Page 204

1      A.  Do you want me to read 6.12(a) out
2  loud?
3      Q.  No, I'm just asking if what I just
4  stated reflects your interpretation of it?
5      A.  "The selling parties could not
6  conduct, manage, operate, engage in, or have an
7  ownership interest in any business or enterprise
8  engaged in any activities that are otherwise
9  competitive with any of seller's businesses as
10 conducted on the closing date except that during
11 the noncompete period, any selling party or any
12 other party listed on Schedule 6.12 may undertake
13 the activities set forth on Schedule 6.12."
14     Q.  Let me move on to talk to you about
15 Claims X.  Mr. Tintner asked you if Claims
16 Exchange competes with CLM and you responded
17 Claims Exchange tries to compete with CLM.  May
18 I use Claims X and Claims Exchange
19 interchangeably?  You understand them to be the
20 same?
21     A.  Sure.
22     Q.  Is Claims Exchange currently doing
23 anything at all?
24     A.  I don't know.  I think they had a
25 webinar recently.

ANNE BLUME
CHARTERED PROPERTY V ADAM POTTER

May 27, 2021
213–216

Page 213

1  they were put to me.
2      Q.   Okay.  Well, let me try asking it in
3  a broader way, then.  What damages do you believe
4  that The Institutes or AICPCU have suffered as a
5  result of what you allege the defendants' actions
6  to have been?
7      A.   For that you would have to go back
8  to the complaint.  I know that there's the loss
9  of goodwill.  We talked about -- I don't have
10  personal knowledge of the loss of any specific
11  sponsors or sponsorships, just the Wilson Elser
12  example that I've been giving.
13          There is diminution in value in the
14  marketplace, right, because there was no
15  competition, and there's not supposed to be
16  competition for five years, and there is, and
17  that to me diminishes the value of The CLM, and
18  we've lost a competitive edge.
19      Q.   Can I ask you specifically about
20  that?  What specific evidence do you have that
21  either The Institutes or AICPCU have suffered any
22  reduction in the value of The CLM as a result of
23  any of the defendants' actions?
24      A.   Well, on June 1st of 2018, The CLM
25  had quite a niche in the marketplace, and, you

Page 214

1  know, frankly, brilliantly created and built, and
2  the machine is fantastic.  The way we bring
3  together the lawyers and the carriers and the
4  insureds and all of the providers, all of the
5  service providers that service those folks,
6  including brokers.  We have brokers that are very
7  strong participants in The CLM.
8          So the way we've connected these
9  groups, if you will, these are the stakeholders
10  in any dispute.  That is what we do, and, you
11  know, that -- as of June 1, 2018, we were pretty
12  much the only association, the only entity out
13  there doing this, and now we've got some
14  confusion in the marketplace.
15          You've got Claims Exchange that is
16  trying to do what we do.  You've got Business
17  Insurance that is delivering content and causing
18  consumer confusion in the marketplace, because
19  they're doing the things that we do.
20      Q.   And so that is your response to the
21  question of what is the evidence of the loss in
22  value?
23      A.   That is my explanation --
24      Q.   Okay.
25      A.   -- of how the asset, The CLM, has

Page 215

1  lost value.
2      Q.   And do you have any specific
3  examples currently of any confusion in the
4  marketplace between The Institutes or CLM and
5  Business Insurance?
6      A.   No.  Sorry, the light keeps -- it's
7  automatic in here.  What I said earlier is I do
8  recall when -- really when BI first came out with
9  its cannabis and hemp conference.  Did you know
10  about this?  Is this with you?  And then same
11  thing with Claims Exchange, did you know about
12  this?  Is this in conjunction with The CLM, for
13  folks that didn't know that Sidney was
14  terminated?  There's definitely confusion,
15  especially -- you know, it's a tight network.
16      Q.   And the phone calls that you just
17  referred to, is that the totality of your
18  knowledge as to any confusion?
19      A.   My personal knowledge, yeah.
20      MR. DENN:  Okay.  I do not believe
21  that I have any other questions.  Thank
22  you.  Mr. Tintner may have some more.
23      MR. TINTNER:  I do not have any
24  follow-up questions.
25      MR. HAYES:  I just have one

Page 216

1  follow-up question.  Can you put up BIH 22
2  again, please.  I believe that's the
3  financial statements.
4      MR. DENN:  Staci, could you put that
5  up.
6      MR. HAYES:  And can you just go to
7  the page that you were looking at, the
8  total revenues for CLM and -- that's fine.
9  Just so you can see the headings, please.
10  Okay.
11          CROSS-EXAMINATION
12  BY MR. HAYES:
13      Q.   If you look -- Anne, if you look at
14  the year-to-date column, it says AC -- and then
15  the top column is ACT.  Is that actual?
16      A.   Yes.
17      Q.   And then it says BGT.  Do you know
18  what that means?
19      A.   Budget.
20      Q.   And then FAV?
21      A.   Right, it would be "favorable"
22  if there's no parens around it.  So for example,
23  commissions, that's favorable, the others are
24  under budget.
25      Q.   And then for the actual, that would



# Exhibit B

## Adam Potter Deposition Transcript Pages

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
 3                      Case No. 1:19-cv-01600-CFC
 4
    The American Institute For Chartered    :
 5  Property Casualty Underwriters and the  :
    Institutes, LLC,                        :
 6                                          :
                  Plaintiff,                :
 7                                          :
                                            :
 8         vs.                              :
                                            :
 9                                          :
                                            :
10                                          :
    Adam Potter, PBIH, LLC, and business    :
11  Insurance Holdings, Inc.,               :
                                            :
12             Defendants.                  :
                                            :
13                                          :
14
15         ------------------------------------
                 REMOTE VIDEOTAPED
16     DEPOSITION UNDER ORAL EXAMINATION OF:
                    ADAM POTTER
17                  (VOLUME II)
                   June 16, 2021
18                  ------------
    REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR
19                  ------------
20
21  JOB #  J7194872
22
23
24
25
```

**Page 2**

```
 1         TRANSCRIPT of the remote videotaped
 2  deposition of the above-named witness, called for
 3  Oral Examination in the above-entitled matter, said
 4  deposition being taken pursuant to Federal Court
 5  Rules, by and before JENNIFER L. WIELAGE, Certified
 6  Shorthand Reporter and Notary Public of the State of
 7  New Jersey, License No. XI01916, on Wednesday,
 8  June 16, 2021, commencing at 10:15 in the forenoon.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  A P P E A R A N C E S:
 2
 3  FOX ROTHSCHILD
    2000 Market St.
    20th Floor
 4  Philadelphia Pennsylvania 19103-3222
    (215) 299-2000
 5  BY:  ROBERT TINTNER, ESQ.
    Attorneys for Adam Potter
 6
    COZEN O'CONNOR PC
 7  1650 Market Street
    Suite 2800
 8  Philadelphia, PA 19103
    (215) 665-2000
 9  BY:  ROBERT W. HAYES, ESQ.
    Attorneys for Plaintiff
10
    DLA PIPER
11  200 S Biscayne Blvd
    Suite 2500
12  Miami, Florida 33131
    (305) 423-8500
13  BY:  CHRISTOPHER G. OPRISON, ESQ.
    chris.oprison@dlapiper.com
14  Attorneys for Business Insurance Holdings Inc.
15  DLA PIPER
    1201 No. Market Street
16  Suite 2100
    Wilmington, DE 19801
17  (302) 468-5700
    BY:  MATTHEW DENN, ESQ.
18  matt.denn@dlapiper.com
    Attorneys for Business Insurance Holdings Inc.
19
    DLA PIPER
20  1251 Avenue Of The Americas
    New York, New York 10020
21  BY:  DAVID TONER, ESQ.
    dtoner@dlapiper.com
22  (212) 335-4500
    Attorneys for Business Insurance Holdings Inc.
23
    ALSO PRESENT - GEORGE ELLIS, Videographer, LINDA
24  HOHN, In-House Counsel for the Institutes, CAROLE
    ACUNTO
25
```

**Page 4**

```
 1              I N D E X
 2
 3
    W I T N E S S
 4
    Testimony of:
 5
 6  ADAM POTTER                          PAGE NO.
 7
    EXAMINATION BY MR. HAYES                  7
 8  EXAMINATION BY MR. OPRISON:            121
    EXAMINATION BY MR. HAYES:              196
 9
10
11
12          E X H I B I T S
13  NUMBER          DESCRIPTION          PAGE
14
    Exhibit      Institutes0010863        22
15  Potter-1     through Instituees10867
    Exhibit      Asset Purchase Agreement  34
16  Potter-2
    Exhibit      Asset Purchase Agreement  38
17  Potter-3     Schedules
    Exhibit      BIH-003-006043 through    58
18  Potter-4     BIH-003-006046
    Exhibit      Stock Purchase Agreement  60
19  Potter-5
    Exhibit      BIH-003-006434            63
20  Potter-6
    Exhibit      BIH-003-005895 through    68
21  Potter-7     5897
    Exhibit      BIH-003-005875 to         71
22  Potter-8     BIH-003-005876
    Exhibit      BIH-002-003715 through    74
23  Potter-9     BIH-002-003718
    Exhibit      Email, March 19, 2019     76
24  Potter-10
    Exhibit      BIH-003-005616            77
25  Potter-11
```



ADAM POTTER VOLUME II
AIFCPCU V POTTER

June 16, 2021
33–36

Page 33

1  events because we already did that.
2      Q.    My question is:  Did you ask that
3  that language specifically also call out conferences
4  in addition to newsletters?
5      A.    Did I specifically ask for that?
6      Q.    Yes.
7      A.    No.
8      Q.    What do you understand, if you have
9  any understanding at all, of what live delivery
10  means?
11      A.    People attending events and
12  conferences in person.
13      Q.    Did you have any objection to
14  agreeing to a covenant not to compete?
15      A.    As long as it was specific enough,
16  no, because I ended up signing one, so no.
17      Q.    You understood why the Institutes
18  would want a covenant not to compete from you and
19  your companies, correct?
20          MR. TINTNER:  Object to the form.
21      A.    Do I understand why?
22      Q.    Yeah.
23      A.    Yeah, I didn't have -- I never had an
24  intent to compete with -- not compete with them.  I
25  don't want to compete with them.

Page 34

1      Q.    Do you agree that Business Insurance
2  is uniquely situated to compete against the CLM
3  because of the prior affiliation?
4          MR. TINTNER:  Object to the form.
5          MR. OPRISON:  Objection to the form.
6      A.    No.
7          Before we start reviewing this, can I
8  take a quick literally two-minute bathroom break?
9      Q.    Sure.
10          THE VIDEOGRAPHER:  Okay.  We're going
11  off the record.  The time is 11:02.
12          (A brief recess was taken.)
13          THE VIDEOGRAPHER:  We are now back on
14  the record.  The time is 11:06.
15          (Exhibit Potter-2, Asset Purchase
16          Agreement, was marked for Identification by
17          the court reporter.)
18  BY MR. HAYES:
19      Q.    Okay.  Mr. Potter, hopefully on the
20  screen share there is the -- a copy of the Asset
21  Purchase Agreement with the Institutes.
22          Is that there?
23      A.    Yes.
24      Q.    And we're going to mark that as
25  Exhibit 2.  And again, I think you still have the

Page 35

1  ability to scroll through if you would like.  This is
2  a long document, but if you want to scroll through
3  it, go ahead.
4      A.    No, I'm familiar with it, generally.
5      Q.    I'm going to direct your attention to
6  Section 12.
7          Do you recognize that as specifically
8  6.12(a) as the noncompetition provision, correct?
9      A.    Correct.
10      Q.    And then that provision applies to
11  each selling party, correct?
12      A.    Correct.
13      Q.    Okay.  And the selling party is
14  defined in the agreement, correct?
15      A.    I believe it's in the definitions.
16      Q.    Right.  Okay.  And it provides that
17  the -- neither any selling party nor its affiliates
18  shall directly or indirectly anywhere in the United
19  States conduct, manage, operate, engage in or have an
20  ownership interest in any business or enterprise,
21  engage in any activities that are otherwise
22  competitive with any of the Sellers' Businesses as
23  conducted on the Closing Date, except that during the
24  Noncompete Period any Selling Party or any other
25  party listed on Schedule 6.12, may undertake the

Page 36

1  activities set forth on 6.12 attached hereto.
2          Did I read that correctly?
3      A.    Approximately.  You made some
4  prepositions in some words, but, yes, approximately.
5      Q.    And you agreed to that provision,
6  correct?
7      A.    Yes.
8      Q.    And the language of the noncompete
9  says:  Except that, during the Noncompete Period, any
10  Selling Party or any other party listed on Schedule
11  6.12 may undertake the activities set forth on
12  Schedule 6.12 attached hereto, correct?
13          That was word for word, right?
14      A.    In that part of the sentence, yes.
15      Q.    And so you understood that the only
16  competitive activities in which you or any of your
17  company -- any selling party could engage during the
18  noncompete period were those activities set forth on
19  Schedule 6.12?
20      A.    No.
21      Q.    So your understanding is you or any
22  of the selling parties could engage in activities
23  that were competitive with the CLM's business that
24  were not set forth in Schedule 6.12?
25      A.    I -- I'm sorry.  I don't think I



ADAM POTTER VOLUME II                          June 16, 2021
AIFCPCU V POTTER                                   37–40

Page 37

1 recall you said that it was competitive with Sellers'
2 business.  I thought you said I couldn't compete -- I
3 couldn't do any activities except for Schedule 6.12
4 related activities.
5     Q.    Let's try it again.
6          So did you understand that the only
7 activities competitive with the CLM's business, as of
8 the time -- well, let me rephrase that.
9          You understood that the only
10 activities in which you or any selling party could
11 engage that were get difficult with the businesses
12 being sold or the assets being sold were those that
13 were set forth on Section 6.12?
14    A.    I don't under -- I'm sorry.
15         Can you repeat that again?  It was a
16 very long sentence or question.
17    Q.    So you understood 6.12(a), one part
18 provided that you or neither you nor any selling
19 party could engage in any activities that are
20 otherwise competitive with any of the Sellers'
21 businesses as conducted as of the closing date,
22 right?
23    A.    We could not.
24    Q.    Correct.
25    A.    Is that what you're asking?

Page 38

1    Q.    Yes.
2    A.    As of the closing date compete with
3 any activities that are competitors with the Sellers'
4 businesses.
5    Q.    And the only exception were those
6 activities set forth on Schedule 6.12?
7    A.    That's what this says, correct.
8    Q.    Okay.  And then -- okay.  You should
9 have in front of you hopefully the Asset Purchase
10 Agreement Schedules.
11    A.    Yes.
12    Q.    Did you understand -- and I would
13 mark the Asset Purchase Agreement Schedules as
14 Exhibit 3.
15         (Exhibit Potter-3, Asset Purchase
16        Agreement Schedules, was marked for
17        Identification by the court reporter.)
18 BY MR. HAYES:
19    Q.    That determining whether -- that the
20 Schedule A defines what the Sellers' businesses were?
21    A.    At the time of closing.
22    Q.    Which is the relevant time period?
23    A.    Correct.
24    Q.    So when 6.12 says -- refers to the
25 Sellers' businesses, Section 6.12?

Page 39

1    A.    Yep.
2    Q.    What is defined as the Sellers'
3 business is set forth in Schedule A?
4    A.    Correct.
5    Q.    Okay.  And then, for instance, for
6 the CLM, No. 5 on Schedule A refers to an Annual
7 Conference, which is an annual event for
8 professionals in the claims and litigation management
9 industries, featuring educational sessions and
10 networking.
11         Correct?
12    A.    That's what it says, yeah.
13    Q.    And No. 6 states:  Specialty
14 conferences, including Retail Restaurant and
15 Hospitality Worker's Compensation, Midwest,
16 Management and Professional Liability, Construction,
17 Claims College, Cyber Summit, Southeast, LMI and
18 Chief Claims Officer Summit.
19         Correct?  Did I read that correctly?
20    A.    You read that correctly.
21    Q.    Doesn't in any way limit those
22 conferences to only those professionals in the claims
23 and litigation management industries, does it?
24    A.    Hold on.  I'm just looking at the top
25 of this document.

Page 40

1         It limits it by the top of the
2 document which says it's professionals in the claims
3 resolutions and the litigation management industries.
4    Q.    It also indicates, does it not, CLM
5 offers the following products and services, right?
6 And then it goes 1 through 11, right?
7    A.    Yes.
8    Q.    Okay.  And 6 is Specialty Conferences
9 and then it provides, including a list of specialty
10 conferences, correct?
11    A.    Yes.
12    Q.    And there's nothing in 6 that limits
13 those specialty -- it to specialty conferences
14 provided to claims and litigation management --
15        MR. TINTNER:  Objection to the form.
16    A.    And that's not correct.
17 BY MR. HAYES:
18    Q.    Where do you see in Section 6 that
19 limitation -- sorry, not section -- in Item 6?
20    A.    Above it.  Everything here relates to
21 the description when -- you know, it's --
22 grammatically, it's English.  You have a paragraph
23 and you say:  Here are the things that relate to
24 this.  It relates to the paragraph.  It relates to
25 claims and litigation management professionals.  As



ADAM POTTER VOLUME II                                    June 16, 2021
AIFCPCU V POTTER                                              41—44

Page 41

1  of the date of closing -- this is what they did at
2  the date of closing, all relating to claims and
3  management professionals.
4          It doesn't relate to, you know,
5  health care workers.
6      Q.    Well, when, for instance, in No. 9,
7  it specifically refers to those presented by claims
8  litigation and insurance professionals, correct?
9      A.    Hosts webinar topics, ranging... yes,
10  presented by.
11     Q.    Okay.
12     A.    The Webinars were presented by.
13     Q.    And under -- right, so what I wanted
14  to limit a topic to claims litigation insurance
15  professionals, so it's specified in No. 9, right?
16     A.    No, it doesn't say the topic.  It
17  says "presented by."
18     Q.    Correct.
19          MR. OPRISON:  Objection to the form
20  of the last question, please.
21  BY MR. HAYES:
22     Q.    The definition of C&E's business is
23  an event planning company that manages all of CLM's
24  events, correct?
25     A.    Correct.

Page 42

1      Q.    You agreed to that description,
2  correct?
3      A.    Do I or did I or -- I'm sorry?
4      Q.    You did, in signing this agreement?
5      A.    Correct.
6      Q.    You understood an event would
7  include, for instance, a conference or a seminar?
8      A.    Correct.
9      Q.    Then if we turn on Exhibit 3 -- turn
10  to, I should say, in Exhibit 3, the Schedule 6.12.
11  6.12 defines the Permitted Activities, correct?
12     A.    Correct.
13     Q.    And it defines the first entity
14  referenced as Business Insurance Holdings, LLC,
15  correct?
16     A.    Yes.
17     Q.    Okay.  And it provides a definition
18  of Business Insurance's existing business, correct?
19     A.    Yes.
20     Q.    Okay.  And just go back to Exhibit 1.
21  Do you agree with me that -- and I'll switch back,
22  but would you agree with me that the description in
23  Schedule 6.12 is, basically, taken from your
24  description of Business Insurance's business in
25  Exhibit 1?

Page 43

1          MR. TINTNER:  Object to the form.
2      A.    I would need to compare side by side.
3      Q.    All right.  Well, let's look at this
4  where you restate in Exhibit 1, define -- the
5  business indicates a series of events and award
6  programs, right?
7      A.    Yes.
8      Q.    Now, if we look back at Exhibit 3,
9  the Schedule Section 6.12, it refers to events and
10  award programs and states, as follows, correct?
11     A.    Yes, that's what it says.
12     Q.    So it was specifically defining
13  specific events and award programs, right?
14     A.    It was giving specific -- no, it was
15  giving examples.
16     Q.    Do you understand the word "as
17  follows" as "examples"?
18     A.    Well, I mean, when we came up with
19  this list, we knew that this was a -- a -- kind of an
20  overall idea of what Business Insurance did, but we
21  knew that there were other things and even as Kate
22  said in her deposition last week, this -- all she
23  wanted to do was make sure that we stayed out of the
24  claims and litigation management space.  She knew
25  this was not a fully exclusive list, and as she even

Page 44

1  said -- you know, which I'm sure you would listen to,
2  that there were other things that we were doing or we
3  planned on doing.  This was not exclusive and she
4  knew we were going to be doing more.
5      Q.    My question to you, sir, is the
6  language in the agreement says:  Events and Award
7  Programs as follows.  Correct?
8      A.    Correct.
9      Q.    And the word "as follows" are added
10  in the agreement to how you phrased it in Exhibit 1
11  with your email?
12     A.    I need to go back and see that.  No,
13  I didn't say "as follows."
14     Q.    So that was added in the agreement,
15  right?
16     A.    It must have been, yes.
17     Q.    At any time, did you -- did you ask
18  that instead of saying "as follows," it's saying for
19  example?
20     A.    I don't recall if I asked.
21     Q.    And do you recall if your attorney
22  did that on your behalf?
23     A.    I don't recall.
24     Q.    Okay.  Do you ask that any language
25  be included to define new businesses into which



# Exhibit C

## Katie Kett Deposition Transcript Pages

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
           DELAWARE COUNTY, PENNSYLVANIA
 2
 3        FOR ATTORNEYS EYES ONLY
 4
   THE AMERICAN INSTITUTE   :
 5 FOR CHARTERED PROPERTY    :
   CASUALTY UNDERWRITERS      :
 6 AND THE INSTITUTES         :
   LLC,                       :
 7                            :
        Plaintiff(s),   :
 8                            :
        vs.             :
 9                            :
   ADAM POTTER, et al.,  :
10                            :
        Defendant(s).   : NO. 1:19-CV-01600
11
                     - - -
12        Tuesday, August 10, 2021
            Philadelphia, Pennsylvania
13                   - - -
14        Videotape deposition held via Zoom
15 webconference, commencing at approximately 2:08
16 p.m., on the above date, before Josephine Guerrieri,
17 Professional Court Reporter and Commissioner of
18 Deeds.
19
20
21                   - - -
22        VERITEXT LEGAL SOLUTIONS
             MID-ATLANTIC REGION
22        1801 Market Street - Suite 1800
23        Philadelphia, Pennsylvania 19103
                     - - -
24
```

Page 2

```
 1 A P P E A R A N C E S:
 2
   COZEN O'CONNOR
 3 BY:  MATTHEW J. SIEGEL, ESQUIRE
   1650 Market Street
 4 Suite 2800
   Philadelphia, Pennsylvania  19103
 5
   Counsel for Plaintiff(s)
 6
 7 FOX ROTHSCHILD, LLP
   BY:  NATHEN M. BUCHTER, ESQUIRE
 8 2000 Market Street
   Tenth Floor
 9 Philadelphia, Pennsylvania  19103
10 Counsel for Defendant(s)
   Adam Potter
11
   DLP PIPER
12 BY:  MATTHEW P. DENN, ESQUIRE
   1201 North Market Street
13 Suite 2100
   Wilmington, Delaware 19801
14
   Counsel for Defendant(s)
15 Business Insurance Holdings, LLC
16
   ALSO PRESENT:
17
   SCOTT LINDENBAUM
18 VIDEOGRAPHER
19
20
21
22
23
24
```

Page 3

```
 1        DEPOSITION SUPPORT INDEX
 2
   DIRECTIONS NOT TO ANSWER:
 3 PAGES:   None
 4
 5 REQUESTS FOR DOCUMENTS OR INFORMATION
   PAGES:   None
 6
 7
   STIPULATIONS AND/OR STATEMENTS:
 8 PAGES:   None
 9
10 MARKED QUESTIONS:
   PAGES:   None
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                - - -
 2          I N D E X
 3
   WITNESS                    PAGE
 4
   KATIE KETT
 5
   EXAMINATION BY
 6
     MR. SIEGEL        8, 179
 7
     MR. DENN          149
 8
     MR. BUCHTER       152
 9
10
11                - - -
12        E X H I B I T S
13
   NUMBER     DESCRIPTION      PAGE
14
     1      3/6/19 E-mail
15          BIH-003-0025932     38
16 2      3/12/19 E-mail
            BIH-002-003715      38
17
     3      4/30/19 E-mail
18          Potter-DE-000639    58
19 4      4/17/19 E-mail
            Potter DE-000682    59
20
     5      5/21/19 E-Mail
21          BIH-002-002489      63
22 6      6/20/19 E-Mail
            BIH-002-002105      66
23
     7      6/26/19 E-Mail
24          BIH-003-001928      72
```

Page 21

1         And when I'm asking you
2   question about Business Insurance, obviously
3   I'm not asking you anything from, you know,
4   that -- that Business Insurance may have
5   done prior to you being hired or anything
6   that it's currently doing, so, everything,
7   when I'm asking at BI's business is the
8   period of time that you were employed there.
9         So, how would you describe
10  BI's audience?
11      A.    I would say the primary target
12  is risk managers and enterprise risk
13  managers, also the greater commercial
14  insurance industry, including insurance
15  carriers, agents, brokers and other service
16  providers like legal, like attorneys or
17  third-party administrators.  Yeah, that's --
18  that's the idea.
19      Q.    Okay.  And what is a
20  third-party administrator in your
21  understanding?
22      A.    To the best of my knowledge, a
23  third-party administrator is a company that
24  primarily focuses on administering claims

Page 22

1   either for -- inhouse for a company or in
2   conjunction with another insurance company.
3       Q.    During your time at BI between
4   2015 and 2021, do you -- to your knowledge,
5   did that audience change at all, was there
6   ever a change in focus or a growth in any
7   one particular area?
8         MR. BUCHTER:  Object to the
9         form of the question.
10        THE WITNESS:  Not to my
11        knowledge.  I don't recall there
12        being a shift that I noticed.
13  BY MR. SIEGEL:
14      Q.    Prior to 2019, and I'm using
15  2019 as a date, because in 2019 and we'll
16  start talking about this later, you began
17  planning for a cannabis and hemp and IP
18  conference, do you recall that?
19      A.    Yes.
20      Q.    So, prior to 2019, prior to
21  the beginning of planning those -- those
22  events, what types of events and conferences
23  did Business Insurance put on?
24      A.    Like I said, typically it was

Page 23

1   either a mix of educational events with
2   content and really World Captive Forum was
3   the biggest one with content and prior to
4   doing cannabis and IT, we -- most of the
5   events were awards' focused.  The other one
6   that had more content was the Women to Watch
7   Awards in New York, and there was also one
8   in London.  Those had more like career
9   development content.
10      Q.    The Women to Watch had career
11  --
12      A.    The Women to Watch, yes.
13      Q.    And what about the World
14  Conference Forum, you said that that was
15  also content related.  What type of content
16  would you include in World Conference Forum
17  events -- World Captive Forum events?
18      A.    Yeah, World Captive Forum,
19  that -- it was primarily -- there's usually
20  three tracks, you have a general track, a
21  property/casualty track and a workers' comp
22  -- sorry, employee benefits, not worker's
23  comp, focused on either -- the content was
24  geared towards people who were -- who either

Page 24

1   already had a captive or were perspective
2   captive owners.
3       Q.    Okay.  For the benefit of the
4   court, when you say captive, can you define
5   what that means?
6       A.    From my understanding, a
7   captive is essentially an in-house insurance
8   company and I don't recall what the minimum
9   capital investment is, but generally all the
10  large enterprise companies have them, unless
11  -- there's different types of captives, like
12  group captives and it's -- they're
13  essentially insurance companies.
14      Q.    And how would you -- and I
15  know this -- well, maybe it was, were you
16  responsible for developing the content for a
17  World Captive Forum event?
18      A.    Well, when I say responsible
19  for content, I really -- I was really --
20  really acted as an intermediary between the
21  advisory board members and the -- it was
22  really the advisory board members who were
23  the industry experts that -- that develop
24  the content and source the speakers, but I

Page 57

1 BY MR. SIEGEL:
2    Q.    And your understanding of a
3 TPA like Sedgwick, Sedgwick Claims
4 Management Services is that they're involved
5 in handling -- in handling insurance claims,
6 right?
7    A.    Correct.
8          MR. BUCHTER:  Object to form.
9 BY MR. SIEGEL:
10   Q.    Do you recall any discussions
11 around this time as the advisory board is
12 taking shape with either Adam or anyone at
13 Wilson Elser about the inclusion of people
14 involved in, you know, the claims space
15 being part of the advisory board?
16         MR. BUCHTER:  Object to form.
17         THE WITNESS:  I don't recall
18     who invited Theresa and I don't --
19     I don't specifically remember
20     conversations about inviting
21     claims professionals to the board.
22 BY MR. SIEGEL:
23   Q.    But there was certainly no
24 discussion saying that claims professionals

Page 58

1 should be excluded from the board, right?
2    A.    Not that I recall, no.
3          MR. BUCHTER:  Object to form.
4 BY MR. SIEGEL:
5    Q.    Do you recall how the pricing
6 was set for attendees at the conference?
7    A.    I think that we based it off
8 previous conferences and may have compared
9 it to other competitive events.
10   Q.    Yeah, I'm not play gotcha or
11 anything --
12   A.    No, I don't recall
13 specifically.
14   Q.    All right.  I'm going to pull
15 up an e-mail that will jog your memory on
16 that.  I guess I forgot to mention that the
17 last exhibit would have been marked as
18 Exhibit-3.
19          - - -
20         (Whereupon, a document was
21     marked for identification as
22     Exhibit-3.)
23          - - -
24 BY MR. SIEGEL:

Page 59

1    Q.    I'm going to pull up what
2 we'll mark as Exhibit-4.
3          - - -
4         (Whereupon, a document was
5     marked for identification as
6     Exhibit-4.)
7          - - -
8         MR. BUCHTER:  Matt, I'm just
9     glad that I'm not the only one
10     that does that.
11         MR. SIEGEL:  Oh, forgets to
12     mention that I did that?
13         MR. BUCHTER:  Yeah, I do that
14     all the time.
15         MR. SIEGEL:  I just feel like
16     everybody should assume that if I
17     put an exhibit up there, it's got
18     a number and everybody remembers.
19 BY MR. SIEGEL:
20   Q.    So, I should have on your
21 screen now, an April 17, 2019 e-mail from
22 Adam Potter, Bates stamped Potter DE-000692.
23 I will -- well, let me see if I can shortcut
24 it, so, you don't have to see the whole

Page 60

1 thing, but you can certainly scroll through
2 it if you'd like.  Really starting from
3 here, Ms. Kett, where the discussion turned
4 to cannabis registration.  I'll turn control
5 over to you, if you'd like and then you can
6 scroll up.
7          Taking a look at Adam's e-mail
8 to you dated April 17th, he says, he found a
9 few cannabis conference registration fees
10 online and suggests a breakdown to you.  Do
11 you see the second one down, there's a 499
12 for early registration, 599 registration for
13 insurance company folks which includes
14 underwriters and claims; do you see that?
15   A.    Yes.
16   Q.    Do you recall any discussions
17 with Adam about opening up registration to
18 folks involved in the claims industry?
19         MR. BUCHTER:  Object to form.
20         THE WITNESS:  I -- not
21     specifically.  I mean, claims is
22     -- claims professionals were --
23     are a part of the Business
24     Insurance audience, so, they are

Page 61

1      typically precluded.
2  BY MR. SIEGEL:
3      Q.     And there was not discussion
4  saying that claims people who might have
5  been part of your audience should be
6  excluded from registering from this event,
7  right?
8      A.     Correct, not excluded from
9  registration.
10     Q.     Then the only -- I know we're
11 repeating ourselves, but the only people
12 that would be excluded were outside counsel,
13 right, based on your agreement with Wilson
14 Elser?
15     A.     Correct.
16     Q.     And that's memorialized at the
17 bottom of that e-mail.  Okay.  Going back to
18 planning for the conference, now talking
19 about the content, to the best of your
20 memory, when was the first time that
21 somebody suggested including a topic on
22 claims at the cannabis conference?
23     A.     I think it was kind of in the
24 early planning stages of that advisory

Page 62

1  board, probably maybe June or July.
2      Q.     Were you involved in those
3  discussions?
4      A.     In leading advisory board
5  calls it came up on the calls, yes.
6      Q.     When you say it, you mean the
7  topic of including claims as a topic of the
8  conference?
9      A.     Yes, a claims-related topic.
10     Q.     Do you recall who brought that
11 up?
12     A.     I -- I do not.
13     Q.     And do you ever remember
14 anyone saying that you should exclude claims
15 as a topic of the conference?
16     A.     Not on advisory board calls.
17     Q.     How about no on the advisory
18 board calls, when you're in the planning
19 stages, were there other conversations about
20 not including claims as a topic of the
21 conference?
22     A.     Not that I remember, no.
23            MR. SIEGEL:  I'm going to
24     pull up a document.  This will be

Page 63

1      Exhibit-6.
2             THE COURT REPORTER:  Five.
3             MR. SIEGEL:  I'm sorry, five.
4             - - -
5             (Whereupon, a document was
6      marked for identification as
7      Exhibit-5.)
8             - - -
9             MR. SIEGEL:  Thank you for
10     keeping me honest.
11 BY MR. SIEGEL:
12     Q.     Tuesday, May 21st, e-mail from
13 Gavin Souter to you, Bates stamped
14 BIH-002-002489.
15            I'll turn control over to you.
16            So, this e-mail from Gavin to
17 you says, attached is a draft consolidating
18 and elaborating a little on the topics that
19 came up during the call.
20            So, do you remember being part
21 of this advisory board call where topics for
22 the cannabis conference were discussed?
23     A.     Yes.
24     Q.     Does this jog your memory that

Page 64

1  it was -- I think you said before it might
2  have been June that claims became a topic of
3  conversation, that it was maybe earlier back
4  in May?
5      A.     Right, yeah.
6      Q.     The topic at issue there is
7  claims experience, review of real world
8  claims in the cannabis sector.
9             Do you recall any specific
10 discussions about what that -- what that
11 topic would actually entail?
12     A.     I don't recall what was
13 discussed specifically an advisory board
14 call about that.
15     Q.     Do you have any idea who
16 raised it as a topic?
17     A.     No, I can't recall.
18     Q.     All right.  But no one
19 suggested deleting it, right?
20     A.     No, I don't --
21            MR. BUCHTER:  Object to the
22     form.
23            THE WITNESS:  -- it was --
24            MR. DENN:  I'm sorry, are you

Page 69

1 tracks?
2          MR. BUCHTER:  Object to form.
3          THE WITNESS:  I think we --
4    generally, we just -- the general
5    topics are more -- that would be
6    of more interest to the entire
7    audience versus just a smaller
8    sector.  So, we like to keep those
9    a little more broad.  Rather than
10   specialized topic.
11 BY MR. SIEGEL:
12   Q.    Is it your understanding that
13 Mr. Stewart is suggesting here that the
14 cannabis claims session may be -- may have
15 broader appeal?
16         MR. BUCHTER:  Object to form.
17   Calls for speculation.
18         MR. SIEGEL:  If you know.
19         THE WITNESS:  I don't know.
20   I think the only -- I think his
21   thinking was that the brokers and
22   insurers would like to understand
23   how claims are handled as well,
24   not -- and not specifically claims

Page 70

1    professionals necessarily.
2  BY MR. SIEGEL:
3    Q.    So, by including -- you think
4  that by including cannabis in a specific
5  track, they would be more narrowly tailored
6  towards claims professionals?
7          MR. BUCHTER:  Object to form.
8    Matt, we're asking her to
9    speculate at this point.
10         MR. SIEGEL:  Well, I'm trying
11   just to follow up on what her last
12   answer was.
13         MR. BUCHTER:  Which was to
14   speculate on what Ian Stewart
15   meant when he wrote that sentence.
16         MR. SIEGEL:  Nate, object to
17   form is fine.  You can answer,
18   Katie.
19         THE WITNESS:  I mean not
20   necessarily.  I think -- as -- we
21   were just trying to collaborate to
22   find -- to come up with a topic
23   that would be of interest to
24   everyone attending the conference,

Page 71

1    not just claims professionals.
2  BY MR. SIEGEL:
3    Q.    Okay.  In your estimation,
4  would a topic on cannabis claims be -- would
5  appeal to claims professionals?
6          MR. BUCHTER:  Object to form.
7          THE WITNESS:  Yes, among
8    other insurance professionals.
9    Sorry, my cat's litter box is in
10   here.
11         MR. SIEGEL:  If you'd like to
12   relocate, feel free to.
13         THE WITNESS:  She's just
14   scratching her litter.
15         MR. SIEGEL:  The benefits of
16   doing things via Zoom.
17 BY MR. SIEGEL:
18   Q.    All right.  I'm going to stop
19 this share.
20         I'm bringing what I'll mark as
21 Exhibit-7, June 26th, 2019 e-mail from Ian
22 Stewart to you Bates stamped BIH-002-001928.
23 No need to give you control, 'cause it's
24 really just this one page.  I'll give you a

Page 72

1  second to read through it.
2    A.    (At which time the Witness
3  reviews the document.)  Okay.
4                - - -
5          (Whereupon, a document was
6          marked for identification as
7          Exhibit-7.)
8                - - -
9  BY MR. SIEGEL:
10   Q.    To your knowledge, did Ian
11 Stewart draft this -- this conference -- I
12 mean, this topic -- what's the word I'm
13 looking for -- summary?
14   A.    I believe so, yes.
15   Q.    Who are Stacy Jackson and
16 Morgan Moore, are they also advisory board
17 members?
18   A.    They are.  Morgan dropped out
19 of the board, I forget at what point.  He
20 wasn't very involved.
21   Q.    Okay.  And to your knowledge,
22 was this the agenda description that would
23 have been sent out to BI's marketing list?
24   A.    I believe we did have it on

Page 73

1 the website at one point. We didn't always
2 include the full description in the
3 marketing materials, aside from the website.
4    Q.    Okay. Let me break that down.
5 So, you would have had e-mail blasts that
6 would have gone out. Those e-mail blasts
7 may not have given the full description,
8 correct?
9    A.    Correct, but they would have
10 been linked to the event site.
11    Q.    So, anybody that received the
12 marketing blast who was linked back to the
13 website, would see this full description on
14 the website?
15        MR. BUCHTER: Object to form.
16        THE WITNESS: They -- they
17        would have if it was still live on
18        the site, yes.
19 BY MR. SIEGEL:
20    Q.    Okay. And just so I'm clear,
21 that e-mail marketing blast would have gone
22 out to both the BI list and to Wilson
23 Elser's list, correct?
24    A.    Correct.

Page 74

1        MR. BUCHTER: Object to form.
2 BY MR. SIEGEL:
3    Q.    Now, a couple of months before
4 the conference, do you remember getting an
5 e-mail from Adam asking you how many claims
6 professionals and underwriters and various
7 people were included -- had signed up for
8 the conference?
9    A.    I don't recall specifically.
10    Q.    Well, as I'm sure you've
11 guessed, I have an e-mail to show you to
12 help jog your memory. We'll mark it as
13 Exhibit-8.
14        - - -
15        (Whereupon, a document was
16        marked for identification as
17        Exhibit-8.)
18        - - -
19 BY MR. SIEGEL:
20    Q.    An e-mail dated August 12,
21 2019 from Adam Potter to you, Bates stamped
22 BIH-002-001080, and start from the bottom
23 and turn control over to you.
24        MR. SIEGEL: Do you need a

Page 75

1 minute?
2        THE WITNESS: My cat is
3 screaming at me for food. Can I
4 just have a minute to feed her?
5        MR. SIEGEL: Absolutely. I
6 should have included that in the
7 list of instructions, if you need
8 a break for any reason, to feed a
9 cat, feel free.
10        THE WITNESS: She gets angry,
11 I'll be right back.
12        THE VIDEOGRAPHER: The time
13 is 3:36. We are now off the video
14 record.
15        - - -
16        (At this point, there was a
17 brief recess taken, after which,
18 the deposition continued as
19 follows:)
20        - - -
21        THE VIDEOGRAPHER: The time
22 is 3:38. Back on the video
23 record.
24        MR. SIEGEL: So, let the

Page 76

1 record reflect we took a break so
2 that the cat would be properly fed
3 and happy and no animals were
4 harmed during the taking of this
5 deposition.
6 BY MR. SIEGEL:
7    Q.    I think I gave you control.
8    A.    Okay.
9    Q.    Do you remember getting this
10 e-mail from Adam?
11    A.    I don't recall specifically.
12    Q.    Okay. So, do you remember
13 discussing with him why he wanted to get a
14 list of the breakdown of the various
15 registrations for the conference?
16    A.    I don't -- I don't recall that
17 he give me a reason. We generally like to
18 have a nice mix of different people from the
19 insurance industry of the different areas of
20 business.
21    Q.    Did you discuss this with
22 them?
23        MR. BUCHTER: Object to form.
24        THE WITNESS: I don't recall

Page 77

1    discussing -- have a conversation
2    with him outside of this e-mail
3    about it.
4  BY MR. SIEGEL:
5    Q.    Okay.  So, I was going to ask
6  you how you -- you specifically referenced
7  the three claims professionals and as seen
8  here there's a rate category for claims
9  professionals.
10       Is this, for lack of a better
11  work, a screen shot or a grab of a -- of a
12  data base?
13    A.    Yeah, that's -- that's like a
14  section of the registration list.
15    Q.    And is claims professionals a
16  drop down selection for that rate category?
17    A.    Yes, it must have been if it's
18  generated in that category column.
19    Q.    Do you know how BI defines
20  somebody as a claims professional?
21       MR. BUCHTER:  Object to form.
22       THE WITNESS:  That's really
23    something more the audience
24    development team handles and,

Page 78

1    typically subscribers are vetted a
2    little more than nonmembers, but I
3    believe they either have to work
4    for like TPA type of company or
5    have claims as their primary
6    responsibility or maybe in their
7    title like VP of claims.
8  BY MR. SIEGEL:
9    Q.    Do you know who makes the
10  decision or at the time who made the
11  decision to categorize somebody as a claims
12  professional versus some other category?
13    A.    I guess it depends on when
14  they became a subscriber, but our -- the VP
15  of marketing would have -- would have made
16  that determination who is Brian McGann.
17    Q.    Okay.  I see in this e-mail
18  August 12th, Adam responds to you and says,
19  and I think he means, can you let me know of
20  three claims professionals, their titles and
21  companies.
22       Did you have any understanding
23  at the time of why Adam wanted to know the
24  titles and companies of the three claims

Page 79

1  professionals?
2    A.    No, I did not.
3    Q.    Did you think that was an odd
4  request?
5       MR. BUCHTER:  Object to form.
6       THE WITNESS:  Well, I don't
7    recall thinking it was strange.
8  BY MR. SIEGEL:
9    Q.    Did he ever ask you to follow
10  up with any of these three claims
11  professionals and, you know, tell them not
12  to come to the conference?
13    A.    No.
14    Q.    Did he ever ask you to take
15  any further action with respect to these
16  three claims professionals after you
17  identified them for him?
18    A.    No, he didn't.
19    Q.    Okay.  Did you have any idea
20  at the time why he was focused on the claims
21  professionals?
22       MR. BUCHTER:  Object to form.
23       THE WITNESS:  I did not know
24    at the time.

Page 80

1  BY MR. SIEGEL:
2    Q.    And I think you said before
3  you never -- you never talked to him about
4  this, you e-mailed back and forth, but you
5  never talked to him about this e-mail?
6    A.    Not that I can recall, no.  I
7  think -- I think I probably just thought he
8  was wondering if a specific person was
9  attending or someone from a company was
10  coming related to claims.
11    Q.    Okay.
12    A.    Like an old CLM member or
13  something.  I didn't think too much into it,
14  I think.
15    Q.    Understood.  When -- 'cause
16  you just mentioned it could have been an old
17  CLM person.
18       Did any of the e-mails --
19  well, strike that.
20       You said e-mail blasts would
21  go out to the BI marketing list.
22       Do you know if at the time --
23  you know, when BI and CLM were putting on
24  joint conferences if the marketing lists

Page 85

1    A.    I think shortly after it was
2  announced, which was like the summer of
3  2018.
4    Q.    Was -- so, June of 2018; does
5  that sound right?
6    A.    Yeah.
7    Q.    Were you aware also at the
8  time that Adam sold not just CLM but two of
9  his other entities?
10    MR. BUCHTER:  Object to form.
11    THE WITNESS:  Yes.
12  BY MR. SIEGEL:
13    Q.    And what was your
14  understanding of what those two other
15  companies were?
16    A.    I think it was the one for
17  jobs, the insurance jobs and then I'm not
18  sure I know the name of other company.  I
19  know that Adam owns multiple companies.
20    Q.    Okay.  We don't need to get
21  into any of the details, but if told you it
22  was Claims Pages and CME Management and
23  Planning; does that sound familiar?
24    A.    Okay.  I think so, yes.

Page 86

1    Q.    So, in connection with that
2  sale, did you ever discuss the sale of CLM
3  with Adam?
4    Let me back up.  Prior to
5  selling CLM, did you know that Adam was
6  looking to sell it.
7    A.    No, I didn't.
8    Q.    After the sale, did you have
9  discussions with Adam about it?
10    A.    I don't recall discussing that
11  with him, no.
12    Q.    And do you -- did you know at
13  the time that there were any restrictions
14  placed on Adam following the sale?
15    MR. BUCHTER:  Object to form.
16    THE WITNESS:  I do not know
17    about restrictions, no.
18  BY MR. SIEGEL:
19    Q.    Okay.  Had United States heard
20  anything about a covenant or an agreement
21  not to complete with CLM?
22    MR. BUCHTER:  Object to form.
23    THE WITNESS:  No, I don't
24    recall hearing about that.

Page 87

1  BY MR. SIEGEL:
2    Q.    Okay.  How about up until the
3  time I just mentioned it, were you aware
4  that there was a noncompete agreement in the
5  sale, in connection with the sale of CLM?
6    A.    I believe I --
7    MR. BUCHTER:  Objection.
8    THE WITNESS:  -- found out
9    about it -- I'm trying to remember
10    -- I think it was shortly after it
11    was sold -- after Adam sold
12    Business Insurance.
13  BY MR. SIEGEL:
14    Q.    All right.  And then there are
15  some e-mails that get into some of those
16  issues and we can talk about that in a
17  little bit.
18    But fair to say that -- up
19  until the time that Business Insurance was
20  sold to the Acuntos, you weren't aware of
21  the existence of a covenant not to compete,
22  right?
23    A.    Right.
24    MR. BUCHTER:  Object to form.

Page 88

1  BY MR. SIEGEL:
2    Q.    So, when you saw that there
3  was going to be a line added saying that if
4  this conference wasn't developed for claims
5  and litigation management professionals --
6  well, let me ask you this, did you agree
7  with that statement?
8    MR. BUCHTER:  Object to form.
9    THE WITNESS:  Yeah, I mean,
10    well, there was a little bit of a
11    -- a conflict with having a
12    claims-related session saying that
13    the conference is not meant for
14    claims professionals.
15    I -- obviously litigation
16    from the start we were not
17    allowing outside counsel to
18    attend, but it didn't make total
19    sense to me, no.
20  BY MR. SIEGEL:
21    Q.    And, so, there was, because
22  you'd said before there were claims
23  professionals on the advisory board, right?
24    A.    Right.

Page 89

1    Q.    And would you say that Wilson
2 Elser, as outside counsel is a law firm
3 that's involved in claims and litigation
4 management?
5         MR. BUCHTER: Object to form.
6         THE WITNESS: Definitely.
7 BY MR. SIEGEL:
8    Q.    And there's -- there was a
9 session devoted to claims at the conference
10 --
11    A.    Initially, reworded, yes.
12         MR. BUCHTER: Are you asking
13    her --
14         MR. SIEGEL: I appreciate
15    that, I think that she clarified
16    it, it was reworded. I meant in
17    the initial planning. And I'm
18    sorry to cut you off, Matt, I
19    didn't mean to cut you off, but I
20    felt like she was in the midst of
21    correcting it.
22 BY MR. SIEGEL:
23    Q.    So, you had -- and you know
24 that there are already claims people that

Page 90

1 had signed up for the conference?
2    A.    Yes.
3    Q.    Right. Okay. So, following
4 this e-mail, did anybody ever suggest to you
5 that -- that you should do anything to make
6 sure that no claims or litigation management
7 professionals attended the conference?
8         MR. BUCHTER: Object to form.
9         THE WITNESS: Aside from this
10    language change, I don't recall
11    having to change registration or
12    notify anyone that they could no
13    longer attend or anything like
14    that.
15 BY MR. SIEGEL:
16    Q.    If they were going to remove
17 somebody from registration or prevent
18 someone from attending, was that something
19 that you would have been involved in?
20         MR. BUCHTER: Object to form.
21    Who do you mean by they, Matt?
22         MR. SIEGEL: I don't remember
23    where I used they in that
24    sentence.

Page 91

1 BY MR. SIEGEL:
2    Q.    If anybody suggested to you
3 that claims and litigation management
4 professional should be removed from the
5 registration list, would that have been
6 something you would have been involved in?
7         MR. BUCHTER: Object to form.
8         THE WITNESS: Possibly, it's
9    never something I had to deal with
10    before. So, I think we would have
11    treated it very delicately if that
12    would have been the case.
13 BY MR. SIEGEL:
14    Q.    But to your knowledge, nothing
15 like that every occurred?
16         MR. BUCHTER: Object to form.
17         THE WITNESS: Not that I know
18    of, no.
19 BY MR. SIEGEL:
20    Q.    Okay. Now, you were still
21 involved at this time, this is in August of
22 2019, the conference is about two months
23 away, were you still involved, at this time,
24 in assisting and developing the content for

Page 92

1 the conference, still working with the
2 advisory board?
3    A.    Yes, I --
4         MR. BUCHTER: Objection.
5         THE WITNESS: -- believe the
6    agenda was final at that point,
7    that -- you know, I was in touch
8    with the advisory board and all of
9    the speakers through the
10    conference.
11 BY MR. SIEGEL:
12    Q.    Okay. Do you remember this
13 e-mail, let's first focus on this e-mail.
14         Do you remember if this e-mail
15 was ever sent to any of the advisory board
16 members?
17    A.    I do not recall spelling it
18 out specifically to the advisory board that
19 these changes were made.
20    Q.    Do you remember anybody
21 discussing with the advisory board that
22 these changes were being made?
23    A.    No.
24    Q.    Okay. And how about with the

Page 93

1  -- with the proposed speakers for the
2  conference, do you remember if the speakers
3  were ever advised of this change to the
4  conference title and description?
5       A.    I can't recall.  I mean,
6  they -- they must have seen it on the
7  website and the program, but I don't recall
8  notifying them specifically about the
9  change.
10      Q.    It only would have been if
11 they had gone onto the website to look at
12 it, but they weren't, to your knowledge,
13 they weren't affirmatively told about these
14 changes, right?
15      A.    Not that I recall, no.
16           MR. BUCHTER:  Objection.
17 BY MR. SIEGEL:
18      Q.    I'm going to pull up a
19 document I'll mark as Exhibit-10.
20              - - -
21           (Whereupon, a document was
22      marked for identification as
23      Exhibit-10.)
24              - - -

Page 94

1  BY MR. SIEGEL:
2       Q.    You should see an August 23rd,
3  2019 e-mail, Bates stamped Potter-DE-000388.
4  And I just want to scroll down to an
5  August 22, 2019 e-mail on page two of the
6  PDF starting with Bates number 389 going
7  into 390.
8            It's an e-mail from Ian
9  Stewart to you and what I can only assume is
10 the advisory board; does that look right?
11      A.    Correct.
12      Q.    And this is August 22nd, this
13 is, what is it, three days after Adam told
14 you he was changing the conference, the
15 second description, title and description,
16 right?
17      A.    Um-hum.
18      Q.    But he references here that
19 there's a section on cannabis claims, right?
20      A.    Um-hum.
21      Q.    Do you know who Beth Osino is?
22      A.    Only through planning the
23 event, yeah.
24      Q.    What does Beth Osino go?

Page 95

1       A.    Claims manager at Golden Bear.
2       Q.    And is Golden Bear an
3  insurance company that specializes in
4  cannabis insurance?
5       A.    Yes, they do -- I believe they
6  have cannabis coverage, yes.
7       Q.    And your understanding of Beth
8  Osino's role is managing claims for Golden
9  Bear, right?
10      A.    Correct.
11           MR. BUCHTER:  Object to form.
12 BY MR. SIEGEL:
13      Q.    And how about -- boy, I don't
14 want to butcher this, Gerrit Nagarwalla,
15 claim supervisor at Panopeus?
16      A.    Yes.
17      Q.    Did you know Gerrit, just from
18 this -- being involved in the advisory
19 board?
20      A.    Yeah, same, met him through
21 the event and he is on the advisory board,
22 yeah.
23      Q.    He's an advisory board member?
24      A.    I'm not sure.  He might have

Page 96

1  joined the next year, actually.  I can't
2  recall if he was -- yeah, I think he joined
3  later as an advisory board member, actually.
4       Q.    What's your understanding of
5  what Panopeus is?
6       A.    They are also an insurer that
7  -- I think a broker, they're an insurer.
8  They handle claims.  They specialist in
9  handling insurance for cannabis-related
10 companies.
11      Q.    And his position is claim
12 supervisor who also is involved in handling
13 claims arising out of cannabis exposure,
14 correct?
15           MR. BUCHTER:  Object to form?
16           THE WITNESS:  Correct.
17 BY MR. SIEGEL:
18      Q.    Nobody ever -- you don't
19 recall anyone suggesting, after this e-mail
20 that we're not longer having a cannabis
21 claim session, right, we're not having a
22 cannabis exposure session?
23           MR. BUCHTER:  Object to form.
24           THE WITNESS:  I don't recall

Page 97

1    those words specifically, but
2    there was no discussion of
3    cancelling the session that I
4    remember, regardless of what we
5    called or described it.
6  BY MR. SIEGEL:
7    Q.    It was going to go forward as
8  planned, correct?
9        MR. BUCHTER:  Object to form.
10       THE WITNESS:  Correct. I
11   think Ian was using kind of the
12   initial topic terms and not the
13   updated session titles that we can
14   up with here.
15 BY MR. SIEGEL:
16   Q.    And nobody suggested at this
17 point, you know, taking the panelists off
18 the mix and bringing new people in, right?
19       MR. BUCHTER:  Object to form.
20       THE WITNESS:  No, I don't
21   recall that.
22 BY MR. SIEGEL:
23   Q.    To your knowledge, was Ian
24 told about the change to the session?

Page 99

1  planning the conference, the agenda, the
2  topics that would be discussed, they
3  essentially continued to plan as they had
4  from the beginning?
5        MR. BUCHTER:  Object to form.
6        THE WITNESS:  Correct, yes.
7  BY MR. SIEGEL:
8    Q.    All right.  I guess we can
9  jump to that e-mail that I was -- I was
10 trying to read your mind, see if that's what
11 you were talking about, but that doesn't
12 make much sense.  So, I'm going to pull up
13 Exhibit-11, which is a September 13, 2019
14 e-mail, initial Bates stamped
15 BIH-001-003551.
16           - - -
17       (Whereupon, a document was
18   marked for identification as
19   Exhibit-11.)
20           - - -
21 By MR. SIEGEL:
22   Q.    I just want to get to a spot
23 -- well, I'll give you control, you can read
24 the whole thing at your leisure.

Page 98

1        MR. DENN:  Objection.  Calls
2    for speculation.
3        THE WITNESS:  Not -- I do not
4    know how he came to know about the
5    change to the session name.  If --
6    I assume he did, but, I don't
7    think -- it was not me, it may
8    have been Adam, I don't know.
9  BY MR. SIEGEL:
10   Q.    Okay.  And why do you assume
11 that he ultimately did find out.  Are you
12 referring to the e-mail prior to the
13 conference that Ian Stewart sent suggesting
14 some changes to the -- to the contract?
15       MR. BUCHTER:  Object to form.
16       THE WITNESS:  No, I assume he
17   noticed it because he was very
18   involved and he was at the
19   conference and he was a speaker.
20   Yeah, I know he found out
21   eventually.  At what point, I'm
22   not sure.  I don't recall.
23 BY MR. SIEGEL:
24   Q.    But to your knowledge, those

Page 100

1        MR. BUCHTER:  Hey, Matt, I
2    don't know how many more exhibits
3    you're going to share, but
4    typically, if we did this in
5    person, everyone would get a copy
6    of the -- of the exhibit and, so,
7    I'm just trying to keep up on my
8    end and putting in the Bates
9    numbers, but maybe we should, as a
10   matter of course, allow everyone
11   to see the full document at least
12   one, just to understand, you know,
13   from top to bottom, what's in it.
14       MR. SIEGEL:  Oh, sure.
15       MR. BUCHTER:  I'm thinking
16   for everybody, just going forward,
17   because it's tough to kind of keep
18   along, especially when we switch
19   back between BI documents and then
20   Potter documents.
21       MR. SIEGEL:  No, that makes
22   sense.  If -- I can turn control
23   over to you, if you'd like, Nate,
24   and you can, you know, scroll

Page 181

1    A.    Yes.
2    Q.    And then turning to the Wilson
3  Elser contact list, I just want to share my
4  screen.
5        We should see a July 1st, 2019
6  e-mail from Ian Stewart you, Bates stamp,
7  BIH-002-001858.  And, I guess, this will be
8  Exhibit-18.
9            - - -
10       (Whereupon, a document was
11     marked for identification as
12     Exhibit-18.)
13           - - -
14 BY MR. SIEGEL:
15   Q.    On June 28, 2019 you said to
16 Mr. Stewart, you ask him, do you have a
17 contract/client list you would like us to
18 include in our promotions for the contract
19 -- for the conference?  My question is,
20 well, actually, there's that, and then he
21 provide you the list on July 1st and says,
22 Katie, here is the contact list.  This is
23 highly valuable IP for us, please keep it
24 strictly confidential and please do not

Page 182

1  distribute it outside BI.
2        You say here that you were
3  going to include it in your promotions for
4  the conference.  Am I correct that when Ian
5  Stewart sent you the Wilson Elser contact
6  list, that the e-mails that went out
7  promoting the conference went out from
8  Business Insurance?
9    A.    Correct, um-hum.
10   Q.    Okay.  So, everybody who was
11 on the Wilson Elser contact list would have
12 gotten an e-mail from Business Insurance
13 promoting the new Business Insurance
14 cannabis and hemp conference?
15   A.    Correct.
16   Q.    And he does say that it is
17 highly valuable IP, so, I don't want to --
18 well, it's marked as attorneys eyes only, so
19 -- and a couple of things have been marked
20 attorneys eyes only, so, let's talk about
21 that issues after we let Ms. Kett go.  But
22 right now, I just want to pull up the list
23 that was attached to that last e-mail that I
24 showed you.  And this is generally Bates --

Page 183

1  this entire spreadsheet is Bates stamped
2  BIH-002-001860, and I would let you scroll
3  through the document, but for some reason my
4  Microsoft Excel decided it wanted to pick
5  right now to not respond.  But we don't need
6  to go through the whole thing.  Just looking
7  at least what's on the screen, does this
8  look to you like the e-mail list that Wilson
9  Elser sent to you?  I'm sorry, the contact
10 list that Wilson Elser sent to you?
11   A.    It does look like that's what
12 it is, yes.
13   Q.    Yeah, and it is, for the
14 record, the e-mail that we must showed you
15 that's marked Exhibit-18 is -- references it
16 has attached to it, cannabis contacts
17 review, Microsoft Excel.  But like I said,
18 it's decided to hang up on me right now.
19 But you can see at the bottom left-hand
20 corner of the screen, this spreadsheet is
21 labeled cannabis contact review?
22   A.    Um-hum, yes.
23   Q.    Okay.  So, your understanding
24 that this spreadsheet is, in fact, the

Page 184

1  spreadsheet that Wilson Elser send to you to
2  use for marketing purposes for the cannabis
3  conference, right?
4    A.    To the best of my knowledge,
5  yes.
6        MR. SIEGEL:  Okay.  I guess
7      we can mark that as Exhibit-19.
8            - - -
9        (Whereupon, a document was
10     marked for identification as
11     Exhibit-19.)
12           - - -
13       MR. SIEGEL:  And with that,
14     since we don't have the ability to
15     scroll through it anyway, I will
16     conclude my questioning.
17       So, thank you very much, Ms.
18     Kett, for your time today.  I
19     don't know if anybody else has any
20     follow up, but I'm done.
21       MR. DENN:  None for me.
22       MR. BUCHTER:  None for me.
23       THE COURT REPORTER:  We lost
24     the videographer.

# Exhibit D

## Peter Miller Deposition Transcript Pages

Peter Miller  Attorneys Eyes Only
August 27, 2021

```
UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE
-----------------------------------------X
THE AMERICAN INSTITUTE FOR CHARTERED
PROPERTY CASUALTY UNDERWRITERS and
THE INSTITUTES, LLC,

                          PLAINTIFFS,


          -against-          Case No.:
                             CA-19-1600
                               CFC

ADAM POTTER, PBIH, LLC and BUSINESS
INSURANCE HOLDINGS, INC.,

                          DEFENDANTS.
-----------------------------------------X
                    DATE: August 27, 2021
                    TIME: 9:32 A.M.


     * CONFIDENTIAL - ATTORNEYS' EYES ONLY *



          REMOTE VIDEO DEPOSITION of PETER

MILLER, taken by the Defendants, pursuant

to a notice and to the Federal Rules of

Civil Procedure, held remotely via Zoom

Videoconference, before Suzanne Pastor, a

Notary Public of the State of New York.
```

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 38

1  although we handle litigation in our claims
2  programs, we did not have a specific
3  designation for it.  And that was an
4  opportunity.  And from a designation point
5  of view that would have constituted a new
6  designation.  Although we've done all kind
7  of work obviously in claims and litigation.
8      Q.    I'd like to ask you about topic
9  number 6 for which you've been identified
10 by the plaintiffs as a person who could
11 testify to facts known or reasonably
12 available to them.
13     A.    I don't know what -- can you
14 repeat what topic number 6 is?
15     Q.    Yes.  I was giving the number
16 for Mr. Hayes' benefit because he had asked
17 me previously to number them.
18          Can you tell me the identity of
19 any customers that the plaintiffs have lost
20 as a result of the cannabis conference
21 that's referred to in the complaint?
22     A.    We've identified I believe
23 based on an analysis more than 15 customers
24 who were in the CLM database who attended
25 the cannabis conference.  And we've

Page 39

1  identified more than 40 companies that were
2  in the CLM database that were at the
3  cannabis conference either as a member or
4  sponsor.
5      Q.    Okay, my question was if you
6  could identify by name any customers that
7  the plaintiffs lost as a result of the
8  cannabis conference that's referred to in
9  the complaint.  So if there are any
10 individual customers who you allege were
11 lost to the Institutes as a result of the
12 cannabis conference, if you could just tell
13 me the identity of those customers.
14          MR. HAYES:  Object to form.
15     A.    Well, I mentioned 15 people who
16 attended a cannabis conference from our
17 database.  And I mentioned 40 companies who
18 attended or were a member at the cannabis
19 conference.  And those individuals and
20 those companies attended a cannabis
21 conference and they were also in our
22 database.
23     Q.    And again, my question is more
24 specific than that.  It is, could you
25 identify any customers that the plaintiffs

Page 40

1  lost as a result of the cannabis
2  conference?
3      A.    I know that any individual --
4  have I -- I don't understand your question.
5      Q.    Yes, my question is can you
6  tell me the identity of any customer that
7  the plaintiffs lost as a result of the
8  cannabis conference.
9          MR. HAYES:  Objection.  Object
10    to the form.  Vague and ambiguous.
11     A.    Well, I think the mere presence
12 of the cannabis conference is a violation
13 of the APA.
14     Q.    That wasn't my question, sir.
15     A.    Well, can I answer the
16 question?
17     Q.    Yes, the question is can you
18 identify any customer that the plaintiffs
19 lost as a result of the cannabis
20 conference.
21          MR. HAYES:  Objection.  Vague
22    and ambiguous.
23     A.    Can I identify any specific
24 individual?  No.
25     Q.    Can you identify any specific

Page 41

1  company that was lost as a result of the
2  cannabis conference?
3          MR. HAYES:  Object to form.
4      A.    Are you asking me other than
5  the 15 -- more than 15 attendees and the
6  more than 40 companies?
7      Q.    No.  I'm not asking you, sir,
8  who attended the conference.  My question
9  was if you could tell me the identity of
10 any customer that the plaintiffs lost as a
11 result of the cannabis conference.
12          MR. HAYES:  Object to the form.
13    Vague and ambiguous.
14     A.    I don't understand that
15 question.  I think I've answered.  I said
16 there were more than 15 individuals and
17 more than 40 companies.
18     Q.    I may have misunderstood your
19 answer.  I believe that you told me that
20 you had a list of individuals or companies
21 that attended the cannabis conference.  And
22 that was not my question.  My question was,
23 could you tell me the identity of any
24 customer that the plaintiffs lost as a
25 result of the cannabis conference.

Peter Miller  Attorneys Eyes Only
August 27, 2021

Page 42

1          MR. HAYES:  Object to the form.
2      Vague and ambiguous.
3      Q.    A person or entity who was a
4  customer of the plaintiffs prior to the
5  cannabis conference who the plaintiffs lost
6  as a result of the cannabis conference.
7      A.    No.
8          MR. HAYES:  Object to the form.
9      Q.    Moving over to topic number 20
10 for which you were identified, can you tell
11 me the identity of any customers of the
12 plaintiffs who have been lost as a result
13 of any alleged violation of the APA by
14 Business Insurance?
15         MR. HAYES:  Object to the form.
16     A.    Well, when I look at business
17 lost, I look at it in several ways.  I
18 mean, first of all, there's the nature of
19 the competition that as a result of a
20 violation of the APA Business Insurance now
21 represents.  So we have Business Insurance
22 in one of our magazines, risk in insurance,
23 the two largest in the industry.  And it's
24 a significant -- their violation of the APA
25 is a significant competitive barrier for us

Page 43

1  because if they are going to put on events
2  that are not sanctioned, strategic business
3  model is to use your magazine to drive
4  people to events, and vice versa.
5          So when we purchased Business
6  Insurance we specifically wanted to make
7  sure that we could protect our investment
8  and that we weren't funding a potential
9  competitor.  So while we believe in
10 competition, this specific entity, Business
11 Insurance, causes us to have to now deal
12 with competition that we shouldn't have for
13 this specific entity.
14         So there's the nature of that.
15 There's also the nature of the industry.
16 The industry, particularly in several
17 lines, is a commodity-based industry.  And
18 the way to compete in a commodity-based
19 industry is to drive down costs.  And many
20 people will decide to go to one conference,
21 not the other.  And if -- what we were
22 trying to do with the noncompete is to
23 ensure that for a limited amount of time we
24 could establish our presence and provide a
25 better service to customers and the

Page 44

1  presence in that market naturally would
2  mean that people would choose to go to one
3  conference, not another.
4      Q.    And we can come back to those,
5  Mr. Miller.  I'm trying to if he can cuss
6  on the topic for which you were identified
7  by the plaintiffs.  So -- and if it makes
8  it more clear, I'll read you what the topic
9  was that the plaintiffs have offered you to
10 testify about.  It's number 20 which
11 states, "Any customer lost as a result of
12 any violation of the APA and any evidence
13 supporting the allegation that violation of
14 the APA was the reason for the loss of that
15 customer."  So that's the topic for which
16 you've been identified by the Institutes to
17 testify on matters known or reasonably
18 available to it.
19         My question simply is derived
20 from that topic, are you able to identify
21 any customer that was lost as a result of
22 any violation of the APA?
23     A.    We had two sponsors, two
24 customers, CoventBridge was one, that in
25 2018 they spent roughly $50,000 with us.

Page 45

1  In 2021 they spent 5,000.
2          We had another one, S E A.  In
3  2018 I believe the number is North of
4  $70,000.  And in 2021 they spent about
5  $17,500.  Both of those, I can think of no
6  other reason than that they -- because we
7  had a good relationship, I can think of no
8  other reason why those numbers would drop.
9      Q.    Have you been in contact with
10 either of those sponsors to ask them why
11 they reduced the level of their
12 sponsorship?
13     A.    Well, I have not.  I would not
14 normally reach out to a customer and say
15 hey, did you go with a competitor.  Because
16 if they hadn't, why would I put that idea
17 in their mind?
18     Q.    So your testimony that these
19 two sponsors reduced their level of
20 sponsorship because of an alleged violation
21 of the APA, that's an inference you've
22 drawn, or are there some facts upon which
23 you base that?
24     A.    Well, the fact that the numbers
25 have dropped, that we had had a good

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 46

1  relationship, I just can't think of another
2  reason.
3        Q.    But it's not based on any
4  fact-finding that you've done with respect
5  to what their reason might have been?
6              MR. HAYES:  Object to the form.
7        A.    I have not called them
8  directly.
9        Q.    And to your knowledge, has
10 anyone at the Institutes done so?
11       A.    I don't know.
12       Q.    You may have answered this
13 question by identifying sponsors when I
14 asked about customers, and you may use
15 those terms interchangeably, but just to
16 make sure that I'm not missing anything,
17 one of the other topics for which you were
18 identified is number 6 -- I'm sorry, number
19 5, relates to sponsors.  So same question I
20 asked before with respect to customers, but
21 I'll ask it with respect to sponsors.
22             Are you aware of any sponsor
23 that the plaintiffs alleged to have lost as
24 a result of the cannabis conference?
25       A.    I mean, look, the --

Page 47

1              MR. HAYES:  Object to the form.
2        A.    -- the long term care
3  conference and the cannabis conference, by
4  a plain reading of the APA are outside the
5  scope of that.  So any sponsor there is
6  potentially, particularly if they're in our
7  database, somebody that we might have been
8  able to do business with.
9        Q.    And my question, sir, and I'm
10 going to ask it first with respect to the
11 cannabis conference and then more broadly.
12 But with respect to the cannabis
13 conference, are you able to identify any
14 sponsor that the plaintiffs lost as a
15 result of that conference?
16             MR. HAYES:  Objection.  Vague
17       and ambiguous.
18       A.    I believe there's one.
19       Q.    Who is that?
20       A.    Wilson Elser.  I believe
21 that -- my belief is that Mr. Heller at
22 Wilson Elser has a relationship with Adam
23 Potter.  And Wilson Elser I believe, my
24 belief is that they were a sponsor of the
25 cannabis conference and they had previously

Page 48

1  done work with CLM.  I believe that to be
2  correct.
3        Q.    And are you aware that Wilson
4  Elser continues to sponsor Institutes
5  events?
6        A.    I believe they do.  But to a
7  lesser extent.
8        Q.    And to what extent has their
9  sponsorship reduced?
10       A.    I would have to look at the
11 number.  I don't have that off the top of
12 my head.
13       Q.    And what is the factual basis
14 for attributing any reduction in
15 sponsorship to the cannabis conference?
16             MR. HAYES:  Object to the form.
17        Beyond the scope of the protective
18        order.
19       A.    Well, as I said, the industry
20 is a zero sum game as it relates to
21 sponsorships.  So if you're going to
22 sponsor the cannabis conference, it likely
23 uses up your budget that you can't sponsor
24 other conferences.
25       Q.    Let me try to break that down

Page 49

1  for a second.  Do you know as a factual
2  matter whether the level of Wilson Elser's
3  sponsorship has in fact dropped?
4        A.    I believe -- I would have to
5  double-check that, but I believe it has.
6        Q.    And your basis for saying that
7  it has dropped as a result of the cannabis
8  conference is an inference based upon your
9  observation of the market and not based on
10 any factual investigation?
11             MR. HAYES:  Object to the form.
12       A.    Based on -- it's based on that
13 the cannabis conference is now in the
14 market, it's a violation of the APA, and
15 there's limited budgets by companies.
16       Q.    But you've not spoken to anyone
17 at Wilson Elser to ask them the reason for
18 any reduction in their level of
19 sponsorship?
20       A.    I have not.
21       Q.    And you're not aware of anyone
22 at the Institutes who has?
23       A.    I don't know the answer to
24 that.
25       Q.    You had made reference to a

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 50
1  long-term care conference.  So again, let
2  me ask the same question more broadly.
3  Other than Wilson Elser, are you aware of
4  any other individual sponsor that the
5  Institutes claims to have lost as a result
6  of any alleged violation of the APA?
7       A.    Well, as I said, the existence
8  of the conference is a violation of the
9  APA.  So that any sponsor of that
10 conferences is a potential loss to us given
11 the nature of the business, especially if
12 they were a CLM sponsor in the past.
13      Q.    And my question was are you
14 aware of any sponsor who the Institutes has
15 actually lost as a result of any alleged
16 APA violation?
17           MR. HAYES:  Object to the form.
18      Vague and ambiguous.
19      A.    Am I aware of any particular
20 sponsor?  No.
21      Q.    Is there a specific potential
22 customer or specific potential sponsor who
23 the Institutes alleges to have lost as a
24 result of any APA violation?
25           MR. HAYES:  Objection; vague

Page 51
1       and ambiguous.
2       A.    Well, I mean, it makes the --
3  when there's competition, particularly when
4  there shouldn't be, it makes the job of
5  finding new sponsors more difficult.  So
6  again, most insurance organizations have a
7  budget for events.  And the existence of
8  Business Insurance events outside those
9  that are specifically enumerated is a drain
10 on those sponsorship dollars.
11      Q.    But just asking as a factual
12 matter, you're not aware of any potential
13 customer or potential sponsor who the
14 Institutes has identified as no longer
15 being a potential customer or a potential
16 sponsor as a result of an APA violation?
17           MR. HAYES:  Objection to form.
18      Vague and ambiguous.
19      A.    I personally am not.
20      Q.    And are you aware of anyone at
21 the Institutes who is?
22           MR. HAYES:  Object to the form.
23      A.    As I sit here today, I am not.
24      Q.    I want to return briefly to
25 topic 13, which is the internal

Page 52
1  communications regarding the interpretation
2  of the noncompete clause.  Am I correct,
3  Mr. Miller, that Ms. Horowitz at some point
4  prepared and shared with you a document
5  that she proposed to describe prohibited
6  and permitted activities for purposes of
7  the noncompete?
8       A.    That wouldn't surprise me.
9           MR. DENN:  Staci, could you put
10      Exhibits 6 and 7 into the chat.
11           (Whereupon, 5/24/18 E-mail,
12      INSTITUTES 7869 was marked as Miller
13      Exhibit 6 for identification as of
14      this date by the Reporter.)
15           (Whereupon, Schedule A,
16      INSTITUTES 7870 to 7877 was marked as
17      Miller Exhibit 7 for identification
18      as of this date by the Reporter.)
19      Q.    Mr. Miller, I'll ask you to
20 look at those, and as with a prior pair of
21 exhibits that were put in, you can see from
22 the sequential Bates numbers that Exhibit 7
23 is an attachment that's referred to in
24 Exhibit 6.
25      A.    (The witness reviews the

Page 53
1  document.)
2           Okay.
3       Q.    So Exhibit 6 is an e-mail from
4  Ms. Horowitz to you dated May 24th, 2018,
5  which is shortly before execution of the
6  purchase agreement.  And you can see, I
7  don't want to try to characterize it, am I
8  correct that she is asking you for your
9  input about how to communicate with the
10 board about the status of the agreement?
11      A.    That's what it looks like.
12      Q.    And she has a list of options,
13 and number 3 says, "Include only the ones
14 that are directly related to hot topics
15 like noncompete, Adam's role, details of
16 revenue payout, et cetera.  I attached a
17 draft for you to see.  Only thing not
18 cleaned up is the noncompete."  Do you see
19 that?
20      A.    Yes.
21      Q.    So what she's indicating is
22 that she's attaching schedules for you to
23 review and she's noting that the noncompete
24 is "not cleaned up"?
25      A.    Is that a question or a

# Exhibit E

## Keith Kenner Deposition Transcript Pages

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
 2                      - - -
         THE AMERICAN INSTITUTE  : CIVIL ACTION NO
 3       FOR CHARTERED PROPERTY   :
         CASUALTY UNDERWRITERS     :
 4       and THE INSTITUTES,       :
         LLC,                      :
 5               Plaintiffs        :
                                   :
 6           vs.                   :
                                   :
 7       ADAM POTTER, PBIH, LLC    :
         and BUSINESS INSURANCE    :
 8       HOLDINGS, INC.            :
                 Defendants   : 1:19-cv-01600
 9
10                      - - -
              Wednesday, August 4, 2021
11
                        - - -
12        CONFIDENTIAL - ATTORNEYS' EYES ONLY
                        - - -
13
14               Oral Deposition of KEITH
15       KENNER, taken pursuant to notice, via Zoom
16       videoconferencing from Glenview, Illinois,
17       beginning at 9:00 a.m. CST, and reported
18       stenographically by Carol McAvey, Registered
19       Professional Reporter and Notary Public.
20                      * * *
21
22
23
                  VERITEXT LEGAL SOLUTIONS
24                  MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
25           Philadelphia, Pennsylvania 19103
```

Page 134

1       CONFIDENTIAL - ATTORNEYS' EYES ONLY
2           MR. DENN: Object to form.
3 BY MR. SIEGEL:
4 Q.   You can answer.
5 A.   Can you rephrase the question, please?
6 Q.   Yeah, do you know whether the intention
7 is for the agenda to be similar to the 2019
8 Cannabis and Hemp Conference?
9           MR. DENN: Objection to form.
10          THE WITNESS: I do not.
11 BY MR. SIEGEL:
12 Q.   Do you know who the target audience will
13 be for that conference?
14 A.   Yes. It would be similar to the target
15 audiences we've had for our virtual events on
16 cannabis.
17 Q.   Okay. And, again, do you know whether
18 the marketing list will include the Wilson
19 Elser marketing list?
20 A.   I do not.
21 Q.   Do you anticipate that the conference
22 will address issues relating to claims arising
23 in the cannabis space?
24          MR. DENN: Objection to form.
25          THE WITNESS: I don't know.

Page 135

1       CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 BY MR. SIEGEL:
3 Q.   Do you know whether there's been any
4 discussion as to whether the event should
5 avoid discussion of claims arising in the
6 cannabis space?
7 A.   I do not know.
8 Q.   How about for any of the planned
9 webinars or virtual conferences, do you know
10 whether there's been any discussion about
11 whether topics should specifically avoid
12 discussions of claims and claims related
13 issues?
14 A.   I have not been part of any discussions
15 that have discussed avoiding claims or people
16 who work in claims as part of our outreach for
17 conferences.
18 Q.   Okay. All right, I may have some more
19 questions on the conferences. I want to just
20 move to one other topic and then we can take a
21 short break and see if we might be able to
22 wrap up soon.
23          Are you familiar with the
24 organization Claims Xchange?
25 A.   No.

Page 136

1       CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 Q.   Okay. Do you know Sydney Posner?
3 A.   I know who she is.
4 Q.   Who is she?
5 A.   Adam's sister.
6 Q.   Do you know that Adam's sister started
7 her own business in roughly October of 2019?
8 A.   I had heard about this, yes.
9 Q.   Okay. And do you know that that
10 company's name is Claims Xchange?
11 A.   Now that you remind me, yes.
12 Q.   Okay. What had you heard about Sydney
13 Posner starting her own business?
14 A.   I really can't recall hearing anything
15 about it, with the exception of Steve
16 mentioning to me that he wanted to help Sydney
17 and offer free subscriptions, Business
18 Insurance subscriptions to people who would be
19 interested in joining her Claims Xchange or
20 claims express.
21 Q.   Okay. Did you know what Steve's role in
22 Claims Xchange was back in October or November
23 of 2019?
24 A.   No.
25 Q.   Okay. So you didn't know that he was

Page 137

1       CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 initially the president of Claims Xchange?
3 A.   No.
4           MR. DENN: Objection to form.
5 BY MR. SIEGEL:
6 Q.   Did you know that his wife Carole Acunto
7 was the secretary and initial incorporator of
8 Claims Xchange?
9 A.   No.
10 Q.   Okay. And did you know that Steve and
11 Carole were both on the Claims Xchange
12 advisory board?
13 A.   No.
14 Q.   Okay. Well, that eliminates a lot of
15 questions then.
16          Do you have an understanding
17 of the relationship currently between Business
18 Insurance and Claims Xchange?
19 A.   No, I don't believe we have one.
20 Q.   Okay. If I were to tell you that the
21 Claims Xchange website says that Business
22 Insurance is a strategic partner, is that news
23 to you?
24 A.   Yes.
25 Q.   I could bring up the web page just to

35 (Pages 134 - 137)

Page 146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1
2          MR. BUCHTER:  Objection.
3          MR. DENN:  Objection calls
4  for speculation.
5          MR. SIEGEL:  You can answer.
6          THE WITNESS:  Yes.
7  BY MR. SIEGEL:
8  Q.   And once that Wilson Elser list is used
9  to generate the marketing list for the
10  conference, would BI typically keep that list
11  and use it for future similar conferences?
12          MR. DENN:  Objection to form.
13  BY MR. SIEGEL:
14  Q.   You're shaking your head.  So not
15  necessarily.  But would they do it at the
16  request of -- you know, if Wilson Elser
17  requested that they send it to the same list,
18  would you continue to use the Wilson Elser
19  marketing list to market future events?
20          MR. DENN:  Same objection.
21          THE WITNESS:  Can you restate
22  the question, please?
23  BY MR. SIEGEL:
24  Q.   Yeah, I'm just curious.  You know, it
25  appears here that Ian Stewart is giving Katie

Page 147

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1
2  Kett the marketing list in preparation for the
3  2019 conference.
4          I'm just curious what
5  happens -- what do you think typically happens
6  to that marketing list after it's used for a
7  conference like the 2019 Cannabis and Hemp
8  Conference?
9  A.   It's used once --
10          MR. DENN:  Objection.
11  BY MR. SIEGEL:
12  Q.   It's used once?
13  A.   Once.
14  Q.   Okay.  If people from that marketing
15  list signed up for the conference and you
16  would then have them on the conference
17  attendee list, is that conference attendee
18  list used to generate marketing lists for
19  future events?
20  A.   Yes.
21  Q.   Okay.  So fair to say it's possible that
22  people from the Wilson Elser list made it onto
23  the cannabis attendance list and then became a
24  part of the Business Insurance general
25  marketing list; correct?

Page 148

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1
2          MR. DENN:  Objection; calls
3  for speculation.
4  BY MR. SIEGEL:
5  Q.   I'm just trying to understand how that
6  works.  So can you answer?
7  A.   Yeah, if they registered for the
8  conference, then yes, they would be part of
9  our list.
10  Q.   Okay.
11          MR. SIEGEL:  That's all the
12  questions I have.  I'll turn it over to
13  Mr. Buchter.
14          Thank you very much for your
15  time, people.
16          THE WITNESS:  Are we done?
17          MR. SIEGEL:  I'm done.
18          MR. BUCHTER:  Not yet.  I just
19  have --
20          THE WITNESS:  I want to know
21  when I'm done.
22          - - -
23          EXAMINATION
24          - - -
25  BY MR. BUCHTER:

Page 149

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1
2  Q.   I just have a handful of questions,
3  Mr. Kenner.  My name is Nate Buchter.  I'm an
4  attorney for Adam Potter.
5          Way back in the beginning of
6  your deposition, you walked us through your
7  general day-to-day job responsibilities as
8  publisher for Business Insurance.
9          Can you indulge me again and
10  just give me a general overview of what goes
11  into your day-to-day responsibilities?
12  A.   Sure.  I handle all of the commercial
13  aspects of Business Insurance, whether that's
14  print advertising, digital advertising and I
15  help out with sponsorship sales for all of our
16  conferences.
17          I also do strategic planning
18  across all those platforms and work closely
19  with our clients and also with our sales
20  people and our conference sales people to keep
21  those enterprises going, if you will.
22  Q.   So I didn't hear any content related
23  topics.  Is it fair to say, then, that you do
24  not participate or are not involved in
25  developing any content on behalf of Business

38 (Pages 146 - 149)

# Exhibit F

## Steve Acunto, Sr. Deposition Transcript Pages

```
                                                    Page 1

 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2                          - - -
         THE AMERICAN INSTITUTE  : CIVIL ACTION NO
 3       FOR CHARTERED PROPERTY   :
         CASUALTY UNDERWRITERS     :
 4       and THE INSTITUTES,       :
         LLC                       :
 5                  Plaintiffs     :
                                   :
 6            vs.                   :
                                   :
 7       ADAM POTTER, PBIH, LLC    :
         and BUSINESS INSURANCE    :
 8       HOLDINGS, INC.            :
                    Defendants     : 1:19-cv-01600
 9
10                          - - -
                 Thursday, August 5, 2021
11
                            - - -
12         CONFIDENTIAL - ATTORNEYS' EYES ONLY
                            - - -
13
14                     Videotaped Deposition of STEVE
15       ACUNTO, SR., VOLUME I, taken pursuant to
16       notice, via Zoom videoconferencing from
17       Greenwich, Connecticut, beginning at 10:22
18       a.m., and reported stenographically by Carol
19       McAvey, Registered Professional Reporter and
20       Notary Public.
21                          * * *
22
23
                 VERITEXT LEGAL SOLUTIONS
24                  MID-ATLANTIC REGION
              1801 Market Street - Suite 1800
25            Philadelphia, Pennsylvania 19103
```

```
 1            CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      the due diligence?
 3      A.    Correct.
 4      Q.    Okay.  But I'm also correct in my
 5      understanding that you never -- you never
 6      asked Mr. Potter to see a copy of the Asset
 7      Purchase Agreement with The Institutes?
 8      A.    You know, on that point, I don't -- it
 9      is unlike me to have done that.  And I do not
10      recall asking for that.
11      Q.    Are you aware of whether or not your son
12      asked Mr. Potter for a copy of the Asset
13      Purchase Agreement with The Institutes?
14      A.    I don't believe he did.  By the way, he
15      is not a lawyer either.
16      Q.    I am going to pull up another document
17      and share my screen.  Give me one second to do
18      so.  No, that's the wrong one.  There we go.
19      Sorry about that.
20                  Okay, do you see the document?
21      A.    Cozen O'Connor.  Let's see, let me read
22      it now.
23      Q.    And I just handed over control to you,
24      so please feel free to scroll through --
25      A.    Thank you.
```

Page 241

1              CONFIDENTIAL - ATTORNEYS' EYES ONLY
2       Q.    -- to familiarize yourself.  Yep, no
3       problem.
4       A.    Okay, I see this.  I completely forgot
5       about this document.
6       Q.    So you do recognize it?
7       A.    Yeah, it's a -- you know, a -- what's it
8       called, preserve hold, hold documents.  And
9       they advise us of a pending -- I don't know
10      why they included CINN Global Initiatives.
11      That was inaccurate.
12                   Anyway, yeah, they said this
13      was to hold our documents together and they
14      were going to institute a suit.  I don't --
15      Q.    Mr. -- go ahead, I'm sorry.
16      A.    Do you see where they -- oh, you see,
17      they sent this to 240 East 38th Street.  I
18      don't know what address -- what the heck that
19      is.  I mean, I don't know how they got that
20      address.  And then Box 9001 Mount Vernon,
21      that's an old mailbox.  We still use it.
22      Maybe that's why it never got here anyway.
23                   So, I do remember the letter,
24      though.  I got it from someplace.
25      Q.    Okay.  So you did receive it before?

Page 242

1           CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     A.    Yeah.

3     Q.    And it's dated at the top, September 6,

4     2019.

5                     Do you recall when you

6     received it?

7     A.    No, I do not.

8     Q.    Okay.

9                     THE COURT REPORTER:  Is this

10    an exhibit, Nate?

11                    MR. BUCHTER:  Yes, this is

12    going to be Exhibit 26, I'm sorry.  I'm really

13    -- I haven't been great at that so far.  I

14    apologize.

15                    THE COURT REPORTER:  That's

16    okay.

17                         - - -

18                    (Whereupon, Exhibit 26 was

19    marked for identification.)

20                         - - -

21    BY MR. BUCHTER:

22    Q.    Do you recall reviewing this letter and

23    the attachment in its entirety when you did

24    receive it?

25    A.    No.  I did advise Steve to keep all the

Page 243

```
 1          CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     documents and I began keeping all my e-mails.
 3     But, you know, essentially what this does is
 4     advising me to hold the documents and -- I
 5     don't know, I think it was designed to
 6     intimidate us a little bit.  But in any case,
 7     you know, I read it.  I didn't see any action
 8     that needed to be taken, except to preserve
 9     documents.  And I don't -- and I honestly do
10     not remember reading the case.
11     Q.    And are you referring to the attachment
12     that's provided with this letter --
13     A.    Yes --
14     Q.    -- when you say --
15     A.    -- I am, and I just don't remember
16     reading it.  And, you know, since I was to
17     preserve things, I would have preserved them.
18     I looked in my -- the backup draw here with my
19     printing, I didn't find it.
20     Q.    Would you agree with me that at this
21     moment to time, September 6, 2019, at this
22     point, The Institutes had filed a lawsuit?
23     A.    Well, it says here that they are -- let
24     me get the wording right.  It says here:  The
25     purpose is to advise you of our
```

Page 244

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     representation... on notice of pending

2     litigation.

3                    What does that mean?  Does

4     that means that they filed the suit or does

5     that mean that they are negotiating, as Adam

6     represented to me?

7     Q.    So you don't have an understanding

8     either way, sitting here today?

9     A.    Again, it's terminology.  I mean pending

10    litigation, does that mean that they're

11    preparing it, that it's been instituted?  What

12    does that mean?

13    Q.    Okay, and if I direct you -- I'm going

14    to take control of the screen, if you don't

15    mind.

16    A.    Sure.

17    Q.    If I direct your attention to the

18    attachment, the first page of the attachment,

19    does this give you any -- refresh your

20    recollection on whether or not the litigation

21    had been initiated by The Institutes at this

22    point?

23    A.    Is this document dated?

24    Q.    Yes, sir.  It's at the top.  That

25

Page 245

          CONFIDENTIAL - ATTORNEYS' EYES ONLY
1
2    specific -- the attachment is dated at the top
3    of Page 1 in the heading.
4    A.    8/28/19, is that it?
5    Q.    Yes, sir, yes, sir.
6    A.    Okay, so it was filed on the 28th of
7    August, just before Labor Day weekend, and
8    they're saying it's pending litigation.  So I
9    got this on or about September 10th, I'd say,
10   US mail, okay.
11                 Okay, so I'm sorry, what is
12   the question?
13   Q.    My question was:  Does this refresh your
14   recollection that as of September 6, 2019,
15   that The Institutes had filed suit in this
16   case?
17                 MR. DENN:  I'm just objecting.
18   I think he testified he wasn't sure if he
19   remembers reading the attachment when he got
20   it.
21                 MR. BUCHTER:  I'm asking if it
22   refreshes -- yeah, I'm just asking if it
23   refreshes his recollection.
24                 THE WITNESS:  My recollection
25   of what, though, Nate?  My recollection of

Page 246

```
 1         CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    what?  Of the matter?  The issues?
 3    BY MR. BUCHTER:
 4    Q.    Yes.
 5    A.    This would, this certainly would, yeah.
 6    Q.    And I believe you just testified a few
 7    minutes ago that you don't recall reading this
 8    attachment to the letter when you received the
 9    letter; is that correct?
10    A.    No, I do not recall reading this.
11    Q.    At any point after Beacon acquired
12    Business Insurance Holdings, Inc., did you
13    review any of the Complaints that the
14    Plaintiffs, The Institutes, filed in this
15    action?
16    A.    I might have read them.  By the way,
17    this is Business Insurance Holdings, LLC.
18    Q.    In the document in front of you, is that
19    what you're referring to?
20    A.    Yeah, uh-hum.
21    Q.    Right.  So let me ask a more pointed
22    question.
23              In between September 3, 2019
24    and October 24, 2019, do you recall reading a
25    Complaint filed by The Institutes in this
```

# Exhibit G

**Anne Blume Deposition (8/26/21)
Transcript Pages**

Anne Blume
August 26, 2021

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR      )
CHARTERED PROPERTY CASUALTY     )
UNDERWRITERS and THE            )
INSTITUTES, LLC,                )
                                )   No. C.A. No.
             Plaintiffs,        )   19-1600-CFC
                                )
   vs.                          )
                                )
ADAM POTTER, PBIH, LLC and
BUSINESS INSURANCE HOLDINGS,
INC.,

             Defendants.
```

     The discovery videotaped video

teleconference deposition of ANNE BLUME, called

by the Defendants, for examination, pursuant to

notice, taken remotely before LAURA MUKAHIRN,

CSR, RPR, CRR, within and for the County of Cook

and State of Illinois, on August 26, 2021,

scheduled to commence at 10:00 o'clock a.m.

Anne Blume
August 26, 2021

Page 82

1    THE WITNESS:  That's fine with me.  I
2  appreciate it.  Rough justice, do you have any
3  estimate of how much time you're going to want?
4  Rough justice.  I won't hold you to it.
5    MR. NIEDERMAN:  I mean --
6    THE WITNESS:  Just trying to --
7    MR. NIEDERMAN:  Half hour would be plenty for
8  me, but I don't know if that gives everybody
9  enough time to get lunch --
10    THE WITNESS:  No, no, no.  I meant how much
11  time you have in questioning.
12    MR. NIEDERMAN:  Sure.  It won't be more than
13  the amount of time that you spent with Mr. Denn.
14    THE WITNESS:  Okay.  Cool.  Fair enough.
15  And, again, I won't hold you to it.  I was just
16  trying to have reasonable expectations about my
17  day.
18    MR. NIEDERMAN:  Certainly.
19    THE WITNESS:  Whatever you want to do as far
20  as a lunch break is absolutely fine with me.
21    MR. HAYES:  I was going to suggest back at
22  2:00 Eastern, 1:00 Central.
23    MR. NIEDERMAN:  That's fine with me.
24    THE WITNESS:  Okay.
25    THE VIDEOGRAPHER:  Go off the record at 1655.

Page 83

1          (Lunch break taken.)
2    THE VIDEOGRAPHER:  We are back recording on
3  the video record at 1800 UTC.
4          Examination
5          By Mr. Niederman
6    Q.   All right.  Good afternoon, Anne.  As I
7  was saying a moment ago before the video turned
8  on, my name is Seth Niederman.  I'm one of the
9  attorneys for Mr. Potter.  It's nice to meet
10  you.  Can you hear me okay?
11    A.   I can.
12    Q.   Excellent.
13    A.   You know what, before we get started,
14  though, during the lunch break I had what I'm
15  calling a V8 moment with respect to one of -- I
16  didn't -- Mr. Denn, Matt, asked me if there was
17  anything else other than what was alleged in the
18  complaint, something like that.  And I just want
19  to be clear that the BI conferences that are
20  specifically referenced in the complaint are
21  those that were known at the time of the filing
22  of the complaint.  But there have, since then,
23  been other webinars and virtual conferences that
24  The Institutes also contends violate the
25  purchase agreement.  So I think that I just want

Page 84

1  to make sure that it's very clear.  And I
2  apologize for any confusion, but I was very
3  confused by the question.
4    MR. NIEDERMAN:  I'll ask Mr. Denn if he'd
5  like to ask any follow-up questions about that
6  clarification now or wait until after I've
7  finished asking some questions that I have for
8  you.  I'm happy to do either.
9          Re-Examination
10          By Mr. Denn
11    Q.   Maybe it's easier if I ask now if you
12  could just identify which conferences, if any,
13  you believe violated the APA?
14    A.   Sure.  The long-term care, there was a
15  webinar, and then a virtual conference.  There's
16  a cyber webinar, and I think that's it as far as
17  events currently known.  But I will add that I
18  note that the business insurance has sent out a
19  survey inquiring of its audience what their
20  other interests are.
21    Q.   And with respect to -- when I say
22  conferences, I'm obviously, given the pandemic,
23  including online events as well.  You understand
24  that?
25    A.   Yes.

Page 85

1    Q.   Could you tell me with respect to the
2  two events that you just identified, what about
3  them it is that allegedly violates the APA?
4    A.   They're events.  They are competitive
5  events, not expressly listed in the permitted
6  activities.
7    Q.   So with respect to the long-term care
8  conference, it is the fact that long-term care
9  is not specifically listed in Schedule 6.12 that
10  causes you to believe it violates the APA?
11    A.   And that it's an event.  You know, one
12  of the seller businesses was C&E, which is an
13  event company.  So just the, you know, events in
14  the insurance space not expressly listed,
15  they're competitive.
16    Q.   Okay.  And for both of these events,
17  the long-term care event and the cyber webinar
18  event, the fact that it is an event and the
19  title of the event is sufficient, in your view,
20  for it to be a violation of the APA?
21    A.   They are insurance-based events.  To be
22  very clear, Ben Heller from Wilson Elser
23  inquired of the CLM of its interest in
24  developing a long-term care program.  So I don't
25  remember exactly what his words were.  But about

Anne Blume
August 26, 2021

Page 86

1  two weeks after that, I got the business
2  insurance e-mail forwarded by Ben which said,
3  you know, this doesn't preclude us from working
4  with you.
5       Q.   Yeah.  My question very simply was do
6  you need to -- in order to allege that these two
7  events violated the APA, do you need to know
8  anything about the content of the events, or is
9  the title of the event sufficient, in your view?
10      A.   I don't know that it's just the title
11 of the event, but at some point in time I've
12 looked at the agendas, and they are focused on
13 the insurance space and would also be appealing
14 to claims litigation management professionals.
15      Q.   Okay.  And in terms of your qualifying
16 your answer from before, I assume you haven't
17 had any contact with anyone else during the
18 lunch break?
19      A.   I had no contact with anybody related
20 to this case.  I did wander the halls here at
21 Cozen O'Connor in Chicago, and I did see a
22 couple people that I know, but nobody related to
23 this case.
24      Q.   Okay.  Thank you.
25      MR. DENN:  That -- I think those are all my

Page 87

1  questions in that area, Seth.
2       THE WITNESS:  Thanks, Matt.  Sorry about the
3  confusion.  I just -- it wasn't how I
4  interpreted your question.  I thought you were
5  talking about different acts, not repeated acts
6  in the same way.
7            Re-Examination
8            By Mr. Niederman
9       Q.   Thank you for the clarification.
10      A.   Sure.
11      Q.   Anne, did you -- I assume it's okay to
12 call you Anne as you indicated at the outset?
13      A.   Please.
14      Q.   Did you review the transcript of your
15 individual deposition in advance of today's
16 deposition?
17      A.   Yes.
18      Q.   And was there anything in that
19 transcript that you would answer differently as
20 the corporate designee of plaintiffs as opposed
21 to the individual who gave testimony previously?
22      MR. HAYES:  Object to the form.
23      THE WITNESS:  Yeah.  I couldn't answer that
24 question really because if -- I think we covered
25 topics that I'm not designated on, and I really

Page 88

1  wasn't looking at it with that lens.
2  BY MR. NIEDERMAN:
3       Q.   And so is your answer that there's
4  nothing that specifically you would change or
5  nothing related to the topics that you would
6  change?
7       MR. HAYES:  Object to the form.  Asked and
8  answered.
9       THE WITNESS:  There's nothing that I would
10 change in my individual capacity.  I didn't look
11 at the testimony I gave with respect to the
12 topics I've been designated on for consistency
13 to see if there was anything that I would
14 change.  That's not something that I --
15 BY MR. NIEDERMAN:
16      Q.   Understood.  No.  Understood.  Thank
17 you for that explanation.
18      A.   Sure.
19      Q.   And we looked earlier -- I believe it's
20 Exhibit No. 2, if you still have those PDFs
21 open, at the Request for Admission Responses,
22 and specifically RFA No. 1.  Do you recall
23 looking at that, and do you still have that
24 document accessible to you?
25      A.   Yes and yes.

Page 89

1       Q.   Excellent.  And so I just had a quick
2  question.  We looked at No. 1, and I believe
3  your testimony was that there -- that The
4  Institutes are not aware of any person who was
5  chosen not to attend a conference because of the
6  actions of BIH.  And I think you confirmed that
7  you wouldn't change that from a date that was
8  originally answered to today.  Do you recall
9  that, and did I accurately summarize your
10 testimony?
11      MR. HAYES:  Object to the question.  It goes
12 beyond the scope of the notice, beyond the
13 limitations of the protective order.
14      THE WITNESS:  Yeah.  I don't -- I don't
15 remember exactly what the question was or
16 exactly what my testimony was.  But if you want
17 to ask me a question, I would be happy to try to
18 answer it.
19 BY MR. NIEDERMAN:
20      Q.   Sure.  We looked at this, and I think
21 your testimony was something along the lines
22 that in response to Mr. Denn's question that you
23 wouldn't change this response to the RFA to
24 update it to say that The Institutes are now
25 aware of any person who has chosen not to attend

# Exhibit H

## Counterclaims of BIH in Potter v. Beacon Intercontinental Group, et al., No. 1:20-cv-4599 (S.D.N.Y.)

Case 1:19-cv-01600-RGA-01599-JGK Document 272 Filed 58/04/22017 Page 30 of 11 PageID #: 4841

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADAM POTTER, | Civil Case No. 1:20-cv-4599 (JGK) |
|         Plaintiff/Counterclaim Defendant, | |
| v. | **DEFENDANTS' SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| BEACON INTERCONTINENTAL GROUP, INC. and BUSINESS INSURANCE HOLDINGS, INC., | |
|         Defendants/Counterclaim Plaintiffs. | |

Defendants Beacon Intercontinental Group, Inc. ("Beacon") and Business Insurance Holdings, Inc. ("BIH") (collectively, "Defendants"), by and through their undersigned counsel, DLA Piper LLP (US), respectfully submit this Second Amended Answer, Affirmative Defenses, and Counterclaims to the Amended Complaint of Plaintiff Adam Potter ("Plaintiff"), dated August 18, 2020, and state as follows:[1]

## NATURE OF ACTION

1. Defendants admit that Plaintiff's Amended Complaint alleges breach of contract, declaratory relief, and unjust enrichment. Defendants deny that Plaintiff is entitled to such relief.

## PARTIES

2. Defendants admit the allegations in Paragraph 2 of the Amended Complaint.

3. Defendants admit that Defendant Beacon is incorporated under the laws of the State of Delaware but deny all remaining allegations in Paragraph 3 of the Amended Complaint.

---

[1] Defendants have herein adopted the headings from the Amended Complaint for ease of reference. To the extent that such headings themselves contain factual or legal statement, allegations, or characterization of any form or type, Defendants deny those statements, allegations, or characterizations.

B.    Deny each and every demand and prayer for relief contained in the Amended Complaint;

C.    Award Defendants their costs and reasonable attorneys' fees; and

D.    Award Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS OF BEACON INTERCONTINENTAL, INC. AND BUSINESS INSURANCE HOLDINGS, INC.

Defendants and Counterclaim Plaintiffs, Beacon Intercontinental Group, Inc. ("Beacon") and Business Insurance Holdings, Inc. ("BIH" or the "Company") (together "Defendants"), for their counterclaims ("Second Amended Counterclaims") against Plaintiff and Counterclaim Defendant Adam Potter ("Potter") state as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

2.    This Court has personal jurisdiction over Potter because the SPA contains a choice of law and forum selection clause whereby the parties expressly agree that any disputes arising out of the SPA must be brought in state or federal court in Manhattan, New York.  Moreover, Potter has, by bringing the above-captioned lawsuit against Beacon and BIH, subjected himself to the jurisdiction of this Court.  Accordingly, venue is also proper in this Court.

## GENERAL ALLEGATIONS

I.    **Potter's Formation and Ownership of BIH**

3.    BIH was formed by Potter.

4.      BIH's predecessor entity was C&E MGMT & Planning, Inc. ("C&E"), a Florida corporation in which Potter owned 100% of the issued and outstanding capital stock of C&E until on or about June 1, 2018.

5.      On or about June 1, 2018, Potter and several entities he owned,[2] including C&E, entered into an Asset Purchase Agreement with The American Institute for Chartered Property Casualty Underwriters and its wholly-owned subsidiary, The Institutes, LLC (collectively, "the Institutes").

6.      Upon information and belief, at the time of the Asset Purchase Agreement ("the Institutes Contract"), C&E was engaged in the business of identifying and securing conference and event locations, hotel contracts, and outside locations.

7.      The Institutes paid Potter nearly $20 million in exchange for all of the assets of C&E and several of Potter's other entities under the Institutes Contract.

8.      The Institutes Contract contained a covenant not to compete clause that prohibited, for a period of five (5) years after execution of the agreement, Potter and C&E from engaging in certain activities that would compete with the business lines acquired by the Institutes ("Non-Compete") through the Institutes Contract.

9.      On or about June 7, 2018, Potter changed C&E's name to Business Insurance Holdings, Inc.

10.      Potter also owned Business Insurance Holdings, LLC ("BIH, LLC").  On or about June 7, 2018, Potter changed the name of BIH, LLC to PBIH, LLC, a Florida limited liability company.

---

[2] The other entities owned directly or indirectly by Potter that were part of the Asset Purchase Agreement included CLM Group, Inc., a Florida corporation, Claims Pages, LLC, a Florida LLC, and Moxie HC, LLC, a Florida LLC.

## II.    Potter and the Acuntos Negotiate the Sale of BIH

11.    In or about June 2019, Potter began discussions with one of Beacon's owners, Steve Acunto, for the sale of BIH.

12.    BIH is an insurance trade publication that covers various segments of the business of risk transfer, including news and opinion affecting insurance carriers, reinsurers, legal, and insurtech enterprises; regulatory, legislative and court decisions; insurer results and trends; and insurance professionals themselves.  BIH also operated conferences concerning a wide range of risk transfer matters.

13.    Potter explained to the Acuntos that, under his ownership, BIH was a profitable insurance trade publication that, among other services, operated and coordinated conferences for insurance industry professionals that provided educational and informational resources concerning a wide range of risk-management issues.  Potter inquired as to whether the Acuntos might be interested in purchasing BIH.

14.    The Acuntos inquired as to Potter's proposed sales price for BIH.  Potter responded that his sales price for BIH was $5 million.

15.    The Acuntos inquired as to the basis for Potter's calculation of the sales price. Potter explained the $5 million sales price was based on the Company's historical financial performance and, in particular, five (5) times the 2018 earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $1 million.

16.    The Acuntos expressed interest in first reviewing BIH's financial records in deciding whether to proceed with the purchase of BIH and, if so, at what price.

Case 1:19-cv-06020-DGK-DLA Document 27-1 Filed 06/04/21 Page 60 of 132 PageID #: 4845

### III.    Potter Misrepresents BIH's Historical Financial Performance

17.    On or about June 13, 2019, Steve Acunto requested that Potter provide financial information concerning BIH.  Steve Acunto explained that, after review of the financial information, he would consider whether to prepare a letter of intent.

18.    On or about June 13, 2019, Potter e-mailed Steve Acunto documents that purported to show BIH's historical financial performance, including income statements (i.e., profit and loss statements) for calendar years 2017 and 2018,[3] as reflected in **Table 1** below:

**BIH's Income Statements Provided by Mr. Potter**

|  | 2017 | % of Sales | 2018 | % of Sales |
|---|---|---|---|---|
| Revenue | $ 4,379,507 | 100.0% | $ 4,935,248 | 100.0% |
| Cost of Good Sold | $ 726,330 | 17% | $ 376,563 | 8% |
| Gross Profit | $ 3,653,177 | 83.4% | $ 4,558,685 | 92.4% |
| Fixed Expenses | 3,670,221 | 83.8% | 3,505,802 | 71.0% |
| Other Income | - | 0.0% | - | 0.0% |
| **EBITDA** | **$ (17,045)** | **-0.4%** | **$ 1,052,882** | **21.3%** |
| Depreciation Expense | $ 10,155 | 0.2% | $ - | 0.0% |
| **Net Income** | **$ (27,200)** | **-0.6%** | **$ 1,052,882** | **21.3%** |

19.    The figures Potter provided to Steve Acunto on or about June 13, 2019 grossly overstated and materially misrepresented BIH's revenue, EBITDA, and net income.

20.    According to calendar year end "income statements" provided by Potter, from 2017 to 2018, BIH's revenues increased slightly from $4.379 million to $4.935 million.

21.    According to this same information provided by Potter, in 2017 BIH generated negative EBITDA totaling <$17,045>.  Potter represented, however, that in 2018, BIH's EBITDA increased to $1.052 million.

---

[3] E-mail from Adam Potter to Steve Acunto Re: PPPPPPPPPP ADAM / STEVE A., June 13, 2019. BI P&L 1-1-17 to 12-31.17[2].pdf. BIH, Inc - P&L (2018).pdf. BIH, LLC - P&L (Jan 1 – Jun 30, 2018).pdf.

22.    In his June 13, 2019 e-mail, Potter expressed his understanding and desire that Steve Acunto would utilize these financial figures in the valuation and due diligence of BIH.

23.    The foregoing financial performance data is unsupported by accounting records concerning BIH that Potter maintained on the accounting software QuickBooks (the "QuickBooks Accounting Records"), which were not provided by Potter prior to the sale and only produced after multiple demands by the Acuntos following the sale.  The income statements prepared and provided by Potter were false and misrepresented the true financial performance of BIH during the relevant time period, as reflected in **Table 2** below:

**BIH's Financial Performance**

|  | 2017 | % of Sales | 2018 | % of Sales |
|---|---|---|---|---|
| Revenue | $  5,033,517 | 100.0% | $  3,744,526 | 100.0% |
| Cost of Goods Sold |  |  |  |  |
|   Conferences / Events | $  - | 0.0% | $  - | 0.0% |
|   AV Expense | 77,372 | 1.5% | 105,290 | 2.8% |
|   Commissions | 310,000 | 6.2% | 4,778 | 0.1% |
|   Continuing Ed Credits | 2,605 | 0.1% | 5,732 | 0.2% |
|   Facility | 2,398,257 | 47.6% | 952,282 | 25.4% |
|   Miscellaneous | 7,563 | 0.2% | 3,791 | 0.1% |
|   Outside Service | 31,380 | 0.6% | 52,276 | 1.4% |
|   Printing | 78,530 | 1.6% | 29,001 | 0.8% |
|   Registration Materials / Supplies | 126,743 | 2.5% | 68,722 | 1.8% |
|   Royalty Expense | 150,000 | 3.0% | 2,010,993 | 53.7% |
| Total Cost of Goods Sold | $  3,182,450 | 63.2% | $  3,232,865 | 86.3% |
| Gross Profit | $  1,851,066 | 36.8% | $  511,661 | 13.7% |
| Fixed Expenses | 726,158 | 14.4% | 1,945,826 | 52.0% |
| Other Income | - | 0.0% | 50,000 | 1.3% |
| **EBITDA** | $  1,124,908 | 22.3% | $ (1,384,165) | -37.0% |
| Depreciation Expense | $  196 | 0.0% | $  293 | 0.0% |
| **Net Income** | $  1,124,712 | 22.3% | $ (1,384,458) | -37.0% |

24.    Based on the Company's QuickBooks Accounting Records, which were not provided by Potter prior to the sale and only produced after multiple demands by the Acuntos following the sale, 2017 revenues at calendar year end were $5.033 million, not $4.379 million as

Potter represented.  More importantly, however, the actual 2018 revenues at calendar year end were $3.744 million, not $4.935 million as Potter previously represented—a negative differential of $1.191 million.

25.    Based on these same QuickBooks Accounting Records, at calendar year end 2017, BIH generated EBITDA totaling $1.1 million, not <$17,045> as Potter represented, while at calendar year end 2018, BIH generated negative EBITDA totaling <$1.384 million>, not $1.052 million as Potter previously represented—*a negative differential of $2.437 million*.

26.    Based on these same QuickBooks Accounting Records, at calendar year end 2017, BIH generated net income totaling $1.124 million, not <$27,200> as Potter represented, while at calendar year end 2018, BIH generated negative net income (i.e., losses) of <$1.384 million>, not $1.052 million as Potter previously represented—*a negative differential of $2.437 million*.

27.    Significantly, the negotiated $5.0 million sales price Potter calculated was based on an agreed upon multiple of five (5) times BIH's 2018 EBITDA.  Because Potter's presentation of the 2018 EBITDA was significantly and materially overstated by $2.437 million and unsupported by the accounting evidence, the sales price was also significantly and materially overstated.

28.    The timing interval of the calculations—a calendar year basis—is not the reason for any discrepancy and material overstatement.  Potter falsified the financial performance data for BIH.  The data reveals the same negative differentials when examining the financial performance data on a fiscal year end ("FYE") basis, that is July 1–June 30.

29.    On or about July 18, 2019, Potter provided Steve Acunto with BIH's purported FYE 2019 income statement outlining the Company's revenue, gross profit, fixed expenses, and

EBITDA for the period July 1, 2018 through June 30, 2019.  Potter's income statement reflected

EBITDA and net income of $27,289, [4] as reflected in **Table 3** below.

**BIH's Income Statements Provided by Mr. Potter**

|  | FYE 2019 | % of Sales |
|---|---|---|
| Revenue | $  5,251,066 | 100.0% |
| Cost of Good Sold | $  1,681,207 | 32% |
| Gross Profit | $  3,569,860 | 68.0% |
| Fixed Expenses | 3,542,570 | 67.5% |
| Other Income | - | 0.0% |
| **EBITDA** | $      27,290 | **0.5%** |
| Depreciation Expense | $        - | 0.0% |
| **Net Income** | $      27,290 | **0.5%** |

30.     According to the Company's QuickBooks Accounting Records, which were not

provided by Potter prior to the sale and only produced after multiple demands by the Acuntos

following the sale, at FYE 2019 (June 30, 2019), BIH generated net income totaling a mere $238

and EBITDA of a mere $12,527.

31.     Potter did not provide the Acuntos with access to BIH's source accounting records,

including the QuickBooks Accounting Records.  Potter represented to Steve Acunto that he, Potter,

had calculated this financial information based on entries Potter made, or directed to be made, in

BIH's QuickBooks accounting software reflecting the Company's actual business transactions.

32.     Steve Acunto understood Potter to be uniquely qualified to know the accuracy and

veracity of the due diligence materials provided by Potter because Potter was the sole owner of

BIH and managed its operations.

---

[4] Upon information and belief, in 2016, 2017 and 2018, BIH's predecessor entity C&E operated
on a calendar year fiscal running January 1 – December 31.  In or about June or July 2018, when
BIH was formed, Potter began operating it on a fiscal year running July 1 – June 30.

33.    Potter repeatedly pressured the Acuntos into completing their due diligence and finalizing the sale on an expedited basis.  In doing so, Potter repeatedly represented that he provided all financial data relating to BIH that would enable the Acuntos to move forward with the sale.

34.    On or about August 6, 2019, Potter e-mailed Steve Acunto inquiring about the status of the draft SPA.

35.    On or about August 8, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.

36.    On or about August 15, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.

37.    On or about August 19, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.  In this communication, Potter expressed "concern[] about finalizing the deal" noting that they had "met on August 1 and put together a game plan to move the transaction forward and close by the end of the month" and that he had still not received a draft SPA to review despite being 10-days out from closing.

38.    On or about August 30, 2019, Steve Acunto, on behalf of Beacon, e-mailed Potter concerning steps required to finalize the transaction.  Potter responded, in part, that if the sale did not close in the next few hours, he would sell BIH to another purportedly interested buyer.  Unbeknownst to the Acuntos, Potter lied; there were no other interested buyers at the time.

39.    On information and belief, Potter intentionally rushed the diligence process to conceal that he had provided the Acuntos with revenue and net income figures that did not reflect BIH's actual financial performance.

40.    The Acuntos and Potter continued negotiations concerning the purchase of BIH after Potter provided the false and fraudulent financial performance information described above. Based on Potter's misrepresentation through the falsified income statements that BIH generated nearly $1.1 million in net revenue in 2018, the parties negotiated a sales price of $5 million, based on the agreed-upon multiple of five (5) times BIH's 2018 EBITDA, as falsely represented by Potter.  Potter initially proposed this "5X" formula in a June 14, 2019 e-mail to Steve Acunto.

41.    A multiple of EBITDA is commonly used to value a company, as it approximates the net income an entity may be expected to generate over a defined period of time.  Thus, the same metric is often also used to negotiate an entity's sales price under a stock purchase or similar agreement, as Beacon and Potter did here.  The purchaser is entitled to rely on the data provided on which the EBITDA calculation is based.

42.    Only *after* executing the SPA did the Acuntos, on behalf of Beacon, discover that Potter had inflated the Company's EBITDA, net income, and revenue figures, which, in turn, inflated the purchase price to which the Acuntos, on behalf of Beacon, ultimately agreed.  But for Potter representing that BIH generated $1.1 million in net income in calendar year 2018, the Acuntos would not have positioned Beacon to purchase BIH for $5 million.

## IV.    Potter Presents the Acuntos with a Proposed Stock Purchase Agreement

43.    In August 2019, the Acuntos formed Beacon as a corporate vehicle for, among other things, acquiring BIH from Potter.

44.    Potter, as Seller, and Beacon, as Buyer, executed the SPA on September 3, 2019. A true and correct copy of the SPA is attached hereto as **Exhibit 1.**

45.    Under the SPA, Beacon acquired 100 percent of BIH's capital stock in exchange for an agreed upon purchase price of $5 million.

- 65 -

46.     The $5 million purchase price was based on the parties' negotiations and Potter's express representations about the Company's financial performance and, in particular, the 2018 EBITDA.

47.     Pursuant to Section 1.02 of the SPA, a payment of $4 million was due at closing. Beacon made the $4 million payment as required under the SPA.

48.     Pursuant to Section 1.02 of the SPA, a payment of an additional $1 million was subject to a condition precedent based on BIH hitting certain performance thresholds, including that BIH achieve "gross annual revenue of $5,250,000." Section 1.02 further stipulates that "the final payment of One Million Dollars ($1,000,000.00) shall be reduced dollar for dollar if [BIH's] gross revenue for the 6 months ending December 31, 2019 is not at least Two Million Dollars ($2,000,000.00) . . . ."

49.     As called for by the SPA, Beacon executed an unsecured promissory note that contained the same conditions precedent to payment. A true and correct copy of the Promissory Note is attached hereto as **Exhibit 2**.

## V.      **Subject to the SPA, Beacon Discovers Potter Fraudulently Misrepresented BIH's Revenue, Net Income, and EBITDA and Misrepresented Revenue as to 10 Questionable Transactions**

50.     Under the SPA, Potter was required to provide "the Books and Records of the Company" at closing, or, "for any such books and records which are not reasonably available at the Closing within thirty (30) Business Days following the Closing." (Ex. 1, § 2.02(a)(iv).)

51.     Further, Section 6.01 of the SPA requires Potter to grant Beacon, after closing and "upon reasonable prior notice, such access to financial records and other information in [his] possession" that are necessary to fulfill a "reasonable business purpose." (Ex. 1, § 6.01.)

52.     Potter failed to comply with his contractual obligations by failing to provide BIH's complete books and records, including the QuickBooks Accounting Records, at or within 30 days

after closing on the SPA or even later upon reasonable notice. His failure was a result of his fear of Beacon learning of the massive fraud Potter had perpetrated.

53.    After executing the SPA and belatedly obtaining access to BIH's QuickBooks Accounting Records, Beacon began to see evidence that Potter had fraudulently misrepresented BIH's revenue, net income and EBITDA. The fraudulent presentation of revenues which induced Beacon into proceeding with the purchase and agreeing to an inflated purchase price of five times BIH's purported 2018 EBITDA.

54.    Subsequent to execution of the SPA, Beacon discovered material deviations in BIH's revenue, net income, and EBITDA compared to the records Potter had previously provided during Potter's pressured and accelerated due diligence period.

55.    These deviations were discovered across the 2017, 2018, and 2019 financials, all of which had the effect of inflating the agreed-upon purchase price and inducing Beacon into proceeding with the purchase of BIH.

56.    Through further investigation and analysis, Beacon discovered that Potter directed at least ten (10), and perhaps more, substantial cash transfers into and out of BIH's accounts between August 2018 and September 2019 from other entities Potter owned or controlled, which Potter improperly and erroneously recorded as revenue to the Company. These self-transfers amounted to Potter improperly recording $1,139,242.56 as revenue.

57.    As set forth in more detail below, the majority of the transactions represented repayment of loans or expenses to BIH and, thus, could not accurately be categorized as revenue.

58.    Each fabricated transaction, as detailed below, artificially increased BIH's purported revenues and profits as represented by Potter to Beacon.

59.    Beacon learned that, despite the income statements provided by Potter showing BIH generated *positive* $1.1 million in income in 2018, the Company generated *negative* income (i.e., losses) totaling $1.4 million, a differential of $2.4 million between what Potter had reported to Beacon (and what Beacon relied upon in agreeing to the $5 million purchase price), and what the true financial data supported.

60.    Beacon also learned that Potter had overstated 2018 EBITDA reported in the income statements, given by Potter to Beacon during due diligence, by approximately $2.4 million.

**Fraudulent Transactions One Through Six**

61.    Transactions 1 through 6 were carried out between on or about August 24, 2018 and on or about December 27, 2018 and resulted in a fraudulent inflation of BIH's revenues by $407,000.

62.    **Transaction 1**, carried out by or at Potter's direction on or about August 24, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with an entity named Moxie HC, LLC ("Moxie"),[5] a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

63.    **Transaction 2**, carried out by or at Potter's direction on or about September 6, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with

---

[5] Moxie HC, LLC is a Florida limited liability company formed by Potter.  Potter was its sole member through in or about December 2019.  Moxie owned 100% of the capital stock in CLM Group, Inc., an entity created by Potter on April 28, 2010 to provide services to property and casualty insurance claims professionals.  On June 1, 2018, Potter sold CLM Group, Inc. to The Institutes, LLC, a subsidiary of The American Institute for Chartered Property Casualty Underwriters.

Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

64.    **Transaction 3**, carried out by or at Potter's direction on or about September 27, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

65.    **Transaction 4**, carried out by or at Potter's direction on or about October 31, 2018, related to an accounting entry reflecting a check deposit in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

66.    **Transaction 5**, carried out by or at Potter's direction on or about November 26, 2018, related to an accounting entry reflecting a check deposit in the amount of $50,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

67.    **Transaction 6**, carried out by or at Potter's direction on or about December 27, 2018, related to an accounting entry reflecting a check deposit in the amount of $57,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

68.    Potter fabricated Transactions 1 through 6 to inflate BIH's revenues and profits for fiscal year 2018.

69.    By posting these non-revenue transfers as revenue to BIH, Potter overstated BIH's revenues by $407,000 through December 31, 2018.

- 69 -

70.     Those transactions actually reflected Potter shuffling funds between related entities to pay for "non-recurring expenses."  Those six transactions overstated BIH 2018 EBITDA and fraudulently inflated the purchase price under the SPA.

71.     On or about December 23, 2019, months after the SPA was executed, when confronted by the Acuntos about the fraudulent transactions, Potter admitted that Transactions 1 through 6 "were transfers from Moxie and *incorrectly categorized* as Sponsorship revenue" and that "[t]he intent of the transfers were [sic] to cover non-recurring expenses, promissory notes, loans & exchange, and permitted personal expenses."[6]

72.     On or about April 14, 2020, Potter, through his counsel, reaffirmed that he had effectively misrepresented Transactions 1 through 6 as revenue in BIH's books and records when he admitted that, in fact, these entries were actually *non-revenue transfers* from Moxie to BIH.[7]

73.     Potter attempted to further mislead Beacon into believing that the fraudulent transfers reflected in Transactions 1 through 6 "did not affect net income as while there was increased revenue they offset non-recurring expenses."[8]  The "non-recurring expenses" noted by Potter—i.e., promissory notes, loans & exchange, and permitted personal expenses—are not properly income statement items.  They could not offset the misreported revenue and should have been recorded on BIH's balance sheet because, fundamentally, these were transactions between

---

[6] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 23, 2019 (emphasis added).

[7] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020 ("The revenue from these transactions was transferred from Moxie HC, a company owned by my client.  BIH was previously a member of Moxie HC and had a number of non-recurring expenses, promissory notes and personal expenses that were not attributed to the Company's operations.  The purpose of these transactions were [sic] to offset these expenses.").

[8] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.

companies controlled by Potter. Yet, Potter failed to record these transactions on the balance sheets provided to Steve Acunto prior to consummation of the sale of BIH, resulting in his misreporting BIH's full year revenues and profits.

74.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transactions 1 through 6 overstated BIH's revenues by $407,000.

75.    Until confronted by the Acuntos, on behalf of Beacon, about the questionable Transactions 1 through 6, Potter failed to disclose the true nature and effect of recording the transfers as revenue to BIH and, in turn, inflating the revenues.

76.    Even after being confronted months after consummation of the sale of BIH about the questionable Transactions 1 through 6, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $407,000 as a result of these transactions.

77.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations concerning revenue, net income, and EBITDA in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

**Fraudulent Transaction Seven**

78.    **Transaction 7**, carried out by or at Potter's direction on or about April 26, 2019, related to an accounting entry reflecting an online transfer in the amount of $190,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

79.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about this fraudulent transaction, Potter admitted he could not explain the transaction, other than it related to "sponsorships," which was an affirmative

misrepresentation.  Potter further attempted to conceal this misrepresentation by explaining, falsely, that because "the checks were cashed and entered as cash into the account" he was unable to recall or determine which "sponsors" purportedly made these payments to BIH.[9]

80.     On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 7, Potter stated, through his counsel, that he was unable to provide additional information because he "no longer has access to the bank accounts or the Company's invoice system."[10]  The BIH bank account and invoice system (to which the Acuntos did not gain access until after executing the SPA) do not support how Potter recorded and characterized Transaction 7.

81.     According to BIH's account statements and accounting records only made available to Beacon long after the sale and after multiple requests, Transaction 7 was an online transfer of funds to BIH from Potter's other entity, Moxie, thereby contradicting Potter's false representation that Transaction 7 reflected revenue generated from payments made by sponsors to BIH.

82.     Potter misreported Transaction 7 as revenue rather than record the transfer on BIH's balance sheet as a transaction between companies owned and controlled at the time by the same individual:  Potter.

83.     Transaction 7 overstated BIH's revenues in calendar year 2019 by $190,000.

84.     Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 7 materially overstated BIH's revenues by $190,000.

---

[9] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[10] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

85.    Until confronted by the Acuntos, on behalf of Beacon, about the questionable Transaction 7, Potter failed to disclose the true nature and effect of recording the transfer as revenue to BIH and, in turn, inflating its revenues.  He failed to notify Beacon of this error and affirmatively concealed such information.

86.    Even after being confronted months after the sale of BIH about the questionable Transaction 7, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $190,000 as a result of this transaction.

87.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

## **Fraudulent Transaction Eight**

88.    **Transaction 8**, carried out by or at Potter's direction on or about May 13, 2019, was composed of two rapid-fire transactions:  8(a) and 8(b).  Transaction 8(a) related to an accounting entry reflecting an online transfer in the amount of $99,342.56 into BIH checking account xx4220 controlled by Potter, from checking account xx1350 associated with Waggy Group, Inc. ("Waggy"), a company also owned and controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

89.    Transaction 8(b) related to an immediate withdrawal of $100,000 from BIH's checking account xx4220, and a corresponding accounting entry for a "Waggy Royalty Expense" payment totaling $100,000.

90.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter misrepresented the nature of Transaction 8.  Potter falsely represented that Transaction 8a, reflected in the initial May 13, 2019 entry, resulted from an unintentional deposit in BIH's bank account that he rectified

- 73 -

on the same day via Transaction 8b, the second entry on May 13, 2019 reflecting an outflow of $100,000 from BIH's account to Waggy's account.[11]

91.      On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 8, Potter stated, through his counsel, that Transaction 8 did not factor into Potter's calculation of BIH's revenues and profits that he represented to Beacon during the due diligence period.[12]  The explanation is utterly implausible and false.

92.      Potter's attempt to legitimize or relate Transactions 8(a) and 8(b) further reveal the fraudulent nature of the transactions.  Nothing in Potter's explanation established that Transaction 8(a) is legitimately related to Transaction 8(b) or that the latter was intended to rectify the former, particularly as the amounts in question are different.

93.      In addition, according to BIH's QuickBooks Accounting Records only made available to Beacon long after the sale and after multiple requests, Transaction 8(b) was not made against the same accounts as Transaction 8(a), that is, was not a reversal of cash and revenues, further exposing the false nature of Potter's explanation.

94.      If, as misrepresented by Potter, Transaction 8(a) was an "error," which Potter corrected on the same day with Transaction 8(b), the proper accounting treatment would have compelled Transaction 8(b) to have been recorded as a reversal of Transaction 8(a), which would have resulted in a debit to revenue and a credit to cash.  Instead, Potter falsely recorded Transaction 8 as revenue and failed to correct the improper entry.

---

[11] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[12] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

95.     Notwithstanding Potter's misrepresentations, Transaction 8 is a transfer from Waggy, a company controlled by Potter, not revenue generated by BIH.  Despite repeated requests by the Acuntos, on behalf of Beacon, Potter failed and refused to provide any accounting or other evidence supporting his assertion that Transaction 8 reflects revenue generated by BIH.  And, there is no such evidence.  Potter should have recorded Transaction 8 as an account payable liability to Waggy, not a revenue transaction.

96.     Transaction 8 overstated BIH's revenues in calendar year 2019 by $99,342.56.

97.     Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 8 materially overstated BIH's revenues by $99,342.56.  Potter failed to notify Beacon of this error and affirmatively concealed such information.

98.     Even after being confronted months after the sale of BIH about the questionable Transaction 8, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $99,342.56.

99.     Beacon reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

### Fraudulent Transaction Nine

100.     **Transaction 9** was composed of two transactions: 9(a) and 9(b).  Transaction 9(a), carried out by or at Potter's direction on or about June 25, 2019, related to an accounting entry reflecting an online withdrawal in the amount of $540,000 from BIH's checking account xx4220, controlled by Potter, to Waggy, an entity also owned and controlled by Potter, identified as a "Waggy Royalty Expense" payment.

101.     Transaction 9(b), carried out by or at Potter's direction on or about July 1, 2019, related to an accounting entry reflecting an online transfer in the amount of $300,000 into BIH's

checking account xx4220, controlled by Potter, from checking account xx7090 associated with Waggy, an entity also owned and controlled by Potter. A corresponding accounting entry was improperly recorded by Potter as revenue earned to BIH and identified as "Print Media Ad Revenue."

102.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter misrepresented the nature of Transaction 9. Potter falsely represented that BIH initiated Transaction 9(a) in error for a "$520,000 Royalty payment," when in fact the actual payment was $540,000 (not $520,000), and that the correct transfer amount after all should have been for $220,000.

103.    Potter further falsely represented that Transaction 9(b), the purported $300,000 repayment to BIH from Waggy, was intended to reimburse BIH the net amount of the overpayment in Transaction 9(a),[13] thereby conceding that Transaction 9(b)'s $300,000 transfer was not revenue generating for BIH. Potter's purported explanation also exposed that Transaction 9(b) was not "Print Media Ad Revenue," as he had falsely represented in BIH's books and records.

104.    On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 9, Potter changed his explanation once again. He stated, through his counsel, that Transaction 9(a) constituted funds that were "transferred as a royalty payment to *Moxie*," an entity owned and controlled by Potter, not *Waggy*, another entity owned and controlled by Potter, as initially represented by Potter and as reflected in the corresponding accounting entry for this transaction.[14] This statement was false. The lies continue to accumulate.

---

[13] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[14] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

105.    The timing of Transactions 9(a) and 9(b) further evidences their fraudulent nature. Transaction 9(a) involved an alleged Royalty Expense overpayment in the amount of $300,000 on June 25, 2019, a mere five (5) days before BIH's 2019 fiscal year end and several weeks after Potter discussed with Steve Acunto a possible sale of BIH.  According to Potter, it was only detected and corrected on July 1, 2019, the first day of fiscal year 2020 resulting in a deposit back into BIH's account *incorrectly booked as revenue from Print Media Ad Revenue.*  This is clearly another round trip transaction timed to have the desired effect of moving money from one entity to another for the purpose of inflating gross revenues.

106.    Further, Transaction 9(b) occurred on or about July 1, 2019, the first day of the six-month period during which BIH's *gross* revenues were the key factor in determining satisfaction of the condition precedent and Potter's entitlement to the final $1 million payment under Section 1.02 of the SPA.  Potter fabricated Transaction 9(b) to intentionally overstate BIH's gross revenues. Potter's representation that Transaction 9(b) was a corrective transaction for 9(a) is not credible.  If true, Transaction 9(b) should have been booked as a reversal of Transaction 9(a), not revenue to BIH.

107.    Despite Beacon's repeated inquiries, Potter failed to provide any accounting evidence to support a legitimate relationship between Transaction 9(a)—the June 25, 2019 withdrawal of $540,000 from BIH to Waggy—and Transaction 9(b)—the July 1, 2019 transfer of $300,000 from Waggy to BIH—or why the latter was booked as revenue, or falsely identified as "Print Media Ad *Revenue*" rather than a royalty expense.  Potter materially misrepresented BIH's financial performance.

108.    Transaction 9 overstated BIH's revenues for the first two months of fiscal year 2020 by $300,000.

- 77 -

109.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 9 materially overstated BIH's revenues for the first two months of fiscal year 2020 by $300,000.  He failed to notify Beacon of this error and affirmatively concealed such information.

110.    Even after being confronted months after the sale of BIH about the questionable Transaction 9, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $300,000.

111.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price or for calculating and agreeing upon the condition precedent terms that must be satisfied before Potter was entitled to payment of the $1 million holdback.

### **Fraudulent Transaction Ten**

112.    **Transaction 10**, carried out by or at Potter's direction on or about August 23, 2019, related to an accounting entry reflecting a counter check deposit in the amount of $142,900 to BIH's checking account xx4220, controlled by Potter, purportedly representing "Print Media Ad Revenue" and "Events Revenue."  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

113.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter conceded the fraudulent nature of Transaction 10.  Potter explained that Transaction 10 "happened one week prior to sale and it appears was deposited into the wrong account and does not apply to BI[H]."[15]

---

[15] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019. According to Potter, "Instead of returning the funds to the proper non-BI[H] account, had the deposit not been made, the reconciliation sheet in the 'remaining in bank account' would have been $142,900 less."

114.    On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 10, Potter reaffirmed, through his counsel, this false narrative that "$142,900 was incorrectly deposited into the Company bank account a week prior to the sale."[16] Again, the lies continue to accumulate.  At a minimum, by Potter's and his counsel's own admission, he misreported Transaction 10 as revenue and, in turn, materially overstated BIH's revenues.

115.    Potter's explanation that Transaction 10 represents yet another six-figure "error" is not credible and unsupported by BIH's accounting records.  If Transaction 10 reflected an error in which Potter erroneously deposited $142,000 into BIH's bank account *one week before a sale was set to close*, he would have realized the mistake and corrected the "error" with a reversing entry that reflected a debit to revenue and a credit to cash.  Potter failed to do so not because of error or oversight, but because of fraud.

116.    There is no accounting evidence to support Potter's mischaracterization of Transaction 10.  Nor is there any accounting or other evidence to support Potter's incredible assertion that he mistakenly deposited $142,900 into an account belonging to an entity he was set to sell to Beacon in less than a week.  Potter knew that the Acuntos, on behalf of Beacon, would feel compelled to close on the sale given Potter's persistent pressure to do so and threats to cancel the deal, including his e-mail just four days prior to that, on August 19, 2019, in which Potter expressed "concern[] about finalizing the deal."

117.    There is no accounting evidence to support that Potter attempted to correct his purported error with a reversing entry, for one simple reason: Potter's true intent was to deposit

---

[16] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

$142,900 into BIH and record this amount as revenue only one week prior to closing on the sale in order to further inflate BIH's revenues while he still had the opportunity to do so.

118.    Transaction 10 overstated BIH's revenues for the first two months of fiscal year 2020 by an additional $142,900.

119.    Transaction 10 was recorded within the six-month period during which revenues were to be used to determine Potter's final payment under the terms of the SPA.

120.    By Potter's own admission, Transaction 10, as recorded by Potter, inappropriately increased BIH's purported revenues, which, had Potter's fraud gone undetected, would have been considered in calculating Potter's $1 million final payment.

121.    Potter had knowledge in the days leading up to the sale of BIH that Transaction 10 would materially overstate BIH's revenues for the first two months of fiscal year 2020 by an additional $142,900.  He failed to notify Beacon of this overstatement and affirmatively concealed such information in order to induce the Acuntos to proceed with the purchase of BIH.

122.    Even after being confronted months after the sale of BIH about the questionable Transaction 10, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated.

123.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price or for calculating and agreeing upon the condition precedent terms that must be satisfied before Potter was entitled to payment of the $1 million holdback.

Potter's Misrepresented the Nature of the Ten Fraudulent Transactions

124.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's revenues in 2018 and 2019 by at least $1,139,242.50, and perhaps more.

- 80 -

125.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's fiscal year 2019 (July 1, 2018-June 30, 2019) revenue and EBITDA by at least $696,342.50, and perhaps more.

126.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's gross revenues in the first two months of fiscal year 2020 (July and August 2019) by at least $442.900, and perhaps more.

127.    Potter consistently failed and refused to provide accurate data and explanation of BIH's financial data.  What financial and accounting information Beacon has been able to compile through its own efforts has shown convincing proof that Potter knowingly and intentionally misrepresented the financial condition of the Company.

128.    After repeated communications and expression of doubt concerning the validity of the above-referenced ten transactions, Potter realized that his fraudulent scheme was getting exposed.

129.    Potter admitted in post-closing correspondence with Beacon to misreporting many of these transactions.

130.    In a December 23, 2019 e-mail, knowing his fraudulent conduct had been discovered, Potter offered to repurchase BIH from Beacon.  Potter's offer was an attempt to prevent Beacon from discovering the further extent to which Potter had falsified BIH's financial and accounting records and taking appropriate action against him.

131.    Potter inflated BIH's net income, revenue, and EBITDA and, later, transmitted the fraudulent financial performance information to Beacon's owners with the purpose and effect of inducing Beacon into executing the SPA and purchasing BIH.

132.    Beacon would not have purchased BIH for $5 million had it known that BIH had

not made $1.1 million in net income in 2018 (as Potter had told Beacon during the due diligence

preceding the execution of the SPA).

133.    Had Beacon known that BIH actually generated *negative* income totaling $1.4

million in 2018, it would not have purchased BIH at all—for *any* price.

### Potter Failed to Disclose He Was Raiding BIH's Coffers by Misreporting Payments to Himself as Royalty Expenses

134.    Potter also failed to disclose to the Acuntos, and affirmatively concealed, that Potter

issued royalty payments from BIH's accounts to himself and companies that Potter controlled.

Potter misreported these distributions in BIH's books and records as royalty expenses incurred by

BIH.

135.    In 2018, Potter caused BIH to incur $2 million in royalty expenses paid to CLM

Group, Inc. and Vacation Inspired Group, Inc., both entities controlled by Potter, as reflected in

**Table 4** below:

### 2018 BIH Royalty Expense

| Date | Payee | Amount |
|------|-------|--------|
| 01/04/2018 | CLM Group, Inc. | $   1,300,000 |
| 05/01/2018 | CLM Group, Inc. | 600,000 |
| 06/29/2018 | Vacation Inspired Group, Inc. | 110,993 |
| **Total** | | **$   2,010,993** |

136.    In 2019, Potter caused BIH to incur an additional $1.3 million in royalty expenses

paid to Waggy and CLM, both entities controlled by Potter, and to Potter in his personal capacity,

as reflected in **Table 5** below:

- 82 -

Case 1:19-cv-06361-RA-OTW   Document 271   Filed 08/04/22   Page 77 of 116 PageID #: 4868

**2019 BIH Royalty Expense**

| Date | Payee | | Amount |
|------|-------|---|--------|
| 03/06/2019 | Waggy Group, Inc. | $ | 250,000 |
| 04/26/2019 | CLM Charitable Initiative, Inc. | | 175,000 |
| 05/13/2019 | Waggy Group, Inc. | | 100,000 |
| 05/31/2019 | Loan & Exchange; Due to Adam Potter | | 18,000 |
| 06/25/2019 | Waggy Group, Inc. | | 540,000 |
| 06/28/2019 | Waggy Group, Inc. | | 97,000 |
| 9/3/2019 | Waggy Group, Inc. | | 150,000 |
| **Total** | | $ | **1,330,000** |

137.     Potter made all of BIH's 2019 royalty payments, except for the final payment, in the last quarter of BIH's FYE 2019.  Potter issued BIH's final royalty payment on September 3, 2019, the same day that Beacon purchased BIH, but failed to disclose this fact to the Acuntos.[17]

**VI.     Potter Failed to Disclose and then Falsely Represented that BIH Under His Ownership Was Not Subject to the Covenant Not to Compete in the Institutes Contract**

138.     The Institutes Contract, a true and correct copy of which is attached hereto as **Exhibit 3**, prohibits the "Selling Parties," which include Potter and C&E, and "Affiliates" of the Selling Parties, from conducting activities that compete with any of the Sellers' Businesses.  (*See* Ex. 3, § 6.12(a).)

139.     Read together, Section 6.12(a) and Schedule 6.12 of the Institutes Contract prohibit Potter and entities, including C&E, and their affiliates, while under his ownership, from offering or promoting educational content that extends beyond the offerings provided by BIH, LLC (later

---

[17] According to BIH's QuickBooks journal entries, the $18,000 royalty expense incurred by BIH on May 31, 2019 was recorded as a debit to Royalty Expense and a credit to Loan & Exchange. The description under the Loan & Exchange account states, "Due to Adam Potter."

known as PBIH, LLC) on June 1, 2018 and competes with the CLM business of offering events and conferences to claims and litigation management professionals.

140.    Section 6.12(b) of the Institutes Contract contains a further covenant against the solicitation of Sellers' customers and business relations.

141.    On or about July 29, 2019, unbeknownst to the Acuntos or Beacon, the Institutes sent a cease and desist letter and notice of breach ("Notice of Breach") to Potter.  A true and correct copy of the Notice of Breach is attached hereto as **Exhibit 4**.

142.    The July 29, 2019 Notice of Breach notified Potter that the Institutes had recently learned Potter, through his company BIH, LLC, was "offering, promoting and producing the Cannabis & Hemp Conference and the Intellectual Property Conference (the 'IP Conference' and collectively, with the C&H Conference, the 'BI Conferences'), scheduled for October 24-25, 2019 and October 24, 2019, respectively, [at] the New York Marriott Marquis . . . ."  (Ex. 4, at 1.)

143.    The July 29, 2019 Notice of Breach further made clear that "[t]his letter shall (i) service as written notice that you are in breach of your covenant not to compete as set forth in the [Institutes Contract]; (ii) constitute a demand that you immediate cease and desist all activities, including cancellation of the BI Conferences serving as the basis for such breach; and (iii) constitute written notice that such breach entitles the Buyer to indemnification under Section 9.2(a) of the [Institutes Contract], which includes, without limitation, the right to recover[] any and all Losses, such as attorneys' fees and any expenses and costs incurred by the Buyer Indemnified Party in connection with enforcing its rights thereunder."  (Ex. 4, at 1.)

144.    The July 29, 2019 Notice of Breach further reminded Potter that "[p]ursuant to Section 6.12(a) of the Purchase Agreement, you have agreed not to, and to cause your Affiliates not to, directly or indirectly, 'conduct, manage, operate [and] engage in . . . any business or

enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses' unless such activity constitutes a Permitted Activity." (Ex. 4, at 1-2.)

145.    According to the July 29, 2019 Notice of Breach, "[t]he BI Conferences are a clear breach of your covenant not to compete, and likely constitute a breach of the other restrictive covenants in [the Institutes Contract] as well." (Ex. 4, at 2.) According to the Notice of Breach, which Potter received hallway through the due diligence process for the sale of BIH to Beacon, the BI Conferences are not a "Permitted Activity" under the Institutes Contract.

146.    As of July 29, 2019, Potter knew that C&E, the predecessor entity to BIH, was subject to the Non-Compete in the Institutes Contract.

147.    As of July 29, 2019, Potter knew or should have known that the Institutes believed BIH, LLC (the predecessor to PBIH, LLC) was subject to the Non-Compete in the Institutes Contract.

148.    The Institutes were not at that time aware that Potter had created a new entity, BIH, as a successor to C&E or that BIH, under Potter's ownership, was an "affiliate" of C&E may be subject to the Non-Compete in the Institutes Contract.

149.    At no time did Potter reveal to Beacon's owners that he had received the July 29, 2019 Notice of Breach or that he had reason to believe the Institutes believed that BIH might be subject to and bound by the Non-Compete in the Institutes Contract.

150.    At no time did Potter provide a copy of the Notice of Breach to the Acuntos.

151.    Instead, Potter affirmatively and deliberately concealed this information from the Acuntos and Beacon in an effort to avoid disruption of the potential sale of BIH.

152.    On or about August 12, 2019, unbeknownst to the Acuntos or Beacon, who were only weeks away from closing on the purchase of BIH from Potter, the Institutes sent a second

cease and desist letter and notice of breach ("Second Notice of Breach") to Potter.  A true and correct copy of the Second Notice of Breach is attached hereto as **Exhibit 5**.

153.    The August 12, 2019 Second Notice of Breach reflected and referred to a conversation that, among other things, set forth grounds the Institutes believed confirmed its position that Potter, through his entities, had breached the Non-Compete in the Institutes Contract as a result of Potter's intention to proceed with the BI Conferences.  (Ex. 5, at 1.)

154.    At no time did Potter reveal to Beacon's owners that he had received the August 12, 2019 Second Notice of Breach or that he believed BIH might be subject to and bound by the Non-Compete in the Institutes Contract.

155.    At no time did Potter provide a copy of the Second Notice of Breach to the Acuntos.

156.    Instead, Potter affirmatively and deliberately concealed this information from Beacon in an effort to avoid disruption of the potential sale of BIH to Beacon.

157.    On August 28, 2019—less than a week before Beacon executed the SPA with Potter—the Institutes commenced a lawsuit against Potter and BIH, LLC (the predecessor to PBIH, LLC), entitled *The American Institutes for Chartered Property Casualty Underwriters, et al. v. Potter, et al.*, No. 1:19-cv-1600 (D. Del) (the "Delaware Federal Action").

158.    The original complaint in the Delaware Federal Action alleged, among other things, Potter and BIH, LLC violated the Non-Compete in the Institutes Contract by coordinating and operating risk-management conferences that competed with risk-management conferences now coordinated and operated by the Institutes through CLM.  The Institutes further alleged that Potter and BIH, LLC breached the Institutes Contract by soliciting CLM sponsors.

159.    Prior to execution of the SPA, Potter made intentional, material misrepresentations and omissions to Beacon regarding the impact of the Institutes' Contract, and the Non-Compete,

- 86 -

in particular, regarding Beacon's ability to operate BIH's risk management conference business under his ownership.

160.    Among other misrepresentations and omissions, Potter failed to disclose the Institutes Contract in Section 3.05(a) of the Disclosure Schedule of the SPA and failed to disclose the scope of the Institutes Non-Compete and the Delaware Federal Action in Schedule 3.09 of the SPA.

161.    The SPA contained a number of representations and warranties made by Potter on which Beacon's purchase of BIH was conditioned. Indeed, Section 5.01 stipulates that "[t]he obligations of [Beacon to] . . . purchase . . . the Company . . . are [] subject to the satisfaction [] by [Potter] of the . . . representation and warranties of [Potter] set forth in [the SPA] [which] shall be true and correct in all material respects as of the date of the [SPA]."

162.    Section 8.04 of the SPA further states that "[a]ll representations and warranties shall survive the Closing . . . ."

163.    In Section 3.06(a), Potter affirmed that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for trivial contracts entered into in the ordinary course of business. Section 3.05(a) of the Disclosure Schedule is blank. Potter misrepresented that BIH was not subject to any such contracts while under his ownership and control and at the time of closing that would limit or encumber BIH from doing anything, or obligate BIH to do something. That representation—or material omission—by Potter was false because, among other reasons, Potter had received the Notice of Breach and Second Notice of Breach before executing the SPA with Beacon but failed to disclose those Notices to Beacon or the nature of the demands.

164.    As described below, BIH under Potter's ownership was an "Affiliate" of a "Selling Party" and, thus, bound by and subject to the Non-Compete in the Institutes Contract.

165.    Upon information and belief, CLM offers conferences to risk management professionals similar to those offered by BIH.

166.    As described above, Beacon acquired BIH with the intention of expanding BIH's risk-management conference portfolio.  Despite informing Potter of this fact, Potter failed to disclose the Institutes Contract to the Acuntos while negotiating and executing the SPA.

167.    Section 3.09 of the SPA states that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened" against BIH.

168.    Although Potter disclosed the Delaware Federal Action in Schedule 3.09, he materially mischaracterized the scope of the Non-Compete by writing in pertinent part:

> In June 2018, Adam Potter [] sold three companies to The Institutes. The Institutes Contract contained a non-compete *for Adam Potter personally, however Business Insurance is not part of the agreement*.  (emphasis added).

169.    Potter's disclosure in Schedule 3.09 was false and misleading, as least as to the entities then owned by Potter.

170.    Potter affirmatively misrepresented that the non-compete applied only to "Adam Potter personally."

171.    The Non-Compete explicitly applies to "a Selling Party," defined to include the "Companies, Potter, and Moxie" and "Affiliates" thereof.  (Ex. 3, § 6.12.)  "Companies" is expressly defined to include C&E.  "Affiliates" is defined as "any Person directly or indirectly controlling, controlled by, or under common control with," *inter alia*, Potter and C&E.[18]

_____

[18] Indeed, in Potter's motion to dismiss the Institutes' amended and supplemental complaint, Potter represented that the agreement entered into between C&E and the Institutes binds BIH.  Potter's

172.    Potter concealed the true nature of the Institutes Contract and the Delaware Federal Action while negotiating and finalizing the SPA.  He did so in order to avoid risk that Beacon would terminate the purchase or insist on a lower purchase price to account for the fact that BIH could potentially become an encumbered company.

173.    As such, so long as C&E and, later, BIH remained under the ownership and control of Potter, it was subject to and bound by the Non-Compete.

174.    Potter knew this, because he agreed to bind C&E to the Non-Compete.  He then renamed C&E as BIH shortly after executing the Institutes Contract but more than a year *before* Beacon purchased BIH from Potter.

175.    At the time Potter made the misrepresentation and mischaracterized the scope of the Non-Compete in Schedule 3.09 of the SPA prior to the sale of BIH to Beacon, BIH was owned by Potter and, thus, an "Affiliate" covered by the Asset Purchase Agreement and the Non-Compete therein.

176.    Potter's assurances that BIH was *not* bound by the Non-Compete *under his ownership* was materially false and induced Beacon to proceed with the purchase of BIH.  This is the case, even though under Beacon's ownership, it is BIH's firmly supportable position in the Delaware Federal Action that it is not subject to the Non-Compete.

177.    As set forth in BIH's Opening Brief in Support of Motion to Dismiss the Amended and Supplemental Complaint in Delaware Federal Action ("Motion to Dismiss"), BIH makes clear its position that it is not subject to the Non-Compete under Beacon's ownership.

---

assertion in his motion to dismiss directly conflicts with his prior representations in the SPA and in correspondence with Beacon before and after execution of the SPA.

178.    Despite his later opportunistic endorsement of BIH's Motion to Dismiss, Potter has nonetheless explicitly advanced the position that BIH *is subject to the Non-Compete* and even went so far as to encourage the Institutes that the proper defendant subject to the Non-Compete was BIH which, in turn, prompted the Institutes to name BIH as a defendant in the Delaware Federal Action.

179.    In an e-mail communication on or about January 30, 2020, after Potter's counsel claimed PBIH was not a proper defendant, counsel for the Institutes inquired of Potter whether he was "willing to identify the 'correct' party that purportedly should be sued instead of Business Insurance Holdings, LLC?"  Through several e-mail exchanges, on or about February 19, 2020, Potter's counsel identified "Business Insurance Holdings, Inc., a Florida corporation" as the "correct party" to sue instead of "Business Insurance Holdings, LLC."  A true and correct copy of the above e-mail exchange is attached hereto as **Exhibit 6**.

180.    At Potter's insistence and invitation, then, on March 27, 2020, the Institutes filed an amended and supplemental complaint in the Delaware Federal Action to assert legal claims against BIH alleging that the Non-Compete is enforceable against BIH as a successor to C&E, even under new ownership by Beacon.  A true and correct copy of the amended and supplemental complaint in the Delaware Federal Action is attached hereto as **Exhibit 7**.  The Institutes further allege that BIH would be in continued breach of the Non-Compete if, under Beacon's ownership, BIH continued to operate risk-management conferences similar to those offered by CLM.

181.    Potter's false representation is further evidenced by his motion to dismiss the Delaware Federal Action, filed May 1, 2020, in which Potter affirmatively states that BIH, even under new ownership by Beacon, is a party to and bound by the Institutes Contract and, in particular, the Non-Compete.

182.    BIH does not concede that it is subject to the Non-Compete.  By failing to disclose the Institutes Contract in Schedule 3.05(a) of the SPA, however, and failing to fully and accurately disclose the Non-Compete in Schedule 3.09 of the SPA, Potter failed to satisfy his representations and warranties upon which the SPA was predicated.  His misrepresentations and omissions were knowing and intentional given that, among other reasons, he received the Notice of Breach and Second Notice of Breach before executing the SPA with Beacon.

183.    Potter also led the Acuntos, on behalf of Beacon, to reasonably believe that the Non-Compete applied only to Potter, not to any entities he owned or controlled.  The plain language of the Non-Compete and the Notice of Breach and Second Notice of Breach make clear that entities owned by Potter were also covered by the Non-Compete, at least insofar as he maintained ownership of those entities.

184.    Potter made the material misrepresentations and omissions described above with the purpose and effect of inducing Beacon into executing the SPA.

185.    Beacon's owners reasonably relied on Potters material misrepresentations and omissions in deciding whether to proceed with the purchase of BIH.

186.    Beacon would not have executed the SPA, and certainly not for the agreed-to sales price, conditions and other terms of the sale, but for Potter's representation that Beacon was purchasing an unencumbered entity (i.e., an entity that was able to generate revenue through organizing risk management conferences—the very same activity it was prohibited from conducting under the Non-Compete).

**VII.    Potter Breached the SPA and Express Warranties**

187.    Potter breached the SPA and its material, express representations and warranties that Beacon relied upon to value BIH and execute the SPA.

188.   The SPA requires that "[t]he representations and warranties of Seller set forth in this agreement shall be true and correct in all material respects as of the Date of this agreement." (Ex. 1, § 5.01(a).)

189.   Potter breached Section 3.06 of the SPA. Section 3.06 imposed a duty upon Potter to disclose in Section 3.05(a) of the Disclosure Schedule all of BIH's non-exempt contracts. (Ex. 1, § 3.05(a).) Potter failed to do so. Instead, he left Section 3.05(a) of the Disclosure Schedule blank when he had an affirmative duty and obligation to disclose certain information about contracts to which BIH, under his ownership, was bound, encumbered and had obligations.

190.   Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract and, in particular, the Non-Compete that applied to BIH under Potter's ownership and if, as he later contended in his motion to dismiss in the Institutes Action, he believed BIH was bound to it under Beacon's ownership.

191.   The Institutes Contract was a non-exempt contract under Section 3.06(a) given that the Institutes Contract resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes and Section 6.12 of the Institutes Contract bound C&E to the Non-Compete.

192.   Beacon relied upon Potter's disclosures—specifically, the lack of any non-exempt contracts—in Section 3.06 in its negotiations with Potter over a purchase price for BIH that would be commensurate with the value of Beacon's acquisition.

193.   Potter knew that Beacon would rely, and did rely, on this information and his fraudulent disclosure schedule.

194.   For instance, on or about June 14, 2019, in response to a request to Potter for "a list of conferences annually," Potter provided a list of conferences hosted by BIH under his ownership.

195.    Beacon suffered damages resulting from this breach of Section 3.06. Potter's breach exposed BIH to potential liability in the Delaware Federal Action.

196.    Potter's breach of Section 3.06 also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes amended and supplemental complaint, BIH is bound by the Non-Compete and is prohibited from hosting conferences that compete with CLM—a position diametrically at odds with Potter's initial disclaimer prior to execution of the SPA as well as his later endorsement of BIH's Motion to Dismiss in the Delaware Federal Action.

197.    The mere threat of litigation and potential exposure has caused BIH under Beacon's ownership, in an abundance of caution, to cancel at least one and potentially more lucrative conferences Beacon, and forego other business opportunities, Beacon believes it should otherwise have the ability to host and undertake. In doing so, Beacon has lost the benefit of its bargain in acquiring BIH from Potter.

198.    Potter also breached Section 3.09 of the SPA. Section 3.09 represents and warrants that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock." (Ex. 1, § 3.09.)

199.    Section 3.09 imposed a duty upon Potter to accurately disclose pending and threatened litigation relating to BIH. Potter disclosed the Delaware Federal Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion. In particular, Potter affirmatively contended that BIH, under his ownership, was not subject to the Institutes Contract or the Non-Compete. He intentionally omitted and failed to disclose that he actually believed BIH was subject to the Non-Compete and, thus, a proper defendant in the

Delaware Federal Action, as he later represented to the Institutes and argued in his own Motion to Dismiss.

200.    Potter's description in Schedule 3.09 is materially inaccurate.

201.    Potter knew that his disclosure in Schedule 3.09 was intentionally misleading and materially inaccurate.  Potter further knew that when Beacon and Potter executed the SPA, BIH was, or would be with his encouragement to the Institutes, an anticipated defendant in the Delaware Federal Action, as evidenced by Potter's later contention in his motion to dismiss.

202.    Potter therefore breached Section 3.09 of the SPA by failing to disclose potential or threatened litigation against BIH.

203.    Beacon relied upon Potter's material misrepresentation and omission in Section 3.09 in its determination to continue with the purchase of BIH according to the sales price proposed by Potter.  In particular, Beacon relied on Potter's implicit assertion that no pending or impending litigation threatened to prevent BIH from hosting or operating conferences.  Potter knew that Beacon intended BIH to host and operate conferences because the parties discussed this very issue during the due diligence preceding the execution of the SPA.

204.    Potter knew that Beacon would rely, and did rely, on this information and his fraudulent disclosure schedule.

205.    Beacon suffered damages resulting from Potter's breach of Section 3.09.  Potter's breach has exposed BIH, to potential liability in the Delaware Federal Action.

206.    Potter's breach of Section 3.09 has also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes Complaint, BIH is ultimately determined to be bound by the Non-Compete and is prohibited from hosting conferences that compete with CLM, as Potter has advocated.  The mere threat of litigation and potential exposure has caused

BIH under Beacon's ownership to cancel potentially lucrative conferences Beacon believes it should otherwise have the ability to host.

207.    Potter breached Section 5.01(a) of the SPA by failing to disclose the Institutes Contract in Section 3.06 and Section 3.05(a) of the Disclosure Schedule and failing to disclose the Delaware Federal Action in Section 3.09 and Disclosure Schedule 3.09 of the SPA.

**VIII.    Potter Sued Beacon in Delaware State Court, Improperly Obtaining a Default Which Was Later Vacated by the Court Due to Improper Conduct by Potter and His Counsel.**

208.    On January 30, 2020, Potter and his counsel filed a complaint under seal against Beacon in Delaware Superior Court, in an action styled *Potter v. Beacon Intercontinental Group, Inc.*, C.A. No. N20C-01-221 AML CCLD (Del. Super. Ct.) (the "Delaware State Action"), alleging that Beacon breached the SPA by not paying the $1 million final payment Potter claims Beacon owes under the SPA.  A true and correct copy of Potter's complaint in the Delaware State Action is attached hereto as **Exhibit 8**.

209.    Despite communicating previously and continuously with counsel for Beacon regarding the dispute that Potter had misrepresented BIH's revenues and fraudulently induced Beacon into executing the SPA, and despite having filed the Delaware State Action complaint under seal, counsel for Potter neither provided counsel for Beacon with a courtesy copy of the complaint nor otherwise notified counsel that Potter had sued Beacon under seal in Delaware Superior Court.

210.    On February 13, 2020, Potter contends he served Beacon's registered agent for service of process with a copy of the Delaware State Action complaint.  Beacon's registered agent failed to transmit the complaint to Beacon at that time and Beacon never received actual notice of the complaint.

211.    On March 5, 2020, Potter contends he obtained a clerk's default—again without notifying or conferring with Beacon or its counsel.  At that time, Beacon lacked actual notice of the Delaware State Action.  A true and correct copy of the clerk's default is attached hereto as **Exhibit 9**.

212.    In a series of e-mails between April 9 and 15, 2020, Potter's counsel demanded that BIH permit Potter to control the joint defense of Potter, his entity, and BIH in the Delaware *Federal* Action with counsel for Potter representing each defendant.  A true and correct copy of the Potter counsel e-mail exchanges are attached hereto as **Exhibit 10**.

213.    Counsel for Potter clearly articulated the intent of Fox Rothschild to represent BIH in the Delaware Federal Action.  In his April 9, 2020 e-mail, counsel for Potter wrote, "So that we may begin with that defense, please confirm in a written response to this e-mail that we [Fox Rothschild] have permission to accept service on behalf of BIH, Inc.  We [Fox Rothschild] are currently in the process of formulating a defense strategy, which may potentially include filing a dispositive motion seeking to have BIH, Inc. dismissed from the above-captioned lawsuit entirely." (Ex. 10.)

214.    Despite seeking to represent BIH in the Delaware *Federal* Action, Potter's counsel at Fox Rothschild never volunteered to BIH, Beacon or its counsel that they had represented Potter in suing and obtaining a clerk's default against Beacon, BIH's parent, in the Delaware *State* Action.

215.    BIH rejected Potter's and his counsel's request to assume its defense in the Delaware Federal Action, knowing that Potter and BIH had a conflict of interest.  (Ex. 10.)  That conflict of interest arose from BIH's firm and verified belief that Potter had defrauded Beacon by overstating BIH's EBITDA and revenues in order to inflate the purchase price Beacon ultimately

agreed to pay. That conflict of interest arises from the verified fact that Potter invited and encouraged Plaintiffs in the Delaware Federal Action to sue BIH as a co-defendant.

216.    Given these facts, BIH had a good faith and well-founded belief that its interests were adverse to and divergent from Potter's in the Delaware Federal Action.

217.    Counsel for BIH and Beacon was *not* aware at the time Fox Rothschild made the demand that Potter and his counsel Fox Rothschild assume control of BIH's defense in the Delaware Federal Action that, more than month before, Potter and his counsel at Fox Rothschild had obtained a clerk's default against Beacon, BIH's parent company, in the Delaware State Action.

218.    In June 2020, counsel for Beacon discovered the Delaware State Action clerk's default while researching claims and defenses concerning the Delaware Federal Action. This was the first that Beacon or the Acuntos, or their counsel, learned of the Delaware State Action or the clerk's default in that action.

219.    The clerk's default was not properly obtained. It was the product of duplicitous and intentional efforts to obfuscate the fact that a complaint had been filed or served.

220.    On June 12, 2020, Beacon moved to set aside the clerk's default in the Delaware State Action. Potter opposed.

221.    At the July 17, 2020 hearing, The Honorable Abigail LeGrow of the Delaware Superior Court granted Beacon's motion and set aside the clerk's default under Delaware Superior Court Civil Rule 60(b)(6). As reflected in the transcript of that hearing, a true and correct copy of which is attached hereto as **Exhibit 11**, Judge LeGrow justified her ruling on grounds that she found "extraordinary circumstances" existed for doing so.

222.    Judge LeGrow pointed to the improper conduct of Potter and his counsel at Fox Rothschild, the same counsel in this case.  So shocked and dismayed at the impropriety of counsel's conduct was Judge LeGrow that she stated on the record "I'm, frankly, not looking to turn this into a written decision that could be embarrassing for certain people [i.e., Fox Rothschild counsel] so I'm going to give you my oral ruling."  (Ex. 11, at 57:22-58:3.)

223.    Judge LeGrow expressed shock at the behavior of Potter and his counsel, describing their actions as "troubling" and "very suggestive" of "underhanded activity."  (Ex. 11, at 33:1–15, 60:10–61:9.)

224.    Judge LeGrow expressed outrage that Fox Rothschild, on behalf of Potter, affirmatively misrepresented the nature of the action *in the instant case*.  To illustrate, Judge LeGrow asked counsel for Potter whether "the basis for the alleged default under the SPA is this indemnification issue" discussed above, that is, Fox Rothschild's demand the BIH retain Fox Rothschild to defend it in the Delaware Federal Action and permit Potter to control the defense of both he and BIH in the Delaware Federal Action, despite having obtained a clerk's default in the Delaware State Action only a month before.  Counsel for Potter expressly "dispute[d] the characterization" and specifically *denied* the original complaint in this instant action asserted a breach of contract claim based on this indemnification issue.  (Ex. 11, at 47:4-54:20.)  That denial was false.

225.    Judge LeGrow immediately confronted Potter's counsel by pulling out a copy of Potter's original complaint in this action and referred counsel to paragraphs 104-106 that, in her words, "specifically address this issue of the indemnification and Mr. Potter's right to assume control of BIH's defense and the fact that the Acuntos, on behalf of both Beacon and BIH, refused." (Ex. 11, at 54:22-55:8.)

226.     Judge LeGrow then quoted from paragraph 121 of Potter's original complaint in the instant action, to wit: "Lastly, Beacon breached the SPA by preventing Potter from exercising his right to assume and control BIH's defense in the Delaware District Court Action with counsel of its choice as provided in the SPA."  (Ex. 11, at 55:10-15.)

227.     Judge LeGrow's clear view, which was shared by the undersigned, is that Potter had no right to demand, and BIH had no obligation to permit, Potter and his counsel at Fox Rothschild to assume and control the defense of both Potter and BIH in the Delaware Federal Action.

228.     Judge LeGrow explained that she would have vacated the default "solely on the fact that Mr. Potter, represented by counsel [Fox Rothschild], was aware that the defendants were disputing the debt [at issue in the Delaware State Action]; was aware that the [D]efendants were represented by counsel relating to that very dispute; filed the complaint [in the Delaware State Action]; entered the direction for entry of default judgment; and never once provided a courtesy copy of th[e] [Delaware State Action] complaint or the default judgment, once it was obtained, to counsel."  (Ex. 11, at 60:12-21.)

229.     Judge LeGrow went further, however, to explain that Delaware Rule 60(b)(6) permits the court "a grand reservoir of equitable power to do justice in a particular case." (Ex. 11, at 59:23-60:1.)

230.     Judge LeGrow noted that "what makes this a particularly troubling case and what makes me more than confident that Rule 60(b)(6) is the appropriate relief here is *what happened thereafter.*" (Ex. 11, at 61:12-15 (emphasis added).)

231.     Judge LeGrow ruled that "with default judgment in hand, Mr. Potter's counsel [Fox Rothschild] then sought to represent Beacon's subsidiary, BIH, in separate but related litigation

without disclosing the existence of the conflict.  And, to me, it is a very clear conflict under Rule 1.7 of the Rules of Professional Conduct."  (Ex. 11, at 61:16-23.)

232.    The conflict between Potter and BIH as presented in the Delaware State Action and presented by Potter and his counsel in this action, is a non-waivable conflict under Rule 1.7 of the American Bar Association's Model Rules of Professional Conduct.

233.    Judge LeGrow went further in her ruling vacating the default and admonishing Potter's counsel by stating "then to compound the error, Potter now contends that the defendants in this [New York Federal] action, the Acuntos' and Beacon's refusal of that representation, when there was a *very clear conflict of interest* that would prevent the representation . . . under rule 1.7, Potter now contends that the refusal amounts to a breach of the SPA and *has so argued in the Southern District of New York.*  So, at best, this is a breakdown in communication between counsel. *At best*.  I think it's something much less unintentional than that.  Or, to avoid the double negative, *much more intentional than that*, and so this Court is not going to be a tool by which parties or their counsel try to gain a leg up in other litigation or try to mask what is going on for purposes of achieving something in other related disputes." (Ex. 11, at 62:3-23 (emphasis added).)

234.    On Monday, July 20, 2020, the very next business day, Potter voluntarily dismissed the Delaware State Action.  A true and correct copy of Potter's notice of voluntary dismissal of the Delaware State Action is attached hereto as **Exhibit 12**.

235.    Potter now has repurposed his claim to recover on the Promissory Note in the Delaware State Action into Count I of the Amended Complaint in this New York Federal Action.

236.    Potter also continues to maintain in the Amended Complaint, despite admonitions by Judge LeGrow and a very clear conflict under the Rule 1.7 of the Rules of Professional Conduct,

that BIH "denied Potter his contractual rights under the SPA's Indemnification Procedures . . . ." (Am. Compl., ¶ 196.)

**IX. Potter Declined to Defend, and Failed His Duty to Indemnify, Beacon and BIH**

237. The only counsel Potter offered BIH in the Delaware Federal Action was Fox Rothschild, its counsel in the Delaware Federal Action, Delaware State Action, and this New York Federal Action. Such representation would be subject to a non-waivable conflict which, as Judge LeGrow admonished, was ethically prohibited because, among other things, Potter and his same counsel had simultaneously obtained a default judgment against Beacon in the Delaware State Action.

238. As a result, under the SPA, BIH is entitled to counsel of its own choosing in the Delaware Federal Action at Potter's expense.

239. Accordingly, on August 4, 2020, counsel for Beacon and BIH sent Potter, through undersigned counsel, a letter "as formal demand for indemnification from Potter in" the Delaware Federal Action. A true and correct copy of the August 4, 2020 demand for indemnification is attached hereto as **Exhibit 13**. The letter continues, "Beacon hereby exercises its contractual right to use counsel of its choosing for" its defense of the Delaware Federal Action. (Ex. 13.)

240. Section 8.01 of the Stock Purchase Agreement stipulates, "Subject to the limitations set forth in Section 8.03, the Seller shall indemnify Buyer and its directors, officers, employees, agents, and Affiliates (the "Buyer Indemnified Parties") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third party legal fees and expenses has been received (collectively, "Losses" and each a "Loss"), to the extent arising or resulting from" various events, including "any breach of any covenant of Seller contained in this Agreement;" or "the inaccuracy or any breach of any representation or warranty made by Seller in this Agreement." (Ex. 1, § 8.01.)

241.    The parties handwrote and initialed SPA Section 8.01(b), which stipulates, "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09," which describes the Delaware Federal Action.  (Ex. 1, § 8.01(b).)

242.    Section 8.02 of the Stock Purchase Agreement contains indemnification procedures, stipulating, "If any party (the 'Indemnified Party') receives notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under this ARTICLE VII (a 'Third Party Claim') and such Indemnified Party intends to seek indemnity pursuant to this ARTICLE VIII, the Indemnified Party shall promptly provide the other party (the 'Indemnifying Party') with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant document evidencing such Third Party Claim and the basis for indemnification sought.  Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from its indemnification obligations hereunder, except if and to the extent that the Indemnifying Party is actually prejudiced thereby."  (Ex. 1, § 8.02.)

243.    Section 8.02 continues, "The Indemnifying Party will have 20 days from receipt of any such notice of a Third-Party Claim to give notice to assume the defense, appeal or settlement proceedings thereof.  If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume and control the defense, appeal or settlement proceedings of the Indemnified Party against the Third-Party Claim with counsel of the Indemnifying Party's choice."  (Ex. 1, § 8.02.)

244.    Section 8.02 further stipulates, "The parties will act in good faith in responding to, defending against, settling or otherwise dealing with such claims."  (Ex. 1, § 8.02.)

245.    By only offering BIH its own conflicted counsel for BIH's defense in the Delaware Federal Action, Potter did not "act in good faith."  (Ex. 1, § 8.02.)

246.    Section 8.02 finally stipulates, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim within the time period specified above, the Indemnified Party may conduct such defense or settlement thereof with counsel of its choosing for the account of the Indemnifying Party (subject to the right of the Indemnifying Party to dispute its obligation to the indemnify with respect to the matter which is the subject of the Third Party Claim)."  (Ex. 1, § 8.02.)

247.    Section 10.01 stipulates, "In the event of any dispute arising out of the subject matter of this Agreement, each prevailing party shall recover, in addition to any other damages assessed, its reasonable attorneys' fees and other costs and expenses incurred in litigating or otherwise settling or resolving such dispute."  (Ex. 1, § 10.01.)

248.    The August 4, 2020 letter satisfied the obligations of BIH and Beacon under SPA Section 8.02.  (*See* Ex. 13.)

249.    On August 14, 2020, counsel for Potter sent a letter to counsel for BIH and Beacon, explaining that Potter would not indemnify, or reimburse BIH or Beacon for their defense, in the Delaware State Action.   A true and correct copy of Potter's counsel's response to the indemnification demand is attached hereto as **Exhibit 14**.

## COUNT I
## FRAUDULENT INDUCEMENT

250.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 249 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

- 103 -

251.    Potter knowingly, and with the intent to defraud, misrepresented BIH's 2017–2019 financial performance by providing the Acuntos with financial documents that inflated the Company's revenue, net income, and EBITDA during the due diligence period that preceded execution of the SPA.

252.    Only after executing the SPA and belatedly gaining access to the Company's Accounting Records did Beacon determine that more than $1.1 million in BIH's purportedly 2018 revenue, as reflected in the due diligence materials, was improperly categorized by Potter as revenue.  Potter directed ten (10) substantial cash transfers into and out of the Company between July 1, 2018 and September 1, 2019 from other entities he owned or controlled.  None of those transactions actually generated revenue for BIH.  These Potter therefore improperly characterized those transfers as revenue to Beacon with the net effect and intention of inflating revenues.

253.    Potter further fraudulently and falsely misrepresented income statements and other financial information for BIH as having generated positive $1.1 million in income in 2018 when, in fact, BIH generated *negative* income (i.e., losses) of $1.4 million—a differential of $2.4 million between what Potter had reported to Beacon (and what Beacon relied upon in agreeing to the $5 million purchase price) and what the true financial data supported.

254.    Potter further overstated 2018 EBITDA for BIH by approximately $2.4 million.

255.    Potter further misrepresented BIH's 2018 net income, revenue and EBITDA and presented this false financial information to Beacon in order to obtain a higher purchase price equal to five (5) times 2018 EBITDA.

256.    Potter further misrepresented BIH's revenue for July and August 2019 in order to further inflate BIH's financial performance and obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA calling for Beacon to make a final $1 million

payment to Potter if BIH's gross annual revenues met or exceeded $5.25 million and gross revenues met or exceeded $2 million for the six months ending December 31, 2019.

257.    During the due diligence period, Potter also made intentional, material misrepresentations and omissions to the Acuntos, for Beacon, regarding the impact of the Institutes Contract on Beacon's ability to operate BIH's risk management conference business.

258.    Among other misrepresentations and omissions, in Schedule 3.09 of the SPA, Potter misrepresented to Beacon that C&E was not bound by the Non-Compete under his ownership, a fact Potter knew at the time to be false. Potter further represented that BIH, while under his ownership, was also not bound by or subject to the Non-Compete, a fact Potter knew at the time to be false.

259.    After executing the SPA, Potter conceded that these representations were false. In February 2020, Potter, through his counsel, encouraged the Institutes counsel in the Delaware Federal Action that BIH was the correct party to sue despite being under Beacon's ownership.

260.    Later, in his motion to dismiss the Amended Complaint in the Delaware Federal Action, counsel for Potter wrote that "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes]. BIH, Inc., is the current name of C&E—one of the Selling Parties."

261.    Potter further concealed that, when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Delaware Federal Action.

262.    In Schedule 3.09 of the SPA, Potter represented that "[i]n June 2018, Adam Potter [] sold three companies to The Institutes. The Agreement contained a non-compete for Adam Potter personally, however [BIH, Inc.] is not part of the agreement." Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Non-Compete, Section

- 105 -

6.12, binds C&E and its "affiliates." BIH, as a successor to C&E, was an "affiliate" while under Potter's ownership, a fact Potter knew.

263.    Potter knew that each of the material misrepresentations and/or material omissions were false and misleading at the time they were made.

264.    Potter controlled BIH's finances when he misrepresented BIH's past profits, revenues and EBITDA to Beacon's owners during the due diligence process.

265.    Potter also executed the Institutes Contract and was party to the Delaware Federal Action before making misrepresentations regarding those topics to Beacon during the due diligence process.

266.    Potter therefore knowingly made misrepresentations and omissions regarding the Company's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action, or caused them to be made, with knowledge of their falsity and/or recklessly without regard for their truthfulness.

267.    Potter made such false and fraudulent misrepresentations and omissions with the intent to deceive Beacon's owners, and with the intent to induce Beacon's owners to enter into the SPA and a gross overvaluation of BIH purporting to be five (5) times BIH's 2018 EBIDTA, but was not.

268.    In deciding to enter into the SPA, Beacon's owners reasonably relied to their detriment on Potter's misrepresentations concerning BIH's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action. Potter was the person most knowledgeable regarding those topics, and his misrepresentations materially altered the cost-benefit analysis conducted by Beacon's owners in deciding to execute the SPA. If not for its

reliance on Potter's misrepresentations, Beacon would not have executed the SPA—*at any price*,
let alone $5 million.

269.   Beacon requests monetary damages from Potter in an amount to be determined at
trial—including but not limited to the purchase price of BIH.

<div style="text-align:center">

**COUNT II**
**NEGLIGENT MISREPRESENTATION**

</div>

270.   Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 269
of this Second Amended Counterclaim Complaint, as if set forth fully herein.

271.   Potter had unique, non-public knowledge regarding BIH's past financial
performance, the Institutes Contract, and the Delaware Federal Action that was unavailable to
Beacon during its due diligence process.

272.   Potter, at least carelessly and negligently, made false and misleading
representations and omissions of material facts directly to Beacon and its representatives during
the due diligence and negotiation periods.

273.   Potter, at least carelessly and negligently, made false and misleading
representations and omissions to Beacon and its representatives regarding BIH's 2017–2019
financial performance by providing the Acuntos with financial documents that inflated BIH's
revenue, net income, and EBITDA during the due diligence period that preceded execution of the
SPA.

274.   Potter, at least carelessly and negligently, overstated BIH's purported 2018 revenue
by nearly $1.1 million in financial performance information provided by Potter to Beacon's
owners.  Potter misrepresented BIH's 2018 net income and revenue in order to obtain a higher
purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA that Beacon would
purchase BIH for a multiple of five (5) times its 2018 calendar year EBITDA.

275.    Potter, at least carelessly and negligently, further misrepresented BIH's revenue for July and August 2019.  Potter did so in order to inflate BIH's financial performance and obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA calling for Beacon to make a final $1 million payment to Potter if BIH's gross annual revenues met or exceeded $5.25 million and gross revenues met or exceeded $2 million for the six months ending December 31, 2019.

276.    During the due diligence period, Potter also made, at least carelessly and negligently, material misrepresentations and omissions to Beacon regarding the impact of the Institutes Contract on Beacon's ability to operate BIH's risk management conference business.

277.    Among other misrepresentations and omissions, in Schedule 3.09 of the SPA, Potter misrepresented to Beacon that C&E was not bound by the Non-Compete under his ownership, a fact Potter knew or should have known at the time to be false.  Potter further represented that BIH, while under his ownership, was also not bound by or subject to the Non-Compete, a fact Potter knew or should have known at the time to be false.

278.    After executing the SPA, Potter conceded that these misrepresentations were false. In February 2020, Potter, through his counsel, encouraged the Institutes counsel in the Delaware Federal Action that BIH was the correct party to sue despite being under Beacon's ownership.

279.    Later, in his motion to dismiss the Amended Complaint, counsel for Potter wrote that "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes].  BIH, Inc., is the current name of C&E—one of the Selling Parties."

280.    Potter further concealed, at least carelessly and negligently, that when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Delaware Federal Action.

281.    In Schedule 3.09 of the SPA, Potter represented that "[i]n June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however Business Insurance is not part of the agreement."  Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Institutes Non-Compete, Section 6.12, binds C&E and its "affiliates."  BIH, as a successor to C&E, was an "affiliate" while under Potter's ownership, a fact Potter knew.

282.    Potter made each of these false representations and omissions at least carelessly and negligently.  He knew or should have expected that Beacon's owners would rely on the representations and omissions in agreeing to a gross overvaluation of BIH and enter into the SPA.

283.    Potter had a duty to impart correct information to Beacon because, as the as the sole owner of BIH and manager of its operations, he was in a special position to know the veracity of representations.

284.    Potter also had a duty to impart correct information to Beacon because he knew that Beacon and its representatives relied on his misrepresentations and omissions concerning BIH when entering into the SPA.  Among other indicia of his knowledge, on June 13, 2019, Potter e-mailed false and misleading financial figures regarding BIH to Steve Acunto and expressed his understanding and desire that Steve Acunto would utilize those figures in the due diligence process and to value BIH.

285.    Beacon reasonably relied on the aforementioned false representations and omissions in valuing BIH and executing the SPA.

286.    In deciding to enter into the SPA, Beacon's owners reasonably relied to their detriment on Potter's at least careless and negligent misrepresentations concerning BIH's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action.  Potter

was the person most knowledgeable regarding those topics, and his misrepresentations materially altered the cost-benefit analysis conducted by Beacon's owners in deciding to execute the SPA.  If not for its reliance on Potter's at least careless and negligent misrepresentations, Beacon would not have executed the SPA—*at any price*, let alone $5 million.

287.    As a proximate result of Potter's negligent misrepresentation, Beacon suffered damages to be determined at trial.

288.    Beacon requests monetary damages from Potter in an amount to be determined at trial—including but not limited to the purchase price of BIH.

<div align="center">

**COUNT III**
**BREACH OF EXPRESS REPRESENTATIONS AND WARRANTIES**

</div>

289.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 288 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

290.    The SPA by and between Potter and Beacon is a valid and binding contract and supported by adequate consideration.  Beacon fully satisfied its obligations under the agreement. Potter has a duty to adhere to the provisions of the SPA.

291.    Potter breached express representations and warranties reflected in Sections 3.06(a) and 3.09 of the SPA.  Section 8.04 of the SPA states that "[a]ll representations and warranties shall survive the Closing . . . ."  (Ex. 1, § 8.04.)

292.    In Section 3.06(a), Potter represented and warranted that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for insignificant contracts "entered into in the ordinary course of business."  (Ex. 1, § 3.06(a).)

293.    Section 3.06 imposed a duty upon Potter to disclose all of BIH's non-exempt contracts.  Potter left Section 3.05(a) of the Disclosure Schedule blank, thereby asserting that BIH was not bound by any non-exempt contract under his ownership.

<div align="center">- 110 -</div>

294.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract.  That agreement was non-exempt under Section 3.06(a) because it resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes and bound C&E to the Non-Compete.

295.    After executing the SPA, Potter conceded that the Institutes Contract is a non-exempt contract.  Potter's motion to dismiss the Institutes' amended and supplemental complaint contends "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes]. BIH, Inc. is the current name of C&E—one of the Selling Parties."  (Potter Motion to Dismiss, at 9.)

296.    Potter therefore breached his Section 3.06(a) duty to disclose the Institutes Contract by leaving Section 3.05(a) of the Disclosure Schedule blank.

297.    The Section 3.06(a) representations and warranties are material because Beacon relied upon them in agreeing to a grossly overvalued and inflated purchase price of BIH and in entering into the SPA.  In particular, Beacon relied on Potter's implicit assertion that no previous agreement would prevent BIH from operating conferences.  Potter knew that Beacon relied on this information because on June 13, 2019, during the due diligence period, Steve Acunto e-mailed Potter to request "a list of conferences annually."  Potter replied on June 14, 2019, providing a list of conferences hosted by BIH.  Beacon used this information to decide to purchase Beacon for what it believed was a fair and reasonable price.

298.    Section 3.06(a) is a material provision in the SPA, upon which Beacon relied in valuing BIH and deciding to execute the SPA.  Section 3.06(a) was an integral part of the bargain and consideration between Beacon and Potter.

299.    In Section 3.09 of the SPA, Potter represented and warranted that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock."  (Ex. 1, § 3.09.)

300.    Section 3.09 imposed a duty upon Potter to disclose, in a materially accurate manner, all pending and threatened litigation relating to BIH.

301.    Potter disclosed the Delaware Federal Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In pertinent part, Potter described the litigation as follows: "In June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however Business Insurance is not part of the agreement."  (Ex. 1, Sched. 3.09.)

302.    Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Institutes Non-Compete binds the Selling Parties, which include C&E and its affiliates, and prohibits them from conducting activities that compete with any of the Sellers' Businesses, including the CLM business of offering events and conferences to claims and litigation management professionals.

303.    Potter knew that his description in Schedule 3.09 was intentionally misleading and materially inaccurate.  He further knew that when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Institutes Action.

304.    Potter therefore breached Section 3.09 of the SPA by failing to disclose threatened litigation against BIH.

305.    The Section 3.09 representations and warranties are material, and Beacon relied upon them in agreeing to a grossly overvalued and inflated purchase price of BIH and in entering into the SPA.  In particular, Beacon relied on Potter's implicit assertion that no pending or

impending litigation threatened to prevent BIH from operating conferences. Potter knew that Beacon relied on this information because on June 13, 2019, during the due diligence period, Steve Acunto e-mailed Potter to request "a list of conferences annually." Potter replied on June 14, 2019, providing a list of conferences hosted by BIH.

306.    Section 3.09 is a material provision in the SPA, upon which Beacon relied in valuing BIH and deciding to execute the SPA. Section 3.09 was an integral part of the bargain and consideration between Beacon and Potter.

307.    Beacon suffered damages resulting from this breach. Potter's breach exposed BIH to potential liability in the Delaware Federal Action.

308.    Potter's breach also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes amended and supplemental complaint in the Delaware Federal Action, BIH is bound by the Institutes Contract and prohibited from hosting conferences that compete with CLM.

309.    Potter's breach further damaged Beacon because it paid an inflated sales price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

310.    Beacon suffered damages as a proximate result of Potter's breach of express representations and warranties reflected in Sections 3.06(a) and 3.09 of the SPA. Potter's breaches exposed BIH to potential liability in the Delaware Federal Action. Potter's breaches further damaged Beacon because they resulted in Beacon paying an inflated price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

311.    Beacon requests monetary damages from Potter in an amount to be determined at trial.

## COUNT IV
## BREACH OF CONTRACT

312.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 311 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

313.    The SPA by and between Potter and Beacon is a valid and binding contract and supported by adequate consideration.

314.    Beacon has fully satisfied its obligations under the agreement.

315.    Potter has a duty to adhere to the provisions of the SPA.

316.    Potter breached at least three provisions in the SPA.

317.    Potter breached Section 3.06(a) by not disclosing the Institutes Contract between C&E, its affiliates, and the Institutes.

318.    In Section 3.06(a), Potter represented and warranted that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for insignificant contracts "entered into in the ordinary course of business."  (Ex. 1, § 3.06(a).)

319.    Section 3.06 imposed a duty upon Potter to disclose all of BIH's non-exempt contracts.

320.    Potter left Section 3.05(a) of the Disclosure Schedule blank, thereby asserting his belief that BIH was not bound by any non-exempt contract.

321.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract.  That agreement was non-exempt under Section 3.06(a) because it resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes, binding C&E to the Institutes Non-Compete, and preventing BIH under Potter's ownership from conducting events

- 114 -

and conferences for claims and litigation management professionals — the essence of its business and the reason Beacon acquired BIH.

322.    Potter breached Section 3.09 failing to disclose the Delaware Federal Action in a truthful and accurate manner.

323.    In Section 3.09 of the SPA, Potter represented and warranted that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock." (Ex. 1, § 3.09.)

324.    Section 3.09 imposed a duty upon Potter to disclose, in a materially accurate manner, all pending and threatened litigation relating to BIH.

325.    Potter disclosed the Institutes Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In pertinent part, Potter described the litigation as follows: "In June 2018, Adam Potter [] sold three companies to The Institutes. The Agreement contained a non-compete for Adam Potter personally, however [BIH, Inc.] is not part of the agreement."

326.    Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Non-Compete binds the Selling Parties, which include C&E and its affiliates, and prohibits them from conducting activities that compete with any of the Sellers' Businesses, including the CLM business of offering events and conferences to claims and litigation management professionals.

327.    Potter therefore breached Section 3.09 of the SPA by failing to disclose threatened litigation against BIH.  At the time Potter executed the SPA, he knew this omission was misleading.

328.    Potter breached Section 5.01 of the SPA by making false and incorrect representations and warranties in Sections 3.06(a) and 3.09.

329.    Section 5.01 stipulates that the "representation and warranties of [Potter] set forth in [the SPA] shall be true and correct in all material respects as of the date of the [SPA]."  (Ex. 1, § 5.01.)

330.    Section 5.01 imposed a duty upon Potter to provide truthful and correct information in the SPA's representations and warranties, including those reflected in Sections 3.06(a) and 3.09 of the SPA.

331.    As set forth in more detail above, Potter made material misrepresentations in Sections in 3.06(a) and 3.09.

332.    These misrepresentations constitute an independent breach of Section 5.01.

333.    Beacon suffered, and will continue to suffer, damages as a proximate result of Potter's breaches of Sections 3.06(a), 3.09, and 5.01 of the SPA.

334.    Potter's breaches exposed BIH to potential liability in the Delaware Federal Action.

335.    Potter's breaches also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes Complaint, BIH is bound by the Institutes Contract and prohibited from hosting conferences that compete with CLM.

336.    Potter's breaches further damaged Beacon because it paid an inflated sales price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

337.    Beacon requests monetary damages from Potter in an amount to be determined at trial.

## COUNT V
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

338.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 337 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

339.    New York recognizes an implied duty of good faith and fair dealing in all contracts to protect a party's reasonable expectations in the absence of the breach of an express term.

340.    Based on the due diligence that preceded execution of the SPA, Potter was aware that Beacon intended to obtain BIH in order to compliment the Acuntos' insurance industry holdings, including a group of entities owned and controlled by the Acuntos that offer services to insurance industry professionals.  As part of the due diligence, the Acuntos told Potter that they wanted to acquire BIH to augment their insurance-related holdings.

341.    During due diligence, Steve Acunto told Potter that he saw BIH as an attractive vehicle from which to offer risk-management conferences.

342.    Steve Acunto told Potter that he intended to expand BIH's conference offerings should he acquire the Company.

343.    Indeed, Beacon's press release concerning its acquisition of BIH expressly stated as much: "BIH Inc.'s **growing annual conference schedule** draws national audiences to destinations across the country for one and two day programs . . . ." (Emphasis added.)

344.    With this knowledge, Potter acted in bad faith by failing to disclose accurately the scope of the Institutes Non-Compete and the Delaware Federal Action.

345.    Potter's representations in his motion to dismiss the Delaware Federal Action that the Institutes Contract **does** bind BIH evidences his bad faith during negotiations with Beacon and in disclosures under Schedule 3.09 of the SPA, where Potter stated otherwise.

- 117 -

346.    By acquiring an entity the Institutes asserts is encumbered by the Non-Compete, and now being a named defendant in the Delaware Federal Action at the insistence of Potter and his counsel, Beacon is prejudiced and hindered in its ability to fully operate the business lines Beacon's owners expected in determining to purchase BIH, despite the fact that Beacon satisfied all of its obligations under the SPA.

347.    Although the SPA does not expressly stipulate that Beacon intended to operate BIH's insurance-industry conferences, by failing to disclose the Non-Compete, Potter denied Beacon the benefit of its bargain in acquiring BIH.

348.    Moreover, under the SPA, Potter was required to provide "the Books and Records of the Company" at closing, or, "for any such books and records which are not reasonably available at the Closing within thirty (30) Business Days following the Closing."  (Ex. 1, § 2.02(a)(iv).)

349.    After the closing, under the SPA, Potter was also required to "grant . . . access to financial records . . . in [his] possession . . . as shall be reasonably required" for "reasonable business purpose[s]" "upon reasonable prior notice."  (Ex. 1, § 6.01.)

350.    After multiple requests from Beacon, Potter finally belatedly provided Beacon with BIH's QuickBooks Accounting Records.  But the QuickBooks Accounting Records reflected a multitude of self-transfers between Potter and entities he owned or controlled.  These self-transfers artificially inflated BIH's revenue, EBITDA and net income and, thus, artificially inflated the parties' negotiated purchase price for the SPA, as described above.

351.    Potter had a duty to provide accurate financial information concerning BIH both before executing the SPA (during due diligence) and after.

352.    Beacon had a reasonable expectation that the financial information Potter provided both before executing the SPA (during due diligence) and after would accurately reflect BIH's

revenue, EBITDA and net income.  It did not.  Accordingly, Potter has breached the duty of good faith and fair dealing implied in the SPA.

353.    Accordingly, Beacon has suffered damages in an amount to be determined at trial.

### COUNT VI
### DECLARATORY RELIEF

354.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 353 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

355.    The Declaratory Relief Act states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.

356.    In correspondence dated April 9 and 14, 2020, counsel for Potter acknowledge that Potter owes BIH a duty to defend and indemnify in the Delaware Federal Action.  (Ex. 10.)

357.    Under SPA Sections 8.01, 8.01(b), and 8.02, Potter has a duty to indemnify BIH in the Delaware Federal Action, and reimburse it for costs and fees incurred therein by their independent counsel.

358.    SPA Section 8.01(b), stipulates that "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09."

359.    The Delaware Federal Action qualifies.

360.    SPA Section 8.02 stipulates that where a party has a duty to indemnify, it has a corollary duty to defend.  The SPA, assuming that the indemnified and indemnifying parties will have aligned interests, grants the indemnifying party the right to assume and control the defense.

361.    SPA Section 8.02 stipulates, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim . . ., the Indemnified Party may conduct such defense or settlement

- 119 -

thereof with counsel of its choosing for the account of the Indemnifying Party (subject to the right of the Indemnifying Party to dispute its obligation to the indemnify with respect to the matter which is the subject of the Third Party Claim)."

362.   Under New York law, where an indemnifying party has a duty to defend and either he or his counsel is in conflict with the indemnified party, the indemnifying party has a duty to reimburse the indemnified party for costs and fees incurred by independent counsel selected by the indemnified party.

363.   Potter and BIH have conflicting interests in the Delaware Federal Action because Potter asserts that BIH is bound by the Institutes Contract whereas BIH asserts that BIH is not bound by the Institutes Contract.  Counsel for Potter is in conflict with BIH because they sued Beacon, BIH's parent, in the Delaware State Action and the instant action.

364.   Because of this, Potter cannot assume and control the defense of BIH in the Delaware State Action.  Instead, Potter has a duty to reimburse BIH and Beacon for fees incurred by counsel of BIH's choosing in the Delaware Federal Action and the above-captioned litigation.

365.   Accordingly, on August 4, 2020, counsel for Beacon and BIH sent Potter, via counsel, a letter "as formal demand for indemnification from Potter in" the Delaware Federal Action and the above captioned litigation.  The letter continues, "Beacon hereby exercises its contractual right to use counsel of its choosing for" its defense of the Delaware Federal action and the above captioned litigation, "at Potter's expense."  This correspondence satisfied the SPA Section 8.02 indemnification procedures.  (Ex. 13.)

366.   On August 14, 2020, counsel for Potter sent a letter to counsel for BIH and Beacon, explaining that Potter would not indemnify, or reimburse BIH or Beacon for their defense, in either the Delaware State Action or the above captioned litigation.  (Ex. 14.)

367.    BIH therefore has a right under New York law and SPA Section 8.02 to obtain independent counsel of its choosing in the Delaware Federal Action, at Potter's expense.

368.    At all times, Beacon and BIH acted in good faith and satisfied their obligations under the indemnification procedures in Section 8.02 of the SPA.

369.    BIH therefore seek a declaration from this Court that Potter owes BIH a duty to indemnify it in connection with the Delaware Federal Action and that Potter owes BIH reimbursement for legal fees and costs incurred by their counsel in connection with the Delaware Federal Action.

## **PRAYER FOR RELIEF**

WHEREFORE, having alleged this Second Amended Counterclaim Complaint against Counterclaim Defendant Adam Potter, Counterclaim Plaintiffs Beacon Intercontinental Group, Inc. and Business Insurance Holdings, Inc. pray that the Court award the following relief:

(a)    Damages, including compensatory and/or punitive damages, lost profits, disgorgement of all monies paid, all other appropriate damages, as well as attorneys' fees and costs in an amount to be determined at trial but in any event no less than $10 million;

(b)    Attorneys' fees and costs incurred by counsel for Beacon and BIH in this action; and

(c)    Any other or further relief as the Court may deem just and proper.

Dated: Miami, Florida
       November 25, 2020

**DLA PIPER LLP (US)**

By:  */s/ Christopher Oprison*
Christopher Oprison, Esq.
Florida Bar No. 0122080
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Tel.:  (305) 423-8522
Fax:  (305) 675-6366
chris.oprison@dlapiper.com
(admitted *pro hac vice*)

Daniel C. Harkins
1251 Avenue of the Americas
New York, New York 10020
Tel.:  (212) 335-4500
Fax:  (212) 335-4501
daniel.harkins@dlapiper.com

*Attorneys for Defendants/Counterclaim Plaintiffs Beacon Intercontinental Group, Inc. and Business Insurance Holdings, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' REPONSE TO DEFENDANT ADAM POTTER'S STATEMENT OF UNDISPUTED MATERIAL FACTS

<div style="margin-left:40%">

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
***Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC***

</div>

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103

March 4, 2022

Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC (collectively, "The Institutes" or "Plaintiffs"), respond to the Statement of Undisputed Material Facts filed by Adam Potter, as follows:

## I.     **The APA and Underlying Transaction**

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Admitted in part; denied in part. Admitted that Ms. Horowitz was involved in the negotiations for The Institutes and led its internal due diligence team. Denied that Ms. Horowitz was the sole negotiator for the transaction, which also involved counsel for The Institutes. *See* Horowitz Tr. at 136:22; 272:20-273:1, attached hereto as **Exhibit A.**

5.     Admitted in part; denied in part. Admitted that certain terms of the transaction were memorialized in an email dated March 13, 2018. The Institutes deny the characterization of the terms as "key," as there is nothing in the email that limits the terms of the transaction solely to those set forth therein or otherwise states that they are the "key" terms.

App.398

6.      Denied. By way of further response, The Institutes considered a non-compete to be a key term of the transaction, as memorialized in an email dated March 8, 2018 from Pete Miller to a member of The Institutes board of trustees. *See* Institutes0008592, attached hereto as **Exhibit B**; Miller Tr. at 12:22-15:17, attached hereto as **Exhibit C**; Miller Dep. Exhibit 1, attached hereto as **Exhibit D**.

7.      Admitted.

8.      Admitted in part; denied in part. Admitted that The Institutes engaged VRC to conduct a valuation. Denied that the VRC valuation was the only basis for The Institutes' arriving at a purchase price, which was also informed by internal discussions with The Institutes' management and board members. *See* Ex. C, Miller Tr. at 12:22-14:20.

9.      Admitted.

**II.    "CLM Business"**

10.     Admitted.

11.     Admitted in part; denied in part. Admitted that the CLM Business is defined in the APA. The Institutes deny the characterization of the business being "fully" defined therein, as a more fulsome description of the CLM membership and focus were provided during The Institutes' 30(b)(6) deposition. *See* Blume 8/26/21 Tr., attached hereto as **Exhibit E**, at 16:4-21:15

3

12.    Admitted in part; denied in part. Admitted that Schedule A does not specifically refer to risk management or risk managers. Denied that risk management and risk managers do not form a part of the CLM Business, as Ms. Blume and Mr. Potter both testified that they are part of the CLM audience. *See id.*; *see also* Potter Tr., attached hereto as **Exhibit F**, at 34:18-36:4.

13.    Admitted in part; denied in part. Admitted that Ms. Pernie so testified; denied that her testimony is the definitive statement on the roles of such individuals, as the roles are subject to interpretation. Ms. Pernie was not testifying as a corporate representative and, therefore, her testimony cannot be imputed to The Institutes.

14.    Admitted in part; denied in part. Admitted that Schedule A lists certain products and services of CLM as of the closing date. Denied that Schedule A "itemizes" all of CLM's products and services. By way of further answer, Schedule A lists certain CLM specialty conferences, but the description states that specialty conferences "include" those on the topics identified in the description, suggesting that the conferences were not limited to that enumeration. Schedule A also refers to CLM webinars as "ranging from" ADR to worker's compensation, again suggesting that the topics of CLM webinars were not limited solely to those two topics. *See* Schedule A, attached hereto as **Exhibit G**

15.    Admitted.

### III.    The APA's Restrictive Covenants

16.    Admitted.

17.    Admitted.

18.    Admitted.

19.    Denied as stated. Schedule 6.12 defines Permitted Activities, in part, as "the business operations of [Business Insurance Holdings, LLC] as specifically set forth below…." Thus, it is the specific description of Business Insurance Holdings, LLC, set forth in the schedule that is considered a Permitted Activity. *See* Plaintiff's SOF at ¶¶ 6-11.

20.    Denied. Schedule 6.12, drafted by Potter, lists the business activities of Business Insurance, without any qualifiers to suggest that its business activities exceeded those specifically enumerated therein. *See id.*

21.    Denied as stated. Ms. Horowitz was not testifying as a corporate designee and, therefore, her testimony regarding the meaning of the non-compete is not binding on The Institutes. Moreover, as she further explained in her deposition, Ms. Horowitz believed that the schedule was meant to define the Permitted Activities and that the purpose of the non-compete, together with the Permitted Activities, was to ensure that neither Potter nor BIH competed with CLM for a period of five years. *See* Ex. A, Horowitz Tr. at 134-140. Mr. Miller,

testifying on behalf of The Institutes, provided the company's interpretation of the meaning of the non-compete. *See* Ex. C, Miller Tr. at 19:8-26:19.

22.　　　Admitted in part; denied in part. Admitted that Ms. Horowitz negotiated the terms of the Permitted Activities; denied that she was the sole negotiator, as she testified she did so with the assistance of counsel. Ex. A, Horowitz Tr. at 136:22; 272:20-273:1.

23.　　　Admitted.

24.　　　Denied as stated. *See* Potter DE-000031-32, attached hereto as **Exhibit H**, for the precise language about the relationship of the non-solicit to the Permitted Activities.

## IV.　　Business Insurance Holdings, LLC, C&E, and Business Insurance Holdings, Inc.

25.　　　Admitted.

26.　　　Admitted.

## V.　　The Cannabis and IP Conferences

27.　　　Admitted.

28.　　　Denied. As promoted, the conference had a claims session, offered special pricing for claims professionals, and featured a panel of claims professionals. *See* Plaintiffs' SOF ¶¶ 29-34.

6

29.    Denied. Although CLM did not have a dedicated cannabis conference, CLM repeatedly offered cannabis-related content prior the Closing Date. *See id.* ¶ 23.

30.    Admitted.

31.    Admitted.

32.    Denied. As stated in the email, Ms. Blume said the Cannabis Conference itself "might" be *de minimus*, but that it was essential to enforce the terms of the non-compete as it appeared immediately that Potter had no intention of honoring its terms. *See* Potter SOF, Ex. 17.

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Admitted.

38.    Admitted.

39.    Admitted.

40.    Admitted.

41.    Admitted.

42.    Admitted.

43.    Admitted.

44.    Denied as stated. Although Plaintiffs have not identified particular customers or sponsors that have ceased all membership and/or sponsorship of CLM, Plaintiffs have identified sponsors who have reduced their sponsorship levels since the Cannabis Conference. *See* Ex. C, Miller Dep. Tr. at 44:19-45:8.

45.    Denied as stated. As more fully explained by Mr. Miller, more than 15 individuals and 40 companies that were CLM members or sponsors attended the Cannabis Conference. *See* Ex. C, Miller Tr. at 38:22-39:4. He further testified that sponsorship of one conference will impact the amount of money a company can spend on another conference, which can lead to a reduction of spending on CLM events. *See id.* at 42:16-44:3.

46.    Admitted.

47.    Denied. To the contrary, the cited April 2021 email was sent in an effort to resolve a discovery dispute in which Potter was seeking a list of all CLM customers and sponsors. Potter's counsel rejected this email and demanded that Plaintiffs enter into a stipulation withdrawing such claims in exchange for Potter withdrawing his discovery demand. The parties could not agree on the terms of such a stipulation, leading to discovery hearing with Magistrate Judge Hall. Following the hearing, Plaintiffs agreed to produce a list of CLM customers and sponsors and, therefore, the April 2021 email was rendered moot. *See* D.I. 170, 175, 179, 180 and 181.

48.     Denied. As stated by Ms. Blume in the cited testimony, Potter interfered with Plaintiffs' relationship with the Wilson Elser law firm.

49.     Admitted.

50.     Admitted.

51.     Admitted. By way of further answer, Mr. Miller testified that although Wilson Elser still sponsors CLM events, they do so to a lesser extent. *See* Ex. C, Miller Tr. at 48:3-7.

52.     Admitted. By way of further answer, *see id.*

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Admitted.

60.     Admitted.

61.     Denied as stated. Ms. Horowitz actually testified that she could not say it "was 100 percent. I wouldn't say -- I don't have the knowledge to say it's solely based on COVID, but that is the reason for the significant difference and

impact to the business." By way of further answer, Ms. Horowitz was not testifying as a corporate designee and, therefore, her testimony is not binding on Plaintiffs.

62.    Admitted.

63.    Admitted.

64.    Admitted.

65.    Admitted.

**VI.    Potter's Sale of BIH to Beacon**

66.    Admitted.

67.    Admitted in part; denied in part. Admitted that Potter resigned from BIH and that he testified he exited the insurance industry. Plaintiffs can neither admit nor deny that Potter has, in fact, exited the industry.

68.    Denied. After the sale, Potter provided transition services to BIH, continued to advise BIH and provided advice regarding the retention of BIH employee Jeremy Campbell and the enforcement of a purported non-compete agreement with Mr. Campbell. *See* Ex. F, Potter Tr. at 102:23-105:5.  Potter also connected BIH with a "cannabis expert" at Wilson Elser, reviewed and approved BIH's sponsorship contract for the C&H Conference, and was "working on a project relating to the Cannabis and Hemp Conference" well into November.  *See* BIH-001-000545; BIH-001-000673; BIH-001-000559; BIH-001-000613-14, attached hereto collectively as **Exhibit I**.

69.    Admitted.

70.    Admitted.

71.    Admitted.

72.    Admitted.

73.    Admitted.

74.    Admitted.

75.    Admitted.

76.    Admitted.

77.    Admitted.

78.    Admitted.

79.    Admitted.

## VII.    ClaimsXchange

80.    Admitted in part; denied in part. Admitted that Potter was not directly involved in the formation of claimsXchange. Denied, however, that he was completely uninvolved as he introduced Sydney Posner to the Acuntos. Moreover, Mr. Acunto indicated that Potter introduced Ms. Posner to him to possibly work with her on an idea she had (*i.e.*, forming claimsXchange). *See* Ex. F, Potter Tr. at 114:11-115:7; Acunto Tr. 160:8-20, attached hereto as **Exhibit J**; BIH-003-004199, attached hereto as **Exhibit K**.

81.    Admitted.

82.     Denied. As set forth above, Potter specifically suggested that the Acuntos meet with Ms. Posner to work with her on claimsXchange. *See* Ex. J, Acunto Tr. 160:8-20.

83.     Denied. *See id.*

*84.*     Denied as stated. Plaintiffs deny that Potter "only" introduced the Acuntos to Ms. Posner, as he suggested they meet to discuss her new venture, claimsXchange. *See id.*

## COUNTERSTATEMENT OF MATERIAL FACTS

1.     Beacon Intercontinental Group Inc., which acquired BIH, filed counterclaims against Potter in the Southern District of New York, asserting that Potter failed to advise them that BIH was bound by the restrictive covenants in Section 6.12 of the APA and, had the buyers been aware of that fact, they would not have purchased BIH for the agreed-upon price.  *See* Counterclaims of BIH in *Potter v. Beacon Intercontinental Grp., Inc., et al.*, No. 1:20-cv-4599 (S.D.N.Y.), attached hereto as **Exhibit L**, at ¶¶ 138-186.

2.     Potter began planning the expansion of BIH's offerings to include specialty conferences about 8 months after closing on the APA.  He testified that as early as February 2019, he decided he wanted BIH to expand and asked BIH editor Gavin Souter to begin researching topics on which to offer conferences to the insurance industry. *See* Ex. F, Potter Tr., at 62:15-65:16.  Potter further testified

App.408

that he began planning the C&H Conference in the beginning of 2019 and announced it in April 2019.  *See id.* at 121:23-122:10.

3.    Clearly, Potter wanted to expand BIH's offerings so that he could better position the company for a sale.  He confirmed that when he first contemplated the C&H Conference and asked Mr. Souter to explore other conference topics, Potter was already contemplating selling BIH.  *See id.* at 62:20-63:11.

4.    Potter claimed that the non-compete only applied to him personally, and not to BIH.  In fact, when he sold BIH to Beacon Intercontinental, he told the Acuntos that not only did the C&H Conference not violate "my non-compete," but he gave them "assurances" that the non-compete did not apply to BIH.  He further testified that, once he sold BIH, it was his belief that BIH could do "whatever they wanted to do."  *See id.* at 169:5-173:6.

*SIGNATURE ON FOLLOWING PAGE*

13

Respectfully submitted,


/s/  *Barry Klayman*
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com

***Attorneys for Plaintiffs, The American***
***Institute for Chartered Property Casualty***
***Underwriters and The Institutes, LLC***

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

March 4, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE, FONT AND WORD LIMITATIONS

Plaintiffs' Response in Opposition to Adam Potter's Statement of Undisputed Material Facts and Counterstatement of Material Facts complies with the type and font requirement and word limitation set forth in this Court's Scheduling Order, as amended, because it has been prepared in Times New Roman 14-point font using Microsoft Word 2016 and contains 1,992 words.

*Signature on following page*

/s/ *Barry Klayman*

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com

*Attorneys for Plaintiffs, The American*
*Institute for Chartered Property Casualty*
*Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
RHayes@cozen.com
MSiegel@cozen.com

DATED: March 4, 2022

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, )))) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, )) | |
| v. )) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., )))) | |
| Defendants. )) | |

## APPENDIX OF EXHIBITS TO PLAINTIFFS' REPONSE TO DEFENDANT ADAM POTTERS
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
RHayes@cozen.com
MSiegel@cozen.com

App.413

## TABLE OF CONTENTS

| Exhibit | |
| --- | --- |
| | |
| Exhibit A | Katherine Horowitz Deposition Transcript Pages |
| Exhibit B | Institutes 0008592 |
| Exhibit C | Peter Miller Deposition Transcript Pages |
| Exhibit D | Peter Miller Deposition Exhibit 1 |
| Exhibit E | Anne Blume Deposition (8/26/21) Transcript Pages |
| Exhibit F | Adam Potter Deposition Transcript Pages |
| Exhibit G | Schedule A |
| Exhibit H | Potter DE-000031-32 |
| Exhibit I | BIH-001-000545; BIH-001-000673; BIH-001-000559; BIH-001-000613-14 |
| Exhibit J | Steve Acunto, Sr. Deposition Transcript Pages |
| Exhibit K | BIH-003-004199 |
| Exhibit L | Counterclaims of BIH in Potter v. Beacon Intercontinental Group, et al., No. 1:20-cv-4599 (S.D.N.Y) |

Case 1:19-cv-01600-RGA-JLH   Document 278   Filed 03/04/22   Page 3 of 122 PageID #: 5123

# Exhibit A

## Katherine Horowitz Deposition Transcript Pages

Case 1:19-cv-01600-RGA-JLH  Document 278  Filed 03/04/22  Page 4 of 122 PageID #: 5124
Katherine Horowitz  Attorneys Eyes Only
June 08, 2021

```
UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE
----------------------------------------X
THE AMERICAN INSTITUTE FOR CHARTERED
PROPERTY CASUALTY UNDERWRITERS and
THE INSTITUTES, LLC,

                         PLAINTIFFS,


        -against-        Case No.:
                         CA-19-1600
                           CFC

ADAM POTTER, PBIH, LLC and BUSINESS
INSURANCE HOLDINGS, INC.,

                         DEFENDANTS.
----------------------------------------X
                 DATE: June 8, 2021
                 TIME: 9:07 A.M.


* CONFIDENTIAL - ATTORNEYS' EYES ONLY *



        REMOTE VIDEO DEPOSITION of

KATHERINE HOROWITZ, taken by the

Defendants, pursuant to a notice and to the

Federal Rules of Civil Procedure, held

remotely via Zoom Videoconference, before

Suzanne Pastor, a Notary Public of the

State of New York.
```

Katherine Horowitz  Attorneys Eyes Only
June 08, 2021

Page 134

1  as it is changed and inserted in this was
2  supposed to make the -- was intended to
3  make the noncompete more restrictive or
4  less restrictive?
5         MR. SIEGEL:  Same objection.
6      You can answer.
7      A.    Related to the permitted
8  activities?
9      Q.    Yes.
10     A.    It was my understanding that
11 the permitted activities was to only
12 illustrate a part of the noncompete, but
13 that the two pages of the -- this whole
14 section, so it was my understanding that
15 6.12 was an illustration but not a
16 catchall.
17     Q.    Explain that.
18     A.    So it was to provide some
19 definition and understanding of the
20 permitted activities.  But at the end of
21 the day this two-page noncompete section
22 was the time that we spent to make sure
23 that we focused to protect the Institutes
24 from a competition standpoint.
25        MR. OPRISON:  Can I ask for a

Page 135

1  favor?  I've got about 16 e-mails coming in
2  in the last two minutes.  We have a filing
3  due at noon in arbitration.  Can I take
4  about two minutes, go off the record and
5  come back on?  I hate to do that because I
6  know we're delaying things.  But I've got
7  to make sure this gets to the arbitrator by
8  noon.  Do y'all mind?
9         MR. SIEGEL:  That's fine.  Do
10     you want to say longer than two,
11     Chris?
12        MR. OPRISON:  Five, that would
13     be great.  To the top of the hour.
14        THE VIDEOGRAPHER:  The time is
15     11:54 a.m. and we're going off the
16     record.
17        (Whereupon, a short recess was
18     taken.)
19        THE VIDEOGRAPHER:  The time is
20     12:04 p.m. and we're back on the
21     record.
22 MR. OPRISON:
23     Q.    I want to follow back up with
24 what you said prior to the break,
25 Ms. Horowitz.  You said -- when I asked you

Page 136

1  about whether or not the noncompete as you
2  read it was more restrictive or less
3  restrictive with the permitted activities
4  language in it, and you said it was "to
5  provide some definition and understanding
6  of the permitted activities, but at the end
7  of the day, this two-page noncompete
8  section was the time that we spent to make
9  sure that we focused to protect the
10 Institutes from a competition standpoint."
11        So again, I want to make sure I
12 understand that clearly.  Do you recall
13 just sort of generally what the point of
14 negotiation with Mr. Potter and
15 Mr. Potter's counsel was over the
16 noncompete, do you have an understanding of
17 what the issues were around the language
18 that was going in or coming out of that
19 provision?
20     A.    Yes.
21     Q.    Explain that if you would.
22     A.    So the legal language I would
23 rely on our attorney to speak to.  But the
24 overall major concern that the Institutes
25 had, which is why I think we saw so many

Page 137

1  revisions and why we went to such great
2  lengths in this noncompete, was we had
3  great concern that, 1, Adam Potter would go
4  out and compete against us; and 2, that BI
5  would compete against us.  So the crux of
6  the strong negotiation was to protect us
7  from those two issues that we had such
8  strong concern about.
9      Q.    Was the effort to try to define
10 the scope or limit the scope of what
11 activities could be engaged in or was it to
12 limit or preclude the entity from doing
13 anything in that space?  Do you understand
14 the difference, the distinction I'm trying
15 to make?
16        MR. SIEGEL:  I just want to
17     object to the form.  But you can
18     answer to the extent you understand
19     his question.
20     A.    I would really appreciate it if
21 you could ask that again.  I don't think I
22 understand.
23     Q.    Let me ask it this way.  BI,
24 you mentioned BI was a publication.  Was BI
25 considered at the time to be a potential

Katherine Horowitz  Attorneys Eyes Only
June 08, 2021

Page 138

1  competitor to the Institutes after
2  acquisition of CLM?
3      A.    At the time of us negotiating
4  the AP, BI was not considered a competitor
5  to CLM.
6      Q.    Why then did the Institutes --
7  strike that.  What was the basis for the
8  Institutes' concern that BI post
9  transaction would compete with the
10  Institutes?
11     A.    Sure.  So there was a few.  The
12  primary -- 1, because Adam was closely
13  involved with BI, and Adam was one of the
14  reasons that CLM became as successful as it
15  did.  And CLM, one of its greatest
16  successes was based on the contacts, the
17  goodwill, the reputation that it had
18  created.
19            And Adam also owned BI.  And BI
20  had a lot of those contacts and shared
21  resources.  As an example, they shared a
22  marketing resource.  The marketing resource
23  kind of straddled both supporting CLM and
24  supporting Business Insurance.  They had
25  joint conferences, they had what we would

Page 139

1  have assumed was the same contact list as
2  CLM because the same owner was funneling
3  that information through.
4            So we had a great concern that
5  a lot of the context, the know-how, the
6  knowledge was also within BI, and they
7  would be well positioned to compete against
8  us.  And we needed that five-year runway to
9  make sure that we had that noncompete.
10            Does that answer your question?
11     Q.    It does.  It does.  So let me
12  just ask this to make sure we put a finer
13  point on it.  Was the goal and objective of
14  the noncompete to prevent Mr. Potter from
15  trying to hold events after the sale
16  working through another entity, but using
17  another entity to do what CLM and C&E
18  Management had previously been used to do?
19            MR. SIEGEL:  Object to the
20       form.  You can answer, Kate.
21     A.    The APA was to protect CLM --
22  was to protect the Institutes against Adam
23  Potter and Business Insurance against
24  competing and getting into my type of
25  insurance management space.  It did not

Page 140

1  only include Adam Potter.
2      Q.    When you say Business
3  Insurance, you're referring to BI, the
4  publication, not BIH, LLC or BIH, Inc.,
5  correct?
6            MR. SIEGEL:  Object to the
7       form.
8      A.    I'm not sure of the legal name
9  that we're talking about right now.  But
10  I'm talking about the business that is
11  known as Business Insurance that has the
12  publication, that does the Women to Watch
13  event, that organization.
14     Q.    Do you have an understanding of
15  whether or not Business Insurance Holdings,
16  Inc., the defendant in this case, was even
17  an entity in existence at the time of the
18  transaction in June of 2018?
19     A.    I do not know their legal name.
20     Q.    Do you know whether or not BIH,
21  and I'll say BIH, Inc. as opposed to BIH
22  LLC, do you know whether or not BIH, Inc.
23  was formed as a corporate entity at the
24  time of the transaction in 2018?
25     A.    I do not know.  And if I knew,

Page 141

1  I don't recall.
2      Q.    Can I have you pull up tab 23,
3  please.
4      A.    Sure.
5      Q.    We'll mark it as the next
6  Exhibit 13.
7            (Whereupon, Institutes 0122 was
8       marked as Exhibit 13 for
9       identification as of this date by the
10      Reporter.)
11     Q.    This is an e-mail exchange from
12  attorney Andreas to Ms. Madonia, Institutes
13  0000122.  It's an e-mail and the attachment
14  is another draft of the APA.  It goes
15  through 0000179.
16     A.    I see it.
17     Q.    Now, you're on the bottom
18  e-mail from Ms. Madonia to Mr. Andreas but
19  not the top e-mail.  So I want to just ask
20  you about what you recall -- first of all,
21  do you recall receiving a draft again on
22  May 16th, 2018?
23     A.    I do not recall this directly,
24  but I see that I'm on it and it looks
25  familiar to me.

Katherine Horowitz  Attorneys Eyes Only
June 08, 2021

Page 270

1   the sentence, the very first sentence, it
2   says, "With the exception of permitted
3   activities."  Do you see that?
4       A.   I do, yes.
5       Q.   So you would agree with me then
6   that this nonsolicitation provision does
7   not apply to the permitted activities.
8       A.   I would not agree with that.  I
9   don't know how to answer that.  You could
10  ask it again.
11      Q.   So does this provision
12  prevent -- let's take a step back.
13           To whom does this provision
14  apply?
15      A.   My understanding of the
16  noncompete section is that it applies to
17  Mr. Potter and BI.
18      Q.   And what are you basing that
19  understanding on?
20      A.   My conversations with our
21  attorneys.
22      Q.   You can't glean that from
23  reading the document?
24      A.   I leave it up to my attorneys
25  to help interpret the legal wording.

Page 271

1       Q.   But you were the lead of the
2   acquisition team, right?
3       A.   So as I had mentioned, it was
4   my first time working with it, it was under
5   the direction of the CEO, and it was
6   closely, very closely partnered with Cozen
7   O'Connor, our law firm, because we'd never
8   done a deal like this before.  So we let
9   them know what we needed, and they made it
10  happen.
11      Q.   Right, and what did you let
12  them know that you needed with respect to a
13  nonsolicitation provision?
14      A.   Regarding a nonsolicitation?
15      Q.   Correct.
16      A.   I don't recall a conversation
17  specific to nonsolicitation.
18      Q.   Okay, so sitting here today,
19  your entire understanding of the scope of
20  the nonsolicitation provision in this
21  agreement is based on conversations that
22  you've had with counsel, and that's it.
23      A.   Yes.
24           MR. SIEGEL:  I just want to for
25      clarity sake, Kate, because your

Page 272

1   counsel is on this deposition right
2   now, Cozen O'Connor is your
3   litigation counsel and was also
4   counsel for the purposes of the
5   agreement.  So when you're talking
6   about relying on your counsel for
7   your interpretation, just clarify
8   whether you're talking about during
9   the negotiations when it was Ann
10  Madonia's involvement, or, to the
11  extent you're talking about your
12  involvement and our discussions, that
13  I would instruct you not to testify
14  about.
15           THE WITNESS:  Okay, thank you,
16  Matt.
17      A.   Do you want me to answer that
18  then with that in mind?
19      Q.   Sure.
20      A.   The conversations were always I
21  shared with our counsel, who was Ann
22  Madonia of Cozen O'Connor at the time, that
23  we needed a strong noncompete and I left it
24  up to her to make sure that was in force.
25  But that didn't mean that other people

Page 273

1   weren't looking at this.
2       Q.   So the potential solicitation
3   of customers or business relationships
4   wasn't a concern for you at the time?
5           MR. SIEGEL:  Object to the form
6       of the question.
7       A.   Nate, would you mind saying
8   that again?  I'm sorry.
9           MR. BUCHTER:  Sue, could you
10      read that back, please.
11           (Whereas, the referred to
12      question was read back by the
13      reporter.)
14      A.   Every -- yes, absolutely that
15  was a concern.  We didn't --
16      Q.   But it wasn't -- sorry.
17      A.   Sorry.
18      Q.   No, no, go ahead, I apologize,
19  I thought you were finished.
20      A.   I'm okay, I'm done.
21      Q.   Okay, so it was a concern, but
22  you did communicate it specifically,
23  correct?
24      A.   So I am sorry that I'm not
25  answering the question maybe how you're

# Exhibit B

**Institutes 0008592**

| | |
|---|---|
| **From**: | Horowitz, Katherine [/O=AICPCU/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=HARDY] |
| **Sent**: | 3/8/2018 6:30:57 PM |
| **To**: | Scheidt, Jeffrey [scheidt@theinstitutes.org] |
| **Subject**: | FW: CLM Valuation |
| **Attachments**: | The Institutes (CLM) Value Calculations 3.8.18.pdf |

For your reference since you will be seeing Jeff –

---

**From:** Zemanick, Janeen **On Behalf Of** Miller, Pete
**Sent:** Thursday, March 8, 2018 1:05 PM
**To:** jeffreytbowman@gmail.com
**Cc:** Horowitz, Katherine <horowitz@theinstitutes.org>
**Subject:** CLM Valuation

Good afternoon Jeff,

Please find attached the draft CLM valuation report from VRC. Page 4 of the report offers the Executive Summary.

After discussion with the valuation company, management recommends the following:

- Extend an initial offer of $20 million, with the thought that we would land at $21 million after negotiation.
    - The offer would be contingent on Board approval and further due diligence.
- The offer would include the expectation that Adam gives us up to 800 hours of his time to help with the transition.
- Following agreement of a purchase price, we would send a Letter of Intent.
    - We would also ask for a non-compete clause from Adam.

Would you be available at 8:30 tomorrow morning to discuss this?  Given the sense of urgency Adam has with his two other offers, we need to extend our offer to Adam no later than early afternoon tomorrow.

Enjoy the dinner and award ceremony this evening.

As always, thank you for your continued support.

Pete

Attorneys' Eyes Only

# Exhibit C

## Peter Miller Deposition Transcript Pages

Peter Miller  Attorneys Eyes Only
August 27, 2021

```
UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE
-----------------------------------------X
THE AMERICAN INSTITUTE FOR CHARTERED
PROPERTY CASUALTY UNDERWRITERS and
THE INSTITUTES, LLC,

                         PLAINTIFFS,


          -against-          Case No.:
                             CA-19-1600
                               CFC

ADAM POTTER, PBIH, LLC and BUSINESS
INSURANCE HOLDINGS, INC.,

                         DEFENDANTS.
-----------------------------------------X
                    DATE: August 27, 2021
                    TIME: 9:32 A.M.


* CONFIDENTIAL - ATTORNEYS' EYES ONLY *



          REMOTE VIDEO DEPOSITION of PETER

MILLER, taken by the Defendants, pursuant

to a notice and to the Federal Rules of

Civil Procedure, held remotely via Zoom

Videoconference, before Suzanne Pastor, a

Notary Public of the State of New York.
```

Peter Miller  Attorneys Eyes Only
August 27, 2021

Page 10

1  our corporate secretary.  So that kind of
2  thing.
3        Q.    Okay.  Well, let me ask you
4  first about that topic then.  As I
5  mentioned, one of the topics for which you
6  were identified by the plaintiffs as the
7  person who could testify about matters
8  known or reasonably available is any
9  internal communications regarding
10 interpretation of the noncompete clause of
11 the APA up to the time of the closing.
12       So --
13       MR. HAYES:  I'm sorry to
14   interrupt.  But can you tell me to
15   what specific topic you're
16   referencing?
17       MR. DENN:  I believe this is
18   number 13 in the deposition notice.
19       MR. HAYES:  Okay, thank you.
20       Q.    Let me just ask you first
21 generally, were there internal
22 communications within the company regarding
23 the interpretation of the noncompete clause
24 prior to closing?
25       A.    Did we talk about the

Page 11

1  noncompete clause?
2        Q.    Within the company, correct.
3        A.    Sure.
4        Q.    Who was involved in those
5  communications?
6        A.    Well, I would have talked -- I
7  would have spoken with Kate Horowitz about
8  it, I would have -- that would be mostly
9  who I talked to about it.  She was handling
10 negotiations.
11       I would have talked to our
12 attorney for sure.  And I would have talked
13 to Jeff Scheidt, our CFO.
14       Q.    Were those communications
15 verbal or were some of those also in
16 writing?
17       A.    Mostly verbal, but there were a
18 few in writing I believe.
19       Q.    Okay.
20       A.    I believe we gave them to you.
21 As far as I know.
22       Q.    With respect to those
23 communications, am I correct that when the
24 Institutes discussed the noncompete clause
25 internally prior to closing, that it

Page 12

1  discussed the noncompete in terms of
2  competition with Mr. Potter personally, not
3  with any business entities?
4        A.    No, you're not correct.
5        MR. DENN:  Staci, could you put
6    Exhibit 1 into the chat, please.
7        Q.    Mr. Miller, you probably saw us
8  doing this yesterday.  The written exhibits
9  we'll put into the chat and that will allow
10 you and the attorneys to open it and have
11 control over scrolling through it.
12       Mr. Miller, if you could just
13 let me know when you're able to see Exhibit
14 1.
15       A.    I have it.
16       MR. HAYES:  I don't.
17       MR. DENN:  If it's in
18   Mr. Miller's chat, it should be in
19   the chat for everyone.
20       MR. HAYES:  All right, it just
21   appeared.
22       (Whereupon, 3/8/18 E-mail,
23   INSTITUTES 6441 to 6442 was marked as
24   Miller Exhibit 1 for identification
25   as of this date by the Reporter.)

Page 13

1        Q.    Mr. Miller, when you're
2  comfortable that you had a chance to review
3  it, just let me know.
4        A.    Okay.
5        Q.    Can you tell me what this
6  document is?
7        A.    It's an e-mail.
8        Q.    And it's between you and Jeff
9  Bowman?  Or a chain of e-mails between you
10 and Jeff Bowman?
11       MR. HAYES:  Pardon me, you need
12   to give me a second.  It's not
13   opening for me.  It keeps saying I
14   can't save it.
15       Sorry, I got it.
16       Q.    Mr. Miller, this document is an
17 exchange of e-mails between yourself and
18 Jeff Bowman, is that correct?
19       A.    Yes.  Let me clarify my prior
20 answer.  When you said "internal," I
21 interpreted that to mean staff of the
22 Institute.  Jeff Bowman is not a staff
23 member of the Institutes.
24       Q.    Who is Mr. Bowman?
25       A.    At the time Jeff -- Jeff Bowman

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 14

1  was the chair of our board.  So if you're
2  including that as "internal," I was not.
3        Q.    Would that change any of the
4  answers you gave previously, knowing that I
5  meant to include board members as being
6  internal?
7        A.    Oh, well then yes.  I mean,
8  obviously this e-mail.  And then I had a
9  couple meetings with board members.
10       Q.    You said Mr. Bowman was at the
11 time the chair of your board?
12       A.    That's correct.
13       Q.    And one of the topics that you
14 referred to -- what was the purpose of this
15 e-mail exchange?
16       A.    It looks like it was to arrange
17 a meeting.
18       Q.    About?
19       A.    About the price that we should
20 pay for CLM.
21       Q.    And if you could look at the
22 March 8th, 2018 e-mail that you sent
23 Mr. Bowman at 13:05 hours, if you could
24 find that.
25       A.    Okay.

Page 15

1        Q.    And am I correct that that
2  is -- that includes a status update for
3  Mr. Bowman on the contract negotiations
4  with Mr. Potter?
5        A.    It would have just included the
6  offer price.  Mostly.  I mean, that was the
7  purpose.
8        Q.    Okay, and I'm literally just
9  reading from it, but it says the offer
10 would be "contingent on board approval and
11 further due diligence.  The offer would
12 include the expectation that Adam gives us
13 up to 800 hours of his time to help with
14 the transition.  Following agreement of a
15 purchase price, we would send a letter of
16 intent.  We would also ask for a noncompete
17 clause from Adam."
18             Did I accurately read that?
19       A.    Yes.
20       Q.    Reviewing that document, does
21 that refresh your recollection at all with
22 respect to the question that I asked
23 previously regarding whether the internal
24 conversations discussed the noncompete in
25 terms of Mr. Potter personally?

Page 16

1             MR. HAYES:  Object to the form.
2        A.    Well, I wouldn't characterize
3  that as a discussion.  I would characterize
4  that as an update.
5        Q.    If I change my question to say
6  discussions and updates referred to the
7  noncompete with respect to Mr. Potter
8  personally, would that --
9        A.    No.  No.  I think if you look
10 at the APA, it clearly refers to the
11 selling parties.  And the APA includes
12 Mr. Potter and three companies, which I
13 believe the judge has ruled on.
14       Q.    I'm not asking about the APA.
15 My question was about the topic for which
16 you were designated, which was the internal
17 discussions about the noncompete prior to
18 execution.
19       A.    So my context for the analysis
20 of the noncompete always included all of
21 the selling parties as listed in the APA.
22 So that would have been my thought.
23             MR. DENN:  Staci, if you could
24       put Exhibits 2 and 3 into the chat.
25             (Whereupon, 5/28/18 E-mail,

Page 17

1  INSTITUTES 6166 was marked as Miller
2  Exhibit 2 for identification as of
3  this date by the Reporter.)
4             (Whereupon, Exhibit 2 E-mail
5  Attachment, INSTITUTES 6167 to 6169
6  was marked as Miller Exhibit 3 for
7  identification as of this date by the
8  Reporter.)
9        Q.    Mr. Miller, I'll give you a
10 chance to open them.  If you look at them
11 together you will see that -- and you can
12 look at the Bates numbers at the bottom,
13 you can see that they are sequential.
14 Exhibit 3 is an attachment to Exhibit 2 and
15 it's referred to in Exhibit 2.  They were
16 produced separately in the litigation so we
17 made them separate exhibits.  But Exhibit 3
18 is an attachment to Exhibit 2.
19             Again, take as much time as you
20 need to to look them over.
21       A.    (The witness reviews the
22 document.)
23             Okay.
24             MR. HAYES:  This document is
25       designated attorneys' eyes only.

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 18

1    Yes, it is.  So for any examination
2    with respect to them, Mr. Potter
3    needs to sign off.
4          MR. DENN:  I'm sorry, I didn't
5    realize that Mr. Potter was on.
6          MR. HAYES:  I didn't either
7    until I looked, so.
8          MR. NIEDERMAN:  Mr. Potter,
9    this is Seth Niederman, I will e-mail
10   you when we're finished discussing
11   this document.  He is now off.
12   Q.    Mr. Miller, am I correct that
13   Exhibit 2 indicates that Exhibit 3 is a set
14   of talking points that Ms. Horowitz
15   prepared for you to discuss the draft
16   purchase agreement with the board of
17   directors?
18   A.    It would be an outline of a
19   status update of where we were with this
20   purchase.
21   Q.    Am I correct that these are
22   talking points that she created for you to
23   use?
24   A.    It would be her suggested
25   talking points.

Page 19

1    Q.    Okay.  And then looking at
2    Exhibit 3 itself, if you could look at the
3    last page of that exhibit which bears Bates
4    number 6169, these are part of the talking
5    points that Ms. Horowitz prepared for you,
6    correct?
7    A.    Correct.
8    Q.    And I think you had mentioned
9    earlier that Ms. Horowitz is one of the
10   people with whom there had been internal
11   communications about interpretation of the
12   noncompete?
13   A.    Ms. Horowitz was working with
14   our attorney to define the noncompete.
15   Q.    So I'm looking at the top of
16   the page under the heading "Purchase
17   Agreement" and the first talking point that
18   Ms. Horowitz has prepared for you there
19   reads, "The largest challenge has been with
20   the noncompete section, but we believe we
21   are in a good place now.  We had Adam
22   define exactly what he wants excluded from
23   the noncompete as it relates to BI.  We
24   also placed in the noncompete that Adam
25   cannot create events, seminars, content

Page 20

1    directly targeted at claims and litigation
2    professionals."  Do you see that?
3    A.    I see that.
4    Q.    My first question again is
5    whether the reference to Mr. Potter not
6    creating events, seminars and content
7    causes you to reconsider your prior
8    response as to whether or not the internal
9    communications discussed the noncompete
10   specifically with respect to Mr. Potter.
11         MR. HAYES:  Object to the form.
12   A.    Our parlance at the time would
13   have said Adam and all his affiliated
14   activities.  So that's a shorthand for Adam
15   and all his affiliated activities.
16   Q.    Is it accurate to say --
17   A.    Which is reflected in the final
18   Asset Purchase Agreement.
19   Q.    Yes, and again, the topic that
20   we're asking you to testify about is the
21   internal communications leading up to it of
22   which this is --
23   A.    Leading up to the plain
24   language of the Asset Purchase Agreement?
25   Q.    Yes.

Page 21

1    A.    Okay.
2    Q.    This section also says, and
3    again, I just read it, but it says we
4    placed in the noncompete that Adam cannot
5    create events, seminars and content
6    directly targeted at claims and litigation
7    professionals.
8          Am I correct that that reflects
9    at the time the internal interpretation of
10   the noncompete with respect to its scope?
11   A.    Well, my lens on that would be
12   the final Asset Purchase Agreement, which
13   was the final definition of the scope of
14   what we wanted.
15   Q.    I understand what you're
16   saying, sir, and again, the topic for which
17   you were designated is internal
18   communications leading up to the document.
19   So I'm not asking you what the final
20   document says.  I'm simply asking whether
21   this communication from Ms. Horowitz to you
22   indicates what the Institutes viewed as
23   being the scope at the time of the
24   communication.
25         MR. HAYES:  Object to the

Peter Miller  Attorneys Eyes Only
August 27, 2021

Page 22

1  question as argumentative.  The
2  witness has now twice testified that
3  the final agreement reflects what was
4  discussed within the Institutes.  And
5  so it is responsive to your question.
6       MR. DENN:  Mr. Hayes, I'm going
7  to ask you to keep your objections to
8  form to that and not suggest how the
9  witness should answer.  I think you
10 know that.
11      MR. HAYES:  Excuse me.  First,
12 I'll ask you not to argue with the
13 witness.  And I was not suggesting
14 answers to the question but simply
15 rephrasing what the witness has
16 already said.
17      MR. DENN:  And I'll ask you not
18 to do that as well.  Again, I think
19 you're familiar with the rule.
20      MR. HAYES:  I will ask you not
21 to argue with the witness.
22   Q.   Mr. Miller, did you understand
23 my last question?
24   A.   Can you repeat it, please?
25      MR. DENN:  Can I ask the court

Page 23

1  reporter just to repeat back the last
2  question.
3       (Whereas, the referred to
4  question was read back by the
5  reporter.)
6   A.   I'm sure I believe I've
7  answered that question.
8   Q.   Is the --
9   A.   I'm unsure of the question.  I
10 said earlier it was Adam and all his
11 affiliated activities which were finally
12 and clearly stated in the final Asset
13 Purchase Agreement.
14   Q.   And I asked you to tell me if
15 the question was unclear and you told me
16 it's unclear.  So I'll try to ask it more
17 clearly.
18      My question does not relate to
19 whether the noncompete was viewed as
20 applying only to Mr. Potter.  My question
21 is whether the end of that sentence which
22 refers to content directly targeted at
23 claims and litigation professionals is how
24 the Institutes viewed the scope of the
25 noncompete at the time this communication

Page 24

1  was made.
2   A.   No.
3   Q.   What is it that is missing from
4  this communication that causes it to be
5  unrepresentative of how the Institutes
6  viewed it at the time?
7       MR. HAYES:  Object to the form.
8       Assumes facts not in evidence.
9   A.   Well, again, in the context of
10 what was -- in the context of what we ended
11 up writing in the Asset Purchase Agreement,
12 there was a list of permissible activities.
13 And for those activities, then there were
14 some provisions.  Anything outside that,
15 our intent, which is reflected in the plain
16 language, was that Business Insurance would
17 not be allowed to do other activities.
18   Q.   Do you recall if you used these
19 talking points from Ms. Horowitz as written
20 for the purpose of the meeting?
21      MR. HAYES:  Object to the form.
22   A.   I don't recall if I used these
23 specific -- every one of these specific
24 talking points.  These are suggested
25 talking points.

Page 25

1   Q.   And this document predates the
2  execution of the Asset Purchase Agreement,
3  correct?
4   A.   I believe so.  I'm not sure of
5  the date of this document.  Is it on there?
6   Q.   It is.  It's May 28th, 2018.
7   A.   Okay, so I think we signed the
8  Asset Purchase Agreement I believe on
9  June 1st.
10   Q.   So these talking points would
11 be just a few days prior to the execution?
12   A.   They would be -- yeah, if
13 that's the date.  But again, they're not
14 inclusive.  They are suggested talking
15 points.
16   Q.   You had referred a few minutes
17 ago to the plain language of the noncompete
18 provision in the APA.  So you are aware
19 that it prohibits those to whom it applies
20 from conducting activities that are
21 competitive with the seller's businesses at
22 the time of the closing unless the
23 activities are specifically permitted
24 activities.  Is that a fair summation of
25 what it provides?

App.427

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 26

1       A.      My understanding of the APA as
2   far as permitted activities states that
3   there's a general noncompete as provided in
4   Section 6.12, that it refers to selling
5   parties.  Selling parties and companies are
6   defined terms.  Those selling parties are
7   referred to in the preamble.  And then --
8   and I believe the judge has decided that
9   Business Insurance is subject to that.
10          And then I would look at the
11  Exhibit 6.12 that lists the permitted
12  activities.  And it's contemporaneous; it
13  lists specifically what Business Insurance
14  is able to do with some provisions.
15  There's a "provided, however" statement in
16  these four clauses.  And my understanding
17  would be that anything Business Insurance
18  did for the term of five years outside of
19  those activities is not permitted.
20          MR. DENN:  Staci, could you put
21      Exhibit 1 from yesterday's deposition
22      into the chat for Mr. Miller.
23      Q.      Mr. Miller, while she's doing
24  that, this is the Institutes' complaint
25  that was filed in this case.  The paragraph

Page 27

1   I'm going to ask you about is paragraph 24,
2   but obviously feel free to look at however
3   much of it you think you need to to provide
4   context.
5       A.      (The witness reviews the
6   document.)
7           Okay.
8       Q.      Again, this is the Institutes'
9   description of the APA.  So I'm just
10  looking at paragraph --
11      A.      I believe it's -- is that
12  lifted from the APA?
13      Q.      I believe that paragraph 24 is
14  the Institutes' description, and then I
15  think paragraph 25 contains language that
16  is actually lifted from it.
17      A.      Thank you.
18      Q.      So you could --
19      A.      I merged 24 and 25, I
20  apologize.
21      Q.      And you could look at either
22  one.  My question is pretty
23  straightforward.  I just wanted to make
24  sure we were working off the same set of
25  words.

Page 28

1           So am I correct that the
2   noncompete section of the purchase
3   agreement prohibits the selling parties
4   from conducting any activities that are
5   competitive with any of the seller's
6   businesses conducted as of the closing
7   date?
8       A.      The selling parties are not
9   permitted to do activities outside those
10  enumerated in the schedule for a period of
11  five years.
12      Q.      Okay, I'm literally just
13  reading the language from the Institutes'
14  document.  And again, you could look at 24
15  which is the Institutes' summation, and you
16  could look at 25.  But am I not reading it
17  correctly that the prohibited actions are
18  activities that are competitive with the
19  seller's businesses, and then there are
20  some exclusions to that which are on the
21  schedule?
22      A.      It says to me that there will
23  be no competition for five years with the
24  seller's businesses as conducted on the
25  closing date, except during the non-compete

Page 29

1   period any selling party or any party
2   listed on Schedule 6.12 may undertake the
3   activities set forth on Schedule 6.12,
4   attached hereto; collectively, the
5   permitted activities."
6       Q.      And the language I just wanted
7   to focus on for purposes of what I'm asking
8   you about today is the seller's businesses,
9   which is this term that's referred to in
10  the agreement and in the complaint.
11          Am I correct that the
12  Institutes internally viewed CLM's business
13  at the time of the closing as being a
14  provider of education and resources for
15  insurance claims, resolution and litigation
16  management professionals?
17      A.      I would say that the Institutes
18  viewed CLM as a provider of events and
19  knowledge that, while pointed at -- kind of
20  pointed at claims and litigation, included
21  risk managers, and frankly, given the
22  nature of the insurance business, any other
23  interested party.
24          MR. DENN:  Staci, could you put
25      Exhibit 4 for today's deposition into

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 38

1  although we handle litigation in our claims
2  programs, we did not have a specific
3  designation for it.  And that was an
4  opportunity.  And from a designation point
5  of view that would have constituted a new
6  designation.  Although we've done all kind
7  of work obviously in claims and litigation.
8       Q.    I'd like to ask you about topic
9  number 6 for which you've been identified
10 by the plaintiffs as a person who could
11 testify to facts known or reasonably
12 available to them.
13      A.    I don't know what -- can you
14 repeat what topic number 6 is?
15      Q.    Yes.  I was giving the number
16 for Mr. Hayes' benefit because he had asked
17 me previously to number them.
18           Can you tell me the identity of
19 any customers that the plaintiffs have lost
20 as a result of the cannabis conference
21 that's referred to in the complaint?
22      A.    We've identified I believe
23 based on an analysis more than 15 customers
24 who were in the CLM database who attended
25 the cannabis conference.  And we've

Page 39

1  identified more than 40 companies that were
2  in the CLM database that were at the
3  cannabis conference either as a member or
4  sponsor.
5       Q.    Okay, my question was if you
6  could identify by name any customers that
7  the plaintiffs lost as a result of the
8  cannabis conference that's referred to in
9  the complaint.  So if there are any
10 individual customers who you allege were
11 lost to the Institutes as a result of the
12 cannabis conference, if you could just tell
13 me the identity of those customers.
14           MR. HAYES:  Object to form.
15      A.    Well, I mentioned 15 people who
16 attended a cannabis conference from our
17 database.  And I mentioned 40 companies who
18 attended or were a member at the cannabis
19 conference.  And those individuals and
20 those companies attended a cannabis
21 conference and they were also in our
22 database.
23      Q.    And again, my question is more
24 specific than that.  It is, could you
25 identify any customers that the plaintiffs

Page 40

1  lost as a result of the cannabis
2  conference?
3       A.    I know that any individual --
4  have I -- I don't understand your question.
5       Q.    Yes, my question is can you
6  tell me the identity of any customer that
7  the plaintiffs lost as a result of the
8  cannabis conference.
9           MR. HAYES:  Objection.  Object
10      to the form.  Vague and ambiguous.
11      A.    Well, I think the mere presence
12 of the cannabis conference is a violation
13 of the APA.
14      Q.    That wasn't my question, sir.
15      A.    Well, can I answer the
16 question?
17      Q.    Yes, the question is can you
18 identify any customer that the plaintiffs
19 lost as a result of the cannabis
20 conference.
21           MR. HAYES:  Objection.  Vague
22      and ambiguous.
23      A.    Can I identify any specific
24 individual?  No.
25      Q.    Can you identify any specific

Page 41

1  company that was lost as a result of the
2  cannabis conference?
3           MR. HAYES:  Object to form.
4       A.    Are you asking me other than
5  the 15 -- more than 15 attendees and the
6  more than 40 companies?
7       Q.    No.  I'm not asking you, sir,
8  who attended the conference.  My question
9  was if you could tell me the identity of
10 any customer that the plaintiffs lost as a
11 result of the cannabis conference.
12           MR. HAYES:  Object to the form.
13      Vague and ambiguous.
14      A.    I don't understand that
15 question.  I think I've answered.  I said
16 there were more than 15 individuals and
17 more than 40 companies.
18      Q.    I may have misunderstood your
19 answer.  I believe that you told me that
20 you had a list of individuals or companies
21 that attended the cannabis conference.  And
22 that was not my question.  My question was,
23 could you tell me the identity of any
24 customer that the plaintiffs lost as a
25 result of the cannabis conference.

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 42

1         MR. HAYES:  Object to the form.
2     Vague and ambiguous.
3         Q.    A person or entity who was a
4    customer of the plaintiffs prior to the
5    cannabis conference who the plaintiffs lost
6    as a result of the cannabis conference.
7         A.    No.
8         MR. HAYES:  Object to the form.
9         Q.    Moving over to topic number 20
10   for which you were identified, can you tell
11   me the identity of any customers of the
12   plaintiffs who have been lost as a result
13   of any alleged violation of the APA by
14   Business Insurance?
15        MR. HAYES:  Object to the form.
16        A.    Well, when I look at business
17   lost, I look at it in several ways.  I
18   mean, first of all, there's the nature of
19   the competition that as a result of a
20   violation of the APA Business Insurance now
21   represents.  So we have Business Insurance
22   in one of our magazines, risk in insurance,
23   the two largest in the industry.  And it's
24   a significant -- their violation of the APA
25   is a significant competitive barrier for us

Page 43

1    because if they are going to put on events
2    that are not sanctioned, strategic business
3    model is to use your magazine to drive
4    people to events, and vice versa.
5         So when we purchased Business
6    Insurance we specifically wanted to make
7    sure that we could protect our investment
8    and that we weren't funding a potential
9    competitor.  So while we believe in
10   competition, this specific entity, Business
11   Insurance, causes us to have to now deal
12   with competition that we shouldn't have for
13   this specific entity.
14        So there's the nature of that.
15   There's also the nature of the industry.
16   The industry, particularly in several
17   lines, is a commodity-based industry.  And
18   the way to compete in a commodity-based
19   industry is to drive down costs.  And many
20   people will decide to go to one conference,
21   not the other.  And if -- what we were
22   trying to do with the noncompete is to
23   ensure that for a limited amount of time we
24   could establish our presence and provide a
25   better service to customers and the

Page 44

1    presence in that market naturally would
2    mean that people would choose to go to one
3    conference, not another.
4         Q.    And we can come back to those,
5    Mr. Miller.  I'm trying to if he can cuss
6    on the topic for which you were identified
7    by the plaintiffs.  So -- and if it makes
8    it more clear, I'll read you what the topic
9    was that the plaintiffs have offered you to
10   testify about.  It's number 20 which
11   states, "Any customer lost as a result of
12   any violation of the APA and any evidence
13   supporting the allegation that violation of
14   the APA was the reason for the loss of that
15   customer."  So that's the topic for which
16   you've been identified by the Institutes to
17   testify on matters known or reasonably
18   available to it.
19        My question simply is derived
20   from that topic, are you able to identify
21   any customer that was lost as a result of
22   any violation of the APA?
23        A.    We had two sponsors, two
24   customers, CoventBridge was one, that in
25   2018 they spent roughly $50,000 with us.

Page 45

1    In 2021 they spent 5,000.
2         We had another one, S E A.  In
3    2018 I believe the number is North of
4    $70,000.  And in 2021 they spent about
5    $17,500.  Both of those, I can think of no
6    other reason than that they -- because we
7    had a good relationship, I can think of no
8    other reason why those numbers would drop.
9         Q.    Have you been in contact with
10   either of those sponsors to ask them why
11   they reduced the level of their
12   sponsorship?
13        A.    Well, I have not.  I would not
14   normally reach out to a customer and say
15   hey, did you go with a competitor.  Because
16   if they hadn't, why would I put that idea
17   in their mind?
18        Q.    So your testimony that these
19   two sponsors reduced their level of
20   sponsorship because of an alleged violation
21   of the APA, that's an inference you've
22   drawn, or are there some facts upon which
23   you base that?
24        A.    Well, the fact that the numbers
25   have dropped, that we had had a good

Peter Miller   Attorneys Eyes Only
August 27, 2021

Page 46

1  relationship, I just can't think of another
2  reason.
3       Q.   But it's not based on any
4  fact-finding that you've done with respect
5  to what their reason might have been?
6            MR. HAYES:  Object to the form.
7       A.   I have not called them
8  directly.
9       Q.   And to your knowledge, has
10 anyone at the Institutes done so?
11      A.   I don't know.
12      Q.   You may have answered this
13 question by identifying sponsors when I
14 asked about customers, and you may use
15 those terms interchangeably, but just to
16 make sure that I'm not missing anything,
17 one of the other topics for which you were
18 identified is number 6 -- I'm sorry, number
19 5, relates to sponsors.  So same question I
20 asked before with respect to customers, but
21 I'll ask it with respect to sponsors.
22           Are you aware of any sponsor
23 that the plaintiffs alleged to have lost as
24 a result of the cannabis conference?
25      A.   I mean, look, the --

Page 47

1            MR. HAYES:  Object to the form.
2       A.   -- the long term care
3  conference and the cannabis conference, by
4  a plain reading of the APA are outside the
5  scope of that.  So any sponsor there is
6  potentially, particularly if they're in our
7  database, somebody that we might have been
8  able to do business with.
9       Q.   And my question, sir, and I'm
10 going to ask it first with respect to the
11 cannabis conference and then more broadly.
12 But with respect to the cannabis
13 conference, are you able to identify any
14 sponsor that the plaintiffs lost as a
15 result of that conference?
16           MR. HAYES:  Objection.  Vague
17      and ambiguous.
18      A.   I believe there's one.
19      Q.   Who is that?
20      A.   Wilson Elser.  I believe
21 that -- my belief is that Mr. Heller at
22 Wilson Elser has a relationship with Adam
23 Potter.  And Wilson Elser I believe, my
24 belief is that they were a sponsor of the
25 cannabis conference and they had previously

Page 48

1  done work with CLM.  I believe that to be
2  correct.
3       Q.   And are you aware that Wilson
4  Elser continues to sponsor Institutes
5  events?
6       A.   I believe they do.  But to a
7  lesser extent.
8       Q.   And to what extent has their
9  sponsorship reduced?
10      A.   I would have to look at the
11 number.  I don't have that off the top of
12 my head.
13      Q.   And what is the factual basis
14 for attributing any reduction in
15 sponsorship to the cannabis conference?
16           MR. HAYES:  Object to the form.
17      Beyond the scope of the protective
18      order.
19      A.   Well, as I said, the industry
20 is a zero sum game as it relates to
21 sponsorships.  So if you're going to
22 sponsor the cannabis conference, it likely
23 uses up your budget that you can't sponsor
24 other conferences.
25      Q.   Let me try to break that down

Page 49

1  for a second.  Do you know as a factual
2  matter whether the level of Wilson Elser's
3  sponsorship has in fact dropped?
4       A.   I believe -- I would have to
5  double-check that, but I believe it has.
6       Q.   And your basis for saying that
7  it has dropped as a result of the cannabis
8  conference is an inference based upon your
9  observation of the market and not based on
10 any factual investigation?
11           MR. HAYES:  Object to the form.
12      A.   Based on -- it's based on that
13 the cannabis conference is now in the
14 market, it's a violation of the APA, and
15 there's limited budgets by companies.
16      Q.   But you've not spoken to anyone
17 at Wilson Elser to ask them the reason for
18 any reduction in their level of
19 sponsorship?
20      A.   I have not.
21      Q.   And you're not aware of anyone
22 at the Institutes who has?
23      A.   I don't know the answer to
24 that.
25      Q.   You had made reference to a

# Exhibit D

## Peter Miller Deposition Exhibit 1

| From: | Jeffrey Bowman [jeffreytbowman@gmail.com] |
|---|---|
| Sent: | 3/8/2018 6:59:21 PM |
| To: | Miller, Pete [miller@theinstitutes.org] |
| CC: | Horowitz, Katherine [horowitz@theinstitutes.org]; Scheidt, Jeffrey [scheidt@theinstitutes.org] |
| Subject: | Re: CLM Valuation |

Got it.

Sent from my iPad

> On Mar 8, 2018, at 13:51, Miller, Pete <miller@theinstitutes.org> wrote:
>
> Jeff,
>
> 8:15 works for me.  I am going to ask Jeff Scheidt and Kate to join us and set up a conference call number.
>
> Goo luck tonight.
>
> Best regards,
>
> Pete
>
> _____
> Peter L. Miller, CPCU | President and CEO
> The Institutes: Proven Knowledge. Powerful Results.
> 720 Providence Road | Suite 100 | Malvern, PA 19355-3433<x-apple-data-detectors://1/0>
> Phone (610) 644-2100 ext. 7732<tel:(610)%20644-2100;7732> | fax (610) 725-1000<tel:(610)%20725-1000>
> https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.TheInstitutes.org&d=DwIFaQ&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=5Upmg3a7D4EZNlmYdVb32bR3Ah0awQnvqBmuW8aR2kg&m=lvHhGY0b_uaolXSoA5duu_Vi2sDp9AUG92ce9aRLF
7s&s=GvDdzenXoEif sp8HGAP8S8qVYLtTZ2NfQJ1TSdJ3Y74&e=<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.theinstitutes.org_&d=DwIFaQ&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=5Upmg3a7D4EZNlmYdVb32bR3Ah0awQnvqBmuW8aR2kg&m=lvHhGY0b_uaolXSoA5duu_Vi2sDp9AUG92ce9aRLF
7s&s=G3O9OXU5TOHp49fkSo_ZnYxtf-WEOMgjX1Gix DOg7OY&e=>
>
> On Mar 8, 2018, at 10:37, Jeffrey Bowman <jeffreytbowman@gmail.com<mailto:jeffreytbowman@gmail.com>> wrote:
>
> Pete ,could we make it 8.15 as I have to get to a meeting at 9am . I think the offer $20 m is in the ball park.
> I am sure you will get a number of texts if we win.
> Talk tomorrow. Regards Jeff
>
> Sent from my iPad
>
> On Mar 8, 2018, at 13:05, Miller, Pete <miller@theinstitutes.org<mailto:miller@theinstitutes.org>> wrote:
>
> Good afternoon Jeff,
>
> Please find attached the draft CLM valuation report from VRC. Page 4 of the report offers the Executive Summary.
>
> After discussion with the valuation company, management recommends the following:
>
>
> ·        Extend an initial offer of $20 million, with the thought that we would land at $21 million after negotiation.
>
> §  The offer would be contingent on Board approval and further due diligence.
>
> ·        The offer would include the expectation that Adam gives us up to 800 hours of his time to help with the transition.
>
> ·        Following agreement of a purchase price, we would send a Letter of Intent.
>
> §  We would also ask for a non-compete c

**EXHIBIT**
0001
P.Miller
08/27/2021

```
>
> Would you be available at 8:30 tomorrow morning to discuss this?  Given the sense of urgency Adam has
with his two other offers, we need to extend our offer to Adam no later than early afternoon tomorrow.
>
> Enjoy the dinner and award ceremony this evening.
>
> As always, thank you for your continued support.
>
> Pete
>
>
> _____
>
> This e-mail and any attachments to it are confidential, privileged, and intended solely for the named
addressee(s). The unauthorized use, disclosure, or alteration of this e-mail is strictly prohibited. If
you have received this e-mail in error, please notify the sender immediately and delete the e-mail.
> <The Institutes (CLM) Value Calculations 3.8.18.pdf>
>
> _____
>
> This e-mail and any attachments to it are confidential, privileged, and intended solely for the named
addressee(s). The unauthorized use, disclosure, or alteration of this e-mail is strictly prohibited. If
you have received this e-mail in error, please notify the sender immediately and delete the e-mail.
```

# Exhibit E

## Anne Blume Deposition (8/26/21)
## Transcript Pages

Anne Blume
August 26, 2021

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR     )
CHARTERED PROPERTY CASUALTY    )
UNDERWRITERS and THE           )
INSTITUTES, LLC,               )
                               )  No. C.A. No.
            Plaintiffs,        )  19-1600-CFC
                               )
   vs.                         )
                               )
ADAM POTTER, PBIH, LLC and
BUSINESS INSURANCE HOLDINGS,
INC.,

            Defendants.
```

    The discovery videotaped video

teleconference deposition of ANNE BLUME, called

by the Defendants, for examination, pursuant to

notice, taken remotely before LAURA MUKAHIRN,

CSR, RPR, CRR, within and for the County of Cook

and State of Illinois, on August 26, 2021,

scheduled to commence at 10:00 o'clock a.m.

Anne Blume
August 26, 2021

|  | Page 14 |
|---|---|
| 1 | any other written communications in preparation |
| 2 | for testifying on behalf of the plaintiffs? |
| 3 | A.   Discovery responses and pleadings.  I |
| 4 | think I also reviewed the letters that were |
| 5 | submitted to the judge.  I'm trying to remember |
| 6 | everything. |
| 7 | Q.   Okay.  Well, let me turn to the actual |
| 8 | topics for which you were designated. |
| 9 | MR. DENN:  And, Staci, if you could put -- |
| 10 | what we're going to do today is put the exhibits |
| 11 | into the chat.  That seems to be the easiest way |
| 12 | for Anne and the attorneys to be able to |
| 13 | manipulate them and look at them.  So, Staci, if |
| 14 | you can put Exhibit 1 into the Chat.  Can you |
| 15 | let me know when that's in? |
| 16 | MS. HUDSON:  Sorry.  It's in. |
| 17 | (Blume Deposition Exhibit |
| 18 | No. 1 was remotely introduced |
| 19 | and provided electronically to |
| 20 | the reporter.) |
| 21 | MR. HAYES:  It's not opening for me.  Do you |
| 22 | just click on it? |
| 23 | MS. HUDSON:  Yes, you can just click on it to |
| 24 | open it. |
| 25 | MR. HAYES:  I'm just -- |

|  | Page 15 |
|---|---|
| 1 | THE VIDEOGRAPHER:  You have to click on it |
| 2 | and save it to a location, and then it'll turn |
| 3 | green, and then you can open it. |
| 4 | BY MR. DENN: |
| 5 | Q.   Anne, are you able to see Exhibit 1? |
| 6 | A.   Yes. |
| 7 | MR. DENN:  Okay.  If -- Mr. Hayes, we'll |
| 8 | wait, and if you could let us know when you're |
| 9 | able to see it. |
| 10 | MR. HAYES:  Okay. |
| 11 | BY MR. DENN: |
| 12 | Q.   Anne, if we can start with Paragraph 17 |
| 13 | of the complaint, and take as much time as you |
| 14 | would like to; you know, look at surrounding |
| 15 | paragraphs or any other part of it that you |
| 16 | think might be relevant to answering the |
| 17 | question.  But my questions start with |
| 18 | Paragraph 17. |
| 19 | A.   Okay. |
| 20 | Q.   So Paragraph 17 alleges that at the |
| 21 | time of the APA, that CLM was operating as a |
| 22 | national trade association for the insurance |
| 23 | claims and litigation management industries.  Do |
| 24 | you see that? |
| 25 | A.   Yes. |

|  | Page 16 |
|---|---|
| 1 | Q.   When the plaintiffs allege that CLM was |
| 2 | a national trade association for the insurance |
| 3 | claims industry, what does that mean? |
| 4 | A.   I think the business of the CLM was |
| 5 | fully defined in the asset purchase agreement. |
| 6 | And it looks to me like this allegation is just |
| 7 | a part of that definition. |
| 8 | Q.   So this was meant to simply be a |
| 9 | partial quotation from the contract itself? |
| 10 | A.   That's what it looks like to me.  It |
| 11 | looks like it is a sentence that was taken out |
| 12 | of the description of the CLM business that's |
| 13 | defined in the purchase agreement. |
| 14 | Q.   And is that also the case for the |
| 15 | allegation that CLM was a national trade |
| 16 | association for the litigation management |
| 17 | industry, same paragraph? |
| 18 | A.   Yeah.  The entire sentence, I think, |
| 19 | following "at the time of the agreement," after |
| 20 | the comma, that looks to me like it was part of |
| 21 | the asset purchase agreement, just a small part. |
| 22 | Q.   And then just turning to Paragraph 19 |
| 23 | of the complaint, two paragraphs later, when |
| 24 | that paragraph refers to the claims resolution |
| 25 | industry, is that the same thing as the |

|  | Page 17 |
|---|---|
| 1 | insurance claims industry?  Are those terms |
| 2 | being used interchangeably in the complaint? |
| 3 | MR. HAYES:  Object to the form. |
| 4 | THE WITNESS:  Yeah.  It says:  A professional |
| 5 | association and the insurance industry with more |
| 6 | than 45,000 professionals in the claims |
| 7 | resolution and litigation management industries. |
| 8 | BY MR. DENN: |
| 9 | Q.   My question was simply are the terms |
| 10 | claims resolution industry and insurance claims |
| 11 | industry, are those two terms, as they're used |
| 12 | in the complaint, are -- do they mean different |
| 13 | things, or are they interchangeable in terms of |
| 14 | the allegations? |
| 15 | MR. HAYES:  Object to the form. |
| 16 | THE WITNESS:  Yeah.  I don't really -- I |
| 17 | don't understand that -- I don't understand the |
| 18 | question.  So you have an insurance industry, |
| 19 | right, and I think we all understand what the |
| 20 | insurance industry is.  You know, carriers issue |
| 21 | policies to companies, companies have risk |
| 22 | managers, risk managers are part of the purchase |
| 23 | of the policy.  There are ultimately claims made |
| 24 | under those policies because that's the purpose |
| 25 | of insurance, and -- right, is to provide |

Anne Blume
August 26, 2021

Page 18

1  financial protection once, you know, against a
2  claim, a potential claim.  And the CLM is
3  involved in providing training and education in
4  that space.  So does that answer your question?
5      Q.    My question was really more specific,
6  just whether or not those two terms were used --
7  those two specific terms were used
8  interchangeably:  claims resolution industry and
9  insurance claims industry.
10      MR. HAYES:  Object to the form of the
11  question.
12      THE WITNESS:  I don't think so.
13      MR. HAYES:  Just, Anne, let me just object
14  and also note it's beyond the scope of the
15  deposition as authorized by the Court.
16      THE WITNESS:  Yeah, I don't think so.
17  BY MR. DENN:
18      Q.    Okay.  And the difference is they're
19  both alleged in the complaint.  And so I guess
20  my question is if they are different, what --
21  how they're different.  Because they're both
22  used in the complaint in different paragraphs.
23      A.    So the term claims resolution is one
24  term you want to look at and the other one is?
25      Q.    The term claims resolution industry

Page 19

1  versus insurance claims industry.
2      A.    Are they interchangeable?
3      Q.    Yes.  That was my question is as
4  they're alleged in the complaint, are they meant
5  to be interchangeable, or are they meant to be
6  two different things?
7      MR. HAYES:  Object to the form.  Beyond the
8  scope.
9      THE WITNESS:  Yeah.  I don't -- I frankly
10  don't understand the question.  I literally
11  can't figure out what you're -- if -- are you --
12  I can't figure out what you're trying to -- what
13  you're asking me.  The intent in the pleading?
14  BY MR. DENN:
15      Q.    Yes.  There are allegations in the
16  pleading as to what -- as to what the business
17  of CLM was, and there is one phrase used in
18  Paragraph 17 and a different phrase used in
19  Paragraph 19 quoting from the contract.  And my
20  question was simply whether those two terms that
21  I mentioned mean the same thing or mean
22  something different:  claims resolution industry
23  and insurance claims industry.  They're both
24  alleged in the complaint.  And my question was
25  simply do they mean the same, or are they

Page 20

1  referring to two different things?  That was it.
2      A.    I don't have an answer for that, and I
3  don't -- I did not prepare the complaint.  The
4  complaint was filed by counsel, and I really
5  couldn't answer that question, because I think
6  the documents -- the purchase agreement defines
7  the business of the CLM, and I think these
8  sentences were taken out of -- and maybe I'm
9  wrong -- but I know that 19 looks like it's a
10  direct quote.  I thought 17 was.  I could be
11  wrong.
12      Q.    Well, let me -- let me ask you, just
13  looking at those two paragraphs together, 17 and
14  19, I know you testified at your prior
15  deposition that CLM allows other individuals to
16  register for its events.  But based on those two
17  paragraphs, 17 and 19, is it accurate to say
18  that the focus of CLM's membership at the time
19  of the APA was the insurance claims and
20  litigation management industries?
21      A.    I wouldn't say that as narrowly as I
22  think you're asking it.  I think that the
23  business of the CLM is well defined in the asset
24  purchase agreement, and the membership of the
25  CLM -- I mean I think here it says more than

Page 21

1  45,000 professionals in the claims resolutions
2  and litigation management industries offering
3  different types of memberships.  There are a lot
4  of people in the CLM that may not be solely
5  involved in insurance claims and litigation
6  management industries, may not be solely
7  involved in claims resolution and litigation
8  management industries that are involved in the
9  insurance ecosystem, again, because the issuance
10  of an insurance policy to protect -- provide
11  financial protection against potential claims,
12  is, itself, a bigger piece of the puzzle and the
13  litigation -- and the claims and litigation
14  management is part of that, but not solely
15  restricted to that.
16      Q.    Understood.  And all I was asking was
17  whether it was accurate to say based on the
18  language that you just read from the complaint
19  whether the focus of CLM's management at the
20  time of the APA was the insurance claims and
21  litigation management industries; not its
22  exclusive membership, but whether that was the
23  focus of its membership?
24      MR. HAYES:  Objection.
25      THE WITNESS:  I can't answer it any

# Exhibit F

## Adam Potter Deposition Transcript Pages

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3                    Case No. 1:19-cv-01600-CFC
 4
    The American Institute For Chartered    :
 5  Property Casualty Underwriters and the  :
    Institutes, LLC,                        :
 6                                          :
           Plaintiff,                       :
 7                                          :
                                            :
 8       vs.                                :
                                            :
 9                                          :
                                            :
10                                          :
    Adam Potter, PBIH, LLC, and business    :
11  Insurance Holdings, Inc.,               :
                                            :
12         Defendants.                      :
                                            :
13                                          :
14
15        ------------------------------------
              REMOTE VIDEOTAPED
16    DEPOSITION UNDER ORAL EXAMINATION OF:
                  ADAM POTTER
17                (VOLUME II)
                June 16, 2021
18                ------------
    REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR
19                ------------
20
21
    JOB #  J7194872
22
23
24
25
```

**Page 2**

```
 1        TRANSCRIPT of the remote videotaped
 2  deposition of the above-named witness, called for
 3  Oral Examination in the above-entitled matter, said
 4  deposition being taken pursuant to Federal Court
 5  Rules, by and before JENNIFER L. WIELAGE, Certified
 6  Shorthand Reporter and Notary Public of the State of
 7  New Jersey, License No. XI01916, on Wednesday,
 8  June 16, 2021, commencing at 10:15 in the forenoon.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2  A P P E A R A N C E S:
 3  FOX ROTHSCHILD
    2000 Market St.
    20th Floor
 4  Philadelphia Pennsylvania 19103-3222
    (215) 299-2000
 5  BY:  ROBERT TINTNER, ESQ.
    Attorneys for Adam Potter
 6
    COZEN O'CONNOR PC
 7  1650 Market Street
    Suite 2800
 8  Philadelphia, PA 19103
    (215) 665-2000
 9  BY:  ROBERT W. HAYES, ESQ.
    Attorneys for Plaintiff
10
    DLA PIPER
11  200 S Biscayne Blvd
    Suite 2500
12  Miami, Florida 33131
    (305) 423-8500
13  BY:  CHRISTOPHER G. OPRISON, ESQ.
    chris.oprison@dlapiper.com
14  Attorneys for Business Insurance Holdings Inc.
15  DLA PIPER
    1201 No. Market Street
16  Suite 2100
    Wilmington, DE 19801
17  (302) 468-5700
    BY:  MATTHEW DENN, ESQ.
18  matt.denn@dlapiper.com
    Attorneys for Business Insurance Holdings Inc.
19
    DLA PIPER
20  1251 Avenue Of The Americas
    New York, New York 10020
21  BY:  DAVID TONER, ESQ.
    dtoner@dlapiper.com
22  (212) 335-4500
    Attorneys for Business Insurance Holdings Inc.
23
    ALSO PRESENT - GEORGE ELLIS, Videographer, LINDA
24  HOHN, In-House Counsel for the Institutes, CAROLE
    ACUNTO
25
```

**Page 4**

```
 1            I N D E X
 2
 3
       W I T N E S S
 4
    Testimony of:
 5
 6  ADAM POTTER                    PAGE NO.
 7
    EXAMINATION BY MR. HAYES          7
 8  EXAMINATION BY MR. OPRISON:      121
    EXAMINATION BY MR. HAYES:        196
 9
10
11
12           E X H I B I T S
13  NUMBER         DESCRIPTION         PAGE
14
    Exhibit      Institutes0010863      22
15  Potter-1     through Instituees10867
    Exhibit      Asset Purchase Agreement 34
16  Potter-2
    Exhibit      Asset Purchase Agreement 38
17  Potter-3     Schedules
    Exhibit      BIH-003-006043 through  58
18  Potter-4     BIH-003-006046
    Exhibit      Stock Purchase Agreement 60
19  Potter-5
    Exhibit      BIH-003-006434          63
20  Potter-6
    Exhibit      BIH-003-005895 through  68
21  Potter-7     5897
    Exhibit      BIH-003-005875 to       71
22  Potter-8     BIH-003-005876
    Exhibit      BIH-002-003715 through  74
23  Potter-9     BIH-002-003718
    Exhibit      Email, March 19, 2019   76
24  Potter-10
    Exhibit      BIH-003-005616          77
25  Potter-11
```



ADAM POTTER VOLUME II                                        June 16, 2021
AIFCPCU V POTTER                                                  33—36

Page 33
1  events because we already did that.
2       Q.     My question is:  Did you ask that
3  that language specifically also call out conferences
4  in addition to newsletters?
5       A.     Did I specifically ask for that?
6       Q.     Yes.
7       A.     No.
8       Q.     What do you understand, if you have
9  any understanding at all, of what live delivery
10  means?
11      A.     People attending events and
12  conferences in person.
13      Q.     Did you have any objection to
14  agreeing to a covenant not to compete?
15      A.     As long as it was specific enough,
16  no, because I ended up signing one, so no.
17      Q.     You understood why the Institutes
18  would want a covenant not to compete from you and
19  your companies, correct?
20          MR. TINTNER:  Object to the form.
21      A.     Do I understand why?
22      Q.     Yeah.
23      A.     Yeah, I didn't have -- I never had an
24  intent to compete with -- not compete with them.  I
25  don't want to compete with them.

Page 34
1       Q.     Do you agree that Business Insurance
2  is uniquely situated to compete against the CLM
3  because of the prior affiliation?
4          MR. TINTNER:  Object to the form.
5          MR. OPRISON:  Objection to the form.
6      A.     No.
7          Before we start reviewing this, can I
8  take a quick literally two-minute bathroom break?
9       Q.     Sure.
10          THE VIDEOGRAPHER:  Okay.  We're going
11  off the record.  The time is 11:02.
12          (A brief recess was taken.)
13          THE VIDEOGRAPHER:  We are now back on
14  the record.  The time is 11:06.
15          (Exhibit Potter-2, Asset Purchase
16          Agreement, was marked for Identification by
17          the court reporter.)
18  BY MR. HAYES:
19      Q.     Okay.  Mr. Potter, hopefully on the
20  screen share there is the -- a copy of the Asset
21  Purchase Agreement with the Institutes.
22          Is that there?
23      A.     Yes.
24      Q.     And we're going to mark that as
25  Exhibit 2.  And again, I think you still have the

Page 35
1  ability to scroll through if you would like.  This is
2  a long document, but if you want to scroll through
3  it, go ahead.
4      A.     No, I'm familiar with it, generally.
5      Q.     I'm going to direct your attention to
6  Section 12.
7          Do you recognize that as specifically
8  6.12(a) as the noncompetition provision, correct?
9      A.     Correct.
10      Q.     And then that provision applies to
11  each selling party, correct?
12      A.     Correct.
13      Q.     Okay.  And the selling party is
14  defined in the agreement, correct?
15      A.     I believe it's in the definitions.
16      Q.     Right.  Okay.  And it provides that
17  the -- neither any selling party nor its affiliates
18  shall directly or indirectly anywhere in the United
19  States conduct, manage, operate, engage in or have an
20  ownership interest in any business or enterprise,
21  engage in any activities that are otherwise
22  competitive with any of the Sellers' Businesses as
23  conducted on the Closing Date, except that during the
24  Noncompete Period any Selling Party or any other
25  party listed on Schedule 6.12, may undertake the

Page 36
1  activities set forth on 6.12 attached hereto.
2          Did I read that correctly?
3      A.     Approximately.  You made some
4  prepositions in some words, but, yes, approximately.
5      Q.     And you agreed to that provision,
6  correct?
7      A.     Yes.
8      Q.     And the language of the noncompete
9  says:  Except that, during the Noncompete Period, any
10  Selling Party or any other party listed on Schedule
11  6.12 may undertake the activities set forth on
12  Schedule 6.12 attached hereto, correct?
13          That was word for word, right?
14      A.     In that part of the sentence, yes.
15      Q.     And so you understood that the only
16  competitive activities in which you or any of your
17  company -- any selling party could engage during the
18  noncompete period were those activities set forth on
19  Schedule 6.12?
20      A.     No.
21      Q.     So your understanding is you or any
22  of the selling parties could engage in activities
23  that were competitive with the CLM's business that
24  were not set forth in Schedule 6.12?
25      A.     I -- I'm sorry.  I don't think I



**ADAM POTTER VOLUME II**
**AIFCPCU V POTTER**

June 16, 2021
61–64

Page 61

1    Q.    And what stock of what entity was
2    being sold?
3    A.    Business Insurance Holdings, Inc.
4    Q.    And what entity was Business
5    Insurance Holdings, Inc.?
6    A.    I don't under -- it was the -- it was
7    the entity. I was Business Insurance Holdings, Inc.
8    I don't understand the question.
9    Q.    When was Business Insurance Holdings,
10   Inc., formed?
11   A.    I'm not -- I don't know the exact
12   date.
13   Q.    When approximately was it formed?
14   A.    July -- June, midsummer of 2018,
15   approximately.
16   Q.    For what purpose was that entity
17   formed?
18   A.    It was the -- I don't understand
19   the --
20   Q.    Okay.
21   A.    I'm sorry. I don't understand. What
22   do you mean why was it -- I don't understand.
23   Q.    I said for what purpose was that
24   entity formed?
25   A.    It was formed to operate Business

Page 62

1    Insurance --
2    Q.    Okay.
3    A.    -- as defined in the agreement.
4    Q.    Did you change the name of C&E
5    Management & Planning, comma, Inc.?
6    A.    Yes.
7    Q.    What was the change name?
8    A.    What was it changed to?
9    Q.    Yes.
10   A.    Business Insurance Holdings, Inc.
11   Q.    And that is the entity that was
12   purchased pursuant to the Stock Purchase Agreement,
13   Exhibit 5, correct?
14   A.    Yes.
15   Q.    When did you first contemplate
16   undertaking a cannabis conference?
17   A.    In 2019.
18   Q.    Okay.
19   A.    I believe.
20   Q.    At that time, had you decided to sell
21   Business Insurance Holdings, Inc.?
22   A.    No.
23   Q.    Okay. Were you contemplating selling
24   it at that point in time?
25   A.    Yes.

Page 63

1    Q.    Okay. When did you first contemplate
2    selling Business Insurance Holdings, Inc.?
3    A.    I can't tell you the year. I don't
4    know.
5    Q.    Was it prior to the time that you
6    sold -- of the asset sale for the CLM entities?
7    A.    No.
8    Q.    Okay. So it was sometime between
9    June of 2018 and when you began -- and when you sold
10   the entity?
11   A.    Correct.
12   Q.    On your screen share, there's a
13   document, the first page of which at the top is an
14   email from Gavin Souter to you dated February 28th of
15   2019?
16   A.    Yeah.
17   Q.    And we'll mark that as Exhibit 6.
18       (Exhibit Potter-6, BIH-003-006434,
19       was marked for Identification by the court
20       reporter.)
21   BY MR. HAYES:
22   Q.    As Bates stamps numbers -- I should
23   say number, BIH-003-006434. Again, you have -- the
24   have the ability to control the screen if you want to
25   look through it to identify this document, please,

Page 64

1    sir.
2    A.    Hold on. Okay.
3    Q.    Can you identify the document,
4    please, Exhibit 6.
5    A.    I'm sorry. Are you waiting to are me
6    for something?
7    Q.    I asked you if you could identify the
8    document.
9    A.    Oh, I'm sorry. Okay. Yes, this is
10   an email from Gavin Souter who was the Business
11   Insurance -- who is the Business Insurance editor to
12   myself.
13   Q.    What was the purpose of this email --
14   did you request the information in this email?
15   A.    Yes.
16   Q.    And why did you request that
17   information?
18   A.    Because we wanted to expand.
19   Q.    I'm sorry. Who wanted to expand?
20   A.    The organization. I wanted the
21   organization to expand.
22   Q.    I didn't hear you. When you say --
23   A.    Yeah, I -- I'm sorry?
24   Q.    When you say "expand," what
25   specifically do you mean?



ADAM POTTER VOLUME II
AIFCPCU V POTTER

June 16, 2021
65–68

Page 65

1     A.     I asked Gavin to look at other
2  conferences that we could start within the insurance
3  industry that weren't in existence today or what
4  other areas we could acquire within the insurance and
5  risk management space.
6     Q.     So I take it you understood
7  Mr. Souter researched different topics that might be
8  addressed in the conference?
9     A.     Yes.
10     Q.     And one of those was cannabis?
11     A.     Yes.
12     Q.     There was a number of other potential
13  conferences, for instance, M&A liability, but you
14  elected to pursue a cannabis and intellectual
15  property conference?
16     A.     Yes.
17     Q.     What influenced you to select those
18  topics, rather than some of the other ones that were
19  identified?
20     A.     Well, the workers' comp, some of the
21  areas that he talked about in Workers' Comp related
22  to claims and I knew I couldn't do that, so I didn't
23  want to touch anything that would be competitive to
24  the CLM.  But I knew that CLM did not have a cannabis
25  conference, an M&A liability or whatever the third

Page 66

1  one was or an intellectual property conference
2  because it didn't relate to claims and litigation
3  management.
4     Q.     Well, there certainly wouldn't be
5  issues in intellectual property about claims and
6  litigation management, correct?
7     A.     No.
8     Q.     Oh, okay.  So you don't have to
9  manage claims and litigation in intellectual
10  property?
11     A.     That's not the area we were going to
12  focus on in the conference, it wasn't going to relate
13  to claims and litigation management.
14     Q.     What were the areas in which you were
15  going to focus on intellectual property?
16     A.     I don't -- I can't answer that.  I
17  don't know.  All I know is I specifically said we
18  can't have anything that competes with the CLM.
19     Q.     Did the CLM have a mergers and
20  acquisition conference?
21     A.     No.
22     Q.     Would you consider the cannabis
23  conference to be a specialty conference?
24     A.     No.
25     Q.     It's not?  What do you understand the

Page 67

1  specialty conference?
2     A.     A specialty conference was a term
3  that we used only for the CLM because we had
4  different types of conferences.
5     Q.     But the specialty conferences at the
6  CLM addressed specific topics, correct?  Like
7  workmen's compensation?
8     A.     Correct.  But so did the annual
9  conference.
10     Q.     At the CLM when you refer to
11  specialty conferences, you meant conferences
12  addressed to a specific topic?
13     A.     In the claims and litigation space,
14  correct.
15     Q.     So is it your testimony that the CLM
16  never addressed areas beyond claims and litigation
17  management in any of its specialty conferences?
18     A.     I -- it wasn't designed to.
19     Q.     That's not my --
20     A.     It was designed for claims and
21  litigation management professionals.
22     Q.     My question is:  Is it your testimony
23  that the CLM never addressed areas beyond claims and
24  litigation management in any of its specialty
25  conferences?

Page 68

1     A.     I don't recall.
2     Q.     You have a document on the screen,
3  the first page at the top is an email from you to
4  among others, Dean Rocco; is that fair?
5     A.     Yes.
6         (Exhibit Potter-7, BIH-003-005895
7     through 5897, was marked for Identification
8     by the court reporter.)
9     Q.     Okay.  Can we mark that document as
10  Exhibit 7.  For the record, that is Bates stamped
11  BIH-003-005895 through 97.
12         And again, you can also control the
13  document, Mr. Potter, so if you want to scroll
14  through it --
15     A.     Okay.
16     Q.     -- and tell me if you can identify
17  that document.
18     A.     Okay.  Yes.  I can identify it.
19     Q.     What is that document, Exhibit 7?
20     A.     It's a series of emails between
21  myself, Dean Rocco and Ian Stewart of Wilson Elser.
22     Q.     To what do those emails pertain?
23     A.     It pertains to the U.S. insurance
24  awards inviting them there.  It pertains to cannabis
25  discussion and our conference strategy session for



Page 101

1  16.  It's Bates stamped BIH-001-000136 through 37.
2          THE REPORTER:  I think that's 17.
3  BY MR. HAYES:
4      Q.      And in Exhibit 17, in your email to
5  Mr. Acunto, you express concern about, quote, getting
6  this done and in all honesty may consider the higher
7  offer as there is no earn-out and they can close by
8  Wednesday.
9          What prompted your concern, quote,
10  getting this done?
11     A.      The delay in executing a contract
12  with Steve.
13     Q.      And what did you -- what did you
14  consider to be the delay?  How long had -- had the
15  negotiations been ongoing?
16     A.      Well, they started in May/June time
17  frame.
18     Q.      So did you receive offers for BIH
19  from other entities after you executed a contract
20  with Mr. Acunto or his organization?
21     A.      No.
22     Q.      These entities kept increasing their
23  offers after the contract was -- strike that.
24          You indicate in your email that you
25  are committed to, quote, keeping my agreement with

Page 102

1  you.  By August 30, was there an agreement to sell
2  BIH to Mr. Acunto?
3      A.      Yes.
4      Q.      As of the writing of this email?
5      A.      Yes.
6      Q.      Okay.  Well, then what was your
7  concern in getting it done?  Did you consider, as of
8  August 30th, you had a binding agreement with
9  Mr. Acunto?
10     A.      No, I didn't say binding agreement.
11  I said my agreement with you.
12     Q.      Did you believe you had a binding
13  agreement with Mr. Acunto?
14          MR. TINTNER:  Objection to the form.
15     A.      I had an agreement, a verbal
16  agreement with Mr. Acunto.
17  BY MR. HAYES:
18     Q.      You agreed on price?
19     A.      Yes.
20     Q.      Had you signed a nondisclosure
21  agreement with Mr. Acunto?
22     A.      I don't remember.
23     Q.      After the sale of BIH, did you
24  continue to provide any services to the organization?
25     A.      Yes.

Page 103

1      Q.      Okay.  What services did you provide?
2      A.      Transition services.
3      Q.      And what was involved in the
4  transition services?
5      A.      Showing them how to use certain
6  things.
7      Q.      I couldn't hear your answer.  I'm
8  sorry.
9      A.      I'm sorry.  Showing them how to use
10  various things.
11     Q.      Okay.  Anything else?
12     A.      I -- he sometimes would bounce ideas
13  off of me.
14     Q.      Did you have a specific commitment of
15  amount of time that you were required to provide
16  Business Insurance or Beacon International after the
17  closing?
18     A.      No.
19     Q.      Were you paid a salary or any
20  compensation?
21     A.      Compensation for what?
22     Q.      For the transition services you
23  provided to them?
24     A.      No.
25     Q.      Okay.  So the only compensation at

Page 104

1  all that you received was the sale price for those
2  transition services?
3      A.      No, because they haven't paid me yet.
4      Q.      They haven't paid you anything yet?
5      A.      They paid me some, but not what I'm
6  due.
7      Q.      So as it was intended in the
8  agreement, the only compensation you would receive
9  for the transition services was the purchase price?
10     A.      Correct.
11     Q.      How long did you continue to provide
12  transition services to Business Insurance?
13     A.      Probably -- maybe four to eight
14  weeks.  I'm guessing.  It was a short period of time.
15     Q.      Okay.  And just when was the closing?
16     A.      I believe in September of 2019.
17     Q.      So you provided transition services
18  through approximately November of 2019?
19     A.      Yes, probably even -- approximately.
20     Q.      Okay.  Did those transition services
21  in any way involve the cannabis conference?
22     A.      No.
23     Q.      Okay.  Did you participate in efforts
24  to retain Jeremy Campbell?
25     A.      Yes.



**ADAM POTTER VOLUME II**
**AIFCPCU V POTTER**

June 16, 2021
105—108

Page 105

1    Q.    Okay.  What specifically did you do?
2    A.    I was advised that Jeremy was leaving
3    to go to the CLM and I advised Steve or Steve and I
4    talked that Jeremy had a noncompete and he should
5    look at enforcing the noncompete.
6    Q.    Okay.  So when you say a
7    "noncompete," what do you mean by that?
8    A.    Well, it prevented Jeremy from
9    working at the CLM, as I understood it.
10    Q.    And how -- what's -- what was the
11    basis for that understanding?
12    A.    I read the agreement.
13    Q.    Okay.  And did the agreement
14    specifically identify the CLM or just simply identify
15    competitive entities?
16    A.    I don't recall.
17    Q.    Okay.  But you believed a non -- that
18    a noncompetition agreement applicable to Jeremy
19    Campbell would have prevented him from working for
20    the CLM?
21    A.    Yes.
22    Q.    Okay.  And of course, that would only
23    be true if the CLM and Business Insurance were
24    competing, correct?
25    A.    No.

Page 106

1    Q.    No?
2    A.    No.
3    Q.    So you understood at that time you
4    could prevent somebody from working at a
5    noncompetitive entity?
6    A.    That's what the agreement said, yes.
7    Q.    Okay.  So then it's specifically
8    identified in the CLM?
9    A.    I don't recall.
10    Q.    Okay.  Whatever the language was, you
11    concluded it precluded Jeremy Campbell from working
12    for the CLM?
13    A.    Correct.
14    Q.    You actually saw a noncompete
15    agreement?
16    A.    Yes.
17    Q.    Okay.  Involving Jeremy Campbell?
18    A.    Absolutely.
19    Q.    Just you saw an actual executed
20    noncompetition agreement for Jeremy Campbell and BIH?
21    A.    Absolutely, 100 percent absolutely.
22        (Exhibit Potter-18, BIH-003-004054,
23        was marked for Identification by the court
24        reporter.)
25    BY MR. HAYES:

Page 107

1    Q.    There should be a document up on the
2    screen share.
3        Do you see that?
4    A.    Hold on.  It might be a size fit to
5    window.
6    Q.    Yes.  Can you -- just trying to move
7    this along.  Maybe a change.  I will scan through the
8    document.
9    A.    Let me see if I can grab it; if it
10    will let me do it now.
11    Q.    Okay.
12    A.    No, I don't have view options.  I can
13    request remote control again.  Click to start.  Yeah,
14    I can access it now.
15        (Reading.)
16    A.    Okay.  Yeah, okay.
17    Q.    Okay.  Exhibit 18 is an email string
18    involving among others you and Keith Kenner at
19    Business Insurance?
20    A.    Is it 2018 or 2019?
21    Q.    2019, pardon me.
22    A.    Correct.
23    Q.    All right.  And the first email
24    chronologically in the string is from Steve Acunto to
25    Keith Kenner, asking:  What do we have on file as of

Page 108

1    Friday/Jeremy Campbell Signed Documents?
2        Do you see that?
3    A.    Yep.
4    Q.    And then Mr. Kenner forwarded that
5    email to you, right?
6    A.    Yep.
7    Q.    And he says:  Steve thinks that
8    Jeremy has a standing noncompete with BI.  However,
9    there doesn't appear to be a non-compete clause in
10    Jeremy's BI employment document.  Only
11    confidentiality.
12        He asked that you "please advise,"
13    right?
14    A.    Yep.
15    Q.    And you asked him to call you to
16    discuss it in reply, correct?
17    A.    Correct.
18    Q.    Did you discuss that with Mr. Kenner?
19    A.    Yes.
20    Q.    Did you ever point him to where there
21    was a noncomp -- noncompete involving Jeremy
22    Campbell?
23    A.    Yes.
24    Q.    Where?
25    A.    In his personnel file.



**ADAM POTTER VOLUME II**
**AIFCPCU V POTTER**

June 16, 2021
113—116

Page 113

1  Mr. Acunto, you were providing him advice or comments
2  with respect to the operations of BIH?
3      A.    No.
4      Q.    No?  What was the substance -- what
5  was the purpose of your email?
6      A.    It was his email to me.
7      Q.    The top email is from you to him, is
8  it not?
9      A.    That was my reply, correct?
10     Q.    I'm sorry.  You broke up.  What did
11 you say?
12     A.    That was my reply.
13     Q.    And so he asked you to put him in
14 contact with two potential resources for Business
15 Insurance, right?
16     A.    Correct.
17     Q.    He asked you a series of other
18 questions, correct?
19     A.    No, I think the other stuff was just
20 an FYI is what he says.
21     Q.    So you comment on that and my
22 question is:  Why did you comment on that?
23         MR. OPRISON:  Objection to the form.
24     A.    I answered his question that he asked
25 me.

Page 114

1  BY MR. HAYES:
2      Q.    Okay.
3      A.    He initially asked me a question in
4  his email.  I gave him the answer.  But I didn't
5  comment on the FYI.
6      Q.    And what was WC central?
7      A.    Is workers' compensation comp
8  central.
9      Q.    That's an independent organization?
10     A.    Correct.
11     Q.    Did you introduce Sydney Posner to
12 Mr. Acunto?
13     A.    I provided Sydney -- I provided Steve
14 with Sydney's information, correct.
15     Q.    What caused you to do that?
16     A.    Steve -- Jeremy left and they --
17 Institutes wrongly fired Sydney and Sydney needed a
18 job and was a great resource.  So I introduced the
19 two of them -- or I didn't introduce them.  I
20 provided Steve with Sydney's information.
21     Q.    Were you aware of any -- did you
22 participate in any meetings or conversations between
23 Ms. Posner and Mr. Acunto?
24     A.    Regarding what?
25     Q.    Anything.

Page 115

1      A.    Was I involved with any meetings or
2  was I there?  I was there.
3      Q.    What meetings were you, quote, there?
4      A.    Well, Sydney is my sister and she
5  came up to have meetings with Steve.  I had meetings
6  with Steve, so I had my meetings with Steve and then
7  Sydney had her meetings with Steve.
8      Q.    I'm asking you, did you
9  participate -- were you actually in the room for
10 those meetings?
11     A.    No.
12     Q.    No?  Okay.  What were your meetings
13 with Steve about?
14     A.    Transitions.
15     Q.    What specifically with respect to
16 transition?
17     A.    I don't remember.
18     Q.    Back to my original question.
19         Did you directly participate in any
20 meetings or communications between Mr. Acunto and
21 Ms. Posner?
22         MR. TINTNER:  Objection to the form.
23     A.    Participate, no.
24     Q.    Did you have any discussions with
25 Mr. Acunto about his meetings with Ms. Posner?

Page 116

1      A.    Don't recall.
2      Q.    Do you recall, when -- what time
3  frame Ms. Posner came up to meet with Steve?
4      A.    It would have been after she was
5  wrong any terminated.  I'm guessing in the fall.
6      Q.    And what's your basis for saying
7  Ms. Posner was wrong any terminated?
8      A.    Based on what I've heard.
9      Q.    Okay.  From whom?
10        THE REPORTER:  Sorry?  Counsel, what
11 did you ask?
12     Q.    From whom?
13        MR. TINTNER:  Objection to the extent
14 it may ask for privileged communications.  But other
15 than privileged communications, he can answer the
16 question.
17     A.    I think there were a number of people
18 in the industry.
19     Q.    Who?
20     A.    I don't some were advisory board
21 members.  I don't remember exactly which ones and
22 also Sydney -- my sister Sydney as well.
23     Q.    Can you identify any of the advisory
24 board members?
25     A.    I don't remember which ones, no.  But



ADAM POTTER VOLUME II                                      June 16, 2021
AIFCPCU V POTTER                                                121–124

Page 121

1  EXAMINATION BY MR. OPRISON:
2          THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 2:50.
4      Q.    Mr. Potter.  My name is Chris
5  Oprison.  I represent Business Insurance Holdings,
6  Inc.  I'm not going to cover what -- a lot of what
7  has already been covered this morning by Mr. Hayes
8  but I do want to cover some new topics or topics that
9  hadn't been covered as fulsomely as we would like
10 them to be.
11         But before we start that out, do you
12 understand that you're still under oath, sir?
13     A.    Yes.
14     Q.    So I'd like to -- we talked when
15 Mr. Hayes was questioning you earlier he was asking
16 you a little bit about the summer period of July and
17 August of 2019.  I'd like to actually talk to you
18 about those cease and desist letters.
19         Do you recall in -- in July 2019
20 receiving a cease and desist letter from the
21 Institutes?
22     A.    Correct, yes.
23     Q.    Prior to that, though, how long had
24 you been planning the cannabis and hemp conference?
25     A.    I want to say it was beginning of the

Page 122

1  year and then it was announced, I want to say in
2  April.
3      Q.    And when you say "announced," was it
4  advertised to the members and the fellows of CLM?
5      A.    No.  For Business Insurance you mean?
6      Q.    Oh, I'm sorry, for Business
7  Insurance, correct, yeah.
8      A.    Yes, it would have been announced to
9  a subset.  I don't know who got the announcement,
10 but, yes.
11     Q.    And in what form would those
12 advertisements or marketing take?  Were they
13 electronic, on the website, mailers?
14     A.    I don't recall -- I mean, I wasn't
15 responsible for it.  So I don't know.
16     Q.    Who was responsible for advertising
17 for the cannabis and hemp conference to be held in
18 October of 2019?
19     A.    Well, we have -- there's three
20 different aspects.  We have promotion of the event
21 and marketing and that would be Katy Kett and Brian
22 McGann.  You have -- I guess two aspects and the
23 second one would be sponsorships and that would have
24 been Jeremy Campbell.
25     Q.    As far as promotions by Ms. Kett and

Page 123

1  Mr. McGann, if you know -- did you direct their
2  activities or how -- are you aware of how they went
3  about promoting the conference?
4      A.    No, I'm not aware.
5      Q.    Was there a -- an advertisement on
6  the Business Insurance website about the conference
7  coming up?
8      A.    Yes.
9      Q.    Did it permit individuals to sign up
10 and register for the conference through the website?
11     A.    Yes.
12     Q.    Did it have a pay portal so that
13 anybody registering could pay electronically through
14 the website?
15     A.    I believe so.
16     Q.    Do you have an understanding --
17     A.    I'm not sure because -- at the -- I
18 don't know when we converted over.  So I'm not sure,
19 but I -- I believe so, but I'm not sure.
20     Q.    How else would perspective
21 registrants or individuals who are looking to attend
22 this conference pay the registration fees?
23     A.    Previously, they went through a very
24 convoluted process before I bought it and I don't
25 remember -- once I bought it, I don't remember when

Page 124

1  we converted.  Our prior process was they would
2  either send an email or register online, but it
3  wasn't a real registration until it was confirmed who
4  that person was.
5          Once it was confirmed who that person
6  was, then they would write back and allow them to,
7  you know, really register, if you will and take their
8  money.
9      Q.    As of -- did you have an
10 understanding of what the -- well, strike that.
11         You looked at a document earlier that
12 Mr. Hayes showed you that had a -- levels or tiers of
13 registration categories and registration fees.
14         Do you recall that?
15     A.    Correct, yes.
16     Q.    That was -- as I recall, you
17 testified those were proposed registration fee rates
18 that Ms. Kett was -- was proposing, right?
19     A.    I don't know who was proposing them.
20 I know that they were being proposed.
21     Q.    Do you recall whether or not
22 something similar to those tiers went into effect and
23 were implemented for the central registrants?
24     A.    I don't know when it went into effect
25 actually, no.



ADAM POTTER VOLUME II                                      June 16, 2021
AIFCPCU V POTTER                                              169–172

Page 169
1  Do you know when in that time period leading up to
2  closing that you had these conversations with the
3  Acuntos?
4      A.    No.
5      Q.    Do you recall specifically reaching
6  out to the Acuntos to let them know that this was a
7  potential issue with the conference for the entity
8  they were looking to buy?
9      A.    Absolutely.
10     Q.    What did you tell them?
11     A.    We are hosting a cannabis and hemp.
12 The Institutes believe it's a violation of my
13 noncompete.  My attorney and I don't see it the same
14 way and we are -- we're taking care of the situation.
15     Q.    Did you ever send the Acuntos a copy
16 of the Asset Purchase Agreement or at least a copy of
17 the noncompete in that agreement to them prior to the
18 closing for the purchase of BIH?
19     A.    I don't recall.
20     Q.    But you did give them assurances that
21 the manner in which the conference was being promoted
22 and the sessions that would be hosted there would be
23 in compliance with the noncompete, correct?
24     A.    Well, I wouldn't phrase it that way.
25 I gave him assurances that the conference was not in

Page 170
1  violation of my noncompete.
2      Q.    Did you also give them assurances
3  that the noncompete did not apply to BIH?
4      A.    Correct.
5      Q.    What did you base that on?
6      A.    My understanding of the SPA -- of the
7  APA.
8      Q.    Did you represent to them that the
9  noncompete only applied to you personally and not to
10 BIH?
11     A.    The noncompete... I believe so but
12 don't recall explicitly when.
13     Q.    Can I have you pull up Tab 50?  This
14 is the Stock Purchase Agreement --
15     A.    Yep.
16     Q.    -- for the sale of BIH bearing Bates
17 numbers BIH-003-003885 through 003911.
18         Do you recognize this document?  It's
19 going to be marked as Exhibit -- BIH Exhibit 50, 5-0?
20     A.    Yes.
21     Q.    Is this the Stock Purchase Agreement
22 that was executed by yourself and the Acuntos on
23 behalf of Beacon and/or Continental?
24     A.    I thought it was just Steve Acunto
25 but I have to look at the bottom of the agreement.

Page 171
1          (Exhibit BIH-50, BIH-003-003885
2          through BIH-003-003911, was marked for
3          Identification by the court reporter.)
4  BY MR. OPRISON:
5      Q.    I believe that's right.  Let me ask
6  you to turn to the second -- it's the page bearing
7  Bates number 3909.  I don't know where it is in the
8  PDF.  Should be towards the end, the fourth page
9  towards the end.  It's Schedule 3.09 entitled
10 Litigation/Judgments.
11     A.    3.09, yes.
12     Q.    This -- do you recognize this as a
13 schedule that identified the litigation or potential
14 litigation with the Institutes?
15     A.    Yes.
16     Q.    And I'm going to read this into the
17 record.  It says:  In June 2018, Adam Potter sold
18 three companies to the Institutes.  The agreement
19 contained a noncompete for Adam Potter personally,
20 however Business Insurance is not part of the
21 agreement.  Let me just stop right there.  It
22 identifies you as being -- as having the noncompete
23 apply to you personally.  However Business Insurance
24 is not part of the agreement.  By Business Insurance,
25 we're referring to Business Insurance Inc., right,

Page 172
1  Business Insurance Holdings, Inc., not the LLC,
2  correct?
3      A.    You know, I drafted this and I was
4  referring to the operations of Business Insurance.
5      Q.    For the entity -- for the Inc., for
6  the C Corporation?
7      A.    I wasn't -- I wasn't differentiating
8  between Inc., LLC.  I was saying Business Insurance
9  operations.
10     Q.    When you say:  The noncompete -- the
11 agreement contained a noncompete for Adam Potter
12 personally, you also understood at the time you
13 drafted this that this applied to other entities that
14 you owned at the time, correct?
15     A.    Yes.
16     Q.    One entity that was not subject to
17 the noncompete in your view was Business Insurance or
18 Business Insurance operations, correct?
19     A.    Correct.  Was not part of any
20 noncompete.
21     Q.    Was not part of the noncompete,
22 right.  And why did you draw that conclusion?  On
23 what basis did you make that assertion here?
24     A.    Because as long as I was involved
25 with the -- with BI, as I understood the agreement,



ADAM POTTER VOLUME II
AIFCPCU V POTTER

June 16, 2021
173–176

Page 173

1  as long as I owned BI I could and couldn't do certain
2  things. It specifically allowed for me to do certain
3  things with BI, the agreement. But once I sold BI,
4  BI could do whatever -- you know, it's under my
5  direction, control, all those other nice words. BI
6  could do whatever they wanted to do.
7      Q.    Was it your understanding then that
8  when BI or Business Insurance Holdings changed
9  ownership from you to Beacon, that whatever
10  restrictions applied -- might have applied before
11  that would not apply to the new ownership? Was that
12  your understanding?
13         MR. HAYES: Object to the form.
14     A.    Yeah.
15  BY MR. OPRISON:
16     Q.    And why did you -- on what basis did
17  you develop that understanding?
18     A.    Presidents because Business Insurance
19  wasn't, you know, a seller to the Institutes.
20  Basically, as I understood the agreement, I was
21  allowed to continue to operate Business Insurance
22  because I had owned it for many years prior.
23     Q.    It would do certain permitted
24  activities but there were other activities that were
25  not permitted, correct?

Page 174

1      A.    I don't know if it specifically
2  culled out nonpermitted activities. It talked about
3  things I wasn't allowed to do.
4      Q.    But those activities, those events or
5  activities that you were not allowed to do, was it
6  your understanding based on your understanding at the
7  time you executed the APA, that those would not apply
8  if ownership ever changed hands?
9         MR. HAYES: Object to the form.
10     A.    Absolutely. I'm sorry. Absolutely.
11  BY MR. OPRISON:
12     Q.    I'm going to go and read the next
13  part of this, it says: The Institutes allege Adam
14  Potter violated the noncompete by creating a cannabis
15  and hemp conference and an intellectual property
16  conference. Counsel retained disagree with the
17  Institutes' position and there has been dialogue
18  between the parties. We remain confident there's a
19  violation and took proactive steps to clarify the
20  intended conference attendees.
21         Do you see that?
22     A.    Yes.
23     Q.    This -- do you know whether -- by
24  reading this, do you have a recollection of when you
25  drafted this language from Schedule 3.09?

Page 175

1      A.    I do not.
2      Q.    Do you know whether or not it came
3  after the filing of the Complaint by the Institutes?
4      A.    It couldn't have, I don't believe.
5      Q.    Do you recall receiving -- or having
6  the Complaint, the original Complaint filed on August
7  28, 2019?
8      A.    Are you asking when I received it or
9  did I receive the Complaint?
10     Q.    When did you learn about the
11  litigation -- the commencement of the litigation?
12     A.    I believe it was after close of
13  Business Insurance.
14     Q.    So after September 3rd is when you
15  found out about the filing of the Complaint?
16     A.    Yes.
17     Q.    When you say here that -- when you
18  say here the Institutes allege Adam Potter, are you
19  referring to allegations in the original Complaint or
20  are you referring to something else?
21     A.    I'm referring to the letters.
22     Q.    But you don't have a specific
23  recollection of when, in August that you drafted this
24  Section 3.09?
25     A.    I do not.

Page 176

1      Q.    Do you have a recollection of whether
2  or not -- or how close in time it was to the closing?
3      A.    I don't.
4      Q.    Were there drafts exchanged back and
5  forth of this Schedule 3.09 between you and
6  Mr. Acunto?
7      A.    I don't recall.
8      Q.    You also agreed, based on the fact
9  that there is potential litigation, to indemnify
10  Beacon Intercontinental should there be any
11  litigation relating to the allegations of violation
12  of the noncompete.
13         Do you recall that? I think your
14  connection is loose, Mr. Potter?
15     A.    I'm sorry?
16     Q.    Did you hear my question?
17     A.    I'm sorry, my connection is unstable.
18     Q.    Yeah, you're freezing and unfreezing?
19     A.    Yeah, see if it works. Is that
20  better now?
21     Q.    Yeah. Let me ask you the question
22  again.
23         You agreed, based on the fact that
24  there was potential litigation, to indemnify Beacon
25  Intercontinental, should there be any litigation



# Exhibit G

## Schedule A

Schedule A

Sellers' Businesses

"CLM Business"

A professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies. CLM offers the following products and services:

1. Claims College creates and teaches courses for the College's eleven specialty schools; issues certificates, and CCP/ACP designations
2. Litigation Management Institute (LMI) is a certification program for Certified Litigation Management Professional (CLMP), and will also be offering a second designation titled LMI2 as an advanced course.
3. CLM Tracker tracks and renews adjuster's continuing education and licenses, including an auto-renewal function.
4. Universal Claims Certificate (UCC) is scheduled to launch on July 1, 2018. The UCC was developed with the most stringent requirements and regulations for each state. The UCC includes a pre-certification course and examination. Mandatory pre-licensing courses and exams will be waived for states that recognize the UCC. Registration and payment of state fees will be managed by a single, centralized system that connects to state systems.
5. Annual Conference is an annual event for professionals in the claims and litigation management industries, featuring educational sessions and networking.
6. Specialty Conferences including: Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI, and Chief Claims Officer Summit.
7. Magazines including (both digital and print formats): CLM Magazine, clmmag, theclm.org, Professional Times Magazine, and Construction Claims Magazine
8. Chapter Events Local networking and educational events are held around the country each year. These events are provided at no cost to the attendees and offer a combination of an educational session and a networking event
9. Webinars Hosts webinar topics, ranging from Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals
10. Training Sessions Hands-on training sessions all approved for adjuster CE credits
11. CLM Wiki Repository of valuable claims handling resources organized by state, including claims and legal resources, and construction rip and tear cases

"C & E Business"

An event planning company that manages all of CLM's events.

50016v11

"CP Business"

A reference source for insurance adjusters and other claim professionals, and service providers, to connect those professionals with vendors, resources and tools, including industry news, videos, documents, forms, tools, industry event calendars, career listings and other resources; maintains related databases including without limitation, service providers, claims associations, courthouses, prosecuting attorneys and fire and police departments, and, more specifically:

1. FOR CLAIMS PROFESSIONALS: CP provides documents, worksheets, letter templates, insurance forms and calculators – all designed to help claims professionals be more effective.
2. FOR ATTORNEYS AND SERVICE PROVIDERS: Claims professionals come to the CP website to access the thousands of tools and resources CP makes available to them, and they also search CP's industry-leading directories in more than 300 categories to find the right attorney or service provider they need on specific claims.
3. PROVIDER DIRECTORY: With more than 7.8 million providers in CP's database, and more than 15,000 highlighted vendor profiles, CP's advanced search tools help claims professionals find the right provider at the right time on the right case.
4. NEWS AND INDUSTRY CALENDARS: CP provides industry-leading newsletters, career listings, industry event calendars and industry statistic listings for the claims professional.

50016v11

# Exhibit H

**Potter DE-000031-32**

Section 6.10    <u>Transition and Cooperation; Further Assurances</u>.  From and after the Closing, the Parties shall: (a) cooperate reasonably with each other to transfer to Buyer the control and enjoyment of the Sellers' Businesses and the Acquired Assets; and (b) not take any action, directly or indirectly, alone or together with others, which obstructs or impairs the assumption by Buyer of the Sellers' Businesses and the Acquired Assets.  After the Closing, the Selling Parties shall promptly deliver to Buyer all correspondence, papers, documents and other items and materials received by any of them or found to be in any of their possession which pertain to the Sellers' Businesses or the Acquired Assets (other than any Excluded Assets).  Each Party shall, from time to time on being reasonably requested to do so by the other Party, now or at any time in the future, take all commercially reasonable actions necessary to do or procure the doing of all such acts and/or execute or procure the execution of all such documents, at the sole cost and expense of the requesting Party, in a form reasonably satisfactory to the other Party as the other Party may reasonably consider necessary for giving full effect to this Agreement and securing to the other Party the full benefit of the rights, powers and remedies conferred upon the other Party in this Agreement.

Section 6.11    <u>Confidentiality</u>.   Each Selling Party shall, and shall cause its respective affiliates and representatives to, keep confidential and not disclose to any other Person or use for its own benefit or the benefit of any other Person any confidential proprietary information, technology, know-how, trade secrets (including all results of research and development), product formulas, industrial designs, franchises, inventions or other intellectual property regarding any Seller or Seller's Business ("<u>Confidential Information</u>") in its possession or control.   The obligations of the Selling Parties under this <u>Section 6.11</u> shall not apply to Confidential Information which (a) is or becomes generally available to the public without breach of the commitment provided for in this Section or (b) is required to be disclosed by Laws of a court or tribunal or Governmental Entity; <u>provided</u>, <u>however</u>, that, in any such case, any Selling Party subject to such requirement shall notify Buyer as early as reasonably practicable prior to disclosure to allow Buyer to take appropriate measures to preserve the confidentiality of such Confidential Information.   Notwithstanding the foregoing, and subject to maintaining confidentiality of same as set forth in this <u>Section 6.11</u>, Moxie and Adam Potter are permitted to use, solely in connection the Permitted Activities, such know-how included in the Confidential Information that is currently used by the Selling Parties outside of the Sellers' Businesses.

Section 6.12    <u>Non-Compete</u>.

(a)      During the period beginning on the Closing Date and ending the fifth (5th) anniversary of the Closing Date (the "<u>Non-Compete Period</u>"), each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on <u>Schedule 6.12</u> attached hereto (collectively, the "<u>Permitted Activities</u>").

(b)      With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of

LEGAL\36402379\4

Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

(c)      During the Non-Compete Period, each Selling Party shall not, and shall cause its affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any employee or independent contractor to leave the employ of Buyer, or engagement by Buyer, for any reason whatsoever, nor shall any Selling Party or any of their affiliates offer or provide employment to (whether such employment is for Seller or any other business or enterprise), or engage, either on a full-time basis or part-time basis, any Person who then currently is, or who within six months immediately prior thereto was, an employee or independent contractor of Buyer or any of the Companies; provided, however, that this prohibition shall not apply to general solicitations not directed at any employees or independent contractors or in the event of any initial contact being made by any employee or independent contractor.  Buyer acknowledges that, on and after the Closing Date, there will be independent contractors engaged part-time with both Parent or Buyer and with a Selling Party or an affiliate of a Selling Party, and that such engagement does not violate this Section 6.12(c); provided, however, that each Selling Party hereby agrees not to, and shall cause its affiliates not to, directly or indirectly, solicit or induce, or attempt to solicit or induce, any such independent contractor to leave its engagement with Parent or Buyer during the Non-Compete Period.

(d)      Each Selling Party acknowledges and agrees that the provisions of this Section 6.12 are reasonable and necessary to protect the legitimate business interests of Buyer and its investment in the Acquired Assets.  Each Selling Party shall not contest that Buyer's remedies at law for any breach or threat of breach by any Selling Party or any of its affiliates of the provisions of this Section 6.12 will be inadequate, and that Buyer shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Section 6.12, without proving actual damages, and to enforce specifically such terms and provisions, in addition to any other remedy to which Buyer may be entitled at law or equity.  The restrictive covenants contained in this Section 6.12 are covenants independent of any other provision of this Agreement or any other agreement between the parties hereunder and the existence of any claim which any Selling Party may allege against Buyer under any other provision of the Agreement or any other agreement will not prevent the enforcement of these covenants.

(e)      If any of the provisions contained in this Section 6.12 shall for any reason be held to be excessively broad as to duration, scope, activity or subject, then such provision shall be construed by limiting and reducing it, so as to be valid and enforceable to the extent compatible with the applicable Laws or the determination by a court of competent jurisdiction.

(f)      In the event of a breach by any Selling Party of any covenant set forth in Sections 6.12(a), (b) or (c) of this Agreement, the term of such covenant will be extended by the period of the duration of such breach.

Section 6.13    Conduct of Business Post-Closing. From the Closing Date through the one (1) year anniversary thereof, Buyer shall not take any action (or omit to take any action) for the purpose or with the intent to eliminate or reduce the amount of the Subsequent Purchase Price.  If Buyer sells Sellers' Businesses to an unaffiliated third party (whether by means of asset

# Exhibit I

**BIH-001-000545; BIH-001-000673; BIH-001-000559; BIH-001-000613-14**

| | |
|---|---|
| **Date:** | Wednesday, September 4 2019 11:01 AM |
| **Subject:** | RE: Ian Steward/ Steve Acunto |
| **From:** | Steve Acunto <sa@cinn.com> |
| **To:** | Adam Potter <adam.potter@businessinsurance.com>; Ian Stewart <Ian.Stewart@wilsonelser.com>; |
| **CC:** | Stephen Acunto <sacunto@mac.com>; |

Thank you, Adam.

Ian,

As a long time friend of WEMED (late Arnie Kideckel, in particular, but also Jon Bing, Jim Corcoran – both long gone from the firm)  – and as a sometime client in Westchester office (Dave Tillem -ret.-and now Dan Fix) it would be a pleasure – let us plan a get together, including Steve Jr. who will be working with me on Conferences.

Perhaps 4"00 PM on the 18th at the Union League Club 37th at Park for a cocktail?

Steve

**From:** Adam Potter <adam.potter@businessinsurance.com>
**Sent:** Wednesday, September 4, 2019 9:47 AM
**To:** Ian Stewart <Ian.Stewart@wilsonelser.com>
**Cc:** Steve Acunto <sa@cinn.com>
**Subject:** introduction

Steve,

I would like to introduce you to Ian Steward with Wilson Elser.  Ian is the cannabis expert and was the force behind the BI Cannabis & Hemp conference.  He formed the board, personally worked on the agenda and secured the speakers.  Wilson Elser is a Founding Partner for the conference and Ian is a great asset to the company.

Once the dust settles a bit, it would be good for the two of you to connect.

Thanks,

Adam Potter
(212) 724-2345

CONFIDENTIAL

**Date:**     Thursday, November 14 2019 09:43 PM
**Subject:** Cannabis and Hemp Conference
**From:**     Adam Potter <adam.potter@businessinsurance.com>
**To:**        Brian McGann <bmcgann@businessinsurance.com>; Steve Acunto <sa@cinn.com>;
**CC:**        Steve Acunto <sa@businessinsurance.com>;

---

Hi Brian,

I hope all is well.

I am working on a project relating to the Cannabis and Hemp conference and need the first date we started promoting the conference.  This would have been done by email.  Can you please advise?

Thanks,

Adam Potter
(212) 724-2345

CONFIDENTIAL

| | |
|---|---|
| **Date:** | Tuesday, September 17 2019 12:20 PM |
| **Subject:** | FOR REVIEW Wilson Elser Sponsorship Agreement, Cannabis Conference |
| **From:** | Steve Acunto <sa@cinn.com> |
| **To:** | Adam Potter (adam.potter@businessinsurance.com) <adam.potter@businessinsurance.com>; |
| **Attachments:** | SponsorshipAgreement_WilsonElser_Cannabis19.pdf |

CONFIDENTIAL

| | |
|---|---|
| **Date:** | Friday, September 20 2019 06:12 AM |
| **Subject:** | FW: Updated Agreement for Meeting Tomorrow AV |
| **From:** | Adam Potter <adam.potter@businessinsurance.com> |
| **To:** | Brittany Collins <bcollins@businessinsurance.com>; |
| **CC:** | Steve Acunto <sa@cinn.com>; Carole Acunto <cha@businessinsurance.com>; |
| **Attachments:** | 091019_Meeting Tomorrow_Business Insurance New York 2019 Event_Updated.pdf |

Hi Brittany –

The contract looks good and I believe it is ok to sign.  It appears the company does not take credit cards and Carole will need to issue a check.

Thanks,

Adam Potter
(212) 724-2345

---

**From:** Brittany Collins <bcollins@businessinsurance.com >
**Date:** Thursday, September 19, 2019 at 6:56 PM
**To:** Adam Potter <adam.potter@businessinsurance.com >
**Subject:** Fwd: Updated Agreement for Meeting Tomorrow AV

Please advise. Use AmEx?

**Brittany Collins** | Manager, Marketing & Events | **Business Insurance**
(219) 208-1598 direct | bcollins@businessinsurance.com
www.businessinsurance.com | @BusInsMagazine
Begin forwarded message:

> **From:** Steve Acunto <sa@cinn.com>
> **Date:** September 19, 2019 at 6:38:55 PM EDT
> **To:** "bcollins@businessinsurance.com " <bcollins@businessinsurance.com >
> **Subject: Fwd: Updated Agreement for Meeting Tomorrow AV**
>
> Please send to Adam
> SA
> Steve Acunto
> Begin forwarded message:
>
>> **From:** Brittany Collins <bcollins@businessinsurance.com >
>> **Date:** September 19, 2019 at 5:38:27 PM EDT
>> **To:** Steve Acunto <sa@cinn.com >
>> **Cc:** Carole Acunto <cha@cinn.com >
>> **Subject: FW: Updated Agreement for Meeting Tomorrow AV**
>>
>> Hello Steve,
>>
>> Attached is the contract for Meetings Tomorrow, our AV provider for Cannabis and IP. Last week you approved signing this contract, however, given the recent developments with cannabis, I wanted to revisit the contract as I have not signed it yet (I worked with Maggie to adjust the screen sizes in each room, the total remains the same).

BIH-001-000613

Please advise,

Brittany

**Brittany Collins** | Manager, Marketing & Events | **Business Insurance**
(219) 208-1598 direct | bcollins@businessinsurance.com
www.businessinsurance.com | @BusInsMagazine

CONFIDENTIAL

# Exhibit J

## Steve Acunto, Sr. Deposition
## Transcript Pages

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2                          - - -
         THE AMERICAN INSTITUTE  : CIVIL ACTION NO
 3       FOR CHARTERED PROPERTY  :
         CASUALTY UNDERWRITERS    :
 4       and THE INSTITUTES,      :
         LLC                      :
 5                  Plaintiffs    :
                                  :
 6            vs.                 :
                                  :
 7       ADAM POTTER, PBIH, LLC   :
         and BUSINESS INSURANCE   :
 8       HOLDINGS, INC.           :
                    Defendants    : 1:19-cv-01600
 9
10                          - - -
                  Thursday, August 5, 2021
11
                            - - -
12          CONFIDENTIAL - ATTORNEYS' EYES ONLY
                            - - -
13
14                  Videotaped Deposition of STEVE
15       ACUNTO, SR., VOLUME I, taken pursuant to
16       notice, via Zoom videoconferencing from
17       Greenwich, Connecticut, beginning at 10:22
18       a.m., and reported stenographically by Carol
19       McAvey, Registered Professional Reporter and
20       Notary Public.
21                          * * *
22
23
                  VERITEXT LEGAL SOLUTIONS
24                   MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
25             Philadelphia, Pennsylvania 19103
```

Page 160

1          CONFIDENTIAL - ATTORNEYS' EYES ONLY

2     that's fine.

3     BY MR. HAYES:

4     Q.    So when we're talking about acquisition,

5     we're talking about the acquisition of

6     Business Insurance Holdings, Inc.; right?

7     A.    Yes.

8     Q.    Okay.  And what was the context in which

9     you heard of Ms. Posner?

10    A.    Adam and I were speaking and he alluded

11    to his sister, her experience, her plight.  I

12    use that word advisably.  He described what

13    she was experiencing as a plight and asked me

14    if I would be interested in meeting with her

15    and maybe working with her on an idea that she

16    had.

17               So being friendly, as we were,

18    and Adam was persuasive and very, very kind

19    toward his sister, Carole and I agreed to meet

20    with her.  And we did.

21    Q.    And when you met with Ms. Posner, did

22    Mr. Potter attend that meeting?

23    A.    No, he didn't.

24    Q.    Did he attend any discussions between

25    you and Ms. Posner?

# Exhibit K

**BIH-003-004199**

**Date:**   Thursday, September 26 2019 12:41 PM
**Subject:** Re: Adam / Steve - wrap up
**From:**   Adam Potter
**To:**    Steve Acunto <sa@cinn.com>;
**CC:**    Carole Acunto <cha@cinn.com>; Stephen Acunto <sacunto@mac.com>;

---

Thanks Steve.  Regarding point 3 – I can provide you with Sydney's contact info, but I can be involved in any discussions.  I have a non-compete with The Institutes which I am strictly adhering and will not violate.

Best,
Adam Potter
(212) 724-2345

---

**From:** Steve Acunto <sa@cinn.com>
**Date:** Thursday, September 26, 2019 at 11:20 AM
**To:** Adam Potter <adam.potter@businessinsurance.com >
**Cc:** Carole Acunto <cha@cinn.com>, Stephen Acunto <sacunto@mac.com >
**Subject:** Adam / Steve - wrap up

Adam:

Enjoyed the get together – let's set another shortly.

Recapping:

- Legal docs – rec'd will review on weekend.
- J Campbell – in negotiation w/ Keith
- Sydney – 10:00 a.m. Tuesday here re: JV
- SA Jr will look at MW's use / position asap
- IP is being rolled over / reset

Ciao,

S.

Comm. Stefano Acunto
1030 Lake Avenue
Greenwich, CT 06831
212-808-5500 ext. 110
914- 772-4797
sa@cinn.com

CONFIDENTIAL

# Exhibit L

## Counterclaims of BIH in Potter v. Beacon Intercontinental Group, et al., No. 1:20-cv-4599 (S.D.N.Y.)

Case 1:19-cv-01600-RGA-001599-JGK  Document 278-1  Filed 08/04/2017/20  Page 56 of 121 PageID #: 5176

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADAM POTTER, | |
| Plaintiff/Counterclaim Defendant, | Civil Case No. 1:20-cv-4599 (JGK) |
| v. | |
| BEACON INTERCONTINENTAL GROUP, INC. and BUSINESS INSURANCE HOLDINGS, INC., | **DEFENDANTS' SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| Defendants/Counterclaim Plaintiffs. | |

Defendants Beacon Intercontinental Group, Inc. ("Beacon") and Business Insurance Holdings, Inc. ("BIH") (collectively, "Defendants"), by and through their undersigned counsel, DLA Piper LLP (US), respectfully submit this Second Amended Answer, Affirmative Defenses, and Counterclaims to the Amended Complaint of Plaintiff Adam Potter ("Plaintiff"), dated August 18, 2020, and state as follows:[1]

## NATURE OF ACTION

1.     Defendants admit that Plaintiff's Amended Complaint alleges breach of contract, declaratory relief, and unjust enrichment.  Defendants deny that Plaintiff is entitled to such relief.

## PARTIES

2.     Defendants admit the allegations in Paragraph 2 of the Amended Complaint.

3.     Defendants admit that Defendant Beacon is incorporated under the laws of the State of Delaware but deny all remaining allegations in Paragraph 3 of the Amended Complaint.

---

[1] Defendants have herein adopted the headings from the Amended Complaint for ease of reference.  To the extent that such headings themselves contain factual or legal statement, allegations, or characterization of any form or type, Defendants deny those statements, allegations, or characterizations.

B.      Deny each and every demand and prayer for relief contained in the Amended Complaint;

C.      Award Defendants their costs and reasonable attorneys' fees; and

D.      Award Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS OF BEACON INTERCONTINENTAL, INC. AND BUSINESS INSURANCE HOLDINGS, INC.

Defendants and Counterclaim Plaintiffs, Beacon Intercontinental Group, Inc. ("Beacon") and Business Insurance Holdings, Inc. ("BIH" or the "Company") (together "Defendants"), for their counterclaims ("Second Amended Counterclaims") against Plaintiff and Counterclaim Defendant Adam Potter ("Potter") state as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

2.      This Court has personal jurisdiction over Potter because the SPA contains a choice of law and forum selection clause whereby the parties expressly agree that any disputes arising out of the SPA must be brought in state or federal court in Manhattan, New York.  Moreover, Potter has, by bringing the above-captioned lawsuit against Beacon and BIH, subjected himself to the jurisdiction of this Court.  Accordingly, venue is also proper in this Court.

## GENERAL ALLEGATIONS

### I.      Potter's Formation and Ownership of BIH

3.      BIH was formed by Potter.

- 57 -

4.      BIH's predecessor entity was C&E MGMT & Planning, Inc. ("C&E"), a Florida corporation in which Potter owned 100% of the issued and outstanding capital stock of C&E until on or about June 1, 2018.

5.      On or about June 1, 2018, Potter and several entities he owned,[2] including C&E, entered into an Asset Purchase Agreement with The American Institute for Chartered Property Casualty Underwriters and its wholly-owned subsidiary, The Institutes, LLC (collectively, "the Institutes").

6.      Upon information and belief, at the time of the Asset Purchase Agreement ("the Institutes Contract"), C&E was engaged in the business of identifying and securing conference and event locations, hotel contracts, and outside locations.

7.      The Institutes paid Potter nearly $20 million in exchange for all of the assets of C&E and several of Potter's other entities under the Institutes Contract.

8.      The Institutes Contract contained a covenant not to compete clause that prohibited, for a period of five (5) years after execution of the agreement, Potter and C&E from engaging in certain activities that would compete with the business lines acquired by the Institutes ("Non-Compete") through the Institutes Contract.

9.      On or about June 7, 2018, Potter changed C&E's name to Business Insurance Holdings, Inc.

10.     Potter also owned Business Insurance Holdings, LLC ("BIH, LLC").  On or about June 7, 2018, Potter changed the name of BIH, LLC to PBIH, LLC, a Florida limited liability company.

---

[2] The other entities owned directly or indirectly by Potter that were part of the Asset Purchase Agreement included CLM Group, Inc., a Florida corporation, Claims Pages, LLC, a Florida LLC, and Moxie HC, LLC, a Florida LLC.

## II.     Potter and the Acuntos Negotiate the Sale of BIH

11.     In or about June 2019, Potter began discussions with one of Beacon's owners, Steve Acunto, for the sale of BIH.

12.     BIH is an insurance trade publication that covers various segments of the business of risk transfer, including news and opinion affecting insurance carriers, reinsurers, legal, and insurtech enterprises; regulatory, legislative and court decisions; insurer results and trends; and insurance professionals themselves.  BIH also operated conferences concerning a wide range of risk transfer matters.

13.     Potter explained to the Acuntos that, under his ownership, BIH was a profitable insurance trade publication that, among other services, operated and coordinated conferences for insurance industry professionals that provided educational and informational resources concerning a wide range of risk-management issues.  Potter inquired as to whether the Acuntos might be interested in purchasing BIH.

14.     The Acuntos inquired as to Potter's proposed sales price for BIH.  Potter responded that his sales price for BIH was $5 million.

15.     The Acuntos inquired as to the basis for Potter's calculation of the sales price. Potter explained the $5 million sales price was based on the Company's historical financial performance and, in particular, five (5) times the 2018 earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $1 million.

16.     The Acuntos expressed interest in first reviewing BIH's financial records in deciding whether to proceed with the purchase of BIH and, if so, at what price.

## III.    Potter Misrepresents BIH's Historical Financial Performance

17.    On or about June 13, 2019, Steve Acunto requested that Potter provide financial information concerning BIH.  Steve Acunto explained that, after review of the financial information, he would consider whether to prepare a letter of intent.

18.    On or about June 13, 2019, Potter e-mailed Steve Acunto documents that purported to show BIH's historical financial performance, including income statements (i.e., profit and loss statements) for calendar years 2017 and 2018,[3] as reflected in **Table 1** below:

**BIH's Income Statements Provided by Mr. Potter**

|  | 2017 | % of Sales | 2018 | % of Sales |
|---|---|---|---|---|
| Revenue | $ 4,379,507 | 100.0% | $ 4,935,248 | 100.0% |
| Cost of Good Sold | $ 726,330 | 17% | $ 376,563 | 8% |
| Gross Profit | $ 3,653,177 | 83.4% | $ 4,558,685 | 92.4% |
| Fixed Expenses | 3,670,221 | 83.8% | 3,505,802 | 71.0% |
| Other Income | - | 0.0% | - | 0.0% |
| **EBITDA** | $ (17,045) | -0.4% | $ 1,052,882 | 21.3% |
| Depreciation Expense | $ 10,155 | 0.2% | $ - | 0.0% |
| **Net Income** | $ (27,200) | -0.6% | $ 1,052,882 | 21.3% |

19.    The figures Potter provided to Steve Acunto on or about June 13, 2019 grossly overstated and materially misrepresented BIH's revenue, EBITDA, and net income.

20.    According to calendar year end "income statements" provided by Potter, from 2017 to 2018, BIH's revenues increased slightly from $4.379 million to $4.935 million.

21.    According to this same information provided by Potter, in 2017 BIH generated negative EBITDA totaling <$17,045>.  Potter represented, however, that in 2018, BIH's EBITDA increased to $1.052 million.

---

[3] E-mail from Adam Potter to Steve Acunto Re: PPPPPPPPPP ADAM / STEVE A., June 13, 2019. BI P&L 1-1-17 to 12-31.17[2].pdf. BIH, Inc - P&L (2018).pdf. BIH, LLC - P&L (Jan 1 – Jun 30, 2018).pdf.

22.    In his June 13, 2019 e-mail, Potter expressed his understanding and desire that Steve Acunto would utilize these financial figures in the valuation and due diligence of BIH.

23.    The foregoing financial performance data is unsupported by accounting records concerning BIH that Potter maintained on the accounting software QuickBooks (the "QuickBooks Accounting Records"), which were not provided by Potter prior to the sale and only produced after multiple demands by the Acuntos following the sale.  The income statements prepared and provided by Potter were false and misrepresented the true financial performance of BIH during the relevant time period, as reflected in **Table 2** below:

**BIH's Financial Performance**

| | 2017 | % of Sales | 2018 | % of Sales |
|---|---|---|---|---|
| Revenue | $    5,033,517 | 100.0% | $    3,744,526 | 100.0% |
| Cost of Goods Sold | | | | |
|   Conferences / Events | $              - | 0.0% | $              - | 0.0% |
|   AV Expense | 77,372 | 1.5% | 105,290 | 2.8% |
|   Commissions | 310,000 | 6.2% | 4,778 | 0.1% |
|   Continuing Ed Credits | 2,605 | 0.1% | 5,732 | 0.2% |
|   Facility | 2,398,257 | 47.6% | 952,282 | 25.4% |
|   Miscellaneous | 7,563 | 0.2% | 3,791 | 0.1% |
|   Outside Service | 31,380 | 0.6% | 52,276 | 1.4% |
|   Printing | 78,530 | 1.6% | 29,001 | 0.8% |
|   Registration Materials / Supplies | 126,743 | 2.5% | 68,722 | 1.8% |
|   Royalty Expense | 150,000 | 3.0% | 2,010,993 | 53.7% |
| Total Cost of Goods Sold | $    3,182,450 | 63.2% | $    3,232,865 | 86.3% |
| Gross Profit | $    1,851,066 | 36.8% | $    511,661 | 13.7% |
| Fixed Expenses | 726,158 | 14.4% | 1,945,826 | 52.0% |
| Other Income | - | 0.0% | 50,000 | 1.3% |
| **EBITDA** | $    1,124,908 | 22.3% | $ (1,384,165) | -37.0% |
| Depreciation Expense | $              196 | 0.0% | $              293 | 0.0% |
| **Net Income** | $    1,124,712 | 22.3% | $ (1,384,458) | -37.0% |

24.    Based on the Company's QuickBooks Accounting Records, which were not provided by Potter prior to the sale and only produced after multiple demands by the Acuntos following the sale, 2017 revenues at calendar year end were $5.033 million, not $4.379 million as

Potter represented.  More importantly, however, the actual 2018 revenues at calendar year end were $3.744 million, not $4.935 million as Potter previously represented—a negative differential of $1.191 million.

25.     Based on these same QuickBooks Accounting Records, at calendar year end 2017, BIH generated EBITDA totaling $1.1 million, not <$17,045> as Potter represented, while at calendar year end 2018, BIH generated negative EBITDA totaling <$1.384 million>, not $1.052 million as Potter previously represented—*a negative differential of $2.437 million*.

26.     Based on these same QuickBooks Accounting Records, at calendar year end 2017, BIH generated net income totaling $1.124 million, not <$27,200> as Potter represented, while at calendar year end 2018, BIH generated negative net income (i.e., losses) of <$1.384 million>, not $1.052 million as Potter previously represented—*a negative differential of $2.437 million*.

27.     Significantly, the negotiated $5.0 million sales price Potter calculated was based on an agreed upon multiple of five (5) times BIH's 2018 EBITDA.  Because Potter's presentation of the 2018 EBITDA was significantly and materially overstated by $2.437 million and unsupported by the accounting evidence, the sales price was also significantly and materially overstated.

28.     The timing interval of the calculations—a calendar year basis—is not the reason for any discrepancy and material overstatement.  Potter falsified the financial performance data for BIH.  The data reveals the same negative differentials when examining the financial performance data on a fiscal year end ("FYE") basis, that is July 1–June 30.

29.     On or about July 18, 2019, Potter provided Steve Acunto with BIH's purported FYE 2019 income statement outlining the Company's revenue, gross profit, fixed expenses, and

EBITDA for the period July 1, 2018 through June 30, 2019. Potter's income statement reflected

EBITDA and net income of $27,289, [4] as reflected in **Table 3** below.

### BIH's Income Statements Provided by Mr. Potter

|  | FYE 2019 | % of Sales |
|---|---|---|
| Revenue | $ 5,251,066 | 100.0% |
| Cost of Good Sold | $ 1,681,207 | 32% |
| Gross Profit | $ 3,569,860 | 68.0% |
| Fixed Expenses | 3,542,570 | 67.5% |
| Other Income | - | 0.0% |
| **EBITDA** | **$      27,290** | **0.5%** |
| Depreciation Expense | $            - | 0.0% |
| **Net Income** | **$      27,290** | **0.5%** |

30.     According to the Company's QuickBooks Accounting Records, which were not

provided by Potter prior to the sale and only produced after multiple demands by the Acuntos

following the sale, at FYE 2019 (June 30, 2019), BIH generated net income totaling a mere $238

and EBITDA of a mere $12,527.

31.     Potter did not provide the Acuntos with access to BIH's source accounting records,

including the QuickBooks Accounting Records. Potter represented to Steve Acunto that he, Potter,

had calculated this financial information based on entries Potter made, or directed to be made, in

BIH's QuickBooks accounting software reflecting the Company's actual business transactions.

32.     Steve Acunto understood Potter to be uniquely qualified to know the accuracy and

veracity of the due diligence materials provided by Potter because Potter was the sole owner of

BIH and managed its operations.

---

[4] Upon information and belief, in 2016, 2017 and 2018, BIH's predecessor entity C&E operated
on a calendar year fiscal running January 1 – December 31. In or about June or July 2018, when
BIH was formed, Potter began operating it on a fiscal year running July 1 – June 30.

33.     Potter repeatedly pressured the Acuntos into completing their due diligence and finalizing the sale on an expedited basis.  In doing so, Potter repeatedly represented that he provided all financial data relating to BIH that would enable the Acuntos to move forward with the sale.

34.     On or about August 6, 2019, Potter e-mailed Steve Acunto inquiring about the status of the draft SPA.

35.     On or about August 8, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.

36.     On or about August 15, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.

37.     On or about August 19, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.  In this communication, Potter expressed "concern[] about finalizing the deal" noting that they had "met on August 1 and put together a game plan to move the transaction forward and close by the end of the month" and that he had still not received a draft SPA to review despite being 10-days out from closing.

38.     On or about August 30, 2019, Steve Acunto, on behalf of Beacon, e-mailed Potter concerning steps required to finalize the transaction.  Potter responded, in part, that if the sale did not close in the next few hours, he would sell BIH to another purportedly interested buyer.  Unbeknownst to the Acuntos, Potter lied; there were no other interested buyers at the time.

39.     On information and belief, Potter intentionally rushed the diligence process to conceal that he had provided the Acuntos with revenue and net income figures that did not reflect BIH's actual financial performance.

40.    The Acuntos and Potter continued negotiations concerning the purchase of BIH after Potter provided the false and fraudulent financial performance information described above. Based on Potter's misrepresentation through the falsified income statements that BIH generated nearly $1.1 million in net revenue in 2018, the parties negotiated a sales price of $5 million, based on the agreed-upon multiple of five (5) times BIH's 2018 EBITDA, as falsely represented by Potter.  Potter initially proposed this "5X" formula in a June 14, 2019 e-mail to Steve Acunto.

41.    A multiple of EBITDA is commonly used to value a company, as it approximates the net income an entity may be expected to generate over a defined period of time.  Thus, the same metric is often also used to negotiate an entity's sales price under a stock purchase or similar agreement, as Beacon and Potter did here.  The purchaser is entitled to rely on the data provided on which the EBITDA calculation is based.

42.    Only *after* executing the SPA did the Acuntos, on behalf of Beacon, discover that Potter had inflated the Company's EBITDA, net income, and revenue figures, which, in turn, inflated the purchase price to which the Acuntos, on behalf of Beacon, ultimately agreed.  But for Potter representing that BIH generated $1.1 million in net income in calendar year 2018, the Acuntos would not have positioned Beacon to purchase BIH for $5 million.

### IV.    Potter Presents the Acuntos with a Proposed Stock Purchase Agreement

43.    In August 2019, the Acuntos formed Beacon as a corporate vehicle for, among other things, acquiring BIH from Potter.

44.    Potter, as Seller, and Beacon, as Buyer, executed the SPA on September 3, 2019. A true and correct copy of the SPA is attached hereto as **Exhibit 1.**

45.    Under the SPA, Beacon acquired 100 percent of BIH's capital stock in exchange for an agreed upon purchase price of $5 million.

46.    The $5 million purchase price was based on the parties' negotiations and Potter's express representations about the Company's financial performance and, in particular, the 2018 EBITDA.

47.    Pursuant to Section 1.02 of the SPA, a payment of $4 million was due at closing. Beacon made the $4 million payment as required under the SPA.

48.    Pursuant to Section 1.02 of the SPA, a payment of an additional $1 million was subject to a condition precedent based on BIH hitting certain performance thresholds, including that BIH achieve "gross annual revenue of $5,250,000." Section 1.02 further stipulates that "the final payment of One Million Dollars ($1,000,000.00) shall be reduced dollar for dollar if [BIH's] gross revenue for the 6 months ending December 31, 2019 is not at least Two Million Dollars ($2,000,000.00) . . . ."

49.    As called for by the SPA, Beacon executed an unsecured promissory note that contained the same conditions precedent to payment. A true and correct copy of the Promissory Note is attached hereto as **Exhibit 2**.

## V.    **Subject to the SPA, Beacon Discovers Potter Fraudulently Misrepresented BIH's Revenue, Net Income, and EBITDA and Misrepresented Revenue as to 10 Questionable Transactions**

50.    Under the SPA, Potter was required to provide "the Books and Records of the Company" at closing, or, "for any such books and records which are not reasonably available at the Closing within thirty (30) Business Days following the Closing." (Ex. 1, § 2.02(a)(iv).)

51.    Further, Section 6.01 of the SPA requires Potter to grant Beacon, after closing and "upon reasonable prior notice, such access to financial records and other information in [his] possession" that are necessary to fulfill a "reasonable business purpose." (Ex. 1, § 6.01.)

52.    Potter failed to comply with his contractual obligations by failing to provide BIH's complete books and records, including the QuickBooks Accounting Records, at or within 30 days

after closing on the SPA or even later upon reasonable notice.  His failure was a result of his fear of Beacon learning of the massive fraud Potter had perpetrated.

53.    After executing the SPA and belatedly obtaining access to BIH's QuickBooks Accounting Records, Beacon began to see evidence that Potter had fraudulently misrepresented BIH's revenue, net income and EBITDA.  The fraudulent presentation of revenues which induced Beacon into proceeding with the purchase and agreeing to an inflated purchase price of five times BIH's purported 2018 EBITDA.

54.    Subsequent to execution of the SPA, Beacon discovered material deviations in BIH's revenue, net income, and EBITDA compared to the records Potter had previously provided during Potter's pressured and accelerated due diligence period.

55.    These deviations were discovered across the 2017, 2018, and 2019 financials, all of which had the effect of inflating the agreed-upon purchase price and inducing Beacon into proceeding with the purchase of BIH.

56.    Through further investigation and analysis, Beacon discovered that Potter directed at least ten (10), and perhaps more, substantial cash transfers into and out of BIH's accounts between August 2018 and September 2019 from other entities Potter owned or controlled, which Potter improperly and erroneously recorded as revenue to the Company.  These self-transfers amounted to Potter improperly recording $1,139,242.56 as revenue.

57.    As set forth in more detail below, the majority of the transactions represented repayment of loans or expenses to BIH and, thus, could not accurately be categorized as revenue.

58.    Each fabricated transaction, as detailed below, artificially increased BIH's purported revenues and profits as represented by Potter to Beacon.

- 67 -

59.    Beacon learned that, despite the income statements provided by Potter showing BIH generated *positive* $1.1 million in income in 2018, the Company generated *negative* income (i.e., losses) totaling $1.4 million, a differential of $2.4 million between what Potter had reported to Beacon (and what Beacon relied upon in agreeing to the $5 million purchase price), and what the true financial data supported.

60.    Beacon also learned that Potter had overstated 2018 EBITDA reported in the income statements, given by Potter to Beacon during due diligence, by approximately $2.4 million.

**Fraudulent Transactions One Through Six**

61.    Transactions 1 through 6 were carried out between on or about August 24, 2018 and on or about December 27, 2018 and resulted in a fraudulent inflation of BIH's revenues by $407,000.

62.    **Transaction 1**, carried out by or at Potter's direction on or about August 24, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with an entity named Moxie HC, LLC ("Moxie"),[5] a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

63.    **Transaction 2**, carried out by or at Potter's direction on or about September 6, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with

---

[5] Moxie HC, LLC is a Florida limited liability company formed by Potter.  Potter was its sole member through in or about December 2019.  Moxie owned 100% of the capital stock in CLM Group, Inc., an entity created by Potter on April 28, 2010 to provide services to property and casualty insurance claims professionals.  On June 1, 2018, Potter sold CLM Group, Inc. to The Institutes, LLC, a subsidiary of The American Institute for Chartered Property Casualty Underwriters.

Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

64. **Transaction 3**, carried out by or at Potter's direction on or about September 27, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

65. **Transaction 4**, carried out by or at Potter's direction on or about October 31, 2018, related to an accounting entry reflecting a check deposit in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

66. **Transaction 5**, carried out by or at Potter's direction on or about November 26, 2018, related to an accounting entry reflecting a check deposit in the amount of $50,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

67. **Transaction 6**, carried out by or at Potter's direction on or about December 27, 2018, related to an accounting entry reflecting a check deposit in the amount of $57,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

68. Potter fabricated Transactions 1 through 6 to inflate BIH's revenues and profits for fiscal year 2018.

69. By posting these non-revenue transfers as revenue to BIH, Potter overstated BIH's revenues by $407,000 through December 31, 2018.

70.     Those transactions actually reflected Potter shuffling funds between related entities to pay for "non-recurring expenses."  Those six transactions overstated BIH 2018 EBITDA and fraudulently inflated the purchase price under the SPA.

71.     On or about December 23, 2019, months after the SPA was executed, when confronted by the Acuntos about the fraudulent transactions, Potter admitted that Transactions 1 through 6 "were transfers from Moxie and *incorrectly categorized* as Sponsorship revenue" and that "[t]he intent of the transfers were [sic] to cover non-recurring expenses, promissory notes, loans & exchange, and permitted personal expenses."[6]

72.     On or about April 14, 2020, Potter, through his counsel, reaffirmed that he had effectively misrepresented Transactions 1 through 6 as revenue in BIH's books and records when he admitted that, in fact, these entries were actually *non-revenue transfers* from Moxie to BIH.[7]

73.     Potter attempted to further mislead Beacon into believing that the fraudulent transfers reflected in Transactions 1 through 6 "did not affect net income as while there was increased revenue they offset non-recurring expenses."[8]  The "non-recurring expenses" noted by Potter—i.e., promissory notes, loans & exchange, and permitted personal expenses—are not properly income statement items.  They could not offset the misreported revenue and should have been recorded on BIH's balance sheet because, fundamentally, these were transactions between

---

[6] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 23, 2019 (emphasis added).

[7] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020 ("The revenue from these transactions was transferred from Moxie HC, a company owned by my client.  BIH was previously a member of Moxie HC and had a number of non-recurring expenses, promissory notes and personal expenses that were not attributed to the Company's operations.  The purpose of these transactions were [sic] to offset these expenses.").

[8] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.

companies controlled by Potter.  Yet, Potter failed to record these transactions on the balance sheets provided to Steve Acunto prior to consummation of the sale of BIH, resulting in his misreporting BIH's full year revenues and profits.

74.     Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transactions 1 through 6 overstated BIH's revenues by $407,000.

75.     Until confronted by the Acuntos, on behalf of Beacon, about the questionable Transactions 1 through 6, Potter failed to disclose the true nature and effect of recording the transfers as revenue to BIH and, in turn, inflating the revenues.

76.     Even after being confronted months after consummation of the sale of BIH about the questionable Transactions 1 through 6, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $407,000 as a result of these transactions.

77.     The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations concerning revenue, net income, and EBITDA in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

**Fraudulent Transaction Seven**

78.     **Transaction 7**, carried out by or at Potter's direction on or about April 26, 2019, related to an accounting entry reflecting an online transfer in the amount of $190,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

79.     On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about this fraudulent transaction, Potter admitted he could not explain the transaction, other than it related to "sponsorships," which was an affirmative

misrepresentation.  Potter further attempted to conceal this misrepresentation by explaining, falsely, that because "the checks were cashed and entered as cash into the account" he was unable to recall or determine which "sponsors" purportedly made these payments to BIH.[9]

80.    On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 7, Potter stated, through his counsel, that he was unable to provide additional information because he "no longer has access to the bank accounts or the Company's invoice system."[10]  The BIH bank account and invoice system (to which the Acuntos did not gain access until after executing the SPA) do not support how Potter recorded and characterized Transaction 7.

81.    According to BIH's account statements and accounting records only made available to Beacon long after the sale and after multiple requests, Transaction 7 was an online transfer of funds to BIH from Potter's other entity, Moxie, thereby contradicting Potter's false representation that Transaction 7 reflected revenue generated from payments made by sponsors to BIH.

82.    Potter misreported Transaction 7 as revenue rather than record the transfer on BIH's balance sheet as a transaction between companies owned and controlled at the time by the same individual:  Potter.

83.    Transaction 7 overstated BIH's revenues in calendar year 2019 by $190,000.

84.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 7 materially overstated BIH's revenues by $190,000.

---

[9] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[10] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

85.     Until confronted by the Acuntos, on behalf of Beacon, about the questionable Transaction 7, Potter failed to disclose the true nature and effect of recording the transfer as revenue to BIH and, in turn, inflating its revenues.  He failed to notify Beacon of this error and affirmatively concealed such information.

86.     Even after being confronted months after the sale of BIH about the questionable Transaction 7, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $190,000 as a result of this transaction.

87.     The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

**Fraudulent Transaction Eight**

88.     **Transaction 8**, carried out by or at Potter's direction on or about May 13, 2019, was composed of two rapid-fire transactions:  8(a) and 8(b).  Transaction 8(a) related to an accounting entry reflecting an online transfer in the amount of $99,342.56 into BIH checking account xx4220 controlled by Potter, from checking account xx1350 associated with Waggy Group, Inc. ("Waggy"), a company also owned and controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

89.     Transaction 8(b) related to an immediate withdrawal of $100,000 from BIH's checking account xx4220, and a corresponding accounting entry for a "Waggy Royalty Expense" payment totaling $100,000.

90.     On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter misrepresented the nature of Transaction 8.  Potter falsely represented that Transaction 8a, reflected in the initial May 13, 2019 entry, resulted from an unintentional deposit in BIH's bank account that he rectified

on the same day via Transaction 8b, the second entry on May 13, 2019 reflecting an outflow of $100,000 from BIH's account to Waggy's account.[11]

91.     On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 8, Potter stated, through his counsel, that Transaction 8 did not factor into Potter's calculation of BIH's revenues and profits that he represented to Beacon during the due diligence period.[12]  The explanation is utterly implausible and false.

92.     Potter's attempt to legitimize or relate Transactions 8(a) and 8(b) further reveal the fraudulent nature of the transactions.  Nothing in Potter's explanation established that Transaction 8(a) is legitimately related to Transaction 8(b) or that the latter was intended to rectify the former, particularly as the amounts in question are different.

93.     In addition, according to BIH's QuickBooks Accounting Records only made available to Beacon long after the sale and after multiple requests, Transaction 8(b) was not made against the same accounts as Transaction 8(a), that is, was not a reversal of cash and revenues, further exposing the false nature of Potter's explanation.

94.     If, as misrepresented by Potter, Transaction 8(a) was an "error," which Potter corrected on the same day with Transaction 8(b), the proper accounting treatment would have compelled Transaction 8(b) to have been recorded as a reversal of Transaction 8(a), which would have resulted in a debit to revenue and a credit to cash.  Instead, Potter falsely recorded Transaction 8 as revenue and failed to correct the improper entry.

---

[11] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[12] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

95.    Notwithstanding Potter's misrepresentations, Transaction 8 is a transfer from Waggy, a company controlled by Potter, not revenue generated by BIH.  Despite repeated requests by the Acuntos, on behalf of Beacon, Potter failed and refused to provide any accounting or other evidence supporting his assertion that Transaction 8 reflects revenue generated by BIH.  And, there is no such evidence.  Potter should have recorded Transaction 8 as an account payable liability to Waggy, not a revenue transaction.

96.    Transaction 8 overstated BIH's revenues in calendar year 2019 by $99,342.56.

97.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 8 materially overstated BIH's revenues by $99,342.56.  Potter failed to notify Beacon of this error and affirmatively concealed such information.

98.    Even after being confronted months after the sale of BIH about the questionable Transaction 8, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $99,342.56.

99.    Beacon reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

### Fraudulent Transaction Nine

100.    **Transaction 9** was composed of two transactions: 9(a) and 9(b).  Transaction 9(a), carried out by or at Potter's direction on or about June 25, 2019, related to an accounting entry reflecting an online withdrawal in the amount of $540,000 from BIH's checking account xx4220, controlled by Potter, to Waggy, an entity also owned and controlled by Potter, identified as a "Waggy Royalty Expense" payment.

101.    Transaction 9(b), carried out by or at Potter's direction on or about July 1, 2019, related to an accounting entry reflecting an online transfer in the amount of $300,000 into BIH's

checking account xx4220, controlled by Potter, from checking account xx7090 associated with Waggy, an entity also owned and controlled by Potter. A corresponding accounting entry was improperly recorded by Potter as revenue earned to BIH and identified as "Print Media Ad Revenue."

102.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter misrepresented the nature of Transaction 9. Potter falsely represented that BIH initiated Transaction 9(a) in error for a "$520,000 Royalty payment," when in fact the actual payment was $540,000 (not $520,000), and that the correct transfer amount after all should have been for $220,000.

103.    Potter further falsely represented that Transaction 9(b), the purported $300,000 repayment to BIH from Waggy, was intended to reimburse BIH the net amount of the overpayment in Transaction 9(a),[13] thereby conceding that Transaction 9(b)'s $300,000 transfer was not revenue generating for BIH. Potter's purported explanation also exposed that Transaction 9(b) was not "Print Media Ad Revenue," as he had falsely represented in BIH's books and records.

104.    On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 9, Potter changed his explanation once again. He stated, through his counsel, that Transaction 9(a) constituted funds that were "transferred as a royalty payment to *Moxie*," an entity owned and controlled by Potter, not *Waggy*, another entity owned and controlled by Potter, as initially represented by Potter and as reflected in the corresponding accounting entry for this transaction.[14] This statement was false. The lies continue to accumulate.

---

[13] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[14] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

105.    The timing of Transactions 9(a) and 9(b) further evidences their fraudulent nature. Transaction 9(a) involved an alleged Royalty Expense overpayment in the amount of $300,000 on June 25, 2019, a mere five (5) days before BIH's 2019 fiscal year end and several weeks after Potter discussed with Steve Acunto a possible sale of BIH.  According to Potter, it was only detected and corrected on July 1, 2019, the first day of fiscal year 2020 resulting in a deposit back into BIH's account *incorrectly booked as revenue from Print Media Ad Revenue.*  This is clearly another round trip transaction timed to have the desired effect of moving money from one entity to another for the purpose of inflating gross revenues.

106.    Further, Transaction 9(b) occurred on or about July 1, 2019, the first day of the six-month period during which BIH's *gross* revenues were the key factor in determining satisfaction of the condition precedent and Potter's entitlement to the final $1 million payment under Section 1.02 of the SPA.  Potter fabricated Transaction 9(b) to intentionally overstate BIH's gross revenues. Potter's representation that Transaction 9(b) was a corrective transaction for 9(a) is not credible.  If true, Transaction 9(b) should have been booked as a reversal of Transaction 9(a), not revenue to BIH.

107.    Despite Beacon's repeated inquiries, Potter failed to provide any accounting evidence to support a legitimate relationship between Transaction 9(a)—the June 25, 2019 withdrawal of $540,000 from BIH to Waggy—and Transaction 9(b)—the July 1, 2019 transfer of $300,000 from Waggy to BIH—or why the latter was booked as revenue, or falsely identified as "Print Media Ad *Revenue*" rather than a royalty expense.  Potter materially misrepresented BIH's financial performance.

108.    Transaction 9 overstated BIH's revenues for the first two months of fiscal year 2020 by $300,000.

109.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 9 materially overstated BIH's revenues for the first two months of fiscal year 2020 by $300,000.  He failed to notify Beacon of this error and affirmatively concealed such information.

110.    Even after being confronted months after the sale of BIH about the questionable Transaction 9, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $300,000.

111.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price or for calculating and agreeing upon the condition precedent terms that must be satisfied before Potter was entitled to payment of the $1 million holdback.

## **Fraudulent Transaction Ten**

112.    **Transaction 10**, carried out by or at Potter's direction on or about August 23, 2019, related to an accounting entry reflecting a counter check deposit in the amount of $142,900 to BIH's checking account xx4220, controlled by Potter, purportedly representing "Print Media Ad Revenue" and "Events Revenue."  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

113.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter conceded the fraudulent nature of Transaction 10.  Potter explained that Transaction 10 "happened one week prior to sale and it appears was deposited into the wrong account and does not apply to BI[H]."[15]

---

[15] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019. According to Potter, "Instead of returning the funds to the proper non-BI[H] account, had the deposit not been made, the reconciliation sheet in the 'remaining in bank account' would have been $142,900 less."

114.    On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 10, Potter reaffirmed, through his counsel, this false narrative that "$142,900 was incorrectly deposited into the Company bank account a week prior to the sale."[16] Again, the lies continue to accumulate.  At a minimum, by Potter's and his counsel's own admission, he misreported Transaction 10 as revenue and, in turn, materially overstated BIH's revenues.

115.    Potter's explanation that Transaction 10 represents yet another six-figure "error" is not credible and unsupported by BIH's accounting records.  If Transaction 10 reflected an error in which Potter erroneously deposited $142,000 into BIH's bank account *one week before a sale was set to close*, he would have realized the mistake and corrected the "error" with a reversing entry that reflected a debit to revenue and a credit to cash.  Potter failed to do so not because of error or oversight, but because of fraud.

116.    There is no accounting evidence to support Potter's mischaracterization of Transaction 10.  Nor is there any accounting or other evidence to support Potter's incredible assertion that he mistakenly deposited $142,900 into an account belonging to an entity he was set to sell to Beacon in less than a week.  Potter knew that the Acuntos, on behalf of Beacon, would feel compelled to close on the sale given Potter's persistent pressure to do so and threats to cancel the deal, including his e-mail just four days prior to that, on August 19, 2019, in which Potter expressed "concern[] about finalizing the deal."

117.    There is no accounting evidence to support that Potter attempted to correct his purported error with a reversing entry, for one simple reason: Potter's true intent was to deposit

---

[16] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

$142,900 into BIH and record this amount as revenue only one week prior to closing on the sale in order to further inflate BIH's revenues while he still had the opportunity to do so.

118.    Transaction 10 overstated BIH's revenues for the first two months of fiscal year 2020 by an additional $142,900.

119.    Transaction 10 was recorded within the six-month period during which revenues were to be used to determine Potter's final payment under the terms of the SPA.

120.    By Potter's own admission, Transaction 10, as recorded by Potter, inappropriately increased BIH's purported revenues, which, had Potter's fraud gone undetected, would have been considered in calculating Potter's $1 million final payment.

121.    Potter had knowledge in the days leading up to the sale of BIH that Transaction 10 would materially overstate BIH's revenues for the first two months of fiscal year 2020 by an additional $142,900.  He failed to notify Beacon of this overstatement and affirmatively concealed such information in order to induce the Acuntos to proceed with the purchase of BIH.

122.    Even after being confronted months after the sale of BIH about the questionable Transaction 10, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated.

123.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price or for calculating and agreeing upon the condition precedent terms that must be satisfied before Potter was entitled to payment of the $1 million holdback.

Potter's Misrepresented the Nature of the Ten Fraudulent Transactions

124.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's revenues in 2018 and 2019 by at least $1,139,242.50, and perhaps more.

125.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's fiscal year 2019 (July 1, 2018-June 30, 2019) revenue and EBITDA by at least $696,342.50, and perhaps more.

126.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's gross revenues in the first two months of fiscal year 2020 (July and August 2019) by at least $442.900, and perhaps more.

127.    Potter consistently failed and refused to provide accurate data and explanation of BIH's financial data. What financial and accounting information Beacon has been able to compile through its own efforts has shown convincing proof that Potter knowingly and intentionally misrepresented the financial condition of the Company.

128.    After repeated communications and expression of doubt concerning the validity of the above-referenced ten transactions, Potter realized that his fraudulent scheme was getting exposed.

129.    Potter admitted in post-closing correspondence with Beacon to misreporting many of these transactions.

130.    In a December 23, 2019 e-mail, knowing his fraudulent conduct had been discovered, Potter offered to repurchase BIH from Beacon. Potter's offer was an attempt to prevent Beacon from discovering the further extent to which Potter had falsified BIH's financial and accounting records and taking appropriate action against him.

131.    Potter inflated BIH's net income, revenue, and EBITDA and, later, transmitted the fraudulent financial performance information to Beacon's owners with the purpose and effect of inducing Beacon into executing the SPA and purchasing BIH.

132.    Beacon would not have purchased BIH for $5 million had it known that BIH had not made $1.1 million in net income in 2018 (as Potter had told Beacon during the due diligence preceding the execution of the SPA).

133.    Had Beacon known that BIH actually generated *negative* income totaling $1.4 million in 2018, it would not have purchased BIH at all—for *any* price.

**Potter Failed to Disclose He Was Raiding BIH's Coffers
by Misreporting Payments to Himself as Royalty Expenses**

134.    Potter also failed to disclose to the Acuntos, and affirmatively concealed, that Potter issued royalty payments from BIH's accounts to himself and companies that Potter controlled. Potter misreported these distributions in BIH's books and records as royalty expenses incurred by BIH.

135.    In 2018, Potter caused BIH to incur $2 million in royalty expenses paid to CLM Group, Inc. and Vacation Inspired Group, Inc., both entities controlled by Potter, as reflected in **Table 4** below:

**2018 BIH Royalty Expense**

| Date | Payee | Amount |
|------|-------|--------|
| 01/04/2018 | CLM Group, Inc. | $  1,300,000 |
| 05/01/2018 | CLM Group, Inc. | 600,000 |
| 06/29/2018 | Vacation Inspired Group, Inc. | 110,993 |
| **Total** | | $  **2,010,993** |

136.    In 2019, Potter caused BIH to incur an additional $1.3 million in royalty expenses paid to Waggy and CLM, both entities controlled by Potter, and to Potter in his personal capacity, as reflected in **Table 5** below:

- 82 -

**2019 BIH Royalty Expense**

| Date | Payee | | Amount |
|------|-------|---|--------|
| 03/06/2019 | Waggy Group, Inc. | $ | 250,000 |
| 04/26/2019 | CLM Charitable Initiative, Inc. | | 175,000 |
| 05/13/2019 | Waggy Group, Inc. | | 100,000 |
| 05/31/2019 | Loan & Exchange; Due to Adam Potter | | 18,000 |
| 06/25/2019 | Waggy Group, Inc. | | 540,000 |
| 06/28/2019 | Waggy Group, Inc. | | 97,000 |
| 9/3/2019 | Waggy Group, Inc. | | 150,000 |
| **Total** | | **$** | **1,330,000** |

137.     Potter made all of BIH's 2019 royalty payments, except for the final payment, in the last quarter of BIH's FYE 2019.  Potter issued BIH's final royalty payment on September 3, 2019, the same day that Beacon purchased BIH, but failed to disclose this fact to the Acuntos.[17]

**VI.    Potter Failed to Disclose and then Falsely Represented that BIH Under His Ownership Was Not Subject to the Covenant Not to Compete in the Institutes Contract**

138.     The Institutes Contract, a true and correct copy of which is attached hereto as **Exhibit 3**, prohibits the "Selling Parties," which include Potter and C&E, and "Affiliates" of the Selling Parties, from conducting activities that compete with any of the Sellers' Businesses.  (*See* Ex. 3, § 6.12(a).)

139.     Read together, Section 6.12(a) and Schedule 6.12 of the Institutes Contract prohibit Potter and entities, including C&E, and their affiliates, while under his ownership, from offering or promoting educational content that extends beyond the offerings provided by BIH, LLC (later

---

[17] According to BIH's QuickBooks journal entries, the $18,000 royalty expense incurred by BIH on May 31, 2019 was recorded as a debit to Royalty Expense and a credit to Loan & Exchange. The description under the Loan & Exchange account states, "Due to Adam Potter."

known as PBIH, LLC) on June 1, 2018 and competes with the CLM business of offering events and conferences to claims and litigation management professionals.

140.    Section 6.12(b) of the Institutes Contract contains a further covenant against the solicitation of Sellers' customers and business relations.

141.    On or about July 29, 2019, unbeknownst to the Acuntos or Beacon, the Institutes sent a cease and desist letter and notice of breach ("Notice of Breach") to Potter. A true and correct copy of the Notice of Breach is attached hereto as **Exhibit 4**.

142.    The July 29, 2019 Notice of Breach notified Potter that the Institutes had recently learned Potter, through his company BIH, LLC, was "offering, promoting and producing the Cannabis & Hemp Conference and the Intellectual Property Conference (the 'IP Conference' and collectively, with the C&H Conference, the 'BI Conferences'), scheduled for October 24-25, 2019 and October 24, 2019, respectively, [at] the New York Marriott Marquis . . . ." (Ex. 4, at 1.)

143.    The July 29, 2019 Notice of Breach further made clear that "[t]his letter shall (i) service as written notice that you are in breach of your covenant not to compete as set forth in the [Institutes Contract]; (ii) constitute a demand that you immediate cease and desist all activities, including cancellation of the BI Conferences serving as the basis for such breach; and (iii) constitute written notice that such breach entitles the Buyer to indemnification under Section 9.2(a) of the [Institutes Contract], which includes, without limitation, the right to recover[] any and all Losses, such as attorneys' fees and any expenses and costs incurred by the Buyer Indemnified Party in connection with enforcing its rights thereunder." (Ex. 4, at 1.)

144.    The July 29, 2019 Notice of Breach further reminded Potter that "[p]ursuant to Section 6.12(a) of the Purchase Agreement, you have agreed not to, and to cause your Affiliates not to, directly or indirectly, 'conduct, manage, operate [and] engage in . . . any business or

enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses' unless such activity constitutes a Permitted Activity." (Ex. 4, at 1-2.)

145.    According to the July 29, 2019 Notice of Breach, "[t]he BI Conferences are a clear breach of your covenant not to compete, and likely constitute a breach of the other restrictive covenants in [the Institutes Contract] as well." (Ex. 4, at 2.) According to the Notice of Breach, which Potter received hallway through the due diligence process for the sale of BIH to Beacon, the BI Conferences are not a "Permitted Activity" under the Institutes Contract.

146.    As of July 29, 2019, Potter knew that C&E, the predecessor entity to BIH, was subject to the Non-Compete in the Institutes Contract.

147.    As of July 29, 2019, Potter knew or should have known that the Institutes believed BIH, LLC (the predecessor to PBIH, LLC) was subject to the Non-Compete in the Institutes Contract.

148.    The Institutes were not at that time aware that Potter had created a new entity, BIH, as a successor to C&E or that BIH, under Potter's ownership, was an "affiliate" of C&E may be subject to the Non-Compete in the Institutes Contract.

149.    At no time did Potter reveal to Beacon's owners that he had received the July 29, 2019 Notice of Breach or that he had reason to believe the Institutes believed that BIH might be subject to and bound by the Non-Compete in the Institutes Contract.

150.    At no time did Potter provide a copy of the Notice of Breach to the Acuntos.

151.    Instead, Potter affirmatively and deliberately concealed this information from the Acuntos and Beacon in an effort to avoid disruption of the potential sale of BIH.

152.    On or about August 12, 2019, unbeknownst to the Acuntos or Beacon, who were only weeks away from closing on the purchase of BIH from Potter, the Institutes sent a second

- 85 -

App.497

cease and desist letter and notice of breach ("Second Notice of Breach") to Potter.  A true and correct copy of the Second Notice of Breach is attached hereto as **Exhibit 5**.

153.    The August 12, 2019 Second Notice of Breach reflected and referred to a conversation that, among other things, set forth grounds the Institutes believed confirmed its position that Potter, through his entities, had breached the Non-Compete in the Institutes Contract as a result of Potter's intention to proceed with the BI Conferences.  (Ex. 5, at 1.)

154.    At no time did Potter reveal to Beacon's owners that he had received the August 12, 2019 Second Notice of Breach or that he believed BIH might be subject to and bound by the Non-Compete in the Institutes Contract.

155.    At no time did Potter provide a copy of the Second Notice of Breach to the Acuntos.

156.    Instead, Potter affirmatively and deliberately concealed this information from Beacon in an effort to avoid disruption of the potential sale of BIH to Beacon.

157.    On August 28, 2019—less than a week before Beacon executed the SPA with Potter—the Institutes commenced a lawsuit against Potter and BIH, LLC (the predecessor to PBIH, LLC), entitled *The American Institutes for Chartered Property Casualty Underwriters, et al. v. Potter, et al.*, No. 1:19-cv-1600 (D. Del) (the "Delaware Federal Action").

158.    The original complaint in the Delaware Federal Action alleged, among other things, Potter and BIH, LLC violated the Non-Compete in the Institutes Contract by coordinating and operating risk-management conferences that competed with risk-management conferences now coordinated and operated by the Institutes through CLM.  The Institutes further alleged that Potter and BIH, LLC breached the Institutes Contract by soliciting CLM sponsors.

159.    Prior to execution of the SPA, Potter made intentional, material misrepresentations and omissions to Beacon regarding the impact of the Institutes' Contract, and the Non-Compete,

in particular, regarding Beacon's ability to operate BIH's risk management conference business under his ownership.

160.    Among other misrepresentations and omissions, Potter failed to disclose the Institutes Contract in Section 3.05(a) of the Disclosure Schedule of the SPA and failed to disclose the scope of the Institutes Non-Compete and the Delaware Federal Action in Schedule 3.09 of the SPA.

161.    The SPA contained a number of representations and warranties made by Potter on which Beacon's purchase of BIH was conditioned.  Indeed, Section 5.01 stipulates that "[t]he obligations of [Beacon to] . . . purchase . . . the Company . . . are [] subject to the satisfaction [] by [Potter] of the . . . representation and warranties of [Potter] set forth in [the SPA] [which] shall be true and correct in all material respects as of the date of the [SPA]."

162.    Section 8.04 of the SPA further states that "[a]ll representations and warranties shall survive the Closing . . . ."

163.    In Section 3.06(a), Potter affirmed that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for trivial contracts entered into in the ordinary course of business.  Section 3.05(a) of the Disclosure Schedule is blank.  Potter misrepresented that BIH was not subject to any such contracts while under his ownership and control and at the time of closing that would limit or encumber BIH from doing anything, or obligate BIH to do something.  That representation—or material omission—by Potter was false because, among other reasons, Potter had received the Notice of Breach and Second Notice of Breach before executing the SPA with Beacon but failed to disclose those Notices to Beacon or the nature of the demands.

164.    As described below, BIH under Potter's ownership was an "Affiliate" of a "Selling Party" and, thus, bound by and subject to the Non-Compete in the Institutes Contract.

165.    Upon information and belief, CLM offers conferences to risk management professionals similar to those offered by BIH.

166.    As described above, Beacon acquired BIH with the intention of expanding BIH's risk-management conference portfolio.  Despite informing Potter of this fact, Potter failed to disclose the Institutes Contract to the Acuntos while negotiating and executing the SPA.

167.    Section 3.09 of the SPA states that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened" against BIH.

168.    Although Potter disclosed the Delaware Federal Action in Schedule 3.09, he materially mischaracterized the scope of the Non-Compete by writing in pertinent part:

> In June 2018, Adam Potter [] sold three companies to The Institutes. The Institutes Contract contained a non-compete *for Adam Potter personally, however Business Insurance is not part of the agreement.*  (emphasis added).

169.    Potter's disclosure in Schedule 3.09 was false and misleading, as least as to the entities then owned by Potter.

170.    Potter affirmatively misrepresented that the non-compete applied only to "Adam Potter personally."

171.    The Non-Compete explicitly applies to "a Selling Party," defined to include the "Companies, Potter, and Moxie" and "Affiliates" thereof.  (Ex. 3, § 6.12.)  "Companies" is expressly defined to include C&E.  "Affiliates" is defined as "any Person directly or indirectly controlling, controlled by, or under common control with," *inter alia*, Potter and C&E.[18]

---

[18] Indeed, in Potter's motion to dismiss the Institutes' amended and supplemental complaint, Potter represented that the agreement entered into between C&E and the Institutes binds BIH.  Potter's

172.    Potter concealed the true nature of the Institutes Contract and the Delaware Federal Action while negotiating and finalizing the SPA.  He did so in order to avoid risk that Beacon would terminate the purchase or insist on a lower purchase price to account for the fact that BIH could potentially become an encumbered company.

173.    As such, so long as C&E and, later, BIH remained under the ownership and control of Potter, it was subject to and bound by the Non-Compete.

174.    Potter knew this, because he agreed to bind C&E to the Non-Compete.  He then renamed C&E as BIH shortly after executing the Institutes Contract but more than a year *before* Beacon purchased BIH from Potter.

175.    At the time Potter made the misrepresentation and mischaracterized the scope of the Non-Compete in Schedule 3.09 of the SPA prior to the sale of BIH to Beacon, BIH was owned by Potter and, thus, an "Affiliate" covered by the Asset Purchase Agreement and the Non-Compete therein.

176.    Potter's assurances that BIH was *not* bound by the Non-Compete *under his ownership* was materially false and induced Beacon to proceed with the purchase of BIH.  This is the case, even though under Beacon's ownership, it is BIH's firmly supportable position in the Delaware Federal Action that it is not subject to the Non-Compete.

177.    As set forth in BIH's Opening Brief in Support of Motion to Dismiss the Amended and Supplemental Complaint in Delaware Federal Action ("Motion to Dismiss"), BIH makes clear its position that it is not subject to the Non-Compete under Beacon's ownership.

---

assertion in his motion to dismiss directly conflicts with his prior representations in the SPA and in correspondence with Beacon before and after execution of the SPA.

178.    Despite his later opportunistic endorsement of BIH's Motion to Dismiss, Potter has nonetheless explicitly advanced the position that BIH *is subject to the Non-Compete* and even went so far as to encourage the Institutes that the proper defendant subject to the Non-Compete was BIH which, in turn, prompted the Institutes to name BIH as a defendant in the Delaware Federal Action.

179.    In an e-mail communication on or about January 30, 2020, after Potter's counsel claimed PBIH was not a proper defendant, counsel for the Institutes inquired of Potter whether he was "willing to identify the 'correct' party that purportedly should be sued instead of Business Insurance Holdings, LLC?"  Through several e-mail exchanges, on or about February 19, 2020, Potter's counsel identified "Business Insurance Holdings, Inc., a Florida corporation" as the "correct party" to sue instead of "Business Insurance Holdings, LLC."  A true and correct copy of the above e-mail exchange is attached hereto as **Exhibit 6**.

180.    At Potter's insistence and invitation, then, on March 27, 2020, the Institutes filed an amended and supplemental complaint in the Delaware Federal Action to assert legal claims against BIH alleging that the Non-Compete is enforceable against BIH as a successor to C&E, even under new ownership by Beacon.  A true and correct copy of the amended and supplemental complaint in the Delaware Federal Action is attached hereto as **Exhibit 7**.  The Institutes further allege that BIH would be in continued breach of the Non-Compete if, under Beacon's ownership, BIH continued to operate risk-management conferences similar to those offered by CLM.

181.    Potter's false representation is further evidenced by his motion to dismiss the Delaware Federal Action, filed May 1, 2020, in which Potter affirmatively states that BIH, even under new ownership by Beacon, is a party to and bound by the Institutes Contract and, in particular, the Non-Compete.

182.    BIH does not concede that it is subject to the Non-Compete.  By failing to disclose the Institutes Contract in Schedule 3.05(a) of the SPA, however, and failing to fully and accurately disclose the Non-Compete in Schedule 3.09 of the SPA, Potter failed to satisfy his representations and warranties upon which the SPA was predicated.  His misrepresentations and omissions were knowing and intentional given that, among other reasons, he received the Notice of Breach and Second Notice of Breach before executing the SPA with Beacon.

183.    Potter also led the Acuntos, on behalf of Beacon, to reasonably believe that the Non-Compete applied only to Potter, not to any entities he owned or controlled.  The plain language of the Non-Compete and the Notice of Breach and Second Notice of Breach make clear that entities owned by Potter were also covered by the Non-Compete, at least insofar as he maintained ownership of those entities.

184.    Potter made the material misrepresentations and omissions described above with the purpose and effect of inducing Beacon into executing the SPA.

185.    Beacon's owners reasonably relied on Potters material misrepresentations and omissions in deciding whether to proceed with the purchase of BIH.

186.    Beacon would not have executed the SPA, and certainly not for the agreed-to sales price, conditions and other terms of the sale, but for Potter's representation that Beacon was purchasing an unencumbered entity (i.e., an entity that was able to generate revenue through organizing risk management conferences—the very same activity it was prohibited from conducting under the Non-Compete).

## VII.    Potter Breached the SPA and Express Warranties

187.    Potter breached the SPA and its material, express representations and warranties that Beacon relied upon to value BIH and execute the SPA.

188.    The SPA requires that "[t]he representations and warranties of Seller set forth in this agreement shall be true and correct in all material respects as of the Date of this agreement." (Ex. 1, § 5.01(a).)

189.    Potter breached Section 3.06 of the SPA.  Section 3.06 imposed a duty upon Potter to disclose in Section 3.05(a) of the Disclosure Schedule all of BIH's non-exempt contracts.  (Ex. 1, § 3.05(a).)  Potter failed to do so.  Instead, he left Section 3.05(a) of the Disclosure Schedule blank when he had an affirmative duty and obligation to disclose certain information about contracts to which BIH, under his ownership, was bound, encumbered and had obligations.

190.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract and, in particular, the Non-Compete that applied to BIH under Potter's ownership and if, as he later contended in his motion to dismiss in the Institutes Action, he believed BIH was bound to it under Beacon's ownership.

191.    The Institutes Contract was a non-exempt contract under Section 3.06(a) given that the Institutes Contract resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes and Section 6.12 of the Institutes Contract bound C&E to the Non-Compete.

192.    Beacon relied upon Potter's disclosures—specifically, the lack of any non-exempt contracts—in Section 3.06 in its negotiations with Potter over a purchase price for BIH that would be commensurate with the value of Beacon's acquisition.

193.    Potter knew that Beacon would rely, and did rely, on this information and his fraudulent disclosure schedule.

194.    For instance, on or about June 14, 2019, in response to a request to Potter for "a list of conferences annually," Potter provided a list of conferences hosted by BIH under his ownership.

195.    Beacon suffered damages resulting from this breach of Section 3.06.  Potter's breach exposed BIH to potential liability in the Delaware Federal Action.

196.    Potter's breach of Section 3.06 also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes amended and supplemental complaint, BIH is bound by the Non-Compete and is prohibited from hosting conferences that compete with CLM—a position diametrically at odds with Potter's initial disclaimer prior to execution of the SPA as well as his later endorsement of BIH's Motion to Dismiss in the Delaware Federal Action.

197.    The mere threat of litigation and potential exposure has caused BIH under Beacon's ownership, in an abundance of caution, to cancel at least one and potentially more lucrative conferences Beacon, and forego other business opportunities, Beacon believes it should otherwise have the ability to host and undertake.  In doing so, Beacon has lost the benefit of its bargain in acquiring BIH from Potter.

198.    Potter also breached Section 3.09 of the SPA.  Section 3.09 represents and warrants that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock."  (Ex. 1, § 3.09.)

199.    Section 3.09 imposed a duty upon Potter to accurately disclose pending and threatened litigation relating to BIH.  Potter disclosed the Delaware Federal Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In particular, Potter affirmatively contended that BIH, under his ownership, was not subject to the Institutes Contract or the Non-Compete.  He intentionally omitted and failed to disclose that he actually believed BIH was subject to the Non-Compete and, thus, a proper defendant in the

Delaware Federal Action, as he later represented to the Institutes and argued in his own Motion to Dismiss.

200.    Potter's description in Schedule 3.09 is materially inaccurate.

201.    Potter knew that his disclosure in Schedule 3.09 was intentionally misleading and materially inaccurate.  Potter further knew that when Beacon and Potter executed the SPA, BIH was, or would be with his encouragement to the Institutes, an anticipated defendant in the Delaware Federal Action, as evidenced by Potter's later contention in his motion to dismiss.

202.    Potter therefore breached Section 3.09 of the SPA by failing to disclose potential or threatened litigation against BIH.

203.    Beacon relied upon Potter's material misrepresentation and omission in Section 3.09 in its determination to continue with the purchase of BIH according to the sales price proposed by Potter.  In particular, Beacon relied on Potter's implicit assertion that no pending or impending litigation threatened to prevent BIH from hosting or operating conferences.  Potter knew that Beacon intended BIH to host and operate conferences because the parties discussed this very issue during the due diligence preceding the execution of the SPA.

204.    Potter knew that Beacon would rely, and did rely, on this information and his fraudulent disclosure schedule.

205.    Beacon suffered damages resulting from Potter's breach of Section 3.09.  Potter's breach has exposed BIH, to potential liability in the Delaware Federal Action.

206.    Potter's breach of Section 3.09 has also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes Complaint, BIH is ultimately determined to be bound by the Non-Compete and is prohibited from hosting conferences that compete with CLM, as Potter has advocated.  The mere threat of litigation and potential exposure has caused

BIH under Beacon's ownership to cancel potentially lucrative conferences Beacon believes it should otherwise have the ability to host.

207.     Potter breached Section 5.01(a) of the SPA by failing to disclose the Institutes Contract in Section 3.06 and Section 3.05(a) of the Disclosure Schedule and failing to disclose the Delaware Federal Action in Section 3.09 and Disclosure Schedule 3.09 of the SPA.

**VIII.** **Potter Sued Beacon in Delaware State Court, Improperly Obtaining a Default Which Was Later Vacated by the Court Due to Improper Conduct by Potter and His Counsel.**

208.     On January 30, 2020, Potter and his counsel filed a complaint under seal against Beacon in Delaware Superior Court, in an action styled *Potter v. Beacon Intercontinental Group, Inc.*, C.A. No. N20C-01-221 AML CCLD (Del. Super. Ct.) (the "Delaware State Action"), alleging that Beacon breached the SPA by not paying the $1 million final payment Potter claims Beacon owes under the SPA.  A true and correct copy of Potter's complaint in the Delaware State Action is attached hereto as **Exhibit 8**.

209.     Despite communicating previously and continuously with counsel for Beacon regarding the dispute that Potter had misrepresented BIH's revenues and fraudulently induced Beacon into executing the SPA, and despite having filed the Delaware State Action complaint under seal, counsel for Potter neither provided counsel for Beacon with a courtesy copy of the complaint nor otherwise notified counsel that Potter had sued Beacon under seal in Delaware Superior Court.

210.     On February 13, 2020, Potter contends he served Beacon's registered agent for service of process with a copy of the Delaware State Action complaint.  Beacon's registered agent failed to transmit the complaint to Beacon at that time and Beacon never received actual notice of the complaint.

211.    On March 5, 2020, Potter contends he obtained a clerk's default—again without notifying or conferring with Beacon or its counsel.  At that time, Beacon lacked actual notice of the Delaware State Action.  A true and correct copy of the clerk's default is attached hereto as **Exhibit 9**.

212.    In a series of e-mails between April 9 and 15, 2020, Potter's counsel demanded that BIH permit Potter to control the joint defense of Potter, his entity, and BIH in the Delaware *Federal* Action with counsel for Potter representing each defendant.  A true and correct copy of the Potter counsel e-mail exchanges are attached hereto as **Exhibit 10**.

213.    Counsel for Potter clearly articulated the intent of Fox Rothschild to represent BIH in the Delaware Federal Action.  In his April 9, 2020 e-mail, counsel for Potter wrote, "So that we may begin with that defense, please confirm in a written response to this e-mail that we [Fox Rothschild] have permission to accept service on behalf of BIH, Inc.  We [Fox Rothschild] are currently in the process of formulating a defense strategy, which may potentially include filing a dispositive motion seeking to have BIH, Inc. dismissed from the above-captioned lawsuit entirely." (Ex. 10.)

214.    Despite seeking to represent BIH in the Delaware *Federal* Action, Potter's counsel at Fox Rothschild never volunteered to BIH, Beacon or its counsel that they had represented Potter in suing and obtaining a clerk's default against Beacon, BIH's parent, in the Delaware *State* Action.

215.    BIH rejected Potter's and his counsel's request to assume its defense in the Delaware Federal Action, knowing that Potter and BIH had a conflict of interest.  (Ex. 10.)  That conflict of interest arose from BIH's firm and verified belief that Potter had defrauded Beacon by overstating BIH's EBITDA and revenues in order to inflate the purchase price Beacon ultimately

agreed to pay. That conflict of interest arises from the verified fact that Potter invited and encouraged Plaintiffs in the Delaware Federal Action to sue BIH as a co-defendant.

216.    Given these facts, BIH had a good faith and well-founded belief that its interests were adverse to and divergent from Potter's in the Delaware Federal Action.

217.    Counsel for BIH and Beacon was *not* aware at the time Fox Rothschild made the demand that Potter and his counsel Fox Rothschild assume control of BIH's defense in the Delaware Federal Action that, more than month before, Potter and his counsel at Fox Rothschild had obtained a clerk's default against Beacon, BIH's parent company, in the Delaware State Action.

218.    In June 2020, counsel for Beacon discovered the Delaware State Action clerk's default while researching claims and defenses concerning the Delaware Federal Action. This was the first that Beacon or the Acuntos, or their counsel, learned of the Delaware State Action or the clerk's default in that action.

219.    The clerk's default was not properly obtained. It was the product of duplicitous and intentional efforts to obfuscate the fact that a complaint had been filed or served.

220.    On June 12, 2020, Beacon moved to set aside the clerk's default in the Delaware State Action. Potter opposed.

221.    At the July 17, 2020 hearing, The Honorable Abigail LeGrow of the Delaware Superior Court granted Beacon's motion and set aside the clerk's default under Delaware Superior Court Civil Rule 60(b)(6). As reflected in the transcript of that hearing, a true and correct copy of which is attached hereto as **Exhibit 11**, Judge LeGrow justified her ruling on grounds that she found "extraordinary circumstances" existed for doing so.

222.    Judge LeGrow pointed to the improper conduct of Potter and his counsel at Fox Rothschild, the same counsel in this case.  So shocked and dismayed at the impropriety of counsel's conduct was Judge LeGrow that she stated on the record "I'm, frankly, not looking to turn this into a written decision that could be embarrassing for certain people [i.e., Fox Rothschild counsel] so I'm going to give you my oral ruling."  (Ex. 11, at 57:22-58:3.)

223.    Judge LeGrow expressed shock at the behavior of Potter and his counsel, describing their actions as "troubling" and "very suggestive" of "underhanded activity."  (Ex. 11, at 33:1–15, 60:10–61:9.)

224.    Judge LeGrow expressed outrage that Fox Rothschild, on behalf of Potter, affirmatively misrepresented the nature of the action *in the instant case*.  To illustrate, Judge LeGrow asked counsel for Potter whether "the basis for the alleged default under the SPA is this indemnification issue" discussed above, that is, Fox Rothschild's demand the BIH retain Fox Rothschild to defend it in the Delaware Federal Action and permit Potter to control the defense of both he and BIH in the Delaware Federal Action, despite having obtained a clerk's default in the Delaware State Action only a month before.  Counsel for Potter expressly "dispute[d] the characterization" and specifically *denied* the original complaint in this instant action asserted a breach of contract claim based on this indemnification issue.  (Ex. 11, at 47:4-54:20.)  That denial was false.

225.    Judge LeGrow immediately confronted Potter's counsel by pulling out a copy of Potter's original complaint in this action and referred counsel to paragraphs 104-106 that, in her words, "specifically address this issue of the indemnification and Mr. Potter's right to assume control of BIH's defense and the fact that the Acuntos, on behalf of both Beacon and BIH, refused." (Ex. 11, at 54:22-55:8.)

226.    Judge LeGrow then quoted from paragraph 121 of Potter's original complaint in the instant action, to wit: "Lastly, Beacon breached the SPA by preventing Potter from exercising his right to assume and control BIH's defense in the Delaware District Court Action with counsel of its choice as provided in the SPA." (Ex. 11, at 55:10-15.)

227.    Judge LeGrow's clear view, which was shared by the undersigned, is that Potter had no right to demand, and BIH had no obligation to permit, Potter and his counsel at Fox Rothschild to assume and control the defense of both Potter and BIH in the Delaware Federal Action.

228.    Judge LeGrow explained that she would have vacated the default "solely on the fact that Mr. Potter, represented by counsel [Fox Rothschild], was aware that the defendants were disputing the debt [at issue in the Delaware State Action]; was aware that the [D]efendants were represented by counsel relating to that very dispute; filed the complaint [in the Delaware State Action]; entered the direction for entry of default judgment; and never once provided a courtesy copy of th[e] [Delaware State Action] complaint or the default judgment, once it was obtained, to counsel." (Ex. 11, at 60:12-21.)

229.    Judge LeGrow went further, however, to explain that Delaware Rule 60(b)(6) permits the court "a grand reservoir of equitable power to do justice in a particular case." (Ex. 11, at 59:23-60:1.)

230.    Judge LeGrow noted that "what makes this a particularly troubling case and what makes me more than confident that Rule 60(b)(6) is the appropriate relief here is *what happened thereafter*." (Ex. 11, at 61:12-15 (emphasis added).)

231.    Judge LeGrow ruled that "with default judgment in hand, Mr. Potter's counsel [Fox Rothschild] then sought to represent Beacon's subsidiary, BIH, in separate but related litigation

without disclosing the existence of the conflict.  And, to me, it is a very clear conflict under Rule 1.7 of the Rules of Professional Conduct."  (Ex. 11, at 61:16-23.)

232.    The conflict between Potter and BIH as presented in the Delaware State Action and presented by Potter and his counsel in this action, is a non-waivable conflict under Rule 1.7 of the American Bar Association's Model Rules of Professional Conduct.

233.    Judge LeGrow went further in her ruling vacating the default and admonishing Potter's counsel by stating "then to compound the error, Potter now contends that the defendants in this [New York Federal] action, the Acuntos' and Beacon's refusal of that representation, when there was a *very clear conflict of interest* that would prevent the representation . . . under rule 1.7, Potter now contends that the refusal amounts to a breach of the SPA and *has so argued in the Southern District of New York*.  So, at best, this is a breakdown in communication between counsel.  *At best*.  I think it's something much less unintentional than that.  Or, to avoid the double negative, *much more intentional than that*, and so this Court is not going to be a tool by which parties or their counsel try to gain a leg up in other litigation or try to mask what is going on for purposes of achieving something in other related disputes." (Ex. 11, at 62:3-23 (emphasis added).)

234.    On Monday, July 20, 2020, the very next business day, Potter voluntarily dismissed the Delaware State Action.  A true and correct copy of Potter's notice of voluntary dismissal of the Delaware State Action is attached hereto as **Exhibit 12**.

235.    Potter now has repurposed his claim to recover on the Promissory Note in the Delaware State Action into Count I of the Amended Complaint in this New York Federal Action.

236.    Potter also continues to maintain in the Amended Complaint, despite admonitions by Judge LeGrow and a very clear conflict under the Rule 1.7 of the Rules of Professional Conduct,

that BIH "denied Potter his contractual rights under the SPA's Indemnification Procedures . . . ." (Am. Compl., ¶ 196.)

### IX.    Potter Declined to Defend, and Failed His Duty to Indemnify, Beacon and BIH

237.    The only counsel Potter offered BIH in the Delaware Federal Action was Fox Rothschild, its counsel in the Delaware Federal Action, Delaware State Action, and this New York Federal Action.  Such representation would be subject to a non-waivable conflict which, as Judge LeGrow admonished, was ethically prohibited because, among other things, Potter and his same counsel had simultaneously obtained a default judgment against Beacon in the Delaware State Action.

238.    As a result, under the SPA, BIH is entitled to counsel of its own choosing in the Delaware Federal Action at Potter's expense.

239.    Accordingly, on August 4, 2020, counsel for Beacon and BIH sent Potter, through undersigned counsel, a letter "as formal demand for indemnification from Potter in" the Delaware Federal Action.  A true and correct copy of the August 4, 2020 demand for indemnification is attached hereto as **Exhibit 13**.  The letter continues, "Beacon hereby exercises its contractual right to use counsel of its choosing for" its defense of the Delaware Federal Action.  (Ex. 13.)

240.    Section 8.01 of the Stock Purchase Agreement stipulates, "Subject to the limitations set forth in Section 8.03, the Seller shall indemnify Buyer and its directors, officers, employees, agents, and Affiliates (the "Buyer Indemnified Parties") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third party legal fees and expenses has been received (collectively, "Losses" and each a "Loss"), to the extent arising or resulting from" various events, including "any breach of any covenant of Seller contained in this Agreement;" or "the inaccuracy or any breach of any representation or warranty made by Seller in this Agreement."  (Ex. 1, § 8.01.)

241.    The parties handwrote and initialed SPA Section 8.01(b), which stipulates, "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09," which describes the Delaware Federal Action.  (Ex. 1, § 8.01(b).)

242.    Section 8.02 of the Stock Purchase Agreement contains indemnification procedures, stipulating, "If any party (the 'Indemnified Party') receives notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under this ARTICLE VII (a 'Third Party Claim') and such Indemnified Party intends to seek indemnity pursuant to this ARTICLE VIII, the Indemnified Party shall promptly provide the other party (the 'Indemnifying Party') with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant document evidencing such Third Party Claim and the basis for indemnification sought.  Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from its indemnification obligations hereunder, except if and to the extent that the Indemnifying Party is actually prejudiced thereby."  (Ex. 1, § 8.02.)

243.    Section 8.02 continues, "The Indemnifying Party will have 20 days from receipt of any such notice of a Third-Party Claim to give notice to assume the defense, appeal or settlement proceedings thereof.  If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume and control the defense, appeal or settlement proceedings of the Indemnified Party against the Third-Party Claim with counsel of the Indemnifying Party's choice."  (Ex. 1, § 8.02.)

244.     Section 8.02 further stipulates, "The parties will act in good faith in responding to, defending against, settling or otherwise dealing with such claims."  (Ex. 1, § 8.02.)

245.     By only offering BIH its own conflicted counsel for BIH's defense in the Delaware Federal Action, Potter did not "act in good faith."  (Ex. 1, § 8.02.)

246.     Section 8.02 finally stipulates, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim within the time period specified above, the Indemnified Party may conduct such defense or settlement thereof with counsel of its choosing for the account of the Indemnifying Party (subject to the right of the Indemnifying Party to dispute its obligation to the indemnify with respect to the matter which is the subject of the Third Party Claim)."  (Ex. 1, § 8.02.)

247.     Section 10.01 stipulates, "In the event of any dispute arising out of the subject matter of this Agreement, each prevailing party shall recover, in addition to any other damages assessed, its reasonable attorneys' fees and other costs and expenses incurred in litigating or otherwise settling or resolving such dispute."  (Ex. 1, § 10.01.)

248.     The August 4, 2020 letter satisfied the obligations of BIH and Beacon under SPA Section 8.02.  (*See* Ex. 13.)

249.     On August 14, 2020, counsel for Potter sent a letter to counsel for BIH and Beacon, explaining that Potter would not indemnify, or reimburse BIH or Beacon for their defense, in the Delaware State Action.   A true and correct copy of Potter's counsel's response to the indemnification demand is attached hereto as **Exhibit 14**.

### COUNT I
### FRAUDULENT INDUCEMENT

250.     Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 249 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

- 103 -

251.    Potter knowingly, and with the intent to defraud, misrepresented BIH's 2017–2019 financial performance by providing the Acuntos with financial documents that inflated the Company's revenue, net income, and EBITDA during the due diligence period that preceded execution of the SPA.

252.    Only after executing the SPA and belatedly gaining access to the Company's Accounting Records did Beacon determine that more than $1.1 million in BIH's purportedly 2018 revenue, as reflected in the due diligence materials, was improperly categorized by Potter as revenue.  Potter directed ten (10) substantial cash transfers into and out of the Company between July 1, 2018 and September 1, 2019 from other entities he owned or controlled.  None of those transactions actually generated revenue for BIH.  These Potter therefore improperly characterized those transfers as revenue to Beacon with the net effect and intention of inflating revenues.

253.    Potter further fraudulently and falsely misrepresented income statements and other financial information for BIH as having generated positive $1.1 million in income in 2018 when, in fact, BIH generated *negative* income (i.e., losses) of $1.4 million—a differential of $2.4 million between what Potter had reported to Beacon (and what Beacon relied upon in agreeing to the $5 million purchase price) and what the true financial data supported.

254.    Potter further overstated 2018 EBITDA for BIH by approximately $2.4 million.

255.    Potter further misrepresented BIH's 2018 net income, revenue and EBITDA and presented this false financial information to Beacon in order to obtain a higher purchase price equal to five (5) times 2018 EBITDA.

256.    Potter further misrepresented BIH's revenue for July and August 2019 in order to further inflate BIH's financial performance and obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA calling for Beacon to make a final $1 million

payment to Potter if BIH's gross annual revenues met or exceeded $5.25 million and gross revenues met or exceeded $2 million for the six months ending December 31, 2019.

257.    During the due diligence period, Potter also made intentional, material misrepresentations and omissions to the Acuntos, for Beacon, regarding the impact of the Institutes Contract on Beacon's ability to operate BIH's risk management conference business.

258.    Among other misrepresentations and omissions, in Schedule 3.09 of the SPA, Potter misrepresented to Beacon that C&E was not bound by the Non-Compete under his ownership, a fact Potter knew at the time to be false.  Potter further represented that BIH, while under his ownership, was also not bound by or subject to the Non-Compete, a fact Potter knew at the time to be false.

259.    After executing the SPA, Potter conceded that these representations were false.  In February 2020, Potter, through his counsel, encouraged the Institutes counsel in the Delaware Federal Action that BIH was the correct party to sue despite being under Beacon's ownership.

260.    Later, in his motion to dismiss the Amended Complaint in the Delaware Federal Action, counsel for Potter wrote that "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes].  BIH, Inc., is the current name of C&E—one of the Selling Parties."

261.    Potter further concealed that, when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Delaware Federal Action.

262.    In Schedule 3.09 of the SPA, Potter represented that "[i]n June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however [BIH, Inc.] is not part of the agreement."  Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Non-Compete, Section

6.12, binds C&E and its "affiliates."  BIH, as a successor to C&E, was an "affiliate" while under Potter's ownership, a fact Potter knew.

263.    Potter knew that each of the material misrepresentations and/or material omissions were false and misleading at the time they were made.

264.    Potter controlled BIH's finances when he misrepresented BIH's past profits, revenues and EBITDA to Beacon's owners during the due diligence process.

265.    Potter also executed the Institutes Contract and was party to the Delaware Federal Action before making misrepresentations regarding those topics to Beacon during the due diligence process.

266.    Potter therefore knowingly made misrepresentations and omissions regarding the Company's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action, or caused them to be made, with knowledge of their falsity and/or recklessly without regard for their truthfulness.

267.    Potter made such false and fraudulent misrepresentations and omissions with the intent to deceive Beacon's owners, and with the intent to induce Beacon's owners to enter into the SPA and a gross overvaluation of BIH purporting to be five (5) times BIH's 2018 EBIDTA, but was not.

268.    In deciding to enter into the SPA, Beacon's owners reasonably relied to their detriment on Potter's misrepresentations concerning BIH's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action.  Potter was the person most knowledgeable regarding those topics, and his misrepresentations materially altered the cost-benefit analysis conducted by Beacon's owners in deciding to execute the SPA.  If not for its

reliance on Potter's misrepresentations, Beacon would not have executed the SPA—*at any price*,
let alone $5 million.

269.    Beacon requests monetary damages from Potter in an amount to be determined at
trial—including but not limited to the purchase price of BIH.

<div align="center">

**COUNT II**
**NEGLIGENT MISREPRESENTATION**

</div>

270.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 269
of this Second Amended Counterclaim Complaint, as if set forth fully herein.

271.    Potter had unique, non-public knowledge regarding BIH's past financial
performance, the Institutes Contract, and the Delaware Federal Action that was unavailable to
Beacon during its due diligence process.

272.    Potter, at least carelessly and negligently, made false and misleading
representations and omissions of material facts directly to Beacon and its representatives during
the due diligence and negotiation periods.

273.    Potter, at least carelessly and negligently, made false and misleading
representations and omissions to Beacon and its representatives regarding BIH's 2017–2019
financial performance by providing the Acuntos with financial documents that inflated BIH's
revenue, net income, and EBITDA during the due diligence period that preceded execution of the
SPA.

274.    Potter, at least carelessly and negligently, overstated BIH's purported 2018 revenue
by nearly $1.1 million in financial performance information provided by Potter to Beacon's
owners.  Potter misrepresented BIH's 2018 net income and revenue in order to obtain a higher
purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA that Beacon would
purchase BIH for a multiple of five (5) times its 2018 calendar year EBITDA.

<div align="center">

- 107 -

</div>

275.    Potter, at least carelessly and negligently, further misrepresented BIH's revenue for July and August 2019.  Potter did so in order to inflate BIH's financial performance and obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA calling for Beacon to make a final $1 million payment to Potter if BIH's gross annual revenues met or exceeded $5.25 million and gross revenues met or exceeded $2 million for the six months ending December 31, 2019.

276.    During the due diligence period, Potter also made, at least carelessly and negligently, material misrepresentations and omissions to Beacon regarding the impact of the Institutes Contract on Beacon's ability to operate BIH's risk management conference business.

277.    Among other misrepresentations and omissions, in Schedule 3.09 of the SPA, Potter misrepresented to Beacon that C&E was not bound by the Non-Compete under his ownership, a fact Potter knew or should have known at the time to be false.  Potter further represented that BIH, while under his ownership, was also not bound by or subject to the Non-Compete, a fact Potter knew or should have known at the time to be false.

278.    After executing the SPA, Potter conceded that these misrepresentations were false. In February 2020, Potter, through his counsel, encouraged the Institutes counsel in the Delaware Federal Action that BIH was the correct party to sue despite being under Beacon's ownership.

279.    Later, in his motion to dismiss the Amended Complaint, counsel for Potter wrote that "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes].  BIH, Inc., is the current name of C&E—one of the Selling Parties."

280.    Potter further concealed, at least carelessly and negligently, that when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Delaware Federal Action.

281.    In Schedule 3.09 of the SPA, Potter represented that "[i]n June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however Business Insurance is not part of the agreement."  Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Institutes Non-Compete, Section 6.12, binds C&E and its "affiliates."  BIH, as a successor to C&E, was an "affiliate" while under Potter's ownership, a fact Potter knew.

282.    Potter made each of these false representations and omissions at least carelessly and negligently.  He knew or should have expected that Beacon's owners would rely on the representations and omissions in agreeing to a gross overvaluation of BIH and enter into the SPA.

283.    Potter had a duty to impart correct information to Beacon because, as the as the sole owner of BIH and manager of its operations, he was in a special position to know the veracity of representations.

284.    Potter also had a duty to impart correct information to Beacon because he knew that Beacon and its representatives relied on his misrepresentations and omissions concerning BIH when entering into the SPA.  Among other indicia of his knowledge, on June 13, 2019, Potter e-mailed false and misleading financial figures regarding BIH to Steve Acunto and expressed his understanding and desire that Steve Acunto would utilize those figures in the due diligence process and to value BIH.

285.    Beacon reasonably relied on the aforementioned false representations and omissions in valuing BIH and executing the SPA.

286.    In deciding to enter into the SPA, Beacon's owners reasonably relied to their detriment on Potter's at least careless and negligent misrepresentations concerning BIH's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action.  Potter

- 109 -

was the person most knowledgeable regarding those topics, and his misrepresentations materially

altered the cost-benefit analysis conducted by Beacon's owners in deciding to execute the SPA.  If

not for its reliance on Potter's at least careless and negligent misrepresentations, Beacon would

not have executed the SPA—*at any price*, let alone $5 million.

287.     As a proximate result of Potter's negligent misrepresentation, Beacon suffered

damages to be determined at trial.

288.     Beacon requests monetary damages from Potter in an amount to be determined at

trial—including but not limited to the purchase price of BIH.

<div align="center">

**COUNT III**
**BREACH OF EXPRESS REPRESENTATIONS AND WARRANTIES**

</div>

289.     Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 288

of this Second Amended Counterclaim Complaint, as if set forth fully herein.

290.     The SPA by and between Potter and Beacon is a valid and binding contract and

supported by adequate consideration.  Beacon fully satisfied its obligations under the agreement.

Potter has a duty to adhere to the provisions of the SPA.

291.     Potter breached express representations and warranties reflected in Sections 3.06(a)

and 3.09 of the SPA.  Section 8.04 of the SPA states that "[a]ll representations and warranties shall

survive the Closing . . . ."  (Ex. 1, § 8.04.)

292.     In Section 3.06(a), Potter represented and warranted that "Section 3.05(a) of the

Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions

for insignificant contracts "entered into in the ordinary course of business."  (Ex. 1, § 3.06(a).)

293.     Section 3.06 imposed a duty upon Potter to disclose all of BIH's non-exempt

contracts.  Potter left Section 3.05(a) of the Disclosure Schedule blank, thereby asserting that BIH

was not bound by any non-exempt contract under his ownership.

294.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract.  That agreement was non-exempt under Section 3.06(a) because it resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes and bound C&E to the Non-Compete.

295.    After executing the SPA, Potter conceded that the Institutes Contract is a non-exempt contract.  Potter's motion to dismiss the Institutes' amended and supplemental complaint contends "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes]. BIH, Inc. is the current name of C&E—one of the Selling Parties."  (Potter Motion to Dismiss, at 9.)

296.    Potter therefore breached his Section 3.06(a) duty to disclose the Institutes Contract by leaving Section 3.05(a) of the Disclosure Schedule blank.

297.    The Section 3.06(a) representations and warranties are material because Beacon relied upon them in agreeing to a grossly overvalued and inflated purchase price of BIH and in entering into the SPA.  In particular, Beacon relied on Potter's implicit assertion that no previous agreement would prevent BIH from operating conferences.  Potter knew that Beacon relied on this information because on June 13, 2019, during the due diligence period, Steve Acunto e-mailed Potter to request "a list of conferences annually."  Potter replied on June 14, 2019, providing a list of conferences hosted by BIH.  Beacon used this information to decide to purchase Beacon for what it believed was a fair and reasonable price.

298.    Section 3.06(a) is a material provision in the SPA, upon which Beacon relied in valuing BIH and deciding to execute the SPA.  Section 3.06(a) was an integral part of the bargain and consideration between Beacon and Potter.

299.    In Section 3.09 of the SPA, Potter represented and warranted that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock."  (Ex. 1, § 3.09.)

300.    Section 3.09 imposed a duty upon Potter to disclose, in a materially accurate manner, all pending and threatened litigation relating to BIH.

301.    Potter disclosed the Delaware Federal Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In pertinent part, Potter described the litigation as follows: "In June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however Business Insurance is not part of the agreement."  (Ex. 1, Sched. 3.09.)

302.    Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Institutes Non-Compete binds the Selling Parties, which include C&E and its affiliates, and prohibits them from conducting activities that compete with any of the Sellers' Businesses, including the CLM business of offering events and conferences to claims and litigation management professionals.

303.    Potter knew that his description in Schedule 3.09 was intentionally misleading and materially inaccurate.  He further knew that when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Institutes Action.

304.    Potter therefore breached Section 3.09 of the SPA by failing to disclose threatened litigation against BIH.

305.    The Section 3.09 representations and warranties are material, and Beacon relied upon them in agreeing to a grossly overvalued and inflated purchase price of BIH and in entering into the SPA.  In particular, Beacon relied on Potter's implicit assertion that no pending or

impending litigation threatened to prevent BIH from operating conferences. Potter knew that Beacon relied on this information because on June 13, 2019, during the due diligence period, Steve Acunto e-mailed Potter to request "a list of conferences annually." Potter replied on June 14, 2019, providing a list of conferences hosted by BIH.

306. Section 3.09 is a material provision in the SPA, upon which Beacon relied in valuing BIH and deciding to execute the SPA. Section 3.09 was an integral part of the bargain and consideration between Beacon and Potter.

307. Beacon suffered damages resulting from this breach. Potter's breach exposed BIH to potential liability in the Delaware Federal Action.

308. Potter's breach also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes amended and supplemental complaint in the Delaware Federal Action, BIH is bound by the Institutes Contract and prohibited from hosting conferences that compete with CLM.

309. Potter's breach further damaged Beacon because it paid an inflated sales price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

310. Beacon suffered damages as a proximate result of Potter's breach of express representations and warranties reflected in Sections 3.06(a) and 3.09 of the SPA. Potter's breaches exposed BIH to potential liability in the Delaware Federal Action. Potter's breaches further damaged Beacon because they resulted in Beacon paying an inflated price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

311.    Beacon requests monetary damages from Potter in an amount to be determined at trial.

<div align="center">

**COUNT IV**
**BREACH OF CONTRACT**

</div>

312.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 311 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

313.    The SPA by and between Potter and Beacon is a valid and binding contract and supported by adequate consideration.

314.    Beacon has fully satisfied its obligations under the agreement.

315.    Potter has a duty to adhere to the provisions of the SPA.

316.    Potter breached at least three provisions in the SPA.

317.    Potter breached Section 3.06(a) by not disclosing the Institutes Contract between C&E, its affiliates, and the Institutes.

318.    In Section 3.06(a), Potter represented and warranted that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for insignificant contracts "entered into in the ordinary course of business."  (Ex. 1, § 3.06(a).)

319.    Section 3.06 imposed a duty upon Potter to disclose all of BIH's non-exempt contracts.

320.    Potter left Section 3.05(a) of the Disclosure Schedule blank, thereby asserting his belief that BIH was not bound by any non-exempt contract.

321.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract.  That agreement was non-exempt under Section 3.06(a) because it resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes, binding C&E to the Institutes Non-Compete, and preventing BIH under Potter's ownership from conducting events

<div align="center">

- 114 -

</div>

and conferences for claims and litigation management professionals — the essence of its business and the reason Beacon acquired BIH.

322.    Potter breached Section 3.09 failing to disclose the Delaware Federal Action in a truthful and accurate manner.

323.    In Section 3.09 of the SPA, Potter represented and warranted that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock." (Ex. 1, § 3.09.)

324.    Section 3.09 imposed a duty upon Potter to disclose, in a materially accurate manner, all pending and threatened litigation relating to BIH.

325.    Potter disclosed the Institutes Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In pertinent part, Potter described the litigation as follows: "In June 2018, Adam Potter [] sold three companies to The Institutes. The Agreement contained a non-compete for Adam Potter personally, however [BIH, Inc.] is not part of the agreement."

326.    Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Non-Compete binds the Selling Parties, which include C&E and its affiliates, and prohibits them from conducting activities that compete with any of the Sellers' Businesses, including the CLM business of offering events and conferences to claims and litigation management professionals.

327.    Potter therefore breached Section 3.09 of the SPA by failing to disclose threatened litigation against BIH.  At the time Potter executed the SPA, he knew this omission was misleading.

- 115 -

328.    Potter breached Section 5.01 of the SPA by making false and incorrect representations and warranties in Sections 3.06(a) and 3.09.

329.    Section 5.01 stipulates that the "representation and warranties of [Potter] set forth in [the SPA] shall be true and correct in all material respects as of the date of the [SPA]."  (Ex. 1, § 5.01.)

330.    Section 5.01 imposed a duty upon Potter to provide truthful and correct information in the SPA's representations and warranties, including those reflected in Sections 3.06(a) and 3.09 of the SPA.

331.    As set forth in more detail above, Potter made material misrepresentations in Sections in 3.06(a) and 3.09.

332.    These misrepresentations constitute an independent breach of Section 5.01.

333.    Beacon suffered, and will continue to suffer, damages as a proximate result of Potter's breaches of Sections 3.06(a), 3.09, and 5.01 of the SPA.

334.    Potter's breaches exposed BIH to potential liability in the Delaware Federal Action.

335.    Potter's breaches also exposed BIH to diminished future revenues if, as Potter asserts in his motion to dismiss the Institutes Complaint, BIH is bound by the Institutes Contract and prohibited from hosting conferences that compete with CLM.

336.    Potter's breaches further damaged Beacon because it paid an inflated sales price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

337.    Beacon requests monetary damages from Potter in an amount to be determined at trial.

## COUNT V
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

338.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 337 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

339.    New York recognizes an implied duty of good faith and fair dealing in all contracts to protect a party's reasonable expectations in the absence of the breach of an express term.

340.    Based on the due diligence that preceded execution of the SPA, Potter was aware that Beacon intended to obtain BIH in order to compliment the Acuntos' insurance industry holdings, including a group of entities owned and controlled by the Acuntos that offer services to insurance industry professionals.  As part of the due diligence, the Acuntos told Potter that they wanted to acquire BIH to augment their insurance-related holdings.

341.    During due diligence, Steve Acunto told Potter that he saw BIH as an attractive vehicle from which to offer risk-management conferences.

342.    Steve Acunto told Potter that he intended to expand BIH's conference offerings should he acquire the Company.

343.    Indeed, Beacon's press release concerning its acquisition of BIH expressly stated as much: "BIH Inc.'s *growing annual conference schedule* draws national audiences to destinations across the country for one and two day programs . . . ." (Emphasis added.)

344.    With this knowledge, Potter acted in bad faith by failing to disclose accurately the scope of the Institutes Non-Compete and the Delaware Federal Action.

345.    Potter's representations in his motion to dismiss the Delaware Federal Action that the Institutes Contract **does** bind BIH evidences his bad faith during negotiations with Beacon and in disclosures under Schedule 3.09 of the SPA, where Potter stated otherwise.

346.    By acquiring an entity the Institutes asserts is encumbered by the Non-Compete, and now being a named defendant in the Delaware Federal Action at the insistence of Potter and his counsel, Beacon is prejudiced and hindered in its ability to fully operate the business lines Beacon's owners expected in determining to purchase BIH, despite the fact that Beacon satisfied all of its obligations under the SPA.

347.    Although the SPA does not expressly stipulate that Beacon intended to operate BIH's insurance-industry conferences, by failing to disclose the Non-Compete, Potter denied Beacon the benefit of its bargain in acquiring BIH.

348.    Moreover, under the SPA, Potter was required to provide "the Books and Records of the Company" at closing, or, "for any such books and records which are not reasonably available at the Closing within thirty (30) Business Days following the Closing." (Ex. 1, § 2.02(a)(iv).)

349.    After the closing, under the SPA, Potter was also required to "grant . . . access to financial records . . . in [his] possession . . . as shall be reasonably required" for "reasonable business purpose[s]" "upon reasonable prior notice." (Ex. 1, § 6.01.)

350.    After multiple requests from Beacon, Potter finally belatedly provided Beacon with BIH's QuickBooks Accounting Records. But the QuickBooks Accounting Records reflected a multitude of self-transfers between Potter and entities he owned or controlled. These self-transfers artificially inflated BIH's revenue, EBITDA and net income and, thus, artificially inflated the parties' negotiated purchase price for the SPA, as described above.

351.    Potter had a duty to provide accurate financial information concerning BIH both before executing the SPA (during due diligence) and after.

352.    Beacon had a reasonable expectation that the financial information Potter provided both before executing the SPA (during due diligence) and after would accurately reflect BIH's

revenue, EBITDA and net income.  It did not.  Accordingly, Potter has breached the duty of good faith and fair dealing implied in the SPA.

353.    Accordingly, Beacon has suffered damages in an amount to be determined at trial.

## COUNT VI
## DECLARATORY RELIEF

354.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 353 of this Second Amended Counterclaim Complaint, as if set forth fully herein.

355.    The Declaratory Relief Act states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.

356.    In correspondence dated April 9 and 14, 2020, counsel for Potter acknowledge that Potter owes BIH a duty to defend and indemnify in the Delaware Federal Action.  (Ex. 10.)

357.    Under SPA Sections 8.01, 8.01(b), and 8.02, Potter has a duty to indemnify BIH in the Delaware Federal Action, and reimburse it for costs and fees incurred therein by their independent counsel.

358.    SPA Section 8.01(b), stipulates that "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09."

359.    The Delaware Federal Action qualifies.

360.    SPA Section 8.02 stipulates that where a party has a duty to indemnify, it has a corollary duty to defend.  The SPA, assuming that the indemnified and indemnifying parties will have aligned interests, grants the indemnifying party the right to assume and control the defense.

361.    SPA Section 8.02 stipulates, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim . . ., the Indemnified Party may conduct such defense or settlement

- 119 -

thereof with counsel of its choosing for the account of the Indemnifying Party (subject to the right of the Indemnifying Party to dispute its obligation to the indemnify with respect to the matter which is the subject of the Third Party Claim)."

362.    Under New York law, where an indemnifying party has a duty to defend and either he or his counsel is in conflict with the indemnified party, the indemnifying party has a duty to reimburse the indemnified party for costs and fees incurred by independent counsel selected by the indemnified party.

363.    Potter and BIH have conflicting interests in the Delaware Federal Action because Potter asserts that BIH is bound by the Institutes Contract whereas BIH asserts that BIH is not bound by the Institutes Contract.  Counsel for Potter is in conflict with BIH because they sued Beacon, BIH's parent, in the Delaware State Action and the instant action.

364.    Because of this, Potter cannot assume and control the defense of BIH in the Delaware State Action.  Instead, Potter has a duty to reimburse BIH and Beacon for fees incurred by counsel of BIH's choosing in the Delaware Federal Action and the above-captioned litigation.

365.    Accordingly, on August 4, 2020, counsel for Beacon and BIH sent Potter, via counsel, a letter "as formal demand for indemnification from Potter in" the Delaware Federal Action and the above captioned litigation.  The letter continues, "Beacon hereby exercises its contractual right to use counsel of its choosing for" its defense of the Delaware Federal action and the above captioned litigation, "at Potter's expense."  This correspondence satisfied the SPA Section 8.02 indemnification procedures.  (Ex. 13.)

366.    On August 14, 2020, counsel for Potter sent a letter to counsel for BIH and Beacon, explaining that Potter would not indemnify, or reimburse BIH or Beacon for their defense, in either the Delaware State Action or the above captioned litigation.  (Ex. 14.)

367.    BIH therefore has a right under New York law and SPA Section 8.02 to obtain independent counsel of its choosing in the Delaware Federal Action, at Potter's expense.

368.    At all times, Beacon and BIH acted in good faith and satisfied their obligations under the indemnification procedures in Section 8.02 of the SPA.

369.    BIH therefore seek a declaration from this Court that Potter owes BIH a duty to indemnify it in connection with the Delaware Federal Action and that Potter owes BIH reimbursement for legal fees and costs incurred by their counsel in connection with the Delaware Federal Action.

## **PRAYER FOR RELIEF**

WHEREFORE, having alleged this Second Amended Counterclaim Complaint against Counterclaim Defendant Adam Potter, Counterclaim Plaintiffs Beacon Intercontinental Group, Inc. and Business Insurance Holdings, Inc. pray that the Court award the following relief:

(a)    Damages, including compensatory and/or punitive damages, lost profits, disgorgement of all monies paid, all other appropriate damages, as well as attorneys' fees and costs in an amount to be determined at trial but in any event no less than $10 million;

(b)    Attorneys' fees and costs incurred by counsel for Beacon and BIH in this action; and

(c)    Any other or further relief as the Court may deem just and proper.

Dated:  Miami, Florida
          November 25, 2020

**DLA PIPER LLP (US)**

By:  */s/ Christopher Oprison*
Christopher Oprison, Esq.
Florida Bar No. 0122080
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Tel.:  (305) 423-8522
Fax:  (305) 675-6366
chris.oprison@dlapiper.com
(admitted *pro hac vice*)

Daniel C. Harkins
1251 Avenue of the Americas
New York, New York 10020
Tel.:  (212) 335-4500
Fax:  (212) 335-4501
daniel.harkins@dlapiper.com

*Attorneys for Defendants/Counterclaim Plaintiffs Beacon Intercontinental Group, Inc. and Business Insurance Holdings, Inc.*