Nos. 22-2967, 22-3025, and 22-3042

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES, LLC
*Plaintiffs-Appellants at 22-2967*
*Plaintiffs-Cross-Appellees at 22-3025 and*
*22-3042*

v.

ADAM POTTER,
*Defendant-Appellee at 22-2967*
*Defendant-Cross-Appellee at 22-3025*
*Defendant-Cross-Appellant at 22-3042*

and

BUSINESS INSURANCE HOLDINGS INC
*Defendant-Appellee at 22-296*
*Defendant-Cross-Appellant at 22-3025*
*Defendant-Cross-Appellee at 22-3042*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE, THE HONORABLE RICHARD G. ANDREWS
DISTRICT COURT NO. 1:19-CV-01600-RGA-JLH

**APPENDIX**
**VOLUME III OF VI (App.535-App.1034)**

D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
 (215) 988-2700 (telephone)
 (215) 988-2757 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

*Attorneys for Plaintiffs-Appellants/Plaintiffs-Cross-*
*Appellees The American Institute for Chartered*
*Property Casualty Underwriters and The Institutes, LLC*

# APPENDIX TABLE OF CONTENTS

## VOLUME I

Notice of Appeal of Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC
October 19, 2022 ....................................................................................App.1

Defendant Business Insurance Holdings, Inc.'s Notice of Appeal
October 27, 2022 ....................................................................................App.3

Notice of Appeal of Defendant, Adam Potter
October 28, 2022 ....................................................................................App.4

Final Judgement
September 29, 2022 ................................................................................App.6

Permanent Injunction
September 29, 2022 ................................................................................App.8

Trial Opinion
September 15, 2022 ..............................................................................App.10

## VOLUME II

Amended and Supplemental Complaint
March 27, 2020 ....................................................................................App.36

Report and Recommendation
February 8, 2021 ..................................................................................App.75

Memorandum Order
March 26, 2021 ....................................................................................App.99

Order
March 26, 2021 ..................................................................................App.106

Adam Potter's Answer With Affirmative Defenses to Plaintiffs' Amended and Supplemental Complaint
April 16, 2021 ....................................................................................App.109

Answer and Cross-Claim of Defendant Business Insurance Holdings, Inc.
April 16, 2021 ....................................................................................App.157

Stipulated Dismissal Without Prejudice of Cross-Claim No. 1
    December 7, 2021 ................................................................................App.215

Stipulated Dismissal Without Prejudice of Cross-Claim No. 1 [Entered]
    December 7, 2021 ................................................................................App.217

Memorandum Opinion
    January 4, 2022 ..................................................................................App.219

Order
    January 4, 2022 ..................................................................................App.225

Adam Potter's Answer With Affirmative Defenses to Business Insurance Holdings
    Inc.'s Cross-Claims
    January 18, 2022 ................................................................................App.226

Business Insurance Holdings, Inc.'s Concise Statement of Material Facts in
    Support of Summary Judgment Motion
    February 11, 2022 ..............................................................................App.234

Plaintiffs' Motion for Partial Summary Judgment
    February 11, 2022 ..............................................................................App.244

Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for
    Partial Summary Judgment
    February 11, 2022 ..............................................................................App.248

Adam Potter's Motion for Summary Judgment on Plaintiffs' Amended and
    Supplemental Complaint
    February 11, 2022 ..............................................................................App.259

Adam Potter's Motion for Summary Judgment on Business Insurance Holdings,
    Inc.'s Cross-Claims
    February 11, 2022 ..............................................................................App.263

Motion to Exclude Testimony of Plaintiffs' Expert Under Federal Rule of Civil
    Procedure 702
    February 22, 2022 ..............................................................................App.266

Defendant Adam Potter's Daubert Motion to Exclude Testimony and Report of
    Christine S. Meyer, Ph. D.
    February 22, 2022 ..............................................................................App.267

Plaintiffs' Reponse to Bih's Statement of Undisputed Material Facts
    March 4, 2022 .................................................................................App.269

Appendix of Exhibits to Plaintiffs' Reponse to Defendant Business Insurance
    Holdings, Inc.'s Statement of Undisputed Material Facts
    March 4, 2022 .................................................................................App.281

Plaintiffs' Reponse to Defendant Adam Potter's Statement of Undisputed Material
    Facts
    March 4, 2022 .................................................................................App.397

Appendix of Exhibits to Plaintiffs' Reponse to Defendant Adam Potters Statement
    of Undisputed Material Facts
    March 4, 2022 .................................................................................App.413

## VOLUME III

Adam Potter's Response to Plaintiffs' Statement of Facts Submitted in Support of
    Their Motion for Partial Summary Judgment
    March 4, 2022 .................................................................................App.535

Declaration of Counsel Submitted in Support of Adam Potter's Answering Brief in
    Opposition to Plaintiffs' Motion for Partial Summary Judgment
    March 4, 2022 .................................................................................App.562

Adam Potter's Response to Business Insurance Holdings, Inc.'s Counterstatement
    of Facts Submitted in Opposition to Potter's Motion for Partial Summary
    Judgment
    March 18, 2022 ...............................................................................App.582

Supplemental Declaration of Counsel Submitted in Further Support of Adam
    Potter's Motion for Summary Judgment on Business Insurance Holdings,
    Inc.'s Cross-Claims
    March 18, 2022 ...............................................................................App.592

Memorandum Order
    May 6, 2022 ....................................................................................App.598

Memorandum
    May 13, 2022 ..................................................................................App.603

Order
    May 13, 2022 ..................................................................................App.613

Memorandum
    May 13, 2022 ......................................................................App.614

Order
    May 13, 2022 ......................................................................App.625

Adam Potter's Motion for Partial Reconsideration of The Court's May 13, 2022
    Order Granting in Part and Denying in Part Summary Judgment As to
    Plaintiffs' Amended and Supplemental Complaint
    May 23, 2022 ......................................................................App.626

[Proposed] Final Pretrial Order
    May 24, 2022 ......................................................................App.630

Order After Pretrial Conference
    June 2, 2022 .......................................................................App.794

Order After Pretrial Conference
    June 6, 2022 .......................................................................App.796

Offer of Proof of Plaintiffs The American Institutes for Chartered Casualty
    Property Underwriters and The Institutes LLC
    June 13, 2022 .....................................................................App.799

Plaintiffs' Motion for Clarification Or Partial Reconsideration on The Court's June
    6, 2022, Order Ruling on Business Insurance Holdings, Inc.'s Motion in
    Limine No . 1
    June 14, 2022 .....................................................................App.827

Order
    June 24, 2022 .....................................................................App.829

Order
    June 27, 2022 .....................................................................App.831

Pretrial Conference Transcript
    May 27, 202 .......................................................................App.833

Opening Post-Trial Brief of Plaintiffs The American Institute for Chartered
    Property Casualty Underwriters and The Institutes, LLC
    July 15, 2022 ......................................................................App.916

Answering Post-Trial Brief of Defendant Business Insurance Holdings, Inc.
    July 29, 2022......................................................................App.955

Defendant Adam Potter's Brief in Support of The Entry of Judgment in His Favor
    and in Opposition to Plaintiffs' Post-Trial Brief
    July 29, 2022......................................................................App.994

## **VOLUME IV**

Business Insurance Holding Inc's Post-Trial Brief As to Its Cross-Claim Against
    Adam Potter
    July 29, 2022....................................................................App.1035

Defendant Adam Potter's Brief in Support of The Entry of Judgment in His Favor
    and in Opposition to Business Insurance Holdings, Inc.'s Post-Trial Brief
    August 5, 2022..................................................................App.1044

Reply in Support of Post-Trial Brief of Plaintiffs The American Institute for
    Chartered Property Casualty Underwriters and The Institutes, LLC
    August 5, 2022..................................................................App.1054

Trial Transcript Volume I
    June 27, 2022....................................................................App.1077

## **VOLUME V**

Trial Transcript Volume II
    June 28, 2022....................................................................App.1451

Trial Transcript, Volume III
    June 29, 2022....................................................................App.1765

## **VOLUME VI**

Plaintiff's Trial Exhibit 11...........................................................App.2091

Plaintiff's Trial Exhibit 12...........................................................App.2107

Plaintiff's Trial Exhibit 13...........................................................App.2136

Plaintiff's Trial Exhibit 14...........................................................App.2186

Plaintiff's Trial Exhibit 18...........................................................App.2290

Plaintiff's Trial Exhibit 26..................................................................App.2317

Plaintiff's Trial Exhibit 27..................................................................App.2319

Plaintiff's Trial Exhibit 45..................................................................App.2322

Plaintiff's Trial Exhibit 52..................................................................App.2325

Plaintiff's Trial Exhibit 86..................................................................App.2331

Plaintiff's Trial Exhibit 90..................................................................App.2332

Plaintiff's Trial Exhibit 102................................................................App.2333

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) ) | |
| Defendants. | ) ) | |

**ADAM POTTER'S RESPONSE TO
PLAINTIFFS' STATEMENT OF FACTS SUBMITTED IN
SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Adam Potter ("Potter"), through undersigned counsel, submits this response to the Statement of Material Facts (the "Response")[1] filed by Plaintiffs The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("Plaintiffs") in support of their Motion for Partial Summary Judgment.

**The Asset Purchase Agreement**

1.      On or about June 1, 2018, The Institutes entered into the Asset Purchase Agreement ("APA") with Claims Pages, LLC, ("CP"), C&E MGMT and Planning,

---

[1] The Response is separate and apart from Potter's separately filed Concise Statement of Undisputed Facts filed in support of his motion for summary judgment (the "Concise Statement").  D.I. 243, 256. The Concise Statement is hereby incorporated by reference and adopted by Potter for separate consideration by the Court in opposition to Plaintiffs' Motion for Partial Summary Judgment.

Inc., ("C&E"), CLM Group, Inc., ("CLM Group" or "CLM"), Adam Potter, and

Moxie HC, LLC, ("Moxie"), to acquire substantially all of the assets of the CLM

Group.  See, **Exhibit "A**."

> **RESPONSE**:  Admitted-in-part; Denied-in-part.  Admitted that Plaintiffs
>
> acquired substantially all of CLM's assets on June 1, 2018 under the APA.
>
> Plaintiffs' characterization that CLM's assets were the only assets they acquired
>
> under the APA is denied.  Plaintiffs acquired substantially all assets of the "the
>
> Sellers used in connection with the Sellers' Businesses," which included CLM, but
>
> also CP and C&E.  D.I. 258, Ex. A (APA), Preamble.

2.     The APA defines The Institutes as "the Buyer" and CP, CLM, and C&E

as "the Sellers." The APA further defines the "Selling Parties" to include CLM, CP,

and C&E, together with Potter and Moxie.  Ex. A, p. 1.

> **RESPONSE**:  Denied as stated.  The APA defines "the Buyer" as The
>
> Institutes, LLC, a wholly owned subsidiary of – and separate entity from – The
>
> American Institute for Chartered Property Casualty Underwriters ("AICPCU"),
>
> which the APA defines as "Parent."  D.I. 258, Ex. A (APA), Preamble.  Plaintiffs'
>
> define the "The Institutes" in their Statement of Facts as The Institutes, LLC and
>
> AICPCU, collectively.

3.     The Institutes paid $17,329,098.00 for the CLM Group assets.  Ex. A,

Section 2.2 at p. 6.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Plaintiffs made a cash payment of $17,329,098 on the Closing Date.  D.I. 258, Ex. A (APA), Preamble, §§ 2.1(c), 2.2-2.3.  Plaintiffs' characterization of that closing cash payment as being made in exchange for only "the CLM Group assets" is denied.  Plaintiffs acquired substantially all assets of "the Sellers used in connection with the Sellers' Businesses" under the APA, which includes CLM, but also CP and C&E. *Id.* at Preamble.

4.    Pursuant to the APA, the Institutes made subsequent payments in the amount of $2,655,049.00.  Ex. A, Sections 2.3 – 2.4 at pp. 6-9.

**RESPONSE:**  Admitted, the majority of which was paid *after* Plaintiffs filed their initial complaint on August 28, 2019 *after* the Cannabis Conference (the "Cannabis Conference") occurred.  D.I. 1 (Initial Complaint), ¶¶ 12, 123-125 (alleging that Plaintiffs owe approximately $2 million under the APA); *see* D.I. 258, Ex. A (APA), § 2.4(c)(i)-(ii).

5.    Section 6.12(a) of the APA prohibits the Selling Parties from conducting any activities that are competitive with any of the Sellers' Businesses conducted as of the closing date for a period of five years following the closing date. Ex. A, p. 28.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Section 6.12(a) of the APA prohibits the Selling Parties from engaging in activities

"competitive with any of the Sellers' Businesses as conducted as of the Closing Date" for five years (the "Non-Compete"). It is denied that this is the full scope of the Non-Compete. Notwithstanding the prohibition against competitive activities "with any of the Sellers' Businesses as conducted as of the Closing Date," Section 6.12(a) expressly permits "any Selling Party, or any other party listed on Schedule 6.12," to undertake the "Permitted Activities." D.I. 258, Ex. A (APA), § 6.12(a).

6.    The APA provides that the Selling Parties can engage in certain Permitted Activities during the Non-Compete Period. "Permitted Activities" are specifically defined, in relevant part, as certain business operations of BIH, owned at the time by Potter. See APA, Schedule 6.12, attached as **Exhibit "B."**

**RESPONSE:** Admitted-in-part; Denied-in-part. Admitted that the Permitted Activities are excluded from the Non-Compete. D.I. 258, Ex. A (APA), § 6.12(a). Plaintiffs' characterization that the Permitted Activities were "specifically defined" or otherwise limited to "certain business operations of BIH" is denied. There is no such limiting language in Schedule 6.12. D.I. 258, Ex. B (Schedule 6.12). The inclusion of Permitted Activities was meant to illustrate a part of the Non-Compete, not to be a catchall. D.I. 257-1, Ex. 5 (Horowitz Tr.), 134:10-24.

7.    Schedule 6.12 delineates the products and services that BIH provides. The Schedule lists the events and awards programs offered by BIH, which are limited to the following: World Captive Forum, U.S. Insurance Awards, Break OutAwards,

4

Innovation Awards, Risk Management Roundtable, and Women to Watch. Ex. B.

**RESPONSE:**   Admitted-in-part; Denied-in-part.   Admitted that Schedule

6.12 listed the products and services that Business Insurance provided as of the

Closing Date.  Plaintiffs' characterization that BIH's Permitted Activities are limited

only to those products or services identified in Schedule 6.12 is denied.   Schedule

6.12 does not contain such limiting language.  *See* D.I. 258, Ex. B (Schedule 6.12).

The inclusion of Permitted Activities was meant to illustrate a part of the Non-

Compete, not to be a catchall.  D.I. 257-1, Ex. 5 (Horowitz Tr.), 134:10-24.

8.     As set forth in Schedule 6.12, BIH's defined business does not include

public conferences or seminars on industry-specific topics, nor conferences relating

to claims and litigation management, as the parties did not contemplate that BIH

would be engaged in any such activities during the Non-Compete Period. Ex. B.

**RESPONSE:** Denied.  Schedule 6.12 identifies World Captive Forum, which

covers "captive insurance" – an industry-specific topic.   Declaration of Seth

Niederman ("Niederman Decl.), Ex. 33 (Potter Tr.), 53:10-25.   Plaintiffs'

characterization that Schedule 6.12 limits BIH's Permitted Activities during the

Non-Compete Period to the products and services identified therein is also denied.

Schedule 6.12 does not contain any such limiting language.   The inclusion of

Permitted Activities was meant to illustrate a part of the Non-Compete, not to be a

catchall.  D.I. 257-1, Ex. 5 (Horowitz Tr.), 134:10-24.  Lastly, Plaintiffs' allegation

that "the parties did not contemplate that BIH would be engaged in any such activities during the Non-Compete Period" is not supported by the record citation provided and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).

9.     Schedule 6.12 identifies activities that BIH could engage in, and conversely, the activities that BIH could not engage in during the Non-Compete Period.  Ex. B.

**RESPONSE:**   Admitted-in-part; Denied-in-part.   Admitted that Schedule 6.12 generally identifies ***some*** of the activities that Potter, Business Insurance, and others could engage in during the Non-Compete period and ***specific*** conditions to on the Permitted Activities related to claims and litigation management (and the CP Business).   D.I. 258, Ex. B (Schedule 6.12).   Plaintiffs' characterization that Schedule 6.12 limits BIH's Permitted Activities during the Non-Compete period to the products and services identified therein is denied.  Schedule 6.12 does not contain any such limiting language.  D.I. 258, Ex. B (Schedule 6.12).  The inclusion of Permitted Activities was meant to illustrate a part of the Non-Compete, not to be a catchall.  D.I. 257-1, Ex. 5 (Horowitz Tr.), 134:10-24.

10.    The definition of Permitted Activities expressly excludes offering and promoting educational content related to claims and litigation management, as well as producing events and conferences with a target audience that includes claims and litigation management professionals.  Ex. B.

App.540

**RESPONSE:**  Admitted that the Permitted Activities excludes offering and promoting educational content related to claims and litigation management, unless in partnership with CLM or CP,  and the production of "live delivery, such as events . . . and conferences targeted to claims and litigation management professionals." D.I. 258, Ex. B (Schedule 6.12).  To that end, the Cannabis Conference's website expressly provided: "This conference was not developed and is not intended for claims and litigation management professionals."   D.I. 258, Ex. F (Cannabis Conference Website), p. 1; Niederman Decl., Ex. 33 (Potter Tr.), 128:11-13 (stating that the Cannabis Conference "wasn't targeted towards claims and litigation professionals.  In fact, we specifically excluded them").

11.    Potter also owned Business Insurance Holding, LLC ("Business Insurance Holdings"), which was not included within the sale. In negotiating the APA, Potter sought to exempt Business Insurance Holdings from the restrictive covenants completely.  The Institutes refused to do so and insisted on specifying in the APA what activities Business Insurance Holdings could engage in after the acquisition.  Potter Dep. 14:16-24 attached as **Exhibit "C."**

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Potter previously owned Business Insurance Holdings, and that neither Business Insurance Holdings (nor its assets) was sold under the APA.  The balance of Plaintiffs' allegations in this paragraph are denied because they are not supported by the record

App.541

citation provided.  Fed. R. Civ. P. 56(c)(1).

12.    Prior to entering into the APA, BIH was not in the business of offering and promoting conferences relating to claims and litigation management. Ex, C, Potter Dep. at 48:6-21.  Kenner Dep. at 21:23-25 attached as **Exhibit "D."**

**RESPONSE:**  Denied.  Plaintiffs' allegations are not supported by the record citations provided and, therefore, are is denied.  Fed. R. Civ. P. 56(c)(1).  Potter's cited testimony reads a portion of Schedule 6.12 into the record.  D.I. 258, Ex. C (Potter Tr.), 48:6-21.  Kenner's cited testimony does not reference what Business Insurance did "[p]rior to entering into the APA."  Instead, Kenner makes a current statement of fact as of the date of his deposition (August 4, 2021) that "[w]e don't have any specific conferences that are dedicated to claims."  D.I. 258, Ex. D (Kenner Tr.), 21:23-25.

13.    In or around late July 2019, The Institutes became aware that BIH was offering and promoting claims and litigation management conferences in direct violation of the Non-Compete provision.  Ex. C, Potter Dep. at 121:19-21; 138:3-5.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Plaintiffs became aware that BIH was offering and promoting the Cannabis Conference and the IP Conference.  D.I. 258, Ex. C (Potter Dep.), 121:19-21; 138:3-5.  Plaintiffs' characterization of the Cannabis Conference and the IP Conferences as "claims and litigation management conferences" is denied as such allegations are not supported

8

by the record citations provided.  Fed. R. Civ. P. 56(c)(1).  In fact, Plaintiffs note

below in Paragraph 15 that the Cannabis Conference was a "conference centered on

cannabis insurance and risk management," not claims and litigation management.

*See* D.I. 258, Ex. F (Webpage and PowerPoint), p. 1.

14.    The Institutes learned that BIH was offering and promoting a Cannabis

& Hemp Conference ("the C&H Conference") and an Intellectual Property

Conference ("the IP Conference") (collectively, "the BIH Conferences"), scheduled

for the end of October, 2019, as described on its website *See*

www.businessinsurance.com/section/events).  Kett Dep. at 118–119:21, attached as

**Exhibit "E:"**  Ex. 14 to Kett Dep., attached as **Exhibit "F."**

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Plaintiffs

learned in late July 2019 that BIH was offering and promoting the Cannabis

Conference and IP Conference for the end of October 2019.  Plaintiffs' allegation

that the IP Conference is "described on [BIH's] website" is not supported by the

citations provided and, therefore, is denied.  Fed. R.. Civ. P. 56(c)(1).  The cited

website, testimony of Ms. Kett, and deposition exhibit only reference the Cannabis

Conference.  *See* www.businessinsurance.com/ section/events; D.I. 258, Ex. F

(Webpage and PowerPoint).

15.    Potter and BIH described the C&H Conference as a "new conference

centered on cannabis insurance and risk management" for insurance and cannabis

industry professionals "grappling with complex coverage and liability issues." They described the IP Conference as an exploration of "business exposure" resulting from intellectual property that aims to educate insurance professionals about "risk management and insurance strategies to protect intellectual property assets" and identify "established and new insurance protections" available to insurance professionals.  See, Ex. F.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that the Cannabis Conference is described on its webpage as a "new conference centered on cannabis insurance and risk management" for insurance and cannabis industry professionals "grappling with complex coverage and liability issues."  Plaintiffs' allegations concerning the IP Conference are not supported by the record citation provided – which only reference the Cannabis Conference – and, therefore, are denied.  Fed. R. Civ. P. 56(c)(1); *see* D.I. 258, Ex. F (Webpage and PowerPoint).

16.    On July 29, 2019, upon learning of the BIH Conferences, The Institutes sent Potter a letter notifying him that the BIH Conferences constituted a breach of the APA and demanding that they be cancelled by July 31, 2019. Ex. C, Potter Dep. at 121:19-21; 138:3-5.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Plaintiffs sent Potter a letter dated July 29, 2019 claiming the Cannabis Conference and IP Conference constituted a breach of the APA, and demanded that they be cancelled.

D.I. 257-2, Ex. 19 (July 29, 2019 Letter).  Plaintiffs' characterization that "the BIH Conferences constituted a breach of the APA," which is not supported by the record citation provided, is denied.  Fed. R. Civ. P. 56(c)(1).

17.    On August 12, 2019, Plaintiffs again asked Potter to cancel the conferences.  Ex. C, Potter Dep. (Ex. BIH 51 at 149:3-10).

**RESPONSE:**  Admitted.  *See* D.I. 257-2, Ex. 20 (Aug. 12, 2019 Letter).

18.    On September 1, 2019, Potter sold BIH to Beacon Intercontinental Group, Inc. ("Beacon").  Dee, Potter Dep., Ex. Potter-5, attached as **Exhibit "G."**

**RESPONSE:**  Admitted.

19.    The BIH Conferences focused on topics that were directly related to the Sellers' Businesses as of the time of the closing of the APA. The BIH Conferences focused on topics that had been addressed by CLM and that related directly to – and therefore competed directly with – CLM's Business. Ex. D, Kenner Dep. at pp. 53:3-25; 54:14-23; 55:8-12.

**RESPONSE:**    Denied.    Plaintiffs' allegations in this paragraph are not supported by the record citation and, therefore, are denied.  Fed. R. Civ. P. 56(c)(1). Anne Blume, CLM's own former chief executive officer stated on July 19, 2019 that "CLM did not have any Cannabis-related products on the Closing Date."  D.I. 257-2, Ex. 17 (July Blume-Horowitz email); D.I. 257-2, Ex. 16 (Blume Tr.), 97:24 to 98:4, 135:17-24.  Similarly, Ms. Blume conceded that CLM did not have an IP

Conference as of the Closing Date.  D.I. 257-2, Ex. 16 (Blume Tr.), 96:18-21.

20.    Schedule A to the APA describes CLM's Business as:

> "a professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies."

Schedule A to the APA, attached as **Exhibit "H".**

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that Schedule A sets forth the definition of the "CLM Business," and contains the quoted language in this paragraph.  It is denied that Plaintiffs' quoted language is the complete definition of the "CLM Business," which according to Ms. Blume is fully defined in Schedule A.  D.I. 257-1, Ex. 9 (Plaintiffs' 30(b)(6)-Blume), 16:4-7, 23:15-16.

21.    Although Schedule A provides examples of CLM's offerings, it does not limit the CLM Business to any specific topic.  *Id.*

**RESPONSE:**  Denied.  The "CLM Business" is fully defined in Schedule A. D.I. 257-1, Ex. 9 (Plaintiffs' 30(b)(6)-Blume), 16:4-7, 23:15-16.

22.    The broad definition of CLM's Business was intentional, as CLM offers conferences on a wide range of topics focused on claims and litigation management matters, as indicated by a review of CLM's conference archives. Ex.C,

App.546

Potter Dep. at 7:6-25; 8:3-24.

**RESPONSE:**    Denied.    Plaintiffs' allegations in this paragraph are not

supported by the record citation provided and, therefore, are denied.  Fed. R. Civ. P.

56(c)(1).  To the contrary, the CLM Business is fully defined in Schedule A.  D.I.

257-1 Ex. 9 (Plaintiffs' 30(b)(6)-Blume), 16:4-7, 23:15-16.

23.    The BIH Conferences clearly addressed topics that have been addressed

by CLM.  <u>See</u>, Ex. H, and Plaintiffs' Response to Request 2 of Defendants' First

Request for Production of Documents attached as **Exhibit "I."**

**RESPONSE:**    Admitted-in-part; Denied-in-part.    Admitted  that  CLM

previously held *claims and litigation management* conferences that may have

referenced cannabis as one of many subtopics.  *See* D.I. 258, Ex. I (RFP R&Os),

¶ 2.  However, the "CLM did not have any Cannabis-related product on the Closing

Date."  D.I. 257-2, Ex. 17 (July Blume-Horowitz email). Schedule A, which fully

defines the CLM Business, does not identify a cannabis, cannabis and hemp, or

intellectual property conference, event, product, or service.  *See* D.I. 258, Ex. H

(Schedule A); D.I. 257-1, Ex. 9 (Plaintiffs' 30(b)(6)-Blume), 16:4-7, 23:15-16; D.I.

257-2, Ex. 16 (Blume Tr.), 96:18-21, 97:24 to 98:4, 135:17-24 (testifying that CLM

did not have a Cannabis or Intellectual Property Conference).  CLM Business'

definition in Schedule A is also limited to "claims resolutions and litigation

management industries," D.I. 258, Ex. H (Schedule A), and the events cited in

App.547

Plaintiffs' discovery responses were limited to those industries. *See, e.g.*, D.I. 258, Ex. I (RFP R&Os), ¶ 2 (citing CLM's 2015 Medical Legal Summit, https://www.theclm.org/Event/_showeventdescription/2886 ("The Medical Legal Summit addresses a wide range of medical legal topics to educate and *assist claims professionals* . . . in the complexities of *managing claims and litigation* involving these topics." (emphasis added))).[2]   The Cannabis Conference, on the other hand, targeted different industries – the risk management and insurance industries – neither of which are identified in the definition of the CLM Business.  D.I. 258, Ex. H (Schedule A).  What is more, the Cannabis Conference expressly stated *in bold letters* that it was not targeted at or developed for claims and litigation management professionals.  D.I. 258, Ex. F (Webpage and PowerPoint); Niederman Decl., Ex. 33 (Potter Tr.), 128:11-13.

24.    A description of the C&H Conference on BIH's website stated the C&H Conference aims to examine the risks to the insurance industry resulting from the legalization of marijuana.  See, Ex. F.

**RESPONSE:**  Admitted.  The description of the Cannabis Conference also

_____

[2] Notably, CLM stopped offering The Medical Legal Summit years ago.  D.I. 258, Ex. C (Potter Tr.), 152:23 to 153:3.  Indeed, Plaintiffs' discovery responses only reference The Medical Legal Summit occurring in years 2014 and 2015 – approximately 3 years before the parties closed on the APA.  D.I. 258, Ex. I (RFP R&Os), ¶ 2, p. 4.

stated: "This conference was not developed and is not intended for claims and litigation management professionals."  D.I. 258, Ex. F (Webpage and PowerPoint), p. 1; Niederman Decl., Ex. 33 (Potter Tr.), 128:11-13.

25.    The APA does not distinguish between pre-loss and post-loss issues. Ex. A.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that the APA does not contain the words "pre-loss" or "post-loss."  Plaintiffs' characterization that "[t]he APA does not distinguish between pre-loss and post-loss issues" is denied. CLM Business is fully defined in the APA as a professional association *for claims and litigation management* industries.  D.I. 258, Ex. H (Schedule A); D.I. 257-1, Ex. 9 (Plaintiffs' 30(b)(6)-Blume), 16:4-7, 23:15-16.    The claims and litigation management industries are "post-loss" industries:

> So in insurance it's . . . pretty basic.  You have a line and in the line you have pre-loss, which is insurance and risk management[,] and you have post-loss, which is claims and litigation."
>
> * * *
>
> CLM was in the post-loss area.  Business Insurance was in the pre-loss area.

D.I. 258, Ex. C (Potter Tr.), 154:3-15.  Therefore, the APA *does* distinguish between "pre-loss" and "post-loss" issues because the Non-Compete – with respect to the CLM Business – only precludes activities competitive with CLM's post-loss products and services as conducted as of the Closing Date, leaving the Selling Parties

free to engage in any other activities, including those involving "*pre-loss*" issues.
D.I. 258, Ex. A (APA), § 6.12(a).  The APA's pre-loss and post-loss distinction is
further demonstrated by the Permitted Activities, which identifies Business
Insurance's business operations as "cover[ing] core risk management and insurance
areas" – both "pre-loss."  D.I. 258, Ex. B (Schedule 6.12); D.I. 258, Ex. C (Potter
Tr.), 154:3-15.  Those business operations – especially in the context of live events
– are expressly excluded from the Non-Compete so long as they do not target claims
and litigation management professionals, D.I. 258, Ex. B (Schedule 6.12), which
neither the IP Conference nor the Cannabis Conference did.  The IP Conference
never occurred.  D.I. 257-2, Ex. 16 (Blume Tr.), 97:17-20.  For the Cannabis
Conference, claims and litigation management professionals were expressly
excluded.  D.I. 258, Ex. F (Webpage and PowerPoint), p. 1; Niederman Decl., Ex.
33 (Potter Tr.), 128:11-13.

26.    As defined in the APA, the CLM Business focuses broadly on claims
and litigation management and offers its members educational content in the form
of, among other things, specialty conferences and webinars.  Ex. F.

**RESPONSE**:  Admitted in part; Denied in part. Admitted that the CLM
Business (as fully defined in the APA) focused on claims and litigation management
and, as of the Closing Date, provided its members with educational content in the
form of certain, specified specialty conferences and webinars.  D.I. 258, Ex. H

16

(Schedule A); D.I. 257-1, Ex. 9 (Plaintiffs' 30(b)(6)-Blume), 16:4-7, 23:15-16.

Plaintiffs' characterization that the CLM Business focuses "broadly on claims and

litigation management," which is not supported by the record citation (or Schedule

A) and, therefore, is denied.

27.    The definition of "Permitted Activities" in Schedule 6.12 to the APA,

which sets forth the specific activities that can be undertaken without violating the

Non-Compete, makes no reference to, or distinction between, "pre-loss" issues and

claims or litigation management.  Ex. B.

**RESPONSE:**    Denied.  Plaintiffs' allegations in this paragraph are not

supported by the record citation provided and, therefore, are denied.  Fed. R. Civ. P.

56(c)(1).  Schedule 6.12 does not contain language limiting the Permitted Activities

to "specific activities that can be undertaken without violating the Non-Compete,"

D.I. 258, Ex. B (Schedule 6.12), and Plaintiffs have not pointed to any such

language.  The inclusion of Permitted Activities was meant to illustrate a part of the

Non-Compete, not to be a catchall.  D.I. 257-1, Ex. 5 (Horowitz Tr.), 134:10-24.

Plaintiffs' allegation that the Permitted Activities "makes no reference to, or

distinction between, "pre-loss issues and claims and litigation management" is also

denied.  Schedule 6.12 expressly describes Business Insurance's business operations

as "cover[ing] core risk management and insurance areas," which are pre-loss.  D.I.

258, Ex. C (Potter Tr.), 154:3-15.  Those business operations – especially in the

context of live events – are expressly excluded from the Non-Compete so long as they do not target claims and litigation management professionals, D.I. 258, Ex. B (Schedule 6.12), which neither the IP Conference nor the Cannabis Conference did. The IP Conference never occurred.  D.I. 257-2, Ex. 16 (Blume Tr.), 97:17-20.  For the Cannabis Conference, claims and litigation management professionals were expressly excluded and the conference webpage contained the following statement: "This conference was not developed and is not intended for claims and litigation management professionals."  D.I. 258, Ex. F (Webpage and PowerPoint), p. 1; Niederman Decl., Ex. 33 (Potter Tr.), 128:11-13.

28.    Prior to entering into the APA, CLM regularly discussed and presented on "pre-loss" issues at its conferences and other events. Ex. C, Potter Dep. 153-158.

**RESPONSE:**   Denied.   Plaintiffs' allegation in this paragraph is not supported by the record citation provided and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).

29.    The BIH Conferences, on their respective websites, say that they focus on emerging issues, risk management solutions, and aim to provide thought leadership on these topics.  Ex. F.

**RESPONSE:**  Admitted-in-part; Denied-in-part.  Admitted that the Cannabis Conference webpage states that it will "discuss the special issues affecting cannabis insurance and risk management, talk about solutions and provide thought leadership

on this emerging issue." D.I. 258, Ex. F (Webpage and PowerPoint). Plaintiffs'

reference to the "BIH Conferences" is not supported by the record citation provided,

and therefore is denied. Fed. R. Civ. P. 56(c)(1). Plaintiffs' only cite to Exhibit F,

which refers to the Cannabis Conference and does not mention the IP Conference,

which never occurred. D.I. 257-2, Ex. 16 (Blume Tr.), 97:17-20.

30.    At the time that The Institutes placed Potter on notice of their breach of

the Non-Compete, the agendas for the BIH Conferences included sessions focused

on claims. See, www.businessinsurance.com/section/events. Ex. F.

**RESPONSE:** Denied. Plaintiffs' allegations in this paragraph – especially

the allegation that "the BIH Conferences included sessions focused on claims" – is

not supported by the record citation provided and, therefore, is denied. Fed. R. Civ.

P. 56(c)(1).

31.    As originally promoted, the Cannabis claims session was described on

BIH's website as follows:

> This panel of experienced cannabis claims professionals
> will attempt to shed light on the type, frequency and
> severity of cannabis claims to date, and what these claims
> will look like in the future (emphasis added).

Ex. C, Potter Dep. at 87:3-25; 88:2-25. *See also*, Ex. 15 to Potter Dep., attached as

**Exhibit "J**."

**RESPONSE:** Admitted-in-part; Denied-in-part. Admitted that the quoted

language by Plaintiffs in this paragraph is ***part*** of this session's original description.

Plaintiffs' characterization this was a "Cannabis claims session" is denied.  The session's description, when read in full, clearly shows it addressed the risks associated with and presented by Cannabis claims, ***not how the claims are resolved or managed***:

> ***The cannabis claims experience is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of significant claims data.*** This panel of experienced cannabis claims professionals will attempt to shed light on the type, frequency and severity of cannabis claims to date, and what these claims will look like in the future.

D.I. 258, Ex. J (Aug. 19, 2019 email) (emphasis added); Niederman Decl., Ex. 33 (Potter Tr.), 128:11-13.

32.    In response to The Institutes' objections, the Cannabis "exposure" session was then modified on BIH's website as:

> The cannabis exposure is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis professionals will attempt to shed light on the various cannabis <u>exposures</u> to date, and how these will involve in the future (emphasis added).

Ex. C, Potter Dep. at 88:2-25.

**RESPONSE:**    Admitted.  Potter explained the change was not necessary, because "we weren't going to talk about claims and any mention so it wasn't related to it," but done only to satisfy Plaintiffs' concerns.  D.I. 258, Ex. C (Potter Tr.), 87:5-17.

33.    The substance of the conference was not modified as shown by the slides utilized during the C&H Conference. Ex. D, Kenner Dep. at 103:7 – 104:23; Ex. E, Kett Dep. at 124:6 – 126:22.

**RESPONSE:**    Denied.    Plaintiffs' allegation in this paragraph is not supported by the record citations provided and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).  Kenner testified that he did not attend the session on Cannabis exposure, did not recall any discussions with anyone about the session, and did not know if the PowerPoint referenced by Plaintiffs was used at the Cannabis Conference.  D.I. 258, Ex. D (Kenner Tr.), 104:24 to 105:12.    Kett, who did attend the Cannabis Conference, did not recall what was discussed when the referenced PowerPoint slides were shown, or what language presenters used.  D.I. 258, Ex. E (Kett Tr.), 125:16 to 126:20.

34.    BIH also offered a special price to claims professionals for the C&H Conference.  Ex. E, Kett Dep. at 163:5 – 166:17.

**RESPONSE:**    Denied.    Plaintiffs' allegation in this paragraph is not supported by the record citations provided and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).  There was no "special price for claims professionals for the [Cannabis] Conference."  The cited testimony refers to an April 17, 2019 email which *suggests* specific pricing for "Risk Managers," "insurance company folks (underwriters/claims)," and "brokers."  Niederman Decl., Ex. 34 (April 17, 2019

Email).

35.    Since Potter sold BIH to Beacon, BIH has held, and plans to hold, additional specialty conferences and webinars. Ex. D, Kenner Dep. at 116:18 – 129:16.

**RESPONSE:**    Admitted-in-part; Denied-in-part.    Admitted that Kenner testified about BIH holding webinars in 2020 and 2021, and a virtual conference in 2021.    Plaintiffs' characterization that BIH "plans to hold[] additional specialty conferences and webinars," which is not supported by the record citation provided, is denied.    Fed. R. Civ. P. 56(c)(1).    Kenner testified only that options were being considered, but that things were "still to be determined," and that substantive conversations about additional events were not currently taking place.    D.I. 258, Ex. D (Kenner Tr.), 121:6-9, 122:11-13, 123:5-12.

36.    The BIH Conferences have designated certain sessions that clearly target claims professionals.    Ex. D, Kenner Dep. at 53:20 – 55:12.

**RESPONSE:**    Denied.    Plaintiffs' allegation in this paragraph is not supported by the record citation and, therefore, is denied.    Fed. R. Civ. P. 56(c)(1). The IP Conference is not discussed in Kenner's cited deposition testimony – only the Cannabis Conference.    *See* D.I. 258, Ex. D (Kenner Tr.), 53:20-55:12.    No testimony was elicited from Kenner that the Cannabis Conference "target[ed] claims professionals" – clearly or otherwise.    *See id.*    In fact, Kenner testified to the

opposite: that BIH wanted to attract "Risk managers, people who were involved in the cannabis industry and people who were involved in the wholesale insurance business underwriting cannabis operations." *Id.* at 53:20-25.

37.   From April 2021 to May 2021, BIH held a "Cannabis Update" webinar series, with one entire session devoted to Cannabis claims. Ex. D, Kenner Dep. at 117: 14-21, 118:3-4, Kenner Exhibit 15.   Ex. 15 to Kenner Dep. is attached as **Exhibit "K."**

**RESPONSE:**   Admitted-in-part; Denied-in-part.   Admitted that Kenner testified about BIH holding a "Cannabis Update" webinar in 2021.   Plaintiffs' characterization of that webinar as containing "one entire session devoted to Cannabis claims," which is not supported by the record citations provided, is denied. Fed. R. Civ. P. 56(c)(1).   Kenner testified that he had no personal knowledge as to what the substance of this webinar entailed, and that he was not involved in any way in planning that webinar.   D.I. 258, Ex. D (Kenner Tr.), 118:13-23.

38.   In July, 2021, BIH held a virtual Long-Term Care Conference in partnership with the law firm that was the exclusive sponsor of the C&H Conference which included sessions that related to claims and litigation management and targeted professionals in those industries. As a result of these types of BIH conferences, Plaintiffs lost sponsorships for their conferences.   Ex. D, Kenner Dep. at 120: 3-24; Miller Dep. at 44:19-25 – 48:24, attached as **Exhibit"L."**

**RESPONSE:**   Admitted-in-part; Denied-in-part.   Admitted that Kenner

testified about BIH holding a "Long Term Care Virtual Conference" in July 2021.

D.I. 258, Ex. D (Kenner Tr.), 120:12-15.  Plaintiffs' allegations that the Long Term

Care Virtual Conference (i) was held "in partnership with the law firm that was

exclusive sponsor of the [Cannabis] Conference," (ii) "included sessions that related

to claims and litigation management," (iii) "targeted professionals in" the claims and

litigation management industries, and (iv) that Plaintiffs lost sponsorships for their

conferences are denied.   None of these allegations are supported by the record

citations provided.  Fed. R. Civ. P. 56(c)(1).  Notably, for purported lost sponsors,

Miller – sitting as Plaintiffs' corporate designee – could only offer a self-serving

belief why Plaintiffs thought that two CLM-sponsors reduced their amount spent

between 2018 and 2021.  When asked, Miller could not identify a specific reason

why CoventBridge or SEA reduced their sponsorship from 2018 – 2021.  D.I. 258,

Ex. L (Miller Tr.), 44:19 to 46:8.  Miller also conceded that he never contacted either

sponsor to find out the reason.[3]  *Id.* at 445:9-13, 46:3-8.

---

[3] Bare assertions, conclusory allegations, mere suspicious, and otherwise self-
serving testimony are insufficient for purposes of summary judgment.  *Betts v. New
Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010); *Hickox v. Novosel*, 2021
WL 6197748, at *2 (M.D. Pa. Dec. 31, 2021) (citing cases); *XpertUniverse, Inc. v.
Cisco Sys., Inc.*, 2013 WL 867640, at *8 (D. Del. Mar. 8, 2013), *aff'd* (Jan. 21, 2015).
Miller incredulously testified that he "can't think of another reason" why
CoventBridge or SEA would reduce their sponsorship during 2018 – 2021, ignoring
the monumental impact of the COVID-19 pandemic on the global economy

39.    In July, 2021, BIH held a cyber security webinar that discussed how companies should respond if their systems were compromised by a ransomware attack, which BIH indicated sounded like a "post-loss" claims related concern. Ex. D, Kenner Dep. at 126:13-15, 128:17-21.

**RESPONSE:**    Admitted-in-part; Denied-in-part.    Admitted that Kenner testified about BIH holding a cyber security webinar in July 2021.    Plaintiffs' allegation that "BIH indicated [a subject covered at that webinar] sounded like a 'post-loss' claims related concern" is not supported by the record citations provided and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).  When asked, Kenner specifically testified "I don't know if I would consider it a claim."  D.I. 258, Ex. D (Kenner Tr.), 128:17 to 129:2.

40.    BIH intends on planning conferences on long-term care, Ex. D, Kenner Dep. at 121:4-12, intellectual property, Kenner Dep. at 123:5-16, and cyber security, Kenner Dep. at 124:9 - 125:16.

**RESPONSE:**    Denied.  Plaintiffs' allegation is not supported by the record citations and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).  Kenner testified a long-

---

beginning in March 2020.  *See* D.I. 258, Ex. L (Miller Tr.), 45:24 to 46:2.  Notably, Ms. Horowitz testified that CLM transitioned all of its in-person events to online events, made the majority of them free for attendees, and "is the reason for the significant difference and impact to the [CLM] business."  D.I. 257-2, Ex. 5 (Horowitz Tr.), 27:10-18, 28:6-17, 182:11 to 183:11.

term care event was "still to be determined" and that "we have not currently had any

additional substantive conversations about a long term care live event in 2022.  D.I.

258, Ex. D (Kenner Tr.), 121:6-9, 122:11-13.   Similarly, Kenner testified that

"[t]here have not been any discussions concerning" restarting the IP Conference that

did not occur.  *Id.* at 123:5-12.  As for cyber security, Kenner only testified that he'd

like BIH "to get . . . back into cyber."  *Id.* at 124:12-14.  Kenner did not testify that

BIH intends on planning, or is even discussing the possibility of, a cyber security

conference.  *See id.* at 124:9-125:16.

41.   The press release (dated 9/4/19), announcing Beacon's acquisition of

BIH from Potter touted BIH's "growing annual conference schedule" which would

include "the implications of cannabis, wild fires, the impact of AI, and cyber

security."  The press release is attached as **Exhibit "M."**

**RESPONSE:**  Admitted.  The APA's plain language does not preclude BIH

from offering new conferences so long as (1) those events do not compete with

Sellers' Businesses conducted as of the Closing Date or (2) are Permitted Activities.

D.I. 258, Ex. A (APA), § 6.12(a); D.I. 258, Ex. B (Schedule 6.12);  D.I. 257-1, Ex.

5 (Horowitz Tr.), 134:10-24.

42.   In Section 6.12(d) of the APA, Potter and BIH acknowledged that the

provisions of the Non-Compete "are reasonable and necessary to protect the

legitimate business interests of [The Institutes] and its investment in the Acquired

Assets." They agreed not to contest that The Institutes' remedies at law for any breach of the Non-Compete "will be inadequate, and that [The Institutes] shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Section 6.12, without proving actual damages." Ex. A at p. 29.

**RESPONSE:** Admitted that Section 6.12(d) contains the quoted language. Despite threating to seek one, D.I. 257-2, Ex. 19 (July 29, 2019 Letter), Plaintiffs never sought an injunction in connection with the Cannabis Conference or the IP Conference and have thus waived any such relief. D.I. 257-2, Ex. 16 (Blume Tr.), 121:25 to 122:3, 209:21-25.

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/ Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: March 4, 2022          *Attorneys for Defendant Adam Potter*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) | |

**DECLARATION OF COUNSEL SUBMITTED IN SUPPORT
OF ADAM POTTER'S ANSWERING BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, I, SETH NIEDERMAN, declare under penalty of perjury as follows:

1.     I am an attorney at law in the State of Delaware, and a partner in the law firm of FOX ROTHSCHILD LLP, attorneys for Defendant Adam Potter ("Potter").

2.     I am authorized to make this Declaration on Potter's behalf, and do so upon personal knowledge and in support of Potter's contemporaneously filed Response to Plaintiffs' Statement of Facts ("Response") and Answering Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Answering Brief").

I hereby certify that following exhibits, attached hereto and referenced in the Response and (by incorporation) the Answering Brief are true and correct copies of the following documents:

| Exhibit[1] | Description |
|---|---|
| 33 | Relevant portions of a certified transcript from the June 16, 2021 Rule 30(b)(1) deposition of Adam Potter |
| 34 | April 17, 2019 email chain, Potter-DE-000682 to -000688 |

I declare under penalty of perjury that the foregoing is true and correct.


By:   */s/ Seth Niederman*_____
       SETH NIEDERMAN (#4588)

Dated: March 4, 2022

---

[1] For consistency and organizational purposes, Potter continues the exhibit numbering from the Declaration of Counsel filed on February 11, 2022 in support of his Motions for Summary Judgment. *See* D.I. 243, 257 (enclosing Exhibits 1-32).

2

# EXHIBIT 33

Case 1:19-cv-01600-RGA-JLH   Document 281-1   Filed 03/04/22   Page 2 of 10 PageID #: 5299

**In the Matter Of:**

AIFCPCU V POTTER

1:19-cv-01600-CFC

**ADAM POTTER**

*June 16, 2021*

*VOLUME II*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                  UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3
                           Case No. 1:19-cv-01600-CFC
 4
     The American Institute For Chartered       :
 5   Property Casualty Underwriters and the     :
     Institutes, LLC,                           :
 6                                              :
              Plaintiff,                        :
 7                                              :
                                                :
 8         vs.                                  :
                                                :
 9                                              :
                                                :
10                                              :
     Adam Potter, PBIH, LLC, and business       :
11   Insurance Holdings, Inc.,                  :
                                                :
12            Defendants.                       :
                                                :
13                                              :

14
             --------------------------------------
15                   REMOTE  VIDEOTAPED
          DEPOSITION  UNDER  ORAL  EXAMINATION  OF:
16                     ADAM  POTTER
                        (VOLUME II)
17                   June 16, 2021
                       -----------
18    REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR
                       ------------
19

20

21
     JOB #   J7194872
22

23

24

25
```



ADAM POTTER VOLUME II                          June 16, 2021
AIFCPCU V POTTER                                           2

 1            TRANSCRIPT of the remote videotaped

 2    deposition of the above-named witness, called for

 3    Oral Examination in the above-entitled matter, said

 4    deposition being taken pursuant to Federal Court

 5    Rules, by and before JENNIFER L. WIELAGE, Certified

 6    Shorthand Reporter and Notary Public of the State of

 7    New Jersey, License No. XI01916, on Wednesday,

 8    June 16, 2021, commencing at 10:15 in the forenoon.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



ADAM POTTER VOLUME II                                    June 16, 2021
AIFCPCU V POTTER                                                     3

```
 1
      A P P E A R A N C E S:
 2
      FOX ROTHSCHILD
 3    2000 Market St.
      20th Floor
 4    Philadelphia Pennsylvania 19103-3222
      (215) 299-2000
 5    BY:  ROBERT TINTNER, ESQ.
      Attorneys for Adam Potter
 6
      COZEN O'CONNOR PC
 7    1650 Market Street
      Suite 2800
 8    Philadelphia, PA 19103
      (215) 665-2000
 9    BY:  ROBERT W. HAYES, ESQ.
      Attorneys for Plaintiff
10
      DLA PIPER
11    200 S Biscayne Blvd
      Suite 2500
12    Miami, Florida 33131
      (305) 423-8500
13    BY:  CHRISTOPHER G. OPRISON, ESQ.
      chris.oprison@dlapiper.com
14    Attorneys for Business Insurance Holdings Inc.

15    DLA PIPER
      1201 No. Market Street
16    Suite 2100
      Wilmington, DE 19801
17    (302) 468-5700
      BY:  MATTHEW DENN, ESQ.
18    matt.denn@dlapiper.com
      Attorneys for Business Insurance Holdings Inc.
19
      DLA PIPER
20    1251 Avenue Of The Americas
      New York, New York 10020
21    BY:  DAVID TONER, ESQ.
      dtoner@dlapiper.com
22    (212) 335-4500
      Attorneys for Business Insurance Holdings Inc.
23
      ALSO PRESENT - GEORGE ELLIS, Videographer, LINDA
24    HOHN, In-House Counsel for the Institutes, CAROLE
      ACUNTO
25
```



ADAM POTTER VOLUME II                                        June 16, 2021
AIFCPCU V POTTER                                                          4

```
 1                    I  N  D  E  X

 2

 3

        W  I  T  N  E  S  S
 4
     Testimony of:
 5

 6   ADAM POTTER                            PAGE NO.

 7

        EXAMINATION BY MR. HAYES              7
 8      EXAMINATION BY MR. OPRISON:          121
        EXAMINATION BY MR. HAYES:           196
 9

10

11                    E X H I B I T S

12

13     NUMBER            DESCRIPTION           PAGE

14
       Exhibit        Institutes0010863        22
15     Potter-1       through Institues10867
       Exhibit        Asset Purchase Agreement 34
16     Potter-2
       Exhibit        Asset Purchase Agreement 38
17     Potter-3       Schedules
       Exhibit        BIH-003-006043 through   58
18     Potter-4       BIH-003-006046
       Exhibit        Stock Purchase Agreement 60
19     Potter-5
       Exhibit        BIH-003-006434           63
20     Potter-6
       Exhibit        BIH-003-005895 through   68
21     Potter-7       5897
       Exhibit        BIH-003-005875 to        71
22     Potter-8       BIH-003-005876
       Exhibit        BIH-002-003715 through   74
23     Potter-9       BIH-002-003718
       Exhibit        Email, March 19, 2019    76
24     Potter-10
       Exhibit        BIH-003-005616           77
25     Potter-11
```



| | | | |
|---|---|---|---|
| 1 | Exhibit<br>Potter-12 | Email, 4/17/2019 | 79 |
| 2<br>3 | Exhibit<br>Potter-13 | Potter-DE-000578 through<br>588, Email, June 27,<br>2019 | 80 |
| 4 | Exhibit<br>Potter-14 | BIH-003-005066 through<br>BIH-003-005069 | 82 |
| 5 | Exhibit<br>Potter-15 | August 19, 2019 Email | 85 |
| 6 | Exhibit<br>Potter-17 | BIH-001-000136 through<br>BIH-001-000137, Email,<br>August 30, 2019 | 100 |
| 7 | Exhibit<br>Potter-18 | BIH-003-004054 | 106 |
| 8 | Exhibit<br>Potter-19 | Potter-DE-001018 | 109 |
| 9 | Exhibit<br>Potter-20 | BIH-003-004353 through<br>BIH-003-004354 | 112 |
| 10 | Exhibit<br>Potter-21 | BIH-003-04387 | 117 |
| 11<br>12 | Exhibit<br>BIH-49 | Institutes0005588<br>through<br>Institutes0005589 | 138 |
| 13 | Exhibit<br>Potter-39 | Institutes0005529 to<br>Institutes0005530 | 142 |
| 14 | Exhibit<br>Potter-51 | Potter-DE-000364 through<br>Potter-DE-000367 | 149 |
| 15 | Exhibit<br>BIH-48 | Institutes000500 | 163 |
| 16 | Exhibit<br>BIH-50 | BIH-003-003885 through<br>BIH-003-003911 | 171 |
| 17 | Exhibit<br>BIH-47 | BIH-003-004763 | 177 |
| 18 | Exhibit<br>BIH-46 | BIH-003-004199 | 183 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |



ADAM POTTER VOLUME II                                          June 16, 2021
AIFCPCU V POTTER                                                          6

```
 1         DEPOSITION SUPPORT INDEX
        DIRECTION TO WITNESS NOT TO ANSWER
 2
                 Page  Line
 3
                 98    23
 4
     REQUEST FOR PRODUCTION OF DOCUMENTS
 5
                 Page   Line
 6

 7
              STIPULATIONS
 8

 9               Page    Line

10

11            QUESTION MARKED

12               Page    Line

13

14

15

16

17

18

19

20

21

22

23

24

25
```



ADAM POTTER VOLUME II                                    June 16, 2021
AIFCPCU V POTTER                                                   53

1    to kind of --

2            Q.      I'm asking --

3            A.      I think --

4            Q.      Please answer my question.

5            A.      But I think that -- I would have to

6    do it through an example.  I'm sorry.

7            Q.      Well, to what extent as you

8    understand these terms could a conference address

9    claims or litigation management?

10           A.      Perfect.  We had the World Captive

11   Forum as defined in -- on the events on Item 1, oral

12   captive forum.  This forum or conference is a

13   three-day conference that has been in existence for

14   about 30 years.

15                   It is to discuss and it relates to

16   everything regarding captives.  In 2018, 2017, 2016,

17   were there sessions in this conference which are

18   online still that have a description that mentions

19   claims?  The answer is yes.  In 2019, were there

20   sessions that included claims?  Yes.  But the overall

21   content is related to captive insurance or world

22   captives.  It's not relating to claims.  Any claims

23   content would be relating to the world captive or

24   captives.  And the Institutes knew that.  They saw

25   the agendas for that and it relates to captives.  It



```
 1            A.       No.

 2            Q.       Did you believe you had an obligation

 3    to notify the Institutes that you were holding a

 4    conference?

 5            A.       No.

 6            Q.       Why not?

 7            A.       Because I was -- I wasn't in

 8    violation of my agreement with the Institutes.

 9            Q.       Why do you say that?

10            A.       Well, because it wasn't -- the CLM

11    never had a cannabis conference and it wasn't

12    targeted towards claims and litigation professionals.

13    In fact, we specifically excluded them.

14            Q.       When did you specifically exclude

15    them?

16            A.       It was after their request.  I don't

17    remember.  I think it was -- if it was the first or

18    second letter that we received from them.

19            Q.       Prior to that, did you actively or

20    take any steps to exclude claims and litigation

21    management professionals from attending the

22    conference?

23            A.       Yes.

24            Q.       What steps?

25            A.       There was a -- well, none of the
```



# EXHIBIT 34

Message
| | |
|---|---|
| **From:** | Adam Potter [adam.potter@businessinsurance.com] |
| **on behalf of** | Adam Potter <adam.potter@businessinsurance.com> [adam.potter@businessinsurance.com] |
| **Sent:** | 4/17/2019 8:20:03 PM |
| **To:** | Katie Kett [kkett@businessinsurance.com] |
| **CC:** | Brittany Collins [bcollins@businessinsurance.com]; Keith Kenner [kkenner@businessinsurance.com]; Jeremy Campbell [jcampbell@businessinsurance.com]; BI - Gavin Souter [gsouter@businessinsurance.com] |
| **Subject:** | Re: Cannabis registration |

I don't see any reason not to open registration earlier, if possible.  I found a few of their cannabis conference registration fees online – see below.  I think we should do something a bit different and more like the WCF conference, where we have different tiers.  What does everyone think about
$99 / $199 for Risk Managers,
$499 (early) / $599 (regular) for insurance company folks (underwriters/claims),
$899/$999 for brokers
$1499 / $1599 for all others

We made a deal with Wilson elser that no other lawyer/law firm is allowed to attend.

Thoughts?









Adam Potter

Chief Executive Officer
(212) 724-2345

**BUSINESS**
**INSURANCE**

---

**From:** BI - Katie Kett <kkett@businessinsurance.com>
**Date:** Wednesday, April 17, 2019 at 5:56 PM
**To:** Adam Potter <adam.potter@businessinsurance.com>
**Cc:** Brittany Collins <bcollins@businessinsurance.com>, BI - Keith Kenner <kkenner@businessinsurance.com>,
BI - Jeremy Campbell <jcampbell@businessinsurance.com>
**Subject:** Re: Cannabis registration

Hold on, I think we decided to open registration around June when the agenda will be much more firm, correct?

It would be good to have the pricing discussion before that anyhow...let me know your thoughts!

---

**From:** Katie Kett <kkett@businessinsurance.com>
**Date:** Wednesday, April 17, 2019 at 2:43 PM
**To:** Adam Potter <adam.potter@businessinsurance.com>
**Cc:** Brittany Collins <bcollins@businessinsurance.com>, Keith Kenner <kkenner@businessinsurance.com>,
Jeremy Campbell <jcampbell@businessinsurance.com>
**Subject:** Cannabis registration

What should we charge for registration, so I can get that set up and launch asap...?

Do we know how much Insurance Business charged for their event? I can't see online...
https://cannabis.ibamag.com/denver/

---

**From:** Adam Potter <adam.potter@businessinsurance.com>
**Date:** Wednesday, April 17, 2019 at 10:55 AM
**To:** Katie Kett <kkett@businessinsurance.com>, Jeremy Campbell <jcampbell@businessinsurance.com>,
Brittany Collins <bcollins@businessinsurance.com>
**Cc:** Gavin Souter <gsouter@businessinsurance.com>
**Subject:** Re: D&I Institute Renewal

Yes we have a date and venue!!

Get Outlook for iOS

---

**From:** Katie Kett
**Sent:** Wednesday, April 17, 2019 1:53:45 PM
**To:** Adam Potter; Jeremy Campbell; Brittany Collins
**Cc:** Gavin Souter
**Subject:** Re: D&I Institute Renewal

All the board members on the site are confirmed.

Teresa Barlett and Mark Pew cannot confirm until we can confirm the event date. Have we signed the venue contract yet??

CONFIDENTIAL

Melanie Lakin is not confirmed yet and someone is working on someone named Gary...I'll follow up again with Ian on those.

See attached for AB contact list. I'm waiting until we confirm the venue to have the first AB call as the date if very important to confirm.

---

**From:** Adam Potter <adam.potter@businessinsurance.com>
**Date:** Wednesday, April 17, 2019 at 10:08 AM
**To:** Jeremy Campbell <jcampbell@businessinsurance.com>, Katie Kett <kkett@businessinsurance.com>, Brittany Collins <bcollins@businessinsurance.com>
**Subject:** Re: D&I Institute Renewal

She is on the board and should be listed. Can someone verify the board members listed on the website?  Thanks!

Get Outlook for iOS

---

**From:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Sent:** Wednesday, April 17, 2019 12:52 PM
**To:** Katie Kett; Adam Potter; Brittany Collins
**Subject:** Fwd: D&I Institute Renewal

Is Teresa Bartlett of Sedgwick on the cannabis AB? She was listed on a sheet I got but not the website?

Jeremy Campbell

Sent from my iPhone

Begin forwarded message:

> **From:** "Kolibash, Julie" <Julie.Kolibash@sedgwick.com>
> **Date:** April 17, 2019 at 12:41:46 PM EDT
> **To:** Jeremy Campbell <jcampbell@businessinsurance.com>
> **Subject:** RE: D&I Institute Renewal
>
> Thanks!  Is Dr. Bartlett speaking?  I looked online and it did not list her on the advisory committee.
>
> Julie
>
> ---
>
> **From:** Jeremy Campbell <jcampbell@businessinsurance.com>
> **Sent:** Tuesday, April 16, 2019 3:30 PM
> **To:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
> **Subject:** RE: D&I Institute Renewal
>
> Julie,
>
> Hot off the presses – attached are some additional details on the new Cannabis & Hemp Conference. The platinum sponsorship has already been sold but silver and gold level are still available. Let me know if any questions and keep me posted on once you have final decisions on the other events as well. Thanks,

CONFIDENTIAL

Jeremy Campbell
513.737.4063 direct | 513.377.7228 wireless
**BUSINESS INSURANCE** | WORKERS COMPENSATION MAGAZINE
DIVERSITY & INCLUSION INSTITUTE

---

**From:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Sent:** Monday, April 15, 2019 9:13 AM
**To:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Subject:** RE: D&I Institute Renewal

Thanks Jeremy.  I do not have any extra budget to put towards W2W so we will have to stick with the silver level for EMEA and gold for the U.S.

This is the first I have heard of the new conferences.  I will need to review and would need corporate to sign off on sponsorship dollars since it is hard to get extra money – especially towards the end of year!

Thanks - Julie

---

**From:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Sent:** Wednesday, April 10, 2019 4:57 PM
**To:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Subject:** RE: D&I Institute Renewal

Julie,

Sounds good. Let me know if any questions arise after your call with Ericka.

I've attached a copy of the custom Global Presenting Sponsorship for Women to Watch as well as the standard sponsorship packages for each event. Let me know if you have any questions on the custom sponsorship.

Also, I heard that Teresa Bartlett of Sedgwick is on the advisory board for the new Cannabis, Hemp and CBD Insurance Conference that we are launching in October. This conference may make sense for you? I am still finalizing the sponsorship flyer but packages are attached and start at just $6500. As you know, this is a huge growth area for the industry and would be great for Sedgwick to get in on this event from the beginning.

I still need to get to Columbus some time soon and will let you know when I do. Hopefully we can grab some lunch and meet in person!

Jeremy Campbell
513.737.4063 direct | 513.377.7228 wireless
**BUSINESS INSURANCE** | WORKERS COMPENSATION MAGAZINE
DIVERSITY & INCLUSION INSTITUTE

---

**From:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Sent:** Wednesday, April 10, 2019 4:26 PM
**To:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Subject:** RE: D&I Institute Renewal

HI Jeremy!
I am not attending RIMS.  I will be holding down the fort at home while everyone else is there ☺

CONFIDENTIAL

I have a call with Ericka in 2 weeks (right before RIMS) so I will let you know what we decide after that conversation.

We definitely want to do the W2W events.  Can you send me the price breakdowns of what you describe below?  I don't have a huge budget due to other events we are doing across the globe – but it's worth looking at!

Catherine Bennett does all our nominations and I am sure she is on top of this.  Those events I could see us doing a table as we have in the past, but I unfortunately don't have additional sponsor dollars to put towards them at this time.

Thanks!!
Julie

---

**From:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Sent:** Wednesday, April 10, 2019 2:45 PM
**To:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Subject:** RE: D&I Institute Renewal

Julie,

Just thought I'd check, you plan on being at RIMS in a few weeks? If so, I'd love to catch up while we're in Boston. If not, let me know if you'd like to set up a call to discuss Sedgwick's event strategy over the remainder of the year.

D&I Institute – As you know, we just finalized our dates and location for the annual conference and are working with Platinum members to put together the agenda and speakers. I would recommend upgrading to Platinum level so that you can be included in planning the conference, receive additional passes to the event, and have the opportunity to place a speaker on a panel.

Women to Watch – I would recommend once again sponsoring both the US and EMEA event. If you are putting more resources and budget to international exposure, an option would be upgrading your EMEA sponsorship to gold level. Another option would be the Global Presenting Sponsor which would place Sedgwick as the premier sponsor of Women to Watch and the Networking Lunch sponsorship at both events ($68k for both events, or $60k as a 3 year deal).

Other events – Innovation Awards nominations opens in a couple weeks. I'd recommend submitting nominations once again for this event as well as all of our award programs.

Jeremy Campbell
513.737.4063 direct | 513.377.7228 wireless
**BUSINESS INSURANCE** | WORKERS COMPENSATION MAGAZINE
DIVERSITY & INCLUSION INSTITUTE

---

**From:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Sent:** Tuesday, February 19, 2019 10:22 AM
**To:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Subject:** RE: D&I Institute Renewal

Great!  I am always here ☺  We will be on spring break with the kids March 9-19.

CONFIDENTIAL

I agree that the D&I and W2W events still make sense for Sedgwick. I am not about adding another event unless I can prove it valuable since some of my efforts (and budget) this year are being shifted to international exposure.

---

**From:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Sent:** Tuesday, February 19, 2019 10:18 AM
**To:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Subject:** RE: D&I Institute Renewal

Julie,

Sounds good. Quick question – when do you plan to put together and finalize budgets for 2019? We'd love to set up some time to discuss opportunities further. I also need to make a trip to Columbus to meet with a couple other clients as well so let me know a good timeframe and maybe we can set up a lunch?

I think the D&I Institute, both Women to Watch events continue to make sense for Sedgwick in addition to our Innovation Awards.

Jeremy Campbell
513.737.4063 direct | 513.377.7228 wireless
**BUSINESS INSURANCE** | WORKERS COMPENSATION MAGAZINE
DIVERSITY & INCLUSION INSTITUTE

---

**From:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>
**Sent:** Monday, February 18, 2019 5:18 PM
**To:** Jeremy Campbell <jcampbell@businessinsurance.com>; DeBruce, Ericka <Ericka.DeBruce@sedgwick.com>
**Subject:** RE: D&I Institute Renewal

Thanks Jeremy! Ericka and I will discuss and get back to you ☺

---

**From:** Jeremy Campbell <jcampbell@businessinsurance.com>
**Sent:** Monday, February 18, 2019 3:55 PM
**To:** Kolibash, Julie <Julie.Kolibash@sedgwick.com>; DeBruce, Ericka <Ericka.DeBruce@sedgwick.com>
**Subject:** D&I Institute Renewal

Julie and Erika,

I hope all is well. I just wanted to give you a heads up that your current membership in the D&I Institute is set to expire on May 19th. We have a little time but I have attached a flyer with additional information on membership packages for 2019. Membership rates stay the same, just have new names. Advocate level which Sedgwick is currently, is now referred to as Gold level.

As you probably know, we are planning to bring back our D&I Institute Annual Conference again in September. You will receive a great deal of brand exposure to attendees at the conference, and in all conference promotions, and many other benefits throughout the year with your gold level membership. If interested in upgrading to Platinum level, you will be on the planning committee to help us plan content and speakers for the annual conference and you will also receive first opportunity to place an executive on a panel discussion.

CONFIDENTIAL

Please let me know before May 19th if you would like to continue your membership in the D&I Institute so that we can make sure there is no lapse in your membership benefits. Also, please let me know if you'd like to set up a call with Deidre and myself to discuss the Institute, how we're doing, things you like and don't like, other initiatives you'd like to see and more. We'd be happy to set up some time to discuss further. Thanks,

Jeremy Campbell
Head of Sales|Events & Workers Compensation Magazine
513.737.4063 direct | 513.377.7228 wireless
BUSINESS INSURANCE EVENTS | WORKERS COMPENSATION MAGAZINE
DIVERSITY & INCLUSION INSTITUTE

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | |
| | ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

**ADAM POTTER'S RESPONSE TO
BUSINESS INSURANCE HOLDINGS, INC.'S
COUNTERSTATEMENT OF FACTS SUBMITTED IN OPPOSITION
TO POTTER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Adam Potter ("Potter"), through undersigned counsel, submits this response to the Counterstatement of Facts (the "Response") filed by Defendant Business Insurance Holdings, Inc. ("BIH") in opposition to Potter's Motion for Summary Judgment on the BIH's Cross-Claims.

85.    Mr. Potter committed, in response to concerns raised by The Institutes, to remove claims altogether from the Cannabis & Hemp conference.  Deposition of Adam Potter (Ex. 1) at 163-168; Ex. 4 (letter from Mr. Potter's counsel to Institutes counsel).

**ANSWER:**  Admitted-in-part; Denied-in-part.  Admitted that Potter made certain

changes to the Cannabis Conference[1] as an accommodation to resolve a potential

dispute raised by The Institutes concerning alleged violations of the underlying asset

purchase agreement.  BIH's allegation that "Potter committed  . . . to remove claims

altogether from the Cannabis conference" is unsupported by the record citations

provided and, therefore, denied.  Fed. R. Civ. P. 56(c)(1).  Further, the August 20,

2019 letter (the "Compromise Letter), and Potter's corresponding testimony, is

inadmissible evidence under Federal Rule of Evidence 408 because it is being used

by BIH to prove the validity of a disputed claim.  The Compromise Letter was sent

by counsel for Potter to counsel for The Institutes as part of compromise negotiations

to resolve a potential dispute in hopes the parties may avoid litigation, and is clearly

marked "FOR SETTLEMENT PURPOSES ONLY."  D.I. 244 (Potter Declaration),

¶¶ 4-6; D.I. 256 (SUMF), ¶¶ 39-40; D.I. 273-2, Ex. 4 (the Compromise Letter).

86.    Mr. Potter was specific that his commitment to remove claims from the

C&H Conference was not simply changing the title of a single panel.  Adam Potter

Deposition (Ex. 1) at 86-88.  But Mr. Potter agreed that he had no idea whether the

presentation had actually been changed.  *Id*. at 89.  He could not recall whether he

had even asked that the presentation be changed.  *Id*. at 90.

**ANSWER:**  Admitted-in-part; Denied-in-part.  Admitted that Potter testified that

---

[1] Potter incorporates by reference the defined terms from his Statement of Undisputed Material Facts ("SUMF").  *See* D.I. 256.

2

more was changed than the word "claims" to "exposure" in the at-issue session description. D.I. 273-2, Ex. 1 (Potter Tr.), 87-88. BIH's characterization that "Potter agreed that he had no idea whether the presentation had actually been changed" is not supported by the record citation provided and, therefore, is denied. Fed. R. Civ. P. 56(c)(1). Potter stated in the cited portion of his deposition testimony that he did not change or prepare the presentation, and did not know what the presentation included. *Id.* In the cited portion of his deposition, Potter was not asked (nor did he testify as to) "whether the presentation had actually been changed" or "whether he had even asked that the presentation be changed." *See id.*

87.    Mr. Potter claimed that he had told Katie Kett not to allow claims and litigation personnel to attend the C&H conference, *id*. at 93-94, but he also admitted that he was aware that claims and litigation personnel had registered for the conference and could not recall if he had taken any action to rescind those registrations. *Id*. at 90-91. Mr. Potter later admitted that he had taken no action to exclude claims and litigation personnel other than attorneys. *Id*. at 128-130. Ms. Kett testified at her deposition that Mr. Potter had asked for the names of claims and litigation personnel who had registered for the conference, that she had provided those names to him, and that he had not asked her to take any action with respect to them. Katie Kett Deposition (Ex. 7) at 76-80.

**ANSWER:**  Admitted-in-part; Denied-in-part. Admitted that Potter testified that he

instructed Katie Kett not to accept any registrations for the Cannabis Conference from claims or litigation management personnel. *See* D.I. 273-2, Ex. 1 (Potter Tr.), 93. BIH's characterization that Potter "admitted that he was aware that claims and litigation management personnel had registered for the conference and could not recall if he had taken any action to rescind those registrations" is not supported by the record citation provided and, therefore, is denied. Fed. R. Civ. P. 56(c)(1). BIH's characterization that "Potter later admitted that he had taken no action to exclude claims and litigation personnel other than attorneys" is also not supported by the record citation provided and, therefore, is denied. *Id.* Potter's cited testimony relates to the time "***prior to***" The Institutes raising an alleged concern about the Cannabis Conference. *See id.* at 128-130. Afterwards, the record reflects that the Cannabis Conference's website was changed to expressly provide: "This conference was not developed and is not intended for claims and litigation management professionals." D.I. 258, Ex. F (Cannabis Conference Website), p. 1; D.I. 247 (Declaration of Seth Niederman), Ex. 33 (Potter Tr.), 128:11-13 (stating that the Cannabis Conference "wasn't targeted towards claims and litigation professionals. In fact, we specifically excluded them"). Outside counsel was also expressly excluded from attending the Cannabis Conference. D.I. 273-2, Ex. 1 (Potter Tr.), 87-88; *see* Supplemental Declaration of Seth Niederman, Ex. 35 (Aug. 13, 2019 email chain). Lastly, BIH's allegations concerning Kett's deposition testimony are not supported by the record

4

citations and, therefore, are denied. Fed. R. Civ. P. 56(c)(1).

88.     Mr. Potter specifically represented to Mr. Acunto prior to the sale of BIH to Beacon International that the non-compete provisions of the APA would not apply to BIH once it was sold to Beacon International.  Stephen Acunto Deposition I (Ex. 2) at 43-44, 81-83, 105-107.

**ANSWER:**  Admitted-in-part; Denied-in-part.  Admitted that Mr. Acunto testified that Potter verbally communicated prior to the sale of BIH to Beacon that the Non-Compete "didn't apply" and that "it didn't touch our transaction" and "it didn't touch us."  D.I. 273-2, Ex. 2 (Acunto Tr.), 44, 82, 106.  BIH's characterization that Potter made a specific representation "that the non-compete provisions of the APA would not apply to BIH once it was sold to Beacon International" is not supported by the record citations provided and, therefore, denied.  Fed. R. Civ. P. 56(c)(1).

89.     Mr. Acunto testified that Mr. Potter represented to him that he had taken pro-active steps to clarify conference attendees. *Id*. at 278.   This representation was also made in writing by Mr. Potter in the Stock Purchase Agreement (Ex. 5) (BIH-3-3909).  Mr. Acunto was also of the belief that material related to claims and litigation had been excised from the C&H conference before he bought the company. Stephen Acunto Deposition I (Ex. 2) at 270-275.  Mr. Potter agreed during his deposition that he had told the Acuntos prior to the sale of BIH that he had modified the C&H Conference, Adam Potter Deposition (Ex. 1) at 161-162, and testified that

the Acuntos were "well aware" of the changes he had made to the conference to address the Institutes' concerns, and that he told the Acuntos "we're taking care of the situation." *Id*. at 167-169.

**ANSWER:**   Admitted-in-part; Denied-in-part.   Admitted that the Stock Purchase Agreement states: "We . . . took proactive steps to clarify the intended conference attendees." D.I. 273-2, Ex. 5 (BIH-003-003909).  It is also admitted that Mr. Acunto testified to his believe that "the inclusion of claims and litigation in the conference . . . were excised before I owned the company." D.I. 273-2, Ex. 2 (Acunto Tr.), 274-75.  It is also admitted that Potter testified as to his belief that the Acuntos were informed prior to closing on the sale of BIH that the Cannabis Conference was being modified.  D.I. 273-2, Ex. 1 (Potter Tr.), 161-62. BIH's characterizations of Potter's testimony in the balance of this paragraph is not supported by the record citations provided and, therefore, are denied. Fed. R. Civ. P. 56(c)(1).  Potter testified about the Acuntos being "well aware," and that "we're taking care of the situation," in connection with the broader dispute with The Institutes concerning alleged violations of the Non-Compete.  D.I. 273-2, Ex. 1 (Potter Tr.), 168-169.

90.    Mr. Potter continued to represent to Mr. Acunto after the sale of BIH to Beacon Intercontinental that the C&H conference complied with the terms of the non-compete provisions of the APA. Stephen Acunto Deposition I (Ex. 2) at 219-221; Stephen Acunto Deposition II (Ex. 3) at 32-39. In fact, Mr. Potter went so far

as to encourage Mr. Acunto to have BIH sign an agreement to indemnify one of the conference sponsors against a tortious interference with contract claim by CLM based on interference with the APA. Ex. 6

**ANSWER:**    Denied.    BIH's allegations in this paragraph – especially its characterization that "Potter went so far as to encourage Mr. Acunto to have BIH sign an agreement to indemnify one of the conference sponsors against a tortious interference with contract claim by CLM based on interference with the APA" is not supported by the record citations provided and, therefore, is denied.  Fed. R. Civ. P. 56(c)(1).  Exhibit 6 is an email chain and does not include a copy of the alleged "agreement to indemnify."  Therefore, this paragraph is denied.

91.    Mr. Potter led the Acuntos to believe that they could assist his sister Sydney Posner with the project that became ClaimsX without violating the APA's non-compete clause. It is undisputed that Mr. Potter introduced Ms. Posner to the Acuntos. Adam Potter Deposition (Ex. 1) at 114. Although Mr. Potter told Mr. Acunto that he (Mr. Potter) could not be directly involved in a project with Sydney Posner, the evidence shows that Mr. Acunto memorialized a conversation in September, 2019 in which Mr. Potter proposed to bring Ms. Posner to a meeting with Mr. Acunto to discuss a "JV." Potter SOF at Exhibit 31. It was only after Mr. Acunto memorialized this conversation that Mr. Potter responded that he (Potter) could not be involved in any discussions because of his non-compete with The Institutes. Id.

Implied in this communication, of course, is that Mr. Acunto was permitted to be involved in such discussions. This is consistent with Mr. Acunto's recollection that Mr. Potter asked him to meet with Ms. Posner and "maybe working with her on an idea she had."   Acunto Deposition I (Ex. 2)  at 160-161.  Mr. Potter admits that he went so far as to bring Ms. Posner to Mr. Acunto, and then sit outside the room while they met.  Adam Potter Deposition (Ex. 1) at 114-115.  Mr. Potter also concedes that he cannot remember if he discussed with Mr. Acunto Ms. Posner's meetings with Mr. Acunto.  *Id*. at 115-116.

**ANSWER:**  Admitted-in-part; Denied-in-part.  Admitted that Potter introduced his sister, Sydney Posner, to the Acuntos.  BIH's allegation that "Potter led the Acuntos to believe that they could assist his sister Sydney Posner with the project that became ClaimsX without violating the APA's non-compete clause" is not supported by any record citation and, therefore, denied.  Fed. R. Civ. P. 56(c)(1).  BIH's allegation that "Potter admits that he went so far as to bring Ms. Posner to Mr. Acunto, and then sit outside the room while they met" is not supported by the record citation provided and, therefore, denied.  Potter was asked "were you actually in the room for those meetings," to which he answered "No." D.I. 273-2 (Potter Tr.), 115.  Potter was never asked, nor did he testify or admit to "sit[ting] outside the room."  It is admitted Potter testified that he could not recall discussing with Mr. Acunto his meetings with Ms. Posner.  BIH's characterization that Potter's lack of recollection

is somehow a "concession" is denied.

92.    After the sale of BIH to Beacon Intercontinental, Mr. Potter provided some transitional services to BIH. *Id*. at 102-103.

**ANSWER:**  Admitted that Potter provided transition services, which he described as "[s]howing [the Acuntos] how to use certain things" and that "[Mr. Acunto] sometimes would bounce ideas off of me."  D.I. 273-2, Ex. 1 (Potter Tr.), 102-03.

93.    Mr. Acunto was not concerned about the legal propriety of BIH continuing with the C&H Conference because of assurances he had from Mr. Potter. Stephen Acunto Deposition I (Ex. 2) at 102-108; Stephen Acunto Deposition II (Ex. 3) at 32-39.

**ANSWER:**  Admitted that Mr. Acunto so testified.

94.    Mr. Acunto stated in verified interrogatory answers that Mr. Potter represented to the Acuntos both before and after the sale of BIH to Beacon Intercontinental that the non-compete provisions of the APA did not apply to BIH after it was sold to Beacon Intercontinental, and that Potter had told him both before and after the sale of BIH to Beacon Intercontinental that Potter had taken steps to ensure that the Cannabis & Hemp Conference complied with the APA.  Adam Potter Omnibus Statement of Undisputed Material Facts, Exhibit 30.

**ANSWER:**  Admitted that Mr. Acunto verified BIH's interrogatory responses that contained these statements.

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/  Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: March 18, 2022                    *Attorneys for Defendant Adam Potter*

App.591

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

**SUPPLEMENTAL DECLARATION OF COUNSEL
SUBMITTED IN FURTHER SUPPORT OF
ADAM POTTER'S  MOTION FOR SUMMARY JUDGMENT
ON BUSINESS INSURANCE HOLDINGS, INC.'S CROSS-CLAIMS**

Pursuant to 28 U.S.C. § 1746, I, SETH NIEDERMAN, declare under penalty

of perjury as follows:

1.    I am an attorney at law in the State of Delaware, and a partner in the

law firm of Fox Rothschild LLP, attorneys for Defendant Adam Potter ("Potter").

2.    I am authorized to make this Declaration[1] on Potter's behalf, and do so

upon personal knowledge and in support of Potter's contemporaneously filed Reply

(the "Reply") in further Support of his Motion for Summary Judgment on the Cross-

---

[1] This is the second declaration with exhibits filed in support of Potter's summary judgment motions, and the third declaration with exhibits overall filed on Potter's behalf in connection with summary judgment.  D.I. 257 (Exs. 1-32); D.I. 281 (Exs. 33-34).

Claims asserted by Defendant Business Insurance Holdings, Inc. ("BIH"), and

Potter's Response to BIH's Counter-Statement of Facts (the "Response").

3.      I hereby certify that following exhibit, attached hereto and referenced

in the Reply and Response, are true and correct copies of the following documents:

| Exhibit[2] | Description |
|:---:|---|
| 35 | An August 13, 2019 email chain, Potter-DE-000429 to -000431 |

I declare under penalty of perjury that the foregoing is true and correct.


By:    */s/ Seth Niederman*
       SETH NIEDERMAN (#4588)

Dated: March 18, 2022

---

[2] For consistency and organizational purposes, Potter continues the exhibit numbering from the Declaration of Counsel filed on February 11, 2022 in support of his Motions for Summary Judgment, D.I. 243, 257 (enclosing Exs. 1-32), and the Declaration of Counsel filed on March 4, 2022, D.I. 281 (enclosing Exs. 33-34).

# EXHIBIT 35

Message
| | |
|---|---|
| **From**: | Adam Potter [adam.potter@businessinsurance.com] |
| on behalf of | Adam Potter <adam.potter@businessinsurance.com> [adam.potter@businessinsurance.com] |
| **Sent**: | 8/13/2019 9:08:20 PM |
| **To**: | Katie Kett [kkett@businessinsurance.com] |
| **Subject**: | Re: Business Ins. Cannabis and Hemp Conf (NY Oct 2019) |

Hi Katie –

We knew it would create an issue, but really needed their assistance in making the conference happen.

We can't film or record the conference.  Many speakers wouldn't participate as recordings typically find themselves used against the person in court for unrelated cases…..i

Adam Potter
Chief Executive Officer
(212) 724-2345



**From:** BI - Katie Kett <kkett@businessinsurance.com>
**Date:** Tuesday, August 13, 2019 at 2:55 PM
**To:** Adam Potter <adam.potter@businessinsurance.com>
**Subject:** FW: Business Ins. Cannabis and Hemp Conf (NY Oct 2019)

FYI

Maybe we should consider filming the conference and making a recording available after the conference (for a price)? Would Wilson Elser oppose that do you think? I'm still finalizing the contract with them.

**From:** Julie Pomerantz <jpomerantz@mwlaw.com>
**Date:** Tuesday, August 13, 2019 at 11:40 AM
**To:** Katie Kett <kkett@businessinsurance.com>
**Subject:** RE: Business Ins. Cannabis and Hemp Conf (NY Oct 2019)

I would hope that you would reconsider and that you would make this CLE friendly for lawyers.  It's a perfect CLE opportunity for those of us practicing in this space. It doesn't seem right for a publication such as yours to exclude your very reader, i.e. the insurance regulatory lawyer.

## MITCHELL ‖ WILLIAMS

**Julie M. Pomerantz**
T 512.480.5100 | F 512.322.0301
jpomerantz@mwlaw.com | MitchellWilliamsLaw.com
500 W. 5th Street | Ste. 1150 | Austin, TX 78701
Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.

**From:** Katie Kett [mailto:kkett@businessinsurance.com]
**Sent:** Tuesday, August 13, 2019 1:09 PM
**To:** Julie Pomerantz
**Subject:** Re: Business Ins. Cannabis and Hemp Conf (NY Oct 2019)

Hi Julie

Yes, I'm afraid you are ineligible to attend our Cannabis conference. We are not allowing any outside counsel to attend this event per an exclusive agreement with our founding partner. But we don't intend to exclude outside counsel from future Cannabis events. Also, outside counsel is eligible to attend all of our other events.

I hope that helps. Please let me know if you have any other questions.

Best
Katie

**Katie Kett** | Director, Marketing & Events | **Business Insurance**
(616) 550-5591 direct | kkett@businessinsurance.com
www.businessinsurance.com | @BusInsMagazine





---

**From:** Julie Pomerantz <jpomerantz@mwlaw.com>
**Date:** Tuesday, August 13, 2019 at 11:03 AM
**To:** Katie Kett <kkett@businessinsurance.com>
**Subject:** Business Ins. Cannabis and Hemp Conf (NY Oct 2019)

Hi Katie,

Is it true that I cannot attend this conference because I am a lawyer, i.e. outside counsel? I don't understand. Pls explain. Thanks. Julie



**Julie M. Pomerantz**
T 512.480.5100 | F 512.322.0301
jpomerantz@mwlaw.com | MitchellWilliamsLaw.com
500 W. 5th Street | Ste. 1150 | Austin, TX 78701
Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.

Confidentiality Notice: This electronic mail transmission and any attachment may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail or by calling (501) 688-8800 Little Rock, AR (479) 464-5650 Rogers, AR (512) 480-5100 Austin, TX or (870) 939-6262 Jonesboro, AR so that our address record can be corrected

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

        Plaintiffs,

        v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

        Defendants.

Civil Action No. 19-1600-RGA

<u>MEMORANDUM ORDER</u>

Before me are Business Insurance Holdings, Inc. ("BIH")'s and Adam Potter's *Daubert*

motions to exclude Plaintiffs' damages expert Dr. Christine Meyer.   (D.I. 259, 260).   I have

considered the parties' briefing.   (D.I. 261, 262, 289, 292, 297, 298).

Plaintiffs allege that BIH and Potter have breached the non-compete provisions of the

Asset Purchase Agreement ("APA").   (D.I. 48).   Dr. Meyer opines that the appropriate measure

of damages for this breach is the difference between the amount Plaintiffs paid for the CLM

assets and the value of the CLM assets received by Plaintiffs (which is lower due to Defendants'

competition).   (D.I. 263-1, Ex. 2, ¶ 10(c)).

Plaintiffs based their purchase price on an initial valuation performed by Valuation

Research Corporation ("VRC") on March 5, 2018 (the "Pre-Acquisition Valuation").   (*See* D.I.

263-2, Ex. 3).   Dr. Meyer created two alternative adjustments to the Pre-Acquisition

1

Valuation— the "Theoretical Adjustment" and the "Actual Revenue Adjustment"—to estimate the value Plaintiffs would have expected to receive assuming competition from Defendants. (D.I. 263-1, Ex. 2, ¶¶ 55–59).    To calculate the damages, Dr. Meyer subtracted the value of the CLM assets estimated using these adjustments from the present value of the purchase price as of June 1, 2018.    (*Id.*, ¶ 63).    She concluded that Plaintiffs' damages are "at least $3.5 to $5.2 million, and as high as $6.7 to $8.0 million."    (*Id.*).

In conducting her analysis, Dr. Meyer assumed, "The valuation in the Pre-Acquisition Valuation Report was conducted under the assumption that Defendants would not compete with CLM after the acquisition of the CLM Assets" by Plaintiffs.    (*Id.*, ¶ 42).    BIH and Potter argue that there is no factual support for this assumption.    (D.I. 261 at 8–9; D.I. 262 at 14–15). Plaintiffs respond by pointing to evidence supporting Dr. Meyer's assumption.    (D.I. 292 at 11–12; *see also* D.I. 263-1, Ex. 1, at 89:5–90:5; 242:1–9).    Thus, I reject this "failure of proof" argument.[1]    BIH and Potter can cross-examine Dr. Meyer about the basis for her assumption.

BIH also argues that Dr. Meyer's "Theoretical Adjustment" model is not supported by the facts of this case.    (D.I. 262 at 15–17).    For her "Theoretical Adjustment," Dr. Meyer uses the Cournot model to assume that Defendants' competition with Plaintiffs would result in a 50% reduction in Plaintiffs' market share.    (D.I. 263-1, Ex. 2, ¶ 57).    The text Dr. Meyer relies on states that one of the "rules/assumptions" of the Cournot model is that the "[p]roducts are homogeneous."    (D.I. 263-5, Ex. 6, at 233).    BIH argues that Plaintiffs and Defendants do not offer homogeneous products and thus the requirements of the model are not met.    (D.I. 262 at

---

[1] Potter's argument that Dr. Meyer improperly assumes that the Pre-Acquisition Valuation attributed value to the non-compete covenant (D.I. 261 at 10–12) is rejected on the same basis.

15–17).   Dr. Meyer opines that the products offered by CLM and Defendants would be

"substantively similar" given Potter's intimate knowledge of CLM and the relevant industry.

(D.I. 263-6, Ex. 7, ¶ 38).   Dr. Meyer testified that although the "products" in this case are not

"completely homogeneous," the Cournot model can be expanded to account for the types of

similarities here.   (D.I. 263-1, Ex. 1, at 274:6–277:9).   Defendants can cross-examine Dr.

Meyer or present contrary evidence to challenge these opinions.   Thus, I decline to exclude Dr.

Meyer's testimony regarding the "Theoretical Adjustment."[2]

BIH also argues that Dr. Meyer's "Actual Revenue Adjustment" model is not supported

by the facts of this case.   (D.I. 262 at 17–18).   For this adjustment, Dr. Meyer estimated the

rate at which CLM's revenue would decrease over the five-year non-compete period due to

competition from Defendants.   (D.I. 263-1, Ex. 2, ¶ 59).   To do this, Dr. Meyer took the

difference between CLM's actual revenue in 2019 and the 2019 projected revenue used in the

Pre-Acquisition Valuation.   (*Id.*).   Using this "diminution" of revenue, she calculated an annual

diminution rate of 9.4% due to competition from Defendants.   (*Id.*; *see also id.* at Ex. 13).   She

then recalculated the Pre-Acquisition Valuation under the assumption that CLM's revenues

would drop 9.4% per year for five years.   (*Id.*, ¶¶ 59, 63).

Instead of comparing CLM's actual revenue numbers from 2018 to 2019, for example,

Dr. Meyer assumes that the $1.1 million difference between the 2019 projected and actual

---

[2] BIH also argues that Dr. Meyer's "Theoretical Adjustment" is not based on reliable principles
and methods because the simple Cournot model is not the appropriate model for analyzing
damages in this case.   (D.I. 262 at 19–20).   Plaintiffs respond by citing various texts and cases
accepting the Cournot model as a way to evaluate competition between firms.   (D.I. 292 at 15–
19).   I therefore decline to exclude Dr. Meyer's analysis on this basis.   Any limitations to the
applicability of the Cournot model to the particular facts of this case can be explored on cross-
examination.

revenues is solely a result of Defendants' competition.    This assumption is entirely unreliable.
It fails to account for the possibility of a faulty projection or the several other reasons why a
business's actual revenue might be 10% lower than projected.    Thus, I will tentatively exclude
Dr. Meyer's "Actual Revenue Adjustment" because her methodology is not sound.    If Plaintiffs
would like me to reconsider, they may bring Dr. Meyer to the pre-trial conference on May 27,
2022, and she may present her methodology and undergo cross-examination on it.    Plaintiffs
should advise by May 20, whether they want to pursue this theory, and will be presenting Dr.
Meyer on May 27th.

     Finally, Potter argues that Dr. Meyer applies an improper methodology because the
proper measure of damages for breach of a restrictive covenant is lost profits, not benefit of the
bargain damages.    (D.I. 261 at 15–16).    Potter does not cite any cases that support this
proposition.[3]    Instead, Delaware courts clearly recognize benefit of the bargain damages for
breach of contract claims.    *See Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del.
2000) ("It is a basic principle of contract law that [the] remedy for a breach should seek to give
the nonbreaching [] party the benefit of its bargain by putting that party in the position it would
have been but for the breach.").    I therefore reject this argument.[4]

---

[3] Potter cites cases in which the court awarded lost profits for breaches of non-compete
covenants, but these cases do not say anything about the validity of benefit of the bargain
damages.    *See Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2009 WL 3161643, at
*15 (Del. Ch. Sept. 30, 2009), *aff'd*, 7 A.3d 486 (Del. 2010); *All Pro Maids, Inc. v. Layton*, 2004
WL 1878784, at *10 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005).
[4] Potter separately argues that there is no evidence to show that CLM's underperformance was
caused by Defendants' competition.    (D.I. 261 at 13–14).    Potter basically faults Dr. Meyer for
not conducting a lost profits analysis.    (*See id.*; D.I. 298 at 6).    I reject this argument for the
reasons stated above.

Consistent with the above discussion, BIH's Motion to Exclude Testimony of Plaintiffs' Expert Under Federal Rule of Civil Procedure 702 (D.I. 259) is **DENIED-IN-PART** and tentatively **GRANTED-IN-PART**.    Potter's *Daubert* Motion to Exclude Testimony and Report of Christine S. Meyer, Ph.D. (D.I. 260) is **DENIED**.

Entered this 6th day of May, 2022.

 /s/ Richard G. Andrews
United States District Judge

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

      Plaintiffs,

      v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

      Defendants.

Civil Action No. 19-1600-RGA

## MEMORANDUM

Before me is Defendant Adam Potter's Motion for Summary Judgment on Business
Insurance Holdings, Inc.'s Cross-Claims.   (D.I. 245).   I have reviewed the parties' briefing.
(D.I. 246, 270, 286).

**I.   BACKGROUND**

Plaintiffs The American Institute for Chartered Property Casualty Underwriters and The
Institutes, LLC (together, "Plaintiffs") allege that Defendants Adam Potter and Business
Insurance Holdings, Inc. ("BIH") have breached the non-compete provisions of the Asset
Purchase Agreement ("APA").   (D.I. 48).   BIH has asserted five cross-claims against Potter.
(D.I. 146 at 52–58).   Potter now moves for summary judgment on BIH's three remaining cross-

1

claims: Negligent Management and Operation of BIH (Cross-Claim II), Fraud (Cross-Claim III),

and Negligent Misrepresentation (Cross-Claim IV).[1]   (D.I. 245).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a).   Material facts are those "that could affect the outcome" of the proceeding.

*Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 248 (1986)).   "[A] dispute about a material fact is 'genuine' if the evidence

is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.*   The

burden on the moving party may be discharged by pointing out to the district court that there is

an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989).   A non-moving

party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

other materials; or (B) showing that the materials cited [by the opposing party] do not establish

the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).   The non-moving party's

---

[1] Cross-Claim I (Indemnification) and Cross-Claim V (Tortious Interference with Contractual
Relationship) have been dismissed.   (D.I. 221, 223).

2

evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A. Negligent Management and Operation (Cross-Claim II)

BIH's "negligent management and operation" claim[2] arises from actions Potter took when he held multiple roles at BIH—officer, director, and sole shareholder. BIH argues that Potter "negligently failed to fulfill his duty of care with respect to BIH" when he failed to take all of the steps he indicated he would take to ensure that the Cannabis & Hemp ("C&H") Conference complied with the APA. (D.I. 146 at 53). The parties agree that this claim is governed by Florida law because BIH is incorporated in Florida. (D.I. 246 at 5; D.I. 270 at 7).

The fiduciary duties owed to a Florida corporation by its officers and directors are provided in the Florida Business Corporation Act. The Act provides that directors must act "[i]n good faith" and "[i]n a manner he or she reasonably believes to be in the best interests of the corporation." FLA. STAT. § 607.0830(1). When making decisions on behalf of the corporation, directors "shall discharge their duties with the care that an ordinary prudent person in a like

---

[2] This claim is essentially a claim for breach of fiduciary duty.

3

position would reasonably believe appropriate under similar circumstances." *Id.* § 607.0830(2).
The Act also codifies the business judgment rule and provides that directors are not personally
liable for actions taken in furtherance of their corporate duties, except in limited circumstances.
*See id.* § 607.0831.

BIH argues that Florida's statutory business judgment rule only insulates directors from
negligence claims, not officers.   (D.I. 270 at 8–9.)   Thus, BIH argues that the statutory business
judgment rule does not apply to Potter because he took the alleged negligent actions as both
BIH's director and officer.   (*Id.* at 9.)

As BIH points out, many Florida district courts have held that section 607.0831 does not
apply to officers.  *See, e.g.*, *FDIC v. Copenhaver*, 2014 WL 12621202, at *10 (M.D. Fla. May
10, 2014) ("By its plain terms, section 607.0831 insulates only directors from claims for ordinary
negligence. . . . Had the legislature intended to insulate officers from negligence claims under
section 607.0831, it surely could have done so, but it did not."), *report and recommendation
adopted sub nom. FDIC v. Mangano*, 2014 WL 12621581 (M.D. Fla. June 4, 2014); *FDIC v.
Florescue*, 2013 WL 2477246, at *4 (M.D. Fla. June 10, 2013) ("A straightforward reading of
the statute makes it appear that the business judgment rule eliminates claims for ordinary
negligence against directors only."); *FDIC v. Brudnicki*, 2013 WL 2145720, at *2–3 (N.D. Fla.
May 15, 2013) (finding that a defendant who was a director and officer was not entitled to the
protection of section 607.0831 in his capacity as an officer because "the statute does not afford
the same protections to officers as it does to directors").

In response, Potter points to two cases which stated that section 607.0831 applies to
directors and officers.   *See FDIC v. Stahl*, 89 F.3d 1510, 1516 n.12 (11th Cir. 1996) ("The

4

Florida legislature passed FLA. STAT. [§ § 607.0830, 607.0831] to afford corporate officers and directors greater protection from liability . . . ."); *FDIC v. Gonzalez-Gorrondona*, 833 F. Supp. 1545, 1556 (S.D. Fla. 1993) ("We find that the Florida statute insulates corporate directors and officers from conduct amounting to gross negligence, and permits liability only for greater derelictions of the duty of care."). In neither case was there actually an issue about the statute's applicability to officers.

I find the reasoning in the more recent Florida district court opinions—which have declined to follow the cases cited by Potter[3]—to be more persuasive. A plain reading of section 607.0831 makes clear that it only applies to "directors." *See* FLA. STAT. § 607.0831 ("A *director* is not personally liable for monetary damages . . . ." (emphasis added)). Thus, Potter is not entitled to the protections of the statutory business judgment rule as far as the claim for ordinary negligence arises from his work as an officer. *See Copenhaver*, 2014 WL 12621202, at *10.

Potter argues that even if he is subject to personal liability for ordinary negligence, he is protected under Florida's common law business judgment rule.[4] (D.I. 246 at 6–7.) Under that rule, there is a presumption that, in making a business decision, corporate directors and officers "acted on an informed basis, in good faith and in the honest belief that the action taken was in the

---

[3] *See, e.g.*, *FDIC as Receiver for Wakulla Bank v. Dodson*, 2014 WL 11511068, at *2 n.2 (N.D. Fla. Feb. 27, 2014) (referring to the statements in *Stahl* and *Gonzalez-Gorrondona* as "dicta"); *Florescue*, 2013 WL 2477246, at *4 (same).

[4] Both parties seem to assume that the common law business judgment rule that protects officers is still applicable. (D.I. 270 at 9–10; D.I. 286 at 3–4 n.2). *See Copenhaver*, 2014 WL 12621202, at *7–11 (applying both the statutory and common law business judgment rule). *But see FDIC v. Dodson*, 2015 WL 7769520, at *3 (N.D. Fla. Sept. 25, 2015) ("It is not entirely clear whether Florida's common-law BJR applies to officers and whether it even survived the enactment of section 607.0831.").

best interests of the company." *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988) (citation omitted). The business judgment rule protects corporate officers and directors from liability "absent a clear showing of fraud, bad faith or abuse of discretion." *Id.* Thus, to survive a motion for summary judgment, BIH "must allege specific facts that show a genuine issue of material fact concerning fraud, bad faith or abuse of discretion." *Id.*

BIH's claim is based on specific representations Potter made to Plaintiffs concerning the C&H Conference. After Plaintiffs notified Potter that the C&H Conference was in breach of the non-compete provisions of the APA, Potter's lawyer sent Plaintiffs a letter stating that he made the following adjustments to the C&H Conference:

> 1. Added to the about page [on BIH's website], in bold: **This conference was not developed and is not intended for claims and litigation management professionals**.
>
> 2. Modified the session title in the "Cannabis & Hemp Conference" to ensure there is no mention of claims in the title, description and session information.
>
> 3. [BIH] will not knowingly allow any claims and litigation management professionals to attend the 2019 Cannabis & Hemp Conference.

(D.I. 273-2, Ex. 4, at 1).[5]

---

[5] Potter argues that this letter is inadmissible under FED. R. EVID. 408 because the letter was sent "For Settlement Purposes Only." (D.I. 246 at 8–9). Rule 408 provides that settlement offers are inadmissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement." FED. R. EVID. 408(a). The focus of Rule 408(a) is on the claim being compromised—here, Plaintiffs' breach of contract claim. *AbbVie Inc. v. Boehringer Ingelheim Int'l GmbH*, 2019 WL 1571666, at *4 n.6 (D. Del. Apr. 11, 2019); *see also Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 699 (8th Cir. 2008) ("Rule 408 as written only applies to evidence of compromise offered to prove liability for or the amount of the claim that was compromised . . . ."). BIH, however, is using this letter to show that Potter made commitments to Plaintiffs on behalf of BIH, not to show the validity of Plaintiffs' breach of contract claim. The compromise letter is admissible for this purpose. *See* FED. R. EVID. 408(b).

BIH argues that Potter failed to fulfill these commitments.   The record evidence, however, makes clear that Potter made the first two adjustments.   (D.I. 238, Ex. F, at 1, 6).   As to the third adjustment, Potter testified that he instructed Katie Kett, a former BIH employee responsible for organizing conferences, not to accept any registrations from claims or litigation management personnel.   (D.I. 273-2, Ex. 1, at 93:19–23).   Although there is some evidence that Potter may have known there were claims professionals registered for the conference, (*id.*, Ex. 7, at 78:17–79:18), this alone is insufficient to establish the "clear showing" of bad faith required to overcome the business judgment rule presumption.   BIH has failed to demonstrate the existence of any genuine factual dispute concerning whether Potter was grossly negligent or acted in bad faith.   Potter is therefore entitled to the business judgment rule presumption.   Thus, I grant Potter's motion for summary judgment on this claim.

### B.   Fraud (Cross-Claim III)

The parties agree that BIH's claim of fraud is governed by Connecticut law.   (D.I. 246 at 9–10; D.I. 270 at 11–12).   To establish liability for fraud, BIH must show by clear and convincing evidence that: "(1) a false representation was made [by Potter] as a statement of fact; (2) the statement was untrue and known to be so by [Potter]; (3) the statement was made with the intent of inducing reliance thereon; and (4) [BIH] relied on the statement to [its] detriment." *Stuart v. Freiberg*, 116 A.3d 1195, 1203 (Conn. 2015) (internal citation omitted).   BIH alleges that Potter "fraudulently induced BIH to (a) continue with the C&H Conference and (b) permit its directors, officers, and/or employees to have involvement with ClaimsX."   (D.I. 146 at 54).

I cannot grant summary judgment on BIH's fraud cross-claim because there are genuine factual disputes as to whether Potter made a false representation about the C&H Conference with

7

the requisite knowledge and intent.   For example, Stephen Acunto—owner of Beacon—testified that Potter told him prior to the sale of BIH to Beacon that the non-compete provisions of the APA would not apply to BIH after the sale.   (D.I. 273-2, Ex. 2, at 44:10–15, 82:15–19).   In the Stock Purchase Agreement with Beacon, Potter again represented that the APA "contained a non-compete for Adam Potter personally, however [BIH] is not part of the agreement."   (*Id.*, Ex. 5, at Schedule 3.09 (BIH-003-003909)).   But BIH was subject to the non-compete.   The assurance in the Stock Purchase Agreement further provided, "We remain confident there is no violation and took proactive steps to clarify the intended conference attendees."   (*Id.*; *see also* Ex. 1, at 161:24–162:3).   Mr. Acunto testified that he believed "the inclusion of claims and litigation in the conference . . . were excised before [he] owned the company."   (*Id.*, Ex. 2, at 274:25–275:5).[6]   Thus, there is evidence that would support a finding of fraud in the representations that BIH was not subject to the non-compete.

There is also a factual dispute regarding whether Potter misled BIH into believing that its directors and officers could be involved with ClaimsX without violating the APA's non-compete.   Potter introduced Mr. Acunto to Sydney Posner (Potter's sister), who started ClaimsX.   (*Id.*, Ex. 1, at 114:11–20).   After Mr. Acunto agreed to meet with Ms. Posner to

---

[6] Potter argues that BIH cannot rely on Potter's pre-sale representations to Mr. Acunto to support its fraud claim because Mr. Acunto was a third party and not affiliated with BIH prior to its sale. (D.I. 246 at 11).   Potter thus reasons that BIH would not have detrimentally relied on these pre-sale statements.   (*Id.*).   I disagree.   After the sale, Mr. Acunto became a director and officer of BIH.   (D.I. 247-3, Ex. 25).   And the evidence supports a finding that he relied on Potter's pre-sale representations in making decisions on behalf of BIH.   (D.I. 273-2, Ex. 2, at 102:18–103:15, 106:3–108:10); *see Tatem v. Norwalk Acquisition 1, LLC*, 2021 WL 4393805, at *13 (Conn. Super. Ct. Aug. 31, 2021) ("Although reliance may be indirect, it must be the plaintiff or her agents and not merely others who rely upon the misrepresentation." (internal citation omitted)).

8

discuss a joint venture, Potter informed him that Potter could not be involved in any discussions because of his non-compete.  (D.I. 247-3, Ex. 31).  Potter did not say anything about whether Mr. Acunto could be involved.  (*See id.*).

Potter argues that BIH fails to present any evidence that Potter made any statements with fraudulent intent.[7]  (D.I. 246 at 12).  Although BIH does not point to any direct evidence of Potter's fraudulent intent, a reasonable factfinder may infer this intent based on the surrounding circumstances. *Miller v. Bourgoin*, 613 A.2d 292, 295 (Conn. 1992) ("It is well recognized that summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." (cleaned up)).

I therefore deny the request for summary judgment on BIH's fraud cross-claim.

### C. Negligent Misrepresentation (Cross-Claim IV)

The parties agree that BIH's claim of negligent misrepresentation is governed by Connecticut law.  (D.I. 246 at 9–10; D.I. 270 at 11–12).  To establish liability for negligent misrepresentation, BIH must show by a preponderance of the evidence: "(1) that [Potter] made a misrepresentation of fact (2) that [Potter] knew or should have known was false, and (3) that [BIH] reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Stuart*, 116 A.3d at 1204 (internal citation omitted).  BIH alleges that Potter "negligently misrepresented BIH's legal responsibilities to BIH following his sale of BIH to Beacon Intercontinental."  (D.I. 146 at 55).  To support its negligent misrepresentation claim, BIH points to the same statements as in its fraud claim.

---

[7] Potter does not argue that the evidence is insufficient to show that there was a false statement.

9

Potter argues that BIH has failed to show that it reasonably relied on the alleged misrepresentations.   (D.I. 246 at 12–13).   There is sufficient evidence to support a finding that Mr. Acunto and BIH relied on Potter's assurances.   (D.I. 273-2, Ex. 2, at 102:18–103:15, 106:3–108:10).   Whether this reliance was reasonable is a factual dispute.   *See Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Conn. 1995) ("We have consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances."). Thus, I deny the request for summary judgment on this claim.

## IV.   CONCLUSION

An appropriate order will issue.

Entered this 13 day of May, 2022.

_____

United States District Judge

10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

        Plaintiffs,

    v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

        Defendants.

Civil Action No. 19-1600-RGA

## ORDER

    For the reasons stated in the accompanying Memorandum, Defendant Adam Potter's

Motion for Summary Judgment on Business Insurance Holdings, Inc.'s Cross-Claims (D.I. 245)

is GRANTED-IN-PART and DENIED-IN-PART.   Specifically, I will GRANT Potter's motion

for summary judgment on Cross-Claim II (Negligent Management and Operation).   I will

DENY Potter's motion for summary judgment on Cross-Claim III (Fraud) and Cross-Claim IV

(Negligent Misrepresentation).

               Entered this _13_ day of May, 2022.

               _____
               United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

      Plaintiffs,

      v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

      Defendants.

Civil Action No. 19-1600-RGA

## MEMORANDUM

Before me are Defendant Business Insurance Holdings, Inc. ("BIH")'s Motion for

Summary Judgment with Respect to Plaintiffs' Claims (D.I. 233); Plaintiffs' Motion for Partial

Summary Judgment (D.I. 236); and Defendant Adam Potter's Motion for Summary Judgment on

Plaintiffs' Amended and Supplemental Complaint (D.I. 241).   I have considered the parties'

briefing.   (D.I. 234, 239, 242, 269, 274, 277, 280, 290, 291, 293, 294).

## I.  BACKGROUND

On June 1, 2018, Plaintiffs The American Institute for Chartered Property Casualty

Underwriters and The Institutes, LLC (together, "Plaintiffs") entered into the Asset Purchase

Agreement ("APA") with Claims Pages, LLC ("CP"), C&E MGMT and Planning, Inc. ("C&E"),

CLM Group, Inc. ("CLM"), Potter, and Moxie HC, LLC ("Moxie").   (D.I. 240-9, Ex. 9).

Pursuant to the APA, Plaintiffs acquired substantially all of the assets of CP, C&E, and CLM.

1

(*Id.* at 1).   The APA contains non-compete and non-solicitation provisions which generally prohibit "each Selling Party"[1] from competing with the "Sellers' Businesses."   (*Id.*, § 6.12(a)–(b)).

In Count I of the Amended and Supplemental Complaint, Plaintiffs claim that BIH and Potter breached the non-compete and non-solicitation provisions of the APA.   (D.I. 48).   Plaintiffs also assert claims for tortious interference (Count II) and declaratory relief (Count IV) against Potter.   (*Id.*).   Plaintiffs, BIH, and Potter have all filed cross-motions for summary judgment on Plaintiffs' breach of contract claim.   (D.I. 233, 236, 241).   Potter has also moved for summary judgment on Plaintiffs' tortious interference and declaratory relief claims.   (D.I. 241).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a).   Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party."   *Id.*   The burden on the moving party may be discharged by pointing out to the district court that there is

---

[1] The APA defines the term "Selling Parties" as "the Companies, Adam Potter and Moxie." (D.I. 240-9, Ex. 9, at 46).   The "Companies" are CP, C&E, and CLM.   (*Id.* at 1).   C&E changed its name to BIH on June 7, 2018.   (D.I. 48 at ¶ 12; D.I. 145 at ¶ 12).   Potter then sold BIH to Beacon Intercontinental Group, Inc. on September 1, 2019.   (D.I. 247-2, Ex. 13).   In rejecting BIH's motion to dismiss the contract claim, this Court held that the non-compete and non-solicitation provisions of the APA still apply to BIH despite its new ownership.   (D.I. 137 at 5–6).

2

an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A.  Breach of Contract (Count I)

Plaintiffs allege that BIH and Potter violated the non-compete and non-solicitation provisions of the APA by promoting and hosting the Cannabis and Hemp Conference ("the C&H

Conference") in October 2019. (D.I. 48 at ¶ 153). The non-compete and non-solicitation

provisions of the APA provide:

> (a) During the period beginning on the Closing Date and ending the fifth (5th) anniversary of the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the "Permitted Activities").

> (b) With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

(D.I. 240-9, Ex. 9, § 6.12).

The parties dispute the proper interpretation of "Sellers' Businesses." The APA states,

"'Sellers' Businesses' or 'Seller's Business' has the meaning set forth in the preamble hereto."

(*Id.* at 45). The preamble provides, "CLM is engaged in the business of operating as a national

trade association for the claims and litigation management industries, as more specifically set

forth in Schedule A . . ."[2] (*Id.* at 1). Schedule A defines "CLM Business" as "A professional

association in the insurance industry with more than 45,000 professionals in the claims

resolutions and litigation management industries, offering different types of memberships, with

local chapters across the United States." (*Id.* at Schedule A (Institutes0008127)). Schedule A

---

[2] There were multiple businesses sold to Plaintiffs in the APA, but in this litigation, Plaintiffs are only concerned with CLM's business. (*See, e.g.*, D.I. 269 at 9).

further provides that CLM offers specific "products and services," including an annual

conference and specialty conferences.   (*Id.*).

Schedule 6.12 of the APA outlines the "Permitted Activities" that are excluded from the

non-compete provisions, with the following limitation:

> [P]rovided, however, on or after the Closing Date, none of the Selling Parties is permitted
> to, and each shall cause its Affiliates not to (and the following are excluded from Permitted
> Activities):
>
> 1. Work/create/develop/offer/promote educational content related to claims and litigation
> management, unless in partnership with CLM and CP.
>
> 2. Produce live delivery, such as events, networking, seminars, award programs, and
> conferences targeted to claims and litigation management professionals.

(*Id.* at Schedule 6.12 (Institutes0008229)).

Plaintiffs argue that the non-compete provision of the APA prohibits Defendants from

offering any "specialty conference" relating to the insurance industry, unless it is listed as a

"Permitted Activity."   (D.I. 294 at 3).   Plaintiffs' interpretation is inconsistent with the plain

language of the APA.   The plain language instead makes clear that CLM's business is limited to

the claims and litigation management industries, not the insurance industry generally.   *See Manti*

*Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) ("When a contract

is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms

and provisions." (internal citation omitted)).   The APA therefore prohibits Defendants from

offering a specialty conference that provides content related to claims and litigation management

or that targets claims and litigation management professionals.

There is a factual dispute regarding whether the C&H Conference offered claims and

litigation management content or targeted claims professionals.   For example, the C&H

5

Conference included a session titled, "Cannabis Exposure: A Peek Down the Rabbit Hole,"[3]

which was described on BIH's website as follows:

> The cannabis exposure is often difficult to evaluate due to rapidly emerging risks in a
> highly regulated industry and lack of access to significant data. This panel of experienced
> cannabis professionals will attempt to shed light on the various cannabis exposures to date,
> and how these will involve [sic] in the future.

(D.I. 238, Ex. J).   This session included slides detailing examples of claims issues that have

arisen in the cannabis industry.   (*Id.*, Ex. E, at 126:6–22).   The fact-finder could conclude

based on such evidence that the C&H Conference offered educational content relating to claims

and litigation management.

Additionally, BIH sent C&H Conference advertisements to individuals on the marketing

list provided by the Wilson Elser law firm, which is involved in claims and litigation

management.   (D.I. 272, Ex. C, at 73:20–24, 89:1–6).   Potter did add a disclaimer to the C&H

Conference advertisement stating, "This conference was not developed and is not intended for

claims and litigation management professionals."   (D.I. 238, Ex. F, at 1).   There is testimony,

however, that least 15 individuals and 40 companies that were CLM members attended the C&H

Conference.   (D.I. 278, Ex. C, at 38:22–39:4).   Based on this evidence, the fact-finder could

conclude that this conference was targeted to claims professionals.   Thus, summary judgment

must be denied.[4]

_____

[3] The session was originally titled "Cannabis Claims: A Peek Down the Rabbit Hole."   Potter
changed the session's title and description to omit all references to "claims" after Plaintiffs
notified him that it violated the APA.   (D.I. 238, Ex. C, at 86:21–88:25).

[4] Potter also argues that the C&H Conference does not violate the non-compete because it is one
of the "Permitted Activities" in Schedule 6.12.   (D.I. 242 at 7–8).   The plain language of the
APA, however, easily dispels this argument.   Schedule 6.12 provides that BIH is permitted to
present "Events and Award Programs *as follows*" and lists six specific events, none of which
include the C&H Conference.   (D.I. 240-9, Ex. 9, at Schedule 6.12 (Institutes0008229)

6

Plaintiffs also claim that Defendants breached the non-compete provisions of the APA when Stephen and Carole Acunto (directors and officers of BIH) briefly joined the advisory board of ClaimsX (CLM's competitor).   (D.I. 48 at ¶ 130).   BIH argues that Plaintiffs have failed to show that the Acuntos' brief involvement with ClaimsX harmed Plaintiffs.   (D.I. 234 at 18–21).   Potter similarly argues that Plaintiffs have failed to show that they suffered any damages because of the C&H Conference.   (D.I. 242 at 11–12).   Plaintiffs respond that they are entitled to "benefit of the bargain" damages, nominal damages, and/or injunctive relief, so summary judgment is improper.   (D.I. 269 at 18–19, 19 n.3; D.I. 280 at 12–13).

Plaintiffs' damages expert Dr. Christine Meyer has opined that Plaintiffs' damages are equal to the difference between the price that Plaintiffs paid for the assets and the actual value of the assets received by Plaintiffs (which was lower due to the competition from Defendants). (*See* D.I. 261-1, Ex. A).   This testimony is sufficient to create a factual dispute as to whether Plaintiffs suffered damages (i.e., lost the benefit of their bargain) as a result of Defendants' alleged breaches.   *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) ("[W]hen a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty."); *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000) ("It is a basic principle of contract law that [the] remedy for a breach should seek to give the nonbreaching [] party the benefit of its bargain by putting that party in the position it would have been but for the breach.").   Any claimed deficiencies in Dr. Meyer's methodology were the subject of Defendants' *Daubert* motions (D.I. 259, 260), which I

---

(emphasis added); *see also id*. (Institutes0008228) ("'Permitted Activities' shall mean the business operations of the following entities, *as specifically set forth below*[.]" (emphasis added))).

mostly denied. Whether her testimony is persuasive presents a different issue, which Defendants can test with cross-examination and opposing testimony.

Finally, BIH argues that Plaintiffs are barred from relief because they did not seek a preliminary injunction and thus failed to mitigate their damages. (D.I. 234 at 21–22). Similarly, Potter argues that Plaintiffs have waived any right to seek injunctive relief due to their failure to do so at the beginning of this litigation. (D.I. 242 at 12–14). These arguments are frivolous. Plaintiffs' decision not to seek a preliminary injunction in no way waives the right to relief or provides a reasonable theory of mitigation.

Because there are genuine disputes of fact, I will deny Plaintiffs', BIH's, and Potter's motions for summary judgment on Plaintiffs' breach of contract claim.

### B. Tortious Interference (Count II)

Potter also moves for summary judgment on Plaintiffs' tortious interference claim. (*Id.* at 14–16).[5] To establish a tortious interference claim under Delaware law, Plaintiffs must prove: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Enzo Life Scis., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 429 (D. Del. 2003). Plaintiffs allege that by offering the C&H Conference and assisting in the operations of ClaimsX, Potter knowingly and intentionally interfered with CLM's existing and prospective contractual and business relationships. (D.I. 48 at ¶¶ 167–168).

---

[5] This Court previously dismissed Count II against BIH. (D.I. 137).

Potter argues that Plaintiffs have failed to identify any business relationship with which Potter tortiously interfered.   (D.I. 242 at 15).   Plaintiffs respond with evidence showing that three customers and sponsors have decreased their spending with CLM from 2018 to 2021—after BIH and ClaimsX entered the market.   (D.I. 278, Ex. C, at 44:19–46:11, 47:9–49:24). This is not enough to establish the existence of a valid business relationship or expectancy.

"To meet the reasonable probability of a business opportunity prong, a plaintiff must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm.'" *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (cleaned up).   Plaintiffs do not point to any evidence showing that there was a reasonable probability that Plaintiffs would continue to receive the same level of sponsorship from the three named sponsors.   *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 611 (Del. Ch.) (finding existence of a prospective business relationship where plaintiff provided evidence showing that there was a reasonable probability of obtaining repeat business from its one-off and long-term catalog customers), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).   Thus, Plaintiffs have failed to show a valid business relationship or expectancy.

Even if Plaintiffs could show a valid business relationship, they have failed to show that Potter's alleged interference caused the customers to decrease their spending.   Plaintiffs' only evidence is the testimony of Mr. Miller (Plaintiffs' 30(b)(6) witness) in which he states that he cannot think of any other reason for the decrease.   (D.I. 278, Ex. C, at 45:18–46:11).   This alone is insufficient to establish proximate causation.

Thus, I will grant Potter's motion for summary judgment with respect to Count II.

9

### C.  Declaratory Relief (Count IV)

In Count IV, Plaintiffs "seek a declaration that Defendant Potter has violated the terms of the [APA] and that [Plaintiffs] are entitled to an offset of the sums paid under the [APA] in an amount equal to the damages caused by Defendant Potter's conduct."  (D.I. 48 at ¶ 179).  Potter argues that Plaintiffs seek a declaration regarding Potter's past conduct, which is not a proper basis for declaratory relief.  (D.I. 242 at 16–17).  Plaintiffs respond that the Magistrate Judge already rejected this argument in denying Potter's motion to dismiss Count IV.  (D.I. 280 at 18).  Specifically, the Magistrate Judge found, "[T]he amended complaint contains sufficient allegations that Potter's allegedly breaching conduct 'continues or is likely to continue in the future.'"  (D.I. 126 at 22).

But the current motion is one for summary judgment, and Plaintiffs must now provide evidence supporting their claim.  *See Celotex Corp.*, 477 U.S. at 322.  "A plaintiff bringing an action for declaratory judgment must prove, by a preponderance of the evidence, that an actual controversy exists."  *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 59 F. Supp. 3d 654, 662 (D. Del. 2014), *aff'd*, 622 F. App'x 169 (3d Cir. 2015).

Plaintiffs, however, have made no effort to show that Potter's conduct "continues or is likely to continue in the future."  *Benson v. Amguard Ins. Co.*, 2017 WL 2672078, at *4 (D. Del. June 21, 2017).  Instead, Potter has testified that he has not been involved in the insurance industry since he resigned from BIH in 2019.  (D.I. 247-2, Ex. 12, at 120:2–15; D.I. 247-3, Ex. 24).  Thus, Plaintiffs have not shown that their declaratory relief claim is anything more than an improper request regarding Potter's past conduct.  *In re Noble*, 2018 WL 2012903, at *2 (D. Del. Apr. 30, 2018) ("Asking a court to proclaim that one's rights were violated is not a proper

10

basis for declaratory relief."). Further, Plaintiffs' declaratory claim is redundant of their breach

of contract claim. *Christiana Care Health Servs., Inc. v. PMSLIC Ins. Co.*, 2015 WL 6675537,

at *5 (D. Del. Nov. 2, 2015) ("Courts have discretion to dismiss a declaratory judgment claim

when . . . the controversy would be resolved by the disposition of another claim in the case.").

Thus, I will grant summary judgment on Count IV.

## IV.   CONCLUSION

An appropriate order will issue.

Entered this **13** day of May, 2022.

United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

      Plaintiffs,

      v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

      Defendants.

Civil Action No. 19-1600-RGA

ORDER

For the reasons stated in the accompanying Memorandum, Defendant Business Insurance

Holdings, Inc.'s Motion for Summary Judgment with Respect to Plaintiffs' Claims (D.I. 233)

and Plaintiffs' Motion for Partial Summary Judgment (D.I. 236) are DENIED.

Defendant Adam Potter's Motion for Summary Judgment on Plaintiffs' Amended and

Supplemental Complaint (D.I. 241) is GRANTED-IN-PART and DENIED-IN-PART.

Specifically, I will GRANT Potter's motion for summary judgment on Count II (Tortious

Interference) and Count IV (Declaratory Relief).   I will DENY Potter's motion for summary

judgment on Count I (Breach of Contract).

Entered this 13 day of May, 2022.

United States District Judge

App.625

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ADAM POTTER'S MOTION FOR PARTIAL RECONSIDERATION
OF THE COURT'S MAY 13, 2022 ORDER GRANTING IN PART
AND DENYING IN PART SUMMARY JUDGMENT AS TO
PLAINTIFFS' AMENDED AND SUPPLEMENTAL COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 54(b) and D. Del. Local Rule

7.1.5, Defendant, Adam Potter ("Potter"), by and through his undersigned counsel,

respectfully moves this Court for the entry of an order, substantially in the form

provided herewith, reconsidering its May 13, 2022 Order Granting In Part and

Denying In Part Potter's Motion For Summary Judgment on Count I (breach of

contract) Asserted By Plaintiffs, The American Institute for Chartered Property

Casualty Underwriters and The Institutes, LLC ("Plaintiffs") in the Amended and

Supplemental Complaint (the "Motion").  (D.I. 304-05).

Specifically, Potter seeks reconsideration of the Court's Order Denying

Summary Judgment on the portion of Plaintiffs' breach of contract claim based on

the 2019 Cannabis & Hemp Conference (the "C&H Conference").  In support of the

1

Motion, Potter relies on the attached Memorandum of Law and documents already filed on the docket.  A proposed form of Order has also been submitted.

WHEREFORE, Potter respectfully request that this Court grant the Motion and enter his proposed form of Order (1) vacating the portion of the May 13, 2022 Order denying Potter summary judgment on Count I (breach of contract) of the Amended and Supplemental Complaint, (D.I. 305), and (2) entering summary judgment in Potter's favor, and against Plaintiffs, on Count I with respect to Plaintiffs' claim that the C&H Conference violated the non-compete.

**FOX ROTHSCHILD LLP**

*/s/  Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
sniederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: May 23, 2022                    *Attorneys for Defendant Adam Potter*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## **[PROPOSED] ORDER**

AND NOW, this _____ day of _____, 2022, upon

consideration of Defendant, Adam Potter's Motion for Partial Reconsideration (the

"Motion") of the Court's May 13, 2022 Order (the "Prior Order") Granting In Part

and Denying In Part Defendant Adam Potter's Motion for Summary Judgment on

the Amended and Supplemental Complaint filed by Plaintiffs The American Institute

for Chartered Property Casualty Underwriters and The Institutes, LLC ("Plaintiffs'),

(D.I. 305), and any opposition thereto, it is hereby ORDERED that the Motion is

GRANTED.  The portion of the Prior Order denying Defendant, Adam Potter's

motion for summary judgment on Count I (breach of contract) is VACATED and

summary judgment is hereby ENTERED in favor of Defendant, Adam Potter, and

against Plaintiffs, as to Count I of the Amended and Supplemental Complaint with

respect to Plaintiffs' claim concerning the 2019 Cannabis & Hemp Conference (the

"C&H Conference") violated the non-compete.

BY THE COURT:


_____

                                                        J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## [PROPOSED] FINAL PRETRIAL ORDER

This matter comes before the Court at a final pretrial conference held pursuant

to Rule 16 of the Federal Rules of Civil Procedure.

**Plaintiff's Counsel**: Barry M. Klayman, Esq., bklayman@cozen.com, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, (302) 295-2035; Robert W. Hayes (Admitted *Pro Hac Vice*), rhayes@cozen.com, and Matthew J. Siegel (Admitted *Pro Hac Vice*), msiegel@cozen.com, 1650 Market Street, Suite 2800, Philadelphia, PA 19103

**Defendant Adam Potter's Counsel:** Seth Niederman (#4588), Fox Rothschild LLP, Citizens Bank Center, 919 North Market Street, Suite 300, Wilmington, DE 19899-2323, SNiederman@foxrothschild.com, (302) 622-4238; Robert S. Tintner (Admitted *Pro Hac Vice*) and Nathan M. Buchter (Admitted *Pro Hac Vice*), 2000 Market Street, 20th Floor, Philadelphia, PA, 19103-3222, RTintner@foxrothschild.com, NBuchter@foxrothschild.com

**Defendant Business Insurance Holdings, Inc.'s Counsel:** Matthew P. Denn (#2985), DLA Piper LLP (US) 1201 N. Market St., Suite 2100, Wilmington, Delaware 19801, (302) 468-5700, matthew.denn@us.dlapiper.com; Christopher G. Oprison (Admitted *Pro Hac Vice*), 200 South Biscayne Blvd., Suite 2500 Miami, FL 33131, chris.oprison@dlapiper.com

I.     NATURE OF THE ACTION

   A.     **Plaintiffs' Amended and Supplemental Complaint**

   The American Institute for Chartered Property Casualty Underwriters ("AICPCU") and The Institutes, LLC (collectively, "The Institutes" or "Plaintiffs"), assert claims for breach of contract based on alleged violations of restrictive covenants in an Asset Purchase Agreement ("APA"). The Institutes seek injunctive relief and monetary damages against Adam Potter ("Potter") and Business Insurance Holdings, Inc. ("BIH") (collectively "Defendants"). They also seek attorneys' fees under the APA's indemnity provisions.

   B.     **Defendant BIH's Answer to Plaintiffs' Complaint and Crossclaims Against Defendant Potter**

   All of the Plaintiffs' claims against BIH have been dismissed with the exception of the Plaintiffs' claim for breach of the APA. BIH has denied the allegations in the Amended and Supplemental Complaint. The Court has denied both the plaintiffs' and BIH's motions for summary judgment on the breach of contract claim.

   BIH filed five cross-claims against Mr. Potter. Cross-Claim No. 1 (indemnification) was dismissed by agreement of the parties without prejudice so that it could be litigated in an action pending between Mr. Potter and Beacon Intercontinental/BIH in U.S. District Court for the Southern District of New York. (D.I. 221) Cross-Claim No. 5 (Tortious Interference with Contractual Relationship)

2

was dismissed by the Court.  (D.I. 223)  The Court granted summary judgment to Mr. Potter with respect to BIH's cross-claim for Negligent Management and Operation, and denied Mr. Potter's motion for summary judgment with respect to BIH's cross-claims for fraud and negligent misrepresentation.  (D.I. 302)

### C.  Defendant Potter's Answers to Plaintiffs' Complaint and BIH's Crossclaims[1]

On May 13, 2022, this Court entered summary judgment in Potter's favor and against Plaintiffs and BIH on all remaining claims and crossclaims except for:

**Plaintiffs:** Breach of Contract (Count I – Delaware law).

**BIH:** Fraud and Negligent Misrepresentation (Crossclaims III and IV – Connecticut law).

Potter has and continues to deny all wrongdoing and liability alleged by Plaintiffs in support of their claims, and BIH in support of its crossclaims (which BIH has expressly made contingent on a finding that BIH is liable to Plaintiffs). Potter further denies that he has caused either Plaintiff or BIH to suffer any damage(s), and further maintains that Plaintiffs are not entitled to any non-monetary relief being sought.

---

[1] Potter reserves the right to amend or supplement any portion of this Pretrial Order for which he is to provide a response (under Local Rule 16.3, any applicable Court order, or otherwise) up to time of trial.

LEGAL\58072003\1

App.632

## II.     JURISDICTION

The Court's subject matter jurisdiction is based on 28 U.S.C. §1332(a)(1) as this action involves a controversy between citizens of different states and an amount in controversy which allegedly exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.  This Court has specific personal jurisdiction over the parties because the contract at issue contains a choice of law and jurisdiction provision, wherein Plaintiffs and Potter, and BIH[2], expressly consented that any disputes thereunder must be brought in the state and federal courts located in New Castle County, Delaware.  For this reason, venue is also proper in this Court.

## III.    STATEMENT OF FACTS WHICH ARE ADMITTED AND REQUIRE NO PROOF

The parties' statement of facts that are admitted and require no proof is attached hereto as **Exhibit A**.

## IV.    STATEMENT OF THE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

Plaintiffs' Statement is attached hereto as **Exhibit B**;

BIH's Statement is attached hereto as **Exhibit C**;

Mr. Potter's Statement is attached hereto as **Exhibit D**.

---

[2] *See* D.I. 137 (Mem. and Order Overruling BIH's Objections) at 2, 5-6.

## V.    STATEMENT OF ISSUES OF LAW WHICH ANY PARTY CONTENDS REMAIN TO BE LITIGATED

### A.    Plaintiffs' Statement

The Institutes contend that there are five (5) outstanding mixed issues of law and fact:

(1) whether the Non-Compete provision in the APA is reasonable and enforceable;

(2) the interpretation of the APA, including what is meant by claims and litigation management and targets claims and litigation management professionals.

(3) whether the facts of the case establish that Defendants have breached, and will continue to breach, the Non-Compete and Non-Solicitation provisions in the APA;

(4) whether The Institutes are entitled to injunctive relief prohibiting the Defendants from engaging in activities prohibited by the Non-Compete and non-solicitation provisions for a period of five (5) years; and

(5)  whether the APA entitles The Institutes to an award of their attorneys' fees and costs.

### 1.    The Non-Compete is Reasonable and Enforceable.

"To be enforceable, a covenant not to compete must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the

LEGAL\58072003\1

covenant, and (4) survive a balance of the equities." *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, *2 (Del. Ch. April 19, 2006).

The APA is valid and supported by adequate consideration – *i.e.*, the nearly $20 million purchase price. *See Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *9 (Del. Ch. Nov. 8, 1992). Restrictive covenants are typical in business acquisitions for the "obvious" purpose of protecting "the purchaser in his enjoyment of the business and its built-up good will." *Tull v. Turek*, 147 A.2d 658, 662 (Del. 1958). Selling parties are generally uniquely situated to compete against an acquired entity because of their prior control of the business.

The five year non-compete clause at issue in this case is reasonable. Courts have found similar restrictions appropriate. *See id.* at 662 (finding ten year restriction valid in sale of business); *C. Edgar Wood, Inc. v. Clark*, 1986 WL 1160 (Del. Ch. Jan. 21, 1986) (three year restriction permissible). The period of noncompetition in the sale of a business is far broader than with a restrictive covenant applicable to former employees because former owners have a stronger association with the company than any one employee. Further, the parties recognized that the CLM Business operates nationwide, so the geographic restriction to the United States is reasonable. There also is no legitimate argument that the scope of the competitive activities are overbroad where the APA defines the CLM's business and Potter drafted that definition.

6

App.635

## 2.      The Scope of the Restrictive Covenants

Contracts must be enforced so as to effectuate the agreement reached by the parties at the time of execution.  *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.,* 206 A.3d 836, 846 (Del. 2019).  That agreement is established by interpreting contract terms as "an objective, reasonable third party" would understand them. *Osborn ex. rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2205 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)). Where there is no uncertainty as to the contract terms, the parties' objective intent must be determined based on the clear and unambiguous meaning of those terms. *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A. 3d 776, 783 (Del. 2012).  However, a court must give effect to the entire agreement and should not adopt an interpretation based on one contractual term that is inconsistent with the entire scope of the agreement.  *Chicago Bridge & Iron Co. v. Westinghouse Electric Co. LLC*, 166 A.2d 912, 927-928 (Del. 2017).

To the extent that the Court's interpretation of the APA in denying Motions for Summary Judgment is intended to be final, as set forth hereinafter, all of the specialty conferences Defendants have planned, organized or marketed involved, at least, claims and litigation management content.  But, the precise meaning of that term, as well as "targeting claims and litigation professionals", will be important in

fashioning prospective injunctive relief so as to avoid attempts to circumvent the prohibitions imposed.

Those terms should be interpreted broadly. "Claims and litigation management" means content on the prevention, handling, defense of claims or litigation or subjects, such as workmen's compensation, that inherently involve those topics. Claims and litigation management professionals means anyone whose responsibilities involve any of those areas, including those with responsibility for risk management. For instance, "management" is a broad term that extends beyond handling a claim or defending litigation. *Management*, *Merriam-Webster On-Line Dictionary*, [https://www.merriam-webster.com/dictionary/management](https://www.merriam-webster.com/dictionary/management) ("the conducting or supervising of something") Moreover, the fundamental purpose of the noncompetition provisions was to prevent the Selling Parties from competing against the acquired entities for five years after the acquisition. So, while Schedule A conclusively defines the scope of the CLM Group's businesses as of the closing of the acquisition, that definition should be interpreted in accordance with the scope of the CLM Group's business as of the closing. The CLM included individuals beyond simply claims managers, such as those involved in risk management and actively defending claims.

### 3. The Undisputed Facts Of Record Establish Defendants' Past, Ongoing, and Future Breaches Of The APA.

The APA unambiguously prohibits Defendants from engaging in the very conduct they admit to have undertaken and that BIH intends to undertake in the future.

Defendants breached the Non-Compete when they promoted and hosted the Cannabis and Hemp Conference;  assisted in the formation of ClaimsX as an entity competitive with CLM; and when BIH planned, promoted, and held additional conferences and webinars in 2020 and 2021, as enumerated in Section IV. The Institutes further contend that that any similar future events planned by BIH will constitute ongoing breaches of the Non-Compete.

The Institutes also intend to prove that Defendants violated the Non-Solicitation provision of the APA by calling upon a significant sponsor of the CLM Business to sponsor Defendants' conferences.

### 4. The Institutes Are Entitled To Injunctive Relief Prohibiting Defendants From Engaging In Competitive Activities Prohibited By The Non-Compete For Five Years.

In the APA, Defendants conceded that The Institutes' remedies at law for any breach would be inadequate, so that they are entitled to injunctive relief without proving actual damages, conceding that monetary damages alone would be inadequate to compensate The Institutes for the harm they inflicted.  Even without this concession, courts have recognized that the "harms resulting from competition

by someone bound by a non-competition agreement are frequently found to be irreparable." *Tristate Courier and Carriage, Inc.*, 2004 WL 835886, at * 13 (Del. Ch. April 15, 2004). Further, in *Equitable Life Insurance Co. v. Young*, 1985 WL 11551 (Del. Ch. May 6, 1985), the Chancery Court granted injunctive relief where an insurance agent, upon resignation from his prior employer and beginning his own business, took away dozens of his former employer's customers. *Id.* The court stated that "it would be difficult, if not impossible, to prove how long those customers would have remained with Equitable but for Young's intervention." *Id.* at *4.

In this instance, while plaintiff has provided a damages estimate with reasonable specificity, it is impossible to determine the full extent of the damage to the CLM's goodwill resulting from defendants' competition. Additionally, BIH has reaped long-term and building business benefits from each of its violations. In particular, its specialty conferences, webinars, and strategic partnership with ClaimsX operated to expand its reach to more claims and litigation management professionals, who are then incorporated into BIH's mailing list. Those individuals – whose names were acquired only though BIH's various competitive breaches – are then targeted for even more of BIH's expanding offerings. As a result, a single BIH violation cannot be viewed in isolation, as each one yields ill-gotten gains that BIH then builds upon with each and every subsequent event. Moreover, ClaimsX will continue as a competitor regardless of any injunctive relief the Court may enter.

LEGAL\58072003\1

Moreover, The Institutes are entitled to enforce the restrictive covenants for five years from the entry of the injunction.  Section 6.12(f) expressly provides that the term of the restrictive covenant shall be extended by the period of the duration of any breach of Section 6.12(a).  Defendants have ignored the covenant-not-compete virtually since the closing.

The Institutes should thus be afforded the full five-year term specified in the APA.  Such a decision is both consistent with Delaware law and necessary as a matter of equity.  Indeed, allowing BIH to compete at the end of the originally-contemplated five years would allow it to seize on the business momentum it achieved through its repeated violations.  Imposing a full-five year non-compete, in contrast, would at the very least stall BIH from capitalizing on its misconduct.

### 5.    The Institutes Are Entitled To Their Attorneys' Fees And Costs

The APA imposed broad indemnity obligations upon the "Selling Parties." Section 9.2 requires them to "indemnify, defend and hold The Institutes harmless "from, against, for and in respect of any pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from "any breach of any representation, warranty, covenant or agreement contained in this Agreement' and the "enforcement by any Buyer Indemnified Party of any of its rights under this Section 9.1 or any other indemnification covenant contained in this Agreement."  APA, §§ 9.2(a) and (f).

"Losses" are defined to mean, in relevant part,

> [A]ll Liabilities, losses, damages . . . awards, judgments, assessments, fines, penalties, charges, fees, costs, expenses and other payments however suffered or characterized, all interest thereon, all reasonable costs and expenses of investigating any claim, lawsuit or arbitration and any appeal therefrom, **all reasonable attorneys', accountants, investment bankers' and expert witness' fees incurred in connection therewith** . . ."

APA, 9.7 (emphasis added).

Here, the attorneys' fees, expert fees and costs The Institutes incurred to enforce Section 6.12 arose out of Defendants' breach of that provision and to enforce Defendants' indemnity obligation. Consistent with standard practice, The Institutes' right to attorneys' fees, experts' fees and costs should be established on the merits and the actual award of fees and costs should be made pursuant to a post-judgment fee petition. *Cove on Herring Creek Homeowners' Ass'n v. Riggs*, 2005 Del. Ch. LEXIS 71, *2 (Del. Ch. Ct. May 19, 2005); *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672 (D. Del. 2013).

## B.    BIH'S Statement

The Court, in its May 13, 2022 Memorandum Opinion (D.I. 304) addressed the primary legal issue in this litigation, the meaning of the non-compete provisions of the APA. The Court stated "The APA therefore prohibits defendants from offering a specialty conference that provides content related to claims and litigation

LEGAL\58072003\1

App.641

management or that targets claims and litigation management professionals." Id.[3]

Given the Court's ruling on this issue[4], there are six issues of law that remain to be litigated:

### 1.   Permissibility of the Plaintiffs Alleging Violations That Were Not Alleged in the Amended and Supplemental Complaint (Motion In Limine No. 1)

The Amended and Supplemental Complaint, filed on March 27, 2020, listed only two events as violating the APA: the cannabis and hemp conference, and an intellectual property conference that never occurred. The plaintiffs have never sought to amend the Complaint to allege any other violations. More recently, the plaintiff's Rule 30(b)(6) witness testified unequivocally on August 26, 2021 that the only BIH actions that the plaintiffs alleged to violate the APA were those listed in the Amended and Supplemental Complaint. The question was believed to be of such significance that the witness was encouraged by BIH counsel to read the entire Complaint before answering, and even after she answered, to again acknowledge that she had an opportunity to review the entire Complaint before doing so. Then after taking a deposition break, the witness unilaterally asked to supplement her

---

[3] Although the Court noted in its Memorandum Opinion that an earlier ruling in this case had held that BIH was bound by the APA even after Mr. Potter sold it, BIH respectfully disagrees with this interpretation of the APA and reserves its appeal rights.

[4] BIH also reserves any appeal rights with respect to its interpretation of the non-compete provisions of the APA.

LEGAL\58072003\1

answer to ambiguously add to the list of alleged APA violations "the long-term care, there was a webinar and then a virtual conference. There's a cyber webinar and I think that's it as far as events currently known." The plaintiffs now seek to supplement their claims yet again to add even more events which occurred prior to the 30(b)(6) witness's deposition. The plaintiffs should not be permitted to informally pile on claims in a rolling process in violation of the scheduling order and federal rules, when the events they seek to now add were publicly advertised and occurred months or years ago.

**Plaintiffs' Response: Despite Defendant's mischaracterization, Plaintiffs adequately identified conferences other than the Cannabis and Hemp Conference and Intellectual Property conference in the Amended and Supplemental Complaint**

The federal courts require only notice pleading. (*See*, Federal Rule of Civ. P., 8(a)(2) (providing for a "short and plain statement of the claim showing that the pleader is entitled to relief"). Claimants need not and should not plead evidence.

The Amended and Supplemental Complaint plainly alleges that, since selling the CLM Group to The Institutes, defendant Potter has leveraged "the experience he gained while he owned Sellers' Businesses, to build Business Insurance as an alternative and competitor to CLM in direct contravention of the Non-Compete." (D.E. 48-1, ¶45). Plaintiffs further allege that Beacon Intercontinental aggressively expanded the scope of BIH's competitive conferences after acquiring this entity. (*Id*., ¶105, BIH announced a "growing

LEGAL\58072003\1

App.643

annual conference schedule" including "cannabis, wildfires, the impact of AI, and cyber security").

These allegations standing alone gave notice that The Institutes claimed that defendants were offering and planning conferences that violate the noncompetition provisions beyond the cannabis and intellectual property conferences. The evidentiary basis for those allegations need not be specified and is left to discovery. Beyond that, The Institutes alleged that Business Insurance deemed itself a competitor of CLM and intended to add "conferences and other events to its agenda." *Id.*, ¶116. BIH claimed that an employee had agreed to a noncompetition provision and threatened to enforce it if he joined CLM. It also sought prospective relief even though the cannabis conference had already occurred and the intellectual property conference had been cancelled. *Id.*, ¶¶159-161.

While The Institutes focused on two conferences, the cannabis conference was the only conference that had been held by the time the Amended and Supplemental Complaint was filed, so The Institutes had more information about it.

Moreover, in discovery, The Institutes claimed that conferences beyond the cannabis and intellectual property conferences violated the noncompetition provisions. In response to Interrogatory 9 of BIH's First Set of Interrogatories,

which requested an identification of all violations of the Asset Purchase

Agreement, The Institutes responded, in part, that:

> The Institutes have learned about the sale of BI to
> Beacon Intercontinental, that BI intends to hold
> conferences similar to the BI Conferences in the future,
> as well as other events, and about the formation of the
> Claims Xchange, all of which is set forth in the Amended
> and Supplemental Complaint. Specifically with respect to
> BIH, The Institutes aver that the BI Conferences were a
> direct violation of the Purchase Agreement and that
> planned future conferences or events within the
> timeframe of the restrictive covenants will constitute
> further violations.

BIH's additional conferences were the subject of significant discovery, including

document production and depositions of BIH executives and employees.

BIH references deposition testimony from Anne Blume, as The Institutes'

corporate designee, that BIH's only violations of the noncompetition agreement

were identified in the "Complaint". But, that testimony just begs the question of

what conferences are referenced in the Complaint. After a lunch break, noting that

she found the question ambiguous. Ms. Blume clarified her testimony, stating that

"I just want to be clear that the BIH conferences that are specifically referenced in

the complaint are those that were known at the time of the complaint. But, there

have, since then, been other webinars and virtual conferences that The Institutes

also contends violate the purchase agreement." Seeking to avoid any ambiguity is

not a concession that the Complaint does not address conferences beyond the

cannabis and IP conference. Further, the question at issue was posed immediately before the lunch, Ms. Blume reflected upon it over the break and did not speak to anyone about her testimony during the break.

> **2.**   **Permissibility of the Plaintiffs Alleging Violation by BIH of a Contractual Provision That It Accused Only Mr. Potter of Violating in the Amended and Supplemental Complaint (Motion In Limine No. 2)**

The Plaintiffs, for the first time in their Answering Brief opposing BIH's summary judgment motion, alleged that they were making claims against BIH under Section 6.12(b) of the APA in addition to Section 6.12(a). In the Complaint, the Plaintiffs had carefully demarcated their claims based on alleged breach of the "Non-Compete Provision" (Section 6.12(a)) (D.I. 48 at ¶¶ 42 – 92, 97 - 143) and alleged breach of the "Non-Solicitation Provision" (Section 6.12(b)) (D.I. 48 at ¶¶ 93 – 96). The claims based on alleged breach of Section 6.12(b) refer very specifically to "Defendant Potter." The Plaintiffs now allege that BIH also violated the Non-Solicitation provision, Section 6.12(b). The Plaintiffs should not be permitted to pursue claims against BIH based on Section 6.12(b) of the APA, given the affirmative indication in the Complaint that Section 6.12(b) was invoked only with respect to Mr. Potter. The Plaintiffs cannot amend their Complaint through an argument opposing summary judgment. *Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d. 573, 587 (W.D. Pa. 2011), nor can they try to constructively amend their

Complaint at the summary judgment stage. *In re Vertis Holdings, Inc.*, Civ. No. 15-867-RGA, 2016 WL 7031282 at * 7 (D. Del., Nov. 30, 2016).

**Plaintiffs' Response: Defendant overlooks key portions of the Amended and Supplemental Complaint in an attempt to escape the Non-Solicitation Provision of the APA**

Defendant asserts that Plaintiffs did not make any claims against BIH under Section 6.12(b) of the APA**,** and that any claims based on the alleged breach of Section 6.12(b) refer exclusively to Defendant Potter.  However, The Institutes expressly alleged that Potter was acting on BIH's behalf -- "Defendant Potter contacted the law firm and solicited and/or inducted it to serve as the founding partner of the conference."  (D.E., 48, ¶ 94).  The referenced conference was the cannabis conference BIH held.  As the Court has already held, the sale to Beacon Intercontinental does not relieve BIH of responsibility for actions taken before the acquisition.  Moreover, The Institutes' repeatedly referred to "defendants'" violations of the noncompetition agreement.

3.   **Whether a Breach of Contract Is Established if No Damages Can be Demonstrated With Respect to Each Claimed APA Violation.**

In order to state a claim for breach of contract in Delaware, Plaintiffs must demonstrate (1) a contractual obligation, (2) a breach of that obligation by BIH, and (3) a resulting damage to the plaintiff.  *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017).  In order for Plaintiffs' breach of contract claim

App.647

relating to a particular claimed breach to survive, damages must be attributable to the specific allegations relating to that alleged breach, and not simply alleged generally. *Johnson v. Government Employees Ins. Co*., 2014 WL 2708300 at * 1 (D. Del., June 16, 2014) (Court grants summary judgment with respect to claimed breach of contract claim because plaintiff has not shown that alleged damages were proximately caused by contract breach); *Duncan v. STTCPL, LLC*, 2020 WL 829374 at * 10 (Del. Super., Feb. 9, 2020) (summary judgment granted on breach of contract claim because damage alleged could not be shown with reasonable certainty to be the result of specific contract breach asserted).   In order to maintain a breach of contract claim for any alleged APA violation, the plaintiffs will need to establish damages specifically tied to the alleged violation.

### 4.   Propriety of Awarding Injunctive Relief.

The plaintiffs argue that boilerplate remedy language in the APA regarding injunctive relief overrides Delaware case law regarding the elements of proving breach of contract and the requirements for awarding a permanent injunction.  BIH disputes this interpretation as being contrary to the plain language of the APA, and Delaware case law regarding interpretation of non-competition agreements. *Concord Steel, Inc. v. Wilmington Steel Processing Co., Inc*., 2008 WL 902406 at * 6 (Del. Ch., April 3, 2008); *Revolution Retail Systems, LLC v. Sentinel Technologies, Inc*., 2015 WL 6611601 at * 10 (Del. Ch., Oct. 30, 2015); *see* also *Sensus USA, Inc.*

LEGAL\58072003\1

App.648

*v. Franklin*, 2016 WL 1466488 at * 7(D. Del., April 14, 2016).  The Plaintiffs also attempt to argue that they are entitled to both monetary damages and injunctive relief.  However, injunctive relief cannot be sought as a matter of law when measurable monetary damages can be awarded.  *Tate v. Schember*, No 19-3026, 809 Fed.Appx. 64 at * 2 (3d. Cir., April 9, 2020).  The Plaintiffs have offered a "benefit of the bargain" calculation by an expert witness, and although BIH believes the expert's opinion should be excluded on *Daubert* grounds, the portion of the plaintiff expert's opinion that the Court has not yet rejected incorporates all monetary damages resulting from the alleged breach of the APA.  The Plaintiffs cannot simultaneously offer a damages theory that is based on the "benefit of the bargain" damages, and argue the irreparable harm necessary for an injunction.

### 5.     Propriety of Awarding Attorney's Fees If No Actual Damages Have Occurred.

The plaintiffs argue that they are entitled to attorney's fees even if they ultimately prove only a technical violation of the APA but establish no damages arising therefrom.  BIH disputes this interpretation as being contrary to the plain language of the APA, and Delaware case law described above regarding narrow interpretation of non-competition agreements.

### 6.     Admissibility of Expert's Opinion.

App.649

Although the Court declined to bar both of the opinions of the plaintiffs' expert before trial so that it could hear testimony and cross-examination on the single theory that it did not exclude, BIH will argue after the expert has an opportunity to testify and be cross-examined at trial that her testimony should be barred for the same reasons stated in its pre-trial motion.

### 7.    Impact of Summary Judgment Ruling on Expert Opinion

Given the Court's finding in its Memorandum Opinion on the parties' summary judgment motions (D.I. 304) as to the meaning of the non-compete language in the APA, the Court should exclude Dr. Meyer's sole remaining expert opinion on *Daubert* grounds.

### C.    Mr. Potter's Statement

Potter contends that the following mixed issues of law and fact remain to be litigated:

### (1)    Potter's Alleged Breach of the Non-Compete and/or Non-Solicit (Plaintiffs – Count I).

Breach of contract under Delaware law requires that a plaintiff establish by a preponderance of the evidence: (i) the existence of a contractual obligation; (ii) breach of that obligation by the defendant, and (iii) resulting damage. *Air Prod. & Chemicals, Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 213 (D. Del. 2017) (citing *VLIW Tech, LLC v. Hewlett Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

LEGAL\58072003\1

App.650

Potter contends that Plaintiffs are incapable of satisfying their burden of proof on a breach of contract claim against Potter.  Instead, the weight of the trial evidence will establish that the activities of the CLM Business "as conducted as of the Closing Date" did not include any of the activities alleged above by Plaintiffs as a basis for finding breach, including the C&H Conference.  APA, § 6.12(a).  Similarly, the majority of trial evidence will establish that Potter did not call-on, solicit, or induce, or attempt to call-on, solicit, or induce any customer or business relation of The Institutes "for the provision of products or services related to any of [the CLM Business]."[5]  APA, § 6.12(b).

### (2) Sufficient Proof that Plaintiffs Suffered Damages as a Result of Potter's Alleged Breaches, and that those Purported Damages can be Reliably Quantified (Plaintiffs – Count I).

Proving the fact of damages is an essential element to a breach of contract claim under Delaware law, *Wiesemann*, 237 F. Supp. 3d at 213, and must be done with reasonable certainty.  *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015), as corrected (Dec. 28, 2015).  If established, the amount of damages then must be quantified based on a "responsible" calculation.  *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).  Indeed, "When acting as the fact finder, the Court

---

[5] *See* D.I. 304, p. 4, n.2 ("There were multiple businesses sold to Plaintiffs in the APA, but in this litigation, Plaintiffs are only concerned with CLM's business.").

LEGAL\58072003\1

App.651

may not set damages based on mere 'speculation or conjecture'" where a plaintiff fails to adequately prove damages. *Id.* (brackets omitted).

Even if Plaintiffs can establish liability at trial, Potter contends that Plaintiffs will be unable to show with reasonable certainty that any such violation caused the damages, or that an amount of resulting damage can be calculated with any modicum of reliability. Plaintiffs have yet (because they are unable) to offer any competent evidence of actual loss from Potter's alleged acts – that is, any lost customers, members, or sponsors. The anticipated testimony of Dr. Christine Meyer – Plaintiffs' damages expert whose opinion this Court has tentatively limited already[6] – will fare no better. Potter contends that he will establish that Dr. Meyer's opinions and the underlying assumptions on which those opinions are based are unsupported by any facts and otherwise unreliable.

### (3) Plaintiffs Failure to Mitigate their Contractual Damages, if Liability and Damages are Sufficiently Established under Delaware Law (Plaintiffs – Count I)

Delaware law imposes a general duty to mitigate damages whenever feasible. *Norkei Ventures, LLC v. Butler–Gordon, Inc.*, 2008 WL 4152775, at *2 (Del. Super. Aug. 28, 2008). Even if Plaintiffs are able to offer sufficient evidence at trial to establish liability, the fact of damages, *and* reliably calculate the amount of such

---

[6] D.I. 301.

LEGAL\58072003\1

App.652

damages, Potter intends to introduce evidence at trial to sufficiently establish that Plaintiffs failed to mitigate that harm under the circumstances.

**(4)    Plaintiffs' Inability to Establish Irreparable Harm and the Other Required Elements for Obtaining Equitable/Injunctive Relief, Again if Liability is Sufficiently Established (Plaintiffs – Count I)**

Plaintiffs note above that they will be pursuing injunctive relief at trial – (apparently) based on nothing more than a lone provision from the APA.  Absent more, these types of "injunction clauses" cannot support the entry of an injunction. The party seeking the extraordinary and drastic remedy of injunctive relief must prove their entitlement to one through record evidence supporting all *prima facie* elements, including proof of irreparable harm.  *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."); *see First Health Grp. Corp. v. Nat'l Prescription Adm'n, Inc.*, 155 F. Supp. 2d 194, 234-35 (M.D. Pa. 2001) (concluding the parties could not contractually waive the judicial requirement that a claimant prove its entitlement to injunctive relief); *see Baker's Aid, a Division of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (same); *see also Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (stating an injunction  is an "extraordinary and drastic remedy" that "should never be awarded as of right" (citations and internal quotation marks omitted)).

Potter contends that Plaintiffs will be unable to offer any evidence of irreparable harm at trial, a claim that is principally contradicted by Plaintiffs' simultaneous pursuit of millions of contractual/expectation damages – the very purpose of which is to place the non-breaching party in the position it would have been but for the breach. *See Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000).

### (5)  Plaintiffs Cannot Recover Consequential Damages on their Breach of Contract Claim.

Plaintiffs' Statements in this Pretrial Order suggests that it is seeking to recover "the damage to the CLM's goodwill resulting from defendants' competition." Plaintiffs' only remaining claim against Potter is Count I (breach of contract). Goodwill and other consequential damages are not available in breach of contract actions brought under Delaware law. *Crowell Corp. v. Himont USA, Inc.*, 1994 WL 762663, at *3 (Del. Super. Dec. 8, 1994) ("Delaware courts have consistently found these damages to be speculative in nature, and; therefore, have barred recovery for them." (citing *Tanner v. Exxon Corp.*, No. 79C–JA–5, 1981 WL 191389, at *2–*3 (Del. Super. July 23, 1981)); *see Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 595 (D. Del. 2004). Therefore, any portion of Plaintiffs' breach of contract claim seeking loss of goodwill or other consequential damages fails as a matter of law. *See Chemipal*, 350 F. Supp. 2d at

595. Additionally, any expert testimony on this issue would be inappropriate and must be excluded. *Id.*

### (6) Plaintiffs Cannot Rely on Allegedly Speculative Damages as a Basis for Irreparable Harm.

Plaintiffs' Statements in this Pretrial Order argues that, "while [they have] provided a damages estimate with reasonable specificity, it is impossible to determine the full extent of the damage to the CLM's goodwill resulting from defendants' competition." Potter denies that allegation. To the contrary, the evidence at trial will show that Plaintiffs cannot offer any evidence demonstrating loss of goodwill. Plaintiffs' alleged inability to calculate "the full extent of" the alleged harm to their goodwill conflates irreparable harm with speculation. *Robson Forensic, Inc. v. Shinsky*, 2022 WL 1198228, at *10 (E.D. Pa. Apr. 22, 2022) ("[M]ere invocation of the term 'goodwill' does not suffice to establish the sort of clear and immediate irreparable harm necessary" to warrant injunctive relief."); *Shabazz v. Delaware Dep't of Correction*, 2020 WL 998541, at *2 (D. Del. Mar. 2, 2020) ("[I]rreparable harm alleged must be actual and imminent, not merely speculative." (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)); *Spanabel v. Delaware Thoroughbred Racing Comm'n*, 2021 WL 3829203, at *2 (Del. Super. Ct. Aug. 26, 2021) ("Speculative harm cannot serve as the basis for irreparable harm.").

App.655

**(7)    No Basis Exists under Delaware Law for Plaintiffs to Recover Attorneys' Fees.**

"Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation." *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017). "An exception to this rule is found in contract litigation that involves a fee shifting provision." *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

Plaintiffs' Statement in this Pretrial Order alleges that "[t]hey . . . seek attorneys' fees under the APA's indemnity provisions." Under Delaware law, "indemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) (citing cases) (internal quotation marks omitted); *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Nov. 22, 2016); *TranSched Systems Ltd. v. Versyss Transit Solutions, LLC*, 2012 WL 1415466, at *2 (Del. Super. Mar. 29, 2012). Here, the APA's plain text does not contain the "clear and unequivocal" language necessary to overcome the presumption in Delaware that the APA's indemnification provisions are limited to third-party claims.

LEGAL\58072003\1

**(8)   Can BIH establish fraud by clear and convincing evidence (BIH – Crossclaim III).**

Fraud in Connecticut requires clear and convincing evidence establishing: (1) a false representation of fact was made; (2) that was untrue and known to be untrue by the party making it; (3) to induce the other party to act upon it; and (4) reliance causing injury. *Stuart v. Freiberg*, 116 A.3d 1195, 1204 (Conn. 2015); *see In re Coby C.*, 402, 945 A.2d 529, 536 (Conn. App. 2008)  (reciting that clear and convincing evidence is proof that "induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist" (citations and internal quotation marks omitted)).

Potter contends that BIH will be unable to satisfy this exacting burden of proof at trial – principally because no such evidence of fraud exists.


**(9)   Can BIH Establish Negligent Misrepresentation by a Preponderance of the Evidence (Crossclaim IV).**

Negligent misrepresentation in Connecticut requires proof by a preponderance of the evidence that: (1) a misrepresentation of fact was made; (2) that the defendant knew or should have known was false; (3) reasonable reliance on

LEGAL\58072003\1

the misrepresentation by the plaintiff; (4) causing pecuniary harm as a result. *Stuart*, 116 A.3d at 1204.

Potter contends that BIH will also be unable to proffer sufficient evidence at trial – even under a preponderance standard – to establish the requisite elements of a negligent misrepresentation claim under Connecticut law.

### (10)    Can BIH Establish Reasonable Reliance (Crossclaim IV).

Fraud and negligent misrepresentation claims brought under Connecticut law require sufficient proof of reasonable reliance on the alleged misrepresentation. *Stuart*, 116 A.3d at 1203-04.  For fraud, that means clear and convincing evidence, and a preponderance of the evidence for negligent misrepresentation.   Potter contends that BIH will be unable to proffer sufficient evidence at trial to satisfy either burden for purposes of establishing reasonable reliance.

### (11)    BIH Voluntarily Assumed the Risks and is Barred from Recovery on its Negligent Misrepresentation Claim (BIH Crossclaims III and IV).

Even if BIH could offer sufficient evidence to meet its requisite burden of proof for providing liability and damages on a negligent misrepresentation claim, Potter intends to proffer evidence sufficient to establish that BIH voluntarily assumed the risks of any purported misrepresentation that may ultimately have resulted in harm.  *Nally v. Charbonneau*, 362 A.2d 494, 496 (Conn. 1975) ("The defense of assumption of risk is applicable when a person knows or as a reasonable

LEGAL\58072003\1

person should know that in pursuing a certain course he will expose himself to the risk of injury, comprehends or ought as a reasonable person to comprehend the nature and extent of the risk and voluntarily subjects himself to it. He thus assumes the risk and cannot recover damages resulting from it.").

## VI.     LIST OF PREMARKED EXHIBITS WHICH EACH PARTY INTENDS TO OFFER AT TRIAL

   Plaintiffs' Trial Exhibit List is attached hereto as **Exhibit E**;

   BIH's Trial Exhibit List is hereto as **Exhibit F**;

   Mr. Potter's Trial Exhibit List is attached hereto as **Exhibit G**.

## VII.    LIST OF ALL WITNESSES THE PARTIES INTEND TO CALL AND WHETHER THE WITNESS WILL TESTIFY IN PERSON OR BY DEPOSITION

### A.     List of Witnesses Plaintiffs Expect to Call

#### 1.     Witnesses Plaintiffs Intend to Call to Testify in Person

  a) Expert witness:

   (1) Dr. Christine Meyer, Ph.D.

  b) Non-Expert Witnesses:

   (1) Peter Miller

   (2) Anne Blume

   (3) Jeffery Scheidt

   (4) Jeremy Campbell

   (5) Keith Kenner

   (6) Adam Potter

   (7) Steve Acunto, Sr.

LEGAL\58072003\1

App.659

  (8) Katie Kett (in person or by video)

  (9) Tina Pernie (in person or by video)

 **2.** **Witnesses Plaintiffs Intend to Call to Testify By Deposition**

  a) Plaintiffs' deposition designations for witnesses it may call by deposition if unavailable are attached here to as **Exhibit H**.

Plaintiffs reserve the right to call any fact or expert witness listed by Defendants.

 **B.** <u>**List of Witnesses Defendant Potter Expects to Call**</u>

  **1.** **Witnesses Potter Intends to Call to Testify in Person**

   a) Expert witness:

    (1) Harris Devor, CPA

   b) Non-Expert Witnesses:

    (1) Adam Potter

    (2) Kathrine Horowitz[7]

    (3) Anne Blume

    (4) Steve Acunto, Sr.

  **2.** **Witnesses Potter Intends to Call to Testify by Deposition**

   a) Potter's designations for witnesses he may call by deposition are attached here to as **Exhibit I**.

Potter reserves the right to call in his cases-in-chief any expert or non-expert witness listed or identified by either Plaintiffs and/or BIH.

---

[7] Potter has asked Plaintiffs whether they will accept service on behalf of Ms. Horowitz of a trial subpoena directed to her.

### C.     List of Witnesses Defendant BIH Expects to Call

BIH intends to call Stephen Acunto Sr., Keith Kenner, and Katherine Horowitz as fact witnesses, and Andrew Goodenough as an expert witness.  BIH has asked the plaintiffs to make Ms. Horowitz available for trial.  BIH's deposition designations for witnesses it may call by deposition if they are unavailable to testify at trial is attached as **Exhibit J**.  BIH also reserves the right to call any witness listed by any other party.

## VIII.     PLAINTIFFS' CLAIMS AND DAMAGES

The Institutes seek injunctive relief and monetary damages against Defendants.  They also seek attorneys' fees under the APA's indemnity provisions.

The Institutes intend to prove that: (1) they did not receive the benefit of the bargain when they purchased the assets of the Sellers' Businesses and are entitled to monetary damages; (2) they are entitled to injunctive relief prohibiting Defendants from engaging in competitive activities prohibited by the Non-compete for five years; (3) they are entitled to attorneys' fees pursuant to the specific language in Article IX of the APA; and (4) they are entitled to recovery of prejudgment interest on their claims.

### A.  The Institutes Will Establish that They Did Not Receive the Benefit of the Bargain.

"It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching party the benefit of its bargain by putting the party in the

position it would have been but for the breach." *Greenstar, LLC v. Heller,* 934 F.Supp 2d 672, 693-94 (D. Del. 2013) (citing *Genencor Int'l, INc. v. Novo Nordisk A/S,* 766 A.2d 8, 11 (Del. 2000)).   The plaintiff must prove the bargain or the prospective economic advantage it would have had but for the breach or wrongful act. *Inter Med. Supplies, Ltd. V. EBI Med. Sys. Inc.,* 181 F.3d 446, 461-63 (3d Cir. 1999).   Damages calculations in complex circumstances should be "based upon values at the time of the transaction . . . which incorporate[s] future expectations." *Colbalt Operating, LLC v. James Crystal Enterprises, LLC,* 2007 WL 2142926, *30 (Del. Ch. July 20, 2007).

A plaintiff must establish a wrong and corresponding injury. *See Heller*, 934 F.Supp. 2d at 693-694 (applying Delaware law).   But, it need only establish the corresponding injury with "reasonable certainty so that the fact of damages [is] taken out of the area of speculation." *Tanner v. Exxon Corp.,* 1981 WL 191389 at *1 (Del. Super. Ct. July 23, 1981) (internal quotations omitted); *see also Beard Rsch., Inc. v. Kates,* 8 A.3d 573, 613 (Del. Ch. 2010); *Total Care Physicians, P.A. v. O'Hara,* 2003 WL 21733023 at *3 (Del. Super. Ct. July 10, 2003) ("The quantum of proof required to establish the amount of damages is not as great as that required to establish the fact of damage.").

The Institutes paid $17,329,098 for CLM at the time of the acquisition plus an additional $2,655,049, for a total of $19,984.147.   The Institutes' Expert, Dr.

Christine S. Meyer, Ph.D., will testify that The Institutes lost at least $3.5 to $5.2 million, and as high as $6.7 to $8.0 million, as a result of the Defendants' violations of the non-compete. Dr. Meyer's analysis establishes that The Institutes would have paid less for the CLM assets if they knew that the Defendants were going to compete against them. Dr. Meyer also opines that her measure of damages is conservative as it compares the actual value received to the price paid, which is lower than the value The Institutes expected to receive.

Defendants indisputably have competed and BIH publicly proclaims its intention to continue competing with the acquired businesses. The APA's Disclosure Schedule contains an express definition of those businesses, drafted by Potter, so Defendants are foreclosed from disputing the scope of the activities in which they may not engage. That definition includes hosting and producing webinars and "specialty conferences." Defendants admittedly produced a specialty conference on cannabis and on long-term care. They have also hosted a series of issue-specific webinars presented by claims and litigation management professionals, including the 6-part cannabis update series and the cybersecurity webinar. BIH executives have also admitted that it has conducted and is planning numerous additional webinars and specialty conferences.

Therefore, The Institutes did not receive the benefit of the bargain as contemplated by the APA, including the financial benefits that the Non-Compete

LEGAL\58072003\1

clause was intended to provide.

### B. In Addition to Money Damages, The Institutes are Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years.

In the APA, Defendants conceded that The Institutes' remedies at law for any breach would be inadequate, so that they are entitled to injunctive relief without proving actual damages, conceding that monetary damages alone would be inadequate.  Even without this concession, courts have recognized that the "harms resulting from competition by someone bound by a non-competition agreement are frequently found to be irreparable."  *Tristate Courier and Carriage, Inc.*, 2004 WL 835886, at *13 (Del. Ch. April 15, 2004).  Further, in *Equitable Life Insurance Co. v. Young*, 1985 WL 11551 (Del. Ch. May 6, 1985), the Chancery Court granted injunctive relief where an insurance agent, upon resignation from his prior employer and beginning his own business, took away dozens of his former employer's customers. *Id*.  The court stated that "it would be difficult, if not impossible, to prove how long those customers would have remained with Equitable but for Young's intervention." *Id*. at *4.

Moreover, The Institutes are entitled to enforce the restrictive covenants for five years from the entry of the injunction.  Section 6.12(f) expressly provides that the term of the restrictive covenant shall be extended by the period of the duration of any breach of Section 6.12(a).  Defendants have ignored the covenant-not-

LEGAL\58072003\1

App.664

compete virtually since the closing, so The Institutes should be afforded the full five

year term specified in the APA.

### C. **The Institutes are Entitled to Attorneys' Fees and Expert Witness Fees Pursuant to the Specific Language in Article IX of the APA.**

Article IX of the APA provides for the reimbursement of attorneys' fees (and

other fees outlined therein), for any party to that suffers "losses" as a result of the

breach of the covenants contained therein.   Specifically, Section 9.2 provides as

follows:

> Section 9.2 <u>Indemnification of Buyer</u>.   The Selling Parties shall, jointly and severally, from and after the Closing, defend, indemnify and hold harmless Buyer and its respective officers, directors, stockholders, Affiliates, agents and representatives (collectively the "Buyer Indemnified Parties") from, against, for and in respect of and pay any and all **<u>Losses</u>** [emphasis added] suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:
>
> > (a) any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement (other than any such breach in existence as of the Closing Date which was disclosed in writing by Sellers to Buyer at or prior to the Closing Date and was waived in writing by Buyer);
> >
> > *     *     *
> >
> > (f) the enforcement by any Buyer Indemnified Party of any of its rights under this <u>Section 9.2</u> or any other indemnification covenant contained in this Agreement.

LEGAL\58072003\1

Pursuant to Section 9.5, there is no limitation on The Institutes' right to recovery. In provides as follows (emphasis added):

> Notwithstanding anything in this Agreement to the contrary, no Party will be entitled to assert any claim for indemnification (for the Selling Parties, under Section 9.1, and for Buyer, under Section 9.2) unless the amount of such Loss exceeds US$50,000 (the "Basket") in the aggregate, in which event the Indemnified Party may assert its right to the full extent of its Loss in excess of the Basket; provided, however, that the maximum aggregate amount of Losses payable by the Selling Parties shall be limited to the Purchase Price (the "Cap"); and provided further, *that the Basket and the Cap shall not apply in the event of fraud, or intentional misrepresentation relating to Sections 4.1, 4.3 4.5, 4.6, 4.7, 4.15, 4.18, 5.1, 5.4 and 5.5, or any indemnification claimed under Sections 9.1(b), 9.1(c), 9.2(b), 9.2(c) and 9.2(d), or for any breaches of covenants in Article VI* [i.e., the Non-compete] . . . .

Section 9.7 defines "Losses" as follows:

> For purposes of this Article IX, "Losses" shall mean all Liabilities, losses, damages (other than consequential, special, incidental or punitive damages), awards, judgments, assessments, fines, penalties, charges, fees, costs, expenses and other payments however suffered or characterized, all interest thereon, all reasonable costs and expenses or investigation any claim, lawsuit or arbitration and any appeal therefrom, all reasonable attorneys', accountants', investment bankers', and expert witness' fees incurred in connection therewith, whether or not such claim, lawsuit or arbitration is ultimately defeated and, subject to this Article IX, all amounts paid incident to any compromise or settlement of any such claim, lawsuit or arbitration.

It is clear from the language of the APA that the Institutes are entitled to their

attorneys' fees and expert witness fees due to the Defendants' breaches of the non-

LEGAL\58072003\1

App.666

compete and non-solicitation covenants set forth in Article VI of the APA. Delaware courts will award attorneys' fees where the contract specifically provides that they are recoverable in the event of a breach. "When construing a contract, and unless a contrary intent appears, [Delaware courts] will give words their ordinary meaning." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 924 (Del. 1992). "Delaware courts have upheld provisions that purport to award fees and costs to the prevailing party." *L&W Ins. Inc., v. Harrington*, 2007 WL 1756540 (Del. Ch. June 6, 2007). For example, in *Faw, Casson & Co., LLP v. Halpen*, the court awarded plaintiff attorneys' fees because the employment agreement provided that the employee, in the event of breach, would "pay an amount or amounts equal to one hundred percent (100%) of the gross fees billing by the company…." 2001 WL 985104, at *2 (Del. Super. Aug. 7, 2001). Further, in *Aveta Inc. v. Cavallieri*, 23 A.3d 157 (Del. Ch. Sept. 20 2010), the Chancery Court stated that "[w]here a contract places the responsibility for payment of attorneys' fees on any party who either breaches the contract or fails to perform in accordance with the terms of the contract, courts will enforce the bargained-for provision absent evidence of an ambiguity or contrary intent . . . . The prevailing party's contractual right to the payment of money … cannot be forgiven in whole or in part by a court out of compassion for the non-prevailing party." *Id.* at 183 (quoting *L&W Ins. Inc. v. Harrington*, 2007 WL 1756540, at *3 (Del. Ch. June 6, 2007)).

LEGAL\58072003\1

App.667

Here, Section 9.2 provides that Selling Parties shall pay any and all "Losses" arising out of or resulting from any breach of any covenant contained in the APA (9.2(a)) and the enforcement by any Buyer Indemnified Party of its rights (9.2(f)), and "Losses" are specifically defined to include attorneys' fees and expert witness fees. Accordingly, The Institutes are entitled to an award of such fees pursuant to Delaware law and the express terms of the APA, in an amount to be determined in a separate fee petition following trial. *See Greenstar, LLC v. Heller, 934 F. Supp. 2d 672 (D. Del. 2013); Cove on Herring Creek Homeowners' Ass'n v. Riggs, 2005 Del. Ch. LEXIS 71, *2 (Del. Ch. Ct. May 19, 2005).*

### D. __The Institutes Are Entitled to Pre-judgment Interest on Its Claims and Post-Judgment Interest if it is Successful on Its Claims.__

An award of pre-judgment interest generally relates back to the date of the loss or injury. *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.,* 996 A.2d 1254, 1262 (Del. 2010); *Hercules, Inc. v. AIU Ins. Co.,* 784 A.2d 481, 508 (Del. 2001).  In a breach of contract action, interest accrues from the date of the breach.  *Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., C.A.*  No. 83C-AU-66, slip op. at 2, Stiftel, J. (Del Super. Aug. 9, 1985).  If there is any confusion as to the date that pre-judgment interest begins to run, the court, in its discretion, may choose the date. *Raymond v. Board of Public Works, C.A.* No. 84C-DE-8, slip op. at 2 n.2, Gebelein, J. (Del. Super. May 8, 1990).

LEGAL\58072003\1

App.668

The rate of interest allowed in actions at law generally is equated to the "legal rate" of interest described in 6 Del. C. § 2301(a).[8]  In equity, setting the rate of interest is a matter of discretion.  *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 226 (Del. 2005); *Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 409 (Del. 1988).

## IX.    <u>**DEFENSES**</u>

**BIH:** Several of BIH's defenses to claims asserted by the Plaintiffs are recited in Section IV above, including Plaintiffs' incorrect claims that they are entitled to either injunctive relief or attorney's fees upon a showing of any technical violation of the non-compete provisions of the APA without an accompanying showing of past or future harm.  BIH will also argue that the Plaintiffs have failed to mitigate their damages[9], and have incurred no damages. In addition, BIH denies that the factual evidence will establish that it has violated the APA, and denies that the factual evidence will establish that The Institutes did not receive the benefit of the bargain.

---

[8] It is important to note that Section 2301(a) does not distinguish between pre-and-post-judgment interest.  The same interest rates applies to both. Therefore, if The Institutes have a judgment entered in their favor, they will be requesting post-judgment interest as well at the rate specified in Section 2301(a). *See TranSched Systems Ltd. v. Versyss Transit Solutions, LLC*, 2012 WL 1415466 (Del. Super. Ct. Mar. 29, 2012).

[9] BIH is aware that the Court has ruled that the plaintiffs' failure to seek a preliminary injunction is not evidence of failure to mitigate damages, and will not present evidence on the failure to seek a preliminary injunction.

40

**Potter:** *See supra* Section IV(C) for a brief statement of what Potter intends to prove as defenses at trial.

## X.        CROSSCLAIMS

BIH will be pursuing cross-claims against Mr. Potter for Negligent Misrepresentation and Fraud.   Both of these claims will be based upon representations that Mr. Potter made to induce BIH to continue with the C&H conference, and representations that Mr. Potter made to induce the Acuntos to have involvement with the entity ClaimsX founded by Mr. Potter's sister.  BIH maintains that its involvement with the C&H Conference and the Acuntos' brief participation with ClaimsX did not violate the APA, but to the extent that they did, Mr. Potter is responsible for any damages that BIH might incur as a result of the false representations he made.

## XI.        AMENDMENTS TO PLEADINGS

## XII.        SETTLEMENT

The parties participated in a settlement conference with Magistrate Judge Jennifer L. Hall on December 9, 2020 in an attempt to resolve this matter. Therefore, the parties certify that they have engaged in a good faith effort to explore the resolution of the controversy by settlement.

## XIII.        ADDITIONAL MATTERS

Not applicable.

## XIV.        MOTIONS *IN LIMINE*

LEGAL\58072003\1

**BIH:** BIH has listed its two motions *in limine* in Section IV above.

**Potter:** Motion *in Limine* No. 1 to preclude Plaintiffs from introducing or eliciting evidence at trial concerning non-party Waggy Group, Inc. *See* Attached as **Exhibit K.**

COZEN O'CONNOR

/s/ Barry M. Klayman
Barry M. Klayman (#3676)
1201 N. Market St., Suite 1001
Wilmington, DE 19801
(302) 295-2035
bklayman@cozen.com

OF COUNSEL:

Robert W. Hayes
Matthew J. Siegel
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
rhayes@cozen.com
msiegel@cozen.com

*Attorneys for Plaintiffs, The
American Institute for Chartered
Property Casualty Underwriters and
The Institutes, LLC*

FOX ROTHSCHILD LLP

/s/ Seth Niederman
Seth Niederman (#4588)
Katelyn M. Crawford (#6591)
Citizens Bank Center
919 N. Market St., Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com
KCrawford@foxrothschild.com

OF COUNSEL:

Robert S. Tintner
Nathan M. Buchter
FOX ROTHSCHILD LLP
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

*Attorneys for Defendant, Adam Potter*

LEGAL\58072003\1

DLA PIPER LLP (US)

*/s/ Matthew P. Denn*
Matthew P. Denn (#2985)
1201 N. Market St., Suite 2100
Wilmington, Delaware 19801
(302) 468-5700
(302) 394-2341 (Fax)
matthew.denn@us.dlapiper.com

OF COUNSEL:

Christopher G. Oprison
DLA PIPER LLP (US)
200 South Biscayne Blvd., Suite
2500
Miami, FL 33131
chris.oprison@dlapiper.com

*Attorneys for Defendant, Business
Insurance Holdings, Inc.*


SO ORDERED this _____ day of _____, 2022.


_____
U.S. District Judge


44

App.673

# EXHIBIT A

1

App.674

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

The American Institute for Chartered )
Property Casualty Underwriters and )
The Institutes, LLC, )
                             )
                 Plaintiffs, )
                             )
            v. )
                             )
Adam Potter and Business Insurance )
Holdings, Inc., )
                             )
               Defendants. )
                             )

Civ. A. No. 1:19-cv-01600-RGA-JLH

## STATEMENT OF FACTS WHICH ARE
## ADMITTED AND REQUIRE NO PROOF

The parties submit the following Statement of Undisputed Facts, which require no proof, and may be used by any party at trial for any reason.

### The APA

1.      The APA defines the "Sellers' Businesses" as the "CP Business," the "C&E Business," and the "CLM Business."

2.      The APA defines "the Buyer" as The Institutes, LLC, a wholly owned subsidiary of The American Institute for Chartered Property Casualty Underwriters ("AICPCU").

3.      The APA defines the "Selling Parties" as CLM, CP, C&E, Potter, and Moxie.

4.      The Institutes paid $17,329,098.00 at the closing.

1

5.      Pursuant to the APA, the Institutes made three subsequent payments in the total amount of $2,655,049.00.

6.      On June 1, 2018, Potter also owned Business Insurance Holdings, LLC ("Business Insurance"), and neither Business Insurance nor its assets were sold under the APA.

### Potter Sells Business Insurance Holdings, Inc. to Beacon Intercontinental Group, Inc.

7.      Section 6.9 of the APA required CP, C&E, and CLM to change their names after Closing.

8.      On June 7, 2018, Potter changed the name of C&E to Business Insurance Holdings, Inc. ("BIH").

9.      On June 7, 2018, Potter changed the name of Business Insurance to PBIH, LLC.

10.     Potter was BIH's sole owner, director, and officer from June 7, 2018 through September 1, 2019.

11.     Potter sold BIH to Beacon Intercontinental Group, Inc., effective September 1, 2019.

12.     Stephen Acunto III ("Mr. Acunto") became a director and officer of BIH, and his wife, Carole Acunto was appointed an officer of BIH (collectively, the "Acuntos").

2

### The Cannabis & Hemp and Intellectual Property Conferences

13.     On July 19, 2019, The Institutes became aware that BIH was offering and promoting a Cannabis & Hemp Conference ("the C&H Conference" or "Cannabis Conference"), and an Intellectual Property Conference ("the IP Conference") scheduled for October 24-25, 2019 and October 24, 2019, respectively.

14.     On July 29, 2019, The Institutes sent Potter a cease and desist letter concerning the C&H Conference and the IP Conference.

15.     On August 12, 2019, The Institutes sent Potter another cease and desist letter concerning the C&H Conference and the IP Conference.

16.     On August 20, 2019, Potter responded (through counsel) to The Institutes' July 29, 2019 and August 12, 2019 letters.

17.     On August 28, 2019, Plaintiffs initiated this lawsuit by filing their initial complaint.

18.     The IP Conference never occurred.

19.     The C&H Conference occurred on October 24-25, 2019.

20.     Wilson Elser Moskowitz Edelman & Dicker LLP ("Wilson Elser") sponsored the C&H Conference.

21.     Plaintiffs did not withhold any payments due under the APA.

App.677

22.    Plaintiffs do not claim CLM lost advisory board members, directors, or trustees because of either Potter or BIH.

23.    The Institutes has stipulated that it is not seeking any damages arising from the loss of any members of its or CLM's boards or advisory boards.

## **ClaimsX**

24.    On October 1, 2019, Articles of Incorporation were filed in Florida for The Claims XChange, Inc. ("ClaimsX").

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## BIH'S DEPOSITION DESIGNATIONS

BIH reserves the right to use any deposition testimony of any witness for purposes of impeachment at trial.

## I.    Keith Kenner (August 4, 2021)

BIH objects to the use of any deposition testimony from Mr. Kenner for any reason other than impeachment if he is present to testify at trial.  The following objections and counter-designations are made only for purposes of use of his deposition testimony if he is not present to testify.

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 11:15 – 12:10 | | |
| 19:9 – 21:22 | | |
| 53:20 – 53:25 | | |
| 57:8 – 57:12 | | |

2

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 114:19 – 114:21 | | |
| 115:14 – 115:19 | FRE 602 | |
| 137:16 – 137:19 | | |
| 139:18 – 139:21 | | |

App.681

## II.    Katie Kett (August 10, 2021)

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 19:11 – 19:15 | | |
| 21:9 – 21:18 | | |
| 22:3 – 22:12 | | |
| 28:19 – 30:8 | Counter designation: 42:5 – 24 | |
| 36:8 – 37:2 | | |
| 53:12 – 53:19 | FRE 602 | |
| 64:21 – 65:13 | | |
| 66:18 – 71:1 | | |
| 80:20 – 82:3 | | |
| 129:16 – 130:17 | | |
| 132:20 – 134:15 | | |
| 136:16 – 137:6 | | |
| 142:11 – 145:15 | | |
| 150:1 – 152:17 | | |
| 162:23 – 166:17 | | |

4

### III.    Adam Potter (June 21, 2021, VOL II)

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 17:17 – 17:25 | FRE 602 | |
| 22:15 – 28:16 | FRE 802 | |
| 38:12 – 41:5 | | |
| 43:8 – 44:4 | FRE 602 | |
| 85:21 – 90:14 | | |
| 92:2 – 92:16 | FRE 802 | |
| 96:6 – 97:23 | | |
| 138:3 – 143:15 | | |
| 160:16 – 163:14 | | |
| 166:15 – 169:4 | FRE 602 | |
| 173:7 – 177:16 | | |
| 192:3 – 195:5 | FRE 602, 802 | |

5

## IV.     Anne Blume May 27, 2021

Plaintiffs object to the use of any deposition testimony from Ms. Blume for any reason other than impeachment if she is present to testify at trial.

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 8:18 – 8:21 | | |
| 15:17 – 18:21 | | |
| 38:8 – 38:13 | | |
| 41:22 – 42:2 | | |
| 45:21 – 46:10 | | |
| 50:21 – 54:16 | | |
| 66:12 – 66:20 | | |
| 72:14 – 74:1 | | |
| 77:6 – 82:19 | FRE 402 (79:13-14; 81:19-82:5) | |
| 85:4 – 87:2 | | |
| 97:6 – 97:12 | | |
| 97:24 – 98:6 | | |
| 99:25 – 100:15 | | |
| 108:8 – 111:15 | | |
| 112:13 – 114:24 | FRE 402 (113:5-114:16) | |
| 133:4 – 136:1 | | |
| 136:4 – 136:12 | | |

6

| | | |
|---|---|---|
| 137:4 – 137:11 | | |
| 137:24 – 138:16 | | |
| 139:10 – 141:23 | | |
| 145:25 – 168:23 | FRE 402 (154:5-160:2) | |
| 175:24 – 176:21 | Counter-designation: 176:22-179:1 | |
| 179:2 – 180:25 | | |
| 182:2 – 182:23 | | |
| 185:7 – 186:16 | | |
| 191:21 – 192:1 | | |
| 194:9 – 197:20 | Counter-designation: 192:23-194:6 | |
| 202:11 – 215:19 | | |

App.685

## V.    Anne Blume, August 26, 2021

Plaintiffs object to the use of any deposition testimony from Ms. Blume for any reason other than impeachment if she is present to testify at trial.

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 7:10 – 7:19 | | |
| 28:8 – 31:11 | | |
| 33:21 – 34:24 | | |
| 40:22 – 41:25 | | |
| 57:19 – 60:20 | FRE 402 (59:11-60:20) | |
| 70:25 – 72:1 | | |
| 79:17 – 80:24 | | |
| 83:1 – 86:24 | | |
| | | |

App.686

## VI.   Katherine Horowitz

Plaintiffs object to the use of any deposition testimony from Ms. Horowitz for any reason other than impeachment if she is present to testify at trial.

| BIH's Designations | Plaintiffs' Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 16:24 – 22:18 | | |
| 23:21 – 25:25 | | |
| 27:10 – 28:2 | | |
| 39:19 – 40:6 | FRE 402 | |
| 47:17 – 48:1 | | |
| 50:11 – 60:4 | | |
| 62:1 – 65:24 | | |
| 66:9 – 97:11 | FRE 402 (66:9-85:23) FRE 602 (90:1-4; 96:20-97:11) | |
| 98:12 – 134:24 | FRE 402 FRE 701 (134:7-20) | |
| 135:23 – 197:23 | FRE 402 (141:5-176:8) FRE 602 (182-184, 196-197) FRE 701 (162-164, 167-168, 182-183) | |
| 245:4 – 246:10 | | |
| 281:21 – 286:16 | FRE 602 | |

## VII.  Peter Miller

Plaintiffs object to the use of any deposition testimony from Mr. Miller for any reason other than impeachment if he is present to testify at trial.

| BIH's Designations | Plaintiffs' Objections/Counter-Designations | Potter's Objections/Counter-designations |
|---|---|---|
| 6:11 – 6:20 | | |
| 29:24 – 38:7 | Counter-designation: 38:18 – 39:4 | |
| 39:23 – 42:7 | | |
| 44:4 – 46:11 | | |
| 47:9 – 51:23 | | |
| 66:2 – 73:18 | Counter-designation: 64:7-66:1 | |
| 76:3 – 83:19 | | |

App.688

Case 1:19-cv-01600-RGA-JLH   Document 308-11   Filed 05/24/22   Page 1 of 13 PageID #: 6255

# EXHIBIT K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) |
| | ) |
| Defendants. | ) ) |

Civ. A. No. 1:19-cv-01600-RGA-JLH

## DEFENDANT ADAM POTTER'S MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM INTRODUCING OR ELICITING EVIDENCE <u>AT TRIAL CONCERNING NON-PARTY WAGGY GROUP, INC.</u>

Defendant Adam Potter ("Potter"), through his undersigned counsel, hereby moves *in limine* to preclude Plaintiffs from introducing or eliciting evidence at trial concerning non-party Waggy Group, Inc. ("Waggy"), pursuant to Federal Rules of Evidence 401 and 402.

## <u>ARGUMENT</u>[1]

Plaintiffs' identified the following purported factual disputes concerning Waggy in their proposed Pretrial order:

> 30.   Whether Mr. Potter's operation of Waggy competed with C&E's Business.

---

[1] Motions to exclude evidence are committed to the Court's sound discretion. *See In re Lucky's Mkt. Parent Co.*, 2022 WL 843763, at *6 (D. Del. Mar. 22, 2022).

1

31.    Whether Waggy received commissions as a result of the C&H Conference.

32.    Whether Waggy's involvement with BIH constituted a violation of the APA.

Prior to March 22, 2022, Plaintiffs never raised Waggy as an issue to be litigated. That is because Waggy is irrelevant to the claims and defenses at issue here.

Waggy is not a party.  None of the pleadings filed in this case – least of all Plaintiffs' initial and amended complaints – contain allegations about (or even make reference to) Waggy.  *See* D.I. 1, 15, 48, 145, 146.  Waggy is not identified in any of the parties' initial disclosures.  Nor did any of the parties – especially Plaintiffs – seek information or documents concerning Waggy during the approximate ***nineteen months of fact discovery*** in this case, which included multiple sets of party and non-party written discovery requests,[2] the production of thousands of documents, and ten depositions.[3]  Waggy is also not mentioned by Plaintiffs' damages expert – Christine Meyer, PhD – in either of her reports.

It is well-settled that only relevant evidence is admissible at trial.  *Forrest v. Beloit* Corp., 424 F.3d 344, 355 (3d Cir. 2005); *Fed. R. Evid.* 402.  Evidence is

---

[2] *See* D.I. 25-26, 78, 83-85, 87, 93, 95, 99 (Interrogatories); D.I. 25-26, 84-85, 87-89, 93-94, 96, 100-01, 107, 117 (Requests for Production); D.I. 83, 95 (Requests for Admissions); D.I. 29-33, 77, 90 and 102 (Subpoenas).

[3] D.I. 163-64, 167-68, 171, 174, 177, 183, 186, 188, 199, 205-207.

relevant if it has a tendency to make a consequential fact in the action more or less probable than it would be without the evidence. *Fed. R. Evid.* 401.

Here, it is clear that both Waggy and the purported factual issues Plaintiffs identified in their proposed Pretrial Order are irrelevant to the issues to be tried next month in this case. This Court recently observed that competition with the "C&E Business" is not an issued Plaintiffs are litigating in this case. D.I. 304, p. 4, n. 2 ("There were multiple businesses sold to Plaintiffs in the APA, ***but in this litigation, Plaintiffs are only concerned with CLM's business*.**" (emphasis added)). As noted above, purported commissions to Waggy in connection with the C&H Conference, or Waggy's purported connection to BIH, are not alleged by Plaintiffs in their amended complaint. Nor were those "issues" previously identified by Plaintiffs during fact discovery.

In sum, there is no basis for Plaintiffs to introduce or elicit evidence at trial concerning Waggy. Thus, Plaintiffs should be precluded from doing so – not only to stop a "trial by surprise" on these issues, but also to prevent unfair prejudice to Defendants. Plaintiffs failure to timely disclose these purported factual disputes about Waggy has prevented Defendants from fully and fairly developing their defenses at trial on these issues by having the opportunity to test and explore their bases during discovery.

Finally, it is noteworthy that this Court granted Plaintiffs leave to amend *for a second time* on March 26, 2021 – approximately fifteen months into fact discovery – but Plaintiffs elected not to exercise that right.  Thus, Plaintiffs had multiple opportunities to timely raise Waggy as an issue in the case, and failed to do so.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Potter requests that this Court exercise its discretion by precluding Plaintiffs from introducing or eliciting evidence at trial concerning Waggy.

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/  Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: May 13, 2022          *Attorneys for Defendant Adam Potter*

4

## CERTIFICATE OF COMPLIANCE

I hereby certify that Adam Potter's Motion *in Limine* to Preclude Plaintiffs from Introducing or Eliciting Evidence at Trial Concerning Non-Party Waggy Group, Inc. ("Motion *in Limine*") complies with the type, font and word limitations set forth in this Court's December 9, 2019 Scheduling Order.  Potter's Motion *in Limine* is 640 total words.

*/s/  Seth Niederman*
Seth Niederman

Dated:  May 13, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT POTTER'S
MOTION *IN LIMINE* TO PRECLUDE EVIDENCE
<u>CONCERNING WAGGY GROUP, INC.</u>**

Defendant Potter moves to exclude evidence from this bench trial with respect to the operation of Waggy Group, Inc. ("Waggy"). Motions in *limine* are rarely appropriate in a non-jury trial, such as this one. *See Wright v. Elton Corp.*, 2022 WL 1091280, at *1 (D. Del. 2022) ("[T]he better course is to hear the testimony and continue to sustain objections when appropriate."). In any event, as long as evidence as to Waggy is admissible on any potential ground, it should not be excluded. *See Leonard v. Stemtech Health Sciences, Inc.*, 981 F.Supp.2d 273, 276 (D. Del. 2013).

Contrary to Potter's assertions, Plaintiffs do, in fact, assert claims against Defendants based on Waggy's booking of hotel rooms and venues for, among others, specialty conferences BIH conducted. They expressly alleged that Defendants violated the APA by not only holding the conferences at-issue, but by *organizing*

App.695

them.  *See* D.I. 46-1, Amended and Supplemental Complaint ("Compl."), ¶ 153.  As

set forth on previous occasions, the noncompetition provisions of Section 6.12 of the

Asset Purchase Agreement provide that "each Selling Party covenants and agrees

not to, and shall cause its Affiliates not to" compete with any of the "Seller's

Businesses" as defined in Schedule A to the Disclosure Schedule.  Schedule A

describes the business of C&E—the entity that is now BIH—as "[a]n event planning

company that manages all of CLM's events."  *See* APA, at Sched. A; *see also*

Compl., ¶ 16.  Additionally, in referencing Potter's retention of the IATA Number

C&E utilized, Schedule 6.12(3) provides that "none of the Selling Parties is

permitted to, and each shall cause its Affiliates not to, book or reserve hotel rooms

and venues in connection with any meetings, conferences or other events for the

insurance industry, and such services are excluded from Permitted Activities."

Discovery has established, including hotel bills and emails that Potter

produced, that he founded Waggy to continue C&E's (now BIH's) business.  And,

in fact, Waggy booked hotel rooms and venues for BIH's specialty conferences and

otherwise planned those conferences.  Evidence of its activities is relevant and

highly probative.

That Waggy is not named as a defendant is immaterial.  Not only does Section

6.12(a) require the Selling Parties to preclude their affiliates from competing in

violation of its provisions, but forming Waggy to compete against the CLM Group affirmatively breached the Asset Purchase Agreement.

Beyond that, evidence of Waggy's actions is, at least, relevant to demonstrate Potter's efforts to recreate the CLM's entire business model—a model that The Institutes paid approximately $20 million to acquire.  Moreover, the breath of the above-referenced prohibition on booking hotel rooms or venues for events in the "insurance industry" is instructive in interpreting the noncompetition provisions of Section 6.12.  For these reasons alone, evidence of the prohibitions on booking hotel rooms and venues and the use of Waggy to violate those provisions is admissible.

Respectfully submitted,

/s/  Barry Klayman
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

Dated: May 23, 2022

3

App.697

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Adam Potter and Business Insurance Holdings, Inc.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. A. No. 1:19-cv-01600-RGA

## DEFENDANT ADAM POTTER'S REPLY IN SUPPORT OF HIS MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM INTRODUCING OR ELICITING EVIDENCE AT TRIAL CONCERNING NON-PARTY WAGGY GROUP, INC.

Potter, through undersigned counsel, submits this Reply in support of his motion *in limine* to preclude Plaintiffs from introducing or eliciting evidence at trial concerning Waggy.

## ARGUMENT

"There were multiple businesses sold to Plaintiffs in the APA, but in this litigation, Plaintiffs are only concerned with CLM's business." (D.I. 304, at 4, n. 1). That was the scope of Plaintiffs' breach of contract claim after discovery closed and dispositive motions were filed. Now after years of litigation, right before trial, Plaintiffs advance new "theories" involving C&E and an IATA Number "based on Waggy's booking of hotel rooms and venues for . . . specialty conferences BIH

conducted" as part of Potter's purported effort "to recreate the CLM's entire business model."  Opp., at 1-3.  Plaintiffs' Opposition provides no justification for their eleventh-hour attempt to introduce these new legal theories, making no reference to any allegation in their pleadings concerning Waggy or purported breaches involving other businesses sold under the APA.  Nor do Plaintiffs dispute that they failed to seek discovery on those topics, despite ample opportunity.[1]

Plaintiffs were required to provide Potter with advance notice of the basis for their claims.  They failed to do that.  Allowing Plaintiffs to proceed on these new theories now would countenance unfair surprise at trial and substantially prejudice Potter, who had no prior notice or opportunity to test these new allegations during discovery or at summary judgment.

## **<u>CONCLUSION</u>**

Thus, Potter requests that this Court preclude Plaintiffs from introducing or eliciting evidence at trial concerning Waggy.

[*Signature of Counsel on Next Page*]

---

[1] Fact discovery was extended six times.  (D.I. 204).

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/  Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**

Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: May 24, 2022                    *Attorneys for Defendant Adam Potter*

## CERTIFICATE OF COMPLIANCE

I hereby certify that Adam Potter's Reply in Support of his Motion *in Limine* to Preclude Plaintiffs from Introducing or Eliciting Evidence at Trial Concerning Non-Party Waggy Group, Inc. ("Reply") complies with the type, font and word limitations set forth in this Court's December 9, 2019 Scheduling Order.  Potter's Reply is 250 total words.

*/s/  Seth Niederman*
Seth Niederman

Dated:  May 24, 2022

Case 1:19-cv-01600-RGA-JLH   Document 308-2   Filed 05/24/22   Page 1 of 15 PageID #: 6153

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' STATEMENT OF THE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

1.     Whether the limitations imposed by Section 6.12(a) of the Asset Purchase Agreement ("APA") are reasonable in scope and duration.

2.     Whether defendants have planned, marketed, advertised, hosted, organized, and/or sponsored specialty conferences in breach of Section 6.12(a) of the APA.

3.     Whether defendant Adam Potter copied the CLM Group's business model after selling that entity to Plaintiffs and whether BIH has and will continue that model after its sale to Beacon Intercontinental.

4.     The scope of "claims and litigation management" as contemplated by the APA, including whether it encompasses risk management and outside counsel, where, *inter alia*:

LEGAL\58072055\1

a. Prior to the time of the APA and to present, CLM's network of members and fellows includes risk managers and outside counsel and its conferences are sponsored by entities that provided services to the insurance industry and attorneys representing the insurance industry;

b. Prior to the APA, CLM provided risk management content to its members at events and, in fact, had an initiative to create more content specifically for risk managers;

c. Risk managers must understand the nature of the claims arising out of activities for which they are managing risk;

d. Prior to the APA, CLM regularly discussed and presented on "pre-loss" issues at its conferences and other events.

e. On April 23, 2018, Mr. Potter's counsel attempted to limit the non-compete in Section 6.12(a) to "businesses that provide substantially all services . . . or resources that are materially geared towards claims professionals[;]"

f. On May 11, 2018, The Institutes refused to so limit the scope of its business to just claims professionals (as well as rejecting the "substantially geared" standard proposed by Mr. Potter);

g. On May 21, 2018, The Institutes explained their rejection of Mr. Potter's proposal as follows:

> You will see that we stuck with the concept of "Permitted Activities". We have no information (nor do we want to start doing due diligence) on the entities you proposed as "Excluded Businesses". Buyer is not aware of any competitive activities that Adam plans to undertake post-closing other than perhaps a "Women's" award event. However, if there are any areas of overlap that concerns Adam, we would like them listed on Schedule 6.12 and Buyer will consider whether to carve-them out of the non-compete. Buyer cannot agree to a blanket carve-out for companies that are in the same space, and that we know little to nothing about[;]

h. The Institutes also asked Mr. Potter to fill in the description of BIH's Business per the following guidelines:

> Please describe any activities that Seller believes will be competitive.  Buyer does not believe there should be any competitive activity post-closing.  If there is a concern that some activities may be deemed competitive, we would like to understand what they are so that Buyer can approve them prior to closing[;]

i. Mr. Potter attempted to define BIH's Business, with respect to its

website, sponsored content, and e-newsletters as follows:

> BI Website is a multichannel, ad-supported website that provides news and information to the insurance industry.  The content focuses on insurance industry news, risk management topics, workers comp . . . and news about industry professionals.  The site is also used to promote BI events and award programs.

> Sponsored Content – paid for partner content, e.g., Risk Perspective (in-depth article, one-on-one, or research treatment of a specific topic with a sponsor perspective embedded)

> . . .

> E-newsletters – BI published several e-newsletters:
> Daily Briefing (M-F)
> Comings & Goings (Mon)
> Risk Management (Tues)
> Workers Comp (Wed)
> Market Pulse (Thurs[)]
> Current Issue (Monthly)
> International (T/TH)[;]

j. The Institutes responded as follows:

> We can't accept the content comment which relates to BI's website, sponsored content and e-newsletters.  We feel that 'providing news and information to the insurance

industry', 'articles', etc., is exactly the business that CLM . . . [is] in. I see those things as being in direct competition to what we are purchasing. If we mentioned that these items will not include claims and litigation management professionals, which include service providers related to the claims and litigation industry, then we will feel more comfortable[;]

k. The Institutes ultimately insisted on a carve-out to the Permitted Activities that excluded any events or conferences "related to claims and litigation management professionals," while maintaining that only "a general industry . . . like Women to Watch" is permissible;

5. Whether defendants have violated Section 6.12(a) of the APA by creating, offering, marketing, planning and/or advertising webinars presented by a claims, litigation and/or insurance professionals on substantive topics.

6. Whether Potter and/or BIH violated Section 6.12(a) of the APA by forming and/or allowing Affiliates – including Waggy Group, Inc. ("Waggy") – to organize conferences or other events for the insurance industry, where, *inter alia*:

a. The parties agreed that Potter, BIH, and their Affiliates could not compete with the Business of C&E, which is "[a]n event planning company that manages all of CLM's events;

b. Schedule 6.12, in a section entitled "Any Person to whom the IATA Number is transferred to after the Closing as permitted under Section 6.1(c)," states that "booking and reserving hotel rooms and venues" is excluded "provided, however, on and after the Closing Date, with the exception of Business Insurance Holdings, LLC (solely in connection with the Permitted Activities), none of the Selling Parties is permitted to, and shall cause its Affiliates not to, book or reserve hotel rooms and venues in connection with any meetings, conferences, or other events for the insurance industry, and such services are excluded from Permitted Activities."

LEGAL\58072055\1

    c. On June 1, 2018, incorporated Waggy;

    d. On August 3, 2018, Mr. Potter was asked what the nature of Waggy's business was, Mr. Potter responded "Waggy is doing conference events / planning. It is what C&E used to do."

    e. Waggy contracted to receive commission from BIH's contracts with hotels for events into 2020.

7.    Whether the APA differentiates between pre- and post-loss issues.

8.    The nature of defendant Adam Potter's representations to Mr. Steven Acunto with respect to Section 6.12 of the APA.

9.    Whether Defendants' solicitation of claims and litigation management speakers for its offerings violates Section 6.12(b) of the APA.

10.    Whether Defendants' solicitation of sponsorships from CLM's sponsors violates Section 6.12(b) of the APA.

11.    Whether Defendants' solicitation of CLM's network of insurance professionals – which includes claims professionals, litigation management professionals, risk managers, and outside counsel – interferes with Plaintiffs' business for purposes of Section 6.12(b) of the APA in that it reduces those individuals' ability to spend time and money at CLM's offerings.

12.    Whether the Intellectual Property Conference ("IP Conference") that Defendants planned related to the claims and litigation management industries or targeted claims and litigation management professionals, where, *inter alia*:

App.707

    a. On March 12, 2019, Mr. Potter identified various groups and entities that may be interested in sponsoring the intellectual property conference, including "numerous law firms" and "outside counsel[;]"

    b. Mr. Potter intended to offer reduced pricing to the IP Conference to "risk managers," "Industry professionals, claims HR[;]"

    c. Defendants described the IP Conference as an exploration of "business exposure" resulting from intellectual property that aims to educate insurance professionals about "risk management and insurance strategies to protect intellectual property assets" and identify "established and new insurance protections" available to insurance professionals.

13.    Whether the Cannabis and Hemp Conference ("C&H Conference") competed with Plaintiff's Business, as prohibited by Section 6.12(a) of the APA, or interfered with Plaintiff's business relations, as prohibited by Section 6.12(b), where, *inter alia*:

    a. On March 19, 2019, Mr. Potter identified a list of potential panelists for the cannabis conference, including underwriters, liability assistant claims managers, casualty claims specialists, and internal company counsel;

    b. On April 17, 2019, Mr. Potter contemplated a pricing structure for the cannabis conference that included discounts for risk managers and "insurance company folks (underwriters/claims)[;]"

    c. On June 27, 2019, Mr. Potter revised the pricing structure again to provide discounted pricing for "industry professionals, claims[;]"

    d. On June 20, 2019, Katie Kett of BIH – in an email eventually sent to Mr. Potter – outlined the proposed syllabus for the cannabis conference, which included "Cannabis Claims[;]"

    e. Defendants originally promoted the C&H Conference as a "new conference centered on cannabis insurance and risk management" for

insurance and cannabis industry professionals "grappling with complex coverage and liability issues[;]"

f.  A description of the C&H Conference on BIH's website stated that it aimed to examine the risks to the insurance industry resulting from the legalization of marijuana;

g.  As originally promoted, the C&H Conference's claims session was described on BIH's website, in part, as follows:

> This panel of experienced cannabis claims professionals will attempt to shed light on the type, frequency and severity of cannabis claims to date, and what these claims will look like in the future[;]

h.  BIH did not change the panelists for the cannabis claims/exposure session after Plaintiffs informed them of their belief that the C&H Conference violated the APA;

i.  Materials presented at the cannabis claims / exposure session referred to, among other things, "fire claims," "theft claims," "product liability," and "CBD claims" involving cannabis, along with "professional liability" and "Civil RICO Litigation[;]"

j.  Defendants solicited one of Plaintiff's sponsors – Wilson Elser – to sponsor the C&H Conference;

k.  BIH used its existing database and the marketing database provided by Wilson Elser to advertise the C&H Conference;

l.  The C&H Conference was attended by approximately 200 professionals, 100 of which registered for the conference prior to the time "claims" was replaced with "exposure" in promotional materials;

m.  At least 15 individuals and 40 companies that were CLM members attended and/or sponsored the C&H Conference;

n.  On November 7, 2019, a BIH employee stated in her "11.7.19 Cannabis Conference Debrief Notes:" that the C&H Conference brought in a

"new audience for BI[H]."

o. In a post-conference survey, BIH asked "what sessions and/or speakers did you find most valuable and why," respondents answered, *inter alia¸* "claims," "claims trends panel," "claim info," and "legal session[;]"

p. Certain of The Institutes' sponsors reduced their spending at The Institutes' conferences following the C&H Conference.

14.     Whether BIH violated either Section 6.12(a) or (b) of the APA when it created, offered, promoted, marketed and/or advertised two workers compensation webinars in 2020 that were presented by claims, litigation and/or insurance professionals.

15.     Whether BIH violated Section 6.12(a) and/or (b) of the APA when it held its Cannabis Update webinar from April to May of 2021, where, *inter alia*:

a. The webinar series was sponsored by Wilson Elser;

b. Professionals in the claims and litigation management industries served as speakers in the webinar series;

c. A BIH employee, Mr. Keith Kenner, testified that the intended audience for the Cannabis Update webinar series was the same as the audience for the C&H Conference;

d. Session 3 of that webinar series, held on May 6, 2021, was entitled "Claims, Policy, & Underwriting."

16.     Whether BIH violated Section 6.12(a) and/or (b) of the APA when it held its Crisis in Senior Care, Risk Management Concerns in Long Term Care Facilities webinar, where, *inter alia*:

LEGAL\58072055\1

    a. The Crisis in Senior Care, Risk Management Concerns in Long Term Care Facilities webinar was presented by a Vice President of Risk and Legal Affairs of an entity and an attorney at Wilson Elser; and

    b. Mr. Kenner testified the webinar included a discussion about claims arising in long term care facilities.

17.    Whether BIH violated Section 6.12(a) and/or (b) of the APA when it held its Long Term Care Conference from July 15-16, 2021, where, *inter alia*:

    a. The Long Term Care Conference was sponsored by Wilson Elser;

    b. BIH advertised the Long Term Care Conference as designed to "address the myriad risks inherent in the skilled nursing industry," including the impact of COVID-19, "[s]lips & falls: The No. 1 injury claim," "abuse and neglect," "[i]nsurance coverage issues," and "litigation trends and trial experiences[;]"

    c. Mr. Kenner testified that the Long Term Care Conferences discussed claims and related to claims and the litigation space;

    d. Mr. Kenner further testified that several speakers in the Long Term Care Conference practice in the claims and litigation management industries.

18.    Whether BIH violated either Section 6.12(a) or (b) of the APA when it held its Specialty Insurance Webinar: Cyber Security on July 29, 2021, where, *inter alia*:

    a. BIH marketed the webinar as follows: "This webinar produced by Business Insurance examines the ransomware threat, what companies can do to prevent attacks, how they should respond if their systems are compromised and what insurance is available to meet ransomware-related losses[;]"

    b. The Cyber Security webinar was presented by the Co-Chair of the "Insurance Recovery and Counseling Practice" at a firm and by the

10

"Chief Claims Officer" at a company.

19.    Whether BIH violated either Section 6.12(a) or (b) of the APA when it held its virtual Cannabis and Hemp Conference on October 13, 2021, which was sponsored by Wilson Elser.

20.    Whether BIH's future offerings – which its website advertises as follows: 2022: Long-Term Care Conference (7/21/2022) in partnership with Wilson Elser; Cannabis Update 2022: Insurance & Risk Management Implications Conference (10/20/2022); 2022 Cannabis and Hemp Conference, and Cyber Risk Webinar (9/28/2022) – will violate either Section 6.12(a) or (b) of the APA.

21.    Whether BIH will continue to offer conferences relating to the claims and litigation management industry, or which targets such industry, unless enjoined by the Court.

22.    Whether BIH will continue to offer webinars relating to the claims and litigation management industry, or presented by such professionals, unless enjoined by the Court.

23.    The extent of Mr. Potter's involvement with ClaimsX – an entity operated by his sister, Sydney Posner – including whether, *inter alia*:

> a.    After the sale of BIH to Beacon closed, Mr. Potter introduced the Acuntos to his sister, Sydney Posner, to work on a joint venture involving a business in claims;

LEGAL\58072055\1

     b.   Whether Mr. Potter led the Acuntos to believe that they could assist Ms. Posner with ClaimsX without violating Section 6.12 of the APA.

24.     Whether BIH violated Section 6.12 of the APA through its involvement

with ClaimsX where, *inter alia*:

     a.   ClaimX's Articles of Incorporation identify it as "an association for the betterment of claims professionals;"

     b.   The filing also identified the Acuntos' home address as ClaimsX's principal place of business and mailing address, Mrs. Acunto as its incorporator, and provided that Mr. Acunto was its president, Mrs. Acunto was its secretary and treasurer, and Ms. Posner was its vice president;

     c.   Mr. Acunto was also appointed to ClaimsX's Board of Advisors ("Board");

     d.   On October 15, 2019, Mr. Acunto sent Ms. Posner a memorandum that identified ClaimsX's purpose as "serving the best interests of the insuring public, insurers, claims professionals, and attorneys and other individuals participating in the fair resolution of insurance claims," and identifying the following planned events: Transportation Conference, Construction Conference, Annual Conference, and a Boat Cruise;

     e.   On November 19, 2019, Ms. Posner – on behalf of ClaimsX – sent BIH a list compiled by CLM of all attendees and their contact information from one of its previous conferences for BIH's use;

     f.   ClaimsX solicited for its Board of Advisors individuals sitting on CLM's Board of Directors;

     g.   On November 22, 2019, Ms. Posner internally touted to Mr. Acunto and others on the ClaimsX Board that their first event – a tree lighting ceremony – filled up "100% consistent with our model: 60% claims[;] 30% attorneys[;] 10% vendors[;]"

     h.   ClaimsX's website initially stated that it was "powered" by BIH;

i.   BIH provided advice to ClaimsX on how to form a board, issue a press release, and BIH offered subscriptions to new ClaimsX members as a source of new ads and subscriptions for BIH;

j.   On December 30, 2019, Ms. Posner wrote to Mr. Acunto to inform him that ClaimsX "decided to disengage the administrative services of Business Insurance but continue a strategic partnership with BI," and ClaimsX "would continue to grow BI's subscriber base [and] advertise BI to new audiences through [ClaimsX] events and communication[;]"

k.   ClaimsX's website subsequently identified BIH as a "strategic partner[;]"

l.   On January 22, 2020, the Acuntos resigned their officer positions with ClaimsX in a letter to Ms. Posner, but affirmed that Mr. Acunto "will find ways to enable [ClaimsX] to be supported by BI[H] via subscriptions and other mechanisms[;]"

m.   On January 29, 2020, Ms. Posner wrote to Mr. Acunto and others as follows with respect to ClaimsX's strategic partnership with BIH:

> We will continue to share [ClaimsX's] membership lists with [BIH] to increase their readership
> . . .
> We would like coverage of our events by BI[H]
> We would like email blasts from BI[H] about [ClaimsX][;]

n.   Mr. Acunto responded that day, stating "[w]e are in accord vis a vis BI[H][;]"

o.   On January 30, 2020, Ms. Posner provided Mr. Acunto with the list of ClaimsX's membership, which included – per Ms. Posner's report – 271 claims professionals, 382 attorneys, and 170 service providers;

p.   Mr. Acunto resigned from his position on the Board on March 2, 2020, however, in doing so, he affirmed that he is "pleased to continue the BI[H] offering for [ClaimsX's] members" and Ms. Posner responded that she was "glad that we will remain strategically partnered[;]"

25.     Whether BIH's assistance to ClaimsXchange, Inc., aided its ability to compete with the CLM after it was reformed as ClaimsXChange, LLC.

26.     Whether BIH is targeting claims and litigation management professionals for each of its offerings when it advertises the event through its mailing list, which includes contact information derived from individuals listed on the attendance sheet for a CLM Conference that ClaimsX provided to BIH and ClaimsX's membership base of claims and litigation management professionals.

27.     Whether Potter violated the APA by failing to cause his Affiliates not to violate the APA in light of:

    a.  BIH's alleged violations of the APA;

    b.  BIH's assertions that Potter did not inform them of their obligations under the APA, represented that the non-compete applied to him personally, encouraged BIH to engage in a joint venture in the claims industry with Ms. Posner; and

    c.  Potter's decision on August 3, 2018, to operate Waggy Group, Inc. ("Waggy") as "doing conference events/planning . .. what C&E used to do," notwithstanding the APA's prohibition on such activity.

28.     What was the amount of Plaintiffs' valuation of the CLM Group.

29.     Whether Plaintiffs assumed Potter and BIH would not compete in valuing the assets of the CLM Group.

30.     Whether Plaintiffs would have paid less for the assets of the CLM Group if they knew Potter and BIH would continue to compete after the sale and would assist Sydney Posner develop a competing organization.

LEGAL\58072055\1

31.    Whether Plaintiffs are entitled to attorneys' fees under Section 9.2(a) of the APA.

32.    The amount of Plaintiffs' damages.

33.    Whether an award of damages can adequately compensate Plaintiffs for the harm they have sustained as a result of Defendants' conduct.

LEGAL\58072055\1

# EXHIBIT C

**BIH STATEMENT OF ISSUES OF FACT STILL TO BE LITIGATED**

1.  The substance of any presentation made at any conference or event organized by BIH
    that is alleged to have violated the non-compete provisions of the APA.

2.  Whether claims and litigation professionals were targeted in the development of the
    agenda or programming for any event organized by BIH.

3.  Whether claims and litigation professionals were specifically targeted in the
    advertising or promotion of any conference or event organized by BIH.

4.  Whether the plaintiffs have incurred any legally recognized damages as a result of
    any allegations against BIH.

5.  The identity of any claims and litigation professionals who actually attended the
    cannabis & hemp conference.

6.  The identity of any claims and litigation professionals who actually attended any
    conference or event organized by BIH.

7.  Whether the plaintiffs took any steps to mitigate any claimed damages from any acts
    alleged to have been committed by BIH.

8.  Whether BIH offered a special price to claims professionals for the cannabis and
    hemp conference in 2019.

9.  Whether the plaintiffs have lost any customer or member as a result of any act of BIH
    in violation of the APA.

10. Whether the plaintiffs have lost any sponsor or had a reduction in the level of
    sponsorship as the result of any act by BIH in violation of the APA.

11. Whether Mr. Potter represented to BIH that the cannabis and hemp conference complied with the terms of the APA.

12. What Mr. Potter said to Mr. Acunto and BIH about BIH's legal authority to work with Mr. Potter's sister Sydney Posner, and what Mr. Potter did to encourage Mr. Acunto to collaborate with Ms. Posner.

13. Whether Mr. Potter knew or should have known that his statements to the Acuntos and BIH were false, whether they relied upon his statements, whether he intended for them to rely on his statements, and whether they were damaged by relying on his statements.

14. To the extent that the Court's May 13, 2022 Order has not resolved all issues with respect to application of the APA to the facts of this case, and the Court deems any provisions of the APA to be ambiguous, factual testimony regarding negotiations over the APA that clarify the intent of any ambiguous language.

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## POTTER'S STATEMENT OF FACTUAL ISSUES
## THAT HE CONTENDS REMAIN TO BE LITIGATED

Defendant Adam Potter ("Potter"), by and through his counsel of record in the above-captioned matter, submits the following Statement of Factual Issues that he contends remain to be litigated. Potter reserves the right to supplement or amend this Statement up to and through trial.

### I.    Plaintiffs' Amended and Supplemental Complaint[1]

1.    Was the C&H Conference a product or service of the "CLM Business" as conducted as of the Closing Date.

2.    Did the CLM Business as conducted as of the Closing Date include a conference dedicated to cannabis and hemp as a product or service.

---

[1] Plaintiffs' breach of contract claim is the only claim that remains against Potter. *See* D.I. 126, 138, 304-05.

3.      Did the CLM Business as conducted as of the Closing Date include a cannabis product?

4.      Did the CLM Business as conducted as of the Closing Date include a conference dedicated to intellectual property as a product or service.

5.      Does Schedule A to the APA list a conference decided to either cannabis and hemp or intellectual property.

6.      Does Schedule A to the APA list a cannabis and hemp- or intellectual property-related product or service.

7.      The parties' intended scope of Schedule 6.12's "Permitted Activities."

8.      Whether the C&H Conference is a Permitted Activity.

9.      What was Katherine Horowitz's role in the due diligence leading up to the execution of the APA.

10.     Is the Non-Compete a material contractual term in the APA.

11.     Is the Non-Solicit a material contractual term in the APA.

12.     Did the C&H Conference provide content related to claims and litigation management.

13.     Did the C&H Conference target claims and litigation management professionals.

14.     Can Plaintiffs establish that Potter breached the Non-Compete by a preponderance of the evidence.

15. Can Plaintiffs establish that Potter breached the Non-Solicit by a preponderance of the evidence.

16. The purpose of the March 8, 2018 valuation report (the "Pre-Acquisition Report") issued by Valuation Research Corporation ("VRC") to Plaintiffs.

17. Did the Pre-Acquisition VRC Report assume no competition from Defendants.

18. Did VRC consider the Non-Compete in the Pre-Acquisition VRC Report.

19. Does the Pre-Acquisition Report reference any restrictive covenants.

20. Was Wilson Elser Moskowitz Edelman & Dicker LLP ("Wilson Elser") a customer or business relation of The Institutes, LLC.

21. Was Plaintiffs' business relationship with Wilson Elser impacted by the C&H Conference.

22. Can Plaintiffs sufficient establish by a preponderance of the evidence that they lost any customers, members, sponsors, or vendors as a result of Potter's alleged conduct (if the Court finds that Potter breached the Non-Compete or Non-Solicit).

23.     Can Plaintiffs sufficiently establish by a preponderance of the evidence the fact of contractual damages as a result of Potter's alleged conduct (if the Court finds that Potter breached the Non-Compete or Non-Solicit).

24.     Did The Institutes get the benefit of their bargain for the assets of the Sellers' Businesses that The Institutes acquired.

25.     If yes, did Plaintiffs fail to mitigate any contractual damages.

26.     If yes, did Plaintiffs (through their own actions) waive the right to recover contractual damages.

27.     Can Plaintiffs establish that they are entitled to any non-monetary relief by a preponderance of the evidence (if the Court finds that Potter violated the Non-Compete or Non-Solicit).

28.     Can Plaintiffs establish irreparable harm by a preponderance of the evidence.

29.     Can Plaintiffs establish that any legal remedies are inadequate.

30.     Are Dr. Christine Meyer's proffered assumptions, expert opinions, and/or damages models supported by the facts and evidence in the case.

## II.    BIH's Crossclaims[2]

31.    Can BIH establish by clear and convincing evidence that Potter made a false representation of fact to BIH.

32.    Can BIH establish by clear and convincing evidence that Potter knowingly made an untrue representation of fact to BIH.

33.    Can BIH establish by clear and convincing evidence that Potter knowingly made an untrue representation of fact to BIH to induce BIH to act upon it.

34.    Can BIH establish by clear and convincing evidence that it relied justifiably on an untrue representation of fact made by Potter.

35.    If yes, can BIH establish by clear and convincing evidence that its reliance on an untrue representation of fact made by Potter was reasonable.

36.    If yes, can BIH establish by clear and convincing evidence that its reliance on an untrue representation of fact made by Potter was caused injury.

37.    Can BIH establish by a preponderance of the evidence that Potter made a material misrepresentation of fact to BIH.

---

[2] BIH's fraud and negligent misrepresentation crossclaims are only crossclaims that remains against Potter.  *See* D.I. 220, 224, 302-03.

App.725

38.    Can BIH establish by a preponderance of the evidence that Potter made a material misrepresentation of fact to BIH that Potter knew or should have known was false.

39.    Can BIH establish by a preponderance of the evidence that it relied on a material misrepresentation of fact made by Potter to BIH.

40.    If yes, can BIH establish by a preponderance of the evidence that its reliance on a material misrepresentation of fact made by Potter to BIH was reasonable.

41.    If yes, can BIH establish by a preponderance of the evidence that its reliance on a material misrepresentation of fact made by Potter to BIH caused pecuniary harm.

42.    If yes, can BIH establish that it sustained any damages as a result of any conduct on the part of Potter.

43.    Was BIH represented by counsel at the time that any alleged untrue representations of fact were made by Potter to BIH.

44.    Is BIH estopped from claiming harm or damages from any alleged untrue representation of fact by Potter to BIH because of its own actions (or the actions of its owners, officers, and/or directors).

45.    Did BIH voluntarily assume the risk(s) of any alleged untrue representation of fact by Potter to BIH.

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' TRIAL EXHIBIT LIST

Plaintiffs reserve the right to rely upon any exhibit identified by Defendants below.  Plaintiffs further reserve the right to use enlargements or blow-ups of any exhibit properly identified in this proposed order at trial.  Plaintiffs further reserve the right to identify and introduce additional exhibits for impeachment purposes at trial.  Plaintiffs also reserve the right to withdraw exhibits based on the Court's ruling on the parties' Motions for Summary Judgment.

App.728

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 8/28/19 | Complaint | No Bates | Blume Day 1 Exhibit_06 | | |
| | 3/27/20 | Amended and Supplemental Complaint | No Bates | Blume Day 1 Exhibit_07 | | |
| | 10/16/20 | Plaintiffs' Response to Defendants' First Set of Interrogatories | No Bates | Blume Day 1 Exhibit_08 | | |
| | 10/16/20 | Plaintiffs' Response to Defendants' First Set of Request for Production | No Bates | | | |
| | 11/12/20 | Plaintiffs' Response to BIH's First Set of Interrogatories | No Bates | Blume Day 2 Exhibit_03 | | |

---

[1] To the extent that BIH and Mr. Potter object to any exhibits, BIH joins any evidentiary basis cited by Mr. Potter. BIH also reserves the right to object to exhibits on hearsay grounds if they are offered for the proof of the matter asserted and the declarant is available.

App.729

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 11/16/20 | Plaintiffs' Answer to BIH's First RFA | No Bates | Blume Day 2 Exhibit_02 | | |
| | 7/19/21 | BIH's Amended Response to Potters First Set of Rogs | No Bates | Acunto Sr. Exhibit_24 | FRE 802 | |
| | 10/15/21 | Expert Report of Meyer, PhD | No Bates | Meyer EXHIBIT_01 | FRE 802, Court's Order on Daubert motion | |
| | 12/10/21 | Expert Reply Report of Meyer, PhD | No Bates | Devor Exhibit_04 | FRE 802, Court's Order on Daubert motion | |
| | 3/8/18 | Email re CLM Valuation | Institutes0008592 | Ex. B to Response to Potter's MSJ | | |
| | 3/8/18 | VRC Pure Valuation for CLM Group (Attorneys' Eyes Only) | Institutes0008372-8387 | Devor Exhibit_02 | FRE 802 | |

App.730

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 1/8/19 | VRC Pure Valuation for CLM Group (Attorneys' Eyes Only) | Institutes00150 96-15124 | Devor Exhibit_03 | FRE 802 | |
| | 6/1/18 | Asset Purchase Agreement between Institutes, AICPCU, Claims Pages, LLC, et al., Adam Potter and Moxie HC, LLC | Potter-DE-000001-0050 | Blume Day 1 Exhibit_02 | | |
| | 6/1/18 | Asset Purchase Agreement Schedules | Potter-DE-000051-0154 | Blume Day 1 Exhibit_01 | | |
| | Undated | Board Notes (Attorneys' Eyes Only) | Institutes00061 67-6169 | Miller Exhibit_03 | FRE 602 | |
| | 8/12/19 | Letter re:  6/1/18 Asset Purchase Agreement | Potter-DE-000346-367 | Potter.EXHIBIT_51 | | |
| | 8/20/19 | Letter re:  Asset Purchase Agreement between The Institutes, LLC, et al. and CLM Group, Inc., et al. | Institutes00050 00-5002 | Potter BIH Exhibit 48 | | |
| | 9/1/19 | Stock Purchase Agreement | BIH-003-003885-3991 | Potter.EXHIBIT_05 | | |

App.731

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 9/6/19 | Notice Letter to S. Acunto re: pending litigation | No Bates | Acunto Sr. Exhibit_26 | FRE 602 | |
| | 10/1/19 | Electronic Articles of Incorporation for Claims Exchange, Inc. | BIH-001-000260-0261 | Acunto Sr. Exhibit_16 | | |
| | 12/31/19 | CLM & Claim Pages Statement of Activities (12/31/19 and 2018) (Attorneys' Eyes Only) | Institutes00147 32-14744 | Blume BIH Exhibit_22 | | |
| | 2019 | Cannabis & Hemp Conference | No Bates | KENNER Exhibit_12 | | |
| | 2019 | Cannabis & Hemp Conference | No Bates | Kett Exhibit_14 | | |
| | 2020 | BI Intellectual Property Conference March 2020 | No Bates | Blume Day 1 Exhibit_04 | FRE 402 | |
| | 2021 | Cannabis Update 2021 | No Bates | KENNER Exhibit_15 | FRE 402 | |
| | Undated | Cyber Security Specialty Ins Webinar | No Bates | KENNER Exhibit_16 | FRE 402 | |
| | Undated | Claims Xchange Website | No Bates | KENNER Exhibit_17 | FRE 402 | |

App.732

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | Undated | Business Insurance Long-Term Care Conference | No Bates | KENNER Exhibit_18 | FRE 402 | |
| | Undated | CLM List of Customers and Sponsors (excel spreadsheet) | No Bates | Blume Day 2 Exhibit_06 | FRE 402, 901 | |
| | Undated | Cover page for Excel File (Kett Ex 19) (Confidential - Attorneys' Eyes Only) | No Bates | Kett Exhibit_19 | | |
| | 11/25/2020 | Counterclaims of BIH in Potter v. Beacon, No. 1:20-cv-4599 (S.D.N.Y.) | | Ex. L to Response to Potter's MSJ | | |
| | Undated | Current BIH Website | | | FRE 402 | |
| | 2/9/18 | Email re: Claims Litigation Management | Institutes0006453-6455 | Horowitz Exhibit 02 | | |
| | 3/8/18 | Email re: CLM Valuation | Institutes0006441-6442 | Miller Exhibit_01 | | |
| | 4/13/18 | Email re: The Institutes/CLM - Purchase Agreement | Institutes0006324 | Horowitz Exhibit 10 | | |
| | 4/23/18 | Draft APA – BP Draft | Institutes0010228-77 | | | |

7

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 5/11/18 | Email re: BP/Institutes - Purchase Agreement | Institutes0000001 | Horowitz Exhibit 12 | | |
| | 5/16/18 | Email re: BP/Institutes - Purchase Agreement | Institutes0000122 | Horowitz Exhibit 13 | | |
| | 5/21/18 | Email re: Institutes/CLM/Purchase Agreement | Institutes0000679-0740 | Horowitz Exhibit 14 | | |
| | 5/22/18 | Email re: Institutes/CLM/Purchase Agreement | Institutes0012150-2152 | Goodenough Exhibit_03 | | |
| | 5/24/18 | Email re: BI Description | Institutes0010863-10867 | Potter.EXHIBIT_01 | | |
| | 5/29/18 | Outlook Invite - Board of Trustees conference call | Institutes0005877-5891 | Blume BIH Exhibit_07 | | |
| | 8/3/18 | Email re: June Reports | BIH-003-006043-6046 | Potter.EXHIBIT_04 | | |
| | 2/28/19 | Email re: Potentials to consider | BIH-003-006434 | Potter.EXHIBIT_06 | | |
| | 3/2/19 | Email re: Conference strategy session | BIH-003-005895-5897 | Potter.EXHIBIT_07 | | |

8

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 3/6/19 | Email re: Cannabis Conference – Call | BIH-003-005932 | Kett Exhibit_01 | | |
| | 3/12/19 | Email re: Another new event? Is he mad? (Confidential - Attorneys' Eyes Only) | BIH-002-003715-3718 | Potter.EXHIBIT_09 | | |
| | 3/14/19 | Email re: question (Confidential - Attorneys' Eyes Only) | BIH-003-005875-5876 | Potter.EXHIBIT_08 | | |
| | 3/19/19 | Email re: Workers Comp – Spring | Potter-DE-000879-0881 | Potter.EXHIBIT_10 | | |
| | 4/16/19 | Email re: Cannabis Advisory Board (Confidential - Attorneys' Eyes Only) | BIH-003-005616-5619 | Potter.EXHIBIT_11 | | |
| | 4/17/19 | Email re: Cannabis registration | Potter-DE-000682-0688 | Potter.EXHIBIT_12 | | |
| | 4/30/19 | Email re: Cannabis AB confirmed | Potter-DE-000639-0644 | Kett Exhibit_03 | | |
| | 5/21/19 | Email re: Cannabis draft | BIH-002-002489-2490 | Kett Exhibit_05 | | |

App.735

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 6/12/19 | Email re: Follow up to our meeting | BIH-003-004906-4907 | Acunto Sr. Exhibit_01 | | |
| | 6/13/19 | Email re: Adam/Steve A. | BIH-001-000005-0006 | Acunto Sr. Exhibit_02 | | |
| | 6/14/19 | Email re: Adam/Steve A. | BIH-001-000019-0022 | Acunto Sr. Exhibit_03 | | |
| | 6/20/19 | Email re: Agenda by themes (Confidential – Attorneys' Eyes Only) | BIH-002-002105-2108 | Kett Exhibit_06 | | |
| | 6/26/19 | Email re: Cannabis Claims - session info | BIH-002-001928 | Kett Exhibit_07 | | |
| | 6/27/19 | Email re: Registration pricing Cannabis, IP and Innovation Highly Confidential - Attorneys' Eyes Only) | Potter-DE-000587-0588 | Potter.EXHIBIT _13 | | |
| | 7/1/19 | Email re: Contact list for Cannabis (Confidential – Attorneys' Eyes Only) | BIH-002-001858-1859 | KENNER Exhibit_19 | | |

App.736

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 7/19/19 | Email re:  Register Now for BI Cannabis & Hemp Conference | Institutes0005531-5535 | Blume Day 1 Exhibit_03 | | |
| | 7/22/19 | Email re:  BI Cannabis Advisory Board Call #3 (Confidential - Attorneys' Eyes Only) | BIH-003-005066-5069 | Potter.EXHIBIT_14 | | |
| | 7/29/19 | Email re:  Asset Purchase Agreement - Notice of Breach | Institutes0005588-5589 | Potter BIH Exhibit 49 | | |
| | 7/30/19 | Email re:  The Institutes/CLM - Notice of Breach | Institutes0005529-5530 | Potter.EXHIBIT_39 | | |
| | 8/6/19 | Email re:  Inquiry | Institutes0005474-5498 | Pernie Exhibit 1 | FRE 402 | |
| | 8/12/19 | Email re:  Cannabis conference (Confidential - Attorneys' Eyes Only) | BIH-002-001080-1081 | Kett Exhibit_08 | | |
| | 8/15/19 | Email re:  BIH Due Diligence - Additional Questions | BIH-001-000147-0149 | Acunto Sr. Exhibit_04 | | |

App.737

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 8/15/19 | Email re:  BIH Due Diligence - Additional Questions | BIH-001-000138-0143 | Acunto Sr. Exhibit_05 | | |
| | 8/19/19 | Email re:  Cannabis/Hemp Conference | BIH-003-004763 | Potter BIH Exhibit 47 | | |
| | 8/19/19 | Email re:  Cannabis/Hemp Conference | BIH-002-000904 | Potter.EXHIBIT_15 | | |
| | 8/23/19 | Email re:  Cannabis registration reaching capacity | Potter-DE-000388-0392 | Kett Exhibit_10 | | |
| | 8/30/19 | Email re BI | BIH-001-000136-0137 | Potter.EXHIBIT_17 | | |
| | 8/31/19 | Email re:  Final Documents | BIH-001-000150-0152 | Acunto Sr. Exhibit_07 | | |
| | 9/4/19 | Email re:  Noon Sept. 4th / BI Press Release / For Issuance | BIH-001-000541-0542 | Acunto Sr. Exhibit_08  KENNER Exhibit_08 | | |
| | 9/4/19 | Email re: Ian Stewart/Steve Acunto | BIH-001-000545 | Ex. I to Response to Potter's MSJ | | |

12

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 9/13/19 | Email re: Review Wilson Elser Sponsorship Agreement, Cannabis Conference (Confidential - Attorneys' Eyes Only) | BIH-001-003551-3553 | Acunto Sr. Exhibit_09 | | |
| | 9/13/19 | Email re: Invoice 10460 - Wilson Elser Moskowitz Edelman & Dicker LLP Sponsorship Agreement | BIH-001-003688-3690 | KENNER Exhibit_05 | | |
| | 9/14/19 | Email re: Review Wilson Elser Sponsorship Agreement, Cannabis Conference (Confidential - Attorneys' Eyes Only) | BIH-002-005708-5710 | Acunto Sr. Exhibit_28 | | |
| | 9/16/19 | Email re: Adam/ Steve - Timely | BIH-003-004232 | Acunto Sr. Exhibit_10 | | |
| | 9/17/19 | Email re: For Review Wilson Elser Sponsorship Agreement, Cannabis Conference | BIH-001-000563 | Acunto Sr. Exhibit_11 | | |
| | 9/17/19 | Email re: Keith / Steve Re Cannabis Conference | BIH-001-000564-0565 | Acunto Sr. Exhibit_12 | | |

App.739

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 9/18/19 | Email re:  Invoice 10460 - Wilson Elser Sponsorship Agreement | BIH-002-005474-5476 | Kett Exhibit_17 | | |
| | 9/20/19 | Email re:  BI litigation | Potter-DE-001026-1028 | Acunto Sr. Exhibit_13 | | |
| | 9/20/19 | Email re: Updated Agreement for Meeting Tomorrow | BIH-001-000613-614 | Ex. I to Response to Potter's MSJ | | |
| | 9/25/19 | Email re:  Jeremy | BIH-003-004299 | Acunto Sr. Exhibit_21 | FRE 402 | |
| | 9/26/19 | Email re:  Adam/Steve - wrap up | BIH-003-004199 | Potter BIH Exhibit 46 | | |
| | 9/30/19 | Email re: Transition of employment | BIH-003-003531-3532 | Acunto Sr. Exhibit_27 | FRE 402 | |
| | 9/30/19 | Email re:  Jeremy Campbell Signed documents / SA | BIH-003-004054 | Potter.EXHIBIT_18 | FRE 402 | |
| | 10/1/19 | ClaimsX Articles of Incorporation | BIH-001-000260 | | | |
| | 10/2/19 | Email re:  Sydney / Steve A. Meeting | BIH-001-000218 | Acunto Sr. Exhibit_14 | | |

App.740

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 10/15/19 | Memorandum re ClaimsX | BIH-001-000220 | | | |
| | 10/20/19 | Email re: Jeremy Campbell | Potter-DE-001018 | Potter.EXHIBIT_19 | FRE 402 | |
| | 10/21/19 | Memorandum re ClaimsX | BIH-001-000238 | | | |
| | 10/21/19 | Email re: Email re contact with resources for BI | BIH-003-004353-4354 | Potter.EXHIBIT_20 | | |
| | 10/28/19 | Email re: Ciao, Sydney | BIH-001-000272 | | | |
| | 11/7/19 | Email re: BI Cannabis Conference Debrief Call (Confidential - Attorneys' Eyes Only) | BIH-002-003827-3828 | KENNER Exhibit_13 | | |
| | 11/7/19 | Email re: Cannabis Survey Feedback (Confidential - Attorneys' Eyes Only) | BIH-002-003818-3826 | Kett Exhibit_15 | | |

App.741

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 11/14/19 | Email re: Cannabis and Hemp Conference | BIH-001-000673 | Ex. I to Response to Potter's MSJ | | |
| | 11/19/19 | Email re: ClaimsXchange / For Release / Nov 19th | BIH-001-000362-0368 | Acunto Sr. Exhibit_17 | FRE 802 | |
| | 11/22/19 | Email re What a week! | BIH-001-000386 | | | |
| | 12/4/19 | Email re: Hearing | BIH-003-004307 | Potter.EXHIBIT_21 | | |
| | 12/30/19 | Email re: Immediate Response Requested | BIH-001-000450-0451 | Acunto Sr. Exhibit_18 | | |
| | 1/22/20 | Email re: Posner / CX Letter as Delivered | BIH-001-000484 | Acunto Sr. Exhibit_19 | | |
| | 1/22/20 | Attached Letter re: Claims Exchange | BIH-001-000485 | Acunto Sr. Exhibit_20 | | |
| | 1/29/20 | Email re Board Meeting Email 3 of 4 | BIH-001-000502 | | | |
| | 1/30/20 | Email re Board Meeting 4 of 4 | BIH-001-000510 | | FRE 802 | |

16

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 3/4/20 | Email re SYDNEY / STEVE ACUNTO | BIH-001-000521 | | | |
| | | | | | | |
| | Undated | https://www.theclm.org/membershiptypes | | | | FRE 401-402; FRE 802; FRE 901 |
| | 10/11/19 | Re: registration list | BIH-002-004579-81 | | | |
| | 7/1/19 | Re: Contact list for Cannabis | BIH-002-1858-59 | Kett 19 | FRE 901 | FRE 901 |
| | | 190628_CannabisContacts Review | BIH-002-001860 | Kett 19 | FRE 901 | FRE 901 |
| | 9/13/19 | FOR REVIEW: Wilson Elser Sponsorship Agreement | BIH-002-005794-97 | Kett 12 | | |
| | Undated | Current ClaimsXchange website | | | | FRE 802; FRE 901 |
| | 2/20/19 | Group Sales Agreement Between BIH and Marriott for WCF 2020 | BIH-003-005162 | | | Waggy MIL; FRE 401- |

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | | | | | | 402; FRE 802 |
| | 3/7/19 | Group Sales Agreement Between BIH, Waggy, and Hyatt | BIH-003-005185 | | | Waggy MIL; FRE 401-402; FRE 802 |
| | 3/29/19 | Group Sales Agreement Between BIH and W for Diversity & Inclusion Conference | BIH-003-005152 | | | Waggy MIL; FRE 401-402; FRE 802 |
| | 4/17/19 | Group Sales Agreement Between BIH and Marriott for IP and C&H Conferences | BIH-003-003226 | | | Waggy MIL; FRE 401-402; FRE 802 |
| | 4/25/19 | Confirmation Agreement Between Hilton and BIH | BIH-003-005179 | | | Waggy MIL; FRE 401-402; FRE 802 |
| | 8/5/19 | BIH Statement of Cash Flows | BIH-001-000076 | | | Waggy MIL; FRE 401-402; FRE 802 |

App.744

| Plaintiffs' Trial Exhibit No. | Date | Description | Bates | Original Exhibit | BIH Objections[1] | Potter Objections |
|---|---|---|---|---|---|---|
| | 12/1/19 | Quick question . . . | BIH-003-003871 | | | Waggy MIL; FRE 401-402; FRE 802 |

App.745

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## BIH TRIAL EXHIBIT LIST

Listed below are additional trial exhibits that BIH may use at the trial of this case.  BIH reserves the right to rely upon any exhibit identified by the plaintiff or defendant Adam Potter.  BIH further reserves the right to use enlargements or blow-ups of any exhibit properly identified in this proposed order at trial.  BIH further reserves the right to identify and introduce additional exhibits for impeachment purposes at trial.  BIH also reserves the right to withdraw any exhibits listed below.  BIH maintains the right to object to e-mails if they are offered to prove the truth of the matter asserted in them and the witness is available at trial.

| Exhibit No. | Bates No. | Objection |
|---|---|---|
| | BIH-1-605 – BIH-1-608 | |
| | BIH-2-394 – BIH-2-396 | |

LEGAL\58047755\1

| | |
|---|---|
| BIH-2-3827 – BIH-2-3828 | |
| BIH-3-3885 – BIH-3-2911 | |
| Glaser0000003 – Glaser0000004 | |
| Institutes 0000124 – Institutes 0000179 | |
| Institutes 0000679 | |
| Institutes 0000680 – Institutes 0000740 | |
| Institutes 0000821 – Institutes 0000823 | |
| Institutes 0000883 – Institutes 0000943 | |
| Institutes 0000967 | |
| Institutes 0000968 – Institutes 0001018 | |
| Institutes 0001077 | |
| Institutes 0001078 – Institutes 0001168 | |
| Institutes 0001508 | |
| Institutes 0001509 – 0001599 | |
| Institutes 0004983 | |
| Institutes 0005037 – Institutes 0005040 | |
| Institutes 0005088 – Institutes 0005090 | |
| Institutes 0005449 – Institutes 0005452 | |
| Institutes 0005529 – Institutes 0005530 | |
| Institutes 0006324 | |
| Institutes 0006325 – Institutes 0006377 | |
| Institutes 0006397 – Institutes 0006398 | |
| Institutes 0006410 – Institutes 0006411 | |
| Institutes 0006529 – Institutes 0006430 | |

3

| | | |
|---|---|---|
| | Institutes 0006511 | |
| | Institutes 0006539 – Institutes 0006546 | |
| | Institutes 7570 – Institutes 7580 | |
| | Institutes 0007601 | |
| | Institutes 0007602 | |
| | Institutes 0007606 – Institutes 0007609 | |
| | Institutes 0007857 – Institutes 0007859 | |
| | Institutes 0007985 | |
| | Institutes 0007986 – Institutes 8035 | |
| | Institutes 0008126 – Institutes 0008229 | |
| | Institutes 11089 – Institutes 11092 | |
| | Potter-DE-692 – Potter-DE-697 | |

LEGAL\58047755\1

App.749

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) |
| Defendants. | ) ) |

Civ. A. No. 1:19-cv-01600-RGA-JLH

<u>**DEFENDANT ADAM POTTER'S LIST OF PROPOSED TRIAL EXHIBITS**</u>

Defendant Adam Potter ("Potter"), by and through his counsel of record in the above-captioned matter, submits the following list of proposed trial exhibits[1]:

---

[1] Potter reserves the right to (i) supplement or amend this proposed exhibit list through trial; (ii) rely on any proposed exhibit identified or introduced by Plaintiffs The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("Plaintiffs") or Defendant Business Insurance Holdings, Inc. ("BIH"); and (ii) identify and introduce additional exhibits, or otherwise as permitted under the Federal Rules, for impeachment/cross-examination purposes at time of use at trial.

App.751

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | Plaintiffs' Initial Complaint | D.I. 1 (Blume 6) | |
| | Plaintiffs' Amended and Supplemental Complaint | D.I. 48 (Blume 7; Exhibit 1-Blume) | |
| | Potter Answer w/ Affirmative Defenses | D.I. 145 | |
| | BIH Answer and Cross-Claim to Amended and Supp Complaint | D.I. 146 (Acunto-30) | |
| | Plaintiffs' Initial Disclosures | N/A | |
| | Plaintiffs' Verified Responses to Defendants' First Set of Interrogatories | N/A | |
| | Plaintiffs' Responses to Defendants' First Set of Requests for Production | N/A | |
| | Plaintiffs' Verified Responses to BIH's First Set of Interrogatories | (Exhibit 3-Blume) | |
| | Plaintiffs' Responses to BIH's First Set of Requests for Production | *See* D.I. 93 | |
| | Plaintiffs' Verified Responses to BIH's Second Set of Interrogatories | *See* D.I. 95 | |
| | Plaintiffs' Answer to BIH's First Set of Requests for Admission | (Exhibit 2-Blume) | |
| | Plaintiffs' Responses to Defendants' Second Set of Requests for Production | N/A | |

---

[2] BIH reserves the right to object to exhibits on hearsay grounds if they are offered for the proof of the matter asserted and the declarant is available.

App.752

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | Plaintiffs' Responses to Defendants' Third Set of Requests for Production | N/A | |
| | BIH's Initial Disclosures | N/A | |
| | BIH's Verified Responses to Plaintiffs' First Set of Interrogatories | N/A | |
| | BIH's Responses to Plaintiffs' First Set of Requests for Production | N/A | |
| | BIH's Initial Responses to Potter's First Set of Interrogatories | N/A | |
| | BIH's Responses to Potter's Second Set of Requests for Production | N/A | |
| | BIH's Amended Responses to Potter's First Set of Interrogatories | (Acunto 24) | |
| | BIH's Responses to Plaintiffs' Second Set of Requests for Production | N/A | |
| | BIH's Responses to Potter's First Set of Requests for Production | N/A | |
| | Potter's Initial Disclosures | N/A | |
| | Potter's Verified Responses to Plaintiffs' First Set of Interrogatories | N/A | |
| | Potter's Responses to Plaintiffs' First Set of Requests for Production | N/A | |
| | Potter's Responses to Plaintiffs' Second Set of Requests for Production | N/A | |

App.753

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | Potter's Responses to BIH's First Set of Requests for Production | N/A | |
| | Expert Rebuttal Report of Harris L. Devor, CPA with Attachments | N/A | |
| | Asset Purchase Agreement, dated June 1, 2018 | Institutes0004249 to -0004298 | |
| | Schedules to Asset Purchase Agreement, dated June 1, 2018 | Institutes0004145 to -0004248 | |
| | Email from Anne Blume to Katherine Horowitz | Institutes0005531 to -0005535 (Blume 3) (K. Horowitz 23) | |
| | Email from Katherine Horowitz to Anne Blume | Institutes0007570 to -0007580 (Blume 5) | |
| | Email from Ian Stewart to Anne Blume | Institutes0005085 to -0005087 (Blume 9) | |
| | Teleconference instructions for The Institutes Board of Trustees Meeting | Institutes0005877 to -0005891 (BIH Ex 7) | |
| | CLM & Claim Pages – Statement of Activities for 2018 and 2019 | Institutes0014732 to -0014744 (BIH Ex. 22) (Exhibit 4-Blume) (Miller 8) | |
| | Email from Katherine Horowitz to Janeen Zemanick | Institutes0007601 to -0007602 (K. Horowitz 1) | |
| | Email from Jeffrey Scheidt to Katherine Horowitz | Institutes0006453 to -0006455 (K. Horowitz 2) | |
| | Email from Adam Potter to Katherine Horowitz | Institutes0006541 to -0006545 (K. Horowitz 3) | |
| | March 5, 2018 VRC Valuation Report | Institutes0006170 to -0006185 | |

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | | (K. Horowitz 4) | |
| | Email from Peter Miller to Katherine Horowitz | Institutes0006410 (K. Horowitz 5) | |
| | Executive Summary | Institutes0007857 (K. Horowitz 6) | |
| | Email from Adam Potter to Katherine Horowitz | Institutes0006511 (K. Horowitz 7) | |
| | Emails between Peter Miller and Katherine Horowitz | Institutes0006429 to -0006430 (K. Horowitz 8) | |
| | Emails between Peter Miller and Katherine Horowitz | Institutes0008394 (K. Horowitz 9) | |
| | Email from Anne Madonia to Andreas Papantoniou attaching draft of the Purchase Agreement | Institutes0006324 to -0006377 (K. Horowitz 10) | |
| | Emails between Peter Miller and Katherine Horowitz | Institutes0007936 (K. Horowitz 11) | |
| | Email from Anne Madonia to Andreas Papantoniou attaching draft of the Purchase Agreement | Institutes0000001 to -0000060 (K. Horowitz 12) | |
| | Emails between Anne Madonia and Andreas Papantoniou attaching draft of the Purchase Agreement | Institutes0000122 to -0000179 (K. Horowitz 13) | |
| | Email from Anne Madonia to Andreas Papantoniou attaching draft of the Purchase Agreement | Institutes0000679 to -0000740 (K. Horowitz 14) | |

6

App.755

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
|  | Emails between Anne Madonia and Andreas Papantoniou attaching draft of the Purchase Agreement | Institutes0000821 to -0000943 (K. Horowitz 15) |  |
|  | Emails between Anne Madonia and Andreas Papantoniou attaching draft of the Purchase Agreement | Institutes0000967 to -0001069 (K. Horowitz 16) |  |
|  | Email from Anne Madonia to Andreas Papantoniou attaching draft of the Schedules to the Purchase Agreement | Institutes0001077 to -0001168 (K. Horowitz 17) |  |
|  | Emails between Katherine Horowitz and Adam Potter | Institutes0007606 to -0007609 (K. Horowitz 18) (Goodenough 4) |  |
|  | Email from Katherine Horowitz to Peter Miller attaching schedules to the purchase agreement | Institutes0007869 to -0007877 (K. Horowitz 19) |  |
|  | Emails between Anne Madonia and Andreas Papantoniou attaching draft of the Schedules to the Purchase Agreement | Institutes0001508 to -0001599 (K. Horowitz 20) |  |
|  | Emails be from Anne Madonia to Katherine Horowitz and Linda Hohn attaching final version of the Purchase Agreement | Institutes0007985 to -0008229 (K. Horowitz 21) |  |
|  | Emails between Katherine Horowitz and Anne Blume | Institutes0007570 to -0007573 (K. Horowitz 22) |  |
|  | Emails between Katherine Horowitz and Anne Blume | Institutes0011089 to -0011092 (K. Horowitz 24) |  |

App.756

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | Webpages about Cannabis and Hemp Conference – October 24-25, 2019 | (Pilotti-3) (Thomas-03) (Acunto-25) | |
| | Board of Trustee Meeting Minutes | Institutes0007943 to -0007945 (Pilotti-4) | |
| | Emails between Adam Potter and Katherine Horowitz | Institutes0010863 to -0010867 (Potter 1) | |
| | Webpage for 2021 Annual Conference in Atlanta | (Pernie-2) | |
| | Emails between Steve Acunto, Katie Kett and Keith Kenner (Kenner 4) | BIH-001-003551 to -003553 (Acunto 9) (Kett 11) | |
| | Email from Jeremy Campbell to Keith Kenner | BIH-001-003688 to -003690 (Kenner 5) | |
| | Emails between Steve Acunto, Katie Kett and Keith Kenner | BIH-002-005794 to -005797 (Kenner 6) (Kett 12) | |
| | Emails between Steve Acunto and Keith Kenner | BIH-001-000564 to -000565 (Kenner 7) (Acunto 12) | |
| | Email from Steve Acunto to Rebecca McLean and Debbie Hilt re: BI Press Release | BIH-001-000541 to -000542 (Kenner 8) (Acunto 8) (Kett 13) | |
| | Webpages and materials for Cannabis and Hemp Conference – October 24-25, 2019 | (Kenner 12) (Kett 14) | |
| | Emails between Adam Potter and Steve Acunto | BIH-003-004906 to -004907 (Acunto 1) | |
| | Emails between Adam Potter and Steve Acunto | BIH-001-000005 to -000006 (Acunto 2) | |

App.757

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | Emails between Adam Potter and Steve Acunto | BIH-001-000019 to -000022 (Acunto 3) | |
| | Emails between Adam Potter, Stephen Acunto, Jr. and Steve Acunto | BIH-001-000147 to -000149 (Acunto 4) | |
| | Emails between Adam Potter, Stephen Acunto, Jr. and Steve Acunto | BIH-001-000138 to -000143 (Acunto 5) | |
| | Stock Purchase Agreement (Potter 5) | BIH-003-003885 to -003991 (Acunto 6) | |
| | Emails between Adam Potter, Stephen Acunto, Jr. and Steve Acunto | BIH-001-000150 to -000152 (Acunto 7) | |
| | Emails between Adam Potter and Steve Acunto | BIH-003-004232 (Acunto 10) | |
| | Emails between Adam Potter and Steve Acunto | BIH-001-000563 (Acunto 11) | |
| | Emails between Steve Acunto, Katie Kett and Keith Kenner | BIH-002-005708 to -005710 (Acunto 28) | |
| | Defendant Business Insurance Holdings, Inc.'s Opening Brief in Support of Motion to Dismiss the Amended and Supplemental Complaint | D.I. 66 (Acunto 29) | |
| | Emails between Katie Kett and Marcia Erker | BIH-002-005474 to -005476 (Kett 17) | |
| | Emails between Katherine Horowitz and Anne Blume | Institutes0007570 to -0007578 (Exhibit 5-Blume) (BIH-Exhibit 14) | |

App.758

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | CLM Spreadsheet | Institutes0015056 (Exhibit 6-Blume) | |
| | Emails between Jeffrey Bowman and Peter Miller | Institutes0006441 to -0006442 (Miller 1) | |
| | Email from Katherine Horowitz to Peter Miller | Institutes0006166 (Miller 2) | |
| | Document Provided in packet to Board | Institutes0006167 to -0006169 (Miller 3) | |
| | The Institutes Press Release | Glaser0000003 to -0000004 (Miller 4) | |
| | Emails re draft email to Executive Committee | Institutes0006397 to -0006398 (Miller 5) | |
| | Email from Katherine Horowitz to Peter Miller | Institutes0007869  (Miller 6) | |
| | Schedules to the Purchase Agreement | Institutes0007870 to -0007877 (Miller 7) | |
| | CLM Webpage "Who We Are" | (Miller 9) | |
| | March 5, 2018 VRC Valuation Report | Institutes0008372 to -0008387 (Exhibit 2-Devor) | |
| | January 8, 2019 VRC Valuation Report | Institutes0015096 to -0015124 (Exhibit 3-Devor) | |
| | Asset Purchase Agreement | Potter-DE-000001 to -000050 (Meyer 2) (Blume 2) | |
| | Emails between Peter Miller and Katherine Horowitz | Institutes0006446 to -0006448 (Meyer 3) | |
| | Emails between Adam Potter, Peter Miller and Katherine Horowitz | Institutes0010124 to -0010125 (Meyer 4) | |

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | December 4, 2019 Transcript of TRO and Preliminary Injunction Hearing in AICPCU v. Sydney Posner, et al., No. 19-cv-5369 (E.D.Pa) | (Meyer 5) | |
| | Asset Purchase Agreement Schedules | Potter-DE-000051 to -000154 (Meyer 6) (Blume 1) | |
| | Benefit of the Bargain Economic Damages | (BIH-1-Meyer) | |
| | Article "25 Percent, 50 Percent…What's in a Number | (BIH-3-Meyer) | |
| | Written Consent of the Sole Shareholder of C&E MGMT and Planning, Inc. | Institutes0008041 to -0008043 D.I. 257-2 (Potter MSJ, Ex. 14) | |
| | Annual Joint Written Action by the Board of Directors and Shareholders of Business Insurance Holdings, Inc. Without a Meeting | BIH-001-000214 to -000216 D.I. 257-2 (Potter MSJ, Ex. 15) | |
| | July 29, 2019 Letter from Plaintiffs' counsel to Adam Potter and counsel | Potter-DE-000362 to -000363 D.I. 257-2 (Potter MSJ, Ex. 19) | |
| | August 12, 2019 Letter from Plaintiffs' counsel to counsel for Adam Potter and Potter | Potter-DE-000364 to -000367 D.I. 257-2 (Potter MSJ, Ex. 20) | |
| | April 23, 2021 email from Plaintiffs' counsel entitled "Institutes v. Potter – Damages Claim" | D.I. 257-2 (Potter MSJ, Ex. 21) | FRE 402 |

App.760

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | CLM's Statement of Activities for 2018-2020 | Institutes0014733; Institutes0014738 | |
| | Resignation of Adam Potter from Business Insurance Holdings, Inc. | BIH-003-004162 D.I. 257-3 (Potter MSJ, Ex. 24) | |
| | Annual Joint Written Action by the Board of Directors and Shareholders of Business Insurance Holdings, Inc. Without a Meeting | BIH-003-004188 to -004189 D.I. 257-3 (Potter MSJ, Ex. 25) | |
| | 2020 Annual Report of Business Insurance Holdings, Inc. publicly filed with the Florida Department of State | D.I. 257-3 (Potter MSJ, Ex. 26) | |
| | Emails between Adam Potter, Steve Acunto, Carole Acunto, and Stephen Acunto Jr. | BIH-003-004582 to -004583 D.I. 257-3 (Potter MSJ, Ex. 28) | |
| | Emails between Adam Potter, Steve Acunto,Carole Acunto and Stephen Acunto, Jr. | BIH-003-004199 D.I. 257-3 (Potter MSJ, Ex. 31) | |
| | Letter from David Walton to Steve Acunto attaching Complaint | (Acunto 26) | FRE 901 |
| | Email from Adam Potter to Katie Kett | Potter-DE-000683 to - 000688 D.I. 281-2 (Potter MSJ, Ex. 34) | |
| | Aug. 13, 2019 email chain | Potter-DE-000429 to -000431 D.I. 288, (Potter MSJ, Ex. 35) | |
| | Board Proposal/Recommendation re: CLM Acquisition | Institutes0005881 | |

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | AICPCU dba The Institutes 2016 Form 990 | Institutes0014848 to -0014904 | |
| | AICPCU dba The Institutes 2017 Form 990 | Institutes0014745 to -0014798 | |
| | AICPCU dba The Institutes 2018 Form 990 | Institutes0014799 to -0014847 | |
| | AICPCU dba The Institutes 2019 Form 990 | Institutes0014905 to -0014957 | |
| | Emails between Peter Miller and Katherine Horowitz | Institutes0006315 to -0006317 | |
| | Email and Spreadsheet re: CLM Forcast | Institutes0008646 to -0008647 | |
| | Emails between Peter Miller and Katherine Horowitz | Institutes0010115 to -0010118 | |
| | Spreadsheet 1 re March 8, 2018 VRC Valuation Report | Institutes0015125 | |
| | Spreadsheet 2 re March 8, 2018 VRC Valuation Report | Institutes0015126 | |
| | CLM's 2021 Annual Conference, available at https://www.theclm.org/Event/ShowEventDescription/14294 | N/A | |
| | "About Us," The CLM, available at https://www.theclm.org/aboutus | N/A | |

| Exhibit No. | Description | Bates Label / Exhibit / Docket No. | Objection[2] |
|---|---|---|---|
| | Claims Association Database, Claims Pages, available at https://www.claimspages.com/tools/claims-associations/ | N/A | |
| | Insurance & Reinsurance Coverage, Wilson Elser Moskowitz Edelman & Dicker LLP, available at https://www.wilsonelser.com/services/11-insurance_reinsurance_coverage?view=events | N/A | |
| | Johnson, Mark W., Where is Your Space?, Harvard Business Review, available at https://hbr.org/2010/02/where-is-your-white-space | N/A | FRE 802 |
| | Declaration of Adam Potter | D.I. 244 | |

14

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## **PLAINTIFFS' DEPOSITION DESIGNATIONS**

BIH reserves the right to use any deposition testimony of any witness for purposes of impeachment at trial.

## I.   Keith Kenner (August 4, 2021)

BIH objects to the use of any deposition testimony from Mr. Kenner for any reason other than impeachment if he is present to testify at trial.  The following objections and counter-designations are made only for purposes of use of his deposition testimony if he is not present to testify.

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations[1] |
|---|---|---|
| 15:24 – 19:8 | FRE 602 (17:12 through 19:2) | FRE 901; FRE 802 |
| 21:23 – 22:15 | | |
| 25:23 – 26:11 | | |

---

[1] To the extent that BIH and Mr. Potter object to testimony, BIH joins any evidentiary basis cited by Mr. Potter.

2

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations[1] |
|---|---|---|
| 26:25 - 28:12 | FRE 402 (28:2 – 28:5) | |
| 30:14-22 | | |
| 36:15 – 38:23 | FRE 402 | |
| 54:1 – 57:7 | FRE 1004 (55:22 – 57:7) | |
| 57:17-23 | | 57:8-16 |
| 70:7 – 72:25 | FRE 402 | FRE 602; FRE 701 |
| 97:23 – 98:5 | FRE 1000 | |
| 100:6 – 103:12 | FRE 402 | FRE 901 |
| 113:7 – 114:18 | | |
| 117:14 – 118:17 | FRE 1000 | 118:18 – 119:10 |
| 119:11 – 123:16 | | |
| 124:7 – 125:16 | | |
| 126:3 – 129:9 | FRE 402 | 130:15-21 |
| 131:3 – 132:18 | FRE 602 132:14 – 132:18 | FRE 602; FRE 701 |
| 136:6-20 | | 136:6-20; 137:16-19 (counter-designation) |
| 140:12 – 144:10 | FRE 602, 1000 | FRE 602; FRE 701 |
| 146:8 – 148:9 | FRE 602 | FRE 602; FRE 701 |

## II.    Katie Kett (August 10, 2021)

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 12:19 – 19:10 | | |
| 21:19 – 22:2 | | 21:1 – 22:12 |
| 25:24 – 28:18 | FRE 402 | |
| 34:12 – 36:6 | FRE 402 | 34:12 – 37:2 |
| 37:3-13 | FRE 402 | FRE 602; FRE 701 |
| 43:1 – 45:16 | FRE 402, 602 | FRE 602; FRE 701 |
| 49:21 – 52:5 | | FRE 901 |
| 55:3 – 56:2 | FRE 1000 | |
| 57:1 – 57:7 | | FRE 602; FRE 701; 55:19 – 57:7 |
| 58:5 – 64:20 | | FRE 602; FRE 701 |
| 65:14 – 66:4 | | |
| 71:2-8 | FRE 602 | 68:11 – 71:8 |
| 71:20 – 73:24 | FRE 602, 1000 | |
| 74:3-23 | | |
| 76:9 – 79:2 | | FRE 602; FRE 701; 76:9 – 80:10 |
| 82:17-21 | | |
| 88:1 – 90:14 | | 82:17 – 91:12 |
| 91:1 – 93:15 | | FRE 602; FRE 701 |

4

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 94:1 – 97:21 | FRE 602, 1000 | FRE 602; FRE 701 |
| 98:24 – 99:6 | FRE 602 | FRE 602; FRE 701; 97:23 – 99:6 |
| 106:7-19 | | |
| 108:4-15 | FRE 602, 1000 | |
| 116:15 – 122:14 | FRE 1000 | |
| 124:6 – 125:14 | | |
| 126:23 – 129:6 | FRE 602, 803, 1000 | FRE 602; FRE 701; 126:23 – 130:17 |
| 181:1 – 184:11 | | |

App.768

### III.    Adam Potter (June 21, 2021, VOL I)

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 34:4 – 36:18 | | |
| 38:3 – 40:7 | FRE 602 | FRE 602 |
| 42:3 – 42:10 | | |

## IV.    Adam Potter (June 21, 2021, VOL II)

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 12:2 – 12:23 | | FRE 402 |
| 14:16 – 14:24 | | |
| 37:17 – 38:7 | | |
| 41:22 – 43:11 | | 41:22 – 44:4 |
| 44:5 – 46:6 | | 43:8 – 44:4 |
| 62:15 – 65:16 | | 62:15 – 67:20 |
| 68:9 – 71:9 | | 68:9 – 71:15 |
| 81:13 – 82:8 | FRE 1000 | |
| 90:11 – 90:23 | | |
| 102:23 – 105:5 | FRE 402 (104:23 – 105:5) | FRE 402 (104:23 – 105:5) |
| 112:19 – 113:16 | | 112:19 – 116:1 |
| 114:11 – 115:7 | | 112:19 – 116:1 |
| 121:19 – 122:10 | | |
| 169:5 – 173:6 | | FRE 402 |
| 182:15 – 184:7 | | FRE 602 |
| 197:11 – 197:19 | FRE 602 | FRE 602 |

7

## V.    Steve Acunto, Sr. (August 5, 2021, VOL I)

BIH objects to the use of any deposition testimony from Mr. Acunto for any reason other than impeachment if he is present to testify at trial.  The following objections and counter-designations are made only for purposes of use of his deposition testimony if he is not present to testify.

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 25:7-25 | | |
| 27:21-24 | | |
| 29:18-31:24 | | |
| 32:9-21 | | |
| 34:9-37:23 | | FRE 701; FRE 802 |
| 39:19-40:19 | | |
| 42:8-46:5 | | FRE 802 |
| 48:17-49:23 | | 51:23 – 52:5 |
| 50:13-51:22 | | 52:15 – 53:13 |
| 53:23-54:3 | | |
| 59:15-60:12 | FRE 1000 | |
| 62:13-19 | | |
| 66:11-23 | FRE 402 | |
| 72:23-73:14 | | |
| 76:6-20 | | |
| 78:3-83:20 | | FRE 802; FRE 901 |

9

| | | |
|---|---|---|
| 102:6-103:15 | | |
| 106:3-10 | | FRE 802 |
| 107:5-15 | | FRE 802 |
| 107:23-108:10 | | |
| 115:8-118:11 | | FRE 802 |
| 120:17-122:10 | | |
| 122:20-124:19 | FRE 1000 | |
| 125:22-126:3 | | |
| 127:10-13 | | |
| 128:13-133:18 | | |
| 136:12-138:14 | FRE 402 | |
| 139:14-19 | | |
| 140:24-143:10 | | FRE 802 |
| 144:5-145:14 | | |
| 147:9-149:13 | | FRE 802 |
| 153:16-154:15 | FRE 402 | |
| 156:2-6 | | |
| 157:5-25 | | |
| 158:15-159:7 | | |
| 159:8-12 | | |
| 160:8-20 | | FRE 402; 160:21 – 161:20 |
| 169:2-10 | | FRE 402; 169:11-20 |

| 171:2-172:25 | | FRE 402 |
|---|---|---|
| 173:19-177:18 | FRE 602 (175:15 – 177:18) | FRE 402 |
| 179:7-13 | FRE 802 | FRE 402; FRE 802 |
| 180:2-14 | FRE 1000 | FRE 402 |
| 181:7-20 | FRE 1000 | FRE 402 |
| 182:24-183:8 | | FRE 402 |
| 185:9-186:23 | | FRE 402 |
| 189:9-190:20 | FRE 402 | FRE 402 |
| 191:10-19 | FRE 402 | |
| 195:3-196:7 | FRE 402 | |
| 199:16-200:3 | FRE 402 | |
| 202:9-23 | | |

App.774

## VI.   Tina Pernie

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 16:2 –12 | | FRE 602 |
| 16:13 – 17:14 | | FRE 602; 16:13-17:13 (counter-designation) |
| 23:2 – 24:20 | | |
| 26:11 – 27:18 | | |
| 50:4 – 52:13 | | |
| 52:19 –54:25 | | 52:19-55:11 (counter-designation) |
| 55:12 – 57:5 | | 55:12-57:10 (counter-designation) |
| 57:17 – 58:14 | | FRE 602 |
| 65:22 – 67:18 | | FRE 602; FRE 802; 65:22 – 68:1; 74:20 - 75:23 (counter-designations) |
| 69:17 –25 | | 69:17-74:2 |
| 74:3 –19 | | FRE 602; FRE 802; 74:3-75:23 (counter-designation) |
| 122:4 – 123:7 | | FRE 602; FRE 802; 122:4-123:11 (counter-designation) |

12

## VII.  Kate Horowitz

| Plaintiffs' Designations | BIH's Objections/Counter-designations | Potter's Objections/Counter-designations |
|---|---|---|
| 44:11 – 46:8 | | FRE 401-402 |
| 109:24 –112:3 | | |
| 205:15 – 207:6 | | FRE 602 |
| 215:25 – 216:16 | | |
| 229:8 – 230:18 | | |
| 305:8 – 307:21 | | |

14

# EXHIBIT I

App.778

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA-JLH |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

## POTTER'S DEPOSITION DESIGNATIONS

Defendant Adam Potter ("Potter"), by and through his counsel of record in the above-captioned matter, submits the following proposed deposition designations [1]

### I.    Keith Kenner (August 4, 2021)

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 11:18 – 12:10 | | |
| 20:2 – 21:15 | | |
| 64:3-12 | | |
| 65:25 – 66:9 | | |

---

[1] Potter reserves the right to (i) supplement or amend this proposed list of deposition designations through trial; (ii) rely on any proposed deposition designations or counterdesignations identified or introduced by Plaintiffs The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("Plaintiffs") or Defendant Business Insurance Holdings, Inc. ("BIH"); and (ii) identify and introduce additional deposition testimony for impeachment/cross-examination purposes, or otherwise permitted under the Federal Rules, at time of use at trial.

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 69:8-18 | | |
| 132:21 – 134:16 | | |
| 149:22 – 150:10 | | |

## II.    Katie Kett (August 10, 2021)

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 20:6 – 21:8 | | |
| 22:20 – 24:13 | | |
| 25:24 – 27:20 | | |
| 29:5 – 30:8 | | |
| 43:1-23 | | |
| 48:17 – 49:14 | | |
| 68:11 – 71:8 | | |
| 80:20- 82:7 | | |
| 104:24 – 106:4 | | |
| 113:12 – 115:7 | | |
| 125:16 – 126:22 | | FRE 602 |
| 127:4-18 | | |
| 129:8 – 130:17 | | |
| 130:24 – 134:15 | | |
| 135:24 – 137:21 | | |
| 150:7 – 151:6 | | |
| 159:21 – 161:22 | | |
| 166:1-17 | | |

App.781

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 166:18 – 169:24 | | |
| 170:9 – 174:22 | | FRE 602 (172:15 – 172:20; 174:2 – 174:22) |
| 175:-13 – 178:10 | | |

5

**III.    Steve Acunto, Sr. (August 5, 2021, VOL I)**

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 102:14 – 104:11 | | Counter-designation: 104:11 – 104:19 |
| 104:19 – 105:13 | | |
| 107:23 to 108:4 | | FRE 402 Counter-designation: 107:5 – 107:15 |
| 154:9 – 156:7 | | |
| 150:23 – 153:8 | | Counter-designation: 156:7 – 157:4 |
| 218:3 – 221:2 | | FRE 402 |
| 222:13 – 223:3 | | |
| 229:23 – 232:2 | | FRE 402 FRE 701 |
| 232:12 – 234:7 | | FRE 402 |
| 235:9 – 238:7 | | FRE 402 |
| 236:10-21 | | FRE 402 |
| 239:23 – 240:15 | | |
| 241:6 – 242:19 | | |
| 243:20 – 244:3 | | |
| 246:21 – 247:18 | | |
| 252:17 – 253:8 | | |
| 255:9 – 256:20 | | |
| 260:2 – 262:13 | | |
| 264:20 – 265:2 | | |
| 267:8 – 268:8 | | Counter-designation: 268:9 – 268:21 |
| 268:22 – 269:9 | | Counter-designation: 269:10 – 269:18 |

| | | |
|---|---|---|
| 271:15 – 272:19 | | FRE 602 |
| 273:16 – 274:15 | | Counter-designation: 274:21 – 275:5 |
| 274:5 – 275:23 | | |
| 276:13 – 279:19 | | |
| 283:22 – 284:19 | | FRE 402 |
| 287:12-288:19 | FRE 701 | |

8

## IV.   Steve Acunto, Sr. (August 12, 2021, VOL II)

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
| --- | --- | --- |
| 12:4-11 | | Counter-designation: 8:12 – 10:10; 12:13 – 12:25 |
| 10:10 – 11:20 | | |
| 13:1-15 | | |
| 15:2-24 | | Counter-designation: 16:15 – 17:3; 17:6 – 19:15 |
| 19:15 – 20:16 | | |
| 22:14 – 23:5 | | FRE 602 |
| 23:24 – 26:2 | | |
| 32:8 – 36:22 | | Counter-designation: 37:16 – 38:2 |
| 38:14 – 40:25 | | |
| 39:15 – 42:25 | | |

**V.    Tina Pernie (July 7, 2021)**

Plaintiffs object to the use of any deposition testimony from Ms. Pernie for any reason other than impeachment if she is present to testify at trial.

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 10:8 – 11:2 | | |
| 19:7 – 20:7 | | |
| 31:19 – 32:9 | | |
| 32:10 – 33:9 | | |
| 33:10 – 34:14 | | |
| 37:5-13 | | |
| 43:11 – 45:14 | FRE 402 | |
| 57:6 - 10 | | |
| 60:11 – 21 | | |
| 61:9-16 | | |
| 71:17 – 72:1 | | |
| 72:3-11 | | |
| 74:20-22 | | |
| 75:20-23 | | |
| 92:24 – 93:11 | | |
| 94:9 – 95:1 | FRE 602 | |
| 95:23 – 97:3 | FRE 602 | |
| 97:12-19 | | |
| 98:18 – 100:21 | | |
| 107:10 – 23 | | |
| 109:6 – 110:3 | FRE 602 | |
| 113:4 – 116:9 | FRE 701 | |

**VI.    Peter Miller/Plaintiffs' Corporate Designee (August 27, 2021)**

Plaintiffs object to the use of any deposition testimony from Mr. Miller for any reason other than impeachment if he is present to testify at trial.

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 5:5 – 6:20 | | |
| 10:20 – 11:10 | | |
| 40:17-24 | | |
| 41:7 – 42:7 | | |
| 44:4 – 46:11 | | |
| 48:25 – 49:24 | | |
| 50:13-20 | | |
| 51:11-23 | | |
| 68:5 – 69:8 | | |
| 71:11 – 72:21 | | |

App.788

**VII. Anne Blume/Plaintiffs' Corporate Designee (August 26, 2021)**
Plaintiffs object to the use of any deposition testimony from Ms. Blume for any reason other than impeachment if she is present to testify at trial.

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 6:17 – 7:19 | | |
| 15:20 - 16:7 | | |
| 20:22-24 | Counter-designation: 20:25-21:15 | |
| 23:15-16 | | |
| 30:8 – 31:11 | | |
| 41:11-25 | | |
| 85:21 – 86:4 | | |
| 89-20 – 90:13 | | |
| 90:2-14 | | |
| 90-17 – 91-15 | | |
| 101-23 – 102-9 | FRE 402 | |

App.789

## VIII. Anne Blume (May 27, 2021)

Plaintiffs object to the use of any deposition testimony from Ms. Blume for any reason other than impeachment if she is present to testify at trial.

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 41:22-24 | | |
| 49:10 – 50:7 | | |
| 50:21 – 51:18 | | |
| 59:2-5 | | |
| 68:22 – 69:5 | | |
| 76:11-22 | | |
| 77:6-17 | | |
| 78:3-15 | | |
| 79:13-18 | FRE 402 (79:13-14) | |
| 81:19 – 82:5 | FRE 402 | |
| 92:4-14 | | |
| 93:22 – 94:6 | | |
| 95:6-16 | | |
| 96:18-24 | FRE 402 | |
| 97:17-20 | | |
| 97:24 – 98:13 | | |
| 102:20-22 | FRE 402 | |

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
| --- | --- | --- |
| 121:25 – 122:18 | | |
| 132:15 – 133:22 | | |
| 136:4-19 | | |
| 137:4-11 | | |
| 138:10-24 | | |
| 145:25 –146:21 | | |
| 149:11-20 | | |
| 162:17 – 163:18 | | |
| 167:6 – 168:4 | | |
| 168:6-23 | | |
| 175:24 – 176:14 | | |
| 191:21 – 192-1 | | |
| 209:21 – 210:3 | | |

App.791

**IX.    Katherine Horowitz (June 8, 2021)**

Plaintiffs object to the use of any deposition testimony from Ms. Horowitz for any reason other than impeachment if she is present to testify at trial.

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 15:25 – 22:16 | | |
| 23:21 – 25:1 | | |
| 28:6-18 | | |
| 39:11 – 40:6 | FRE 402 | |
| 23:10 – 25:25 | | |
| 27:10-18 | | |
| 28:6-17 | | |
| 35:7 – 36:11 | | |
| 65:11-24 | | |
| 86:4 – 87:3 | | |
| 88:1 – 89:7 | | |
| 134:7-20 | FRE 701 | |
| 162:5 – 164:7 | FRE 701 | |
| 181:17-22 | | |
| 182:11 – 183:11 | FRE 602, 701 | |
| 192:1-18 | | |
| 195:15 – 197:23 | FRE 602 | |
| 210:14-25 | | |

| Potter's Designations | Plaintiffs' Objections/Counter-designations | BIH's Objections/Counter-Designations |
|---|---|---|
| 215:10-16 | | |
| 256:8 – 260:20 | | |
| 263:18-22 | | |
| 264:20 – 265:9 | FRE 702 | |
| 281:21 – 282:5 | FRE 602 | |
| 282:20 – 283:6 | FRE 602 | |

App.793

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUE FOR          :
CHARTERED PROPERTY CASUALTY        :
UNDERWRITERS, et al.,              :
                                   :
            Plaintiff,             :
                                   :
      v.                           :        Civil Action No. 19-1600-RGA-JLH
                                   :
ADAM POTTER, et al.,               :
                                   :
            Defendants.            :

**ORDER AFTER PRETRIAL CONFERENCE**

Now, this 2nd day of June, 2022, after a pretrial conference, and upon consideration of the

proposed pretrial order (D.I. 308) and the discussion at the pretrial conference on May 27, 2022,

IT IS HEREBY ORDERED that:

1.  The Proposed Pretrial Order (D.I. 308) is **ADOPTED** as modified by any discussion

at the pretrial conference.

2.  A bench trial will begin on June 27, 2022.  On June 27-29, 2022, each party should be

prepared to present its case starting at 8:30 a.m. and continuing until 5:00 p.m. of each trial day,

although the end of the trial day may, in the discretion of the Court, be earlier than 5:00 p.m.

The trial on the cross-claims is scheduled to begin at 9:00 a.m. on June 30, 2022.

3.  The trial is timed.  In the case of the Plaintiffs against Defendants, each side (the two

Defendants being considered as one side) is allowed **10 ½ hours** for its opening statement and its

direct and cross-examination of witnesses.  Time during the trial day that does not neatly fit into

one of those categories will be attributed to one side or the other as the Court thinks most

appropriate.  The trial on the cross-claims is scheduled to begin at 9:00 a.m. on June 30, 2022,

and each Defendant is allowed one hour for its opening statement and its direct and cross-examination of witnesses.

    4.  The parties requested post-trial briefing and declined closing argument.  The schedule and length of such briefing will be decided later.

    5.  Trial counsel are to be present and ready to proceed at 8:00 a.m. each and every day of trial.  **COUNSEL SHOULD UNDERSTAND THAT THERE MAY BE LONG LINES (PARTICULARLY WHEN A JURY IS BEING SELECTED) TO ENTER THE COURTHOUSE AND SHOULD PLAN ACCORDINGLY.**   There will be up to an hour for lunch and a fifteen-minute break in both the morning and the afternoon.

    6.  The three motions in limine will be resolved in a separate order.

    7.  Any trial logistics should be coordinated through the Courtroom Deputy.

                      /s/ Richard G. Andrews
                      _____
                      United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

     Plaintiffs,

     v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

     Defendants.

Civil Action No. 19-1600-RGA

ORDER AFTER PRETRIAL CONFERENCE

BIH's Motion in Limine No. 1 (D.I. 308 at 13–17) is **GRANTED-IN-PART**.   BIH

attempted to determine which acts Plaintiffs alleged to be violations of the APA.  (*See, e.g.*, D.I.

309-1, Ex. 4, at 80:12–18; Ex. 6, Interrogatory 4).  Based on the exhibits provided to the Court, it

appears that the only time Plaintiffs provided a specific response was in Anne Blume's

deposition.   Ms. Blume stated that BIH's long-term care webinar, long-term care virtual

conference, and cyber webinar also violated the APA.  (*Id.*, Ex. 4, at 84:11–17).  Plaintiffs have a

duty to supplement their responses, and they have not shown the Court they have done so.  Thus,

Plaintiffs may only present evidence relating to the events they specifically disclosed to BIH—

the "BI Conferences" identified in the Amended and Supplemental Complaint (D.I. 48 at ¶ 47),

and the long-term care webinar, the long-term care conference, and the cyber webinar identified

by Ms. Blume.

BIH's Motion in Limine No. 2 (D.I. 308 at 17–18) is **DENIED**.   Although the relevant

paragraphs in the Amended and Supplemental Complaint recite specific actions taken by Potter,

App.796

it is clear that these actions—i.e., obtaining a sponsor for BIH's C&H Conference—were taken on behalf of BIH.   (D.I. 48 at ¶¶ 93–96).   Further, the Amended and Supplemental Complaint refers to "Defendants' Breach of the Non-Solicitation Provision," not just Potter's breach.   (*Id.* at 24; *see also id.* at ¶ 41 ("Defendants have violated the Non-Solicitation . . . .")).

Potter's Motion in Limine (D.I. 308-11, Ex. K) is **DENIED**.   At the pretrial conference, Plaintiffs' counsel indicated that they intend to introduce evidence of Waggy's actions only to show Potter's attempts to recreate CLM's business model.   (Tr. at 48:20–49:9).   Presumably, proof of the business model supports the conclusion that the complained-of conferences are violative of the non-compete clause.   I find that evidence of Waggy's actions is relevant for this limited purpose.   I do not think that BIH will suffer any unfair prejudice from the introduction of this evidence for this limited purpose, and I do not think it will take much trial time.

At the pretrial conference, the parties requested clarification as to whether this Court's interpretation of the contract in its summary judgment opinion was final.   (Tr. at 12:23–13:14; 66:12–17).   In the summary judgment opinion, I stated, "The plain language . . . makes clear that CLM's business is limited to the claims and litigation management industries, not the insurance industry generally.   The APA therefore prohibits Defendants from offering a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals."   (D.I. 304 at 5 (internal citation omitted)).   While I could perhaps have been clearer, I determined that the APA's non-compete provisions were unambiguous.   The plain language of the non-compete "prohibits Defendants from offering a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals."   Therefore, parol evidence offered to change this plain meaning is not permitted.

App.797

That is not to say, however, that background information on how the industry works would not be helpful in determining whether certain events offered "claims and litigation management" content or targeted "claims and litigation management professionals."  My contract interpretation in the summary judgment opinion was limited to the term "Sellers' Businesses"—more specifically, "CLM Business."  (*See id.* at 4–5.)  I did not provide an interpretation of "claims and litigation management" or "claims and litigation management professionals."  The parties therefore may present evidence as is necessary to assist the Court in interpreting these phrases.  *See U.S. Legal Support, Inc. v. Lucido*,  2021 WL 4940823, at *5 (Del. Ch. Oct. 22, 2021) ("When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence . . . includ[ing] 'overt statements and acts of the parties, the business context, prior dealings between the parties, business custom and usage in the industry.'" (footnote omitted)).

At the pretrial conference, Mr. Hayes stated (somewhat vaguely so far as I am concerned) that Plaintiffs intended to put on testimony in order to preserve an issue related to the denial of their summary judgment motion.  (Tr. at 26:9–24)  Plaintiffs are not to put on evidence at trial solely for the purpose of preserving an issue relating to the denial of their summary judgment motion.  But they may present this evidence by proffer no later than June 13, 2022, in such detail as they think necessary to preserve whatever issue they are trying to preserve.

Entered this  6  day of June, 2022.


/s/ Richard G. Andrews
United States District Judge

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC,<br><br>                          Plaintiffs,<br><br>           v.<br><br>Adam Potter and Business Insurance Holdings, Inc.,<br><br>                          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civ. A. No. 1:19-cv-01600-RGA-JLH |

## OFFER OF PROOF OF PLAINTIFFS
## THE AMERICAN INSTITUTES FOR CHARTERED CASUALTY
## <u>PROPERTY UNDERWRITERS AND THE INSTITUTES LLC</u>

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

June 13, 2022

Pursuant to the Court's June 6, 2022 Order after Pretrial Conference (D.I. 311), Plaintiffs, The American Institute of Chartered Property Casualty Underwriters and The Institutes ("The Institutes" or "Plaintiffs"), submit the following Offer of Proof.

## BACKGROUND

By Order entered May 13, 2022, the Court denied the parties' Cross-Motions for Summary Judgment as to Count I of the Amended and Supplemental Complaint.  (D.I. 305)  Plaintiffs asserted claims for breach of the noncompetition provisions of the Asset Purchase Agreement pursuant to which The Institutes acquired the assets of the CLM Group (the "APA") in Count I.  In the accompanying Memorandum Opinion, the Court interpreted the noncompetition provisions differently than each of the parties.

As to The Institutes' proffered interpretation, the Court ruled that:

> Plaintiffs argue that the non-compete provision of the APA prohibits Defendants from offering any "specialty conference" relating to the insurance industry, unless it is listed as a Permitted Activity."  (D.I. 294 at 3). Plaintiffs' interpretation is inconsistent with the plain language of the APA.  The plain language makes clear that CLM's business is limited to the claims and litigation management industries, not the insurance industry generally.  The APA therefore prohibits Defendants from offering a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals."

(D.I. 304, PageID 6077)(citation omitted).  Conversely, this interpretation of the noncompetition provisions is broader than defendants' narrower interpretations,

including that those provisions foreclose only specialty conferences that target

claims and litigation management professionals and that the list of "Permitted

[competitive] Activities" is not exclusive.  (*See e.g.*, D.I. 304 at PageID 6078, n.

4).

The Court also held that there was a genuine dispute of material fact as to

whether the 2019 Cannabis & Hemp Conference violated the noncompetition

provisions.  (*Id.*, at 6077).  In so ruling, it implicitly rejected defendant Adam

Potter's argument that the Cannabis & Hemp Conference was not covered by the

noncompetition provisions because the CLM Group never offered a dedicated

cannabis conference prior to the closing.

As discussed at the Final Pretrial Conference, there was uncertainty as to the

extent to which, if at all, the summary judgment ruling limited the issues for trial.

As the Court found counsel's explanation of this concern to be vague, The

Institutes reiterate their concern.

The denial of a summary judgment motion generally has no impact beyond

the resolution of that motion.  A denial means there is a factual dispute to be

resolved.  A dispute to be resolved at trial, by the fact finder and, importantly,

based on the trial (not summary judgment) record.  *Travelers Cas. & Sur. Co. v.*

*Ins. Co. of N. Am.*, 609 F.3d 143, 167 n32 (3d Cir. 2010)("[o]nce the trial has taken

App.801

place, the focus is on the evidence actually admitted and not on the earlier summary judgment record.)( (internal quotations and citations omitted).

As such, parties generally cannot "appeal an order denying summary judgment after a full trial on the merits." *See Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). Any appeal from whatever final order is entered will be determined based on the trial record. *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, *supra*. So, if the arguments made and evidence presented at the summary judgment stage are not introduced into the trial record, any challenge to the resolution of the issues presented in that motion will not be preserved.

Courts have recognized an exception to this general principle where a binding determination of law is made in ruling on a summary judgment motion. . *See Blessey Marine Servs., Inc. v. Jeffboat, L.L.C.*, 771 F.3d 894, 897 (5th Cir. 2014) ("if the appellant seeks review of "the district court's legal conclusions in denying summary judgment, and the case was a bench trial," we have jurisdiction to review the denial of summary judgment."). However, research has not identified any case in which the Third Circuit has recognized this exception. And, one court has referred to it as a "controversial exception". *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 404 (7th Cir. 2018).

Under this analysis, the threshold concern presented by the ruling on the Cross-Motions for Summary Judgment in this case was whether the Court intended

its contract interpretation to be final.  A court's view of even legal issues may evolve based on the more developed evidentiary record generated during trial. Even unambiguous contracts must be interpreted within the context of the circumstances in which they were executed,.  So, for instance, the Court's interpretation of  "Sellers' Businesses" may change based on evidence of the broad range of individuals to whom the CLM's specialty conferences have been marketed.  It was evidence of this nature to which counsel was referring in stating that evidentiary proffers may be made to preserve the record.

In its Order after Pretrial Conference, the Court clarified that its interpretation of "Sellers' Businesses," specifically "the CLM Business", was final. (D.I. 311 PageID 6404-05).  But, given the state of the law, the concern for preserving this issue for appellate review remains.

So, The Institutes submit this Offer of Proof on two issues.  First, the definition of "Sellers' Businesses."  Second, as the noncompetition provision prohibits defendants from engaging in any "competitive" business, whether this prohibition applied to defendants' specialty conferences and webinars in that they compete with those of the CLM's for attendees, sponsors, advertisers and faculty. While The Institutes believes this issue is distinct from the definition of "Sellers' Businesses", it is addressed out of an abundance of caution because accepting plaintiffs' position would mean conferences beyond those offering claims and

App.803

litigation management content or targeting claims and litigation management professionals would be covered by the noncompetition provision.

## SUPPORTING EVIDENCE[1]

Defendant, Adam Potter, founded "The CLM" and developed it into the preeminent professional association of insurance industry professionals working in claims assessment and resolution, litigation management and risk management, adjusters, corporate counsel, third-party administrators and service providers. The CLM also offers membership to attorneys representing the insurance industry, including counsel defending covered claims and first-party claims.

One of the services the CLM provides are specialty conferences on subjects of emerging, heightened or recurring interest to the insurance industry. Another service is webinars on various topics, including workmen's compensation issues. These events are marketed to and attended by CLM fellows and members as well as other industry professionals. They are of interest to other insurance professionals because the topics addressed often transcend claims and litigation management issues. And, other insurance professionals must be aware of trends in claims. For instance, underwriters should understand the nature of the claims arising under a specific policy coverage to define and revise policy terms. Beyond

---

[1] Most, if not all, of this evidentiary proffer is relevant and therefore admissible as to other issues to be resolved at trial. They are proffered to develop the issues for which this Offer of Proof is submitted.

App.804

that, as The CLM's specialty conferences draw a broad segment of the industry and the attorneys representing them together, one of the primary reasons to attend is to network.

Specialty conferences are held in hotels, convention centers and other such venues and may last several days.  When Potter owed The CLM, C&E MGMT and Planning, Inc. (the entity now named BIH) booked the venue and blocks of rooms for attendees to reserve if they wished.  The CLM plans the conferences, engages "faculty", selects topics and assists in developing the curriculum.

A primary source of revenue generated by specialty conferences and webinars is advertising and sponsorships.  Specialty conferences provide a "captive" audience for third-parties providing goods and services to the insurance industry and the attorneys representing it.  Advertising and sponsorships were and remain a crucial funding source for The CLM.

Advertisers and sponsors operate in accordance with budgets.  Attorney CLM members also are similarly constrained.  And, there is limited number of educational/networking conferences those attorneys and even CLM members can attend.  Experts in any subject matter have limited time to develop presentations and participate in conferences.  All of these entities have other demands on their resources and time.

So, while the CLM is the preeminent professional association for claims and litigation management professionals, its specialty conferences and webinars face competition from other professional events for advertising and sponsorship dollars, faculty and attorney fellow participation. For instance, a court reporting or expert firm advertising or sponsoring a CLM seminar may also advertise at or sponsor other professional conferences drawing litigation counsel, such as those offered by the Defense Research Institute and Product Liability Advisory Council.

While he owned The CLM, Potter acquired Business Insurance. At that point, Business Insurance principally published well regarded periodicals and newsletters for the insurance industry. Potter expanded Business Insurance's offerings to include award shows and events, such as Woman to Watch and World Captive Forum. Not only is Business Insurance well regarded, but it became associated with the CLM through its common ownership under Potter and the entities' joint sponsorship of events.

Even though Business Insurance Holdings' Events and Award Programs do not generally contain claims and litigation management content and are not targeted to claims and litigation professionals, they still compete with The CLM's specialty conferences. While claims and litigation management professionals are not specifically targeted, they are encompassed within the audience for Business Insurance's events and award programs. Further those events and programs also

attract an audience that entities advertising and sponsoring CLM specialty

conferences and webinars seek to reach, so Business Insurance competes with The

CLM for advertising and sponsorship.

In negotiating the APA, The Institutes initially sought to require Business

Insurance to discontinue all competitive activities.  Ultimately, it was agreed that

Business Insurance may continue to provide its existing products and services

subject to the caveat that they may not involve claims and litigation management

content or target claims and litigation management professionals.

The noncompetition provisions of the APA were intended to accomplish this

objective.

## ARGUMENT

### A.    The "Sellers' Businesses" Extend Beyond Claims And Litigation Management

The noncompetition provisions are structured to include the specific

prohibitions in Section 6.12, define the "Sellers' Business" with which the "Selling

Parties" could not compete in Schedule A, and specify the carve outs for, *inter

alia*, Business Insurance in Schedule 6.12.

Section 6.12(a) broadly requires each "Selling Party" "not to, and . . . to

cause its Affiliates not to, directly or indirectly, and anywhere in the United States

conduct, manage, operate, engage in or have an ownership interest in any business

or enterprise engaged in any activities that are otherwise competitive with any of

App.807

the Sellers' Businesses as conducted on the Closing Date . . ." (For ease of reference, a copy of the pertinent provisions of the APA are attached hereto and marked Exhibit A.) "Sellers' Businesses" is a defined term and is deemed to have the "meaning set forth in the preamble herein." (APA, Appendix A, p. 45). That preamble separately defines each Seller's Business, with The CLM's business described as "operating as a national trade association for the claims and litigation management industries, as more specifically set forth in Schedule A . . ." (APA, Preamble, at 1). Schedule A recognizes that the CLM is a "professional association in the **insurance industry** with more than 45,000 professionals in the claims resolutions and litigation management industries, with local chapters across the United States" and thereafter lists eleven specific "products and services" in which the CLM engages . . ." (Exhibit B hereto)(emphasis added)

One category of those products and services is "Specialty Conferences including: Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI and Chief Claims Officer Summit." (Exhibit B, Schedule A at 1) Another category is hosting "webinar topics ranging from Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals." (*Id.*)

App.808

Schedule A's identification of "Specialty Conferences" specifies a broad category of services.  The reference to Specialty Conferences is not limited by content or by to whom they are targeted.  Further, the description of webinars contains its own limiting language - - they must be presented by claims, litigation or insurance professionals.  Given this express limitation, the parties certainly would have expressly stated any other limitations that they intended.

Beyond that, several identified products and services are expressly limited to those provided to claims and litigation management professionals.  (*See e.g*, "Annual Conference," defined as "an annual event for professionals in the claims and litigation management industries")  If the parties intended to impose similar limitations on Specialty Conferences, they would have expressly so stated in describing that service as well.  *See, e.g., MicroStrategy Inc. v. Acacia Rsch. Corp.*, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010) ("The use of different language in the two sections shows the parties knew how to cover [an issue more broadly] when that was their intent."); *see also Veloric v. J.G. Wentworth, Inc.,* No. CIV.A. 9051-CB, 2014 WL 4639217, at *12 (Del. Ch. Sept. 18, 2014) (failure to provide for term in one section, where provided in another, supports finding that the parties did not intend for unmentioned term to apply).

Reference to claims and litigation management content and targeting claims and litigation management professionals is made only in the carve outs from

Permitted Activities in Schedule 6.12-1.  Those limitations apply to the scope of the Permitted Activities not to the noncompetition provisions.  Further, as the noncompetition provisions prohibit only competitive activities, there would have been no need to create exceptions for "Permitted Activities" if they were not competitive.  And, after the carve-outs from Permitted Activities, only events providing content other than claims and litigation management and targeting professionals in other insurance fields remain, so those types of events must be deemed competitive.  Beyond that, the description of Business Insurance's services demonstrates that its competitive activities extend to the insurance industry as a whole.  (*See e.g.*, Ex. B, Schedule 6.12-1),("Business Insurance is a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services.").

Nevertheless, the Court held that the "plain language [of the APA] instead makes clear that CLM's business is limited to the claims and litigation management industries, not the insurance industry generally."  (D.I. 304 PageID#6076).  But, the Court did not specify what language establishes this limitation.  It cites the references in the APA's preamble to The CLM's status as a trade association for the claims and litigation management industries, but the preamble also provides that its products and services are more specifically

App.810

described in Schedule A.  That Schedule refers to the CLM as a "professional association in the insurance industry" and thereafter describes the products and services it offers.  It broadly refers to "specialty conferences" and webinars as two of those services.  The language utilized to describe those services does not admit of any limitation to claims and litigation content or professionals.  Even an organization focused on claims and litigation management may provide ancillary products and services.

Reading limitations into this broad category of services based on a single reference erroneously distorts the meaning of the entire definition of Sellers' Businesses.  *See*, *Chicago Bridge & Iron Co., N.V. v. Westinghouse Electric Co. LLC*, 166 A.2d 912 (2016).  In *Chicago Bridge*, the Supreme Court of Delaware held that:

> In giving sensible life to a real world contract, courts must read the specific provisions of the contract in light of the entire contract.  That is true in all commercial contexts, but especially so when the contract at issue involves definitive acquisition agreement addressing the sale of an entire business.

*Id*., at 913-14.  The Court ruled that the Court of Chancery had erroneously interpreted an acquisition agreement's provisions for a "True-Up" of the purchase price to permit a purchaser to challenge the accuracy of financial statements provided to the purchaser pre-closing.  The Supreme Court concluded that, in reading the agreement in that manner:

12

> [T]he Court of Chancery rendered meaningless the
> Purchase Agreement's Liability Bar.  It also slighted the
> requirement in the text of the Purchase Agreement that
> Westinghouse indemnify Chicago Bridge for a broad set
> of claims related to Stone . . . By so interpreting the
> contract, the Court of Chancery failed to give adequate
> weight to the structure of the Purchase Agreement and
> the subordinate and confined purpose of the True Up.

*Id*., at 916-17.

Similarly, but conversely, reading limitations into the broad reference to

specialty conferences and webinars based on a single reference in the preamble to

the CLM as a trade association of claims and litigation management professionals

is inconsistent with the structure of the APA in which the Sellers' Businesses is

defined in Schedule A.  The reference to The CLM as a trade association states

what it is.  Schedule A states what it does.  Defendants may not compete with what

the CLM does.

### B.    BIH's Conferences And Webinars Are Competitive Even If They Are Not The Exact Same Businesses

Section 6.12(a) prohibits any "activities that are otherwise competitive with

the Sellers' Businesses"  "Competitive" means to strive for the same objective or

goal.  "Compete" *Merriam-Webster Online Dictionary*, merriam-webster.com.

The APA imposes broader limitations on defendants than simply engaging in the

exact same business.  They also may not engage in "otherwise competitive"

activities.  Even if the Sellers' Businesses are limited to claims and litigation

management, defendants have still engaged in otherwise competitive activities.

13

App.812

For instance, claims and litigation management professionals attend specialty conferences or webinars on other insurance related topics. That is particularly true for senior executives who may have claims and litigation management and other areas of responsibility. Conversely, professionals in other aspects of the insurance business attend CLM events. Further, as previously noted, some CLM advertisers and sponsors market their products and services beyond claims and litigation management personnel. The CLM competes with BIH's for the limited time and financial resources attendees and limited budgets advertisers and sponsors have to devote to specialty conferences and webinars.

Respectfully submitted,

/s/  *Barry Klayman*
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com

*Attorneys for Plaintiffs, The American
Institute for Chartered Property Casualty
Underwriters and The Institutes, LLC*

App.813

Case 1:19-cv-01600-RGA-JLH   Document 313-1   Filed 06/13/22   Page 1 of 8 PageID #: 6438

# EXHIBIT A

===============================================================

ASSET PURCHASE AGREEMENT

By and Among

THE INSTITUTES, LLC

as Buyer,

THE AMERICAN INSTITUTE FOR CHARTERED
PROPERTY CASUALTY UNDERWRITERS
Parent,

CLAIMS PAGES, LLC,
C&E MGMT AND PLANNING, INC. and
CLM GROUP, INC.

as Sellers,

And

ADAM POTTER

and

MOXIE HC, LLC

DATED June 1, 2018

===============================================================

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated June 1, 2018, by and among The Institutes, LLC ("Buyer"), a Pennsylvania limited liability company and wholly-owned subsidiary of The American Institute For Chartered Property Casualty Underwriters ("Parent"), a Pennsylvania non-profit corporation, Claims Pages, LLC, a Florida limited liability company ("CP"), C&E MGMT and Planning, Inc., a Florida corporation ("C&E"), CLM Group, Inc., a Florida corporation ("CLM" and, together with CP and C&E, collectively, "Sellers" or the "Companies" and each individually, a "Seller" or a "Company"), ADAM POTTER, an adult individual residing in Naples, Florida ("Adam Potter"), and MOXIE HC, LLC, a Florida limited liability company ("Moxie").  Buyer, Parent, each Seller, Adam Potter and Moxie are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

### W I T N E S S E T H :

A.     Moxie owns 100% of the membership interests in CP and 100% of the issued and outstanding capital stock of CLM, and Adam Potter owns 100% of the issued and outstanding capital stock of C&E.

B.     CP is engaged in the business of providing reference information for insurance claims adjusters, as more specifically set forth in Schedule A (the "CP Business"), C&E is engaged in the business of identifying and securing conference and event locations, hotel contracts and outside locations, as more specifically set forth in Schedule A (the "C&E Business"), and CLM is engaged in the business of operating as a national trade association for the claims and litigation management industries, as more specifically set forth in Schedule A (the "CLM Business" and, together with the CP Business and the C&E Business, the "Sellers' Businesses" and each individually, the "Seller's Business").

C.     Sellers desire to sell, and Buyer desires to purchase, substantially all of the assets of Sellers used in connection with the Sellers' Businesses, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties hereby, intending to be legally bound hereby, covenant and agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1     Definitions.   Defined terms used in this Agreement have the meanings ascribed to them by definition or in Appendix A.

### ARTICLE II
### PURCHASE AND SALE OF ACQUIRED ASSETS

Section 2.1     Purchase and Sale of Acquired Assets; Assumed Liabilities.

Section 6.10   Transition and Cooperation; Further Assurances.  From and after the Closing, the Parties shall: (a) cooperate reasonably with each other to transfer to Buyer the control and enjoyment of the Sellers' Businesses and the Acquired Assets; and (b) not take any action, directly or indirectly, alone or together with others, which obstructs or impairs the assumption by Buyer of the Sellers' Businesses and the Acquired Assets.  After the Closing, the Selling Parties shall promptly deliver to Buyer all correspondence, papers, documents and other items and materials received by any of them or found to be in any of their possession which pertain to the Sellers' Businesses or the Acquired Assets (other than any Excluded Assets).  Each Party shall, from time to time on being reasonably requested to do so by the other Party, now or at any time in the future, take all commercially reasonable actions necessary to do or procure the doing of all such acts and/or execute or procure the execution of all such documents, at the sole cost and expense of the requesting Party, in a form reasonably satisfactory to the other Party as the other Party may reasonably consider necessary for giving full effect to this Agreement and securing to the other Party the full benefit of the rights, powers and remedies conferred upon the other Party in this Agreement.

Section 6.11   Confidentiality.   Each Selling Party shall, and shall cause its respective affiliates and representatives to, keep confidential and not disclose to any other Person or use for its own benefit or the benefit of any other Person any confidential proprietary information, technology, know-how, trade secrets (including all results of research and development), product formulas, industrial designs, franchises, inventions or other intellectual property regarding any Seller or Seller's Business ("Confidential Information") in its possession or control.   The obligations of the Selling Parties under this Section 6.11 shall not apply to Confidential Information which (a) is or becomes generally available to the public without breach of the commitment provided for in this Section or (b) is required to be disclosed by Laws of a court or tribunal or Governmental Entity; provided, however, that, in any such case, any Selling Party subject to such requirement shall notify Buyer as early as reasonably practicable prior to disclosure to allow Buyer to take appropriate measures to preserve the confidentiality of such Confidential Information.  Notwithstanding the foregoing, and subject to maintaining confidentiality of same as set forth in this Section 6.11, Moxie and Adam Potter are permitted to use, solely in connection the Permitted Activities, such know-how included in the Confidential Information that is currently used by the Selling Parties outside of the Sellers' Businesses.

Section 6.12   Non-Compete.

(a)    During the period beginning on the Closing Date and ending the fifth (5th) anniversary of the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the "Permitted Activities").

(b)    With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of

LEGAL\36402379\4

Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

(c)     During the Non-Compete Period, each Selling Party shall not, and shall cause its affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any employee or independent contractor to leave the employ of Buyer, or engagement by Buyer, for any reason whatsoever, nor shall any Selling Party or any of their affiliates offer or provide employment to (whether such employment is for Seller or any other business or enterprise), or engage, either on a full-time basis or part-time basis, any Person who then currently is, or who within six months immediately prior thereto was, an employee or independent contractor of Buyer or any of the Companies; provided, however, that this prohibition shall not apply to general solicitations not directed at any employees or independent contractors or in the event of any initial contact being made by any employee or independent contractor.  Buyer acknowledges that, on and after the Closing Date, there will be independent contractors engaged part-time with both Parent or Buyer and with a Selling Party or an affiliate of a Selling Party, and that such engagement does not violate this Section 6.12(c); provided, however, that each Selling Party hereby agrees not to, and shall cause its affiliates not to, directly or indirectly, solicit or induce, or attempt to solicit or induce, any such independent contractor to leave its engagement with Parent or Buyer during the Non-Compete Period.

(d)     Each Selling Party acknowledges and agrees that the provisions of this Section 6.12 are reasonable and necessary to protect the legitimate business interests of Buyer and its investment in the Acquired Assets.  Each Selling Party shall not contest that Buyer's remedies at law for any breach or threat of breach by any Selling Party or any of its affiliates of the provisions of this Section 6.12 will be inadequate, and that Buyer shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Section 6.12, without proving actual damages, and to enforce specifically such terms and provisions, in addition to any other remedy to which Buyer may be entitled at law or equity.  The restrictive covenants contained in this Section 6.12 are covenants independent of any other provision of this Agreement or any other agreement between the parties hereunder and the existence of any claim which any Selling Party may allege against Buyer under any other provision of the Agreement or any other agreement will not prevent the enforcement of these covenants.

(e)     If any of the provisions contained in this Section 6.12 shall for any reason be held to be excessively broad as to duration, scope, activity or subject, then such provision shall be construed by limiting and reducing it, so as to be valid and enforceable to the extent compatible with the applicable Laws or the determination by a court of competent jurisdiction.

(f)     In the event of a breach by any Selling Party of any covenant set forth in Sections 6.12(a), (b) or (c) of this Agreement, the term of such covenant will be extended by the period of the duration of such breach.

Section 6.13    Conduct of Business Post-Closing. From the Closing Date through the one (1) year anniversary thereof, Buyer shall not take any action (or omit to take any action) for the purpose or with the intent to eliminate or reduce the amount of the Subsequent Purchase Price.  If Buyer sells Sellers' Businesses to an unaffiliated third party (whether by means of asset

sale, sale of fifty (50%) percent or more of the stock ownership in one or a series of related transactions other than to an Affiliate or the Parent) ("Spin Off Sale") prior to the six (6) month anniversary of the Closing Date, then Buyer agrees to pay to Sellers the full amount of the UCC Subsequent Payment, PLRB Subsequent Payment and the Revenue Target Subsequent Payment, and such payments will be paid to Sellers within thirty (30) days of the consummation of the Spin Off Sale in accordance with the payment instructions set forth in Section 2.4; provided, however, that the acceleration of the Subsequent Purchase Price shall not be due to Sellers under this Section 6.13 in the event that the Selling Parties are in breach of Section 2.4.

**ARTICLE VII**
**CONDITIONS TO OBLIGATIONS TO CLOSE**

Section 7.1    Conditions to Obligation of Buyer.    The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to the satisfaction (or waiver in writing by Buyer as of the Closing) of the following conditions:

(a)    (i) the representations and warranties set forth in Article IV above shall be true and correct in all material respects as of the Closing Date, and (ii) the Selling Parties shall have performed and complied with all of their covenants hereunder in all material respects through the Closing;

(b)    Buyer shall have been furnished with a certificate executed by the Selling Parties (the "Sellers' Closing Certificate"), dated the Closing Date, certifying that the conditions set forth in Section 7.1(a) have been fulfilled (or waived in writing by Buyer) at or prior to the Closing Date;

(c)    there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)    all of the Required Consents shall have been obtained;

(e)    the Selling Parties shall have executed and delivered to Buyer the agreements, instruments, documents and certificates provided for in Section 3.2;

(f)    all actions to be taken by the Selling Parties in connection with consummation of the transactions as specified by this Agreement and all instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer.

Section 7.2    Conditions to Obligation of the Selling Parties.    The obligation of the Selling Parties to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction (or waived in writing by the Selling Parties) of the following conditions:

(a)    (i) the representations and warranties set forth in Article V above shall be true and correct in all material respects as of the Closing Date, and (ii) Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

APPENDIX A

As used in the Agreement, the following terms shall have the following meanings:

"12-Month Post-Closing Period" has the meaning set forth in Section 2.4(c)(i).

"12-Month Statement" shall mean the unaudited statement of the Net Revenue for the 12-Month Post-Closing Period, together with the calculation of the Revenue Target Subsequent Payment, prepared by Buyer.

"Acquired Assets" has the meaning set forth in Section 2.1(a).

"Adam Potter" has the meaning set forth in the preamble hereto.

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"Agreement" has the meaning set forth in the preamble hereto.

"Allocation" has the meaning set forth in Section 2.5.

"Ancillary Agreement" means any agreement, exhibit, statement, document or certificate executed and delivered in accordance with or required by this Agreement and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

"Assignment of Lease" has the meaning set forth in Section 3.2(a).

"Assumed Liabilities" has the meaning set forth in Section 2.1(c).

"Assumption Agreement" has the meaning set forth in Section 3.2(a).

"Basket" has the meaning set forth in Section 9.5.

"Bill of Sale" has the meaning set forth in Section 3.2(a).

"Board" means the Board of Trustees of Parent.

"Books and Records" has the meaning set forth in Section 2.1(a)(vii).

"Business Day" means any day, other than a Saturday or a Sunday or any other day on which banks are required or authorized to close in the State of New York.

"Buyer" has the meaning set forth in the preamble hereto.

"Buyer Indemnified Parties" has the meaning set forth in Section 9.2.

"Buyer Closing Certificate" has the meaning set forth in Section 7.2(b).

individually or in the aggregate, would not reasonably be expected to materially impair the value of the Acquired Assets or the use of the Acquired Assets in the ordinary course of business; or (e) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties which are contracts entered into in connection with the business of such Company and are set forth on Schedule 4.6(a).

"Person" shall mean a natural person, corporation, partnership, joint venture, trust, limited liability company, unincorporated organization or other entity, or a Governmental Entity.

"Personal Information" shall mean any information that identifies an individual, including name, physical address, telephone number, email address, financial account number or government-issued identifier (including Social Security number and driver's license number), medical, health or insurance information, gender, date of birth, educational or employment information, facial or biometric data, geolocation data, Internet Protocol addresses, unique device identifiers or other persistent identifiers, solely to the extent the foregoing is protected pursuant to data privacy or data security Laws applicable to any of the Companies.  Personal Information may relate to any individual, including a current, prospective or former customer or employee of any of the Companies.

"PLRB Acquisition" has the meaning set forth in Section 2.4(a).

"PLRB Documents" has the meaning set forth in Section 2.4(a).

"PLRB Subsequent Payment" has the meaning set forth in Section 2.4(a).

"PLRB" means Property Loss Research Bureau, a not-for-profit corporation, organized under the laws of the State of Illinois.

"Product Launch" has the meaning set forth in Section 2.4(b).

"Purchase Price" shall mean the Initial Purchase Price, plus any PLRB Subsequent Payment, UCC Subsequent Payment and Revenue Target Subsequent Payment.

"Related Parties" has the meaning set forth in Section 4.13.

"Required Consents" has the meaning set forth in Section 4.2.

"Required Net Revenue" has the meaning set forth in Section 2.4(c)(i).

"Revenue Target Subsequent Payment" has the meaning set forth in Section 2.4(c)(i).

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" or "Sellers" has the meaning set forth in the preamble hereto.

"Seller Indemnified Parties" has the meaning set forth in Section 9.1.

"Sellers' Businesses" or "Seller's Business" has the meaning set forth in the preamble hereto.

45

# EXHIBIT B

Schedule A

Sellers' Businesses

"CLM Business"

A professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies. CLM offers the following products and services:

1. <u>Claims College</u> creates and teaches courses for the College's eleven specialty schools; issues certificates, and CCP/ACP designations
2. <u>Litigation Management Institute (LMI)</u> is a certification program for Certified Litigation Management Professional (CLMP), and will also be offering a second designation titled LMI2 as an advanced course.
3. <u>CLM Tracker</u> tracks and renews adjuster's continuing education and licenses, including an auto-renewal function.
4. <u>Universal Claims Certificate (UCC)</u> is scheduled to launch on July 1, 2018. The UCC was developed with the most stringent requirements and regulations for each state. The UCC includes a pre-certification course and examination. Mandatory pre-licensing courses and exams will be waived for states that recognize the UCC. Registration and payment of state fees will be managed by a single, centralized system that connects to state systems.
5. <u>Annual Conference</u> is an annual event for professionals in the claims and litigation management industries, featuring educational sessions and networking.
6. <u>Specialty Conferences</u> including: Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI, and Chief Claims Officer Summit.
7. <u>Magazines</u> including (both digital and print formats): CLM Magazine, clmmag, theclm.org, Professional Times Magazine, and Construction Claims Magazine
8. <u>Chapter Events</u> Local networking and educational events are held around the country each year. These events are provided at no cost to the attendees and offer a combination of an educational session and a networking event
9. <u>Webinars</u> Hosts webinar topics, ranging from Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals
10. <u>Training Sessions</u> Hands-on training sessions all approved for adjuster CE credits
11. <u>CLM Wiki</u> Repository of valuable claims handling resources organized by state, including claims and legal resources, and construction rip and tear cases

"C & E Business"

An event planning company that manages all of CLM's events.

Schedule 6.12 – Permitted Activities


Permitted Activities


"Permitted Activities" shall mean the business operations of the following entities, as specifically set forth below:

1.      Business Insurance Holdings, LLC:

Business Insurance is a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services.  Business Insurance delivers in-depth analysis on new and emerging risks, case studies of successful programs, market intelligence on trends, and guidance on how to capitalize on opportunities and overcome challenges. Business Insurance covers core risk management and insurance areas such as property/casualty insurance, captive insurance and other alternative risk transfer vehicles, and enterprise risk management.

Business Insurance provides the following products and services:

    a. Monthly Business Insurance magazine (in print and digital formats)
    b. WC Workers Comp magazine (in print and digital formats)
    c. Businessinsurance.com website: a multichannel, ad-supported website that provides news and information to the insurance industry. The content focuses on insurance industry news, risk management topics, workers comp, international news, opinion pieces, research/reports, job postings and news about industry professionals.  The site is also used to promote BI events and award programs.
    d. wcauthority.com website
    e. Lead Gen Programs (including webinars, white papers and emails): campaigns sold to advertisers for the purposes of generating leads for their business. Through digital marketing tactics, including emails, white papers and webinars, BI works with clients to meet their target lead number
    f. E-newsletters and e-news alerts: bi-weekly newsletters including:
- Daily Briefing (M-F)
- Comings & Goings (Mon)
- Risk Management (Tues)
- Workers Comp (Wed)
- Market Pulse (Thurs)
- Current Issue (Monthly)
- International (T/TH)
    g. Show daily publications
    h. Sponsored content which is paid for partner content, e.g., Risk Perspective (in-depth article, one-on-one, or research treatment of a specific topic with a sponsor perspective embedded)
    i. Risk Perspectives
    j. Women to Watch Foundation

50016v11

  k. Diversity & Inclusion Institute
  l. Events and Award Programs as follows:
    1. World Captive Forum
    2. U.S. Insurance Awards
    3. Break Out Awards
    4. Innovation Awards
    5. Risk Management Roundtable: invitation only roundtable meeting of senior-level risk managers to discuss hot industry topics.
    6. Women to Watch (EMEA and USA)

provided, however, on and after the Closing Date, none of the Selling Parties is permitted to, and each shall cause its Affiliates not to (and the following are excluded from Permitted Activities):

  1. Work/create/develop/offer/promote educational content related to claims and litigation management, unless in partnership with CLM and CP
  2. Produce live delivery, such as events, networking, seminars, award programs, and conferences targeted to claims and ligation management professionals.
  3. Undertake any involvement with newsletters, publications, emails, communication, sponsorships, research papers which cannot directly be targeted for claims and litigation professionals
  4. Target or create information that relates to the CP Business

2.  Sync Meeting Management Corp:

Meeting planning and management services; provided, however, on and after the Closing Date, none of the Selling Parties is permitted to, and each shall cause its Affiliates not to, provide any such services in connection with meetings, conferences or other events for the insurance industry, and such services are excluded from Permitted Activities.

3.  Any Person to whom the IATA Number is transferred to after the Closing as permitted under Section 6.1(c):

Booking and reserving hotel rooms and venues; provided, however, on and after the Closing Date, with the exception of Business Insurance Holdings, LLC (solely in connection with Permitted Activities), none of the Selling Parties is permitted to, and each shall cause its Affiliates not to, book or reserve hotel rooms and venues in connection with any meetings, conferences or other events for the insurance industry, and such services are excluded from Permitted Activities.

<u>"CP Business"</u>

A reference source for insurance adjusters and other claim professionals, and service providers, to connect those professionals with vendors, resources and tools, including industry news, videos, documents, forms, tools, industry event calendars, career listings and other resources; maintains related databases including without limitation, service providers, claims associations, courthouses, prosecuting attorneys and fire and police departments, and, more specifically:

1. FOR CLAIMS PROFESSIONALS: CP provides documents, worksheets, letter templates, insurance forms and calculators – all designed to help claims professionals be more effective.
2. FOR ATTORNEYS AND SERVICE PROVIDERS: Claims professionals come to the CP website to access the thousands of tools and resources CP makes available to them, and they also search CP's industry-leading directories in more than 300 categories to find the right attorney or service provider they need on specific claims.
3. PROVIDER DIRECTORY: With more than 7.8 million providers in CP's database, and more than 15,000 highlighted vendor profiles, CP's advanced search tools help claims professionals find the right provider at the right time on the right case.
4. NEWS AND INDUSTRY CALENDARS: CP provides industry-leading newsletters, career listings, industry event calendars and industry statistic listings for the claims professional.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

The American Institute for Chartered   )
Property Casualty Underwriters and     )
The Institutes, LLC,                   )
                                       )    Civ. A. No. 1:19-cv-01600-RGA-JLH
                                       )
                          Plaintiffs,  )
                                       )
         v.                            )
                                       )
Adam Potter and Business Insurance     )
Holdings, Inc.,                        )
                                       )
                          Defendants.  )
                                       )

**PLAINTIFFS' MOTION FOR CLARIFICATION OR PARTIAL
RECONSIDERATION ON THE COURT'S JUNE 6, 2022, ORDER RULING
ON BUSINESS INSURANCE HOLDINGS, INC.'S MOTION IN LIMINE
NO . 1**

Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ( "Plaintiffs"), by and through their counsel, and pursuant to District of Delaware Local Rule 7.1.5, hereby move the Court to reconsider its June 6, 2022, Order ruling on Business Insurance Holdings, Inc.'s ("BIH") Motion in Limine No. 1. In support of this Motion, Plaintiffs rely on the attached Memorandum of Law, which is incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that the Court grant its Motion and enter its proposed form of order, attached hereto, which would vacate the portion of the June 6, 2022, Order granting BIH's Motion in Limine No. 1 and deny BIH's Motion in Limine No. 1.

Dated: June 14, 2022

/s/  *Barry Klayman*
Barry M. Klayman, Esq. (#3676)
COZEN O'CONNOR
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
***Attorneys for Plaintiffs, The American
Institute for Chartered Property Casualty
Underwriters and The Institutes, LLC***


OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103
RHayes@cozen.com
MSiegel@cozen.com

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

      Plaintiffs,

    v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

      Defendants.

Civil Action No. 19-1600-RGA

ORDER

Potter asks this Court to reconsider the denial of his motion for summary judgment on

Plaintiffs' breach of contract claim.  (D.I. 306).  I will deny this request.

As a preliminary matter, the briefing reveals that both Potter and Plaintiffs disagree with

my interpretation of the APA's non-compete provision.  I construed this provision to prohibit

"Defendants from offering a specialty conference that provides content related to claims and

litigation management or that targets claims and litigation management professionals."  (D.I. 304

at 5).  Potter and Plaintiffs both contend, however, that the APA's references to "content related

to claims and litigation management" and "conferences targeted to claims and litigation

management professionals" do not define the scope of "Sellers' Businesses" and instead limit the

"Permitted Activities."  (D.I. 307 at 7–8; D.I. 312 at 4–5).  Because of this mutual disagreement,

I will give the parties the opportunity to brief this issue post-trial.[1]

---

[1] This does not change my previous ruling precluding parol evidence at trial.  (*See* D.I. 311 at 2).

1

Nevertheless, I will deny Potter's renewed request for summary judgment. The APA prohibits Defendants from engaging in "any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date." (D.I. 240-9, Ex. 9, § 6.12). Potter contends that the undisputed evidence shows that CLM did not offer any cannabis-related product as of the Closing Date. (D.I. 307 at 9). He therefore argues that the C&H Conference falls outside the scope of the non-compete. (*Id.*). That is not a conclusion I can reach in connection with a motion for summary judgment.

Schedule A of the APA conclusively sets forth the definition of "CLM Business." (D.I. 240-9, Ex. 9, at Schedule A (Institutes0008127); D.I. 311 at 2 ("I determined that the APA's non-compete provisions were unambiguous.")). This definition is not limited to the specific past product offerings of CLM. Thus, evidence that CLM did not offer any cannabis-related product before the Closing Date does not necessarily prove that a cannabis conference is outside the scope of the non-compete.

Potter's Motion for Partial Reconsideration of the Court's May 13, 2022 Order Granting in Part and Denying in Part Summary Judgment as to Plaintiffs' Amended and Supplemental Complaint (D.I. 306) is **DENIED**.

Entered this ⧸⧹ day of June, 2022.

United States District Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

     Plaintiffs,

  v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

     Defendants.

Civil Action No. 19-1600-RGA

## ORDER

I read the briefing filed in connection with Plaintiffs' motion for clarification or partial

reconsideration in regard to my ruling on Defendant BIH's MIL #1. (D.I. 315, 321).

Motions to reconsider are not favored. There are limited circumstances in which a court

will even consider them, and the only such circumstance Plaintiffs cite is when there is a need to

correct a clear error of law or fact to prevent manifest injustice. Plaintiffs do not, so far as I can

tell, assert a clear error of law or fact, and, further, even if there were an error, there would be no

manifest injustice. Plaintiffs seek to show a breach of a covenant not to compete. They have

some number of conferences Defendants put on (or planned to put on) that I am not preventing

them from proving. (*See* D.I. 315 at 6; *see also* D.I. 311 at 1). Maybe those conferences violate

the non-compete clause; maybe they don't. That's one of the issues for trial. Putting on

evidence of more conferences, including ones that are advertised for the future, would seem

unnecessarily cumulative if permitted, and might therefore be excluded on that basis. *See* Fed.

1

R. Evid. 403.  In any event, not permitting Plaintiffs to put on evidence of them (even if erroneous) is certainly not a manifest injustice.

Plaintiffs want to introduce evidence about the 2020 workmen's compensation webinars. (D.I. 315 at 1, 8).  They state that they only recently learned about them, presumably in the Spring of 2022.  They do not say why that is.  I do not think "recently-discovered evidence" and "evolving circumstances" (*id.* at 8) justify Plaintiffs' position.  I therefore see no justification for permitting Plaintiffs to introduce evidence about these webinars.

Plaintiffs want to introduce evidence about a conference (Insurance and Risk Management Implications) "planned" for October 2022.  (*Id.* at 1).  When Plaintiffs learned of that is not stated in the briefing, and they do not say that it has been the subject of any discovery. The point of having fact and expert discovery cut-offs is so that both sides can prepare for trial based on matters that have been the subject of discovery.  Evidence about the planned October 2022 conference is, it appears, outside the scope of discovery, and is therefore excluded.

I gather that Plaintiffs want to put on evidence that the specialty conferences that I have not excluded are, or are planned to be, annual events.  To the extent Plaintiffs want to show that Defendants want to repeat (or have already repeated) the non-excluded conferences as annual events, Plaintiffs can show that.  But, to the extent Plaintiffs want to show that a particular conference (or the promotion of such) violated the non-compete clause, they are restricted to the conferences to which I previously limited them.  (D.I. 311 at 1).

The motion (D.I. 314) is **DENIED**.

Entered this day of June, 2022.

United States District Judge

2

1

1           IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3

4    THE AMERICAN INSTITUTE FOR      )
     CHARTERED PROPERTY CASUALTY     )
5    UNDERWRITERS and THE            )
     INSTITUTES, LLC,                )
6                                    )
                      Plaintiffs,    )
7                                    ) C.A. No. 19-1600-RGA
     v.                              )
8                                    )
     ADAM POTTER and BUSINESS        )
9    INSURANCE HOLDINGS, INC.,       )
                                     )
10                                   )
                      Defendants.    )
11

12                                   J. Caleb Boggs Courthouse
                                     844 North King Street
13                                   Wilmington, Delaware

14                                   Friday, May 27, 2022
                                     2:04 p.m.
15                                   Pretrial Conference

16
     BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
17

18   APPEARANCES:

19           COZEN O'CONNOR
             BY:  BARRY M. KLAYMAN, ESQUIRE
20           BY:  ROBERT W. HAYES, ESQUIRE
             BY:  MATTHEW J. SIEGEL, ESQUIRE
21
                                     For the Plaintiffs
22

23           FOX ROTHSCHILD LLP
             BY:  SETH A. NIEDERMAN, ESQUIRE
24           BY:  ROBERT S. TINTNER, ESQUIRE

25                                   For the Defendant
                                     Adam Potter

1   APPEARANCES CONTINUED:

2           DLA PIPER LLP
        BY:  MATTHEW P. DENN, ESQUIRE
3       BY:  CHRISTOPHER G. OPRISON, ESQUIRE

4               For the Defendant
                Business Insurance Holding, Inc.
5

02:04:42   6           ***  PROCEEDINGS  ***

02:04:42   7           DEPUTY CLERK:  All rise.  Court is now in

02:04:52   8   session.  The Honorable Richard G. Andrews presiding.

02:04:52   9           THE COURT:  All right.  Please be seated.

02:04:54   10          So, this is the time scheduled for the pretrial

02:04:56   11  conference in *The American Institute for Chartered Property*

02:05:03   12  *Casualty Underwriters, et al vs. Adam Potter and Business*

02:05:08   13  *Insurance Holdings.*  Number 19-1600.

02:05:13   14          All right.  So, who's here for the Plaintiff?

02:05:16   15          MR. KLAYMAN:  Good afternoon, Your Honor.  My

02:05:20   16  name is Barry Klayman from Cozen O'Connor.  I'm here with my

02:05:24   17  colleagues, Robert Hayes and Matthew Siegel, both of whom

02:05:30   18  have been admitted pro hac.

02:05:33   19          Mr. Hayes will be the primary spokesperson for

02:05:35   20  the Plaintiffs.

02:05:38   21          THE COURT:  Okay.  Thank you.

02:05:39   22          Mr. Denn.

02:05:42   23          MR. DENN:  Good afternoon, Your Honor.  Matt

02:05:45   24  Denn for DLA Piper representing Defendant, Business

02:05:48   25  Insurance Holdings.  With me today is Chris Oprison from our

02:05:51 1   Miami office, my colleague who I believe you met remotely

02:05:54 2   previously.  And sitting in the back is Mr. Acunto, Stephen

02:05:59 3   Acunto, who is the President and CEO of the Business

02:06:03 4   Insurance Holdings.

02:06:03 5           THE COURT:  All right.  Thank you.

02:06:05 6           MR. NIEDERMAN:  Good afternoon, Your Honor.

02:06:08 7   Seth Niederman from Fox Rothschild on behalf of Defendant

02:06:12 8   Potter.  I'm joined by my colleague, Rob Tintner, out of our

02:06:17 9   Philadelphia office.

02:06:18 10          THE COURT:  Okay.  Thank you, Mr. Niederman.

02:06:20 11          MR. NIEDERMAN:  Thank you, Your Honor.

02:06:27 12          THE COURT:  All right.  So, I read the Proposed

02:06:32 13  Final Pretrial Order.  I read Exhibit K, which was the

02:06:37 14  motion in limine.  And I saw what I -- when I guess I was

02:06:45 15  reading the Final Pretrial Order pretty fast, there was

02:06:48 16  actually two motions in limine in the middle of the text at

02:06:55 17  pages, I think it's 13 to 18.

02:07:01 18          So, I've read them.  I looked and I saw where

02:07:05 19  you said what you were thinking about in terms of witnesses.

02:07:09 20  I had some questions about that.

02:07:10 21          Let me just find the right page.  Yes.  So, the

02:07:33 22  witnesses start on Page 30.  And so, I just wanted to get a

02:07:45 23  sense of who these people are.

02:07:49 24          So, Dr. Meyer, I know her from the Daubert

02:07:53 25  motion.  Do I take it that Harris Devor and Andrew

02:08:01 1  Goodenough are also, for lack of a better word, damages

02:08:06 2  experts?

02:08:07 3          MR. DENN:  Yes, Your Honor.

02:08:08 4          MR. NIEDERMAN:  Yes, Your Honor.

02:08:09 5          THE COURT:  Okay.  And so, one of the things

02:08:17 6  that I, I guess, will have to discuss at the some point

02:08:21 7  today, and this is just an aside for right now, is I don't

02:08:28 8  have a good sense of how much BIH and Potter are arguing the

02:08:35 9  same things and how much they are or how much I guess BIH is

02:08:43 10 shifting blame over to Mr. Potter.

02:08:47 11         Do the Defendants have some amount of joint

02:08:55 12 strategy, or they just oppose each other or what?

02:09:00 13         MR. DENN:  Your Honor, I think it's accurate to

02:09:03 14 say that both Defendants strongly contend that there is no

02:09:06 15 liability.  So, to the extent that there are cross claims,

02:09:10 16 and I think it's also accurate to say that our arguments in

02:09:13 17 that regard are very similar.  There are some differences,

02:09:17 18 but they're not -- those differences are not in conflict.

02:09:21 19 Our cross claims against Mr. Potter are premised on there

02:09:25 20 being a finding of liability, but we both argue that there

02:09:28 21 should be no finding of liability.

02:09:30 22         THE COURT:  Well, I guess in terms of at a trial

02:09:34 23 where everything's up in the air, probably a better way to

02:09:39 24 say it is everything is possible.  Something that might be

02:09:43 25 decided -- is the BIH case against Mr. Potter, is that just

02:09:53 1    going to come out in the overall scheme of things, or is

02:09:55 2    that going to be part of -- is that going to be a separate

02:10:04 3    part while the Plaintiff's just looking on and the two of

02:10:08 4    you are going back and forth?

02:10:09 5              MR. DENN:  Your Honor, would you prefer that I

02:10:10 6    speak from here or at the microphone?

02:10:12 7              THE COURT:  You know, Mr. Denn, that's a good

02:10:14 8    question.  In the post-pandemic days, we've become a lot

02:10:18 9    more laxed on where people speak from.  So, wherever you're

02:10:22 10    comfortable.

02:10:23 11              MR. DENN:  Okay.  Your Honor, if this were a

02:10:25 12    jury trial, I think we probably would have given more

02:10:29 13    thought to trying to separate these issues out.  But, again,

02:10:33 14    subject to my colleagues' input, I think that we would be

02:10:36 15    able to present our cross claims in the course of the

02:10:43 16    Plaintiffs' and Defendants' cases being presented.

02:10:48 17              THE COURT:  So, I understand that answer,

02:10:50 18    Mr. Denn, but I'm trying to get a sense of:  Is this a minor

02:10:56 19    part of what's going to be going on or is this more

02:10:58 20    significant than that?  I recognize that you said you

02:11:04 21    haven't given it all that much thought.

02:11:06 22              MR. DENN:  Well, I'd say certainly very

02:11:08 23    significant to our client just in terms of, you know, how he

02:11:13 24    views the case.  In terms of time allocation, I think that

02:11:16 25    the factual allegations with respect to the cross claims are

02:11:21 1  fairly narrow and involve discussions and communications

02:11:24 2  that happened within a discrete period of time.  So, I would

02:11:29 3  say certainly significant legally, but in terms of, you

02:11:32 4  know, time likely to be taken up as the factual

02:11:36 5  presentation, not as significant.

02:11:39 6           THE COURT:  Okay.  Has there been any discussion

02:11:48 7  between the two Defendants like, for example, when Dr. Meyer

02:11:55 8  testifies, are you expecting that each Defendant is going to

02:12:00 9  cross-examine her --

02:12:03 10           MR. DENN:  Your Honor, one other protocol

02:12:05 11  question which I should have asked at the outset.  Do you

02:12:07 12  mind if Mr. Oprison responds to questions that are --

02:12:11 13           THE COURT:  No, no.  I'm happy to see you

02:12:14 14  responding to questions, but I would be happy to see him,

02:12:16 15  too.

02:12:17 16           MR. DENN:  I would expect that both Defendants

02:12:21 17  would be cross-examining Dr. Meyer, Your Honor.  One issue

02:12:25 18  that I think we noted in the Pretrial Order that we did hope

02:12:28 19  to address, if not today, but then before trial, is whether

02:12:33 20  the Court's ruling on the summary judgment motion might have

02:12:36 21  some further impact on the permissibility of some of

02:12:39 22  Dr. Meyer's testimony.  There were some assumptions that she

02:12:43 23  explicitly made with respect to the one theory that the

02:12:46 24  Court allowed to remain that were based upon an

02:12:50 25  understanding of what the non-compete meant which we think

02:12:53 1   is not consistent with what the Court ruled a non-compete

02:12:56 2   meant.  So, we had hoped to revisit that at some point.

02:12:59 3              THE COURT:  Okay.  All right.

02:13:03 4              So, we can come back to that.  But in terms of

02:13:08 5   the witnesses, besides the three experts, there's

02:13:12 6   essentially a list of people the Plaintiff has said that

02:13:15 7   they intend to call in person.  And for the most part, I

02:13:19 8   don't know who they are, and I would just like to hear what

02:13:22 9   their relevance to the case is in a very general kind of

02:13:27 10  way.

02:13:28 11             Peter Miller.

02:13:29 12             MR. HAYES:  He is the Chief Executive Officer of

02:13:31 13  the Institutes, Your Honor, and generally his testimony will

02:13:34 14  be as to the Asset Purchase Agreement.  The circumstances

02:13:40 15  leading the Institute to acquire the CLM Group, the basis

02:13:44 16  for that, what they expected as a result of acquiring that

02:13:48 17  entity.  And to the extent it's permissible, the

02:13:53 18  understanding of a non-compete.

02:13:55 19             THE COURT:  Okay.  Anne Blume.

02:14:01 20             MR. HAYES:  She was, for most of the time period

02:14:06 21  involved, the CEO of the CLM Group itself, the division

02:14:10 22  of -- now a division of the Institutes.  And she would be

02:14:13 23  expected, as a general matter, to testify as to the impact

02:14:17 24  of -- well, the nature of the CLM, and the impact of the

02:14:23 25  Defendants' competition on it, and the nature of their

02:14:24 1  competition.

02:14:30 2          THE COURT:  All right.  Jeffrey Scheidt.

02:14:32 3          MR. HAYES:  He is the CFO of the Institutes, and

02:14:35 4  he will testify laying some of the groundwork for Dr. Meyer

02:14:39 5  as to the valuation that was made up to determine the

02:14:42 6  purchase price of the CLM Group.

02:14:45 7          THE COURT:  All right.  Jeremy Campbell.

02:14:51 8          MR. HAYES:  He's a -- I don't remember his exact

02:14:54 9  title, but he's an employee with the CLM.  Previously worked

02:14:57 10 with Business Insurance.  And he will testify as to the

02:15:02 11 nature of the business of Business Insurance before the

02:15:05 12 closing and also as to the impact -- the nature of the CLM

02:15:11 13 and the impact of competition.  And we believe he will

02:15:14 14 testify -- that may be one witness that we don't need,

02:15:18 15 depending on how things shake out.

02:15:20 16         THE COURT:  And I'm sorry.  You said something

02:15:21 17 that perhaps I should know this, but I didn't quite catch

02:15:25 18 it.  You said he was once an employee of Business Insurance?

02:15:29 19         MR. HAYES:  Yes.

02:15:34 20         THE COURT:  But he then became an employee of

02:15:40 21 CLM?

02:15:41 22         MR. HAYES:  He left Business Insurance and

02:15:43 23 became an employee of the CLM -- one of the things, for

02:15:47 24 instance, he would testify is while BIH claims it's not

02:15:51 25 competing with the CLM, when he wanted to leave Business

02:15:57 1   Insurance, they inaccurately claimed that they had a

02:16:00 2   non-compete with him and said that his working with the CLM

02:16:04 3   would violate that non-compete.  Of course, that would only

02:16:07 4   be true if they were competitors.

02:16:08 5           So, that's the nature -- some of the nature of

02:16:11 6   the testimony we would expect from Mr. Campbell.

02:16:14 7           THE COURT:  All right.  Keith Kenner.

02:16:16 8           MR. HAYES:  Is an employee of or I guess, is he

02:16:19 9   a former employee?  Current.  He's a current employee of

02:16:25 10  BIH.  And we would expect he would testify as to the nature

02:16:28 11  of the conferences that were held, the plans for future

02:16:32 12  conferences.

02:16:34 13          THE COURT:  And so, if he's an employee of BIH,

02:16:37 14  I take it they agreed to produce him at trial or --

02:16:42 15          MR. HAYES:  That is my understanding, Your

02:16:44 16  Honor.

02:16:44 17          THE COURT:  Okay.  And I'm sorry.  You said --

02:16:52 18  I'm sorry.  I didn't write this down.  An employee of BIH,

02:16:55 19  and the general gist of what he's going to say is what?

02:16:58 20          MR. HAYES:  Is that he will testify as to the

02:17:00 21  conferences and the webinars that BIH held, their plans for

02:17:06 22  future conferences and generally their plans in the future

02:17:10 23  with respect to the subject matter.

02:17:12 24          THE COURT:  All right.  So, I know who

02:17:15 25  Mr. Potter is, and I know who Mr. Acunto is.  And then there

1   is a reference to Katie Kett, and it says "in person or by

2   video."

3   So, first off, I was wondering the "by video,"

4   does that mean by video deposition?

5   MR. HAYES:  What we had in mind, I don't know

6   what Your Honor's preferences are, but I know some courts

7   are allowing if the witness is out of state, not subject to

8   the subpoena power of the Court, to actually set up a video

9   conference to have the testimony.  And if we cannot obtain

10  her voluntary appearance, we would prefer to go that way.

11  If the Court is not amenable to that, it would be like a

12  videotape deposition.

13  THE COURT:  Okay.  And so, the next person, Tina

14  Pernie says in person or by video.  That's the same meaning

15  there?

16  MR. HAYES:  Yes.

17  THE COURT:  Who is Katie Kett?  That is related

18  to?

19  MR. HAYES:  She's a former employee of BIH and

20  will be able to testify as to the conferences.

21  THE COURT:  And Tina Pernie?

22  MR. HAYES:  She's a former employee of the CLM,

23  and again, to the extent necessary, would testify to fill in

24  any gaps as to the operations of the CLM and the impact of

25  the competition.

02:18:35 1         THE COURT: So, the people from BIH who are

02:18:40 2  going to testify about all these conferences, is there a

02:18:46 3  list somewhere of what the conferences are that are the

02:18:54 4  subject of their testimony?

02:18:55 5         MR. HAYES: I don't know if there is presently

02:18:58 6  such a list, but we could certainly provide it to the Court

02:19:01 7  if you would like.

02:19:02 8         THE COURT: Well, how many conferences are we

02:19:03 9  talking about?

02:19:04 10         MR. HAYES: There's multiple conferences.

02:19:06 11  There's the cannabis and hemp conference, the IP conference,

02:19:10 12  the artificial intelligence conference. And I'm going to

02:19:13 13  say conference to mean webinar and or in-person conference,

02:19:17 14  but I lost myself. I lost track. The AI conference.

02:19:24 15  Workmen's patient conference. Long-term care conference and

02:19:29 16  or webinar.

02:19:32 17         THE COURT: And so, these people are going to be

02:19:37 18  introducing: Here's the program in this conference. Here's

02:19:41 19  the program in that conference? I went to that conference.

02:19:44 20  Here's what happened?

02:19:45 21         MR. HAYES: Yes, and we hope to do it within the

02:19:48 22  context of the Court's ruling who the people were there.

02:19:50 23  Who did they target? You know, was there content relating

02:19:55 24  to claim and litigation management? Was this a specialty

02:19:58 25  conference?

02:19:59 1          And these are basically -- putting aside COVID

02:20:03 2   for a second, these are conferences that are annual, planned

02:20:06 3   to be annual events to occur every year as updates of the

02:20:11 4   law or whatever.

02:20:12 5          THE COURT:  Okay.  Where are Katie Kett and Tina

02:20:29 6   Pernie physically located?

02:20:31 7          MR. HAYES:  Your Honor, if I may, Katie Kett is,

02:20:36 8   I believe, in Michigan and Tina Pernie lived in Florida.

02:20:44 9          THE COURT:  Okay.  All right.

02:20:51 10         Thank you, Mr. Hayes.

02:20:54 11         MR. HAYES:  Thank you, Your Honor.

02:20:55 12         THE COURT:  So, Mr. Denn and Mr. Oprison.

02:21:02 13         MR. OPRISON:  Oprison.

02:21:03 14         THE COURT:  Oprison.  Sorry.  So, you have

02:21:05 15   mostly the same people, but you also have Katherine

02:21:09 16   Horowitz?

02:21:09 17         MR. DENN:  We do, Your Honor.

02:21:10 18         THE COURT:  Who is she?

02:21:11 19         MR. DENN:  She is, I believe, a current employee

02:21:15 20   of the Institutes.

02:21:17 21         THE COURT:  And you're calling her to testify to

02:21:19 22   what effect?

02:21:20 23         MR. DENN:  Well, Your Honor, this sort of goes

02:21:24 24   to one of the questions that we have for the pretrial today

02:21:28 25   and applies to some of the witnesses that Mr. Hayes was just

02:21:32 1   listing.  Our intent before the Summary Judgment Order and

02:21:37 2   Opinion came out was to call her as a witness with respect

02:21:39 3   to the intent of the non-compete.  She was the primary

02:21:44 4   person for the Institutes' non-lawyer person negotiating the

02:21:48 5   non-compete.

02:21:50 6            It looks to us like the Court has said exactly

02:21:56 7   what the non-compete means in the course of issuing its

02:22:00 8   summary judgment opinion.  So, we left her in the Pretrial

02:22:04 9   Order and also made some deposition designations in the

02:22:08 10  event that we were mistaken about that.  But if we were

02:22:11 11  correctly reading the Court's language of the summary

02:22:16 12  judgment opinion or there's a sentence that fairly

02:22:18 13  explicitly states what the non-compete means, you know, we

02:22:23 14  would not anticipate needing her testimony.

02:22:26 15           And we also have some -- are not sure about the

02:22:31 16  relevance of some of what the Plaintiff's listed experts

02:22:34 17  would be testifying to if that is, in fact -- again, if

02:22:37 18  we're reading the Court's summary judgment opinion

02:22:40 19  correctly.

02:22:40 20           Your Honor also touched on -- when Your Honor

02:22:46 21  was asking Mr. Hayes about what conferences, how many

02:22:52 22  conferences, et cetera, Your Honor has touched on our first

02:22:55 23  motion in limine which is -- and we can wait to get to that,

02:22:58 24  but --

02:22:59 25           THE COURT:  No, no, no.  I mean, at least when I

14

02:23:09 1   was reading the motions in limine, I wasn't seeing the

02:23:16 2   answer to that question.  And, you know, at the time of

02:23:25 3   summary judgment, it seemed like very limited -- a very

02:23:30 4   limited thing.  And I was wondering, obviously, there was --

02:23:40 5   and so, I had the impression, yes, the Defendant would like

02:23:42 6   to keep it to what was in the summary judgment motion and

02:23:46 7   the Plaintiff, obviously, had some broader scope in mind,

02:23:51 8   but I was trying to get a sense of what that broader scope

02:23:54 9   was.

02:23:58 10          And while we're on that topic, do the experts

02:24:06 11  for the Plaintiff or either of the Defendants in their

02:24:11 12  reports identify -- perhaps the most relevant are Dr. Meyer.

02:24:21 13  Does she identify what conferences she thinks are in

02:24:30 14  violation?  Because it seemed like maybe that would be

02:24:36 15  something factored in, especially to what she thinks the

02:24:39 16  damages are.

02:24:41 17          Does she?

02:24:43 18          MR. HAYES:  So, Dr. Meyer is a damages expert,

02:24:45 19  so she's assuming liability.  And as the Court noted in its

02:24:49 20  ruling on the summary judgment motion, she's just applying

02:24:52 21  the benefit of the bargain.

02:24:54 22          THE COURT:  But, you know, there's a range

02:25:00 23  between -- well, so, I take it she doesn't say anything at

02:25:03 24  all about what she thinks the violation was.  It's just it

02:25:09 25  was violated.

02:25:10 1          MR. HAYES:  She's assuming that the Defendants

02:25:13 2     and claims exchanged are competing against the Institutes in

02:25:21 3     that space, in the space that's prohibited by the

02:25:25 4     restrictive covenant.

02:25:26 5          THE COURT:  But there's kind of a difference if

02:25:28 6     they're competing in that space and they're Amazon or

02:25:32 7     they're competing in that space and they are, you know, a

02:25:37 8     mom-and-pop distributor then on one street corner of the

02:25:42 9     town.

02:25:43 10          MR. HAYES:  And what we would say, Your Honor,

02:25:44 11     is that they're not -- they're certainly not the size of

02:25:48 12     Amazon.  And as with any non-compete, when Mr. Potter was

02:25:53 13     competing, he was uniquely positioned to compete against us

02:25:57 14     because he had all the relationships with these entities.

02:26:00 15          THE COURT:  Right.  But, you know, if you and I

02:26:05 16     are competing law firms, and I take one client away from

02:26:10 17     you, that's one thing.  If I take a hundred clients away

02:26:13 18     from you, that's a different thing.  And I would think the

02:26:16 19     damages from those two things are different.

02:26:19 20          MR. HAYES:  So, but I would say that that's true

02:26:21 21     if you were pursuing a lost profits damages.  And certainly,

02:26:28 22     you know, the extent to which the Defendants are out there

02:26:30 23     competing is relevant to the damage model.  But our position

02:26:35 24     is that they're trying to get as many of these specialty,

02:26:38 25     these conferences as they can get and that they will --

02:26:42 1   their testimony will be in the future.  They -- and the

02:26:44 2   evidence will show that Mr. Potter wanted to develop the

02:26:49 3   same -- use the same business model as he had at CLM and to

02:26:53 4   compete for these types of conferences to draw away spots.

02:26:58 5          THE COURT:  So, in other words, if Dr. Meyer is

02:27:01 6   cross-examined and asked a question of how many conferences

02:27:05 7   have there been in violation -- that were put on in

02:27:13 8   violation of the non-compete agreement, she's going to say,

02:27:17 9   I don't know, but for -- and there's at least one because

02:27:21 10  I'm assuming liability?

02:27:22 11         MR. HAYES:  She -- yeah, I think the more -- the

02:27:26 12  more basis of Dr. Meyer's opinion is the breadth of the

02:27:32 13  competition, not so much what specific conferences to date

02:27:36 14  particularly and looking to the future.  And really she's

02:27:40 15  trying to put herself back in the position of the Institutes

02:27:44 16  when they invested and acquired CLM.  The Institutes -- and,

02:27:50 17  you know, the Defendants dispute this, but our position is

02:27:53 18  that the Institutes assume that there would be no

02:27:56 19  competition, that the CLM has its little niche market and

02:28:01 20  within that niche market it really didn't have any

02:28:04 21  competition.  And it certainly wouldn't have competition

02:28:07 22  from Mr. Potter or from BIH.

02:28:10 23         And so, she's trying to put herself back in the

02:28:13 24  shoes of the Institutes.  And if they were then told that,

02:28:16 25  you know, if you're going to acquire this entity, that guess

02:28:19 1   what, Potter's going to compete against you.  And then BIH

02:28:24 2   is going to compete against you in this sphere, that they're

02:28:27 3   going to assist the relationship manager to start her own

02:28:33 4   entity and start competing against you.  What would you have

02:28:36 5   paid her?

02:28:38 6        And I think very instructive is when I asked

02:28:40 7   that question of Mr. Goodenough, the Defendants' expert, I

02:28:43 8   believe it was that expert, he said, If they had that

02:28:45 9   assumption, they would have never bought this business

02:28:49 10  because, you know, you're not getting what you paid for.

02:28:52 11       And Dr. Meyer will explain it better than I can,

02:28:55 12  but I mean, that's what she's trying to do and say that,

02:28:58 13  Look, we assumed that we're not going to -- we're buying

02:29:02 14  this from Potter.  He's going to get out of the business.

02:29:04 15       THE COURT:  Well, so, if that's the case, then

02:29:13 16  it doesn't matter how many instances of competition you

02:29:19 17  prove.  As long as you prove one, you're good?

02:29:22 18       MR. HAYES:  I would think that it would show

02:29:24 19  that it doesn't -- it's either both what they're doing, what

02:29:28 20  they're planning, what they will do, what their unique

02:29:33 21  advantage is.  I think it's a compilation of all of those

02:29:36 22  factors and not -- it's, certainly maybe that's pertinent,

02:29:40 23  but it's a compilation of all of those factors.

02:29:42 24       THE COURT:  But Dr. Meyer doesn't take that into

02:29:45 25  account?

02:29:45  1          MR. HAYES:  I think she takes into account the

02:29:53  2     inherent advantages that these entities had in competing in

02:29:56  3     this space and that we assume, we would -- we would not face

02:30:01  4     competition from them or from the claims exchanged.  And I

02:30:05  5     don't -- you know, I don't -- I'd have to look back at her

02:30:09  6     report to say exactly what she assumed with the conferences,

02:30:12  7     but I think the thrust of -- that's the opinion.  If you

02:30:14  8     were sitting there before you bought this business, assuming

02:30:17  9     you would go forward with it, what would you have paid for

02:30:21 10     it?

02:30:23 11          THE COURT:  Okay.  All right.

02:30:33 12          Is there some question like by interrogatory or

02:30:37 13     something else that was, you know, along the lines of

02:30:46 14     identify all conferences that were put on in violation of

02:30:51 15     this non-compete clause?

02:30:52 16          MR. HAYES:  Not that I recall, Your Honor, but

02:30:53 17     we went, for instance, in some of -- this was our learning

02:30:58 18     what these folks were doing.  And so that's -- we took the

02:31:03 19     depositions.  We got this information from them.  We took

02:31:05 20     the depositions.

02:31:06 21          THE COURT:  Right.  Okay.  So, Mr. Denn.

02:31:09 22          MR. DENN:  Your Honor, I think this is

02:31:12 23     responsive to your questions.  I was going to hand up copies

02:31:15 24     of our responses to the Plaintiff's Interrogatories and

02:31:21 25     Document Requests fairly early in the case where they asked

02:31:23 1  about future conferences, and we declined to answer and said

02:31:27 2  explicitly that the case was only about the cannabis and

02:31:32 3  hemp, and the other conference that was never held that was

02:31:34 4  mentioned in the Complaint.

02:31:35 5  And there was no motion to compel.  There was no

02:31:40 6  effort that I can recall to get that information.  So --

02:31:42 7  THE COURT:  So, I take it -- so, this probably

02:31:46 8  is relevant, maybe that was mentioned in what I read, but I

02:31:50 9  take it you didn't ask any questions inviting them to expand

02:31:59 10 the case as to what conferences you say are in violation to

02:32:03 11 this.  You left it as the Complaint stated it?

02:32:06 12 MR. DENN:  We asked, Your Honor, at the 30(b)(6)

02:32:09 13 deposition of the Plaintiff's witness.  We actually asked

02:32:12 14 very precisely what acts -- I can't remember if it was

02:32:17 15 events, acts by BIH are alleged to violate the non-compete.

02:32:22 16 And we laid this out in our motion, asked the question very

02:32:25 17 directly.  The 30(b)(6) witness' response --

02:32:28 18 THE COURT:  And the 30(b)(6) witness, what topic

02:32:32 19 was it that --

02:32:40 20 MR. DENN:  I'll pull it out, Your Honor, but I

02:32:43 21 believe it was on this issue.

02:32:44 22 THE COURT:  Well, no, no.  I'm just curious of

02:32:46 23 the issue because while I recognize there was, obviously --

02:32:51 24 well, there was no dispute that reached me.  Whether or not

02:32:54 25 there was some dispute that reached Judge Connolly, I don't

02:32:57  1    know.  But, you know, if you had a 30(b)(6) topic that was

02:33:04  2    along the lines of:  What do you contend constitutes the

02:33:13  3    non-compete in this case, you know, that wouldn't be a very

02:33:22  4    good 30(b)(6) topic.  That would be a good written discovery

02:33:26  5    topic because it would give him a chance to think about what

02:33:28  6    the answer is.

02:33:29  7         But I'm just kind of wondering -- it doesn't

02:33:38  8    strike me that the answer of a 30(b)(6) witness is very

02:33:49  9    persuasive as to what would be limiting on that, but maybe

02:33:57 10    it depends how the question is asked.

02:34:02 11         MR. DENN:  I guess we would ask for the

02:34:04 12    opportunity, Your Honor, to submit that, because the witness

02:34:06 13    was asked multiple times to review the Complaint and to

02:34:12 14    let me, I was taking the deposition, know if there was

02:34:16 15    anything outside of what was in the Complaint that was

02:34:18 16    alleged to have been a violation of the non-compete.  He

02:34:21 17    said no twice.

02:34:23 18         We took a break for lunch.  The witness came

02:34:25 19    back and just before Mr. Potter's attorney began his

02:34:29 20    questioning --

02:34:29 21         THE COURT:  I remember seeing that in some of

02:34:31 22    these papers.

02:34:31 23         MR. DENN:  -- sort of spontaneously offered that

02:34:34 24    she wanted to amend her answer from before lunch, mentioned

02:34:38 25    two events when she spontaneously amended her answer.  And

02:34:43 1    then subsequent to that, I mean, you heard my friend,

02:34:47 2    Mr. Hayes, just list off what sounded like half a dozen

02:34:51 3    additional events in addition to the ones that she

02:34:54 4    mentioned.

02:34:54 5              So, you know, our argument is that the Complaint

02:34:59 6    alleged what it alleged, that, you know, it was clear from

02:35:03 7    our discovery responses very early in the case that we

02:35:06 8    viewed that as being the scope of the dispute.  It was not

02:35:10 9    until this 30(b)(6) deposition that a witness, after first

02:35:14 10   saying there wasn't anything more, recalled two other past

02:35:18 11   conferences.  And now, here we are just a few months later,

02:35:22 12   and the list has dramatically expanded.

02:35:24 13             And we think that's not only a fairness issue,

02:35:27 14   but also, at this point, a futility issue in the sense that

02:35:32 15   Your Honor issued this summary judgment ruling that requires

02:35:36 16   some fairly specific evidence in order to establish that any

02:35:40 17   of these conferences would have violated the non-compete,

02:35:44 18   either with respect to how the advertising was targeted or

02:35:47 19   the substance of the conferences.  And I would be interested

02:35:53 20   to hear -- well, Your Honor probably has other things to do,

02:35:57 21   but I'm -- what I'm interested in doesn't matter, but I

02:36:00 22   think the Plaintiffs would be hard pressed to offer a

02:36:03 23   good-faith proffer that any of the witnesses that they have

02:36:05 24   identified are going to be able to offer any type of

02:36:07 25   detailed testimony about the content of the conferences or

02:36:13  1    about the -- whatever targeting might have been done with

02:36:16  2    respect to the advertising.  So, I think with the summary

02:36:19  3    judgment opinion, on top of everything else, there's also a

02:36:23  4    futility issue at this point.

02:36:24  5         THE COURT:  So, one of the things that I think

02:36:27  6    was submitted with the Proposed Pretrial Order, which I did

02:36:31  7    not look at, was the exhibit list of everybody.  Are there

02:36:39  8    on the exhibit list of the Plaintiff, you know, brochures

02:36:44  9    for all these conferences that Mr. Hayes is now mentioning?

02:36:48 10         MR. DENN:  I think there were brochures, Your

02:36:50 11    Honor, but I do not think they're going to answer the

02:36:52 12    question that Your Honor posed which or the standard that

02:36:55 13    Your Honor established which was whether the substance

02:36:58 14    related to claims in litigation management.  So, there would

02:37:02 15    be -- there, I believe, were panels where claims are

02:37:05 16    mentioned.

02:37:07 17         But as we've stated in our papers, you can't

02:37:10 18    really have a conference about anything involving insurance

02:37:12 19    without mentioning the word claims.  If you're having a risk

02:37:15 20    prevention conference, obviously, you're talking about

02:37:17 21    claims.  So, that fact alone that there is an agenda that

02:37:22 22    could be offered up doesn't meet the standard that the

02:37:24 23    non-compete requires.  And that's why we think there's a

02:37:28 24    futility issue that without more than that, simply the word

02:37:32 25    claim appearing in the title of a panel, somebody saying the

02:37:35 1   word claim in response to a question, that standing alone

02:37:39 2   doesn't violate the non-compete.

02:37:50 3           THE COURT:  So, how many exhibits are on the

02:37:53 4   various parties' lists at this point, just ball park?

02:37:59 5           MR. HAYES:  I think approximately a hundred to

02:38:09 6   120.

02:38:10 7           THE COURT:  A hundred to 120, that's for you

02:38:13 8   all?

02:38:14 9           MR. HAYES:  Yes.

02:38:27 10          MR. NIEDERMAN:  And the same number.  I don't

02:38:28 11  have the numbered list, but judging on the number of pages,

02:38:32 12  I do think there is some overlap.  And the parties have

02:38:35 13  expressed some interest and willingness to put in a joint

02:38:39 14  exhibit list of those exhibits, obviously.

02:38:43 15          THE COURT:  All right.  So, and Mr. Denn or

02:38:50 16  Mr. Oprison.

02:38:51 17          MR. OPRISON:  Oprison.  Yes, Your Honor.

02:38:53 18          THE COURT:  What's your estimate of your number

02:38:54 19  of exhibits?

02:38:55 20          MR. DENN:  Your Honor, we have listed 40, but I

02:38:57 21  think with respect to our exhibits, and I think this is

02:39:00 22  probably even more true for the Plaintiff's exhibits, almost

02:39:04 23  all of ours have to do with the interpretation of the

02:39:08 24  non-compete.  So, to the extent that we leave here today

02:39:10 25  with an understanding that it means what the Court said in

02:39:14 1   the summary judgment opinion, we may have ultimately very

02:39:18 2   few exhibits to enter.  And I think that may also be true

02:39:21 3   for the other parties.

02:39:21 4              THE COURT:  All right.  So, one thing I'd like

02:39:24 5   you to do on exhibits between now and the trial is compare

02:39:33 6   your various lists.  If the Plaintiff has it on their list,

02:39:38 7   then the defense should knock it off their list and use the

02:39:43 8   Plaintiff's numbering.  If both -- but if -- and if both

02:39:49 9   Defendants have it on their list, you need to -- and I'll go

02:39:56 10  with Mr. Potter since he's first named.  If it's on his

02:40:01 11  list, then Business Insurance, there's no reason for you to

02:40:07 12  have a duplicate.

02:40:08 13             So, let's only have one version of any exhibit.

02:40:12 14  Okay?

02:40:14 15             MR. NIEDERMAN:  Yes, Your Honor.  Understood.

02:40:19 16             THE COURT:  All right.  So, Mr. Denn, you said

02:40:37 17  or hinted at at least twice that you'd like to get some

02:40:45 18  legal issue decided, which I am taking to mean or what I

02:40:53 19  think you've said is:  Is what is said in the summary

02:40:58 20  judgment opinion essentially a final interpretation of the

02:41:06 21  non-compete clause such that there's no reason to have any

02:41:13 22  testimony about it because it's not ambiguous; and

02:41:20 23  therefore, there's no reason to be arguing about what people

02:41:24 24  intended or hoped for from either side when the APA was

02:41:35 25  signed.

02:41:36 1          MR. DENN:  That's correct, Your Honor.  And in

02:41:38 2   the pretrial, one of the legal issues listed by the

02:41:41 3   Plaintiffs in the Pretrial Order is that they want to --

02:41:45 4   they want to discuss:  What does that sentence mean?  And

02:41:49 5   that they want to, you know, I guess, have witnesses or

02:41:54 6   testimony about what did that mean?  And the example that

02:41:57 7   they give of what they think it might mean essentially are

02:42:00 8   trying to reargue the issue from the outset.

02:42:04 9          So, they talk about, well, claims of litigation

02:42:07 10  management could mean a conference on risk prevention.

02:42:10 11         THE COURT:  And I'm sorry, Mr. Denn, which page

02:42:12 12  of the Pretrial Order are you pointing me to?

02:42:18 13         MR. DENN:  I'm covered in my stack here, Your

02:42:21 14  Honor.  At Pages 7 and 8.  Mostly Page 8 where it says these

02:42:37 15  terms should be interpreted broadly.  Claims of litigation

02:42:41 16  management means content on the prevention and handling

02:42:44 17  defense or any conference on the subject like workers'

02:42:47 18  compensation that inherently involves those topics.

02:42:50 19         So, under this, you know, a risk prevention

02:42:54 20  conference would be claims of litigation management.  Any

02:42:56 21  conference about workers' compensation, no matter what the

02:42:59 22  substance, would be claims and litigation management.  And

02:43:02 23  this to us appears to just be trying to reargue what the

02:43:07 24  Court has already said.

02:43:09 25         So, you know, we -- the Court's Order wasn't how

02:43:15 1   we interpret the non-compete.  It's not exactly how the

02:43:18 2   Plaintiffs interpreted it, but we think that it is clear as

02:43:21 3   stated.  And so, we think it's certainly a basis to go

02:43:27 4   forward with the trial in a focused way that's going to

02:43:31 5   allow the efficient introduction of evidence with the clear

02:43:35 6   legal standard.

02:43:37 7           THE COURT:  Okay.  Mr. Hayes, do you have

02:43:38 8   anything to say about that?

02:43:39 9           MR. HAYES:  I have two things, Your Honor.

02:43:41 10  First, on the issue of the interpretation so far, the Third

02:43:46 11  Circuit has ruled that you cannot appeal the denial of a

02:43:51 12  motion for summary judgment.  So, you know, and it said,

02:43:54 13  certainly if it's a fact issue, that whatever the judge

02:43:59 14  rules on the summary judgment, you've got to put your

02:44:01 15  evidence on the record to preserve your right for appeal.

02:44:04 16  And it has recognized that that may be different if a judge

02:44:08 17  is making some legal determination as part of that ruling on

02:44:12 18  the motion for summary judgment.

02:44:14 19          But I would submit that on this issue, the Court

02:44:17 20  interpreted the agreement, for purposes of that motion for

02:44:20 21  summary judgment, as it did based on the record it had

02:44:23 22  before it.  The Court will now act as the factfinder, will

02:44:27 23  listen to all the record, all the context.  And that may

02:44:30 24  change the Court's view, and so it should hear that.

02:44:33 25          But even if the Court says, no, my

02:44:35  1    interpretation is my interpretation, and like Mr. Denn, the
02:44:39  2    one thing I think we would agree on, certainly to protect
02:44:42  3    the record, we would want the Court to advise us of that --
02:44:46  4    ask the Court to advise us of that.
02:44:48  5            But the second issue is the Court said, if it
02:44:52  6    has claims and litigation management content, then it's a
02:44:56  7    violation of the non-compete.  You know, and Mr. Denn now
02:45:01  8    argues, well, just because we mention claims, we have to
02:45:04  9    talk about claims because you can't have a content without
02:45:08 10    talking about claims.
02:45:09 11            We would submit that's exactly -- that's why you
02:45:11 12    can't do it.  I mean, you were told -- you said you wouldn't
02:45:14 13    have claims and you won't -- and you should not be permitted
02:45:17 14    to do that.  But certainly if we're going to start battling
02:45:22 15    on what's claims and litigation management, and what does it
02:45:25 16    mean targeting claims and management personnel, targeting,
02:45:29 17    then that's something the Court has to further interpret.
02:45:33 18            And there are no definitions of those phrases in
02:45:36 19    the agreement.  And we do think that that requires an
02:45:40 20    understanding of the underlying background to say:  What did
02:45:46 21    the parties intend when -- if that's what they meant, what
02:45:48 22    did they mean by claims and litigation management?  You
02:45:51 23    know, risk managers are members, as I understand, in the
02:45:55 24    CLM.  And so, that would be a fact saying, okay, if you're
02:45:59 25    addressing risk management which, you know, as a risk

02:46:03 1   manager, you've got to understand what claims are coming

02:46:05 2   out, what kind of incidents are happening.  That, to me, is

02:46:09 3   claims and litigation management.

02:46:10 4           You know, I'm sure they don't agree, but

02:46:12 5   that's -- so, that would be fodder for the Court to decide.

02:46:16 6   I don't think that you've decided it yet, and I do think

02:46:18 7   that that now creates an ambiguity in the agreement that we

02:46:22 8   need oral evidence on, if I'm being clear.

02:46:26 9           THE COURT:  All right.  I understand what you've

02:46:27 10  said, I think.

02:46:28 11          MR. HAYES:  Thank you.

02:46:48 12          THE COURT:  The Pretrial Order, and I'm thinking

02:46:55 13  about Pages 9, 10, 11 and I guess part of 12 has, you know,

02:47:16 14  kind of a bolded Paragraph 4 about entitlement to injunctive

02:47:22 15  relief and bolded Paragraph 5 about entitlement to their

02:47:25 16  attorneys' fees and costs.

02:47:27 17          Is this something that the Plaintiff was

02:47:32 18  expecting to put on trial evidence about?

02:47:35 19          MR. HAYES:  We certainly will put on, I mean,

02:47:40 20  evidence as to the difficulty of measuring the damages which

02:47:43 21  is -- and, you know, we believe it's also kind of a legal

02:47:48 22  issue for injunctive relief for the Court to decide.

02:47:50 23          I would submit that, generally speaking,

02:47:52 24  injunctive relief is something that is commonly entered on

02:47:57 25  enforcement of covenants not to compete.

02:48:00 1          THE COURT:  No, I understand that.  But, again,

02:48:02 2   the question really was:  Is this going to take up trial

02:48:05 3   time with you putting on some evidence about it or is this

02:48:10 4   just part of the relief that you want if you win?

02:48:13 5          MR. HAYES:  I think the first is part of the

02:48:14 6   relief.  The second we will -- I mean, it's a contract, so

02:48:18 7   we have to point the Court to the contract that somebody

02:48:21 8   will briefly discuss the indemnity and other attorneys' fees

02:48:25 9   provision, but I don't think that this will be taken --

02:48:27 10          THE COURT:  So, you're going to put someone on

02:48:30 11   for that, but I take it you're not going to call your

02:48:32 12   bookkeeper and say how much the attorneys' fees are?

02:48:35 13          MR. HAYES:  No, because we would submit, Your

02:48:36 14   Honor, that what's typically done is in the trial, the Court

02:48:40 15   or the factfinder makes a determination if we're entitled to

02:48:43 16   attorneys' fees.  And then after the judgment, we file a fee

02:48:48 17   petition, and then we all go through the fun exercise of

02:48:51 18   determining the reasonableness of those fees.  At least

02:48:55 19   that's how it's always been done.

02:48:57 20          And we cited some cases from Delaware.  It

02:49:00 21   appears to be that way in Delaware as well.

02:49:02 22          THE COURT:  Well, so my experience with

02:49:12 23   attorneys' fees is, you know, in post-trial motions, someone

02:49:20 24   files a motion, says they're entitled to attorneys' fees for

02:49:23 25   one reason or another.  And I think they're supposed to be

02:49:26 1   giving a ball park estimate as to put the other side on

02:49:31 2   notice.  But you're right, then you would determine whether

02:49:33 3   or not there is an award of attorneys' fees, and then you'd

02:49:37 4   start going through the details of trying to figure out

02:49:39 5   exactly how much that is.

02:49:43 6        The one time that I vaguely remember having it

02:49:49 7   be a trial issue in a case that didn't go to trial, it

02:49:53 8   strikes me if it's a trial issue, you need to not only prove

02:49:59 9   your entitlement, but prove how much.  You know, because

02:50:02 10   it's like it's damages.

02:50:04 11        MR. HAYES:  Because attorneys' fees are

02:50:06 12   generally awarded as costs.  Costs are determined at

02:50:12 13   post-judgment, at least that's the rationale that I've seen

02:50:16 14   with what courts have typically done.  Beyond that, I mean,

02:50:20 15   the attorneys' fees are not -- we're not going to -- are not

02:50:22 16   going to be -- they're still running, to put it a different

02:50:28 17   way, you know, through the trial and such.

02:50:30 18        So, you would have to go through that exercise,

02:50:34 19   after trial any way at least, to supplement as to the

02:50:37 20   attorneys' fees.  We can certainly put on --

02:50:39 21        THE COURT:  So, what kind of evidence do you

02:50:40 22   actually put on at trial about attorneys' fees when

02:50:44 23   presumably your entire argument for attorneys' fees is based

02:50:48 24   on contract interpretation?

02:50:49 25        MR. HAYES:  This is the -- you know, I wasn't

02:50:51 1  planning at least to put in the amounts, but that this is

02:50:56 2  what the provision provides.  You know, we hired -- we,

02:51:00 3  obviously, have these lawyers here.  We paid them fees.  You

02:51:04 4  know, we have -- we also had these other costs.  We've

02:51:09 5  incurred experts.  We've had these other types of areas

02:51:11 6  that --

02:51:11 7        THE COURT:  But if you're entitled to costs by

02:51:24 8  contract, it strikes me that that's either an up or down

02:51:30 9  thing.  And what exactly those costs are, as you said,

02:51:33 10  that's a post-trial thing.  So, I'm kind of wondering, since

02:51:37 11  the entitlement to costs is based on the APA and what it

02:51:46 12  says in it, I'm just kind of wondering, other than

02:51:53 13  introducing the APA into evidence, which is going to happen

02:51:57 14  anyhow, just kind of it's kind of dubious that there's

02:52:01 15  really anything more for you to do at trial with regards to

02:52:04 16  that.

02:52:04 17        MR. HAYES:  I don't think it's much more than

02:52:06 18  that, Your Honor.  Simply we have incurred fees, and we're

02:52:10 19  entitled to add costs such as expert fees.  And then I think

02:52:13 20  it's all determined post-trial through affidavits and, as

02:52:18 21  you said, what's the standard rates within the industry.

02:52:22 22        THE COURT:  All right.  Do you all agree that

02:52:24 23  that's the way that that should go?

02:52:26 24        MR. DENN:  Procedurally, that makes sense, Your

02:52:29 25  Honor.  You know, it's -- the contract calls for reasonable

02:52:32 1  attorneys' fees if there's a finding.  And as we noted in

02:52:34 2  the Pretrial Order, you know, I think the word reasonable is

02:52:39 3  important, and it's in the event that there were a finding

02:52:42 4  of liability would require some interpretation by the Court.

02:52:47 5  And particularly, you know, through the prism of how

02:52:50 6  Delaware courts view non-compete agreements.  So...

02:52:53 7           THE COURT:  Does it go the other way?  If you

02:52:55 8  win, do they pay your attorneys' fees?

02:52:57 9           MR. DENN:  Sadly, no, Your Honor.  Although, if

02:53:02 10  the -- well, no.

02:53:03 11           THE COURT:  No, no.  I'm not inviting.

02:53:07 12           MR. DENN:  Right.  On the other, Your Honor, on

02:53:10 13  the injunctive relief, we agree that that is not an issue

02:53:15 14  that should require a lot of additional fact testimony at

02:53:21 15  trial.  We do, however, think that it's an issue that can be

02:53:23 16  resolved before trial in the sense that the Plaintiff can't

02:53:28 17  claim monetary damages as it has through Dr. Meyer and

02:53:33 18  irreparable harm simultaneously.  And there's case law that

02:53:37 19  we cited in the pretrial, Proposed Pretrial Order to that

02:53:40 20  effect.  There's a couple cases cited by the Plaintiff, but

02:53:43 21  I don't believe that either of those cases involved a

02:53:45 22  simultaneous claim for money damages and for a permanent

02:53:49 23  injunction.

02:53:49 24           So, we think that the law is pretty clear and

02:53:53 25  allows the Court, even before trial starts, to say that you

02:53:56 1    can't -- having made a claim for monetary damages.  And as

02:54:00 2    the Court's aware, we think it's --

02:54:02 3                THE COURT:  So, what if I find that you're

02:54:04 4    liable to say they didn't prove the monetary damages?

02:54:09 5                MR. DENN:  We think they have to make a choice,

02:54:10 6    Your Honor, as to how they go forward.

02:54:12 7                THE COURT:  It seems to me that if they do have

02:54:15 8    to make a choice, it would be fairer to see how the first

02:54:19 9    choice works out before saying you can't get your second

02:54:22 10   choice.  Don't you think?

02:54:24 11               MR. DENN:  We think that they can't make the --

02:54:28 12   they cannot make -- that they have to make a choice at the

02:54:30 13   outset, Your Honor, but obviously, you know, again, this is

02:54:32 14   a bench trial, and the Court certainly is capable of making

02:54:36 15   the transition, if necessary.

02:54:38 16               THE COURT:  All right.  So, let's just talk

02:54:52 17   about these motions in limine a little bit.

02:54:58 18               So, they're all brought by the Defendants.  I

02:55:02 19   thought two of the three sounded like the Potter version and

02:55:07 20   the BIH version.  I don't think there was that much

02:55:11 21   difference, but I could be wrong about that.

02:55:13 22               So, Mr. Hayes, the first one basically is based

02:55:19 23   on this idea that your Complaint identified -- well, the

02:55:28 24   Defendant says two events violating the APA.  And

02:55:35 25   essentially that you never did anything certainly to specify

02:55:43 1    other violations in any kind of -- well, first, in any kind

02:55:53 2    of pleading standard, or by pleading or really anything else

02:56:00 3    that counts.

02:56:01 4         What do you have to say about that?

02:56:03 5         MR. HAYES:  Your Honor, I do -- the Complaint

02:56:05 6    was filed at the time in -- I think the Amended Complaint

02:56:11 7    was filed in March of 2020, if I'm not mistaken.  And the

02:56:16 8    allegations were that they -- has leverage -- that Potter

02:56:21 9    has leveraged the experience he gained while he owned the

02:56:23 10   seller's businesses to build Business Insurance as an

02:56:26 11   alternative competitor to CLM in direct contradiction to the

02:56:30 12   non-compete.

02:56:30 13        We made general allegations that they were --

02:56:33 14   that these -- through these conferences, they were directly

02:56:36 15   competing with us.  And we specifically identified the two

02:56:40 16   conferences that either had marketed or occurred at that

02:56:44 17   time.  But I think certainly the general allegation that

02:56:48 18   you're competing against us in violation of the non-compete

02:56:51 19   puts the Plaintiff -- Defendants, pardon me, on notice that

02:56:55 20   any of these conferences are deemed violative, any

02:57:01 21   conference like these is deemed violative of the

02:57:04 22   non-compete.

02:57:05 23        In discovery, while we didn't challenge their

02:57:09 24   interrogatory answer, we went out and we took the

02:57:11 25   depositions of Mr. Potter.  We got documents from them as to

02:57:14 1   what they were doing.  We took the deposition of Mr. Acunto

02:57:17 2   and obtained documents from BIH.  We specifically took

02:57:21 3   depositions of Ms. Kett, Mr. Kenner, as the marketers and

02:57:25 4   people directly involved with these conferences to tell us

02:57:29 5   exactly what they were doing.

02:57:30 6          We obtained the -- we monitored all their

02:57:33 7   websites to find out exactly what they were putting on the

02:57:36 8   market, what they were doing.  This was all discovery that

02:57:38 9   was done.  What we did obtain, we turned over to them.  I

02:57:42 10  don't think that there was any question in this case that

02:57:44 11  they knew that we were going after more conferences than

02:57:46 12  just these two.  I mean, you're not going to bring this

02:57:50 13  entire lawsuit on just two, two conferences.

02:57:53 14         And then as to the 30(b)(6) witness, I objected

02:57:59 15  to those questions on the ground that they were beyond the

02:58:01 16  scope of the 30(b)(6).  And there was motion practice before

02:58:06 17  the Magistrate Judge on the 30(b)(6) notice because it was

02:58:10 18  so broad, and the Court narrowed their notice.

02:58:13 19         And then the question that was asked of the

02:58:15 20  witness, Ms. Blume was, you know, does the Complaint

02:58:20 21  identify all the conferences you claim violate it in the

02:58:24 22  non-compete?  And she said, Yes.  She thought about it

02:58:28 23  over -- that was the last question before the lunch break.

02:58:30 24  She thought about it over the lunch break.  She did not talk

02:58:33 25  to anyone about the case, and she didn't talk to me at all.

02:58:37 1          THE COURT:  Well, I take it that's not actually

02:58:39 2  an issue.

02:58:39 3          MR. HAYES:  Okay.  And then she came back in and

02:58:42 4  said, I just -- I was confused by your question.  I want to

02:58:46 5  make sure we're clear.  I believe the Complaint identifies

02:58:49 6  other conferences, but the ones that are specifically

02:58:52 7  identified are, you know, beyond that.  Here are these other

02:58:56 8  conferences.  And she identified those that she could

02:58:58 9  remember at that point in time.

02:59:00 10          And it strikes me that Mr. Denn asked what

02:59:03 11  conferences you claim violate the covenant.  He must have

02:59:07 12  known or at least believed that there were other conferences

02:59:10 13  beyond those set forth in the Complaint.  And so, they

02:59:14 14  never -- and they never -- they're admitting they never

02:59:17 15  asked those interrogatories of what conferences we say

02:59:20 16  compete.  The discovery was going full bore without any

02:59:23 17  objections you're going beyond.  All these questions were

02:59:26 18  asked.  Documents were produced about how Mr. Potter, you

02:59:32 19  know, with -- something that always stuck in my mind is has

02:59:36 20  he gone mad because he wants -- they wanted to do all these

02:59:39 21  additional conferences.  And his whole game or game plan, I

02:59:43 22  should say, was he wanted to pump up the value of Business

02:59:47 23  Insurance so he could sell that, which is -- which he did

02:59:49 24  sell it to Mr. Acunto or his company, Beacon

02:59:55 25  Intercontinental.

02:59:56 1          So, we've alleged it.  It was the subject of

02:59:58 2  extensive discovery.  The Defendants knew what we were

03:00:00 3  alleging here, and we should be able to put on that

03:00:05 4  evidence.

03:00:10 5          MR. DENN:  Your Honor, to the extent that the

03:00:13 6  Court thinks that either the topics listed in the 30(b)(6)

03:00:17 7  notice or the exact language used by the witness are

03:00:20 8  material, we would request to be able to submit them because

03:00:24 9  I respectfully disagree with the characterization of what

03:00:28 10  she said.  She didn't say she was confused.  I think that

03:00:31 11  the papers say that she said the question was ambiguous.

03:00:34 12  She didn't say the question was ambiguous.  I think her

03:00:36 13  exact quote was she had a fleeting moment.

03:00:40 14          But, regardless, Your Honor, yes, we did ask:

03:00:44 15  Was there anything -- we asked her:  Were there any events

03:00:48 16  that BIH organized that she believed violated the

03:00:51 17  non-compete other than what was in the Complaint?  As I

03:00:54 18  indicated, she first indicated no.  After being asked the

03:00:57 19  question multiple times, and then gave the answer she gave

03:01:01 20  after lunch.

03:01:02 21          But to the extent the Court thinks that the

03:01:03 22  specific language is important, we're very confident that it

03:01:06 23  supports our version, and we would ask for the opportunity

03:01:09 24  to submit it.  But even having said that, Your Honor, even

03:01:12 25  after she augmented her answer, she identified, as best I

03:01:15 1   can understand her answer, two other events.  And we're now

03:01:19 2   being asked to litigate a case involving, I lost count at

03:01:23 3   some point, but some multiple of that, six, eight.  I don't

03:01:26 4   know what the number is now.

03:01:27 5        So, even if we take as a given that the 30(b)(6)

03:01:31 6   witness was permitted to effectively amend the Complaint

03:01:36 7   through her testimony, we're still way beyond that.  And as

03:01:40 8   I said earlier, Your Honor, there is this futility issue

03:01:44 9   because the requirement that is established by the Court's

03:01:48 10  summary judgment opinion as to what has to be offered to

03:01:50 11  show a breach, the Plaintiffs -- again, I would be

03:01:57 12  interested to hear a proffer otherwise, but I do not believe

03:01:59 13  that any of the witnesses that they have identified in any

03:02:02 14  admissible form can offer the content of any of these

03:02:05 15  additional conferences, nor can they offer any specific

03:02:10 16  information about the targeting of the advertising for these

03:02:13 17  specific conferences.

03:02:14 18       So, on top of the fairness issue and the notice

03:02:16 19  issue, there's just a futility issue which is one of the

03:02:19 20  standards that the Court looks to when it's deciding whether

03:02:23 21  to allow a party to amend the Complaint which is effectively

03:02:27 22  what the Plaintiffs are requesting.

03:02:31 23       THE COURT:  All right.  Thank you, Mr. Denn.

03:02:33 24       Hold on a minute.  So, do both of you agree that

03:03:26 25  the main factual basis for me making a ruling on this would

03:03:33  1    be whatever the allegations in the Amended Complaint are

03:03:39  2    about future events, so to speak, the deposition topic that

03:03:50  3    the Rule 30(b)(6) was noticed on or how it was described in

03:03:54  4    the Rule 30(b)(6) notice.  Then the actual transcript of the

03:04:00  5    relevant portions of the Blume deposition, I guess before

03:04:05  6    and after lunch.

03:04:09  7         Is there anything else that I would need that I

03:04:16  8    should have in terms of ruling on this?

03:04:19  9         MR. HAYES:  Just, Your Honor, the amount of

03:04:22 10    discovery, for instance, the depositions of Mr. Potter,

03:04:27 11    Kinder and Kett as they were asked questions about these

03:04:30 12    conferences.  That's how we got this information of what

03:04:32 13    they were doing where.

03:04:33 14         THE COURT:  So, yeah, but, you know, the problem

03:04:35 15    with just depositions is it's not really how you give

03:04:43 16    notice.  And it occurs to me actually, then there would be a

03:04:46 17    fourth thing is I guess your interrogatory answer where you

03:04:51 18    said, We understand it to be just this.

03:04:54 19         So, can you all agree between yourselves and

03:05:00 20    submit me just a one-page letter that has attached to it not

03:05:06 21    the whole Complaint, not the whole deposition, just what you

03:05:10 22    agree are the pages that give me enough context so I can

03:05:13 23    look through a relatively small stack of papers and see what

03:05:17 24    I think about this?  And so, it would have those four

03:05:20 25    things, the Amended Complaint, the topics, the deposition

03:05:24 1  transcript, and the interrogatory answer by the Defendant or

03:05:32 2  Defendants.

03:05:32 3            MR. DENN:  Yes, Your Honor.  We can do that.

03:05:34 4  Just so I'm clear, when you say "the deposition transcript,"

03:05:36 5  you're talking specifically about Ms. Bloom's deposition,

03:05:38 6  the 30(b)(6) witness?

03:05:39 7            THE COURT:  Yes, where you addressed her on the

03:05:43 8  things you mentioned earlier.  Do you think maybe you can

03:05:47 9  get them in by Wednesday of next week?

03:05:49 10           MR. DENN:  We should be able to do that.

03:05:51 11           MR. HAYES:  Your Honor, could we also add into

03:05:53 12 that the 30(b)(6) notice itself and the Magistrate Judge's

03:05:57 13 ruling?

03:05:57 14           THE COURT:  Did the Magistrate's ruling address

03:05:59 15 this?

03:06:01 16           MR. HAYES:  The scope of the 30(b)(6).

03:06:02 17           MR. DENN:  I don't know that there -- I could be

03:06:04 18 mistaken.  I'm not sure if there's a transcript.  I have no

03:06:07 19 objection if there is a transcript.  I just don't recall.

03:06:09 20           THE COURT:  Well, if there's a Magistrate Judge

03:06:12 21 ruling that's relevant to this, yes, you can put that in.

03:06:16 22 Was this a -- this is Judge Hall.  So, if there was a

03:06:20 23 ruling, it's probably a verbal ruling.  Okay.

03:06:25 24           Well, in any event, and in the cover letter that

03:06:30 25 comes with it, because it may or may not be obvious to me,

03:06:34 1   identify which deposition topic it is that this fell under.

03:06:40 2   You know, I don't want argument.  I mean, it actually is

03:06:43 3   most helpful if you said in the cover letter, It's these

03:06:46 4   paragraphs of the Amended Complaint, this deposition topic,

03:06:52 5   and these pages of the deposition transcript, and this

03:06:57 6   interrogatory.  So, not only do I have the paper, but I have

03:07:00 7   a list to make sure that I can see that what I'm looking at

03:07:03 8   is what I'm supposed to be looking at.

03:07:05 9            All right.  So, I will get back to you on motion

03:07:09 10  in limine number one.

03:07:12 11           So, maybe I was a little less clear.  There's

03:07:20 12  less than two pages about the non-solicitation provision.

03:07:26 13  That's Pages 17 and 18 of the Pretrial Order.

03:07:33 14           What is your argument here, Mr. Denn?

03:07:35 15           MR. DENN:  Our argument, Your Honor, is that the

03:07:39 16  Amended and Supplemental Complaint as written very

03:07:42 17  specifically carves BIH as a party out of that particular

03:07:47 18  allegation.  And particularly, if you compare it to the

03:07:52 19  original filed Complaint, there are the -- this Amended

03:07:56 20  Complaint.  The Complaint was amended to add BIH as a party.

03:07:59 21  We were not initially a defendant.

03:08:01 22           And the Plaintiffs went through the Complaint,

03:08:05 23  went through the original Complaint and in a fairly targeted

03:08:09 24  way added allegations against BIH to certain portions of the

03:08:14 25  Complaint and left other portions of the Complaint only.

03:08:17  1          THE COURT:  So, your argument here is they never

03:08:20  2   said BIH is violating the non-solicitation provision?

03:08:24  3          MR. DENN:  Correct.  And unlike the discussion

03:08:26  4   that we just had, Your Honor, about the other conferences,

03:08:32  5   the very first that we're getting any hint that there's an

03:08:35  6   allegation that BIH is being accused as a party of violating

03:08:39  7   the non-solicitation is in the Plaintiff's summary judgment

03:08:42  8   papers.

03:08:43  9          So --

03:08:44  10         THE COURT:  Okay.  So, hold that thought.  So,

03:08:46  11  Mr. Hayes, your response in the motion in limine --

03:08:52  12         MR. HAYES:  Is that we specifically allege that

03:08:55  13  Potter was acting on their behalf.  That he, Defendant

03:08:58  14  Potter, solicited the law firm and or induced it to serve as

03:09:02  15  the founding partner of the conference referring to the

03:09:05  16  cannabis and hemp conference.

03:09:07  17         THE COURT:  Well, so, I forget how exactly the

03:09:17  18  Amended Complaint is laid out in terms of what's written.

03:09:21  19  Is there a separate count that says Potter violated the

03:09:26  20  non-solicitation agreement or is that just under general

03:09:31  21  breach of contract?

03:09:33  22         MR. HAYES:  I think there's one count for breach

03:09:37  23  of contract, but we specifically alleged that the

03:09:44  24  Defendants -- we repeatedly refer to the Defendants'

03:09:46  25  violation, and we specifically addressed in part of the

03:09:49 1   common allegations the violation of the non-solicitation

03:09:53 2   clause.  And in that section, if I'm recalling correctly,

03:09:57 3   and I'm looking for verification here, in that specific

03:10:01 4   section, we alleged that Potter solicited the law firm for

03:10:05 5   that conference.  Potter was acting for BIH.  Right.  BIH

03:10:13 6   was the entity that put on the conference.

03:10:24 7            THE COURT:  All right.  So, if I look at the

03:10:28 8   Amended Complaint, Paragraph 94, I will either agree with

03:10:30 9   you or not agree with you, and that will resolve the matter?

03:10:34 10           MR. HAYES:  Yes, I believe so, and also to our

03:10:36 11  repeated reference to Defendants' violations of the

03:10:39 12  non-compete.

03:10:43 13           THE COURT:  All right.  Well, I will look at

03:10:46 14  that, and I don't think I need anything more from you on

03:10:49 15  that.

03:10:51 16           All right.  Then, we also have motion in limine

03:11:07 17  K which has to do with the Waggy Group, and it also has to

03:11:18 18  do with the C & E business.  And what I think I said in the

03:11:29 19  motion for summary judgment and, in fact, it's quoted by, I

03:11:32 20  guess, the Defendant, there are multiple businesses sold to

03:11:37 21  Plaintiff in the APA, but in this litigation Plaintiffs are

03:11:40 22  only concerned with CLM's business.

03:11:43 23           So, Mr. Hayes, was that a misstatement on my

03:11:47 24  part or was that right?

03:11:49 25           MR. HAYES:  I think it was a statement that was

03:11:52 1   made within the context of the issues that were raised on

03:11:55 2   the summary judgment motion.  And that's --

03:11:58 3           THE COURT:  So, you're saying it's accurate

03:12:01 4   based on what was presented and heard in the summary

03:12:05 5   judgment, but the summary judgment was not the whole case,

03:12:08 6   and so it doesn't limit the whole case?

03:12:13 7           MR. HAYES:  That's correct, Your Honor.

03:12:15 8           THE COURT:  All right.  What do you all have to

03:12:17 9   say?

03:12:20 10          MR. TINTNER:  Your Honor, the reason it wasn't

03:12:21 11  raised on the summary judgment motion is our first notice

03:12:23 12  that Waggy Group was even an issue in this case was when we

03:12:26 13  received the draft pretrial with those facts.  It's not

03:12:30 14  mentioned in the Complaint or the Amended Complaint

03:12:34 15  anywhere.  There was no discovery taken on the issue.  And,

03:12:36 16  frankly, we would have moved for summary judgment if we

03:12:39 17  thought that was an issue.

03:12:41 18          The reference in the amended paragraph in,

03:12:45 19  excuse me, the Amended Complaint that they reference says,

03:12:48 20  In organizing and promoting the BI conferences, Defendants

03:12:51 21  have breached the restricted covenants.  That says nothing

03:12:55 22  about commissions for hotels or anything having to do with

03:13:00 23  sort of the background.

03:13:02 24          And I will tell Your Honor that the Waggy Group,

03:13:05 25  the Plaintiffs are fully aware that Mr. Potter formed the

03:13:09 1   Waggy Group.  They asked him to change the name and to

03:13:11 2   create the Waggy Group.  And there's been back and forth in

03:13:14 3   the last three years about the payment of commissions that

03:13:16 4   are owed to the CLM.

03:13:18 5           So, this isn't something that they learned

03:13:20 6   during the course of discovery.  But what they did is they

03:13:23 7   added allegations into the facts in the pretrial that would

03:13:27 8   suggest that somehow they're going to put evidence or this

03:13:29 9   is going to be an issue that the Court should consider.

03:13:32 10  We've had absolutely no notice of that.  And we are

03:13:36 11  prejudiced, and we would tell the Court that we would have

03:13:39 12  taken discovery, and we would have moved for summary

03:13:41 13  judgment.  And we did expect --

03:13:43 14          THE COURT:  Well, so, you know, you would have

03:13:45 15  moved for summary judgment.  I mean, it was on a meritless

03:13:50 16  claim.  Presumably it would come out the same, regardless

03:13:54 17  whether you did or you didn't move for summary judgment.

03:13:56 18  But what discovery would you have taken?

03:14:01 19          MR. TINTNER:  What the allegations are.  There's

03:14:03 20  nothing in the Amended Complaint about it.  We would have

03:14:05 21  called witnesses to say, you know, what are you asking?

03:14:07 22  What are you saying that we violated through the Waggy

03:14:10 23  Group?  What is it?

03:14:11 24          THE COURT:  And I'm sorry, when you say "we,"

03:14:13 25  maybe I got things --

03:14:14 1          MR. TINTNER:  Mr. Potter.  I'm sorry.  It only

03:14:16 2  relates to Mr. Potter.

03:14:17 3          THE COURT:  Okay.  So, actually you're Potter's

03:14:19 4  counsel.  You're BIH's counsel?

03:14:21 5          MR. TINTNER:  Correct.

03:14:22 6          THE COURT:  All right.  So, Mr. Potter created

03:14:28 7  the Waggy Group at some point.

03:14:30 8          MR. TINTNER:  Immediately after the --

03:14:32 9          THE COURT:  And so, you would need to take

03:14:34 10  discovery.  Presumably, you don't need to take discovery

03:14:37 11  from the Waggy Group --

03:14:38 12          MR. TINTNER:  Correct.

03:14:39 13          THE COURT:  -- because that's essentially your

03:14:41 14  client; right?

03:14:41 15          MR. TINTNER:  Right.

03:14:43 16          THE COURT:  So, what is it you would need to do?

03:14:45 17          MR. TINTNER:  We would need to take discovery

03:14:47 18  into the allegations that they have inserted into the

03:14:49 19  pretrial.  We've never -- there were no responses to

03:14:50 20  interrogatories or document requests.  There was nothing in

03:14:53 21  the --

03:14:54 22          THE COURT:  Well, so give me -- maybe it's in

03:14:55 23  the motion, but give me an idea of something that they're

03:15:00 24  now -- so, they're claiming Waggy booked hotel rooms.

03:15:04 25          MR. TINTNER:  Correct.

03:15:04  1          THE COURT:  Isn't that the kind of thing that

03:15:06  2    you, as the lawyer who represents the owner of Waggy, can

03:15:13  3    figure out whether or not it did or did not book hotel

03:15:16  4    rooms?

03:15:17  5          MR. TINTNER:  Well, it's not that they booked

03:15:18  6    hotel rooms or didn't book hotel rooms.  It's whether they,

03:15:22  7    in doing something for BIH, which was, remember,

03:15:25  8    Mr. Potter's company until September of 2019, whether that

03:15:28  9    somehow violated the restrictive covenant.  That would be

03:15:31 10    the issue.

03:15:32 11          We don't believe, obviously, that it did.  We

03:15:34 12    don't believe that there's anything --

03:15:37 13          THE COURT:  No, I get that you don't, but I

03:15:38 14    guess what I'm having trouble understanding is they say

03:15:42 15    Mr. Potter did stuff as through BIH and Waggy or something

03:15:49 16    along those lines.  And your client, obviously, knows more

03:16:02 17    or less what it is he did or he didn't do.  If they have

03:16:10 18    documents that they obtained from you that purport to be

03:16:13 19    actions of his, presumably he knows what they mean.

03:16:20 20          MR. TINTNER:  But --

03:16:20 21          THE COURT:  So, do you understand why I'm having

03:16:23 22    trouble?

03:16:24 23          MR. TINTNER:  I do, except that we've never been

03:16:26 24    able to test those allegations or ask -- never, obviously,

03:16:29 25    listed as a topic for the 30(b)(6).  It was never something

03:16:32  1    that we pursued in discovery at all.

03:16:36  2            THE COURT:  Well, tell me, if you asked a

03:16:37  3    30(b)(6) witness, what would you ask them about the Waggy

03:16:40  4    Group?  I mean, presumably they have nothing to do with

03:16:43  5    whatever it was the Waggy Group was doing.

03:16:46  6            MR. TINTNER:  How did those commissions compete

03:16:48  7    with something that C&E Management was doing at the time

03:16:57  8    that C&E Management, among others -- obviously, there would

03:16:58  9    be more that we would test.  And, obviously, they're

03:17:01 10    referencing -- they don't even tell us the conferences that

03:17:03 11    they claimed that he supported with, you know, hotels or

03:17:07 12    whatever that would compete.  We don't even know that

03:17:10 13    information.  That's not even listed in the paragraphs that

03:17:13 14    they included.

03:17:18 15            THE COURT:  So, Mr. Hayes, how does the Waggy

03:17:49 16    Group -- because I noticed in your answer, you italicized

03:17:54 17    the word *organizing*.  If putting on the conferences is a

03:17:58 18    violation, why do you get any extra points for booking hotel

03:18:07 19    rooms for those conferences?

03:18:09 20            MR. HAYES:  It's just -- I think I alluded to

03:18:11 21    this earlier when we were discussing Dr. Meyer's testimony.

03:18:15 22    It just -- it shows that what -- after selling the CLM to

03:18:22 23    the Institutes for approximately $20 million, Mr. Potter set

03:18:27 24    about to recreate that exact same structure, that same exact

03:18:32 25    business plan.  He had BIH doing, you know, the substance.

03:18:36 1   He has -- now, he has Waggy going out there and, you know,

03:18:39 2   booking the venues and booking the hotel rooms.

03:18:43 3       And we're not asking for commissions on the

03:18:46 4   hotel rooms, and we're not -- as to damages.  It's just

03:18:49 5   simply to show with a bunch -- with a good deal of other

03:18:54 6   evidence that this was just not isolated instances, that

03:18:59 7   what Mr. Potter was trying to do was recreate the CLM in

03:19:04 8   violation of the restrictive covenant.  And I think that's

03:19:07 9   the purpose for which it's offered, and I think --

03:19:10 10       THE COURT:  So, you imagine it to go like this,

03:19:14 11   you call Mr. Potter as an adverse witness.  You ask him some

03:19:18 12   questions about the cannabis conference or, you know, some

03:19:23 13   of these other conferences you've mentioned.  And then you

03:19:26 14   say, Did you conclude Waggy Group also offered to book hotel

03:19:30 15   rooms for these conferences?  And you expect he would say

03:19:33 16   yes, and then you prove what you need to prove?

03:19:36 17       MR. HAYES:  Yeah.  I mean, I would -- and my

03:19:38 18   question would be even more, without telegraphing it, is

03:19:40 19   that, Now, you set up the CLM.  It was -- you had the CLM

03:19:44 20   that did the content, did the marketing.  You had C&E do the

03:19:48 21   hotel rooms, and this is exactly how you set up the

03:19:51 22   structure; right?  Yeah.

03:19:52 23       Now, when you set it up, you took BIH, and you

03:19:55 24   moved it from being just primarily a publication entity, and

03:19:59 25   you're setting up the same structure; right?  You have --

03:20:03 1    now, BIH is going to do the conferences.  You set up Waggy

03:20:05 2    to do the booking the hotel rooms, to get the venues.  You

03:20:09 3    have the same -- exactly what you sold to the Institutes for

03:20:13 4    $20 million, you're trying to recreate.

03:20:16 5            That, to me, I would submit to the Court is the

03:20:18 6    relevance of what we're trying to prove here.  We're not

03:20:21 7    asking for accountings of commissions on hotel rooms or

03:20:25 8    venues.

03:20:32 9            THE COURT:  Okay.  The point that Mr. Tintner

03:21:01 10   made that you never said anything to indicate that Waggy's

03:21:11 11   actions were in violation of the non-compete, that

03:21:18 12   essentially Waggy doesn't appear anywhere in any pleading or

03:21:21 13   other piece of paper filed in this case before the Pretrial

03:21:28 14   Order, what's your response to that?

03:21:33 15           MR. HAYES:  I don't know that we identified

03:21:35 16   Waggy because it's not a party.  And the covenant not to

03:21:39 17   compete not only required Potter to comply, but then it

03:21:44 18   causes his affiliates to comply.  And the claim is against

03:21:48 19   Potter, you know, and that's why it was alleged in that

03:21:53 20   matter.

03:21:54 21           THE COURT:  And so, when Mr. Tintner says the

03:21:58 22   first you expressly said that something involving Waggy was

03:22:03 23   a violation was in the preparation of the Pretrial Order, is

03:22:07 24   that pretty much correct?

03:22:08 25           MR. HAYES:  I think that's probably the

03:22:10  1    first time we used the word Waggy, but we didn't focus on

03:22:13  2    the organization of the conferences.  We specifically

03:22:17  3    challenged that as a violation by Potter.  And I think that,

03:22:22  4    again, it is known as Waggy.  We're not required --

03:22:27  5              THE COURT:  Well, so, in terms of the organizing

03:22:31  6    of the conferences, and there you cite Paragraph 153 of the

03:22:54  7    Complaint.

03:22:54  8              MR. HAYES:  Right.

03:23:07  9              THE COURT:  All right.  Hold on a minute.

03:23:12 10              MR. HAYES:  And then Section 612.3 of the

03:23:15 11    agreement expressly addresses the booking of conferences.

03:23:19 12              THE COURT:  Yeah, I don't think -- right.  All

03:23:26 13    right.  Well, I will look at that.  I take it with the

03:23:31 14    understanding that the first time you ever said Waggy in

03:23:43 15    terms of saying anything in the pleadings that would give

03:23:47 16    notice that Waggy was involved in the case is in the

03:23:50 17    preparation of the Pretrial Order, but your position is

03:23:54 18    essentially that Docket Item 48, Paragraph 153 of the

03:24:06 19    Complaint in this pleading is broad enough to cover anything

03:24:15 20    that Mr. Potter did in terms of organizing C&E business or

03:24:22 21    anything else because the APA said -- you know, I don't

03:24:31 22    think the relationship of the APA is that issue so much, but

03:24:34 23    that's it basically.  There's your notice and that's

03:24:39 24    really -- if I look at that, I'll pretty much be able to

03:24:44 25    figure it out, one way or the other?

03:24:46 1        MR. HAYES:  Yeah, the reason we generally

03:24:48 2   alleged -- pursuant to notice pleading in the Complaint, in

03:24:51 3   the pretrial statement we were alleging the evidence we were

03:24:55 4   going to put in.  So, we specifically referred to Waggy.

03:24:58 5        THE COURT:  Okay.

03:24:59 6        MR. TINTNER:  Your Honor.

03:24:59 7        THE COURT:  Did you have something more,

03:25:01 8   Mr. Tintner?

03:25:01 9        MR. TINTNER:  Yeah, if you don't mind.  I mean,

03:25:03 10   the idea of organizing a conference is not what is being

03:25:07 11   described by getting the hotels and all of that.  That's

03:25:10 12   scheduling the conferences.  It's not organizing the

03:25:13 13   conferences.  Organizing the conferences is planning and

03:25:16 14   promoting the conferences.

03:25:18 15        MR. TINTNER:  So, it is not read to be that.

03:25:20 16   There's nothing in the disclosures, nothing in the discovery

03:25:22 17   responses.  There's nothing.  Waggy Group is not mentioned.

03:25:26 18   Your Honor was correct when you said the first time we

03:25:28 19   received any notice that anything through Waggy Group, which

03:25:31 20   is obviously a different entity and a different company, was

03:25:35 21   when we received the pretrial.

03:25:38 22        Thank you.

03:25:45 23        THE COURT:  All right.  Well, so I will get this

03:25:48 24   thing on the first motion in limine from you about Wednesday

03:25:52 25   of next week.  I will take the other two under advisement,

03:25:55 1  and I will attempt to get out some Order hopefully by Friday

03:26:01 2  of next week telling you what I think about all of those.

03:26:04 3           All right.  So, basically I don't want to have

03:26:29 4  the two witnesses, Katie Kett and Tina Pernie appear by

03:26:33 5  videoconference.  They can either come in person or they can

03:26:40 6  have their depositions presented.

03:26:46 7           On the subject of depositions being presented,

03:26:54 8  do the parties understand that you need to edit these

03:26:58 9  depositions down so that you get rid of all the redundant

03:27:02 10 and irrelevant information and focus them in on whatever --

03:27:08 11 not only those depositions, but I understand there are other

03:27:11 12 witnesses that were deposed -- that whatever ones of those

03:27:14 13 you think are important play, that you need to spend some

03:27:23 14 time, maybe you have, designating the depositions that you

03:27:31 15 actually need and getting rid of the rest?

03:27:36 16           Mr. Hayes?

03:27:37 17           MR. HAYES:  Yes.

03:27:38 18           THE COURT:  Mr. Denn?

03:27:39 19           MR. DENN:  Yes, Your Honor.

03:27:40 20           THE COURT:  Mr. Niederman?

03:27:41 21           MR. NIEDERMAN:  Yes, Your Honor.

03:27:41 22           THE COURT:  Okay.  All right.

03:27:43 23           So, how much time do you think we need for this

03:27:45 24 trial?

03:27:47 25           MR. DENN:  Your Honor, I think the answer to

54

03:27:51  1   that is very much dependent on the question of whether you

03:27:55  2   think that there's parol evidence to be considered with

03:27:59  3   respect to the contract.  I think that -- I'm just, you

03:28:04  4   know, making a percentage here based on what I've seen on

03:28:07  5   the exhibits.  I think over half of the trial exhibits and

03:28:11  6   deposition designations relate to parol evidence about the

03:28:16  7   meaning of the non-compete clause.

03:28:18  8         So, and I think probably that the same is true

03:28:21  9   for live witness testimony, non-expert.  So, I think it

03:28:27 10   would -- I don't know if Your Honor intends to give us some

03:28:31 11   guidance on that, but I think that the length of the trial

03:28:33 12   will depend, to a large degree, on that.

03:28:37 13         THE COURT:  There's going to be an hour limit,

03:28:40 14   and I may or may not set that today, but -- and so, just to

03:28:50 15   make sure everybody is on the same page, essentially for any

03:28:56 16   trial, basically I give each side -- it's a little confusing

03:29:05 17   because there's two different parties on the defense side,

03:29:08 18   but I give each side a certain amount of time for their

03:29:11 19   opening statement, their direct examination and their

03:29:15 20   cross-examination.  And so, that's going to be a limited

03:29:27 21   amount of time because I think there's actually a limited

03:29:30 22   amount of issues here, whether there's parol evidence or

03:29:33 23   not.

03:29:37 24         Mr. Hayes, you're the one with the burden of

03:29:40 25   proof.  What do you think you need for what you plan to do?

03:29:46 1          MR. HAYES:  I think we need three days, Your
03:29:48 2 Honor.  And are you talking about just my direct examination
03:29:52 3 or are you talking about how long our direct -- our whole
03:29:56 4 case will last?
03:29:57 5          THE COURT:  I'm talking about your whole case.
03:29:59 6          MR. HAYES:  Our whole case, you have two
03:30:01 7 lawyers, cross-examining.  It will be three days, three
03:30:03 8 trial days.
03:30:05 9          THE COURT:  Okay.  You mean for everybody's
03:30:08 10 case, three days?
03:30:09 11          MR. HAYES:  Yes.  Well, let me be sure I'm being
03:30:13 12 clear.  My direct of my witnesses will not take three days
03:30:17 13 of trial.
03:30:18 14          THE COURT:  No, I didn't think --
03:30:19 15          MR. HAYES:  Okay.  Okay.
03:30:20 16          THE COURT:  I was --
03:30:20 17          MR. HAYES:  Got it.
03:30:21 18          THE COURT:  -- assuming -- all right.  What do
03:30:25 19 you all think?
03:30:30 20          MR. DENN:  Your Honor, I'm not sure I completely
03:30:33 21 understood if Mr. Hayes was saying he thought the case in
03:30:37 22 its totality would take three days.
03:30:39 23          THE COURT:  That's what I think he said.
03:30:40 24          MR. HAYES:  I guess what I was saying is from
03:30:44 25 beginning to end, including cross-examination, our direct,

03:30:47  1    our case-in-chief will be three days.

03:30:49  2              THE COURT:  Oh, okay.

03:30:51  3              MR. HAYES:  Okay.

03:30:52  4              THE COURT:  Well, you're wrong about that.

03:30:53  5              MR. HAYES:  Okay.

03:30:54  6              THE COURT:  It's going to be less.  And I'm

03:30:58  7    sorry, I don't mean to say you're wrong.  That's just not

03:31:00  8    realistic.  You know, there's just very little actually

03:31:13  9    here.  You're trying to prove that Mr. Potter competed and

03:31:16 10    solicited, and you're doing this by showing that he put on a

03:31:23 11    bunch of conferences or want to put on a bunch of

03:31:27 12    conferences.  Whether there's parol evidence or not about

03:31:32 13    these things, that's just not going to take much time.

03:31:35 14              And so maybe -- I'll get back to you.  And, of

03:31:46 15    course, a little bit -- but, in any event, Mr. Denn, what do

03:31:50 16    you think on behalf of BIH?

03:31:52 17              MR. DENN:  I think, you know, again, for the

03:31:56 18    case in its entirety, Plaintiff, Defendants, cross claims,

03:32:00 19    et cetera, I think our ball park was three days.  Without

03:32:03 20    parol evidence on the contract, that it can be done in three

03:32:06 21    days.  And if parol evidence is coming in, it is more likely

03:32:10 22    four or five days.

03:32:12 23              THE COURT:  All right.  This is a different

03:32:16 24    question because, you know, generally what I do is I have a

03:32:31 25    lot of patent cases where there are multiple defendants.

03:32:35 1  And they, generally speaking, coordinate their efforts, and

03:32:42 2  it's pretty easy because then I say, Okay, Plaintiff, you

03:32:45 3  get nine hours and Defendants, you get nine hours, even

03:32:49 4  though there's multiple defendants, but they're not

03:32:52 5  litigating against each other at the same time.

03:33:01 6       Do you have any input on that from the defense

03:33:05 7  side as to how to account for the fact that some of what you

03:33:10 8  want to do is shoot at each other?

03:33:14 9       MR. TINTNER:  Well, Mr. Potter doesn't have any

03:33:18 10 cross claims.  So, from our perspective, which may be

03:33:20 11 different, and I don't want to speak for BIH, and we

03:33:23 12 certainly haven't spoken about this, but we would be

03:33:25 13 amenable to severing those claims because the Court

03:33:28 14 doesn't -- as Mr. Denn pointed out, the Court doesn't need

03:33:31 15 to address those if you rule in Defendants' favor.  And we

03:33:35 16 could, obviously -- and we would attempt to streamline.

03:33:39 17 We're certainly not going to duplicate.

03:33:41 18      So, whoever steps up to do cross-examination,

03:33:43 19 the other lawyer is not going to repeat what's already been

03:33:46 20 cross-examined.  So, we can certainly coordinate.  But if

03:33:48 21 the Court wants to sever that and decide later whether you

03:33:51 22 wanted to have another trial on that, I mean, we would be

03:33:53 23 amenable to that.

03:33:54 24      THE COURT:  Well, what do you think about that?

03:33:56 25      MR. DENN:  I guess, Your Honor, I don't know

03:34:01  1    that that is necessary only because the factual basis for

03:34:05  2    the cross claims is pretty limited.  And Your Honor probably

03:34:09  3    saw in the summary judgment motions, there are a handful of

03:34:13  4    communications between Mr. Potter and the Acuntos that make

03:34:19  5    up most of the factual basis for the cross claims, along

03:34:21  6    with a written agreement that they entered into for the sale

03:34:25  7    of BIH.  So, we don't foresee that taking up a whole lot of

03:34:30  8    time at trial or necessarily creating a lot of confusion.

03:34:35  9          Again, if it were a jury, it would be different

03:34:36 10    because Your Honor is correct that there are -- you know,

03:34:38 11    that there are issues between the Defendants.  But I don't

03:34:42 12    know that it's going to be a logistical issue to do it all

03:34:45 13    at once.

03:34:46 14          THE COURT:  Do you think, Mr. Denn, that

03:35:10 15    essentially the witnesses on the cross claims are basically

03:35:15 16    just Mr. Acunto and Mr. Potter and some documents?

03:35:20 17          MR. DENN:  That's correct, Your Honor.

03:35:21 18          THE COURT:  Do you expect that Mr. Acunto and

03:35:35 19    Mr. Potter both are planning to be here for the length of

03:35:40 20    the trial, whatever that is?

03:35:41 21          MR. DENN:  Mr. Acunto is, Your Honor, although

03:35:44 22    you raised a separate issue which is that we think that

03:35:49 23    because he's physically going to be here that the Plaintiffs

03:35:51 24    should not necessarily be able to call him as part of their

03:35:53 25    case-in-chief.

03:35:55  1          THE COURT:  Okay.  Well, let's stick with --

03:35:57  2          MR. DENN:  But, yes.

03:35:58  3          THE COURT:  And Mr. Potter?

03:36:00  4          MR. TINTNER:  Mr. Potter will be here.

03:36:04  5          THE COURT:  All right.  So, here's what I'm

03:36:06  6   thinking:  I'm going to give the sides an equal amount of

03:36:10  7   time, and I'm going to try the Plaintiffs versus the two

03:36:24  8   Defendants in that amount of time.  But I think when that's

03:36:29  9   over, we can have, you know, like two extra hours where you

03:36:37 10   can put on Mr. Acunto and Mr. Potter on the cross claims.

03:36:45 11          Right?  That should be enough time for that,

03:36:47 12   don't you think?

03:36:48 13          MR. DENN:  Yes.

03:36:50 14          MR. TINTNER:  Yes.

03:36:50 15          THE COURT:  Okay.  All right.

03:37:07 16          So, for the main event, so to speak, I'm going

03:37:13 17   to give each side ten-and-a-half hours.  But, again, that is

03:37:18 18   for your opening, your direct examination and your

03:37:23 19   cross-examination.  So, ten-and-a-half hours, that's the

03:37:27 20   total of 21 hours for both sides.  We can do that in three

03:37:33 21   days.

03:37:34 22          We'll start at 8:30 a.m.  You need to be here at

03:37:38 23   8:00 a.m. to make sure that everyone is ready.  And we'll go

03:37:42 24   until 5:00 p.m.  We'll have roughly an hour for lunch.

03:37:47 25   We'll have a 15-minute break in the morning and 15-minute

03:37:51  1   break in the afternoon.

03:37:53  2          The clock runs continuously.  So, once we're in

03:37:58  3   Court -- so, you need to have things ready to go because the

03:38:04  4   clock is not going to stop just because you're busy getting

03:38:08  5   organized to do whatever is next.

03:38:12  6          And so, we will finish the claim against the

03:38:18  7   Defendants' part by the close of business Wednesday.  And

03:38:23  8   then Thursday morning we'll do the cross claims maybe

03:38:28  9   starting at 9:00 a.m.  And I will get back to you soon, some

03:38:45 10   time next week as to what I think about parol evidence, you

03:38:55 11   know, because -- well, I need to see what I think about

03:39:12 12   that.

03:39:12 13          So, and Mr. Denn, you were bringing up something

03:39:19 14   about could they call Mr. Potter or Mr. Acunto in their

03:39:24 15   case-in-chief.

03:39:27 16          MR. DENN:  Correct, Your Honor.

03:39:28 17          THE COURT:  So, Mr. Hayes, do you have any

03:39:38 18   thoughts on that topic?

03:39:40 19          MR. HAYES:  We would certainly have a right and

03:39:43 20   intend to call him in our case-in-chief.  We could certainly

03:39:48 21   subpoena him and will, if necessary.

03:39:50 22          THE COURT:  Well, that's not actually the issue

03:39:58 23   because I have a certain amount of management discretion as

03:40:03 24   to how to structure things.  So, yes, I can't make you rest

03:40:07 25   your case until he's testified --

03:40:10 1          MR. HAYES:  Oh, yeah.

03:40:10 2          THE COURT:  -- but I can say, and often -- and

03:40:15 3   I'm not saying that's what I'm going to do here, often I

03:40:18 4   say, well, it makes more sense because one of the other

03:40:24 5   rules we tend to have is when somebody takes the stand, we

03:40:28 6   like them to be just on the stand once.

03:40:31 7          So, recognizing that I don't have to do what you

03:40:37 8   said, tell me why I should do what you said.

03:40:41 9          MR. HAYES:  So, I misunderstood Your Honor's

03:40:43 10  question.  I mean, I'm aware they do that in Chancery.  I

03:40:45 11  wasn't clear that -- if they want one -- if it's a hostile

03:40:48 12  witness, the other side calls them first.  I thought they

03:40:52 13  were saying I wasn't allowed to call him.

03:40:54 14         THE COURT:  No, no, no.  That's --

03:40:57 15         MR. HAYES:  It seems to me that while sometimes

03:41:02 16  it's better to have the witness testify on direct by his

03:41:08 17  counsel first for clarity, in this instance we're going to

03:41:12 18  be asking him specific questions that go directly to our

03:41:16 19  burden of proof.  What is BIH doing?  What are your plans?

03:41:21 20  And what are these conferences?

03:41:24 21         And so, to me, that goes to the crux of the

03:41:28 22  matter, and I have the burden of proof.  One of the nice --

03:41:33 23  one of the -- since you have the burden of proof, one of the

03:41:37 24  countervailing advantages is you get to go first.

03:41:40 25         So, I would like you, the judge, to hear

03:41:43  1    Mr. Acunto first from me.

03:41:45  2              THE COURT:  All right.  If you do go first, I

03:41:49  3    take it, would it be agreeable that once you've finished if

03:41:53  4    they want they can just postpone all examination of him

03:41:55  5    until it's their turn?

03:41:57  6              MR. HAYES:  Yes, if that's what I -- I believe

03:41:59  7    that that's their right.

03:42:00  8              THE COURT:  All right.  So, Mr. Denn, why should

03:42:10  9    I do what you want me to do which presumably is just have --

03:42:16 10    hold their case open and have him testify under your direct

03:42:21 11    examination before there's cross?

03:42:24 12              MR. DENN:  Your Honor, I guess I'm not as

03:42:26 13    convinced as Mr. Hayes that he would be able to compel

03:42:29 14    Mr. Acunto's appearance.  If he simply -- I mean, he's going

03:42:33 15    to be here every day, but I don't think he would be required

03:42:36 16    to be here every day, and he could come on the second day.

03:42:41 17    But, again, in terms of, you know, why it's better as

03:42:44 18    opposed to what is or is not permissible, just in terms of

03:42:48 19    the orderly presentation of evidence, it seems like having

03:42:51 20    him testify affirmatively and then subject to as much

03:42:56 21    cross-examination as Mr. Hayes wants for purposes of making

03:42:59 22    out whatever kind of prima facie case he needs to make out,

03:43:03 23    it just seems like a more understandable and orderly way to

03:43:06 24    present the evidence.  Of the different issues that we've

03:43:09 25    discussed today, Your Honor, it is not the most important.

03:43:12 1          THE COURT:  All right.  And in terms of

03:43:20 2    Mr. Potter, do you have this concern or are you more or

03:43:22 3    less --

03:43:24 4          MR. TINTNER:  No.

03:43:28 5          THE COURT:  Okay.  I think it's -- I think

03:43:32 6    Plaintiff makes a reasonable request and so, I think, as I

03:43:38 7    understand this case, obviously, I don't fully understand

03:43:43 8    it, but to the extent I do understand it, it seems to me

03:43:49 9    that it might benefit Plaintiff to be able to do what will

03:43:56 10   presumably be a lot of leading questions, get from

03:43:59 11   Mr. Acunto whatever they think they need for their case.  It

03:44:04 12   might sharpen it, rather than him having to deduce it as

03:44:09 13   cross-examination as he goes along.  So, I'm going to let

03:44:13 14   them call him in the Plaintiff's case.

03:44:16 15          And I assume that, in fact, he will be here for

03:44:21 16   whatever it is they want him, and they will give you some

03:44:24 17   notice in advance of whether they're calling him on the

03:44:26 18   Monday or on the Tuesday.

03:44:28 19          MR. DENN:  He'll be here every day, Your Honor.

03:44:30 20          THE COURT:  All right.  Let me check my notes.

03:44:59 21          Are you all asking the court reporter for daily

03:45:02 22   copy or anything like that?

03:45:06 23          MR. DENN:  Yes, Your Honor.  Okay.

03:45:08 24          THE COURT:  Okay.  Well, did they ask already?

03:45:14 25          THE REPORTER:  No, Your Honor.

03:45:14 1          THE COURT:  Well, make sure you talk to the

03:45:16 2   court reporter so you have a good understanding what's going

03:45:18 3   on in terms of what you're expecting from her.  But this is

03:45:22 4   just to bring up that when the trial is done, if you have

03:45:26 5   any corrections to the trial transcript, they have to be

03:45:32 6   submitted to the court reporter no later than two weeks

03:45:35 7   after you get the transcript.  So, presumably essentially --

03:45:42 8   or the trial ends, so presumably two weeks from the Thursday

03:45:49 9   the trial ends if you have any corrections, you're going to

03:45:52 10  need to get them in to her.

03:45:54 11         It would be helpful if you had an exhibit

03:46:00 12  notebook of the exhibits that you expect to ask each witness

03:46:05 13  on direct.  In terms of whatever deposition testimony you're

03:46:14 14  planning on offering, is that videotaped or is that done the

03:46:21 15  old-fashioned way?

03:46:24 16         MR. HAYES:  I don't remember if all are

03:46:27 17  videotaped, but I believe --

03:46:29 18         MR. SIEGEL:  I think most of them were

03:46:31 19  videotaped, Your Honor.

03:46:32 20         THE COURT:  All right.

03:46:33 21         MR. SIEGEL:  If they're not on videotape, would

03:46:35 22  you prefer us read them into the record or give them to Your

03:46:37 23  Honor?

03:46:37 24         THE COURT:  If they're important enough for you

03:46:39 25  to take some of your time to do it, then you should read

03:46:41 1    them into the record.  If they're not worth that time, then

03:46:45 2    you should just forego them.

03:46:47 3            Okay.  I guess the other thing is could you like

03:46:54 4    on the Thursday before trial send to me the resumes of the

03:47:02 5    three experts?  I take it that while there's some argument

03:47:10 6    about Dr. Meyer's methodology, there's no actual question,

03:47:15 7    all three of these people are experts; right?

03:47:21 8            MR. DENN:  No, Your Honor.  We have the concern

03:47:22 9    that we expressed at the outset about the impact of the

03:47:28 10   summary judgment ruling on --

03:47:30 11           THE COURT:  Right.

03:47:30 12           MR. DENN:  But not --

03:47:31 13           THE COURT:  In terms of expertise.

03:47:33 14           MR. DENN:  No, Your Honor, we don't have any.

03:47:34 15           THE COURT:  So, if you would just send them to

03:47:36 16   me on the Thursday beforehand.  So, all right.  So, I think

03:47:56 17   that exhausts what I have noted or marked in some way that I

03:48:02 18   can recall right now.

03:48:03 19           Is there anything you want to bring up,

03:48:06 20   Mr. Hayes?

03:48:07 21           MR. HAYES:  Your Honor, just does the Court

03:48:10 22   believe that opening statements are going to be helpful?

03:48:13 23   It's a bench trial.  Courts have a lot of --

03:48:16 24           THE COURT:  I think it's up to you.  You make

03:48:18 25   the judgment as to whether they're going to be helpful or

03:48:20 1  not.  What you say has a lot to do with the answer to that

03:48:25 2  question.  So, generally speaking, I mean, most of the bench

03:48:31 3  trials I have involve pretty complex technology, so I always

03:48:34 4  like to have an opening.  But I think it would be -- you

03:48:42 5  know, it's entirely possible that a seven or eight-minute

03:48:50 6  opening could be appropriate --

03:48:52 7                MR. HAYES:  Okay.

03:48:52 8                 THE COURT:  -- under these circumstances.  But

03:48:54 9  you would be the judge of that and you will have to factor

03:48:58 10  in that you have a limited amount of time.

03:49:01 11                 So, okay.  Anything else?

03:49:02 12                 MR. HAYES:  When you said the parol evidence is

03:49:08 13  also whether we can argue what the meaning of the agreement,

03:49:13 14  you know, whether the summary judgment decision has set that

03:49:17 15  in stone or whether that's a subject to be debated.

03:49:19 16                 THE COURT:  Right.  That's something I'm going

03:49:21 17  to get back to you on.

03:49:22 18                 MR. HAYES:  Right, right.

03:49:23 19                 THE COURT:  Anything else?

03:49:24 20                 MR. HAYES:  No.

03:49:24 21                 THE COURT:  Mr. Denn?

03:49:26 22                 MR. DENN:  Sort of the other end of the coin of

03:49:29 23  Mr. Hayes' question in terms of closings, whether the Court

03:49:32 24  will want the parties to submit any kind of briefs following

03:49:36 25  the trial.

03:49:36 1          THE COURT:  So, that's a good question.  Unless

03:49:53 2   I'm in the fairly rare position of ruling at the end of

03:49:58 3   evidence on Wednesday or possibly Thursday -- well, so,

03:50:05 4   actually, do you want to do closing argument?  Do you want

03:50:10 5   to do briefing?  Do you want to do both?  Do you want to do

03:50:14 6   neither?

03:50:15 7          MR. HAYES:  For me, I would like to do

03:50:18 8   post-hearing briefing once we have the transcripts.

03:50:22 9          MR. DENN:  Mr. Oprison has told me that he would

03:50:24 10  also prefer briefing, which I believe that that will also

03:50:29 11  require that he write the brief.

03:50:32 12         MR. TINTNER:  Yes, Your Honor, post-hearing

03:50:34 13  briefing.

03:50:34 14         THE COURT:  Okay.  All right.  Well, so, usually

03:50:39 15  what happens in terms of post-hearing briefing is that you

03:50:42 16  all talk to each other.  You know, I would like the briefing

03:50:58 17  not to be stretched out too far because I would like to be

03:51:01 18  able to decide the case by, I don't know, the beginning of

03:51:13 19  September or so.  So, you should talk to each other about

03:51:26 20  how long the briefing you think there should be or what the

03:51:30 21  page lengths are and what the timing is.  The page lengths

03:51:34 22  I'm relatively flexible on, but the timing is I would like

03:51:37 23  to have that briefing in pretty quickly.

03:51:42 24         And what I'm thinking is that you will get the

03:51:46 25  transcripts at the end of -- if you're paying for daily

03:51:50 1   copy, you're going to get them like on the Thursday that the

03:51:54 2   trial ends.  And I would think that maybe I would want to

03:52:00 3   have all the briefing in by like the end of July.

03:52:05 4        And I don't want to -- you know, it's not a rush

03:52:09 5   kind of thing in a sense of -- well, I need -- so, we can --

03:52:16 6   there could be a little bit of flexibility there, but talk

03:52:19 7   to each other about the length and the schedule.  And I

03:52:27 8   would think that it's good to have an opening brief, and an

03:52:32 9   answering brief, and a short reply brief as what the number

03:52:36 10  of briefs is.  But I think that reply brief could be a very

03:52:42 11  short schedule because it's really not a lot of time to be

03:52:48 12  raising things, just to point out by the Plaintiff what they

03:52:51 13  don't like about what the Defendant said in their brief.

03:52:54 14        Anything else, Mr. Denn?

03:52:55 15        MR. DENN:  Two other, hopefully, quick items,

03:52:58 16  Your Honor.  One is that just hearing -- I don't --

03:53:01 17  Mr. Hayes is an appellate expert, and I'm not, but hearing

03:53:04 18  his explanation as to why he thought it might be necessary

03:53:07 19  to present factual evidence on the parol evidence in order

03:53:10 20  to preserve some sort of --

03:53:13 21        THE COURT:  Yeah, if it turns out that it's just

03:53:15 22  a question of preserving, what I would say is you submit the

03:53:18 23  evidence in writing.  It's a pretty ineffective, not

03:53:22 24  ineffective, but inefficient way to like do it live if the

03:53:27 25  only thing we're doing is preserving the record for appeal.

03:53:30 1    Right?

03:53:31 2            So, let me think about that while I'm thinking

03:53:34 3    about what extent the parol evidence there is.  Is that what

03:53:40 4    you were driving at?

03:53:41 5            MR. DENN:  That was going to be my suggestion,

03:53:42 6    Your Honor, that there just be some sort of proffer that we

03:53:45 7    not need to take up trial time.

03:53:47 8            THE COURT:  Yeah, that would be my thinking,

03:53:49 9    too, if we get to that point.

03:53:51 10           MR. DENN:  And the only other item, Your Honor,

03:53:52 11   is we discussed this very briefly at the beginning, but the

03:53:57 12   summary judgment opinion, because it recites what the

03:54:00 13   non-compete means, we think creates a separate basis to

03:54:05 14   challenge on Daubert grounds Dr. Meyer's remaining theory of

03:54:11 15   damages.  And she in her -- and I think Mr. Hayes actually

03:54:14 16   made some reference to this -- she, in developing her expert

03:54:17 17   opinion, basically made an assumption that -- I think he

03:54:21 18   phrased it as no competition.  And she actually has in her

03:54:24 19   expert report in Paragraph 24 that she sort of says what she

03:54:28 20   thinks the non-compete means.  And she's fairly specific

03:54:30 21   about what she thinks it means in terms of how she then used

03:54:34 22   that to do her report.  And it's not what the Court says it

03:54:37 23   means.

03:54:38 24           And she was actually questioned at her

03:54:40 25   deposition about what if a non-compete turns out to not mean

03:54:45 1   what you think it means.  And, again, this is something we

03:54:48 2   wouldn't want to resolve here today, but I wanted to ask.

03:54:52 3   Having just said that, I don't want Mr. Oprison to have to

03:54:54 4   write any more stuff than has to be written.  If the Court

03:54:58 5   would allow us to submit something specifically with respect

03:55:01 6   to that as to whether basically there's anything left for

03:55:06 7   Dr. Meyer to testify about, because she made an assumption

03:55:09 8   pretty explicit in her report that it turns out not to be

03:55:13 9   what the Court has said that the contract means.

03:55:17 10          THE COURT:  Was that brought up in the briefing

03:55:20 11   on Daubert in relation to her?

03:55:23 12          MR. DENN:  It was not, Your Honor, because at

03:55:25 13   the time there was still an open question as to what the

03:55:27 14   non-compete meant.  But she was questioned about it in

03:55:31 15   anticipation of the fact that at some point there would be

03:55:34 16   some resolution of that.

03:55:35 17          THE COURT:  All right.  And Mr. Hayes.

03:55:37 18          MR. HAYES:  So, Your Honor, they had an

03:55:39 19   opportunity to file a Daubert motion, and the Court

03:55:42 20   generally denied it.

03:55:43 21          THE COURT:  Yeah, yeah, yeah.  So, I'm not going

03:55:45 22   to let them file another Daubert motion, but what I was

03:55:48 23   wondering is, nevertheless, what's your -- because they

03:55:55 24   certainly are forecasting that if, nothing else, they're

03:55:59 25   going to object at some point that she's relying on the

03:56:04 1   assumption that's different than what I ruled.

03:56:08 2          And so, let's assume that all comes to pass,

03:56:12 3   what are you going to say about that?

03:56:15 4          MR. HAYES:  That happens all the time in trial.

03:56:18 5   You ask a witness, an expert on cross-examination, well, you

03:56:21 6   know, you assumed this.  What if that changed?  Would that

03:56:24 7   change your opinion?

03:56:25 8          So, if the Defendants wanted to ask her, you

03:56:30 9   know, you assumed this, the Court's ruled this, does that

03:56:32 10   change your opinion, I guess they can ask her.  But I don't

03:56:35 11   believe that that's a basis to disqualify an expert.

03:56:38 12          THE COURT:  Okay.  Mr. Denn, do you have

03:56:43 13   anything to say in response to that?

03:56:45 14          MR. DENN:  No, Your Honor.  I just do not know.

03:56:49 15   I mean, if Your Honor has said we can't file another Daubert

03:56:52 16   motion, then you probably answered my questions because

03:56:56 17   that's effectively what we would be doing.  We just don't

03:56:58 18   think there's anything left based on that.

03:57:01 19          THE COURT:  Yeah.  So, I think the way to handle

03:57:03 20   that is pretty much the way Mr. Hayes said is if there's

03:57:06 21   some assumption that she has made front and center of her

03:57:12 22   opinion, and at the time the assumption is contrary to

03:57:18 23   whatever I've ruled, you can bring that out through

03:57:28 24   cross-examination and then argue it to me later on.

03:57:33 25          Anything more, Mr. Denn?

03:57:35  1              MR. DENN:  No, Your Honor.  Thank you.

03:57:36  2              THE COURT:  Mr. Niederman or Mr. Tintner?

03:57:39  3              MR. NIEDERMAN:  No, Your Honor.

03:57:40  4              MR. TINTNER:  No, Your Honor.

03:57:40  5              THE COURT:  Okay.  All right.

03:57:43  6              Well, thank you for your time today.  Hard thing

03:57:47  7    to do on the day before Memorial Day weekend.  So, enjoy

03:57:51  8    your weekend and we'll be in recess.

03:57:53  9              DEPUTY CLERK:  All rise.

03:59:11 10              (Court was recessed at 3:59 p.m.)

        11              I hereby certify the foregoing is a true and

        12    accurate transcript from my stenographic notes in the

        13    proceeding.

        14                   /s/ Heather M. Triozzi
                             Certified Merit and Real-Time Reporter
        15                   U.S. District Court

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

## $

**$20** [2] - 48:23, 50:4

## /

**/s** [1] - 72:14

## 1

**10** [1] - 28:13
**11** [1] - 28:13
**12** [1] - 28:13
**120** [2] - 23:6, 23:7
**13** [1] - 3:17
**15-minute** [1] - 59:25
**153** [2] - 51:6, 51:18
**17** [1] - 41:13
**18** [2] - 3:17, 41:13
**19-1600** [1] - 2:13
**19-1600-RGA** [1] - 1:7

## 2

**2019** [1] - 47:8
**2020** [1] - 34:7
**2022** [1] - 1:14
**21** [1] - 59:20
**24** [1] - 69:19
**27** [1] - 1:14
**2:04** [1] - 1:14

## 3

**30** [1] - 3:22
**30(b)(6** [16] - 19:12, 19:17, 19:18, 20:1, 20:4, 20:8, 21:9, 35:14, 35:17, 37:6, 38:5, 39:3, 39:4, 40:6, 40:12, 48:3
**30(b)(6)** [3] - 35:16, 40:16, 47:25
**3:59** [1] - 72:10

## 4

**4** [1] - 28:14
**40** [1] - 23:20
**48** [1] - 51:18

## 5

**5** [1] - 28:15
**5:00** [1] - 59:24

## 6

**612.3** [1] - 51:10

## 7

**7** [1] - 25:14

## 8

**8** [2] - 25:14
**844** [1] - 1:12
**8:00** [1] - 59:22
**8:30** [1] - 59:22

## 9

**9** [1] - 28:13
**94** [1] - 43:8
**9:00** [1] - 60:9

## A

**a.m** [3] - 59:22, 59:23, 60:9
**able** [12] - 5:15, 10:20, 21:24, 37:3, 37:8, 40:10, 47:24, 51:24, 58:24, 62:13, 63:9, 67:18
**absolutely** [1] - 45:10
**account** [2] - 17:25, 18:1, 57:7
**accountings** [1] - 50:7
**accurate** [4] - 4:13, 4:16, 44:3, 72:12
**accused** [1] - 42:6
**acquire** [2] - 7:15, 16:25
**acquired** [1] - 16:16
**acquiring** [1] - 7:16
**act** [1] - 26:22
**acting** [2] - 42:13, 43:5
**actions** [2] - 47:19, 50:11
**acts** [2] - 19:14, 19:15
**actual** [2] - 39:4, 65:6
**Acunto** [12] - 3:2, 3:3, 9:25, 35:1, 36:24, 58:16, 58:18, 58:21, 59:10, 60:14, 62:1, 63:11
**Acunto's** [1] - 62:14
**Acuntos** [1] - 58:4
**Adam** [2] - 1:25, 2:12
**ADAM** [1] - 1:8
**add** [3] - 31:19, 40:11, 41:20
**added** [2] - 41:24, 45:7
**addition** [1] - 21:3
**additional** [4] - 21:3, 32:14, 36:21, 38:15

**address** [3] - 6:19, 40:14, 57:15
**addressed** [2] - 40:7, 42:25
**addresses** [1] - 51:11
**addressing** [1] - 27:25
**admissible** [1] - 38:14
**admitted** [1] - 2:18
**admitting** [1] - 36:14
**advance** [1] - 63:17
**advantage** [1] - 17:21
**advantages** [2] - 18:2, 61:24
**adverse** [1] - 49:11
**advertising** [3] - 21:18, 22:2, 38:16
**advise** [2] - 27:3, 27:4
**advisement** [1] - 52:25
**affidavits** [1] - 31:20
**affiliates** [1] - 50:18
**affirmatively** [1] - 62:20
**afternoon** [4] - 2:15, 2:23, 3:6, 60:1
**agenda** [1] - 22:21
**agree** [9] - 27:2, 28:4, 31:22, 32:13, 38:24, 39:19, 39:22, 43:8, 43:9
**agreeable** [1] - 62:3
**agreed** [1] - 9:14
**Agreement** [1] - 7:14
**agreement** [8] - 16:8, 26:20, 27:19, 28:7, 42:20, 51:11, 58:6, 66:13
**agreements** [1] - 32:6
**AI** [1] - 11:14
**air** [1] - 4:23
**al** [1] - 2:12
**allegation** [3] - 34:17, 41:18, 42:6
**allegations** [10] - 5:25, 34:8, 34:13, 39:1, 41:24, 43:1, 45:7, 45:19, 46:18, 47:24
**allege** [1] - 42:12
**alleged** [9] - 19:15, 20:16, 21:6, 37:1, 42:23, 43:4, 50:19, 52:2
**alleging** [2] - 37:3, 52:3
**allocation** [1] - 5:24
**allow** [3] - 26:5, 38:21, 70:5
**allowed** [2] - 6:24, 61:13
**allowing** [1] - 10:7

**allows** [1] - 32:25
**alluded** [1] - 48:20
**almost** [1] - 23:22
**alone** [2] - 22:21, 23:1
**alternative** [1] - 34:11
**Amazon** [2] - 15:6, 15:12
**ambiguity** [1] - 28:7
**ambiguous** [3] - 24:22, 37:11, 37:12
**amenable** [3] - 10:11, 57:13, 57:23
**amend** [3] - 20:24, 38:6, 38:21
**Amended** [11] - 34:6, 39:1, 39:25, 41:4, 41:16, 41:19, 42:18, 43:8, 44:14, 44:19, 45:20
**amended** [2] - 20:25, 41:20, 44:18
**American** [2] - 2:11
**AMERICAN** [1] - 1:4
**amount** [9] - 4:11, 39:9, 54:18, 54:21, 54:22, 59:6, 59:8, 60:23, 66:10
**amounts** [1] - 31:1
**Andrew** [1] - 3:25
**ANDREWS** [1] - 1:16
**Andrews** [1] - 2:8
**anne** [1] - 7:19
**annual** [2] - 12:2, 12:3
**answer** [17] - 5:17, 14:2, 19:1, 20:6, 20:8, 20:24, 20:25, 22:11, 34:24, 37:19, 37:25, 38:1, 39:17, 40:1, 48:16, 53:25, 66:1
**answered** [1] - 71:16
**answering** [1] - 68:9
**anticipate** [1] - 13:14
**anticipation** [1] - 70:15
**anyhow** [1] - 31:14
**APA** [7] - 24:24, 31:11, 31:13, 33:24, 43:21, 51:21, 51:22
**appeal** [2] - 26:11, 26:15, 68:25
**appear** [2] - 50:12, 53:4
**appearance** [2] - 10:10, 62:14
**APPEARANCES** [2] - 1:18, 2:1
**appearing** [1] - 22:25
**appellate** [1] - 68:17
**applies** [1] - 12:25

**applying** [1] - 14:20
**appropriate** [1] - 66:6
**areas** [1] - 31:5
**argue** [3] - 4:20, 66:13, 71:24
**argues** [1] - 27:8
**arguing** [2] - 4:8, 24:23
**argument** [8] - 21:5, 30:23, 41:2, 41:14, 41:15, 42:1, 65:5, 67:4
**arguments** [1] - 4:16
**artificial** [1] - 11:12
**aside** [2] - 4:7, 12:1
**Asset** [1] - 7:14
**assist** [1] - 17:3
**assume** [4] - 16:18, 18:3, 63:15, 71:2
**assumed** [4] - 17:13, 18:6, 71:6, 71:9
**assuming** [5] - 14:19, 15:1, 16:10, 18:8, 55:18
**assumption** [6] - 17:9, 69:17, 70:7, 71:1, 71:21, 71:22
**assumptions** [1] - 6:22
**attached** [1] - 39:20
**attempt** [2] - 53:1, 57:16
**attorney** [1] - 20:19
**attorneys'** [14] - 28:16, 29:8, 29:12, 29:16, 29:23, 29:24, 30:3, 30:11, 30:15, 30:20, 30:22, 30:23, 32:1, 32:8
**augmented** [1] - 37:25
**award** [1] - 30:3
**awarded** [1] - 30:12
**aware** [3] - 33:2, 44:25, 61:10

## B

**background** [2] - 27:20, 44:23
**ball** [3] - 23:4, 30:1, 56:19
**bargain** [1] - 14:21
**Barry** [1] - 2:16
**BARRY** [1] - 1:19
**based** [8] - 6:24, 26:21, 30:23, 31:11, 33:22, 44:4, 54:4, 71:18
**basis** [8] - 7:15, 16:12, 26:3, 38:25, 58:1,

58:5, 69:13, 71:11
**battling** [1] - 27:14
**Beacon** [1] - 36:24
**became** [2] - 8:20, 8:23
**become** [1] - 5:8
**BEFORE** [1] - 1:16
**beforehand** [1] - 65:16
**began** [1] - 20:19
**beginning** [3] - 55:25, 67:18, 69:11
**behalf** [3] - 3:7, 42:13, 56:16
**bench** [3] - 33:14, 65:23, 66:2
**benefit** [2] - 14:21, 63:9
**best** [1] - 37:25
**better** [5] - 4:1, 4:23, 17:11, 61:16, 62:17
**between** [6] - 6:7, 14:23, 24:5, 39:19, 58:4, 58:11
**beyond** [6] - 30:14, 35:15, 36:7, 36:13, 36:17, 38:7
**BI** [1] - 44:20
**BIH** [32] - 4:8, 4:9, 4:25, 8:24, 9:10, 9:13, 9:18, 9:21, 10:19, 11:1, 16:22, 17:1, 19:15, 33:20, 35:2, 37:16, 41:17, 41:20, 41:24, 42:2, 42:6, 43:5, 47:7, 47:15, 48:25, 49:23, 50:1, 56:16, 57:11, 58:7, 61:19
**BIH's** [1] - 46:4
**bit** [3] - 33:17, 56:15, 68:6
**blame** [1] - 4:10
**bloom's** [1] - 40:5
**Blume** [3] - 7:19, 35:20, 39:5
**Boggs** [1] - 1:12
**bolded** [2] - 28:14, 28:15
**book** [3] - 47:3, 47:6, 49:14
**booked** [2] - 46:24, 47:5
**booking** [5] - 48:18, 49:2, 50:2, 51:11
**bookkeeper** [1] - 29:12
**bore** [1] - 36:16
**bought** [2] - 17:9, 18:8
**breach** [3] - 38:11,

42:21, 42:22
**breached** [1] - 44:21
**breadth** [1] - 16:12
**break** [5] - 20:18, 35:23, 35:24, 59:25, 60:1
**brief** [6] - 67:11, 68:8, 68:9, 68:10, 68:13
**briefing** [10] - 67:5, 67:8, 67:10, 67:13, 67:15, 67:16, 67:20, 67:23, 68:3, 70:10
**briefly** [2] - 29:8, 69:11
**briefs** [2] - 66:24, 68:10
**bring** [4] - 35:12, 64:4, 65:19, 71:23
**bringing** [1] - 60:13
**broad** [2] - 35:18, 51:19
**broader** [2] - 14:7, 14:8
**broadly** [1] - 25:15
**brochures** [2] - 22:8, 22:10
**brought** [2] - 33:18, 70:10
**build** [1] - 34:10
**bunch** [3] - 49:5, 56:11
**burden** [4] - 54:24, 61:19, 61:22, 61:23
**business** [10] - 8:11, 16:3, 17:9, 17:14, 18:8, 43:18, 43:22, 48:25, 51:20, 60:7
**BUSINESS** [1] - 1:8
**Business** [12] - 2:4, 2:12, 2:24, 3:3, 8:10, 8:11, 8:18, 8:22, 8:25, 24:11, 34:10, 36:22
**businesses** [2] - 34:10, 43:20
**busy** [1] - 60:4
**buying** [1] - 17:13
**BY** [7] - 1:19, 1:20, 1:20, 1:23, 1:24, 2:2, 2:3

## C

**C&E** [4] - 48:7, 48:8, 49:20, 51:20
**C.A** [1] - 1:7
**Caleb** [1] - 1:12
**Campbell** [2] - 8:7, 9:6
**cannabis** [4] - 11:11, 19:2, 42:16, 49:12

**cannot** [3] - 10:9, 26:11, 33:12
**capable** [1] - 33:14
**care** [1] - 11:15
**carves** [1] - 41:17
**case** [36] - 4:25, 5:24, 7:9, 17:15, 18:25, 19:2, 19:10, 20:3, 21:7, 30:7, 32:18, 35:10, 35:25, 38:2, 44:5, 44:6, 44:12, 50:13, 51:16, 55:4, 55:5, 55:6, 55:10, 55:21, 56:1, 56:18, 58:25, 60:15, 60:20, 60:25, 62:10, 62:22, 63:7, 63:11, 63:14, 67:18
**case-in-chief** [4] - 56:1, 58:25, 60:15, 60:20
**cases** [5] - 5:16, 29:20, 32:20, 32:21, 56:25
**Casualty** [1] - 2:12
**CASUALTY** [1] - 1:4
**catch** [1] - 8:17
**causes** [1] - 50:18
**center** [1] - 71:21
**CEO** [2] - 3:3, 7:21
**certain** [3] - 41:24, 54:18, 60:23
**certainly** [5] - 5:22, 6:3, 11:6, 15:11, 15:21, 16:21, 17:22, 26:3, 26:13, 27:2, 27:14, 28:19, 30:20, 33:14, 33:25, 34:17, 57:12, 57:17, 57:20, 60:19, 60:20, 70:24
**Certified** [1] - 72:14
**certify** [1] - 72:11
**cetera** [2] - 13:22, 56:19
**CFO** [1] - 8:3
**challenge** [2] - 34:23, 69:14
**challenged** [1] - 51:3
**chance** [1] - 20:5
**Chancery** [1] - 61:10
**change** [4] - 26:24, 45:1, 71:7, 71:10
**changed** [1] - 71:6
**characterization** [1] - 37:9
**Chartered** [1] - 2:11
**CHARTERED** [1] - 1:4
**check** [1] - 63:20
**Chief** [1] - 7:12
**chief** [4] - 56:1, 58:25,

60:15, 60:20
**choice** [5] - 33:5, 33:8, 33:9, 33:10, 33:12
**Chris** [1] - 2:25
**CHRISTOPHER** [1] - 2:3
**Circuit** [1] - 26:11
**circumstances** [2] - 7:14, 66:8
**cite** [1] - 51:6
**cited** [3] - 29:20, 32:19, 32:20
**claim** [11] - 11:24, 22:25, 23:1, 32:17, 32:22, 33:1, 35:21, 36:11, 45:16, 50:18, 60:6
**claimed** [2] - 9:1, 48:11
**claiming** [1] - 46:24
**claims** [33] - 4:15, 4:19, 5:15, 5:25, 8:24, 15:2, 18:4, 22:14, 22:15, 22:19, 22:21, 25:9, 25:15, 25:20, 25:22, 27:6, 27:8, 27:9, 27:10, 27:13, 27:15, 27:16, 27:22, 28:1, 28:3, 56:18, 57:10, 57:13, 58:2, 58:5, 58:15, 59:10, 60:8
**clarity** [1] - 61:17
**clause** [4] - 18:15, 24:21, 43:2, 54:7
**clear** [10] - 21:6, 26:2, 26:5, 28:8, 32:24, 36:5, 40:4, 41:11, 55:12, 61:11
**CLERK** [2] - 2:7, 72:9
**client** [4] - 5:23, 15:16, 46:14, 47:16
**clients** [1] - 15:17
**CLM** [22] - 7:15, 7:21, 7:24, 8:6, 8:9, 8:12, 8:21, 8:23, 8:25, 9:2, 10:22, 10:24, 16:3, 16:16, 16:19, 27:24, 34:11, 45:4, 48:22, 49:7, 49:19
**CLM's** [1] - 43:22
**clock** [2] - 60:2, 60:4
**close** [1] - 60:7
**closing** [2] - 8:12, 67:4
**closings** [1] - 66:23
**coin** [1] - 66:22
**colleague** [2] - 3:1, 3:8
**colleagues** [1] - 2:17

**colleagues'** [1] - 5:14
**comfortable** [1] - 5:10
**coming** [2] - 28:1, 56:21
**commissions** [5] - 44:22, 45:3, 48:6, 49:3, 50:7
**common** [1] - 43:1
**commonly** [1] - 28:24
**communications** [2] - 6:1, 58:4
**company** [3] - 36:24, 47:8, 52:20
**compare** [2] - 24:5, 41:18
**compel** [2] - 19:5, 62:13
**compensation** [2] - 25:18, 25:21
**compete** [44] - 6:25, 7:1, 7:18, 9:2, 9:3, 13:3, 13:5, 13:7, 13:13, 15:12, 15:13, 16:4, 16:8, 17:1, 17:2, 18:15, 19:15, 20:3, 20:16, 21:17, 22:23, 23:2, 23:24, 24:21, 26:1, 27:7, 28:25, 32:6, 34:12, 34:18, 34:22, 35:22, 36:16, 37:17, 43:12, 48:6, 48:12, 50:11, 50:17, 54:7, 69:13, 69:20, 69:25, 70:14
**competed** [1] - 56:9
**competing** [11] - 8:25, 15:2, 15:6, 15:7, 15:13, 15:16, 15:23, 17:4, 18:2, 34:15, 34:18
**competition** [11] - 7:25, 8:1, 8:13, 10:25, 16:13, 16:19, 16:21, 17:16, 18:4, 69:18
**competitor** [1] - 34:11
**competitors** [1] - 9:4
**compilation** [2] - 17:21, 17:23
**Complaint** [35] - 19:4, 19:11, 20:13, 20:15, 21:5, 33:23, 34:5, 34:6, 35:20, 36:5, 36:13, 37:17, 38:6, 38:21, 39:1, 39:21, 39:25, 41:4, 41:16, 41:19, 41:20, 41:22, 41:23, 41:25, 42:18, 43:8, 44:14, 44:19, 45:20, 51:7, 51:19,

52:2
**completely** [1] - 55:20
**complex** [1] - 66:3
**comply** [2] - 50:17, 50:18
**concern** [2] - 63:2, 65:8
**concerned** [1] - 43:22
**conclude** [1] - 49:14
**conference** [28] - 2:11, 10:9, 11:11, 11:12, 11:13, 11:14, 11:15, 11:18, 11:19, 11:25, 19:3, 22:18, 22:20, 25:10, 25:17, 25:20, 25:21, 34:21, 42:15, 42:16, 43:5, 43:6, 49:12, 52:10
**Conference** [1] - 1:15
**conferences** [60] - 9:11, 9:12, 9:21, 9:22, 10:20, 11:2, 11:3, 11:8, 11:10, 12:2, 13:21, 13:22, 14:13, 15:25, 16:4, 16:6, 16:13, 18:6, 18:14, 19:1, 19:10, 21:11, 21:17, 21:19, 21:25, 22:9, 34:14, 34:16, 34:20, 35:4, 35:11, 35:13, 35:21, 36:6, 36:8, 36:11, 36:12, 36:15, 36:21, 38:15, 38:17, 39:12, 42:4, 44:20, 48:10, 48:17, 48:19, 49:13, 49:15, 50:1, 51:2, 51:6, 51:11, 52:12, 52:13, 52:14, 56:11, 56:12, 61:20
**confident** [1] - 37:22
**conflict** [1] - 4:18
**confused** [2] - 36:4, 37:10
**confusing** [1] - 54:16
**confusion** [1] - 58:8
**Connolly** [1] - 19:25
**consider** [1] - 45:9
**considered** [1] - 54:2
**consistent** [1] - 7:1
**constitutes** [1] - 20:2
**contend** [2] - 4:14, 20:2
**content** [7] - 11:23, 21:25, 25:16, 27:6, 27:9, 38:14, 49:20
**context** [4] - 11:22, 26:23, 39:22, 44:1
**CONTINUED** [1] - 2:1
**continuously** [1] -

60:2
**contract** [10] - 29:6, 29:7, 30:24, 31:8, 31:25, 42:21, 42:23, 54:3, 56:20, 70:9
**contradiction** [1] - 34:11
**contrary** [1] - 71:22
**convinced** [1] - 62:13
**coordinate** [2] - 57:1, 57:20
**copies** [1] - 18:23
**copy** [2] - 63:22, 68:1
**corner** [1] - 15:8
**correct** [11] - 25:1, 42:3, 44:7, 46:5, 46:12, 46:25, 50:24, 52:18, 58:10, 58:17, 60:16
**corrections** [2] - 64:5, 64:9
**correctly** [3] - 13:11, 13:19, 43:2
**costs** [8] - 28:16, 30:12, 31:4, 31:7, 31:9, 31:11, 31:19
**counsel** [2] - 46:4, 61:17
**count** [3] - 38:2, 42:19, 42:22
**countervailing** [1] - 61:24
**counts** [1] - 34:3
**couple** [1] - 32:20
**course** [5] - 5:15, 9:3, 13:7, 45:6, 56:15
**Court** [43] - 2:7, 6:24, 7:1, 10:8, 10:11, 11:6, 13:6, 14:19, 23:25, 25:24, 26:19, 26:22, 26:25, 27:3, 27:4, 27:5, 27:17, 28:5, 28:22, 29:7, 29:14, 32:4, 32:25, 33:14, 35:18, 37:6, 37:21, 38:20, 45:9, 45:11, 50:5, 57:13, 57:14, 57:21, 60:3, 65:21, 66:23, 69:22, 70:4, 70:9, 70:19, 72:10, 72:15
**COURT** [157] - 1:1, 2:9, 2:21, 3:5, 3:10, 3:12, 4:5, 4:22, 5:7, 5:17, 6:6, 6:13, 7:3, 7:19, 8:2, 8:7, 8:16, 8:20, 9:7, 9:13, 9:17, 9:24, 10:13, 10:17, 10:21, 11:1, 11:8, 11:17, 12:5, 12:9,

12:12, 12:14, 12:18, 12:21, 13:25, 14:22, 15:5, 15:15, 16:5, 17:15, 17:24, 18:11, 18:21, 19:7, 19:18, 19:22, 20:21, 22:5, 23:3, 23:7, 23:15, 23:18, 24:4, 24:16, 25:11, 26:7, 28:9, 28:12, 29:1, 29:10, 29:22, 30:21, 31:7, 31:22, 32:7, 32:11, 33:3, 33:7, 33:16, 36:1, 38:23, 39:14, 40:7, 40:14, 40:20, 42:1, 42:10, 42:17, 43:7, 43:13, 44:3, 44:8, 45:14, 45:24, 46:3, 46:6, 46:9, 46:13, 46:16, 46:22, 47:1, 47:13, 47:21, 48:2, 48:15, 49:10, 50:9, 50:21, 51:5, 51:9, 51:12, 52:5, 52:7, 52:23, 53:18, 53:20, 53:22, 54:13, 55:5, 55:9, 55:14, 55:16, 55:18, 55:23, 56:2, 56:4, 56:6, 56:23, 57:24, 58:14, 58:18, 59:1, 59:3, 59:5, 59:15, 60:17, 60:22, 61:2, 61:14, 62:2, 62:8, 63:1, 63:5, 63:20, 63:24, 64:1, 64:20, 64:24, 65:11, 65:13, 65:15, 65:24, 66:8, 66:16, 66:19, 66:21, 67:1, 67:14, 68:21, 69:8, 70:10, 70:17, 70:21, 71:12, 71:19, 72:2, 72:5
**court** [3] - 63:21, 64:2, 64:6
**Court's** [9] - 6:20, 11:22, 13:11, 13:18, 25:25, 26:24, 33:2, 38:9, 71:9
**Courthouse** [1] - 1:12
**courts** [4] - 10:6, 30:14, 32:6, 65:23
**covenant** [5] - 15:4, 36:11, 47:9, 49:8, 50:16
**covenants** [2] - 28:25, 44:21
**cover** [3] - 40:24, 41:3, 51:19
**covered** [1] - 25:13

**COVID** [1] - 12:1
**Cozen** [1] - 2:16
**COZEN** [1] - 1:19
**create** [2] - 45:2
**created** [1] - 46:6
**creates** [2] - 28:7, 69:13
**creating** [1] - 58:8
**cross** [25] - 4:15, 4:19, 5:15, 5:25, 6:9, 6:17, 16:6, 54:20, 55:7, 55:25, 56:18, 57:10, 57:18, 57:20, 58:2, 58:5, 58:15, 59:10, 59:19, 60:8, 62:11, 62:21, 63:13, 71:5, 71:24
**cross-examination** [8] - 54:20, 55:25, 57:18, 59:19, 62:21, 63:13, 71:5, 71:24
**cross-examine** [1] - 6:9
**cross-examined** [2] - 16:6, 57:20
**cross-examining** [2] - 6:17, 55:7
**crux** [1] - 61:21
**curious** [1] - 19:22
**current** [3] - 9:9, 12:19

## D

**daily** [2] - 63:21, 67:25
**damage** [1] - 15:23
**damages** [13] - 4:1, 14:16, 14:18, 15:19, 15:21, 28:20, 30:10, 32:17, 32:22, 33:1, 33:4, 49:4, 69:15
**date** [1] - 16:13
**Daubert** [6] - 3:24, 69:14, 70:11, 70:19, 70:22, 71:15
**days** [12] - 5:8, 55:1, 55:7, 55:8, 55:10, 55:12, 55:22, 56:1, 56:19, 56:21, 56:22, 59:21
**deal** [1] - 49:5
**debated** [1] - 66:15
**decide** [4] - 28:5, 28:22, 57:21, 67:18
**decided** [3] - 4:25, 24:18, 28:6
**deciding** [1] - 38:20
**decision** [1] - 66:14
**declined** [1] - 19:1
**deduce** [1] - 63:12
**deemed** [2] - 34:20,

34:21
**Defendant** [11] - 1:25, 2:4, 2:24, 3:7, 6:8, 14:5, 33:24, 40:1, 42:13, 43:20, 68:13
**defendant** [1] - 41:21
**defendants** [2] - 56:25, 57:4
**Defendants** [21] - 1:10, 4:11, 4:14, 6:7, 6:16, 14:11, 15:1, 15:22, 16:17, 24:9, 33:18, 34:19, 37:2, 40:2, 42:24, 44:20, 56:18, 57:3, 58:11, 59:8, 71:8
**Defendants'** [7] - 5:16, 7:25, 17:7, 42:24, 43:11, 57:15, 60:7
**defense** [4] - 24:7, 25:17, 54:17, 57:6
**definitions** [1] - 27:18
**degree** [1] - 54:12
**DELAWARE** [1] - 1:2
**Delaware** [4] - 1:13, 29:20, 29:21, 32:6
**denial** [1] - 26:11
**denied** [1] - 70:20
**DENN** [56] - 2:2, 2:23, 4:3, 4:13, 5:5, 5:11, 5:22, 6:10, 6:16, 12:17, 12:19, 12:23, 18:22, 19:12, 19:20, 20:11, 20:23, 22:10, 23:20, 25:1, 25:13, 31:24, 32:9, 32:12, 33:5, 33:11, 37:5, 40:3, 40:10, 40:17, 41:15, 42:3, 53:19, 53:25, 55:20, 56:17, 57:25, 58:17, 58:21, 59:2, 59:13, 60:16, 62:12, 63:19, 63:23, 65:8, 65:12, 65:14, 66:22, 67:9, 68:15, 69:5, 69:10, 70:12, 71:14, 72:1
**Denn** [24] - 2:22, 2:24, 5:7, 5:18, 12:12, 18:21, 23:15, 24:16, 25:11, 27:1, 27:7, 36:10, 38:23, 41:14, 53:18, 56:15, 57:14, 58:14, 60:13, 62:8, 66:21, 68:14, 71:12, 71:25
**dependent** [1] - 54:1
**deposed** [1] - 53:12
**deposition** [19] - 10:4, 10:12, 13:9, 19:13,

20:14, 21:9, 35:1, 39:2, 39:5, 39:21, 39:25, 40:4, 40:5, 41:1, 41:4, 41:5, 54:6, 64:13, 69:25

**depositions** [11] - 18:19, 18:20, 34:25, 35:3, 39:10, 39:15, 53:6, 53:7, 53:9, 53:11, 53:14

**DEPUTY** [2] - 2:7, 72:9

**described** [2] - 39:3, 52:11

**designating** [1] - 53:14

**designations** [2] - 13:9, 54:6

**detailed** [1] - 21:25

**details** [1] - 30:4

**determination** [2] - 26:17, 29:15

**determine** [2] - 8:5, 30:2

**determined** [2] - 30:12, 31:20

**determining** [1] - 29:18

**develop** [1] - 16:2

**developing** [1] - 69:16

**Devor** [1] - 3:25

**difference** [2] - 15:5, 33:21

**differences** [2] - 4:17, 4:18

**different** [12] - 15:18, 15:19, 26:16, 30:16, 52:20, 54:17, 56:23, 57:11, 58:9, 62:24, 71:1

**difficulty** [1] - 28:20

**direct** [10] - 34:11, 54:19, 55:2, 55:3, 55:12, 55:25, 59:18, 61:16, 62:10, 64:13

**directly** [4] - 19:17, 34:14, 35:4, 61:18

**disagree** [1] - 37:9

**disclosures** [1] - 52:16

**discovery** [16] - 20:4, 21:7, 34:23, 35:8, 36:16, 37:2, 39:10, 44:15, 45:6, 45:12, 45:18, 46:10, 46:17, 48:1, 52:16

**discrete** [1] - 6:2

**discretion** [1] - 60:23

**discuss** [3] - 4:6, 25:4, 29:8

**discussed** [2] - 62:25,

69:11

**discussing** [1] - 48:21

**discussion** [2] - 6:6, 42:3

**discussions** [1] - 6:1

**dispute** [4] - 16:17, 19:24, 19:25, 21:8

**disqualify** [1] - 71:11

**distributor** [1] - 15:8

**DISTRICT** [2] - 1:1, 1:2

**District** [1] - 72:15

**division** [2] - 7:21, 7:22

**DLA** [2] - 2:2, 2:24

**Docket** [1] - 51:18

**Document** [1] - 18:25

**document** [1] - 46:20

**documents** [5] - 34:25, 35:2, 36:18, 47:18, 58:16

**done** [8] - 22:1, 29:14, 29:19, 30:14, 35:9, 56:20, 64:4, 64:14

**down** [3] - 9:18, 31:8, 53:9

**dozen** [1] - 21:2

**Dr** [16] - 3:24, 6:7, 6:17, 6:22, 8:4, 14:12, 14:18, 16:5, 16:12, 17:11, 17:24, 32:17, 48:21, 65:6, 69:14, 70:7

**draft** [1] - 44:13

**dramatically** [1] - 21:12

**draw** [1] - 16:4

**driving** [1] - 69:4

**dubious** [1] - 31:14

**duplicate** [2] - 24:12, 57:17

**during** [1] - 45:6

**E**

**early** [2] - 18:25, 21:7

**easy** [1] - 57:2

**edit** [1] - 53:8

**effect** [2] - 12:22, 32:20

**effectively** [3] - 38:6, 38:21, 71:17

**efficient** [1] - 26:5

**effort** [1] - 19:6

**efforts** [1] - 57:1

**eight** [2] - 38:3, 66:5

**eight-minute** [1] - 66:5

**either** [14] - 14:11, 17:19, 21:18, 24:24, 31:8, 32:21, 34:16,

37:6, 43:8, 53:5

**employee** [12] - 8:9, 8:18, 8:20, 8:23, 9:8, 9:9, 9:13, 9:18, 10:19, 10:22, 12:19

**end** [5] - 55:25, 66:22, 67:2, 67:25, 68:3

**ends** [3] - 64:8, 64:9, 68:2

**enforcement** [1] - 28:25

**enjoy** [1] - 72:7

**enter** [1] - 24:2

**entered** [2] - 28:24, 58:6

**entire** [2] - 30:23, 35:13

**entirely** [1] - 66:5

**entirety** [1] - 56:18

**entities** [2] - 15:14, 18:2

**entitled** [4] - 29:15, 29:24, 31:7, 31:19

**entitlement** [4] - 28:14, 28:15, 30:9, 31:11

**entity** [6] - 7:17, 16:25, 17:4, 43:6, 49:24, 52:20

**equal** [1] - 59:6

**especially** [1] - 14:15

**ESQUIRE** [7] - 1:19, 1:20, 1:20, 1:23, 1:24, 2:2, 2:3

**essentially** [10] - 7:6, 24:20, 25:7, 33:25, 46:13, 50:12, 51:18, 54:15, 58:15, 64:7

**establish** [1] - 21:16

**established** [2] - 22:13, 38:9

**estimate** [2] - 23:18, 30:1

**et** [2] - 2:12, 13:22, 56:19

**event** [5] - 13:10, 32:3, 40:24, 56:15, 59:16

**events** [8] - 12:3, 19:15, 20:25, 21:3, 33:24, 37:15, 38:1, 39:2

**evidence** [29] - 16:2, 21:16, 26:5, 26:15, 28:8, 28:18, 28:20, 29:3, 30:21, 31:13, 37:4, 45:8, 49:6, 52:3, 54:2, 54:6, 54:22, 56:12, 56:20, 56:21, 60:10, 62:19, 62:24, 66:12, 67:3,

68:19, 68:23, 69:3

**exact** [5] - 8:8, 37:7, 37:13, 48:24

**exactly** [11] - 13:6, 18:6, 26:1, 27:11, 30:5, 31:9, 35:5, 35:7, 42:17, 49:21, 50:3

**examination** [13] - 54:19, 54:20, 55:2, 55:25, 57:18, 59:18, 59:19, 62:4, 62:11, 62:21, 63:13, 71:5, 71:24

**examine** [1] - 6:9

**examined** [2] - 16:6, 57:20

**examining** [2] - 6:17, 55:7

**example** [2] - 6:7, 25:6

**except** [1] - 47:23

**exchanged** [2] - 15:2, 18:4

**excuse** [1] - 44:19

**Executive** [1] - 7:12

**exercise** [2] - 29:17, 30:18

**exhausts** [1] - 65:17

**Exhibit** [1] - 3:13

**exhibit** [5] - 22:7, 22:8, 23:14, 24:13, 64:11

**exhibits** [10] - 23:3, 23:14, 23:19, 23:21, 23:22, 24:2, 24:5, 54:5, 64:12

**expand** [1] - 19:9

**expanded** [1] - 21:12

**expect** [7] - 6:16, 9:6, 9:10, 45:13, 49:15, 58:18, 64:12

**expected** [2] - 7:16, 7:23

**expecting** [3] - 6:8, 28:18, 64:3

**experience** [2] - 29:22, 34:9

**expert** [10] - 14:18, 17:7, 17:8, 31:19, 54:9, 68:17, 69:16, 69:19, 71:5, 71:11

**expertise** [1] - 65:13

**experts** [7] - 4:2, 7:5, 13:16, 14:10, 31:5, 65:5, 65:7

**explain** [1] - 17:11

**explanation** [1] - 68:18

**explicit** [1] - 70:8

**explicitly** [3] - 6:23,

13:13, 19:2

**expressed** [2] - 23:13, 65:9

**expressly** [2] - 50:22, 51:11

**extensive** [1] - 37:2

**extent** [9] - 4:15, 7:17, 10:23, 15:22, 23:24, 37:5, 37:21, 63:8, 69:3

**extra** [2] - 48:18, 59:9

**F**

**face** [1] - 18:3

**facie** [1] - 62:22

**fact** [9] - 13:17, 22:21, 26:13, 27:24, 32:14, 43:19, 57:7, 63:15, 70:15

**factfinder** [2] - 26:22, 29:15

**factor** [1] - 66:9

**factored** [1] - 14:15

**factors** [2] - 17:22, 17:23

**facts** [2] - 44:13, 45:7

**factual** [6] - 5:25, 6:4, 38:25, 58:1, 58:5, 68:19

**fairer** [1] - 33:8

**fairly** [7] - 6:1, 13:12, 18:25, 21:16, 41:23, 67:2, 69:20

**fairness** [2] - 21:13, 38:18

**faith** [1] - 21:23

**far** [2] - 26:10, 67:17

**fashioned** [1] - 64:15

**fast** [1] - 3:15

**favor** [1] - 57:15

**fee** [1] - 29:16

**fees** [18] - 28:16, 29:8, 29:12, 29:16, 29:18, 29:23, 29:24, 30:3, 30:11, 30:15, 30:20, 30:22, 30:23, 31:3, 31:18, 31:19, 32:1, 32:8

**fell** [1] - 41:1

**few** [2] - 21:11, 24:2

**figure** [3] - 30:4, 47:3, 51:25

**file** [4] - 29:16, 70:19, 70:22, 71:15

**filed** [4] - 34:6, 34:7, 41:19, 50:13

**files** [1] - 29:24

**fill** [1] - 10:23

**Final** [2] - 3:13, 3:15

**final** [1] - 24:20
**finish** [1] - 60:6
**finished** [1] - 62:3
**firm** [2] - 42:14, 43:4
**firms** [1] - 15:16
**first** [22] - 10:3, 13:22, 21:9, 24:10, 26:10, 29:5, 33:8, 33:22, 34:1, 37:18, 42:5, 44:11, 50:22, 51:1, 51:14, 52:18, 52:24, 61:12, 61:17, 61:24, 62:1, 62:2
**five** [1] - 56:22
**fleeting** [1] - 37:13
**flexibility** [1] - 68:6
**flexible** [1] - 67:22
**Florida** [1] - 12:8
**focus** [2] - 51:1, 53:10
**focused** [1] - 26:4
**fodder** [1] - 28:5
**folks** [1] - 18:18
**following** [1] - 66:24
**FOR** [2] - 1:2, 1:4
**forecasting** [1] - 70:24
**forego** [1] - 65:2
**foregoing** [1] - 72:11
**foresee** [1] - 58:7
**forget** [1] - 42:17
**form** [1] - 38:14
**formed** [1] - 46:24
**former** [3] - 9:9, 10:19, 10:22
**forth** [3] - 5:4, 36:13, 45:2
**forward** [3] - 18:9, 26:4, 33:6
**founding** [1] - 42:15
**four** [2] - 39:24, 56:22
**fourth** [1] - 39:17
**Fox** [1] - 3:7
**FOX** [1] - 1:23
**frankly** [1] - 44:16
**Friday** [2] - 1:14, 53:1
**friend** [1] - 21:1
**front** [1] - 71:21
**full** [1] - 36:16
**fully** [2] - 44:25, 63:7
**fun** [1] - 29:17
**futility** [5] - 21:14, 22:4, 22:24, 38:8, 38:19
**future** [7] - 9:11, 9:22, 16:1, 16:14, 19:1, 39:2

**G**

**gained** [1] - 34:9
**game** [2] - 36:21

**gaps** [1] - 10:24
**general** [6] - 7:9, 7:23, 9:19, 34:13, 34:17, 42:20
**generally** [9] - 7:13, 9:22, 28:23, 30:12, 52:1, 56:24, 57:1, 66:2, 70:20
**gist** [1] - 9:19
**given** [3] - 5:12, 5:21, 38:5
**good-faith** [1] - 21:23
**Goodenough** [1] - 4:1
**goodenough** [1] - 17:7
**ground** [1] - 35:15
**grounds** [1] - 69:14
**groundwork** [1] - 8:4
**Group** [17] - 7:15, 7:21, 8:6, 43:17, 44:12, 44:24, 45:1, 45:2, 45:23, 46:7, 46:11, 48:4, 48:5, 48:16, 49:14, 52:17, 52:19
**guess** [18] - 3:14, 4:6, 4:9, 4:22, 9:8, 16:25, 20:11, 25:5, 28:13, 39:5, 39:17, 43:20, 47:14, 55:24, 57:25, 62:12, 65:3, 71:10
**guidance** [1] - 54:11

**H**

**hac** [1] - 2:18
**half** [4] - 21:2, 54:5, 59:17, 59:19
**Hall** [1] - 40:22
**hand** [1] - 18:23
**handful** [1] - 58:3
**handle** [1] - 71:19
**handling** [1] - 75:13
**happy** [2] - 6:13, 6:14
**hard** [2] - 21:22, 72:6
**harm** [1] - 32:18
**Harris** [1] - 3:25
**HAYES** [77] - 1:20, 7:12, 7:20, 8:3, 8:8, 8:19, 8:22, 9:8, 9:15, 9:20, 10:5, 10:16, 10:19, 10:22, 11:5, 11:10, 11:21, 12:7, 12:11, 14:18, 15:1, 15:10, 15:20, 16:11, 17:18, 18:1, 18:16, 23:5, 23:9, 26:9, 28:11, 28:19, 29:5, 29:13, 30:11, 30:25, 31:17, 34:5, 36:3,

39:9, 40:11, 40:16, 42:12, 42:22, 43:10, 43:25, 44:7, 48:20, 49:17, 50:15, 50:25, 51:8, 51:10, 52:1, 53:17, 55:1, 55:6, 55:11, 55:15, 55:17, 55:24, 56:3, 56:5, 60:19, 61:1, 61:9, 61:15, 62:6, 64:16, 65:21, 66:7, 66:12, 66:18, 66:20, 67:7, 70:18, 71:4
**Hayes** [23] - 2:17, 2:19, 12:10, 12:25, 13:21, 21:2, 22:9, 26:7, 33:22, 42:11, 43:23, 48:15, 53:16, 54:24, 55:21, 60:17, 62:13, 62:21, 65:20, 68:17, 69:15, 70:17, 71:20
**Hayes'** [1] - 66:23
**hear** [5] - 7:8, 21:20, 26:24, 38:12, 61:25
**heard** [2] - 21:1, 44:4
**hearing** [6] - 67:8, 67:12, 67:15, 68:16, 68:17
**Heather** [1] - 72:14
**held** [3] - 9:11, 9:21, 19:3
**helpful** [4] - 41:3, 64:11, 65:22, 65:25
**hemp** [3] - 11:11, 19:3, 42:16
**hereby** [1] - 72:11
**herself** [2] - 16:15, 16:23
**hint** [1] - 42:5
**hinted** [1] - 24:17
**hired** [1] - 31:2
**hold** [4] - 38:24, 42:10, 51:9, 62:10
**Holding** [1] - 2:4
**HOLDINGS** [1] - 1:9
**Holdings** [2] - 2:13, 2:25, 3:4
**Honor** [92] - 2:15, 2:23, 3:6, 3:11, 4:3, 4:4, 4:13, 5:5, 5:11, 6:10, 6:17, 7:13, 9:16, 12:7, 12:11, 12:17, 12:23, 13:20, 13:22, 15:10, 18:16, 18:22, 19:12, 19:20, 20:12, 21:15, 21:20, 22:11, 22:12, 22:13, 23:17, 23:20, 24:15, 25:1, 25:14, 26:9,

29:14, 31:18, 31:25, 32:9, 32:12, 33:6, 33:13, 34:5, 37:5, 37:14, 37:24, 38:8, 39:9, 40:3, 40:11, 41:15, 42:4, 44:7, 44:10, 44:24, 52:6, 52:18, 53:19, 53:21, 53:25, 54:10, 55:2, 55:20, 57:25, 58:2, 58:10, 58:17, 58:21, 60:16, 62:12, 62:25, 63:19, 63:23, 63:25, 64:19, 64:23, 65:8, 65:14, 65:21, 67:12, 68:16, 69:6, 69:10, 70:12, 70:18, 71:14, 71:15, 72:1, 72:3, 72:4
**Honor's** [2] - 10:6, 61:9
**HONORABLE** [1] - 1:16
**Honorable** [1] - 2:8
**hope** [2] - 6:18, 11:21
**hoped** [2] - 7:2, 24:24
**hopefully** [2] - 53:1, 68:15
**Horowitz** [1] - 12:16
**hostile** [1] - 61:11
**hotel** [11] - 46:24, 47:3, 47:6, 48:18, 49:2, 49:4, 49:14, 49:21, 50:2, 50:7
**hotels** [3] - 44:22, 48:11, 52:11
**hour** [2] - 54:13, 59:24
**hours** [6] - 57:3, 59:9, 59:17, 59:19, 59:20
**hundred** [3] - 15:17, 23:5, 23:7

**I**

**idea** [3] - 33:23, 46:23, 52:10
**identified** [8] - 21:24, 33:23, 34:15, 36:7, 36:8, 37:25, 38:13, 50:15
**identifies** [1] - 36:5
**identify** [5] - 14:12, 14:13, 18:14, 35:21, 41:1
**imagine** [1] - 49:10
**immediately** [1] - 46:8
**impact** [7] - 6:21, 7:23, 7:24, 8:12, 8:13, 10:24, 65:9
**important** [5] - 32:3,

37:22, 53:13, 62:25, 64:24
**impression** [1] - 14:5
**IN** [1] - 1:1
**in-person** [1] - 11:13
**inaccurately** [1] - 9:1
**INC** [1] - 1:9
**Inc** [1] - 2:4
**incidents** [1] - 28:2
**included** [1] - 48:14
**including** [1] - 55:25
**incurred** [2] - 31:5, 31:18
**indemnity** [1] - 29:8
**indicate** [1] - 50:10
**indicated** [2] - 37:18
**induced** [1] - 42:14
**industry** [1] - 31:21
**ineffective** [2] - 68:23, 68:24
**inefficient** [1] - 68:24
**information** [6] - 18:19, 19:6, 38:16, 39:12, 48:13, 53:10
**inherent** [1] - 18:2
**inherently** [1] - 25:18
**injunction** [1] - 32:23
**injunctive** [4] - 28:14, 28:22, 28:24, 32:13
**input** [2] - 5:14, 57:6
**inserted** [1] - 46:18
**instance** [4] - 8:24, 18:17, 39:10, 61:17
**instances** [2] - 17:16, 49:6
**Institute** [2] - 2:11, 7:15
**INSTITUTE** [1] - 1:4
**Institutes** [11] - 7:13, 7:22, 8:3, 12:20, 15:2, 16:15, 16:16, 16:18, 16:24, 48:23, 50:3
**INSTITUTES** [1] - 1:5
**Institutes'** [1] - 13:4
**instructive** [1] - 17:6
**INSURANCE** [1] - 1:9
**insurance** [1] - 22:18
**Insurance** [12] - 2:4, 2:13, 2:25, 3:4, 8:10, 8:11, 8:18, 8:22, 9:1, 24:11, 34:10, 36:23
**intelligence** [1] - 11:12
**intend** [3] - 7:7, 27:21, 60:20
**intended** [1] - 24:24
**intends** [1] - 54:10
**intent** [2] - 13:1, 13:3

**Intercontinental** [1] - 36:25

**interest** [1] - 23:13

**interested** [3] - 21:19, 21:21, 38:12

**interpret** [2] - 26:1, 27:17

**interpretation** [7] - 23:23, 24:20, 26:10, 27:1, 30:24, 32:4

**interpreted** [3] - 25:15, 26:2, 26:20

**Interrogatories** [1] - 18:24

**interrogatories** [2] - 36:15, 46:20

**interrogatory** [5] - 18:12, 34:24, 39:17, 40:1, 41:6

**introducing** [2] - 11:18, 31:13

**introduction** [1] - 26:5

**invested** [1] - 16:16

**inviting** [2] - 19:9, 32:11

**involve** [2] - 6:1, 66:3

**involved** [4] - 7:21, 32:21, 35:4, 51:16

**involves** [1] - 25:18

**involving** [3] - 22:18, 38:2, 50:22

**IP** [1] - 11:11

**irrelevant** [1] - 53:10

**irreparable** [1] - 32:18

**isolated** [1] - 49:6

**issue** [32] - 6:17, 19:21, 19:23, 21:13, 21:14, 22:4, 22:24, 24:18, 25:8, 26:10, 26:13, 26:19, 27:5, 28:22, 30:7, 30:8, 32:13, 32:15, 36:2, 38:8, 38:18, 38:19, 44:12, 44:15, 44:17, 45:9, 47:10, 51:22, 58:12, 58:22, 60:22

**issued** [1] - 21:15

**issues** [6] - 5:13, 25:2, 44:1, 54:22, 58:11, 62:24

**issuing** [1] - 13:7

**italicized** [1] - 48:16

**item** [1] - 69:10

**Item** [1] - 51:18

**items** [1] - 68:15

**itself** [2] - 7:21, 40:12

### J

**Jeffrey** [1] - 8:2

**Jeremy** [1] - 8:7

**joined** [1] - 3:8

**joint** [2] - 4:11, 23:13

**Judge** [4] - 19:25, 35:17, 40:20, 40:22

**judge** [4] - 26:13, 26:16, 61:25, 66:9

**Judge's** [1] - 40:12

**judging** [1] - 23:11

**judgment** [33] - 6:20, 13:8, 13:12, 13:18, 14:3, 14:6, 14:20, 21:15, 22:3, 24:1, 24:20, 26:12, 26:14, 26:18, 26:21, 29:16, 30:13, 38:10, 42:7, 43:19, 44:2, 44:5, 44:11, 44:16, 45:13, 45:15, 45:17, 58:3, 65:10, 65:25, 66:14, 69:12

**Judgment** [1] - 13:1

**July** [1] - 68:3

**jury** [2] - 5:12, 58:9

### K

**Katherine** [1] - 12:15

**Katie** [5] - 10:1, 10:17, 12:5, 12:7, 53:4

**keep** [1] - 14:6

**Keith** [1] - 9:7

**Kenner** [2] - 9:7, 35:3

**Kett** [7] - 10:1, 10:17, 12:5, 12:7, 35:3, 39:11, 53:4

**kind** [17] - 7:9, 15:5, 20:7, 28:2, 28:14, 28:21, 30:21, 31:10, 31:12, 31:14, 34:1, 47:1, 62:22, 66:24, 68:5

**Kinder** [1] - 39:11

**King** [1] - 1:12

**Klayman** [1] - 2:16

**KLAYMAN** [2] - 1:19, 2:15

**knock** [1] - 24:7

**known** [2] - 36:12, 51:4

**knows** [2] - 47:16, 47:19

### L

**lack** [1] - 4:1

**laid** [2] - 19:16, 42:18

**language** [3] - 13:11, 37:7, 37:22

**large** [1] - 54:12

**last** [3] - 35:23, 45:3, 55:4

**law** [6] - 12:4, 15:16, 32:18, 32:24, 42:14, 43:4

**lawsuit** [1] - 35:13

**lawyer** [3] - 13:4, 47:2, 57:19

**lawyers** [2] - 31:3, 55:7

**laxed** [1] - 5:9

**laying** [1] - 8:4

**leading** [2] - 7:15, 63:10

**learned** [1] - 45:5

**learning** [1] - 18:17

**least** [8] - 13:25, 16:9, 24:17, 29:18, 30:13, 30:19, 31:1, 36:12

**leave** [2] - 8:25, 23:24

**left** [6] - 8:22, 13:8, 19:11, 41:25, 70:6, 71:18

**legal** [5] - 24:18, 25:2, 26:6, 26:17, 28:21

**legally** [1] - 6:3

**length** [3] - 54:11, 58:19, 68:7

**lengths** [2] - 57:5, 57:9

**less** [5] - 41:11, 41:12, 47:17, 56:6, 63:3

**letter** [3] - 39:20, 40:24, 41:3

**leverage** [1] - 34:8

**leveraged** [1] - 34:9

**liability** [6] - 4:15, 4:20, 4:21, 14:19, 16:10, 32:4

**liable** [1] - 33:4

**likely** [2] - 6:4, 56:21

**limine** [9] - 3:14, 3:16, 13:23, 14:1, 33:17, 41:10, 42:11, 43:16, 52:24

**limit** [2] - 44:6, 54:13

**limited** [5] - 14:3, 14:4, 54:20, 54:21, 58:2, 66:10

**limiting** [1] - 20:9

**lines** [3] - 18:13, 20:2, 47:16

**list** [14] - 7:6, 11:3, 11:6, 21:2, 21:12, 22:7, 22:8, 23:11, 23:14, 24:6, 24:7, 24:9, 24:11, 41:7

**listed** [3] - 13:16, 23:20, 25:2, 37:6, 47:25, 48:13

**listen** [1] - 26:23

**listing** [1] - 13:1

**lists** [2] - 23:4, 24:6

**litigate** [1] - 38:2

**litigating** [1] - 57:5

**litigation** [11] - 11:24, 22:14, 25:9, 25:15, 25:20, 25:22, 27:6, 27:15, 27:22, 28:3, 43:21

**live** [2] - 54:9, 68:24

**lived** [1] - 12:8

**LLC** [1] - 1:5

**LLP** [2] - 1:23, 2:2

**located** [1] - 12:6

**logistical** [1] - 58:12

**long-term** [1] - 11:15

**Look** [1] - 17:13

**look** [7] - 18:5, 22:7, 39:23, 43:7, 43:13, 51:13, 51:24

**looked** [1] - 3:18

**looking** [5] - 5:3, 16:14, 41:7, 41:8, 43:3

**looks** [2] - 13:6, 38:20

**lost** [4] - 11:14, 15:21, 38:2

**lunch** [7] - 20:18, 20:24, 35:23, 35:24, 37:20, 39:6, 59:24

### M

**mad** [1] - 36:20

**Magistrate** [3] - 35:17, 40:12, 40:20

**Magistrate's** [1] - 40:14

**main** [2] - 38:25, 59:16

**Management** [2] - 48:7, 48:8

**management** [13] - 11:24, 22:14, 25:10, 25:16, 25:20, 25:22, 27:6, 27:15, 27:16, 27:22, 27:25, 28:3, 60:23

**manager** [2] - 17:3, 28:1

**managers** [1] - 27:23

**March** [1] - 34:7

**marked** [1] - 65:17

**market** [3] - 16:19, 16:20, 35:8

**marketed** [1] - 34:16

**marketers** [1] - 35:3

**marketing** [1] - 49:20

**material** [1] - 37:8

**matt** [1] - 2:23

**matter** [8] - 7:23, 9:23,

17:16, 21:21, 25:21, 43:9, 50:20, 61:22

**MATTHEW** [2] - 1:20, 2:2

**Matthew** [1] - 2:17

**mean** [31] - 10:4, 11:13, 13:25, 17:12, 21:1, 24:18, 25:4, 25:6, 25:7, 25:10, 27:12, 27:16, 27:22, 28:19, 29:6, 30:14, 35:12, 41:2, 45:15, 47:19, 48:4, 49:17, 52:9, 55:9, 56:7, 57:22, 61:10, 62:14, 66:2, 69:25, 71:15

**meaning** [3] - 10:14, 54:7, 66:13

**means** [10] - 13:7, 13:13, 23:25, 25:16, 69:13, 69:20, 69:21, 69:23, 70:1, 70:9

**meant** [4] - 6:25, 7:2, 27:21, 70:14

**measuring** [1] - 28:20

**meet** [1] - 22:22

**members** [1] - 27:23

**Memorial** [1] - 72:7

**mention** [1] - 27:8

**mentioned** [9] - 19:4, 19:8, 20:24, 21:4, 22:16, 40:8, 44:14, 49:13, 52:17

**mentioning** [2] - 22:9, 22:19

**Merit** [1] - 72:14

**meritless** [1] - 45:15

**met** [1] - 3:1

**methodology** [1] - 65:6

**Meyer** [1] - 3:24, 6:7, 6:17, 8:4, 14:12, 14:18, 16:5, 17:11, 17:24, 32:17, 70:7

**Meyer's** [5] - 6:22, 16:12, 48:21, 65:6, 69:14

**Miami** [1] - 3:1

**Michigan** [1] - 12:8

**microphone** [1] - 5:6

**middle** [1] - 3:16

**might** [7] - 4:24, 6:20, 22:1, 25:7, 63:9, 63:12, 68:18

**Miller** [1] - 7:11

**million** [2] - 48:23, 50:4

**mind** [5] - 6:12, 10:5, 14:7, 36:19, 52:9

**minor** [1] - 5:18

**minute** [3] - 38:24, 51:9, 66:5
**misstatement** [1] - 43:23
**mistaken** [3] - 13:10, 34:7, 40:18
**misunderstood** [1] - 61:9
**model** [2] - 15:23, 16:3
**mom** [1] - 15:8
**mom-and-pop** [1] - 15:8
**moment** [1] - 37:13
**Monday** [1] - 63:18
**monetary** [3] - 32:17, 33:1, 33:4
**money** [1] - 32:22
**monitored** [1] - 35:6
**months** [1] - 21:11
**morning** [2] - 59:25, 60:8
**most** [8] - 7:7, 7:20, 14:12, 41:3, 58:5, 62:25, 64:18, 66:2
**mostly** [2] - 12:15, 25:14
**motion** [24] - 3:14, 3:25, 6:20, 13:23, 14:6, 14:20, 19:5, 19:16, 26:12, 26:18, 26:20, 29:24, 35:16, 41:9, 42:11, 43:16, 43:19, 44:2, 44:11, 46:23, 52:24, 70:19, 70:22, 71:16
**motions** [5] - 3:16, 14:1, 29:23, 33:17, 58:3
**move** [1] - 45:17
**moved** [4] - 44:16, 45:12, 45:15, 49:24
**MR** [165] - 2:15, 2:23, 3:6, 3:11, 4:3, 4:4, 4:13, 5:5, 5:11, 5:22, 6:10, 6:16, 7:12, 7:20, 8:3, 8:8, 8:19, 8:22, 9:8, 9:15, 9:20, 10:5, 10:16, 10:19, 10:22, 11:5, 11:10, 11:21, 12:7, 12:11, 12:13, 12:17, 12:19, 12:23, 14:18, 15:1, 15:10, 15:20, 16:11, 17:18, 18:1, 18:16, 18:22, 19:12, 19:20, 20:11, 20:23, 22:10, 23:5, 23:9, 23:10, 23:17, 23:20, 24:15, 25:1, 25:13, 26:9,

28:11, 28:19, 29:5, 29:13, 30:11, 30:25, 31:17, 31:24, 32:9, 32:12, 33:5, 33:11, 34:5, 36:3, 37:5, 39:9, 40:3, 40:10, 40:11, 40:16, 40:17, 41:15, 42:3, 42:12, 42:22, 43:10, 43:25, 44:7, 44:10, 45:19, 46:1, 46:5, 46:8, 46:12, 46:15, 46:17, 46:25, 47:5, 47:20, 47:23, 48:6, 48:20, 49:17, 50:15, 50:25, 51:8, 51:10, 52:1, 52:6, 52:9, 52:15, 53:17, 53:19, 53:21, 53:25, 55:1, 55:6, 55:11, 55:15, 55:17, 55:20, 55:24, 56:3, 56:5, 56:17, 57:9, 57:25, 58:17, 58:21, 59:2, 59:4, 59:13, 59:14, 60:16, 60:19, 61:1, 61:9, 61:15, 62:6, 62:12, 63:4, 63:19, 63:23, 64:16, 64:18, 64:21, 65:8, 65:12, 65:14, 65:21, 66:7, 66:12, 66:18, 66:20, 66:22, 67:7, 67:9, 67:12, 68:15, 69:5, 69:10, 70:12, 70:18, 71:4, 71:14, 72:1, 72:3, 72:4
**multiple** [7] - 11:10, 20:13, 37:19, 38:3, 43:20, 56:25, 57:4
**must** [1] - 36:11

## N

**name** [2] - 2:16, 45:1
**named** [1] - 24:10
**narrow** [1] - 6:1
**narrowed** [1] - 35:18
**nature** [7] - 7:24, 7:25, 8:11, 8:12, 9:5, 9:10
**necessarily** [2] - 58:8, 58:24
**necessary** [5] - 10:23, 33:15, 58:1, 60:21, 68:18
**need** [25] - 8:14, 24:9, 28:8, 30:8, 39:7, 43:14, 46:9, 46:10, 46:16, 46:17, 49:16, 53:8, 53:13, 53:15, 53:23, 54:25, 55:1,

57:14, 59:22, 60:3, 60:11, 63:11, 64:10, 68:5, 69:7
**needing** [1] - 13:14
**needs** [1] - 62:22
**negotiating** [1] - 13:4
**never** [12] - 17:9, 19:3, 33:25, 36:14, 42:1, 46:19, 47:23, 47:24, 47:25, 50:10
**nevertheless** [1] - 70:23
**next** [6] - 10:13, 40:9, 52:25, 53:2, 60:5, 60:10
**nice** [1] - 61:22
**niche** [2] - 16:19, 16:20
**NIEDERMAN** [8] - 1:23, 3:6, 3:11, 4:4, 23:10, 24:15, 53:21, 72:3
**Niederman** [4] - 3:7, 3:10, 53:20, 72:2
**nine** [1] - 57:3
**non** [42] - 6:25, 7:1, 7:18, 9:2, 9:3, 13:3, 13:4, 13:5, 13:7, 13:13, 15:12, 16:8, 18:15, 19:15, 20:3, 20:16, 21:17, 22:23, 23:2, 23:24, 24:21, 26:1, 27:7, 32:6, 34:12, 34:18, 34:22, 35:22, 37:17, 41:12, 42:2, 42:7, 42:20, 43:1, 43:12, 50:11, 54:7, 54:9, 69:13, 69:20, 69:25, 70:14
**non-compete** [35] - 6:25, 7:1, 7:18, 9:2, 9:3, 13:3, 13:5, 13:7, 13:13, 15:12, 16:8, 18:15, 19:15, 20:3, 20:16, 21:17, 22:23, 23:2, 23:24, 24:21, 26:1, 27:7, 32:6, 34:12, 34:18, 34:22, 35:22, 37:17, 43:12, 50:11, 54:7, 69:13, 69:20, 69:25, 70:14
**non-expert** [1] - 54:9
**non-lawyer** [1] - 13:4
**non-solicitation** [5] - 41:12, 42:2, 42:7, 42:20, 43:1
**North** [1] - 1:12
**notebook** [1] - 64:12
**noted** [4] - 6:18, 14:19, 32:1, 65:17

**notes** [2] - 63:20, 72:12
**nothing** [8] - 44:21, 45:20, 46:20, 48:4, 52:16, 52:17, 70:24
**notice** [16] - 30:2, 34:19, 35:17, 35:18, 37:7, 38:18, 39:4, 39:16, 40:12, 44:11, 45:10, 51:16, 51:23, 52:2, 52:19, 63:17
**noticed** [2] - 39:3, 48:16
**number** [7] - 2:13, 23:10, 23:11, 23:18, 38:4, 41:10, 68:9
**numbered** [1] - 23:11
**numbering** [1] - 24:8

## O

**O'Connor** [1] - 2:16
**O'CONNOR** [1] - 1:19
**object** [1] - 70:25
**objected** [1] - 35:14
**objection** [1] - 40:19
**objections** [1] - 36:17
**obtain** [2] - 10:9, 35:9
**obtained** [3] - 35:2, 35:6, 47:18
**obvious** [1] - 40:25
**obviously** [15] - 14:4, 14:7, 19:23, 22:20, 23:14, 31:3, 33:13, 47:11, 47:16, 47:24, 48:8, 48:9, 52:20, 57:16, 63:7
**occur** [1] - 12:3
**occurred** [1] - 34:16
**occurs** [1] - 39:16
**OF** [1] - 1:2
**offer** [1] - 21:22, 21:24, 38:14, 38:15
**offered** [5] - 20:23, 22:22, 38:10, 49:9, 49:14
**offering** [1] - 64:14
**office** [2] - 3:1, 3:9
**Officer** [1] - 7:12
**often** [2] - 61:2, 61:3
**old** [1] - 64:15
**old-fashioned** [1] - 64:15
**once** [6] - 8:18, 58:13, 60:2, 61:6, 62:3, 67:8
**one** [32] - 4:5, 6:10, 6:17, 6:23, 8:14, 8:23, 12:24, 15:8, 15:16, 15:17, 16:9,

17:17, 22:5, 24:4, 24:13, 25:2, 27:2, 29:25, 30:6, 33:22, 38:19, 39:20, 41:10, 42:22, 51:25, 54:24, 61:4, 61:11, 61:22, 61:23, 68:16
**one-page** [1] - 39:20
**ones** [3] - 21:3, 36:6, 53:12
**open** [2] - 62:10, 70:13
**opening** [6] - 54:19, 59:18, 65:22, 66:4, 66:6, 68:8
**operations** [1] - 10:24
**Opinion** [1] - 13:2
**opinion** [14] - 13:8, 13:12, 13:18, 16:12, 18:7, 22:3, 24:1, 24:20, 38:10, 69:12, 69:17, 71:7, 71:10, 71:22
**opportunity** [3] - 20:12, 37:23, 70:19
**oppose** [1] - 4:12
**opposed** [2] - 62:18
**Oprison** [9] - 2:25, 6:12, 12:12, 12:13, 12:14, 23:16, 23:17, 67:9, 70:3
**OPRISON** [3] - 2:3, 12:13, 23:17
**oral** [1] - 28:8
**order** [2] - 21:16, 68:19
**Order** [17] - 3:13, 3:15, 6:18, 13:1, 13:9, 22:6, 25:3, 25:12, 25:25, 28:12, 32:2, 32:19, 41:13, 50:14, 50:23, 51:17, 53:1
**orderly** [2] - 62:19, 62:23
**organization** [1] - 51:2
**organized** [2] - 37:16, 60:5
**organizing** [4] - 44:20, 48:17, 51:5, 51:20, 52:10, 52:12, 52:13
**original** [2] - 41:19, 41:23
**otherwise** [1] - 38:12
**outset** [4] - 6:11, 25:8, 33:13, 65:9
**outside** [1] - 20:15
**overall** [1] - 5:1
**overlap** [1] - 23:12
**owed** [1] - 45:4
**own** [1] - 17:3

**owned** [1] - 34:9
**owner** [1] - 47:2

**P**

**p.m** [3] - 1:14, 59:24, 72:10
**page** [6] - 3:21, 25:11, 39:20, 54:15, 67:21
**Page** [2] - 3:22, 25:14
**Pages** [3] - 25:14, 28:13, 41:13
**pages** [5] - 3:17, 23:11, 39:22, 41:5, 41:12
**paid** [4] - 17:5, 17:10, 18:9, 31:3
**pandemic** [1] - 5:8
**panel** [1] - 22:25
**panels** [1] - 22:15
**paper** [2] - 41:6, 50:13
**papers** [5] - 20:22, 22:17, 37:11, 39:23, 42:8
**Paragraph** [6] - 28:14, 28:15, 43:8, 51:6, 51:18, 69:19
**paragraph** [1] - 44:18
**paragraphs** [2] - 41:4, 48:13
**pardon** [1] - 34:19
**park** [3] - 23:4, 30:1, 56:19
**parol** [10] - 54:2, 54:6, 54:22, 56:12, 56:20, 56:21, 60:10, 66:12, 68:19, 69:3
**part** [12] - 5:2, 5:3, 5:19, 7:7, 26:17, 28:13, 29:4, 29:5, 42:25, 43:24, 58:24, 60:7
**particular** [1] - 41:17
**particularly** [3] - 16:14, 32:5, 41:18
**parties** [6] - 23:12, 24:3, 27:21, 53:8, 54:17, 66:24
**parties'** [1] - 23:4
**partner** [1] - 42:15
**party** [5] - 38:21, 41:17, 41:20, 42:6, 50:16
**pass** [1] - 71:2
**past** [1] - 21:10
**patent** [1] - 56:25
**patient** [1] - 11:15
**pay** [1] - 32:8
**paying** [1] - 67:25
**payment** [1] - 45:3

**people** [10] - 3:23, 5:9, 7:6, 11:1, 11:17, 11:22, 12:15, 24:23, 35:4, 65:7
**percentage** [1] - 54:4
**perhaps** [2] - 8:17, 14:12
**period** [2] - 6:2, 7:20
**permanent** [1] - 32:22
**permissibility** [1] - 6:21
**permissible** [2] - 7:17, 62:18
**permitted** [2] - 27:13, 38:6
**Pernie** [5] - 10:14, 10:21, 12:6, 12:8, 53:4
**person** [8] - 7:7, 10:1, 10:13, 10:14, 11:13, 13:4, 53:5
**personnel** [1] - 27:16
**perspective** [1] - 57:10
**persuasive** [1] - 20:9
**pertinent** [1] - 17:22
**Peter** [1] - 7:11
**petition** [1] - 29:17
**Philadelphia** [1] - 3:9
**phrased** [1] - 69:18
**phrases** [1] - 27:18
**physically** [2] - 12:6, 58:23
**piece** [1] - 50:13
**PIPER** [1] - 2:2
**Piper** [1] - 2:24
**Plaintiff** [16] - 2:14, 7:6, 14:7, 14:11, 22:8, 24:6, 28:17, 32:16, 32:20, 34:19, 43:21, 56:18, 57:2, 63:6, 63:9, 68:12
**Plaintiff's** [8] - 5:3, 13:16, 18:24, 19:13, 23:22, 24:8, 42:7, 63:14
**Plaintiffs** [13] - 1:6, 1:21, 2:20, 21:22, 25:3, 26:2, 38:11, 38:22, 41:22, 43:21, 44:25, 58:23, 59:7
**Plaintiffs'** [1] - 5:16
**plan** [3] - 36:21, 48:25, 54:25
**planned** [1] - 12:2
**planning** [5] - 17:20, 31:1, 52:13, 58:19, 64:14
**plans** [4] - 9:11, 9:21, 9:22, 61:19

**play** [1] - 53:13
**pleading** [5] - 34:2, 50:12, 51:19, 52:2
**pleadings** [1] - 51:15
**point** [14] - 4:6, 7:2, 21:14, 22:4, 23:4, 29:7, 36:9, 38:3, 46:7, 50:9, 68:12, 69:9, 70:15, 70:25
**pointed** [1] - 57:14
**pointing** [1] - 25:12
**points** [1] - 48:18
**pop** [1] - 15:8
**portions** [3] - 39:5, 41:24, 41:25
**posed** [1] - 22:12
**position** [5] - 15:23, 16:15, 16:17, 51:17, 67:2
**positioned** [1] - 15:13
**possible** [2] - 4:24, 66:5
**possibly** [1] - 67:3
**post** [8] - 5:8, 29:23, 30:13, 31:10, 31:20, 67:8, 67:12, 67:15
**post-hearing** [1] - 67:8, 67:12, 67:15
**post-judgment** [1] - 30:13
**post-pandemic** [1] - 5:8
**post-trial** [3] - 29:23, 31:10, 31:20
**postpone** [1] - 62:4
**POTTER** [1] - 1:8
**Potter** [15] - 1:25, 2:12, 3:8, 4:8, 17:14, 33:19, 34:8, 39:10, 42:13, 42:14, 42:19, 43:4, 50:17, 50:19, 51:3
**potter** [30] - 4:10, 4:19, 4:25, 9:25, 15:12, 16:2, 16:22, 24:10, 34:25, 36:18, 43:5, 44:25, 46:1, 46:2, 46:6, 47:15, 48:23, 49:7, 49:11, 51:20, 56:9, 57:9, 58:4, 58:16, 58:19, 59:3, 59:4, 59:10, 60:14, 63:2
**potter's** [2] - 20:19, 47:8
**Potter's** [2] - 17:1, 46:3
**power** [1] - 10:8
**practice** [1] - 35:16
**precisely** [1] - 19:14

**prefer** [4] - 5:5, 10:10, 64:22, 67:10
**preferences** [1] - 10:6
**prejudiced** [1] - 15:15
**premised** [1] - 4:19
**preparation** [2] - 50:23, 51:17
**present** [3] - 5:15, 62:24, 68:19
**presentation** [2] - 6:5, 62:19
**presented** [4] - 5:16, 44:4, 53:6, 53:7
**presently** [1] - 11:5
**preserve** [2] - 26:15, 68:20
**preserving** [2] - 68:22, 68:25
**President** [1] - 3:3
**presiding** [1] - 2:8
**pressed** [1] - 21:22
**presumably** [9] - 30:23, 45:16, 46:10, 47:19, 48:4, 62:9, 63:10, 64:7, 64:8
**Pretrial** [1] - 1:15, 3:13, 3:15, 6:18, 13:8, 22:6, 25:3, 25:12, 28:12, 32:2, 32:19, 41:13, 50:13, 50:23, 51:17
**pretrial** [9] - 2:10, 12:24, 25:2, 32:19, 44:13, 45:7, 46:19, 52:3, 52:21
**pretty** [11] - 3:15, 32:24, 50:24, 51:24, 57:2, 58:2, 66:3, 67:23, 68:23, 70:8, 71:20
**prevention** [4] - 22:20, 25:10, 25:16, 25:19
**previously** [2] - 3:2, 8:9
**price** [1] - 8:6
**prima** [1] - 62:22
**primarily** [1] - 49:24
**primary** [2] - 2:19, 13:3
**prism** [1] - 32:5
**pro** [1] - 2:18
**problem** [1] - 39:14
**procedurally** [1] - 31:24
**proceeding** [1] - 72:13
**PROCEEDINGS** [1] - 2:6
**produce** [1] - 9:14
**produced** [1] - 36:18
**proffer** [3] - 21:23,

38:12, 69:6
**profits** [1] - 15:21
**program** [2] - 11:18, 11:19
**prohibited** [1] - 15:3
**promoting** [2] - 44:20, 52:14
**proof** [4] - 54:25, 61:19, 61:22, 61:23
**Property** [1] - 2:11
**PROPERTY** [1] - 1:4
**Proposed** [3] - 3:12, 22:6, 32:19
**protect** [1] - 27:2
**protocol** [1] - 6:10
**prove** [9] - 17:17, 30:8, 30:9, 33:4, 49:16, 50:6, 56:9
**provide** [1] - 11:6
**provides** [1] - 31:2
**provision** [4] - 29:9, 31:2, 41:12, 42:2
**publication** [1] - 49:24
**pull** [1] - 19:20
**pump** [1] - 36:22
**Purchase** [1] - 7:14
**purchase** [1] - 8:6
**purport** [1] - 47:18
**purpose** [1] - 49:9
**purposes** [2] - 26:20, 62:21
**pursuant** [1] - 52:2
**pursued** [1] - 48:1
**pursuing** [1] - 15:5
**put** [22] - 16:7, 16:15, 16:23, 18:14, 23:13, 26:14, 28:18, 28:19, 29:10, 30:1, 30:16, 30:20, 30:22, 31:1, 37:3, 40:21, 43:6, 45:8, 52:4, 56:10, 56:11, 59:10
**puts** [1] - 34:19
**putting** [4] - 12:1, 29:3, 35:7, 48:17

**Q**

**questioned** [2] - 69:24, 70:14
**questioning** [1] - 20:20
**questions** [13] - 3:20, 6:12, 6:14, 12:24, 18:23, 19:9, 35:15, 36:17, 39:11, 49:12, 61:18, 63:10, 71:16
**quick** [1] - 68:15
**quickly** [1] - 67:23
**quite** [1] - 8:17

**quote** [1] - 37:13
**quoted** [1] - 43:19

**R**

**raised** [3] - 44:1, 44:11, 58:22
**raising** [1] - 68:12
**range** [1] - 14:22
**rare** [1] - 67:2
**rates** [1] - 31:21
**rather** [1] - 63:12
**rationale** [1] - 30:13
**reached** [2] - 19:24, 19:25
**read** [7] - 3:12, 3:13, 3:18, 19:8, 52:15, 64:22, 64:25
**reading** [4] - 3:15, 13:11, 13:18, 14:1
**ready** [2] - 59:23, 60:3
**Real** [1] - 72:14
**Real-Time** [1] - 72:14
**realistic** [1] - 56:8
**really** [9] - 16:14, 16:20, 22:18, 29:2, 31:15, 34:2, 39:15, 51:24, 68:11
**reargue** [2] - 25:8, 25:23
**reason** [6] - 24:11, 24:21, 24:23, 29:25, 44:10, 52:1
**reasonable** [3] - 31:25, 32:2, 63:6
**reasonableness** [1] - 29:18
**recalled** [1] - 21:10
**recalling** [1] - 43:2
**received** [3] - 44:13, 52:19, 52:21
**recess** [1] - 72:8
**recessed** [1] - 72:10
**recites** [1] - 69:12
**recognize** [2] - 5:20, 19:23
**recognized** [1] - 26:16
**recognizing** [1] - 61:7
**record** [7] - 26:15, 26:21, 26:23, 27:3, 64:22, 65:1, 68:25
**recreate** [3] - 48:24, 49:7, 50:4
**redundant** [1] - 53:9
**refer** [1] - 42:24
**reference** [5] - 10:1, 43:11, 44:18, 44:19, 69:16
**referencing** [1] - 48:10
**referred** [1] - 52:4

**referring** [1] - 42:15
**regard** [1] - 4:17
**regardless** [2] - 37:14, 45:16
**regards** [1] - 31:15
**relate** [1] - 54:6
**related** [2] - 10:17, 22:14
**relates** [1] - 46:2
**relating** [1] - 11:23
**relation** [1] - 70:11
**relationship** [2] - 17:3, 51:22
**relationships** [1] - 15:14
**relatively** [2] - 39:23, 67:22
**relevance** [3] - 7:9, 13:16, 50:6
**relevant** [4] - 14:12, 15:23, 19:8, 39:5, 40:21
**relief** [6] - 28:15, 28:22, 28:24, 29:4, 29:6, 32:13
**relying** [1] - 70:25
**remain** [1] - 6:24
**remaining** [1] - 69:14
**remember** [7] - 8:8, 19:14, 20:21, 30:6, 36:9, 47:7, 64:16
**remotely** [1] - 3:1
**repeat** [1] - 57:19
**repeated** [1] - 43:11
**repeatedly** [1] - 42:24
**reply** [2] - 68:9, 68:10
**report** [4] - 18:6, 69:19, 69:22, 70:8
**Reporter** [1] - 72:14
**reporter** [3] - 63:21, 64:2, 64:6
**REPORTER** [1] - 63:25
**reports** [1] - 14:12
**representing** [1] - 2:24
**represents** [1] - 47:2
**request** [2] - 37:8, 63:6
**requesting** [1] - 38:22
**Requests** [1] - 18:25
**requests** [1] - 46:20
**require** [3] - 32:4, 32:14, 67:11
**required** [2] - 50:17, 51:4, 62:15
**requirement** [1] - 38:9
**requires** [3] - 21:15, 22:23, 27:19
**resolution** [1] - 70:16

**resolve** [2] - 43:9, 70:2
**resolved** [1] - 32:16
**respect** [9] - 5:25, 6:23, 9:23, 13:2, 21:18, 22:2, 23:21, 54:3, 70:5
**respectfully** [1] - 37:9
**responding** [1] - 6:14
**responds** [1] - 6:12
**response** [5] - 19:17, 23:1, 42:11, 50:14, 71:13
**responses** [4] - 18:24, 21:7, 46:19, 52:17
**responsive** [1] - 18:23
**rest** [2] - 53:15, 60:24
**restricted** [1] - 44:21
**restrictive** [3] - 15:4, 47:9, 49:8
**result** [1] - 7:16
**resumes** [1] - 65:4
**review** [1] - 20:13
**revisit** [1] - 7:2
**RICHARD** [1] - 1:16
**Richard** [1] - 2:8
**rid** [2] - 53:9, 53:15
**rise** [2] - 2:7, 72:9
**risk** [6] - 22:19, 25:10, 25:19, 27:23, 27:25
**Rob** [1] - 3:8
**Robert** [1] - 2:17
**ROBERT** [2] - 1:20, 1:24
**rooms** [11] - 46:24, 47:4, 47:6, 48:19, 49:2, 49:4, 49:15, 49:21, 50:2, 50:7
**Rothschild** [1] - 3:7
**ROTHSCHILD** [1] - 1:23
**roughly** [1] - 59:24
**Rule** [2] - 39:3, 39:4
**rule** [1] - 57:15
**ruled** [5] - 7:1, 26:11, 71:1, 71:9, 71:23
**rules** [2] - 26:14, 61:5
**ruling** [14] - 6:20, 11:22, 14:20, 21:15, 26:17, 38:25, 39:8, 40:13, 40:14, 40:21, 40:23, 65:10, 67:2
**running** [1] - 30:16
**runs** [1] - 60:2
**rush** [1] - 68:4

**S**

**sadly** [1] - 32:9
**sale** [1] - 58:6
**saw** [3] - 3:14, 3:18,

58:3
**schedule** [2] - 68:7, 68:11
**scheduled** [1] - 2:10
**scheduling** [1] - 52:12
**Scheidt** [1] - 8:2
**scheme** [1] - 5:1
**scope** [5] - 14:7, 14:8, 21:8, 35:16, 40:16
**seated** [1] - 2:9
**second** [5] - 12:2, 27:5, 29:6, 33:9, 62:16
**Section** [1] - 51:10
**section** [2] - 43:2, 43:4
**see** [6] - 6:13, 6:14, 33:8, 39:23, 41:7, 60:11
**seeing** [2] - 14:1, 20:21
**sell** [2] - 36:23, 36:24
**seller's** [1] - 34:10
**selling** [1] - 48:22
**send** [2] - 65:4, 65:15
**sense** [9] - 3:23, 4:8, 5:18, 14:8, 21:14, 31:24, 32:16, 61:4, 68:5
**sentence** [2] - 13:12, 25:4
**separate** [5] - 5:2, 5:13, 42:19, 58:22, 69:13
**September** [2] - 47:8, 67:19
**serve** [1] - 42:14
**session** [1] - 2:8
**set** [9] - 10:8, 36:13, 48:23, 49:19, 49:21, 49:23, 50:1, 54:14, 66:14
**Seth** [1] - 3:7
**SETH** [1] - 1:23
**setting** [1] - 49:25
**seven** [1] - 66:5
**sever** [1] - 57:21
**severing** [1] - 57:13
**shake** [1] - 8:15
**sharpen** [1] - 63:12
**shifting** [1] - 4:10
**shoes** [1] - 16:24
**shoot** [1] - 57:8
**short** [2] - 68:9, 68:11
**show** [4] - 16:2, 17:18, 38:11, 49:5
**showing** [1] - 56:10
**shows** [1] - 48:22
**side** [8] - 24:24, 30:1, 54:16, 54:17, 54:18,

57:7, 59:17, 61:12
**sides** [2] - 59:6, 59:20
**SIEGEL** [3] - 1:20, 64:18, 64:21
**Siegel** [1] - 2:17
**signed** [1] - 24:25
**significant** [4] - 5:20, 5:23, 6:3, 6:5
**similar** [1] - 4:17
**simply** [4] - 22:24, 31:18, 49:5, 62:14
**simultaneous** [1] - 32:22
**simultaneously** [1] - 32:18
**sitting** [2] - 3:2, 18:8
**six** [1] - 38:3
**size** [1] - 15:11
**small** [1] - 39:23
**so..** [1] - 32:6
**sold** [2] - 43:20, 50:3
**solicitation** [5] - 41:12, 42:2, 42:7, 42:20, 43:1
**solicited** [3] - 42:14, 43:4, 56:10
**someone** [2] - 29:10, 29:23
**sometimes** [1] - 61:15
**somewhere** [1] - 11:3
**soon** [1] - 60:9
**sorry** [8] - 8:16, 9:17, 9:18, 12:14, 25:11, 45:24, 46:1, 56:7
**sort** [7] - 12:23, 20:23, 44:23, 66:22, 68:20, 69:6, 69:19
**sounded** [2] - 21:2, 33:19
**space** [5] - 15:3, 15:6, 15:7, 18:3
**speaking** [3] - 28:23, 57:1, 66:2
**specialty** [2] - 11:24, 15:24
**specific** [8] - 16:13, 21:16, 37:22, 38:15, 38:17, 43:3, 61:18, 69:20
**specifically** [11] - 34:15, 35:2, 36:6, 40:5, 41:17, 42:12, 42:23, 42:25, 51:2, 52:4, 70:5
**specify** [1] - 33:25
**spend** [1] - 53:13
**sphere** [1] - 17:2
**spoken** [1] - 57:12
**spokesperson** [1] - 2:19

**spontaneously** [2] - 20:23, 20:25
**spots** [1] - 16:4
**stack** [2] - 25:13, 39:23
**stand** [2] - 61:5, 61:6
**standard** [5] - 22:12, 22:22, 26:6, 31:21, 34:2
**standards** [1] - 38:20
**standing** [1] - 23:1
**start** [6] - 3:22, 17:3, 17:4, 27:14, 30:4, 59:22
**starting** [1] - 60:9
**starts** [1] - 32:25
**state** [1] - 10:7
**statement** [3] - 43:25, 52:3, 54:19
**statements** [1] - 65:22
**STATES** [1] - 1:1
**states** [1] - 13:13
**stenographic** [1] - 72:12
**Stephen** [1] - 3:2
**steps** [1] - 57:18
**stick** [1] - 59:1
**still** [3] - 30:16, 38:7, 70:13
**stone** [1] - 66:15
**stop** [1] - 60:4
**strategy** [1] - 4:12
**streamline** [1] - 57:16
**street** [1] - 15:8
**Street** [1] - 1:12
**stretched** [1] - 67:17
**strike** [1] - 20:8
**strikes** [3] - 30:8, 31:8, 36:10
**strongly** [1] - 4:14
**structure** [4] - 48:24, 49:22, 49:25, 60:24
**stuck** [1] - 36:19
**stuff** [2] - 47:15, 70:4
**subject** [9] - 5:14, 9:23, 10:7, 11:4, 25:17, 37:1, 53:7, 62:20, 66:15
**submit** [12] - 20:12, 26:19, 27:11, 28:23, 29:13, 37:8, 37:24, 39:20, 50:5, 66:24, 68:22, 70:5
**submitted** [2] - 22:6, 64:6
**subpoena** [2] - 10:8, 60:21
**subsequent** [1] - 21:1
**substance** [4] - 21:19, 22:13, 25:22, 48:25

**suggest** [1] - 45:8
**suggestion** [1] - 69:5
**summary** [30] - 6:20, 13:8, 13:11, 13:18, 14:3, 14:6, 14:20, 21:15, 22:2, 24:1, 24:19, 26:12, 26:14, 26:18, 26:21, 38:10, 42:7, 43:19, 44:2, 44:4, 44:5, 44:11, 44:16, 45:12, 45:15, 45:17, 58:3, 65:10, 66:14, 69:12
**Summary** [1] - 13:1
**supplement** [1] - 30:19
**Supplemental** [1] - 41:16
**supported** [1] - 48:11
**supports** [1] - 37:23
**supposed** [2] - 29:25, 41:8

**T**

**target** [1] - 11:23
**targeted** [2] - 21:18, 41:23
**targeting** [4] - 22:1, 27:16, 38:16
**technology** [1] - 66:3
**telegraphing** [1] - 49:18
**ten** [2] - 59:17, 59:19
**ten-and-a-half** [2] - 59:17, 59:19
**tend** [1] - 61:5
**term** [1] - 11:15
**terms** [21] - 3:19, 4:22, 5:23, 5:24, 6:3, 7:4, 25:15, 39:8, 42:18, 51:5, 51:15, 51:20, 62:17, 62:18, 63:1, 64:3, 64:13, 65:13, 66:23, 67:15, 69:21
**test** [2] - 47:24, 48:9
**testified** [1] - 60:25
**testifies** [1] - 6:8
**testify** [15] - 7:23, 8:4, 8:10, 8:14, 8:24, 9:10, 9:20, 10:20, 10:23, 11:2, 12:21, 61:16, 62:10, 62:20, 70:7
**testifying** [1] - 13:17
**testimony** [15] - 6:22, 7:13, 9:6, 10:9, 11:4, 13:4, 16:1, 21:25, 24:22, 25:6, 32:14, 38:7, 48:21, 54:9,

64:13
**text** [1] - 3:16
**THE** [162] - 1:1, 1:2, 1:4, 1:5, 1:16, 2:9, 2:21, 3:5, 3:10, 3:12, 4:5, 4:22, 5:7, 5:17, 6:6, 6:13, 7:3, 7:19, 8:2, 8:7, 8:16, 8:20, 9:7, 9:13, 9:17, 9:24, 10:13, 10:17, 10:21, 11:1, 11:8, 11:17, 12:5, 12:9, 12:12, 12:14, 12:18, 12:21, 13:25, 14:22, 15:5, 15:15, 16:5, 17:15, 17:24, 18:11, 18:21, 19:7, 19:18, 19:22, 20:21, 22:5, 23:3, 23:7, 23:15, 23:18, 24:4, 24:16, 25:11, 26:7, 28:9, 28:12, 29:1, 29:10, 29:22, 30:21, 31:7, 31:22, 32:7, 32:11, 33:3, 33:7, 33:16, 36:1, 38:23, 39:14, 40:7, 40:14, 40:20, 42:1, 42:10, 42:17, 43:7, 43:13, 44:3, 44:8, 46:6, 46:9, 46:13, 46:16, 46:22, 47:1, 47:13, 47:21, 48:2, 48:15, 49:10, 50:9, 50:21, 51:5, 51:9, 51:12, 52:5, 52:7, 52:23, 53:18, 53:20, 53:22, 54:13, 55:5, 55:9, 55:14, 55:16, 55:18, 55:23, 56:2, 56:4, 56:6, 56:23, 57:24, 58:14, 58:18, 59:1, 59:3, 59:5, 59:15, 60:17, 60:22, 61:2, 61:14, 62:2, 62:8, 63:1, 63:5, 63:20, 63:24, 63:25, 64:1, 64:20, 64:24, 65:11, 65:13, 65:15, 65:24, 66:8, 66:16, 66:19, 66:21, 67:1, 67:14, 68:21, 69:8, 70:10, 70:17, 70:21, 71:12, 71:19, 72:2, 72:5
**theory** [2] - 6:23, 69:14
**therefore** [1] - 24:23
**thinking** [6] - 3:19, 28:12, 59:6, 67:24,

69:2, 69:8
**thinks** [7] - 14:13, 14:15, 14:24, 37:6, 37:21, 69:20, 69:21
**Third** [1] - 26:10
**thoughts** [1] - 60:18
**three** [15] - 7:5, 33:19, 45:3, 55:1, 55:7, 55:10, 55:12, 55:22, 56:1, 56:19, 56:20, 59:20, 65:5, 65:7
**thrust** [1] - 18:7
**Thursday** [5] - 60:8, 64:8, 65:4, 65:16, 67:3, 68:1
**timing** [2] - 67:21, 67:22
**Tina** [5] - 10:13, 10:21, 12:5, 12:8, 53:4
**Tintner** [5] - 3:8, 50:9, 50:21, 52:8, 72:2
**TINTNER** [23] - 1:24, 44:10, 45:19, 46:1, 46:5, 46:8, 46:12, 46:15, 46:17, 46:25, 47:5, 47:20, 47:23, 48:6, 52:6, 52:9, 52:15, 57:9, 59:4, 59:14, 63:4, 67:12, 72:4
**title** [2] - 8:9, 22:25
**today** [9] - 2:25, 4:7, 6:19, 12:24, 23:24, 54:14, 62:25, 70:2, 72:6
**took** [7] - 18:18, 18:19, 20:18, 34:24, 35:1, 35:2, 49:23
**top** [2] - 22:3, 38:18
**topic** [10] - 14:10, 19:18, 20:1, 20:4, 20:5, 39:2, 41:1, 41:4, 47:25, 60:18
**topics** [2] - 25:18, 37:6, 39:25
**total** [1] - 59:20
**totality** [1] - 55:22
**touched** [2] - 13:20, 13:22
**town** [1] - 15:9
**track** [1] - 11:14
**transcript** [9] - 39:4, 40:1, 40:4, 40:18, 40:19, 41:5, 64:5, 64:7, 72:12
**transcripts** [2] - 67:8, 67:25
**transition** [1] - 33:15
**trial** [42] - 4:22, 5:12, 6:19, 9:14, 24:5,

26:4, 28:18, 29:2, 29:14, 29:23, 30:7, 30:8, 30:17, 30:19, 30:22, 31:10, 31:15, 31:20, 32:15, 32:16, 32:25, 33:14, 53:24, 54:5, 54:11, 54:16, 55:8, 55:13, 57:22, 58:8, 58:20, 64:4, 64:5, 64:8, 64:9, 65:4, 65:23, 66:25, 68:2, 69:7, 71:4
**trials** [1] - 66:3
**Triozzi** [1] - 72:14
**trouble** [2] - 47:14, 47:22
**true** [6] - 9:4, 15:20, 23:22, 24:2, 54:8, 72:11
**try** [1] - 59:7
**trying** [14] - 5:13, 5:18, 14:8, 15:24, 16:15, 16:23, 17:12, 25:8, 25:23, 30:4, 49:7, 50:4, 50:6, 56:9
**Tuesday** [1] - 63:18
**turn** [1] - 62:5
**turned** [1] - 35:9
**turns** [3] - 68:21, 69:25, 70:8
**twice** [2] - 20:17, 24:17
**two** [24] - 3:16, 5:3, 6:7, 15:19, 20:25, 21:10, 26:9, 33:19, 33:24, 34:15, 35:12, 35:13, 38:1, 41:12, 52:25, 53:4, 54:17, 55:6, 59:7, 59:9, 64:6, 64:8, 68:15
**type** [1] - 21:24
**types** [2] - 16:4, 31:5
**typically** [2] - 29:14, 30:14

**U**

**U.S** [1] - 72:15
**U.S.D.C.J** [1] - 1:16
**ultimately** [1] - 24:1
**under** [6] - 25:19, 41:1, 42:20, 52:25, 62:10, 66:8
**underlying** [1] - 27:20
**understandable** [1] - 62:23
**understood** [2] - 24:15, 55:21
**UNDERWRITERS** [1] - 1:5

**Underwriters** [1] - 2:12
**unique** [1] - 17:20
**uniquely** [1] - 15:13
**UNITED** [1] - 1:1
**unless** [1] - 67:1
**unlike** [1] - 42:3
**up** [23] - 4:23, 6:4, 8:5, 10:8, 18:23, 22:22, 29:2, 31:8, 36:22, 49:19, 49:21, 49:23, 49:25, 50:1, 57:18, 58:5, 58:7, 60:13, 64:4, 65:19, 65:24, 69:7, 70:10
**updates** [1] - 12:3

## V

**vaguely** [1] - 30:6
**valuation** [1] - 8:5
**value** [1] - 36:22
**various** [2] - 23:4, 24:6
**venues** [3] - 49:2, 50:2, 50:8
**verbal** [1] - 40:23
**verification** [1] - 43:3
**version** [4] - 24:13, 33:19, 33:20, 37:23
**versus** [1] - 59:7
**video** [5] - 10:2, 10:3, 10:4, 10:8, 10:14
**videoconference** [1] - 53:5
**videotape** [2] - 10:12, 64:21
**videotaped** [3] - 64:14, 64:17, 64:19
**view** [2] - 26:24, 32:6
**viewed** [1] - 21:8
**views** [1] - 5:24
**violate** [5] - 9:3, 19:15, 23:2, 35:21, 36:11
**violated** [6] - 14:25, 21:17, 37:16, 42:19, 45:22, 47:9
**violating** [3] - 33:24, 42:2, 42:6
**violation** [16] - 14:14, 14:24, 16:7, 16:8, 18:14, 19:10, 20:16, 27:7, 34:18, 42:25, 43:1, 48:18, 49:8, 50:11, 50:23, 51:3
**violations** [2] - 34:1, 43:11
**violative** [2] - 34:20, 34:21
**voluntary** [1] - 10:10

**vs** [1] - 2:12

## W

**Waggy** [27] - 43:17, 44:12, 44:24, 45:1, 45:2, 45:22, 46:7, 46:11, 46:24, 47:2, 47:15, 48:3, 48:5, 48:15, 49:1, 49:14, 50:1, 50:12, 50:16, 50:22, 51:1, 51:4, 51:14, 51:16, 52:4, 52:17, 52:19
**Waggy's** [1] - 50:10
**wait** [1] - 13:23
**wants** [3] - 36:20, 57:21, 62:21
**webinar** [2] - 11:13, 11:16
**webinars** [1] - 9:21
**websites** [1] - 35:7
**Wednesday** [4] - 40:9, 52:24, 60:7, 67:3
**week** [4] - 40:9, 52:25, 53:2, 60:10
**weekend** [2] - 72:7, 72:8
**weeks** [2] - 64:6, 64:8
**whole** [9] - 36:21, 39:21, 44:5, 44:6, 55:3, 55:5, 55:6, 58:7
**willingness** [1] - 23:13
**Wilmington** [1] - 1:13
**win** [2] - 29:4, 32:8
**witness** [21] - 8:14, 10:7, 13:2, 19:13, 19:18, 20:8, 20:12, 20:18, 21:9, 35:14, 35:20, 37:7, 38:6, 40:6, 48:3, 49:11, 54:9, 61:12, 61:16, 64:12, 71:5
**witness'** [1] - 19:17
**witnesses** [12] - 3:19, 3:22, 7:5, 12:25, 21:23, 25:5, 38:13, 45:21, 53:4, 53:12, 55:12, 58:15
**wondering** [6] - 10:3, 14:4, 20:7, 31:10, 31:12, 70:23
**word** [7] - 4:1, 22:19, 22:24, 23:1, 32:2, 48:17, 51:1
**words** [1] - 16:5
**workers'** [2] - 25:17, 25:21
**workmen's** [1] - 11:15

**works** [1] - 33:9
**worth** [1] - 65:1
**write** [3] - 9:18, 67:11, 70:4
**writing** [1] - 68:23
**written** [5] - 20:4, 41:16, 42:18, 58:6, 70:4

## Y

**year** [1] - 12:3
**years** [1] - 45:3
**yourselves** [1] - 39:19

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | Civ. A. No. 1:19-cv-01600-RGA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) | |
| | ) | |
| Defendants. | ) | |

## OPENING POST-TRIAL BRIEF OF PLAINTIFFS THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS AND THE INSTITUTES, LLC

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted *Pro Hac Vice*)
Matthew J. Siegel (Admitted *Pro Hac Vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

July 15, 2022

## Table of Contents

**Page**

PRELIMINARY STATEMENT .............................................................1

BACKGROUND FACTS ....................................................................4

ARGUMENT ...................................................................................8

I.      THE UNDISPUTED FACTS ESTABLISH DEFENDANTS' PAST,
        ONGOING, AND FUTURE BREACHES OF THE APA ...........................8

        A.      The BIH Conferences Violated the Non-Compete As Interpreted By
                The Court. ..........................................................................9

                1.      The Conferences Provided Claims Content and Were Targeted,
                        in Part, to Claims and Litigation Professionals. ......................9

        B.      Defendants' Assistance in the Formation of ClaimsX Violated the
                Non-Compete. ....................................................................13

        C.      Defendants Violated the Non-Solicitation Provision of the APA ......14

II.     "CONTENT RELATED TO CLAIMS AND LITIGATION
        MANAGEMENT" INCLUDES RISK MANAGEMENT...........................16

III.    THE APA PROHIBITS DEFENDANTS FROM COMPETING WITH
        ANY OF THE PRODUCTS AND SERVICES IDENTIFIED IN
        SCHEDULE A OTHER THAN PERMITTED ACTIVITIES ....................19

IV.     THE INSTITUTES ARE ENTITLED TO MONETARY DAMAGES AND
        INJUNCTIVE RELIEF ...............................................................23

        A.      The Institutes Did Not Receive the Benefit of the Bargain. ...............23

        B.      In Addition to Money Damages, The Institutes are Entitled to
                Injunctive Relief Prohibiting Defendants from Engaging in
                Competitive Activities for Five Years. ................................30

        C.      The Institutes are Entitled to Attorneys' Fees and Expert Witness Fees
                Pursuant to the Specific Language in Article IX of the APA. ............33

        D.      The Institutes Are Entitled to Pre- and Post-Judgment Interest.........34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Homepatient, Inc. v. Collier*,
   2006 WL 1134170 (Del. Ch. April 19, 2006) ....................................................8

*Chicago Bridge & Iron Co., N.V. v. Westinghouse Electric Co. LLC*,
   166 A.2d 912 (Del. 2016) ...............................................................21, 22

*D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson*,
   757 N.W.2d 803 (Wis. 2008)................................................................26

*Greenstar, LLC v. Heller*,
   934 F. Supp.2d 672 (D. Del. 2013)....................................................24, 34

*Leaf Invenergy Co. v. Invenergy Renewables LLC*,
   210 A.3d 688 (Del. 2019) ....................................................................27

*In re Live Concert Antitrust Litig.*,
   863 F. Supp.2d 966 (C.D. Cal. 2012) .................................................30

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*,
   2021 WL 1592473 (Del. Ch. Ct. 2021) .........................................26, 30

*McLachlan v. Wilmington Dry Goods Co.*,
   22 A.2d 851 (Del. Super. 1941)...........................................................27

*MicroStrategy Inc. v. Acacia Rsch. Corp.*,
   2010 WL 5550455 (Del. Ch. Dec. 30, 2010)....................................20

*Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., C.A.*,
   1985 WL 189241 (Del. Super. Aug. 9, 1985) ..................................34

*Montg. Cellular Holding Co., Inc. v. Dobler*,
   880 A.2d 206 (Del. 2005) ...................................................................35

*Raymond v. Board of Public Works, C.A.*,
   1990 WL 63829 (Del. Super. May 8, 1990)......................................35

*Siga Technologies, Inc. v. PharmAthene, Inc.*,
   132 A.3d 1108 (Del. 2015) .................................................................24

ii

*In re Southern Peru Copper Corp. Shareholder Deriv. Litig.*,
     52 A.3d 761 (Del. Ch. 2011) ...............................................................30

*Spicer, Trustee for Estate of Brady v. Maxus Healthcare Partners,*
     *LLC*,
     616 S.W.3d 59 (Tex. App. Ct. 2020) ....................................................27

*Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*,
     996 A.2d 1254 (Del. 2010) ...................................................................34

*Tristate Courier and Carriage, Inc.*, 2004 WL 835886 (Del. Ch. April
     15, 2004) ................................................................................................31

*WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc.*,
     158 P.3d 651 (Wyo. 2007).....................................................................27

**Statutes**

6 Del. C. § 2301(a)......................................................................................35

## PRELIMINARY STATEMENT

The evidence overwhelmingly establishes multiple breaches of the noncompetition and non-solicitation provisions of the Asset Purchase Agreement ("APA"), pursuant to which Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("The Institutes"), acquired CLM Group, Inc. ("The CLM"), Claims Pages, Inc. and C&E MGMT, Inc. (now Business Insurance Holdings, Inc. ("BIH")).

Defendant, Adam Potter ("Potter") and BIH, admitted presenting claims content at specialty conferences and webinars first offered in October 2019 and resumed doing so in the second half of 2021. The APA's noncompetition provisions clearly and unambiguously prohibited Defendants from doing so. It does not matter if it were impossible to present specialty conferences to risk managers without discussing claims experience. Defendants are bound by terms to which they voluntarily agreed regardless of how intrusive compliance may be. The whole point of the acquisition was that Potter would no longer compete and that BIH's competition would be limited to those activities expressly stated in the APA.

Potter also admits to soliciting Wilson Elser to serve as the exclusive law firm sponsor of BIH's Cannabis & Hemp ("C&H") Conference. At the time, Wilson Elser was a CLM sponsor. BIH then continued to solicit Wilson Elser to sponsor

1

subsequent specialty conferences and webinars.  Those solicitations violated the non-solicitation provision found in Section 6.12(b) of the APA.

BIH also directly assisted Potter's sister, Sydney Posner, in establishing ClaimsXchange ("ClaimsX") as a rival trade association in the insurance business for claims and litigation management professionals, which offers specialty conferences that directly compete with the CLM for attendees, sponsors and speakers.  BIH offered free subscriptions to Business Insurance to new ClaimsX members and provided ClaimsX with initial administrative support services.  BIH benefitted from its contributions to ClaimsX in the form of access to ClaimsX's membership database, which BIH then incorporated into its own mailing list for use in targeting claims and litigation management professionals for its own offerings.

Additionally, the APA's restrictive covenants were not merely prohibitory. They also required Potter to affirmatively ensure that his affiliates complied with their proscriptions.  He breached those obligations by failing to require Beacon Intercontinental Group, Inc. ("Beacon") to cause BIH to comply with the APA's restrictive covenants after the acquisition, so he cannot raise as a defense that BIH's violations of the restrictive covenants occurred after he sold the Company.

A final injunction is necessary to enforce compliance with the APA.  As The Institutes never received the benefit of these restrictive covenants, the injunction

should extend five years from its entry.  The Institutes are also entitled to an award of attorneys' fees, experts' fees, and other costs under Article IX of the APA.

The Institutes should furthermore receive benefit of the bargain damages.  As the Court recognized in denying BIH's *Daubert* Motion, benefit of the bargain damages are a fundamental measure of the losses resulting from a contract breach. A non-breaching party is entitled to the difference between the benefit it would have received if the breaching party had fulfilled its contractual obligations and the benefit it received from the performance actually delivered.  Here, in the asset purchase context, it is the difference between what a reasonable purchaser would have paid for the intangible assets of The CLM Group's ongoing business if defendants honored the restrictive covenants and did not compete and what would have been paid for those assets in the face of competition from what Christine Meyer characterized as the "next-best competitor."  Tr. at 456:25-457:1.

There is no doubt that the purchase price for The CLM in the face of competition would have been lower.  Pete Miller testified that The Institutes would not have purchased The CLM Group if it knew defendants would compete.  *Id.* at 46:6-15; 64:4-65:2.  As explained by Dr. Meyer, well-settled economic theory establishes that competition will diminish The CLM's market share, which impairs value.  *Id. at* 461:4-466:14.  The fact that it may be difficult to quantify that loss should not serve as a basis to deny The Institutes' compensation for that loss.

3

App.922

## **BACKGROUND FACTS**

Potter created The CLM.  It evolved from focusing on the development of ethical billing standards to be the preeminent association of insurance industry professionals working to control risk and address claims.  Tr. 155:16-164:1.  The CLM is unique in its focus upon fostering dialogue and information sharing among professionals involved in the entire claim lifecycle.  Blume Dir., Tr. at 179:9-13.  To that end, CLM's fellows encompass risk managers, claims managers and adjusters, executives with broad responsibilities, third-party administrators, and service providers.  *Id.* at 118:13-19; 165:2-167:10. The CLM also offers membership to attorneys representing the insurance industry.  *Id.; see also* 118:23-119:5; 438:4-12.

One of the services CLM offers are specialty conferences on subjects of emerging or recurring interest to the insurance industry.  It also hosts webinars presented by insurance industry professionals.   Beyond education, specialty conferences foster networking.  As Anne Blume, former CEO of CLM, testified: "You are speaking with other people, both before and after the session about not only the content … but other things as well. You have the opportunity to engage in a dialogue with the other members."  Tr. at 179:9-13. Specialty conferences are a primary funding source for The CLM through registration fees and sponsorships by entities seeking to market attendees.  *Id.* at 167:25-168:25.  Further, Potter created

App.923

C&E to generate commissions from booking venues and blocks of hotel rooms for specialty conferences and other events. *Id.* at 573:9-574:2.

After he developed the CLM, Potter acquired the publisher of Business Insurance ("BI"). BI is a preeminent publication read by a broad segment of the insurance industry. Potter expanded BI into offering events (such as the Diversity and Inclusion Summit) and award programs (*e.g.*, Woman To Watch). It also co-sponsored several specialty conferences and events with the CLM.

In 2018, The Institutes approached Potter about collaborating with The CLM. The Institutes are a nonprofit entity that offers programs through which those involved in the industry may earn a certification as a chartered claims or underwriting professional. The Institutes believed there were synergies between its programs and the CLM's education programs for claims and litigation professionals. That overture led to an agreement for The Institutes to acquire the majority of the CLM Group's assets.

A fundamental provision of the APA was a broad noncompetition and non-solicitation provision. As The Institutes grew to understand Potter's involvement with BI and its collaborations with the CLM, a key issue became the extent of BI's post-acquisition competition. The Institutes initially sought to require BIH to discontinue all competitive activities. *See* Tr. at 116:3-117:24. Ultimately, the parties defined the existing competitive activities in which BI could engage subject

to the caveat that they may not involve claims and litigation management content or target claims and litigation management professionals. *See* P-14, Schedule 6.12.

Potter subsequently consolidated BI into C&E which then changed its name to BIH.  Within seven months of the acquisition, Potter began planning for BI to offer a series of specialty conferences on an annual basis.  He instructed BI's staff to develop topics for these conferences.  *Id.* at 241:3-242:14.  They initially settled on a cannabis and hemp and intellectual property conference and began planning and marketing those conferences.  Potter directly solicited the Wilson Elser law firm -- a CLM sponsor -- to serve as the exclusive sponsor of the cannabis and hemp conference.  Tr. at 247:4-250:9; P-45; P-46.

Potter also set up another of his companies, Waggy, to earn commissions by booking venues and hotel room blocks for the conferences.  Tr. at 246:2-18.   That was, of course, the role C&E played within The CLM Group.  With BI serving the same function as Claims Pages (publishing industry magazines and newsletters), Potter essentially recreated The CLM Group within a year of selling its assets.

In the summer of 2019, Potter entered into negotiations with Steven Acunto to sell BIH to Beacon, another publisher of insurance industry literature.  During the course of these negotiations, The Institutes learned of the C&H and IP conferences and sent a cease and desist letter.  Potter advised Acunto of this demand, but assured him that it was without basis and that, in any event, the noncompetition provisions

applied to BIH only while he owned it.  Tr. 271:23-273:1.  Shortly before the execution of a September 1, 2019, Stock Purchase Agreement for the sale of BIH to Beacon, The Institutes commenced this action.

While the APA affirmatively required Potter to cause his affiliates to comply with its restrictive covenants, the Stock Purchase Agreement contained no limitations on BIH's ability to compete after the acquisition.  To the contrary, Potter represented that the noncompetition provisions did not apply to BIH and indemnified Beacon for any claims The Institutes may assert against it.  *See* Tr. at 770:9-772:5.

With full knowledge of The Institutes' claims, Acunto incredibly never asked to review the restrictive covenants, The Institutes demand letter or their Complaint. Instead, he just blithely proceed with the C&H Conference because of the adverse public relations that may be generated by cancelling it.  Tr. at 819:6-824:17.  Acunto also caused BIH to assist The CLM's former Chief Relationship Officer (Sydney Posner) to establish the ClaimsXchange as a rival professional association of claims and litigation management professionals to The CLM.  BIH, *inter alia,* gave free limited time subscriptions to new ClaimsX members and provided administrative services to the fledgling organization.  Tr. 222:20-25; 310:6-14; P-102.

Under Beacon, BIH also continued to expand its specialty conference offerings.  While COVID disrupted those plans (and the entire industry), BIH offered virtual conferences and webinars during the Pandemic and created a market

App.926

presence.  With the Pandemic hopefully easing, BIH has offered new long term care

and cybersecurity annual conferences and intends to expand its offerings.

All of these actions violated the APA's restrictive covenants.

## <u>ARGUMENT</u>

## I.    THE UNDISPUTED FACTS ESTABLISH DEFENDANTS' PAST, ONGOING, AND FUTURE BREACHES OF THE APA

To be enforceable, restrictive covenants must (1) meet general contract law

requirements, (2) be reasonable in scope and duration, both geographically and

temporally, (3) advance a legitimate economic interest of the party enforcing the

covenant, and (4) survive a balance of the equities." *Am. Homepatient, Inc. v.

Collier*, 2006 WL 1134170, *2 (Del. Ch. April 19, 2006).  The existence of none of

these factors is disputed.[1]  Instead, both Potter and BIH claim to have complied with

the APA's restrictive covenants.  But, defendants admit to offering claims analysis

in their specialty conferences – a core function of the CLM.  Their entire compliance

defense is grounded in a distortedly narrow interpretation of the restrictive

covenants.  That interpretation has already been rejected.

### A.    The BIH Conferences Violated the Non-Compete As Interpreted By The Court.

---

[1] Nor could they be.  The CLM competes nationally and a five year term is customary in multi-million dollar acquisitions. Potter and BIH were uniquely situated to compete against The Institutes because of Potter's prior control of CLM and his ownership of BIH.  The key terms of the restrictive covenants were heavily negotiated and were based on definitions of the relevant businesses that were drafted by Potter himself.

App.927

**1.    The Conferences Provided Claims Content and Were Targeted, in Part, to Claims and Litigation Professionals.**

In ruling on the Cross-Motions for Summary Judgment, the Court rejected defendants' distorted interpretation of the non-compete. *See* D.I. 304. Recognizing that the APA defined the CLM's business to include specialty conferences, the Court held that a conference violates the non-compete if it provides content related to claim and litigation management and/or if it is targeted to claims and litigation management professionals. *See id.* at PageID#6076. While The Institutes maintain that even the Court's interpretation of the restrictive covenants is too narrow, defendants clearly violated those covenants even as so interpreted.

Acunto admitted that BIH's series of cannabis and hemp, long term care and cybersecurity conferences all of necessity involved claims content. Tr. at 294:25-295:21. And, Potter admitted that BIH's conferences compete, at least indirectly, with The CLM's conferences for sponsorships. *See id.* at 663:3-664:18. Moreover, the evidence demonstrated that defendants violations were broader than either Acunto or Potter were willing to admit. Notably, the evidence establishes that:

- The Cannabis and Hemp Session materials specifically referenced claims, including "fire claims," "theft claims," "product liability," and "CBD claims", and "professional liability" and "Civil RICO Litigation" (*id.* at 429:9-20 and P-23);

- Conference attendees touted the claims session: "as part of the claims underwriting team that handles these products, these seminars are few and far between"; "I enjoy[ed] the forms panel and the claims trends panel as that pertains to what I do." Tr. at 431:3-18 and P-97.

9

- The cancelled IP conference was slated to have a session entitled "Taking The Mystery Out of IP Insurance Claims" (*see* Tr. at 341:15-342:11 and P-24);

- The LTC webinar, presented by a Wilson Elser litigation attorney, featured a discussion about "claims arising in the long-term care setting" and "what types of high incidents of claims would happen at such facilities, like slips and falls" (Tr. at 344:5-18 and P-32);

- The Long Term Care Conference, which Wilson Elser also sponsored, "was marketed to address slips and falls, which are the number one injury claim, abuse and neglect ...and litigation trends and trial experiences," and Kenner agreed that those topics interest to claims and litigation management professionals (Tr. at 346:9-347:7; 347:8-11 and P-28);

- The Cyber Security addressed how companies should respond to cyber security events, which Mr. Kenner confirmed would be a post-loss [i.e., claim-related]" (*see id.* at 349:6-350:20 and P-26).

When Tina Pernie, CLM's former Chief Operating Officer, first learned of the C&H Conference, she believed it competed with The CLM, stating: "in terms of looking at the website, my initial reaction at the time is, Oh, there's claims content on here.... it seemed as though it was kind of encroaching on CLM's educational content," *id.* at 327:6-13, and it competed against CLM's "targeted marketing." *Id.* at 328:1-7. Pernie stated that BIH had never presented claims content at any of its events, so "seeing a claims track suddenly . . . pop up at a Business Insurance event seemed as though it was encroaching in, you know, kind of our -- it's the CLM's area." *Id.* at 328:17-329:4.

BIH's use of claims professionals at these conferences further demonstrates the claims content. One of the panelists for the so-called "exposure" session at the C&H conference manages cannabis claims for Golden Bear Insurance, and another

was a claims supervisor at Canopius (a cannabis insurer).  *Id.* 421:12-423:15.[2]  And
the cyber webinar was presented by the co-chair of the "Insurance Recovery and
Counseling Practice" at a large law firm and by the "Chief Claims Officer" at an
insurance company.  *See id.* at 349:6-350:20.

The  conferences  also  targeted  claims  and  litigation  management
professionals.  As early as April 17, 2019, Potter contemplated a special, discounted
pricing  structure  for  risk  managers  and  "insurance  company  folks
(underwriters/claims)."  *See* Tr. at 403:18-23.  Katie Kett testified that no effort was
made to exclude claims professionals and that the claims session would certainly
interest claims professionals.  *See id.* at 404:5-8; 409:4-15.

And, to promote the conference, Defendants used the marketing list from its
lead conference sponsor—Wilson Elser, a law firm in the claims and litigation
management industry—to attract attendees.  *See* Tr. at 400:6-20.  This marketing list
is no doubt intended to reach Wilson Elser's potential clients (i.e., insurance claims
professionals who might hire the firm to handle their cannabis claims) and Potter
knew full well that Wilson Elser worked with claims professionals. *See id.* at 638:5-
12.  Nevertheless, there is zero evidence that Potter informed Wilson Elser that
claims people were not the target audience.

---

[2] Kenner agreed that several of the LTC conference speakers practice in the claims
and litigation management industries.  *See id.* at 348:5-22.

App.930

Further, at least seven[3] claims and litigation management professionals attended the conference and Mr. Miller's unrebutted testimony establishes that at least 15 individuals and 40 companies that were CLM members or sponsors attended and/or sponsored the conference. *See id.* at 50:9-23; 354:13-355:14. And, as Mr. Kenner testified, once someone is on BIH's mailing list, that person receives invitations for subsequent events, and there is no attempt to cull the list to make sure that BIH is not reaching out to claims professionals for future conferences. Simply put, if someone attended the cannabis conference, they would be on the list to receive marketing for future events. *See* Tr. at 354:13-355:14. Therefore, there is every expectation that the number of claims professionals being solicited will continue to snowball and grow exponentially with each violation of the APA.

Even Mr. Acunto acknowledged (perhaps unintentionally) that the conference was targeted to claims professionals. Asked what panels at that conference were targeted to claims and litigation management professionals," Mr. Acunto stated: "None of them and all of them." Tr. at 788:15-21. More generally, he was asked to what extent does having claims professionals as BIH subscribers or advertisers drive the content at BIH conferences, he replied: "A hundred percent. I mean, why would

---

[3] Though Defendants will likely argue that seven out of more than 200 attendees is an insignificant number, it must be remembered that this conference was the first of its kind for BIH, so attracting seven claims professionals was significant.

we offer anything that they wouldn't be interested in?"  Tr. at 780:2-8.  That is not compliance with the APA.  And putting aside the attendees, just inviting claims professionals to serve on panels at conferences is targeting such professionals.

### B.    Defendants' Assistance in the Formation of ClaimsX Violated the Non-Compete.

Potter conceded that he set up a meeting between BIH and his sister, Ms. Posner, to form a venture that competed with The Institutes.  Though he did not participate in the subsequent meeting, Potter was well aware of what was happening.  As confirmed by BIH, Potter introduced Posner to Acunto and suggested they work on a project together – a project that Potter knew would be a joint venture.  *See* P-86 (Sep. 26, 2019, email where Acunto recaps meeting he just had with Potter and references meeting with Posner "re JV"); Tr. at 835:18-836:1 (Acunto testifying "JV" means joint venture, which manifested as ClaimsX).  Simply by facilitating that partnership, he enabled, rather than prevented, his Affiliate, BIH, to compete with The Institutes and interfere with their business relations.

That partnership was further solidified in an October 2, 2019, email exchange between Acunto and Posner, in which Acunto said that he was "interested … in the concept that you have developed and will look to find ways to [collaborate]." *See* P-90; Tr. at 303:20-304:7.  Less than two weeks later, on October 15, 2019, Acunto sent Posner a memorandum that identified ClaimsX's purpose as "serving the best interests of the insuring public, insurers, claims professionals, and attorneys and

App.932

other individuals participating in the fair resolution of insurance claims," and identifying various planned conferences and events. *See* Tr. 305:19-25; P-93. Whether Acunto was aware at the time that BIH was bound by the non-compete is immaterial; the fact is that BIH was entering into a partnership with an organization that was set up specifically to compete with CLM.

The strategic partnership between ClaimsX and BIH extended to BIH offering subscriptions to new ClaimsX members without charge. *See* Tr. at 309:16-311:7. BIH also provided ClaimsX with initial administrative support and services. *See* P-102. While Posner informed Acunto on December 30, 2019, that ClaimsX no longer needed BIH's assistance in that regard, she affirmed that ClaimsX would "continue a strategic partnership with BIH" and "continue to grow BI's subscriber base [and] advertise BI to new audiences through [ClaimsX] events and communication." *See* P-102. BIH was advertised online as ClaimsX's strategic partner until at least August 4, 2021. *See* Tr. at 357:14-22; P-27.

### C.    Defendants Violated the Non-Solicitation Provision of the APA

Potter, on behalf of BIH, violated the non-solicitation provision of the APA when he contacted the Wilson Elser law firm to be a sponsor for the C&H conference. BIH then compounded that violation by enlisting Wilson Elser as a sponsor for several of its subsequent conferences and webinars and using its mailing list to target claims and litigation management professionals.

14

Ms. Blume testified that a Wilson Elser lawyer told her Potter initially called

Wilson Elser with the idea for the conference. *See* Tr. at 199:4-7; 200:10-12. While

Potter does not dispute that he called Wilson Elser, he claims he did so to ask what

they knew about the cannabis industry and whether a conference would be

successful. *Id.* at 247:21-248:1. To suggest he only called for information is a

distinction without a difference; calling Wilson Elser and saying he was planning a

new specialty conference on cannabis was a solicitation of the firm's involvement.

Potter also claims that he was permitted to solicit Wilson Elser because, at the

time of the APA, Wilson Elser was a CLM sponsor, not a sponsor of The Institutes

(i.e., the "Buyer" as defined in the APA). However, once the APA closed and CLM

became a part of The Institutes, all of CLM's customers and sponsors became

customers and sponsors of The Institutes. *See id.* at 251:20-252:2. Thus, when he

reached out to Wilson Elser, Potter solicited a customer and sponsor of The Institutes

in violation of Section 6.12(b) of the APA. And BIH's continued association with

Wilson Elser as a sponsor and/or presenter at the various events cited above

constitutes further breaches of Section 6.12(b).

## II.   "CONTENT RELATED TO CLAIMS AND LITIGATION MANAGEMENT" INCLUDES RISK MANAGEMENT

Although "claims and litigation management" and "claims and litigation

management professionals" are not defined in the APA, the trial testimony clearly

established that they should be interpreted broadly. "Claims and litigation

App.934

management" means content on the prevention, handling, defense of claims or litigation or subjects that inherently involve those topics. "Claims and litigation management professionals" means anyone whose responsibilities involve any of those areas, including those with responsibility for risk management. Thus, when BIH puts on a conference risk management and "pre-loss" topics of interest only to risk managers, it is still providing content related to claims and litigation management, which is squarely within the definition of the CLM Business.

Nevertheless, Defendants want this Court to draw an arbitrary line between "pre-loss" and "post-loss" content and argue that as long as information relates to "pre-loss" activity and is presented to risk managers, brokers, TPAs, etc., it is not claims-related. The APA however, speaks of no such distinction and there was ample testimony at trial that content related to "claims and litigation management" runs the gamut from pre-loss planning to post-loss administration.

Tina Pernie confirmed that "claims administration" involves both pre- and post-loss considerations. Tr. at 315:9-18 (testifying "the claims administration piece can start at ...the risk mitigation phase" and includes "loss and then it goes in the post-loss.") Similarly, "litigation management" can begin before a loss ever occurs. As Ms. Pernie explained:

> it's a pretty wide stoke of things that can fall into litigation management. So managing the actual litigation on claims that are happening, meaning the work that's being done, the expenses, finding

App.935

the right panel counsel, managing them. I think it's kind of a wide swath.

*Id.* at 316:21-317:1.  Moreover:

> There's some litigation management that has to -- has to occur pre-loss, because you have to know who your panel counsel are. You have to have established billing guidelines.  You have to potentially have a system through which they're going to submit their bills once it becomes a loss. So there is kind of a pre or preparatory phase of litigation management.

*Id.* at 317:13-20.  Mr. Miller explained that "part of claims litigation, claims … is to say: How do I avoid them…? [I]f I get a claim, a rational question to me would be: Well, can I avoid this claim? So, that's a pre-loss sort of activity."  *Id.* at 30:17-21.

Thus, the concept of claims and litigation management does not relate solely to "post-loss" related activities and no such arbitrary distinction is made in the APA. This makes sense because the CLM's membership is and was comprised of, among others, professional risk managers.  *Id.* at 318:18-25.  Further, "while risk manager is not in the name of CLM, which has changed over the years, they are listed specifically on the website under the membership category of fellow as one of the subcategories." *Id.* at 325:23-326:1.  Ms. Blume testified that when she resigned, CLM had "just shy of 3,000 people" who identified themselves as risk managers or people involved in risk management.  *Id.* at 167:5-10.

In fact, according to Ms. Pernie, the target audience for CLM educational events included everyone in the risk management lifecycle, including not only the

App.936

members, but "claims professionals, risk management professionals, litigation management professionals, brokers." *Id.* at 320:7-321:10. And prior to the sale of CLM to The Institutes, CLM provided risk management content to its members. *See id.* at 324:16-24. Ms. Blume said that CLM's specialty conferences "frequently" addressed pre-claim issues, citing examples such as sessions on "identifying and insuring and handling environmental risks pre-construction," "cyber security and how to prevent such problems," and "preventing whistleblower claims in health care organizations." *Id.* at 174:16-25.

Defendants' argument that the Permitted Activities allow BIH to provide "pre-loss" education to risk managers is simply not supported by the record given the testimony cited above. Teaching risk managers, and the insurance industry as a whole, about the claims landscape and litigation trends is precisely what The CLM has always done.

## III.    THE APA PROHIBITS DEFENDANTS FROM COMPETING WITH ANY OF THE PRODUCTS AND SERVICES IDENTIFIED IN SCHEDULE A OTHER THAN PERMITTED ACTIVITIES

The APA bars competition with or solicitation of relationships relating to "Sellers' Businesses." Once again, the Court previously held that Sellers' Businesses constitute, of relevance here, conferences with claims content or targeted to claims and litigation content, so that Defendants were prohibited from engaging in any such activities. But, that limitation too narrowly defines Seller's Businesses

and ignores that the APA prohibits competing with the Seller's Businesses, not just engaging in the exact same businesses.  As set forth previously, The Institutes has established that defendants repeatedly violated the noncompetition and non-solicitation provisions even under the Court's interpretation.  Nevertheless, The Institutes addresses the scope of the non-competition provision because it impacts the scope of the injunctive relief sought and to the extent there is any question as to defendants' liability.

Sellers' Businesses is defined to have the "meaning set forth in the [APA's] preamble", which defines The CLM's Business as "operating as a national trade association for the claims and litigation management industries, as more specifically set forth in Schedule A[.]" P-13, at p. 45, Preamble, at 1.  Schedule A recognizes that CLM is a "professional association in the **insurance industry** with more than 45,000 professionals in the claims resolutions and litigation management industries" and thereafter lists specific "products and services" The CLM offers.  P-14.

One category of those products and services is "Specialty Conferences.  That reference is to a broad category of services, and is not limited by content or to whom they are targeted.  Another product and service is hosting "webinar topics" on a "rang[e]" of issues, "presented by claims, litigation and insurance professionals." *Id.* The description of webinars contains its own limiting language -- they must be presented by claims, litigation or insurance professionals.  Given this express

19

limitation, the parties certainly would have expressly stated any other limitations they intended.

Several identified products and services are expressly limited to those provided to claims and litigation management professionals.  *See e.g*, "Annual Conference," defined as "an annual event for professionals in the claims and litigation management industries."  If the parties intended Specialty Conferences be similarly limited, they would have expressly so stated in describing that service. *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010) ("The use of different language in the two sections shows the parties knew how to cover [an issue more broadly] when that was their intent.").

Reference to claims and litigation management content and targeting claims and litigation management professionals is made only in the carve outs from Permitted Activities in Schedule 6.12-1.  Those limitations apply to the scope of the Permitted Activities, not to the noncompetition provisions.   Further, as the noncompetition provisions prohibit only competitive activities, it would have been unnecessary to create exceptions for "Permitted Activities" if they were not competitive.   And, after the carve-outs from Permitted Activities, only events providing content other than claims and litigation management and targeting professionals in other insurance fields remain, so those types of events must be deemed competitive.  Beyond that, the description of Business Insurance's services

App.939

demonstrates that its competitive activities extend to the insurance industry as a whole.  *See e.g.*, P-14, Schedule 6.12-1.

The reference in the preamble to The CLM as a trade association for claims and litigation management professionals should not limit the broad definition of its products and services in Schedule A.  In *Chicago Bridge & Iron Co., N.V. v. Westinghouse Electric Co. LLC*, 166 A.2d 912 (Del. 2016), the Supreme Court of Delaware held that to give "sensible life to a real world contract, courts must read the specific provisions of the contract in light of the entire contract ...especially [] when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business." *Id*. at 913-14.  The Court ruled that the Court of Chancery erroneously interpreted an acquisition agreement's provisions for a "True-Up" of the purchase price to permit a purchaser to challenge the accuracy of financial statements provided to the purchaser pre-closing.  It concluded that, in reading the agreement in that manner:

> [T]he Court of Chancery rendered meaningless the Purchase Agreement's Liability Bar.  It also slighted the requirement in the text of the Purchase Agreement that Westinghouse indemnify Chicago Bridge for a broad set of claims related to Stone ...By so interpreting the contract, the Court of Chancery failed to give adequate weight to the structure of the Purchase Agreement and the subordinate and confined purpose of the True Up.

*Id*. at 916-17.

App.940

Similarly, but conversely, reading limitations into the broad reference to specialty conferences and webinars based on a single reference in the preamble to the CLM as a trade association of claims and litigation management professionals is inconsistent with the structure of the APA in which the Sellers' Businesses is defined in Schedule A.  The reference to The CLM as a trade association states what it is.  Schedule A states what it does.  Defendants may not compete with what the CLM does.

Sellers' Businesses as defined in the APA include any specialty conferences, so BIH should be prohibited from offering any conferences of that nature.  Beyond that, as noted previously, the APA does not merely bar Defendants from engaging in the exact same business.  Rather, Section 6.12(a) prohibits any "activities that are ***otherwise competitive*** with the Sellers' Businesses."  Thus, even if the Sellers' Businesses are limited to claims and litigation management, Defendants have still engaged in otherwise competitive activities.

For instance, claims and litigation management professionals attend specialty conferences or webinars on other insurance related topics.  That is particularly true for senior executives with claims and litigation management responsibilities.  Conversely, professionals in other aspects of the insurance business attend CLM events.  Further, some CLM advertisers and sponsors market their products and services beyond claims and litigation management personnel.

App.941

The CLM competes with BIH's audience for the limited time and financial resources attendees and limited budgets sponsors have to devote to specialty conferences and webinars. *See, e.g.,* Tr. at 171:25-172:13; 176:16-19.  As Mr. Acunto succinctly testified: "They are in the business of offering conferences. We're in the business of offering conferences[.]" Tr. at 292:5-15.

Potter and BIH all but admitted that BIH now competes with CLM when they attempted to argue that Jeremy Campbell, the former director of sponsorships for BIH, was in violation of a non-existent non-compete when he was hired by CLM in September of 2019.  *See* Tr. at 368:10-369:2. Mr. Kenner confirmed that one of the reasons they wanted to enforce the alleged non-compete was their concern that Mr. Campbell would be in a position to compete with BIH when he moved to CLM. *See* Tr. at 356:6-9; 357:2-4.  But if Potter and BIH did not believe Mr. Campbell was going to a competing entity, the non-compete would be meaningless.  This demonstrates Defendants' understanding that BIH and CLM were competing.

## IV.    THE INSTITUTES ARE ENTITLED TO MONETARY DAMAGES AND INJUNCTIVE RELIEF

### A.    The Institutes Did Not Receive the Benefit of the Bargain.

To recover damages, a plaintiff must prove the injury and a reasonable basis to measure the losses resulting from the injury. *Siga Technologies, Inc. v. PharmAthene, Inc.,* 132 A.3d 1108, 1130 (Del. 2015).  Once a plaintiff establishes injury in fact, it need not prove the amount of damages with precise certainty.  *Siga*

*Technologies, Inc. v. PharmAthene, Inc., supra*. In fact, "doubts about the extent of damages are generally resolved against the breach[ing] party." *Id.*

A breach causes injury where it deprives the nonbreaching party of the benefit of its bargain. *Greenstar, LLC v. Heller*, 934 F. Supp.2d 672, 693-4 (D. Del. 2013). The Delaware Supreme Court explained that the benefit of the bargain is measured:

> [B]y the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.

*Siga Technologies, Inc. v. PharmAthene, Inc.,* 132 A.3d at 1130 (Del. 2015).

The Institutes offered compelling evidence of injury. Pete Miller testified that The Institutes would not have proceeded with the transaction if it were contemplated that defendants would compete. Tr. 64:21-65:2. In an email to The Institutes' Board Chair seeking authority to make the $20 million offer, he identified a noncompete as a key term. Tr. 35:14-38:21. Miller's email was written reacquisition and in the ordinary course of business. Jeffrey Scheidt, who prepared The Institutes' initial valuation, testified that it was based on the understanding that defendants would not compete post-acquisition beyond the permitted activities. *Id.*, 126:5-24.

The Institutes' insistence upon a broad non-compete in response to Potter's attempt to narrow the draft language shows the importance it ascribed to preventing BIH and Potter from competing.  Beyond measuring the loss, Dr. Meyer's analysis demonstrated that a company facing competition will ultimately lose market share.  *See id.* at 461:4-466:14.  Defendants did not controvert this testimony.  Further, the assistance BIH provided ClaimsX facilitated competition by another entity with the exact business model.

Moreover, The Institutes acted immediately upon learning of the C&H Conference because of concern about BIH entering this market.  As Ms. Horowitz said, The Institutes acted "to protect what we purchased." Tr. at 697:9; *see also* Tr. at 52:4-10 (Miller testifying as to "great concern" about BIH's "very formidable presence," as "[t]hey have great reach into the industry" and "they're going to get more into events," which would "certainly diminish the value of the investment we made.").

Neither Potter nor Acunto claimed that defendants' competition did not affect the value of The CLM.  BIH presented no expert damages testimony.  Potter offered the testimony of Harris Devor, but he opined only that CLM suffered no harm from the initial C&H conference.  *See* Tr. at 739:10-20.  He grudgingly conceded on cross-examination that a prospective buyer of CLM would at least

assess whether BIH's move into the specialty conference space impacted its value. *See id.* at 740:3-741:9.

In *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.,* 2021 WL 1592473 (Del. Ch. Ct. 2021), the purchaser of an entity developing T-cell therapies to treat cancer treatment the defendants spun-off sought to recover for the diminished value of the entity as a result of defendants' competing against in violation of noncompetition agreements. After holding that the defendant misrepresented the extent to which it would refrain from competing against the spin-off, the Court of Chancery had no difficulty concluding that these actions caused injury by diminishing the value of the acquired entity. *Id.* , at *2 ("Resolution of the damages question is, in theory, simple. What is the difference between what Millennium thought it had purchased , and what it actually got as a result of Harpoon's fraud?")[4] Courts in other jurisdictions have repeatedly articulated this same view. *See, e.g., D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson*, 757 N.W.2d 803, 811 (Wis. 2008) (affirming award to plaintiffs for

---

[4] The defendant in *Maverick* technically complied with the acquisition agreement's noncompetition provisions, but the Court still found liability on the grounds that it had misrepresented their scope. That is an immaterial distinction because in either event the plaintiff did not receive the protection from subsequent competition it was promised. Further the measure of damages for fraud and breach of contract are similar. The difference between the value of the entity as represented (in fraud) or if the defendant had performed as promised (contract) and the value of what was received.

violation of restrictive covenants in sale of business likening relief to "that of a buyer of a defective car, who had, this court recognized, ordinary loss of bargain damages: the difference between the actual value of the goods accepted and the value that they would have had if they had been as warranted."); *Spicer, Trustee for Estate of Brady v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 111 (Tex. App. Ct. 2020) (affirming award of damages for breach of APA where "the jury was asked to determine by how much [buyer] had overpaid for the assets on the day of the sale and whether [buyer] was entitled to recover the difference when the overvaluation was revealed).[5]

While Potter delivered the assets promised, their value was diminished by defendants' subsequent competition.  *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 (Del. 2019) (damages include "the loss in value caused by the deficient performance compared to what had been expected.") (internal quotations omitted); *See McLachlan v. Wilmington Dry Goods Co*., 22 A.2d 851, 853 (Del. Super. 1941) ("The usual damages recoverable for the breach of warranty ...is the difference between the actual value of the goods bought and their value if they had been as warranted.").  Unlike, for example, artwork, businesses have no intrinsic value.  Regardless of valuation methodology, the measure of a

---

[5] *See also*, *WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc*., 158 P.3d 651, 656 (Wyo. 2007) (affirming award for violation of non-compete in sale of business in amount of value of the performance of the non-compete itself).

App.946

business' worth is its projected profits.  Here, a prospective purchaser simply could not project the same profitability level if The CLM faces competition from defendants.

As recognized in the VRC Asset Valuation Report, the acquired assets were virtually all intangible, consisting of trademarks, customer relationships and goodwill. *See* P-12.  The value of those assets reflects a business' ability to generate revenues based on its brand reputation, customer relationships and competitive position. Competition from a former founding owner who was viewed synonymously with The CLM and an entity previously associated with it and with a strong brand recognition in the insurance business invariably will affect The CLM's brand and customer relationships and alter its competitive position.[6]

Having established injury, The Institutes provided a reasonable measurement of the amount of the resulting loss through Dr. Meyer's testimony.  Dr. Meyer calculated The CLM's diminished value by applying the Cournot model to assess the impact of defendants' competition on The CLM's future profitability.  That model was developed over one hundred years ago, has been repeatedly validated and

---

[6] That is why The Institutes insisted upon broad restrictive covenants.  Conversely, a purchaser of a company with tangible strategic advantages may not be concerned about competition from the former owner.  For example, the purchaser of an airport parking lot immediately next to the airport may not be concerned about competition from the seller because it could not, at least not without significant investment, challenge that locational advantage.

App.947

is used, *e.g.*, by the Federal Trade Commission and Department of Justice in applying the Horizontal Merger Guidelines.  Further, there were numerous factors supporting Meyer's conclusions, including additional competition from ClaimsX.

Defendants insist that The Institutes' only measure of damages is any profits lost.  That is simply not the law.  Defendants also claim that The CLM's failure to prove any losses attributable to their competition shows it will sustain no competitive harm.  But, COVID masked any such losses.  In any event, Ms. Pernie confirmed that certain sponsors reduced their spend with CLM, which she specifically attributed to the presence of ClaimsX in the market. Specifically, she cited to CoventBridge, SEA, and Winget Spadafora as entities that "have decided to move over to ClaimsXchange." Tr. at 331:17-332:3.  Mr. Miller similarly testified that CoventBridge and SEA both significantly reduced their spend with CLM from 2018 to 2021.  *See* Tr. at 51:8-14.

This case has never just been about a few conferences; it is about The Institutes' well-founded concerns for the future.  The Institutes were promised five years of lead time to grow CLM without competition from BIH.  Instead, BIH laid the groundwork to emerge from COVID as a formidable competitor, with the infrastructure in place to run conferences, a well-planned slate of conferences, and sponsors and panelists to present content to the public.  Not even injunctive relief can compensate for this harm.

Meyer's damages analysis quantifies this harm.  This type of exercise is never "straightforward" and "inevitably involves some speculation", but that is not a valid reason for rejecting the results generated by its application.  *In re Southern Peru Copper Corp. Shareholder Deriv. Litig*., 52 A.3d 761, 816 (Del. Ch. 2011).  Courts regularly permit damage experts to use the same economic models and statistical analyses employed to quantify damages that are utilized in business valuations, provided the assumptions underlying the expert testimony are not indefensible.  *See In re Live Concert Antitrust Litig*., 863 F. Supp.2d 966, 981-82 (C.D. Cal. 2012). That is exactly what Dr. Meyer did here.  Moreover, the *Maverick* court held that the defendants' competition reduced the value of the acquired entity by fifty percent even though there was a significant risk the technology would ever be marketed.

Meyer's testimony demonstrates that The Institutes lost between $6.7 to $8.0 million as a result of the Defendants' violations of the non-compete.  Tr. 471:18-473:13.  Damages should be awarded within that range.

**B.      In Addition to Money Damages, The Institutes are Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years.**

The Institutes are entitled to enforce the restrictive covenants for five years from the entry of the injunction.  Section 6.12(f) expressly provides that the term of the restrictive covenant shall be extended by the period of the duration of any breach

of Section 6.12.  Defendants have ignored Section 6.12 virtually since the closing, so The Institutes should be afforded the full five year term specified in the APA.

In the APA, Defendants conceded that The Institutes' remedies at law would be inadequate, so that they are entitled to injunctive relief.  Even without this concession, "harms resulting from competition by someone bound by a non-competition agreement are frequently found to be irreparable." *Tristate Courier and Carriage, Inc.*, 2004 WL 835886, at *13 (Del. Ch. April 15, 2004).

Here, it is impossible to determine the full extent of the CLM's damages and BIH has reaped long-term and building business benefits from each of its violations. Its specialty conferences, webinars, and strategic partnership with ClaimsX operated to expand its reach to more claims and litigation management professionals, who are then incorporated into BIH's mailing list.  Those individuals – whose names were acquired only through BIH's various competitive breaches – are then targeted for even more of BIH's expanding offerings.  Thus, a single BIH violation cannot be viewed in isolation, as each one yields ill-gotten gains that BIH then builds upon with each subsequent event.  Moreover, ClaimsX will continue as a competitor regardless of any injunctive relief the Court may enter.

The Institutes are entitled to enforce the restrictive covenants for five years from the entry of the injunction.  Defendants have ignored the covenant-not-compete virtually since the closing and BIH has no intention of cutting back its offerings, or

App.950

removing any of the claims content from future events.  *See* Tr. at 357:23-358:9, 358:10-10.   Indeed, Mr. Potter's original intention was for the C&H and IP conferences to be annual events.  *Id.* at 242:11-14.  Mr. Kenner would like to see BIH focus on IP in the future, as he considers it to be a growing part of the business, and said BIH intends to continue growing in the LTC space and already has another event scheduled for 2022.  *See id*. at 342:12-15; 348:21-349:5.  Such a conference would draw sponsors that might otherwise sponsor a CLM event.  *See id.* at 185:2-8.  BIH also seeks to expand its offerings in the cyber security space and already has another webinar scheduled for September 2022.  *See id.* at 350:21-351:4.

Defendants also publicly announced their intention to expand BIH's conference offerings.  *See* Tr. 287:7-11; P-74.  The press release following the sale of BIH announced new potential offerings such as cybersecurity, wildfires, and AI.  Mr. Acunto confirmed that BIH continued to advertise and market its growing conference schedule, which included cyber security, the new addition or iteration of the C&H conference, and the LTC conferences.  *See* Tr. at 288:10-289:5. And lest there be any doubt that such future offerings will violate the non-compete, when Mr. Acunto was asked whether future specialty conferences will contain claims content, he responded: "How could it not?" Tr. at 295:17-21.

The Institutes should thus be afforded the full five-year term specified in the APA.  Such a decision is both consistent with Delaware law and necessary as a

matter of equity.  Indeed, allowing BIH to compete at the end of the originally-contemplated five years would allow it to seize on the business momentum it achieved through its repeated violations.  Imposing a full-five year non-compete, in contrast, would at the very least stall BIH from capitalizing on its misconduct.

**C.    The Institutes are Entitled to Attorneys' Fees and Expert Witness Fees Pursuant to the Specific Language in Article IX of the APA.**

The APA provides for the award of attorneys' fees in the indemnity provisions of Article IX.  Specifically, Section 9.2 provides:

> <u>Indemnification of Buyer</u>.  The Selling Parties shall ... defend, indemnify and hold harmless Buyer ...from, against, for and in respect of and pay any and all **<u>Losses</u>** [emphasis added] suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:
>
> > (a) any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement ...
> >                    *        *        *
> > (f) the enforcement by any Buyer Indemnified Party of any of its rights under this <u>Section 9.2</u> or any other indemnification covenant contained in this Agreement.

In Section 9.7, "Losses" are defined to include "all reasonable attorneys', . . . and expert witness' fees incurred in connection therewith[.]"

Read together, Sections 9.2 and 9.7 create a broad right to indemnity for "all" Losses, including attorneys' and expert witness' fees, resulting from "any" breach of any "covenant" or enforcement of the indemnity rights set forth therein.  The Institutes claims in this case fall within the broad scope of these provision as they

App.952

claim  a breach of the restrictive covenants specified in Sections 6.12.  And, the attorneys' and expert fees and litigation costs generated in this matter were "incurred in connection" with those claims.

Moreover, Section 9.5 provides that the basket and cap specified therein do not apply to any "breaches of covenants in Article VI."  Expressly providing that breaches of Article VI are exempt from the basket and cap definitively evidences that intention that claim for breach of the various covenants specified therein are included within the indemnity provisions.  The parties would not have exempted those claims from the cap and basket if they were not encompassed within the indemnity obligations.  Moreover, the noncompetition and other provisions of Article VI impose obligations upon the Selling Parties personal to The Institutes, so a breach thereof would not result in third party claims against the plaintiffs.

The Institutes are entitled to an award of such fees under the express terms of the APA, in an amount to be determined in a separate fee petition following trial.  *See, e.g., Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672 (D. Del. 2013).

### D.    The Institutes Are Entitled to Pre- and Post-Judgment Interest.

An award of pre-judgment interest generally relates back to the date of the loss or injury.  *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.,* 996 A.2d 1254, 1262 (Del. 2010).  In a breach of contract action, interest accrues from the date of the breach.  *Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., C.A.*, 1985 WL

189241 (Del. Super. Aug. 9, 1985).  A court in its discretion may determine when

prejudgment interest began to accrue if there is any uncertainty as to when interest

began to run.  *Raymond v. Board of Public Works, C.A.,* 1990 WL 63829 (Del. Super.

May 8, 1990).  The rate of interest allowed in actions at law generally is equated to

the "legal rate" of interest described in 6 Del. C. § 2301(a). In equity, setting the rate

of interest is a matter of discretion.  *Montg. Cellular Holding Co., Inc. v. Dobler*,

880 A.2d 206, 226 (Del. 2005).

Respectfully submitted,

/s/  Barry Klayman
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
***Attorneys for Plaintiffs, The American***
***Institute for Chartered Property Casualty***
***Underwriters and The Institutes, LLC***

OF COUNSEL:
Robert W. Hayes (Admitted
*Pro Hac Vice*)
Matthew J. Siegel (Admitted
*Pro Hac Vice*)
COZEN O'CONNOR
1650 Market Street
Suite 2800
Philadelphia, PA  19103

July 15, 2022

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC, | |
| Plaintiffs, | C.A. No. 1:19-cv-01600- RGA-JLH |
| v. | |
| ADAM POTTER, PBIH, LLC and BUSINESS INSURANCE HOLDINGS, INC., | |
| Defendants. | |

## ANSWERING POST-TRIAL BRIEF OF
## DEFENDANT BUSINESS INSURANCE HOLDINGS, INC.

Dated: July 29, 2022

**DLA PIPER LLP (US)**
Matthew P. Denn (DE Bar No. 2985)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
Telephone: 302.468.5700
Facsimile: 302.394.2341
matthew.denn@dlapiper.com

**OF COUNSEL:**

Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: 305.423.8522
Facsimile: 305.675.6366
chris.oprison@dlapiper.com

*Attorneys for Defendant Business Insurance Holdings, Inc.*

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................2

ARGUMENT ......................................................................................................14

I.    THE PLAINTIFFS HAVE NOT ESTABLISHED A BREACH OF
      CONTRACT BY BIH ..................................................................................14

      A.    The Plaintiffs Have Not Proven That They Incurred Any
            Damages, A Necessary Element of a Breach of Contract Claim........14

            i.    The Plaintiffs' Witnesses Were Unable to Demonstrate
                  that Any Customer, Sponsor, or Advertiser Was Lost As a
                  Result of Any Alleged Breach by BIH ....................................16

            ii.   The Plaintiffs Have Not Provided the Court With a
                  Reasonable Basis to Measure Damages....................................18

                  (a)   Dr. Meyer's Testimony Was Not the Product of
                        Reliable Principles and Methods ....................................19

                  (b)   Dr. Meyer Did Not Reliably Apply Her Model to
                        the Facts Of the Case .....................................................20

                  (c)   Dr. Meyer's Testimony Does Not Fit the Issues in
                        the Case ..........................................................................23

            iii.  The Case Law Cited by the Plaintiffs Suggesting That
                  They Need Not Prove Damages Is Inapposite .........................23

      B.    The Plaintiffs Have Not Proven That BIH Provided Content
            Related to Claims and Litigation Management....................................25

      C.    The Plaintiffs Have Not Proven That BIH Targeted Its Events at
            Claims and Litigation Management Professionals..............................26

D.    The Plaintiffs Have Not Proven that ClaimsX Provided Content Related to Claims and Litigation Management at Any Events Where BIH Was Involved ....................................................................27

E.    BIH Did Not Violate the Non-Solicitation Provision of the APA ......28

II.    THE COURT SHOULD REJECT THE PLAINTIFFS' REQUEST TO REARGUE THE MEANING OF THE CONTRACT BASED ON THE EXACT SAME ARGUMENTS THE PLAINTIFFS MADE PRIOR TO THE COURT'S PRIOR DECISION ......................................................29

III.    THE DEFENDANTS ARE ENTITLED TO NO RELIEF ...........................30

A.    The Plaintiffs Are Not Entitled to an Injunction ................................31

B.    The Plaintiffs Should Not Receive an Award of Attorney's Fees from BIH ..............................................................................................32

CONCLUSION .....................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Capital Corp. v. GC-Sun Holdings,*
  LP, 910 A.2d 1020 (Del. Ch. 2006).....................................................26

*Concord Steel Inc. v. Wilmington Processing Co., Inc.,*
  C.A. No. 3369-VCP, 2008 WL 902406 (Del. Ch., April 3, 2008).............*passim*

*Deere & Co. v. Exelon Generation Acquisitions, LLC,*
  C.A. No. N13C-07-330-MMJ-CCLD, 2016 WL 6879525 (Del.
  Super., Nov. 22, 2016)..........................................................32

*Duncan v. STTCPL, LLC,*
  C.A. No. K16C-12-020-JJC, 2020 WL 829374 (Del. Super., Feb.
  9, 2020) ..........................................................................15

*eBay, Inc v. MercExchange, LLC,*
  547 U.S. 388 (2006)...............................................................31

*Schneider ex. rel. Estate of Schneider v. Fried,*
  320 F.3d 396 (3d. Cir. 2003) .....................................................19

*Hydrogen Master Rights, Ltd. v. Weston,*
  228 F. Supp. 3d. 320 (D. Del. 2017)..............................................14

*Johnson v. Gov't Employees Ins. Co.,*
  C.A. No. 06-408-RGA, 2014 WL 2708300 (D. Del., June 16,
  2014) .............................................................................15

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.,*
  C.A. No 2019-0002-SG, 2021 WL 1592473 (Del. Ch., April 23,
  2021) .............................................................................24

*SARN Energy LLC v. Tatra Defence Vehicle A.S.,*
  C.A. No. N17C-06-355-EMD-CCLD, 2019 WL 6525256 (Del.
  Super., Oct. 21, 2019)............................................................32

*Siga Techs., Inc. v. PharmAthene, Inc.,*
  132 A.3d 1108 (Del. 2015) .......................................................24

Case 1:19-cv-01600-RGA-JLH   Document 327   Filed 07/29/22   Page 5 of 39 PageID #: 6653

**<u>Other Authorities</u>**

Federal Rule of Evidence 702 .................................................................................19

App.959

## SUMMARY OF ARGUMENT

Prior to trial, the Court clearly established what the Plaintiffs would need to prove in order to show that any conference or event offered by Business Insurance Holdings (BIH) violated the parties' Asset Purchase Agreement (APA): the Plaintiffs could only show a breach of contract by proving that BIH had offered "a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals," (D.I. 304 at p. 5).

In spite of knowing of this standard, the Plaintiffs introduced no evidence at trial of the actual content offered at any conference that they alleged to have violated the APA, and no evidence that BIH had targeted claims and litigation management professionals with respect to any of its events or conferences. The Plaintiffs did not just fail to introduce evidence of content that met the standard required by the Court; they introduced no evidence of any actual content from any conference, with the exception of some slides from a single conference that on their face have nothing to do with managing claims or litigation.

The Plaintiffs also failed to show that any of BIH's alleged violations of the APA – either the conferences referenced above, or Mr. Acunto's fleeting involvement with the board of ClaimsXchange ("ClaimsX") – damaged the Plaintiffs in any way.  Damages are a required element of a claim for breach of

1

contract in Delaware, and the damages must be shown specifically for each alleged breach in order for a cause of action to be sustained.  The Plaintiffs could not demonstrate damages by any means other than through their expert Christine Meyer, and Dr. Meyer's testimony was shown at trial to be based on incorrect factual assumptions, the misapplication of the model she professed to use, and the misapplication of state law regarding "benefit of the bargain" damages.  Dr. Meyer's "model" resulted in absurd outcomes, and fell far short of the standard that is required for the Court to use it as a basis to find that damages occurred.

The Plaintiffs, recognizing that they did not introduce evidence sufficient to meet the requirements established by the Court, also attempt to (1) suggest definitions of the terms used by the Court that would eviscerate the Court's earlier rulings (Opening Brief (D.I. 325) at pp. 16-19), and (2) persuade the Court that its earlier rulings were in error (*id*. at 19-23).  The Court should reject both of these efforts.

## STATEMENT OF FACTS

The Plaintiffs had the burden of proof in this case, and they failed to introduce any evidence necessary to satisfy the legal elements of their claims.  The material facts with respect to BIH are familiar to the Court.  The case primarily involves five

App.961

events that the Plaintiffs allege to have violated the APA.[1]  Mr. Acunto, the indirect owner of BIH through Beacon Intercontinental during each of the five events, testified at trial that BIH did not target claims and litigation professionals for its events or have events focused on claims and litigation management.  Tr. at 778-780. The Plaintiffs also allege that Mr. Acunto's brief personal involvement with a new company known as ClaimsX violated the APA.  Mr. Acunto testified that his personal involvement with ClaimsX was brief and sharply limited, and did not involve any planning of events. BIH's only involvement with ClaimsX was a business arrangement whereby Business Insurance would attempt to enhance its subscriptions by initially offering them for free to ClaimsX members.  Mr. Potter acknowledges that he told Mr. Acunto that the APA's non-compete provisions did not apply to BIH once Mr. Potter sold the company, Tr. at 253, and the Plaintiffs acknowledge that Mr. Potter made this assurance to Mr. Acunto.  Opening Brief at pp. 6-7.

**No Evidence of Conference Content Related to Claims and Litigation Management**

As noted above, the Court expressly rejected the interpretation of the APA urged before trial by the Plaintiffs – that any event organized by BIH other than an event expressly listed in the APA's "Schedule of Permitted Activites" was a

---

[1] It is undisputed that the planning for the first event, the cannabis and hemp conference, was done while Mr. Potter still owned BIH.

violation of the non-compete clause.  Instead, the Court stated that there were two ways that the Plaintiffs could demonstrate that a conference violated the APA, one of which was to show that the conference provided "content related to claims and litigation management."  The Plaintiffs do not attempt to argue that BIH's conferences met this standard.  The most they argue is that the disputed conferences "involved claims content."  Opening Brief at pp. 9-10.  But that is not the requirement established by the Court.

Tellingly, the Plaintiffs did not introduce evidence of any actual content at any of the conferences in dispute.  In spite of having a list of every attendee at the cannabis and hemp conference, any one of whom Plaintiffs' counsel could have contacted to ask about the actual content that was offered; in spite of having discussed internally the possibility of sending someone to the cannabis and hemp conference to determine its content; in spite of apparently having the ability at one point to access actual recordings of at least one of the on-line events in question (PX26), the Plaintiffs offered absolutely no evidence of any content offered at any conference, other than a set of slides from the cannabis and hemp conference that not even the Plaintiffs argue discuss claims and litigation management.  (PX23)

**No Evidence of Targeting of Claims and Litigation Professionals**

The Plaintiffs also offered no evidence that any BIH conference "targets claims and litigation professionals."  The Plaintiffs presented evidence that

4

particular conferences might be "of interest" to claims and litigation professionals, and also presented evidence that BIH made no affirmative effort to purge its subscriber lists of any person who might be a claims and litigation professional. But the fact that a panel at a particular conference might be of interest to a claims or litigation professional, or the fact that BIH did not attempt to cleanse its lists of claims and litigation professionals, does not constitute "targeting" of those persons under any rational definition of the term.

The purported examples of "targeting" offered by the Plaintiffs are not only not "targeting," but they are not described accurately in the Plaintiffs' brief. The entirety of the "targeting" alleged by the Plaintiffs, after three days of trial testimony, consists of four pieces of evidence. Opening Brief at pp. 11-13.

1.    The Plaintiffs, quoting former BIH employee Katie Kett, allege that "Potter contemplated a special, discounted pricing structure for risk managers and 'insurance company folks (underwriters/claims).'"  D.I. 325 at p. 11.  First, of course, contemplating something is not the same thing as doing it, so even if the Plaintiffs' statement accurately recited the evidence, the mere fact that Mr. Potter thought about offering a discounted pricing structure for claims and litigation professionals would not be evidence of "targeting."  But the evidence does not even suggest that Mr. Potter thought about targeting them.  The email referred to in the testimony cited the Plaintiffs is to Katie Kett, and it says:

App.964

> I think we should do something a bit different and more like the WCF conference, where we have different tiers. What does everyone think about $99/$199 for Risk Managers, $499 (early)/$599 regular) for insurance company folks (underwriters/claims), $899/$999 for brokers $1499/$1599 for all others"

(PX 51). When Ms. Kett was asked to explain the email, she indicated that she thought Mr. Potter was simply trying to describe the types of people who worked for insurers, and distinguish them from risk managers to whom he wanted to offer a much lower price in order to encourage risk managers to attend. Tr. at 439-441. In other words, to the extent the testimony cited by the Plaintiffs demonstrates anything, it is that Mr. Potter wanted to encourage people who were not claims and litigation managers to attend.

2.     The Plaintiffs argue that Ms. Kett said that that "no effort was made to exclude claims professionals and that the claims session would certainly interest claims professionals." Opening Brief at p. 11. She did not say either of these things. With respect to interest by claims professionals, Ms. Kett said the following:

> Q: So, is it your understanding that Ian Stewart is suggesting here that the cannabis claims session may be – may have broader appeal?

> A: I don't know. I think the only – I think his thinking was that the brokers and insurers would like to understand how claims are handled as well, and not – and not specifically claims professionals necessarily.

> Q: So, by including – you think that by including cannabis in a specific track, they would be more narrowly tailored towards claims professionals?

THE WITNESS:   I mean, not necessarily.  I think – I was – we were
just trying to collaborate to find – to come up with a topic that would
be of interest to – to everyone attending the conference, not – not just
claims professionals.

Q:  In your estimation, would a topic on cannabis claims be – would
appeal to claims professionals?

THE WITNESS:    Yes, among – among other insurance professionals.

Tr. at 408-409.  Ms. Kett's actual testimony not only does not say what the Plaintiffs

recite, but actually suggests the opposite – that the panel in question was designed

to appeal to a broad audience in the insurance industry, and was not targeted at

claims or litigation professionals.  And leaving aside the fact that there is a difference

between targeting claims and litigation professionals and affirmatively seeking to

bar their attendance, Ms. Kett confirmed that Mr. Potter did discourage attendance

by claims and litigation professionals, specifically by changing the web site for the

conference to indicate that it was not developed and was not intended for claims and

litigation management professionals.  (PX 70 & Tr. at 416).  Ms. Kett identified this

request as something designed to make sure that no claims or litigation management

professionals attended the cannabis conference.  Tr. at 419.

3.    The Plaintiffs argue that the Defendants' use of a marketing list from a

law firm (Wilson Elser) constituted targeting of claims and litigation management

professionals.  But there is no evidence whatsoever of who was on the Wilson Elser

list.  Tr. at 364-365.  The use of the Wilson Elser list was at the law firm's request,

Tr. at 400, not at Mr. Potter or BIH's request.

4.      Finally, the Plaintiffs argue that the fact that some claims and litigation

professionals attended the cannabis conference constitutes evidence that the

conference was targeted at claims and litigation professionals.  Opening Brief at 12.

The fact that claims and litigation professionals were there, of course, does not mean

that they were targeted.  As Mr. Acunto explained, there were a number of ways that

claims and litigation professionals could have learned of the conference other than

being targeted.  Tr. at 781-782.  Mr. Potter explicitly testified that Business

Insurance did not target claims professionals.  Tr. at 615.  Mr. Potter confirmed that

Business Insurance's subscription list was open to anyone who wanted to purchase

a subscription, and included not only people from all parts of the insurance industry

but also people who were not part of the insurance industry at all.  Tr. at 641.  Mr.

Acunto also denied that the cannabis conference, or any BIH conference, was

targeted at claim or litigation management professionals.  Tr. at 778.

In addition to the four supposed examples of "targeting" described above, the

Plaintiffs also claim that Mr. Acunto inadvertently acknowledged that one of the

conferences – the cannabis and hemp conference – was targeted at claims and

litigation professionals.  This would make no sense, of course, as Mr. Acunto

testified that all of the marketing for the cannabis and hemp conference was done

8

before he even owned BIH.  Tr. at 284.  But beyond that, a full reading of both
statements cited by the Plaintiffs reveals that Mr. Acunto was not admitting anything
of the type.

In the first instance cited by the Plaintiffs, a full reading of Mr. Acunto's
testimony makes clear that he is referring to insurance brokers in making his
statement:

> Q:  So what, if any, panels at the 2019, October 2019 cannabis and
> hemp conference were targeted to claims and litigation management
> professionals?
>
> A:  Did you say "what if"?
>
> Q:  What, if any, panels at that conference were targeted to claims and
> litigation management professionals?
>
> A:  None of them and all of them.
>
> Q:  What do you mean by that?
>
> A:  Well anyone who's in the business, I'm sure they would want to
> understand – look, if I were a claims professional, let's just say I would
> want to understand what a hemp producer did if I were going to be faced
> with defending a policy in three years, let's just say.  It's a subject
> matter that's a broad interest, a new one.  This was not – you know,
> Cannabis and Hemp have not been legal.  In fact, they're still not legal
> anywhere.  It was a new emerging field in insurance.  The insurable
> interests in that process, in other words, the portion of the process that
> could be subject to insurance was emerging, being found out, purity,
> potency, et cetera.
>
> So I would be surprised – I'm not surprised if anyone in the business
> would not want to learn it, especially brokers, because they're going to
> be the ones called upon to write the business later on.  And they do
> participate in the claims process as brokers.  They – for example when

App.968

you have a car collision, you call your broker.  Broker participates in the claim, right?  They would be a party to that.

So I'm surprised there weren't more people there and then – in fact, there weren't – that there weren't – there weren't more people on the legal side.

Tr. at 788-789.

The second example cited by the Plaintiffs also does not stand for the proposition they claim when read in context. Mr. Acunto, in explaining why people serving as general counsel at insurance companies who might have claims management as part of their broader portfolios would be interested in BIH conferences, said:

> "A general counselor of an insurance company will have multiple hats, and that individual would be responsible for claims management, hiring lawyers, alternative dispute resolution.  I was very active with an association that we worked with, we did their printing and stuff, called the American Reinsurance and Insurance Arbitration Society.  I think it still exists in Washington.  We were part of helping general counsel, in many cases, move their disputes to arbitration, rather than to – to come to court.

> Those individuals would have an interest, for example, in how a cannabis business plays out, what the risks are, what the exposures are. I mean, it's common sense that anybody in the business who wants to stay with it would try to – right now, there are other things trending, and they will want to do that too, cyber risk, the wildfires in New Mexico.

> I actually got a call, would we consider doing a seminar on the implications of the wildfires on the insurance market in New Mexico. So these are trends, and people do want to follow them.

App.969

Q:  Simply because you have claims management professionals or litigation management professionals as subscribers or advertisers, interested parties, does that – to what extent does that affect or drive the content at any of your risk management conferences that you offer?

A:  A hundred percent.  I mean, why would we offer anything that they wouldn't be interested in?

Q:  Right.  But I'm asking specifically:  Do you – do you have conferences that are focused on claims and litigation management, or are they continued to be focused on risk management?

A:  We do not have – to answer the first part, no, we do not have conferences or events that focus on claims or claims management or litigation.  Our focus is risk management.

Tr. at 779-780.  Contrary to the implication in the Plaintiffs' brief, Mr. Acunto was discussing the content of BIH conferences, not the target audience, and when he said "why would we offer anything that they wouldn't be interested in?", he was referring to the general counsel of insurance companies that he had just finished describing at length.  Tr. at 780.

**Mr. Acunto's Individual Involvement With ClaimsX Was Fleeting And Caused No Damage to the Plaintiffs**

Mr. Acunto testified at length at trial regarding his fleeting involvement with ClaimsX, which he undertook only after Mr. Potter assured him that he was permitted by the APA to do.  As described by Mr. Acunto, and uncontradicted by the Plaintiffs, Mr. Acunto met with Ms. Posner shortly after purchasing BIH; agreed to serve as a board member for ClaimsX; briefly provided some administrative help to Ms. Posner in setting up ClaimsX; and attended half of a single board meeting

11

before leaving the board.  Tr. at 807-812.  Mr. Acunto specifically testified that he did not assist ClaimsX in organizing any events.  Tr. at 812-813.  He also testified that the only involvement BIH had with ClaimsX was offering free subscriptions to ClaimsX members, which BIH would later attempt to convert to paid subscriptions. Tr. at 811.[2]

No Plaintiffs' witness was able to articulate any damage that the Plaintiffs incurred as a result of the existence of ClaimsX – either during Mr. Acunto's brief tenure on the board, or in the years following.  Mr. Miller said that he was not aware of any customers or sponsors that CLM had lost as a result of ClaimsX.  Tr. at 100. Ms. Horowitz testified that CLM had lost some board members as a result of the creation of ClaimsX, Tr. at 698, but the parties have stipulated that lost board members do not constitute damages for purposes of this case.  (D.I. 196)  Ms. Horowitz admitted that she could only think of a single CLM member who may have failed to attend a CLM event as a result of the creation of ClaimsX, but that she didn't know why that person had failed to attend a ClaimsX event and that everything she knew was from Anne Blume.  Tr. at 699-700.  Ms. Blume, in turn, testified that as recently as August of 2021with respect to ClaimsX, "I don't think they were doing much," Tr. at 216, and that she was not aware of a single customer

---

[2] The Plaintiffs continue to state that BIH had a "strategic partnership" with ClaimsX, based on a statement on ClaimsX's web site, even though the unrefuted trial testimony is that there was no such strategic partnership.  Tr. at 363.

or sponsor that had failed to attend or sponsor a CLM event because of any action by BIH.  Tr. at 217-218.  Finally, Tina Pernie speculated "anecdotally, through conversations I have had with the sales team," that two companies – CoventBridge and SEA – had "decided to move over to ClaimsXchange," and that she would "wager to guess" that a third would.  Tr. at 331-332.  The Plaintiffs provided no direct evidence that any of these three companies were or had ever been sponsors of ClaimsXchange, much less that any such sponsorship had been the cause of any reduction in support to the Plaintiffs.

**Non-Solicitation Clause**

The uncontradicted testimony at trial was that Wilson, Elser approached Mr. Potter about sponsoring the cannabis conference after Mr. Potter had previously spoken to a friend at the firm more generally about the viability of such a conference. Tr. at 637.  The Plaintiffs do not allege any violation of the non-solicitation clause by BIH other than a single sentence that says "BIH's continued association with Wilson Elser as a sponsor and/or presenter at the various events cited above constitutes further breaches of Section 6.12(b)."  Opening Brief at p. 15

**No Evidence of Damages**

As discussed *infra* at 16-17, the Plaintiffs introduced no evidence of any damages arising from any actions by BIH, other than to offer the testimony of an expert.  To the extent that there was any fact testimony regarding CLM's

13

App.972

performance following the Defendants' alleged violations of the APA, the testimony from the Plaintiffs' own witnesses was that CLM had continued to perform well.  Tr. at 691.  To the extent that CLM failed to meet any revenue targets after the alleged violations, the Plaintiffs' own fact witnesses attributed this shortfall directly to the Covid-19 pandemic.  Tr. at 212, 696.

## ARGUMENT

The Plaintiffs did not carry their burden to show a breach of contract, did not prove damages of any kind, and are not entitled to any relief.  In spite of being assured by Mr. Potter that it was not subject to the non-compete provisions of the APA, BIH has adhered to the non-compete clause as it is interpreted by the Court.

## I.   THE PLAINTIFFS HAVE NOT ESTABLISHED A BREACH OF CONTRACT BY BIH.

In order to prevail in a claim for breach of contract, the Plaintiffs must demonstrate (1) a contractual obligation, (2) a breach of that obligation by BIH, and (3) a resulting damage to the Plaintiff.  *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d. 320, 333 (D. Del. 2017).  The Plaintiffs failed to prove either a breach by BIH of the APA, or any resulting damages.

### A.   The Plaintiffs Have Not Proven That They Incurred Any Damages, A Necessary Element of a Breach of Contract Claim.

Damages resulting from a breach of contract are not just a remedy, they are a required element of the cause of action.  *Hydrogen Master Rights*, 228 F. Supp. 3d.

App.973

at 333.  Moreover, the damages demonstrated must arise from the breach in question; they cannot be alleged generally.  *Johnson v. Gov't Employees Ins. Co*., C.A. No. 06-408-RGA, 2014 WL 2708300, at *1 (D. Del., June 16, 2014); *Duncan v. STTCPL, LLC*, C.A. No. K16C-12-020-JJC, 2020 WL 829374, at *10 (Del. Super., Feb. 9, 2020).

The Plaintiffs' expert witness argued at trial that any factual evidence regarding individual lost customers, advertisers, or sponsors was irrelevant to the question of damages because of the intervening event of the Covid-19 epidemic:

> Q:     Okay.  Now, I think you sat in the courtroom this week during the trial and you heard some testimony about whether or not the CLM after the acquisition lost any customers and what the impact was.
>
> Does any of that information impact your conclusions?
>
> A:     Well, in this particular case the general nature of the competition was certainly something that I looked at and was aware of and, as I said before, the example, for example, Wilson Elser.  But of course, we had COVID which came in between.
>
> So, it's not possible in this situation to look at actual – the actual performance and gain any – any real insights in terms of, you know, what the thinking would have been about the effect on value of competition because, you know, we didn't see sort of a – the kind of marketplace or conferences that everyone thought we were going to see. We – you know, obviously no one was going to conferences for some period of time.

Tr. at 475-476.  The only way that the Plaintiffs could establish any damages at all, or any measure of damages, was through their expert's "benefit of the bargain" analysis.  As explained below, that analysis should be rejected in its entirety.

i.    **The Plaintiffs' Witnesses Were Unable to Demonstrate that Any Customer, Sponsor, or Advertiser Was Lost As a Result of Any Alleged Breach by BIH.**

The Plaintiffs, having conceded that they could not prove damages through any actual evidence of lost customers, sponsors, or advertisers, sought to make their case for damages solely through expert testimony.  But before being permitted to offer a damages estimate, the Plaintiffs must prove that some actual damage occurred.  As the Court has previously held in this case, the Plaintiffs were required to show the fact of damages with reasonable certainty.  D.I. 304 at p. 7 (citing *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).  The Plaintiffs did not do so.  In fact, to the limited degree that evidence was introduced at trial regarding the financial health of CLM, the evidence was that CLM was meeting the Plaintiffs' expectations, even in the face of the Covid-19 pandemic.  *Supra* at 14.

Of the few sponsors or advertisers who the Plaintiffs even suggested had ended or reduced their support of CLM, the Plaintiffs offered no evidence that any of that change in support was related in any way to any actions by BIH.  With one exception, the Plaintiffs' witnesses all squarely stated that they had no idea why any company reduced its support, and the one witness (Tina Pernie) who suggested otherwise said "anecdotally, through conversations I have had with the sales team," that two companies – CoventBridge and SEA – had "decided to move over to ClaimsXchange."  This statement was not only speculative on its face, but directly

16

contrary to the testimony of Mr. Miller – who, unlike Ms. Pernie, still works for The Institutes.  Mr. Miller testified that CoventBridge and SEA continued to be sponsors of the CLM, albeit at lower levels for which he had no explanation.  There was no direct evidence introduced that CoventBridge or SEA were financial supporters of ClaimsX.  In short, there was no evidence of an injury in fact resulting from any alleged contract breach, and certainly not evidence meeting the "reasonable certainty" standard.

Recognizing that they cannot prove injury in fact, the Plaintiffs seek to simply bypass the requirement.  First, they argue that "A breach causes injury where it deprives the nonbreaching party of the benefit of its bargain."  Opening Brief at 24. But that is simply an effort to skip the first step of the analysis.  Second, the Plaintiffs argue that the non-compete agreement was important to them in agreeing to buy CLM, and that they would not have purchased CLM if they had known that the Defendants would compete with them.  *Id.*[3]  The mere fact that a Plaintiff alleges

_____

[3] The Plaintiffs also incorrectly argue that "Jeffrey Scheidt, who prepared the Institutes' initial valuation, testified that it was based on the understanding that Defendants would not compete post-acquisition beyond the permitted activities." Opening Brief at p. 24.  That is not what Mr. Scheidt said.  In fact, Mr. Scheidt candidly admitted that his valuation was based on a much more narrow assumption about competition – simply that the sellers would not duplicate the specific programs that were already being offered by the CLM after selling the company.  Tr. at 146-147.  His testimony is important not only for legal reasons, as it completely undermines the factual assumption underpinning the testimony of the Plaintiffs' expert, but is also important in assessing the equities of the case.  Not even the Plaintiffs have argued that the Defendants did what Mr. Scheidt assumed they would

that a contractual term was important does not, as a matter of law, mean that the Plaintiff was injured by non-compliance with that term. The Plaintiffs cite no authority for this proposition, and it would effectively eliminate the "resulting damage to Plaintiff" element of the legal definition of a contract breach.

The Plaintiffs argue that "neither Potter nor Acunto claimed that the Defendants' competition did not affect the value of The CLM." Opening Brief at p. 25. Leaving aside that it was not their burden to do so, Mr. Potter and Mr. Acunto did not have to make that argument. The Plaintiffs' own witnesses introduced evidence that the CLM had thrived during the period of the supposed contract violation. Ms. Blume, for example, testified that CLM's financial trends were all positive in 2019 and even into 2020 right up until the point of the pandemic. Tr. at 212.

### ii. The Plaintiffs Have Not Provided the Court With a Reasonable Basis to Measure Damages.

The testimony of the Plaintiffs' expert, Dr. Christine Meyer, failed almost every standard required of expert testimony by the Federal Rules of Civil Procedure. Her testimony should be stricken, and given that it was the sole basis upon which the Plaintiffs claimed quantifiable damages, the Court should find that the Plaintiffs have proven no damages and cannot sustain a breach of contract claim.

_____

not do – mimicking existing CLM events. The Plaintiffs have received exactly what Mr. Scheidt thought they had bargained for.

App.977

Although the Court usually hears pre-trial *Daubert* motions to exclude expert testimony (and did so in this case), *Daubert* is an explanation of Federal Rule of Evidence 702, and if expert testimony offered at trial does not satisfy the standard of Rule 702, it should not be considered by the Court following a bench trial, both because it fails the requirements of Rule 702 and because it does not provide a reasonable basis to measure damages.

Rule 702 requires that an expert's testimony be the product of reliable principles and methods, that the expert reliably apply those principles and methods to the facts of the case, and that the testimony fit the issues in the case. *Schneider ex. rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-406 (3d. Cir. 2003). Dr. Meyer's testimony failed on all three fronts, and should be given no weight by the Court.

### (a)    Dr. Meyer's Testimony Was Not the Product of Reliable Principles and Methods.

Dr. Meyer testified that she used the "Cournot Model" as described in "Industrial Organization" by Jeffrey Church and Roger Ware as the basis for her expert analysis, Tr. at 512, that she used the "simple model" described in the treatise to do her analysis, Tr. at 516, and that the simple model required that products be homogeneous, two firms choose output, two firms compete with each other just once and make their production decisions simultaneously, and that there is no entry by other producers. *Id*. Yet she agreed that the products in this case are not

homogeneous, Tr. at 517, and that the companies did not compete with each other just once, Tr. at 519.  Jeremy Campbell, the Plaintiffs' own witness, testified that CLM had multiple competitors, not just one.  Tr. at 370-371.  In short, virtually none of the required assumptions for the simple Cournot model that Dr. Meyer applied were present in this case.  Dr. Meyer insisted that there were other versions of the Cournot model that allowed for some of these assumptions to be relaxed, Tr. at 461-465, but she admitted that she had not applied other versions of the Cournot model – she applied the simple one, which was unsupported by any of the actual facts of the case.  Tr. at 518.  Dr. Meyer also admitted that her model would result in exactly the same measure of damages no many how many times the non-compete clause was assumed to be violated, and no matter how seriously the non-compete was assumed to be violated.  Tr. at 535.  She admitted that even if she learned that, rather than losing business as a result of the Defendants' actions, CLM had actually tripled its business since 2018, tripled its profits, and tripled its revenues, that this would not affect her model.  Tr. at 505.  A model that, by the expert's own admission, does not adhere to the basic requirements of the treatise upon which it is based, and results in facially absurd results, is not the product of reliable principles and methods.

### (b)     Dr. Meyer Did Not Reliably Apply Her Model to the Facts Of the Case

To the degree that Dr. Meyer made particular factual assumptions in applying her model, those factual assumptions were revealed at trial to be incorrect.  In other

App.979

areas, Dr. Meyer purposefully did not check her model against available facts at all, even though she agreed that care should be taken to ensure that her model was consistent with the facts of the case.  Tr. at 498.

Dr. Meyer testified that the VRC analysis that formed the basis for the Plaintiffs' purchase price of CLM and the other businesses they bought was "based on assurances that Defendants would not engage in any behavior other than those enumerated in Section 6.12 of the APA".  Tr. at 494.  Dr. Meyer testified that this assumption found its way into the VRC analysis because Institutes CFO Jeffrey Scheidt provided VRC with financial projections that "were based on the assumption that [the Defendants] would not be competing."  Tr. at 453-454.  But as it turns out, that was not the assumption that Mr. Scheidt made in preparing his revenue estimates for VRC.  Mr. Scheidt testified that in generating his revenue projections for VRC, he simply assumed that the Defendants would not duplicate the events that CLM was already putting on.  Tr. at 146-147.  Dr. Meyer's core factual assumption, that Mr. Scheidt had "embedded" in his revenue projections a far more sweeping non-compete assumption, is completely contradicted by Mr. Scheidt's own trial testimony.  Indeed, the Plaintiffs have not alleged that the Defendants have done anything that Mr. Scheidt assumed they would refrain from doing in generating his revenue projections; if Dr. Meyer were truly measuring the difference between the assumptions built into the VRC analysis through Mr. Scheidt's revenue projections

and the Defendants' actions, she would have come up with a damages estimate of zero.

Dr. Meyer also purposefully declined to make basic factual inquiries that would have tested her model.  For example, Dr. Meyer agreed that her model assumed that CLM would lose 50% of its market share by December 31, 2022.  Tr. at 499.  But she admitted that she had made no effort to try to determine CLM's actual market share.  Tr. at 504.  She also confirmed that her model was attempting to readjust the VRC model assuming a 50 percent reduction in market share, Tr. at 532, but that she did not take the simple step of contacting VRC and asking VRC how it would have adjusted its model if it had been told to assume a 50% reduction in market share.  Tr. at 533-534.  When the Court asked Dr. Meyer to confirm that under her model, "what actually happened after the deal went through, other than there was some competition, didn't matter," Dr. Meyer agreed that in her view, because of Covid-19, "I don't think we can look at what actually happened."  Tr. at 548.

Dr. Meyer did not reliably apply her model to the facts of the case, and in multiple instances went out of her way to avoid learning easily discoverable facts that would have tested her model.

**(c)    Dr. Meyer's Testimony Does Not Fit the Issues in the Case.**

As the Plaintiffs themselves point out, "benefit of the bargain" or "expectation" damages are calculated by a sum that would "put the promisee in the same position as if the promisor had performed the contract."  Opening Brief at p. 24, citing *Siga Techs., Inc.*, 132 A.3d at 1130.  But by her own admission, Dr. Meyer did not attempt to make this calculation – by purposefully ignoring any facts about how the Defendants' alleged breach actually impacted the Plaintiffs, she had no baseline against which to measure the difference between the value of the contract as promised[4] and its value following the alleged breach.  Benefit of the bargain damages are not measured by trying to hypothesize how the Plaintiffs would have reassessed the value of the contract if non-compliance was assumed.  Not only does Dr. Meyer's testimony fail to meet basic standards of reliability and factual accuracy, it also does not reflect the legal test for damages upon which the Plaintiffs rely.

**iii.    The Case Law Cited by the Plaintiffs Suggesting That They Need Not Prove Damages Is Inapposite.**

Recognizing that they have not provided the Court with a reasonable basis for calculating damages, the Plaintiffs also argue that they do not really need to do so.

---

[4] Dr. Meyer's decision to use the VRC analysis as the basis for determining the actual value of CLM at the time of purchase was also undermined by Mr. Scheidt's admission at trial that his revenue estimates relied upon by VRC were simply CLM's prior revenues increased by 3% every year.  Tr. at 135.

App.982

They claim that "doubts about the extent of damages are generally resolved against the breaching party," Opening Brief at p. 24, and argue that the mere finding of a misrepresentation of a non-competition agreement can be the basis for monetary damages. Opening Brief at p. 26. That is not the law in simple breach of contract cases. The Plaintiffs' arguments are based upon two cases where the courts found that the Defendants had engaged in willful misconduct. See *Siga Techs.*, 132 A.3d at 1131; *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, C.A. No 2019-0002-SG, 2021 WL 1592473, at *10 (Del. Ch., April 23, 2021) (damages award based on Court's finding that "the perpetrator of an intentional tort should not get the benefit of uncertainty in the quantum of harm he has caused").[5] This is a simple breach of contract case, where the Plaintiffs have not even alleged, much less proven, willful conduct by the Defendants. Moreover, the Delaware Supreme Court in *Siga Techs* did not suggest that a plaintiff could recover damages with no calculation of damages whatsoever, merely that the plaintiff "need not establish the amount of damages with precise certainty" once the fact of damages had been proven. Siga Techs., 132 A.3d at 1131.

---

[5] Additionally, in *Maverick Therapeutics,* the Defendant actually agreed with the Court that simply discounting the purchase price by a particular percentage representing competition was an appropriate measure of damages, and disagreed only over the percentage (suggesting 25% rather than 50%). *Id.* at, *12 & n.160. It was based in part upon this concession from the Defendant that the Court in *Maverick* determined that it could make a "responsible estimate" of the amount of damages. *Id.* at 11.

App.983

**B.     The Plaintiffs Have Not Proven That BIH Provided Content Related to Claims and Litigation Management.**

The Plaintiffs did not introduce any evidence of any content at any conference, other than a set of slides from the cannabis and hemp conference that do not mention claims or litigation management.  The Plaintiffs attempt to wordsmith this deficiency by saying that the conferences "of necessity involved claims content," or had materials that referred to claims, or discussed claims trends, or were enjoyed by people involved in claims underwriting, or discussed claims, or had speakers who handled claims.  Opening Brief at pp. 9-10.  But saying the word "claims" over and over again does not constitute evidence of claims and litigation management content. The Plaintiffs ultimately do not even argue that they have introduced actual evidence of claims and litigation management content.

The only way that the Plaintiffs can address their failure to introduce evidence of any actual content at any conference is simply to argue that any content involving insurance in any way constitutes "claims and litigation management" content.  And indeed, they make that argument.  Opening Brief at pp. 15-18.  The Plaintiffs' argument that the term should be interpreted "broadly," *id.* at 15, is directly contradictory to Delaware law interpreting non-compete agreements.   In fact, Delaware law requires that restrictive covenants be interpreted narrowly.  *Concord Steel Inc. v. Wilmington Processing Co., Inc.*, C.A. No. 3369-VCP, 2008 WL 902406, at *6 (Del. Ch., April 3, 2008) (interpreting restrictive covenant in asset

25

purchase agreement).    But even the most broad interpretation of "claims and litigation management content" would not encompass the Plaintiffs' definition, which would render any conference involving insurance a conference with claim and litigation content.    The Plaintiffs' own witness Anne Blume admitted at trial that "claims management" refers to activity that takes place after a claim has occurred. Tr. at 212.

     **C.**    **The Plaintiffs Have Not Proven That BIH Targeted Its Events at Claims and Litigation Management Professionals.**

In applying its interpretation of the APA, the Court should do so consistent with Delaware law that requires that non-compete provisions be construed narrowly. See, e.g., *Concord Steel Inc.*, 2008 WL 902406, at *6; *Allied Capital Corp. v. GC-Sun Holdings*, LP, 910 A.2d 1020, 1024 (Del. Ch. 2006).  With respect to applying the phrase "targets claims and litigation management professionals," BIH proposes that the Court use the common-sense definitions of "target" used in standard dictionaries.    Whether it is "to direct advertising, criticism, or a product at someone,"[6] or "to direct an action, message, etc. at someone or something,"[7] the central meaning of the verb "target" requires some affirmative effort on the part of

---

[6] Cambridge Dictionary
(https://dictionary.cambridge.org/us/dictionary/english/target)
[7] Britannica Dictionary (https://www.britannica.com/dictionary/target)

App.985

the Defendant to direct its advertising to a particular person or persons. This is even more true given the narrow definition required by Delaware case law.

The Plaintiffs' allegations all involve BIH's alleged failure to take actions, rather than any affirmative effort by BIH. Whether it is the allegation that BIH did not affirmatively seek to purge its subscriber rolls or its conference rolls of claims and litigation management professionals, or the allegation that BIH conceded that some of its conference content might be of interest to claims and litigation management professionals (among many others), or the allegation that BIH agreed to a law firm's request that BIH invite people from the law firm's mailing list (which may or may not have included claims and litigation management professionals), these allegations all involve supposed failures by BIH to take action. The very nature of targeting requires action by the Defendant, and the Plaintiffs have provided no evidence whatsoever of that.

### D.    The Plaintiffs Have Not Proven that ClaimsX Provided Content Related to Claims and Litigation Management at Any Events Where BIH Was Involved.

Mr. Acunto testified, and the Plaintiffs do not appear to dispute, that his involvement with ClaimsXchange was brief and did not involve the active planning of any events. There was no evidence introduced at trial that ClaimsXchange, during Mr. Acunto's involvement with the organization, targeted claims or litigation management professionals for its events. (There was testimony that board members

left CLM for ClaimsXchange's board, but the parties have stipulated that the Plaintiffs were not seeking damages for the loss of board members.  D.I. 196)  The Plaintiffs did not introduce evidence at trial sufficient to show that BIH or its affiliates violated the APA through Mr. Acunto's brief involvement with ClaimsXchange.

### E.  BIH Did Not Violate the Non-Solicitation Provision of the APA.

In an apparent afterthought, the Plaintiffs allege that BIH also violated the non-solicitation provision of the APA (Section 6.12(b)) because it continued to associate with the Wilson Elser law firm after Mr. Potter had allegedly solicited the firm to sponsor the cannabis and hemp conference.  Opening Brief at pp. 14-15.  Mr. Potter explained at trial, in uncontradicted testimony, that Wilson Elser first raised with him the possibility of sponsoring the cannabis and hemp conference.  Tr. at 599-600.  Beyond that, Mr. Potter explained at trial that Section 6.12(b) was meant only to apply to customers of The Institutes at the time of purchase, which is why the reference in the non-solicitation paragraph is to "Buyer's Customers" rather than "Sellers' Businesses."  Tr. at 250-251.  This interpretation of the contract not only comports with its plain language, but makes far more sense than the Plaintiffs' interpretation which would cause an APA violation literally any time any Defendant had any communication, even inadvertently, with any customer of CLM -- even if the same customers were also an existing customer of BIH.  If Section 6.12(b) were

App.987

interpreted as the Plaintiffs argue, it would be unenforceable for being inequitable and not enforcing the Plaintiffs' legitimate economic interests. *Concord Steel Inc.* 2008 WL 902406, at *4. Finally, the plain language of Section 6.12(b) demonstrates that its scope is intended to be limited to customers related to the Sellers' Businesses, effectively restricting Section 6.12(b) in the same manner that Section 6.12(a) is restricted.

## II.    THE COURT SHOULD REJECT THE PLAINTIFFS' REQUEST TO REARGUE THE MEANING OF THE CONTRACT BASED ON THE EXACT SAME ARGUMENTS THE PLAINTIFFS MADE PRIOR TO THE COURT'S PRIOR DECISION.

The Plaintiffs also attempt to persuade the Court to reverse its previous interpretation of the APA by repeating exactly the same argument that the Court already considered and rejected at the summary judgment stage. In their summary judgment brief, the Plaintiffs argued that the "Sellers Business" with which the Defendants were forbidden from competing included all "specialty conferences" of any kind. D.I. 269 at p. 8. The Plaintiffs argued that because some of the examples listed in "Schedule A" of the contract referred to claims or litigation management professionals, that the Court should infer that "specialty conferences" applied to any specialty conference of any kind, because the term did not have the same qualification. *Id.* at p 9. The Court rejected this argument in its opinion on the parties' summary judgment motion.

App.988

Undeterred, the Plaintiffs have resurrected exactly the same argument in their post-trial brief.  Opening Brief at pp. 18-23.  The result of this argument, according to the Plaintiffs, is that the Defendants are forbidden from holding specialty conferences -- which the Plaintiffs effectively define to mean any conference about anything [8] -- unless the conferences are enumerated in the list of "permitted activities" in Schedule 6.12.  The Court has already found that this interpretation is "inconsistent with the plain language of the APA."  D.I. 302 at p. 5.

The language of the APA says the same thing now that it did when the parties sought summary judgment, and the Plaintiffs' interpretation is still contrary to the plain language.

## III.    THE DEFENDANTS ARE ENTITLED TO NO RELIEF.

For the reasons described above, the Plaintiffs are not entitled to an award of monetary damages.  The Plaintiffs have also requested a permanent injunction, effectively doubling the length of the non-compete clause, and an award of attorney's fees and costs.  Even if the Court were to find a violation of the APA, these requests are not permitted by law.

---

[8] "That reference [to Specialty Conferences] is to a broad category of services, and is not limited by content or to whom they are targeted."  Opening Brief at p. 19

App.989

### A.    The Plaintiffs Are Not Entitled to an Injunction.

The Plaintiffs have asked for a permanent injunction extending the non-compete provisions of the APA for another five years.  Aside from the fact that the Plaintiffs have not established a breach of the APA, the Plaintiffs' request fails virtually every prong of the test applied by the courts in assessing permanent injunction requests.  To grant a permanent injunction, the Court must find that the Plaintiff has suffered an irreparable injury, the remedies such as monetary damages are inadequate to compensate for that injury, that a remedy in equity is justified by the balance of the hardships between the Plaintiff and Defendant, and that the public interest would not be disserved.  *eBay, Inc v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  In this case, the Plaintiffs have vigorously insisted that monetary damages are not only adequate but capable of estimation.  Although the Plaintiffs have failed to establish their right to such damages, they cannot make that claim and ask for an injunction at the same time.  Additionally, the only two events about which the Plaintiffs even attempted to introduce any evidence at trial – the cannabis and hemp conference and Mr. Acunto's brief personal involvement with ClaimsX – occurred within the first year and a half of the non-compete clause.  Imposition of a five-year injunction based on two events that occurred soon after the APA was signed would violate basic principles of equity and fairness.

App.990

**B.    The Plaintiffs Should Not Receive an Award of Attorney's Fees from BIH.**

The Plaintiffs claim that if they can establish a breach of the APA, they are entitled to an award of attorney's fees from BIH under Section 9.2 of the APA.  First, as a contractual matter, a long line of Delaware cases establishes that indemnification language of the type in the APA does not allow for attorney's fees claims arising from first-party actions between parties to the contract.  "Standard indemnity clauses are not presumed to apply to first party claims.  Otherwise a typical indemnification provision would swallow the American Rule.  In order for an indemnification provision to cover fee-shifting among parties, the contract must specifically state that requirement." *Deere & Co. v. Exelon Generation Acquisitions, LLC*, C.A. No. N13C-07-330-MMJ-CCLD, 2016 WL 6879525 at *1 (Del. Super., Nov. 22, 2016).  The language that the Court cited in *Deere & Co.* as being insufficient to justify an attorney's fee award is similar to the language relied upon by the Plaintiffs in this case:

> "From and after the Closing, [Exelon] shall indemnify, defend and hold harmless [Deere]…from and against any and all Losses incurred by [Deere] by reason of, arising out of, resulting from or related to…(ii) any breach or nonperformance of any of the covenants or agreements of [Exelon] contained in this Agreement."

*Id.  See also SARN Energy LLC v. Tatra Defence Vehicle A.S.*, C.A. No. N17C-06-355-EMD-CCLD, 2019 WL 6525256, at *1 (Del. Super., Oct. 21, 2019) (denying attorney fees based upon similar indemnification language).  Because the APA does

not contain the "clear and unequivocal agreement to shift fees…in connection with a dispute between parties to the contract, *Deere*, 2016 WL 6879525, at *1, and in fact employs indemnification language similar to that which other Delaware courts have found insufficient to create a right to attorney's fees in a dispute between the parties, the Plaintiffs' request should be denied even if the Court were to find that a breach of contract had occurred.

In addition, given that any finding of a breach by the Court is likely to have resulted in either no damage or trivial damages, the attorney's fees incurred by the Plaintiffs after years of pre-trial proceedings and a full trial would be vastly disproportionate to the magnitude of the litigation. To award the Plaintiffs attorney's fees would be unreasonable (the contract recognizes only "reasonable" attorney's fees as Losses), and would also render the contractual language itself inequitable. A covenant not to compete must survive a balancing of the equities in order to be enforceable by the Court, *Concord Steel*, 2008 WL 902406, at *4, and because the Plaintiffs are (improperly) seeking to invoke the indemnification provision with respect to enforcement of the restrictive covenant, the indemnification provision is also subject to a balance of the equities analysis as applied to the restrictive covenant. It would be facially inequitable (and, again, unreasonable) to require the Defendants to pay attorney's fees for years-worth of litigation over acts that have had no provable impact on the Plaintiffs.

## CONCLUSION

For the reasons stated above, Defendant BIH asks that the Court enter judgment in its favor.

Dated: July 29, 2022                         **DLA PIPER LLP (US)**

                                             */s/ Matthew P. Denn*
**OF COUNSEL:**                              Matthew P. Denn (DE Bar No. 2985)
Christopher Oprison (admitted *pro hac vice*) 1201 North Market Street, Suite 2100
DLA PIPER LLP (US)                           Wilmington, DE 19801-1147
200 South Biscayne Boulevard, Suite 2500     Telephone: 302.468.5700
Miami, Florida 33131                         Facsimile: 302.394.2341
Telephone: 305.423.8522                      matthew.denn@dlapiper.com
Facsimile: 305.675.6366
chris.oprison@dlapiper.com                   *Attorneys for Defendant Business*
                                             *Insurance Holdings, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) ) | |

---

**DEFENDANT ADAM POTTER'S BRIEF IN
SUPPORT OF THE ENTRY OF JUDGMENT IN HIS FAVOR
AND IN OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF**

---

Seth Niederman (#4588)
**FOX ROTHSCHILD LLP**
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: July 29, 2022                    *Attorneys for Defendant Adam Potter*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF FACTS ....................................................................5

I.     THE APA, VRC'S VALUATION OF THE SELLERS' BUSINESSES, AND THE
       PARTIES' AGREED UPON DEAL POINTS. ....................................................5

II.    THE "CLM BUSINESS." ....................................................................7

III.   THE APA'S RESTRICTIVE COVENANTS AT ISSUE. .........................................8

IV.    THE C&H AND INTELLECTUAL PROPERTY CONFERENCES.........................9

V.     WILSON ELSER. ..........................................................................12

VI.    POTTER SELLS BUSINESS INSURANCE. .....................................................12

VII.   SYDNEY POSNER, JEREMY CAMPBELL, AND CLAIMSXCHANGE. ................13

VIII.  COVID-19'S IMPACT ON THE CLM BUSINESSES. ......................................13

IX.    WAGGY GROUP. ..........................................................................14

ARGUMENT ............................................................................15

I.     THERE WAS NO BREACH OF THE RESTRICTIVE COVENANT. ......................15

       A.   The Non-Compete's Three-Step Framework. ....................................15

            1.   Step Two of the Non-Compete's Analytical Framework Requires that
                 the C&H Conference be a Product or Service Conducted by the CLM
                 Business as of the Closing Date, and it was Not.................................16

            2.   The C&H Conference was a Permitted Activity even if Found to be
                 Competitive with the CLM Business. .................................................18

       B.   No Basis Exists to Interpret "Content Related to Claims and Litigation
            Management" as Including Risk Management and other Pre-Loss
            Content. ...........................................................................20

       C.   CLM's "Specialty Conferences" and "Webinars" are Limited to the
            Events it Provided as of the Closing Date.........................................23

i

D.     Potter Did Not Violate the Non-Solicit. ...............................................26

E.     Arguments As to ClaimsXchange Should Be Disregarded. ...............27

II.     PLAINTIFFS ARE NOT ENTITLED TO MONEY DAMAGES OR INJUNCTIVE RELIEF. ......................................................................................................28

A.     Plaintiffs Received the Benefit of Their Bargain. ...............................28

B.     Plaintiffs Did Not Establish Any Damages Caused By Potter's Alleged Breach of the APA. ............................................................................30

1.     Plaintiffs Did Not Offer Any Evidence of An Injury.........................30

2.     No Evidence Exists in the Record Showing that Plaintiffs Suffered Damages as a Result of Potter's Alleged Breaches. ..........................31

C.     Plaintiffs are Not Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years. ..................33

D.     Plaintiffs are Not Entitled to Attorneys' Fees and Expert Witness Fees. .............................................................................................................34

CONCLUSION ..........................................................................................................35

App.996

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020 (Del.Ch. 2006) ........................................................................................24

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959).................................33

*Beard Rsch., Inc. v. Kates*, 8 A.3d 573 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) .................................................32

*ConAgra Foods Inc. v. Lexington Ins. Co.*, 21 A.3d 62 (Del. 2011).................23

*Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406 (Del. Ch. Apr. 3, 2008) .......................................................................................24

*Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8 (Del. 2000) ............ 28, 34

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336 (Del. Ch. Dec. 31, 2020)...................................................................35

*Greenstar LLC v. Heller*, 934 F. Supp. 2d 672 (D. Del. 2013) ................... 28, 29

*Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242 (Del. 2007) ...........................34

*Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199 (Del. 2021) ................................................................................................ 15, 16, 24

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics*, 2021 WL 1592473 (Del. Ch.) ...........................................................................................................29

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010)............... 21, 22, 24

*Rhone-Poulenc Basic Chem. Co. v. American Motorists Inc. Co.*, 616 A.2d 1192 (Del. 1992)....................................................................................................23

*Shawe v. Elting*, 157 A.3d 142 (Del. 2017).......................................................34

*Siga Technologies, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015) ......30

Defendant, Adam Potter ("Potter"), through counsel, submits this Brief in Support of the Entry of Judgment in his Favor and in Opposition to the Opening Post-Trial Brief ("Opening Brief") filed by Plaintiffs The American Institute for Chartered Property Casualty Underwriters ("AICPCU") and The Institutes, LLC ("The Institutes," together with AICPCU, Plaintiffs").

## PRELIMINARY STATEMENT

Down to a single claim for breach of contract which the parties tried before this Court on June 27-29, 2022, Plaintiffs failed to meet their burden of proof with respect to establishing: (1) any alleged breach by Potter of the restrictive covenants; (2) causation; or (3) actual damages.  Much like the other filings made by Plaintiffs in this case, Plaintiffs resort to argument, speculation and innuendo to bolster their bare allegations rather than providing the Court with citations to relevant testimony or supporting evidence.  Indeed, in the Preliminary Statement of their Opening Brief, Plaintiffs surprisingly refer to the evidence in their favor as "overwhelming" and showing "multiple breaches" of the at-issue non-compete and non-solicit.  Nothing could be further from the truth.

Indeed, Plaintiffs improperly seek through this case to have the Court impose broader restrictions into the at-issue asset purchase agreement (the "APA") and to create a monopoly for "specialty conferences" that are inconsistent with the express language of the APA and that have twice been rejected by this Court.

1

Moreover, after almost three (3) years of litigation, and despite their attempts to broaden the restrictions in the APA, Plaintiffs have still only *alleged* three (3) acts of competition/solicitation as to Potter, none of which Plaintiffs established as a breach of the APA at trial.

  ***First***, Plaintiffs claimed that Potter planned and organized the Cannabis and Hemp Conference (the "C&H Conference") in 2019.  Not only did the undisputed evidence and testimony establish that:  (1) Plaintiffs did not have any cannabis or hemp product at the time of the closing on the APA (June 2018) but also, (2) Plaintiffs, by their own admission, did not offer any "specialty conference" on cannabis or hemp at that time or now (consistent with Schedule A to the APA); and (3) the C&H Conference put on by defendant, Business Insurance Holdings, Inc. ("BIH"), in October 2019 was not targeted to claims and litigation management professionals.  The marketing materials for the C&H Conference expressly state so. Most importantly, despite a clear and affirmative obligation on Plaintiffs' part to demonstrate at trial that CLM had a cannabis or hemp product as of the June 2018 closing date, they failed to address the issue entirely at the trial.  As a result, the C&H Conference and Potter's limited involvement in it did not in any way breach the non-competition provision of the APA.  The fact that there was some discrete but arguably limited "claims content" at the C&H Conference related entirely to risk

management and business insurance issues simply did not establish any violation of the APA.

**Second**, Potter did not improperly solicit the Wilson Elser law firm to participate in the C&H Conference or not to engage in business activities with CLM. If the Court concludes that the C&H Conference did not violate the non-competition provision of the APA, then certainly the involvement of Wilson Elser also could not constitute a violation of the non-solicit. Separately, however, the restriction contained in the non-solicit merely restricted Potter from calling-on, soliciting or inducing, or attempting to induce, any "customer or other business relation of **Buyer**," which as defined in the APA was "**The Institutes**." Thus, because Wilson Elser was a customer of BIH, as well as CLM, at the time of the APA – and not of The Institutes – Plaintiffs should be precluded from making any type of claim under the non-solicit as there was no violation under the express language of the APA.

**Third**, Plaintiffs state: "Potter conceded that he set up a meeting between BIH and his sister, Ms. Posner to form a venture that competed with CLM. Though he did not participate in the subsequent meeting, Potter was well aware of what was happening." Op. Br. at 13. Not surprisingly, those statements are unsupported by record citations because they are patently false and were contradicted by the testimony and evidence presented at trial, which showed that Potter introduced Posner to Steve Acunto, Sr. ("Acunto") for one reason only: to hire Posner at BIH to replace Jeremy

App.1000

Campbell who had recently given notice. Based upon that uncontroverted evidence – and the fact that Plaintiffs offered no other evidence to the contrary – there is simply no merit to Plaintiffs' bare and unsupported assertion that Potter assisted in the formation of Claims Xchange or otherwise violated the APA in that regard. The Court should disregard any allegations or resulting arguments by Plaintiffs that takes such improper liberties with the testimony and record evidence.

With respect to causation and damages, Plaintiffs failed to establish any causal connection between the aforementioned allegations of breach and any harm suffered by Plaintiffs. To cover up such deficiencies in the evidence presented, and their own admissions that they suffered no lost customers, business or sponsors as a result of any conduct on the part of Potter, Plaintiffs claim some limited loss of revenues from CoventBridge, SEA and Winget Spadafora. Aside from the fact that Plaintiffs wholly failed to connect the loss of those revenues to any conduct on the part of Potter (or BIH), they failed to present any testimony or evidence explaining why such loss of revenues has anything to do with this case. The entirety of Plaintiffs' damages theory is based not just on some hypothetical analysis but pure and unadulterated speculation. Plaintiffs failed to offset any losses due to COVID-19 on their purported damages (despite all of their witnesses testifying to the contrary) or the impact of what amounts to an isolated allegation of competition (indeed, as to Potter, one single event in the last four years) had on their theoretical assessment. Plaintiffs' damages expert clearly

could have done that analysis. Instead, in the absence of such evidence, Plaintiffs failed to show any actual damages or advance a cognizable damages theory that could be supported in any way by the "benefit of the bargain" they claim to have lost.

Finally, in one last-gasp effort to salvage some form of recovery, Plaintiffs claim that they are entitled to attorneys' fees and injunctive relief. The attorneys' fees provision contained in the indemnification provision of the APA is inapplicable to this dispute. The fact that Plaintiffs waited four (4) years into a five (5) year restrictive covenant to move for such purported injunctive relief belies the absence of any immediate or irreparable harm. Such a claim is also undercut by their purported and speculative damages analysis. The absence of any damages – much like the failure to establish any breach of the APA – independently and collectively warrants the entry of judgment in Potter's favor and against Plaintiffs entirely on the breach of contract claim and all accompanying requests for relief.

## STATEMENT OF FACTS

### I.   THE APA, VRC'S VALUATION OF THE SELLERS' BUSINESSES, AND THE PARTIES' AGREED UPON DEAL POINTS.

On June 1, 2018, Plaintiffs closed on their largest ever purchase acquiring substantially all assets of The CLM Group, Inc. ("CLM"), Claims Pages, LLC ("CP"), and C&E MGMT and Planning, Inc. ("C&E") through the APA. P-13; Tr. at 32:5. The "Buyer" was The Institutes. P-13; at Preamble and Appendix A. The

"Sellers" or "Selling Parties" were CLM, CP, C&E, Potter, and Moxie HC, LLC.[1]

*Id.* The target in The Institutes' acquisition ("Sellers' Businesses") were the "CLM

Business," "CP Business," and "C&E Business." *Id.*

Early on in due diligence, The Institutes engaged Valuation Research

Corporation ("VRC") to provide a valuation of the Sellers' Businesses' assets. Tr.

at 31:20-32:10. On March 8, 2018, VRC provided The Institutes with a valuation

opinion report, which is "a report in which [The Institutes] relied in determine what

purchase price to pay." *Id.* at 32:18-20; P-11. This "Pre-Valuation" report does not

reference any restrictive covenants, non-compete, or non-solicit. *See* P-11.

Katherine Horowitz, then a Senior Vice President, negotiated for The

Institutes. Tr. at 675:17-676:17. Horowitz also led The Institutes' due diligence

team under the direction of its Chief Executive Officer, Peter Miller.[2] *Id.* Horowitz

never exceeded Miller's directives when negotiating with Potter; she communicated

the terms exactly as Miller provided them to her. *Id.* at 70:18-24, 676:18-24.

On March 13, 2018, Horowitz sent Miller a draft email congratulating Potter

and memorializing the points "agreed to" in a recent conversation. Potter-09. The

email contained purchase price terms and identified other (mutual) consideration for

the "CLM Offer." *Id.* It also noted the deal was contingent on final board approval

---

[1] Potter owned CLM, CP, and C&E as of the Closing Date. P-13; at Preamble and Appendix A;
Tr. at 675:7-14.

[2] Miller executed the APA on behalf of The Institutes. P-13, Potter-DE-000040.

and "the remainder of the due diligence requested." *Id.* Horowitz's email did not mention a restrictive covenant or non-compete. *Id.*; Tr. at 681:3-8.

Miller responded later that day, approving Horowitz's draft email without any edits. Potter-21. Horowitz then sent the email to Potter. Potter-22.

After closing on the APA, The Institutes engaged VRC to issue another report "to value identifiable assets [from the transaction] and report them . . . for financial statement purposes." Tr. at 128:5-8. Jeffrey Scheidt, The Institutes' Chief Financial Officer, doesn't typically value non-compete provisions because "even if there is one . . . the value is in customer relationships and then trademark." *Id.* at 130:19-131:2. But VRC did, stating in that "Post-Acquisition" report that "the value of the non-compete is believed to be immaterial." P-12, Institutes0015099.

## II.   THE "CLM BUSINESS."[3]

The APA defines the "CLM Business" as "the business of operating as a national trade association for the claims and litigation management industries, as more specifically set forth in <u>Schedule A</u>" (emphasis in original). Schedule A identifies 11 products and services offered by the CLM Business as of the Closing Date – all of which concern claims handling, dispute resolution, and litigation management for "professionals in the claims resolution and litigation management

---

[3] "There were multiple businesses sold to Plaintiffs in the APA, but in this litigation, Plaintiffs are only concerned with CLM's business." D.I. 304 at 4.

industries." P-14, Sched. A. "Specialty Conferences" are one of those products. *Id.*

Schedule A identifies 10 specialty conferences – none among them dedicated to

cannabis and hemp or intellectual property. *Id.*; Tr. at 206:21-25. In fact, cannabis,

hemp, or intellectual property is not mentioned anywhere in Schedule A. *Id.*; Tr. at

193:14-19. Also absent from Schedule A's definition of the CLM Business is any

reference to "risk managers" or the "risk management" industry. P-14, Sched. A.

Business Insurance's Permitted Activities in Schedule 6.12 is the ***only*** place in the

APA and its schedules where "risk managers" and "risk management" is mentioned.

Tr. at 63:14-64:3, 65:15-66:3.

### III. THE APA'S RESTRICTIVE COVENANTS AT ISSUE.

The APA contains non-compete and a non-solicit provisions. P-13, § 6.12(a).

The non-compete prohibits the Selling Parties from competing with, or causing their

Affiliates[4] to compete with, "Sellers' Businesses ***as conducted as of the Closing***

***Date***" for five years, except that during th[at] timeframe "any Selling Party, or any

other party listed on Schedule 6.12, may undertake the activities set forth on

Schedule 6.12 attached hereto (collectively, the 'Permitted Activities')." *Id.*

(emphasis added); *see* P-14, Schedule 6.12. Business Insurance Holdings, LLC,

which Potter owned at the time, is one of the parties identified in Schedule 6.12's

Permitted Activities. *Id.* at Schedule 6.12(a).

---

[4] *See* P-13, Appendix A (defining "Affiliates").

8

The non-solicit prohibits the Selling Parties from, or causing their Affiliates to, "directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other ***business relation of Buyer*** for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations." P-13, § 6.12(b) (emphasis added).

## IV.   THE C&H AND INTELLECTUAL PROPERTY CONFERENCES.

Plaintiffs first learned BIH was offering the "C&H Conference" in July 2019. Tr. at 212:10-13. Cannabis and hemp is an emerging area. *Id.* at 245:1-5, 789:5-6. CLM did not have any cannabis-related product on the Closing Date, including a cannabis and hemp conference or cannabis advisory committee. Potter-1; Tr. at 191:21-192:3, 197:20-198:8, 205:17-19, 328:8-16.

The C&H Conference did not target claims and litigation management professionals. *Id.* at 362:14-23, 594:11-21. It did not contain claims and litigation management content either. *Id.* at 595:14-20, 596:18-597:2. The C&H Conference's content was focused entirely on an emerging risk and risk management. *See* P-23. The so-called "claims sessions" as initially marketed stated:

> **Business Track Session: Cannabis Claims: A Peek Down the Rabbit Hole**
>
> The cannabis claims experience ***is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of significant claims data***.

9

> This panel of experienced cannabis claims professionals will attempt to shed light on the type, frequency and severity of cannabis claims to date, and what these claims will look like in the future.

P-70 (emphasis added).

After learning about the C&H Conference, Plaintiffs sent Potter a cease and desist letter demanding that BIH cancel the C&H Conference as well as an intellectual property conference that BIH was also planning.  Tr. at 632:20-633:4. Like cannabis and hemp, CLM did not have an intellectual property conference on the Closing Date.  *Id.* at 207:1-4, 319:5-8.  BIH's intellectual property conference also never occurred.  *Id.* at 81:1-8, 300:3-5, 340:8-14.

At no point did Potter ever believe the C&H Conference (or the intellectual property conference) violated the non-compete.  Tr. at 572:1-7, 634:13-19, 636:2-5. Potter left the claims and litigation management industry after selling the Sellers' Businesses in June 2018.  *Id.* at 569:15-23.  Since then, Potter has not (i) competed with CLM; (ii) solicited any of CLM's customers, members, or business associates; (iii) owned an interest in any business or enterprise that competes with CLM; (iv) or operated, managed, or otherwise engaged in activities that compete with CLM.  *Id.* at 571:8-25; *see id.* at 198:22-25.

Nonetheless, Potter wanted to "do as much as I can to show [CLM] that this [C&H Conference] is not for their audience."  *Id.* at 597:3-11.  Outside lawyers were already precluded from attending the C&H Conference.  *Id.* at 400:22-401:3, 404:9-

10

12, 596:2-5.  In addition to that pre-existing limitation, Potter created and placed the

following disclaimer (in bold text) on the C&H Conference webpage: "**This

conference was not developed and is not intended for claims and litigation

management professionals**."  *Id.* at 597:11-12 (emphasis in original); P-23; P-70.

Potter changed the session "to show that its exposure related . . . not claims related":

> **Business Track Session: Cannabis *Exposure*: A Peek
> Down the Rabbit Hole**
>
> The cannabis exposure is often difficult to evaluate due to
> rapidly emerging risks in a highly regulated industry and
> lack of access to significant data. This panel of
> experienced cannabis professionals will attempt to shed
> light on the various cannabis *exposures* to date, and how
> these will involve in the future.

P-70; Tr. at 597:12-14 (emphasis added).

The C&H Conference occurred in October 2019.  Tr. at 425:10-12.  Plaintiffs

did not attend it; nor did they speak with anyone who attended the C&H Conference.

*Id.* at 102:15-104:6, 196:2-10, 203:23-204:1, 689:6-24.  Plaintiffs have not identified

any members, customers, or sponsors lost because of Potter, the C&H Conference,

or the cancelled intellectual property conference.  *Id.* at 83:18-84:23, 98:5-11, 106:6-

12, 207:5-20, 218:14-18, 330:7-331:7, 691:3-6.  Plaintiffs have identified three

customers (CoventBridge, SEA, and Winget Spadafora) that reduced the amount

spent with CLM between 2018 and 2021, *id.* at 51:8-14, 331:25-332:2, but never

spoke to anyone from those companies to determine why their spending decreased

11

for those years.  *Id.* at 87:5-14.  CoventBridge, SEA, and Winget Spadafora were not

and have never been BIH sponsors.  *Id.* at 602:22-603:5.

## V.   WILSON ELSER.

Wilson Elser sponsored the C&H Conference.  *Id.* at 249:14-16.  Potter did

not ask Wilson Elser to sponsor the C&H Conference – Wilson Elser suggested it.

*Id.* at 248:15-16, 249:19-21, 600:21-601:3.  Potter wrote to Ian Stewart of Wilson

Elser to invite him to an awards presentation and to gauge interest overall in the

creation of a cannabis conference.  *Id.*  At the time, Wilson Elser was a business

relation of CLM, *id.* at 250:4-9, but not The Institutes.  *Id.* at 250:25-251:23.  Wilson

Elser remains a sponsor of CLM today – recently sponsoring CLM's 2021 and 2022

annual conference.  *Id.* at 99:9-20, 200:16-18, 717:22-23.  A Wilson Elser attorney

even told Blume his firm's involvement in a BIH event does not preclude us (Wilson

Elser) from working with you (CLM).  *Id.* at 182:12-20, 207:21-24.  Wilson Elser

and its attorneys are still CLM-members.  *Id.* at 191:13-14, 200:16-18.

## VI.   POTTER SELLS BUSINESS INSURANCE.

Potter sold BIH to Beacon Intercontinental Group, Inc. 55 days before the

C&H Conference.  *Id.* at 570:3-6; P-18; *see* P-23.  Acunto signed that sale agreement

on behalf of Beacon.  P-23.  Potter exited the risk management and business

insurance industry after that sale and has no plans to return.  Tr. at 569:24-570:19.

**VII.   SYDNEY POSNER, JEREMY CAMPBELL, AND CLAIMSXCHANGE.**

Sydney Posner is Potter's sister.  *Id.* at 618:1-2.  Posner worked at CLM as its lead salesperson prior to The Institutes, and then as CLM's Chief Relationship Officer after the sale until The Institutes discharged her.  *Id.* at 301:6-8, 618:3-16.

In September 2019, Business Insurance's lead salesperson (Jeremy Campbell) gave notice that he was leaving.  *Id.* at 366:25-367:2.  Potter learned about Campbell's departure and introduced Posner to Acunto so that they could discuss Posner replacing Campbell given her sales experience.  *Id.* at 619:12-24, 645:13-19 (A: "The whole inten[t] on introducing her [to Acunto] was to replace Jeremy Campbell for his job that he left."), 807:15-17, 869:7-13, 871:23-872:2.  Potter never participated in any discussions between Posner and Acunto.  *Id.* at 620:13-15.  In fact, Potter affirmatively communicated to Acunto that he would only make an introduction, and that he would not participate in any discussions. P-86.

Posner later formed ClaimsXchange.  *Id.* at 645:23-24.  Potter has no involvement with ClaimXchange.  *Id.* at 621:14-17.  He does not have any ownership interest in ClaimsXchange nor is he a member.  *Id.* at 621:2-10.

**VIII.   COVID-19'S IMPACT ON THE CLM BUSINESSES.**

Prior to COVID-19, CLM annually held 10-12 in-person events.  *Id.* at 686-18-20.  CLM would collect registration/attendance fees for those in-person events,

as well as sponsorship revenue. *Id.* at 687:1-10. Registration/attendance fees and sponsorship revenue were the <u>majority</u> of CLM's 2019 revenue.[5] *Id.* at 692:15-21.

From March 2020 – August 2021, CLM transitioned all in-person events to online events because of COVID-19. *Id.* at 687:11-17. CLM made the majority of its post-COVID-19 online events free for attendees. *Id.* at 687:25-688:5. CLM did not accept sponsorship revenue from March 2020 – August 2021. *Id.* at 89:22-25. CLM also refunded sponsors for in-person events that CLM converted online events after March 2020 because of COVID-19. *Id.* at 688:13-19. CLM did not to meet its 2020 target revenues because of COVID-19. *Id.* at 696:9-11.

## IX.   WAGGY GROUP.

With Plaintiffs' permission and consent, Potter formed Waggy Group, Inc. ("Waggy") after closing on the APA to handle "all the run-off hotel commissions that were permitted in the agreement for CLM and also . . . receive the commissions for Business Insurance as well." *Id.* at 246:6-18. The APA states Potter "shall have the absolute right to use the IATA Number with any other Person and other business relationships other than with Buyer," but that the Selling Parties keep ten (10%) of the commissions earned in connection with that IATA number and certain events contracts with hotels that are annexed to the agreement. P-13, §§ 2.1(a)(xii), 6.1(a).

---

[5] Horowitz also identified membership revenue, but that testimony is contrary to Miller's prior testimony stating that CLM membership is free. *Id.* at 94:5-8, 97:7-12.

App.1011

# **ARGUMENT**

### I. THERE WAS NO BREACH OF THE RESTRICTIVE COVENANT.

### A. The Non-Compete's Three-Step Framework.

The non-compete's plain text provides a three-step framework for analysis.

*First*, the Court must determine if a "Selling Party" or an "Affiliate" (if caused by a Selling Party) undertook the alleged activities within five years from the Closing Date.  P-13, § 6.12(a).  If yes, then proceed to Step Two.  If no, the inquiry is over; the alleged activities are not prohibited conduct.  *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) ("When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions." (citation and internal quotation marks omitted)).

*Second*, the Court must determine if the alleged "activities . . . are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date."  P-13, § 6.12(a).  If yes, then one must proceed to Step Three.  If not, the inquiry is over; the alleged activities are not prohibited conduct.

*Third*, the Court must determine if the alleged activities are excepted Permitted Activities.  Only this third step requires an analysis into the content and target audience of the alleged activities to determine if they comply with Schedule 6.12's express limitation on "educational content related to claims and litigation management" or "live delivery, such as events . . . and conferences targeted to claims and litigation management professionals."  P-14, Sched. 6.12.

> *1. Step Two of the Non-Compete's Analytical Framework Requires that the C&H Conference be a Product or Service Conducted by the CLM Business as of the Closing Date, and it was Not.*

While not decided on summary judgment, the Court must now consider the non-compete's plain language to determine whether the C&H Conference was a product or service offered by the CLM Business as conducted as of the Closing Date. Step Two of the non-compete asks whether the alleged "activities . . . are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date." P-13, § 6.12(a). Here, the Sellers' Businesses at issue – the CLM Business – is defined as "offer[ing] specific 'products and services,' including an annual conference and specialty conferences," to the claims and litigation management industries. D.I. 320 at 2; D.I. 304 at 4-5; P-14, Sched. A. The undisputed trial evidence established the C&H Conference was ***not*** a product or service conducted by the CLM Business as of the Closing Date. Therefore, it did not violate the non-compete. *Manti Holdings*, 261 A.3d at 1208.

Schedule A conclusively defines the CLM Business and contains no reference to cannabis and hemp, let alone a dedicated cannabis and hemp conference. Potter, who owned the CLM Business as of the Closing Date, confirmed that it had no cannabis or hemp product. Tr. at 594:6-10. So too did Blume and Horowitz for Plaintiffs. *Id.* at 193:14-16, 688:23-25. Notably, Blume also stated in a July 19, 2019 email that "CLM did not have any Cannabis-related product on the Closing

16

Date." Potter-1. That declaration is particularly compelling because it was unsolicited, made internally at The Institutes by CLM's then-chief executive officer, and extends more broadly than just events, to include ***any cannabis-related product***.

At trial, Plaintiffs made this issue rather simple for the Court to decide, failing to present any affirmative evidence, which it was their burden to do, that the CLM Business offered any cannabis or hemp product – let alone a conference similar to the C&H Conference – as of the closing date. Instead, Plaintiffs fall back on the argument that they have some type of monopoly on all "specialty conferences" related to the insurance industry. The Court has already rejected that argument. Thus, in the absence of affirmative evidence to the contrary, it is undisputed that the CLM Business had no cannabis or hemp product as of the closing date, and it offered no such conference. Indeed, Blume stated at trial and in her e-mail: there was no cannabis or hemp product. Schedule A also lists no cannabis or hemp product.

Thus, the indisputable facts recited above conclusively establish that the C&H Conference was not a product or service conducted by the CLM Business as of the Closing Date and, as a result, does not violate the non-compete. Per the non-compete's plain text, the Court need not entertain a Permitted Activities analysis or go any further into content and target audience if the C&H Conference was not one of the CLM Businesses' products or services conducted as of the Closing Date.

17

2. *The C&H Conference was a Permitted Activity even if Found to be Competitive with the CLM Business.*

There was ample evidence introduced at trial showing that the C&H Conference was a Permitted Activity, even if the Court determines the C&H Conference competed with the CLM Business.  The Permitted Activities expressly include the "business operations" of Business Insurance:

> a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services.  Business Insurance delivers in-depth analysis on new and emerging risks, case studies of successful programs, market intelligence on trends, and guidance on how to capitalize on opportunities and overcome challenges.

P-14, Sched. 6.12.  The Permitted Activities also list products and services that Business Insurance provided as of the Closing Date, including events.  *Id.*  Thus, the Permitted Activities authorized Business Insurance to develop events based on an "in-depth analysis on new and emerging risks" and "enterprise risk management." *See id.*  Cannabis and hemp falls under that definition.  *Id.* at 245:1-5 (stating that cannabis and hemp "was a new and emerging area which . . . was specifically called out for new and emerging areas within the permitted activities"), 789:5-6.

The C&H Conference also did not violate the Permitted Activities' claims and litigation management exceptions.  P-14, Sched. 6.12.  Plaintiffs presented no evidence at trial showing the C&H Conference targeted claims and litigation

App.1015

management professionals.  The C&H Conference's marketing materials expressly stated the opposite, Tr. at 597:11-12, and Plaintiffs  have proffered no evidence that any, but a few (7 out of 200), *potential* claims professionals even attended the C&H Conference.[6]  Indeed, the undisputed evidence was that the C&H Conference was designed for business insurance and risk managers who were interested in the cannabis space – a new and emerging risk.  *Id.* at 245:1-5, 339:21-340:3, 352:8-14, 789:5-6.  Because Wilson Elser was a C&H Conference sponsor, attendees were limited to non-lawyer professionals, precluding the majority of CLM's members from attending.  *Id.* at 318:12-16, 400:22-401:3, 404:9-12, 596:2-5.

Second, the C&H Conference's content was not on claims and litigation management.  *Id.* at 595:14-20, 596:18-597:2.    The content was on business insurance and risk management; specifically, how to evaluate the exposure of the rapidly emerging cannabis risks.  *See* P-23.  Even the one so-called "claims session" (out of several) upon which Plaintiffs center the entirety of their content argument, which based on a full reading of the session description demonstrates that it was focused on evaluating the rapidly emerging risks associated with cannabis, not how cannabis claims are resolved or managed.  P-70; *see id.* at 339:21-340:3, 352:8-14.

---

[6] The trial testimony was unclear whether these attendees were "claims" professionals or merely risk managers, but the burden to establish that was clearly on Plaintiffs (who failed).

App.1016

Finally, Schedule 6.12 is by no means an exclusive list of Business Insurance events; nor was it ever intended to be one.  *See* Tr. at 245:1-18, 610:16-613:8. Schedule 6.12 contains *no* language limiting BIH's business operations to certain products and services.  *See* P-14, Sched. 6.12.  While Plaintiffs would like to expand the non-compete's scope beyond its clear text to include all "specialty conferences" related to the insurance industry (despite no such description in Schedule A), and limit the Permitted Activities to only those products and services enumerated there, they cannot do so.  The non-compete's language, coupled with the Permitted Activities in Schedule 6.12, demonstrates clearly: the C&H Conference did not compete and was not in violation of the non-compete.  As such, Plaintiffs have failed to establish that Potter breached the non-compete.

### B. No Basis Exists to Interpret "Content Related to Claims and Litigation Management" as Including Risk Management and other Pre-Loss Content.

Plaintiffs argue the phrase "content related to claims and litigation management" should be interpreted broadly to include "risk management" and other "pre-loss" content.  Op. Br. at 20-22.  Plaintiffs are asking this Court to suspend logic and ignore the APA's plain language, basic contract interpretation principles, and the weight of the trial evidence.  Plaintiffs' argument should be rejected.

Schedule A conclusively defines the CLM Business as limited to the claims resolution and litigation management industries.  D.I. 320 at 2; D.I. 304 at 5; *see* P-

14, Sched. A.  "Risk management" is **not** directly part of that definition.  In fact, the **only** place where "risk management" is even mentioned in the APA's 50 pages of single-spaced text, and 104 pages of schedules, is Schedule 6.12's Permitted Activities.  There, the parties expressly state the operations of Business Insurance "covers core risk management," and that several of Business Insurance's products and services include "risk management" content.  *See* P-13; P-14, Sched. 6.12 ("Businessinsurance.com website . . . **content focuses on . . . risk management** . . . ."; [B]i-weekly newsletters **including    . . . Risk Management**"; and the "Risk Management Roundtable" event (emphasis added)).

Business Insurance's Permitted Activities are, of course, excluded from the competitive activities prohibited by the  non-compete. *see* P-13, § 6.12, provided that they are not to include "content related to claims and litigation management" or target claims and litigation management professionals.  P-14, Sched. 6.12.

Here, Plaintiffs' interpretation of "content related to claims and litigation management" is implausible, writing much of Business Insurance's contractually agreed upon Permitted Activities out of Schedule 6.12 entirely.  Delaware courts "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citations and internal quotation marks omitted)).  According to Plaintiffs, the parties expressly agreed that Business Insurance did and

was permitted to continue to provide risk management-related content in its various products and services, but then several lines later stated that Business Insurance was also precluded from those risk management-related activities because it is "content related to claims and litigation management."  If true, why even identify in Schedule 6.12 the Businessinsurance.com website, with its "content focuse[d] on . . . risk management," the biweekly newsletter, which "include[s] . . . Risk Management," or Business Insurance's "Risk Management Roundtable," as Permitted Activities in the first place?  Plaintiffs' interpretation of "content related to claims and litigation management" is not objectively reasonable.  *Osborn*, 991 A.2d at 1159.

   That interpretation is also unsupported by the weight of trial evidence.  Potter[7] testified at trial about the "two main aspects" of the insurance industry – "pre-loss" and "post-loss" – and how Business Insurance was on one side (pre-loss), and CLM was on the other (post-loss).  *Id.* at 577:1-18, 585:24-586:23, 588:1-589:21.  Potter explained that "pre-loss is a risk manager . . . an insurance company underwriter" and is about assessing and analyzing risk.  *Id.* at 577:4-10.  Potter then explained "post-loss," which "is after a claim occurs" and deals with notice of and response to a claim.  *Id.* at 577:11-16.  And while there is some overlap, there is a line between the two where "the people are on one side or the other."  *Id.* at 578:7-11.  Notably,

---

[7] Potter was a risk manager at three different companies before starting CLM.  Tr. at 576:22.  He also handled claims in another profession.  *Id.* at 225:9-10.  Perhaps most important, Potter founded CLM and was its sole owner through the Closing Date.  *See id.* at 225:2-3.

Tina Pernie, whose testimony Plaintiffs primarily rely upon here, corroborated Potter, testifying that risk management, claims management, and even litigation management **are all different roles**.  *Id.* at 321:21-322:12.  So did Blume.  *Id.* at 211:15-16 ("Claims can be part of risk management.  It's not always.  It depends.").

Plaintiffs have offered no competent trial evidence to support their tortured interpretation of "content related to claims and litigation management," show that it is ambiguous, or that it was intended by the parties to include anything other than its ordinary meaning – claims management and litigation management content.  *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Inc. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."); *ConAgra Foods Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68-69 (Del. 2011) (stating that Delaware courts interpret writings by "giv[ing] effect to the plain meaning of a contract's terms and provisions when the contract is clear and unambiguous").

### C. CLM's "Specialty Conferences" and "Webinars" are Limited to the Events it Provided as of the Closing Date.

Plaintiffs next argue the non-compete does not limit the products and services of the CLM Business to the "claims and litigation management industries" unless that phrase is expressly stated in connection with the product or service in Schedule A.  Op. Br. at 22-27.  Schedule A identifies 11 products and services for the CLM Business, but Plaintiffs only reference two in their post-trial brief: specialty

conferences and webinars.  This argument is (again) contrary to the APA's plain language and contract interpretation principles and, therefore, should be rejected.

Plaintiffs continue to ignore the non-compete's express limitation to "the Sellers' Businesses *as conducted as of the Closing Date*."  P-13, § 6.12(a) (emphasis added).  The phrase "as conducted as of the closing date" is not superfluous; it must have meaning under Delaware contract interpretation principles (and does).  *Osborn*, 991 A.2d at 1159.  It must also be observed that "Delaware courts construe restrictive covenants narrowly as written."  *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *6 (Del. Ch. Apr. 3, 2008); *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1024 (Del. Ch. 2006) ("Restrictive covenants in contracts . . . limit[ing] the commercial freedom otherwise available to the parties cannot reasonably be read in [a] squishy and uncertain manner . . . .").

When read in that (proper) context, the phrase "as conducted as of the closing date" plainly limits the non-compete's scope to the CLM Business as of June 1, 2018.  *Manti Holdings*, 261 A.3d at 1208.  If it was not part of the CLM Business on June 1, 2018, the non-compete does not prohibit it.  The uncontroverted trial record shows that the CLM did not have any cannabis product or intellectual property conference as of the Closing Date.  Potter-1; P-14, Sched. A; Tr. at 191:21-192:3, 193:14-19, 197:20-198:8, 205:17-19, 206:21-25, 207:1-4, 319:5-8, 328:8-16.

Notably, the parties identified specific "Specialty Conferences" and "Webinars" in the APA, *see* P-14, Sched. A, some of which Blume testified about at trial. *Compare id.* (listing "Restaurant and Hospitality," "Workers Compensation," and "Midwest"), *to* Tr. at 162:9-22 (discussing same). Why identify any "Specialty Conferences" and "Webinars" at all if the identification of those products in Schedule A was intended to preclude Potter and Business Insurance from presenting ***any*** specialty conferences or webinars other than those specifically identified in the Permitted Activities? Simply listing "Specialty Conferences" and "Webinars" would have accomplished what Plaintiffs argue. But that is not what the parties agreed to in Schedule A. They agreed to language in Schedule A, which provides a complete list of all "Specialty Conferences" and "Webinars," held by CLM held as of the Closing Date. *See* Tr. at 592:3-593:7. The ***only*** way that makes sense is if those "Specialty Conferences" and "Webinars" were intended to be limited. To that end, Schedule A and the non-compete's express limitation of "the Sellers' Businesses" to "as of the Closing Date" are entirely consistent in that regard.[8]

---

[8] For example, CLM held a Medical-Legal Summit from 2014 or 2015 through 2016. Tr. at 592:15-20. It is not listed in Schedule A because CLM did not produce a Medical-Legal Summit as of June 1, 2018 – the Closing Date. *Id.* at 194:24-195:13, 592:21-593:4.

25

### D. Potter Did Not Violate the Non-Solicit.

That same reasoning provided above is fatal to Plaintiffs' breach of contract claim alleging Potter violated the non-solicit.  There was no evidence presented that Potter solicited or induced, or attempted to solicit or induce, "any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses."  *See* 6.12 of the APA.  CLM did not have any cannabis-related product as of the Closing, nor a stand-alone conference on cannabis as of April 2021 when Blume left CLM.  Tr. at 319:1-4.  The non-solicit is also expressly inapplicable to Permitted Activities, such as the C&H Conference.  *See* P-13, § 6.12(b).

Potter testified at trial – and the documentary evidence confirms – that Potter reached out to Ian Stewart at Wilson Elser not to sponsor the C&H Conference, but to inquire about the new and emerging industry in general.  *Id.*at 248:15-16, 249:19-21, 600:21-601:3.  It was Mr. Stewart who offered and suggested that Wilson Elser sponsor the C&H Conference and serve on its planning committee.  *See id.*  It was not a solicitation or inducement.

Moreover, there is no evidence in the record that Potter engaged in conduct that "would otherwise interfere with the business relationship between Buyer and its customers or other business relations."  Again, Wilson Elser, the only identified "customer" or "sponsor" was not a customer of sponsor of the "Buyer" – The Institutes.  P-13; at Preamble and Appendix A.  Indeed, the only "business

26

relationship" that Plaintiffs referenced at trial, Wilson Elser, is both a sponsor of CLM and BIH. Tr. at 191:8-15. Plaintiffs presented no evidence of interference with any relationship with Wilson Elser, which is still a CLM-member (along with its attorneys); still sponsors CLM events; and sits on CLM's cannabis advisory board. *Id.* at 99:9-20, 183:6-18, 191:13-14, 200:16-18, 717:22-23. Notably, Blume testified that a Wilson Elser partner expressly advised that Wilson Elser's involvement in a BIH event would <u>not</u> preclude the firm from working sponsoring CLM events and participating in CLM. *Id.* at 182:12-20, 207:21-24.

Thus, Plaintiffs presented no evidence demonstrating that Potter violated the non-solicit because of any contact or involvement by Wilson Elser in the C&H Conference or otherwise.

### E. Arguments As to ClaimsXchange Should Be Disregarded.

For all of the reasons previously articulated, any issue as to Potter with respect to ClaimsXchange are a red herring that should be disregarded. Potter did not introduce Posner to Acunto for the purpose of setting up a joint venture. Instead, the introduction was made to find Ms. Posner a job. Because Posner was a fired/former employee of CLM, there was no prohibition against that introduction in the restrictive covenant of the APA. Plaintiffs should have conceded this issue in the absence of any supporting evidence. Nevertheless, there is no basis for any argument

that Potter's introduction of Posner to Acunto is in violation of the APA, and accordingly, such an argument fails to support Plaintiffs' breach of contract claim.

## II.    PLAINTIFFS ARE NOT ENTITLED TO MONEY DAMAGES OR INJUNCTIVE RELIEF.

### A. Plaintiffs Received the Benefit of Their Bargain.

Plaintiffs confuse receipt of the benefit of the bargain that they negotiated – an APA with restrictive covenants – with an alleged breach of those provisions.  It is undisputed that The Institutes obtained the Sellers' Businesses and received a negotiated non-compete and non-solicit.  As such, Plaintiffs received the benefit of their bargain in the underlying transaction and Dr. Meyer's damages analysis is not applicable to the purported future breach of the APA alleged by Plaintiffs here.

Although Delaware Courts recognize benefit of the bargain as a damages theory for breach of contract claims, Dr. Meyer's damages analysis does not fit into any type of benefit of the bargain theory.  *See Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000) ("It is a basic principle of contract law that [the] remedy for a breach should seek to give the nonbreaching [] party the benefit of its bargain by putting that party in the position it would have been but for the breach.").  Plaintiffs cite to *Greenstar LLC v. Heller*, 934 F. Supp. 2d 672 (D. Del. 2013), to support application of Dr. Meyer's benefit of the bargain damages analysis.

*Greenstar* involved, *inter alia*, an award of damages for breaches of representations and warranties in an asset purchase agreement related to certain

28

environmental liabilities.  *Id.* at 693-96.  The Court awarded damages for the breach of the representations and warranties equal to the cost associated with specific breach – *i.e.*, the cost to remove the environmental liability.  *Id. at* 694.  Similarly, the proper measure for calculating damages related to Plaintiffs' alleged breach of the APA's restrictive covenants should be the damages caused by the specific breach (if proven) – *i.e.*, the lost profits related to any lost customers, sponsors, or potential competition but clearly limited to what the actual competition was.

Plaintiffs also cite to *Maverick Therapeutics, Inc. v. Harpoon Therapeutics*, 2021 WL 1592473 (Del. Ch. April 23, 2021) to support Dr. Meyer's benefit of the bargain damages analysis.  However, *Maverick* involved an award of expectation damages ***for fraudulent representations*** made concerning the sale of a business – not a breach of the related purchase agreement.  *Id.* at *1.  This is not a distinction without a difference as Plaintiffs contend.  *See Greenstar*, 934 F. Supp. 2d at 696 ("[W]here an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort.").  Fraudulent inducement and breach of contract are distinct claims with separate elements.  *See id.*  Here, Plaintiffs are not claiming they were fraudulently induced into entering into the APA or any of its provisions.  Rather, Plaintiffs claim that Potter (and BIH) breached the APA's restrictive covenants.  The proper measure of damages related to a breach of a restrictive

covenant should be the damages associated with the specific breach – *i.e.*, the lost profits related to any lost customers, sponsors or potential competition but, again, limited to the actual competition.

### B. Plaintiffs Did Not Establish Any Damages Caused By Potter's Alleged Breach of the APA.

For the reasons set forth above, Plaintiffs have not established a breach of the APA and therefore cannot recover damages.  Additionally, Plaintiffs cannot recover damages because they have not offered evidence of an injury or any reasonable basis to measure losses resulting from any alleged injury.  *See Siga Technologies, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015).

### 1. Plaintiffs Did Not Offer Any Evidence of An Injury.

Plaintiffs' contend that they offered evidence of injury through testimony concerning the value Plaintiffs attributed to the non-compete.  Op. Br. at *28*. However, Plaintiffs could not identify any members, customers, or sponsors lost because of Potter, the C&H Conference, or the cancelled intellectual property conference.  Tr. at 83:18-84:23, 98:5-11, 106:6-12, 207:5-20, 218:14-18, 330:7-331:7, 691:3-6.  Plaintiffs' argument that "COVID-19 masked any such losses" does not obviate their affirmative burden of proof or otherwise justify their inability to prove resulting damages from Potter's alleged conduct.  Equally plausible here is that CLM cannot show damages because there was no injury caused by Potter in the first place (which is what Potter argues). *See id.* at 696:9-11 (testifying CLM did not

meet 2020 target revenue because of COVID-19).  Either way, Plaintiffs did not establish an injury caused by Potter's purported competition.

Faced with no other injury to support their purported damages, Plaintiffs attempt to claim some limited loss of revenues from CoventBridge, SEA, and Winget Spadafora between 2018-2021.  Op. Br. at 28.  Again,  Plaintiffs failed to offer any competent evidence at trial to establish a nexus between this alleged reduction of sponsorship revenues and Potter's alleged conduct.  Plaintiffs conceded at trial that they never spoke to anyone from those companies about why they decreased their spending.  *Id.* at 87:5-14.  The trial evidence established that CLM transitioned all conferences from in-person to virtual because of COVID-19 during that same timeframe; made most of those virtual conferences free; did not collect sponsorship revenue, and even refunded sponsorship revenue paid for in-person conferences.  *Id.* at 89:22-25, 687:11-17, 687:25-688:5, 688:13-19.  Moreover, the sponsors were not and have never been sponsors of BIH.  *Id.* at 602:22-603:5.

Thus, Plaintiffs failed to connect their alleged loss of sponsorship revenues to Potter's alleged conduct (or BIH).  Discussed more below, Plaintiffs' entire damages theory is based on speculation, which cannot establish a compensable injury.

> 2. *No Evidence Exists in the Record Showing that Plaintiffs Suffered Damages as a Result of Potter's Alleged Breaches.*

In order to be recoverable, damages must be quantified based on a "responsible" calculation.  *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.),

*aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).  "When acting as the fact finder, the Court may not set damages based on mere 'speculation or conjecture'" where a plaintiff fails to adequately prove damages.  *Id.* (brackets omitted).  Plaintiffs failed to establish that any alleged violation of the restrictive covenants caused actual damages, or that an amount of resulting damage can be calculated with any modicum of reliability. Indeed, Plaintiffs offered no competent evidence of actual loss from Potter's alleged acts.

Dr. Meyer's testimony revealed that the underlying assumptions on which her opinions are based are unsupported by any record facts and are otherwise unreliable. Dr. Meyer's assumptions related to competition in the VRC Report were incorrect and unconfirmed.  Tr. at 523:7-528:4, 533:12-534:14.  Dr. Meyer's damages theory also incorrectly assumed Potter's continued involvement with BIH, *id.* at 542:11-543:6, which ceased in September 2019.  *Id.* at 569:15-23.  Dr. Meyer's testimony also revealed that she did not strictly apply the Cournot model that her theoretical adjustment relies on and therefore the damages are not reliable.  *Id.* at 515:25-522:7.

Lastly, Dr. Meyer's damages theory also fails to offset or account for:

- Any losses CLM suffered because of COVID-19.  *Id.* at 510:10-17.  Plaintiffs' witnesses testified that COVID significantly impacted the CLM Business.  *See id.* at 48:3-5, 86:4-8, 132:8-16, 181:1-8, 686:14-688:19, 696:9-11.

- The number and scope of the allegedly competitive events.  *Id.* at 508:15-510:9.  The evidence presented at trial relates to isolated allegations of competition as to Potter – *e.g.*, a single event in the last four years.

App.1029

- The lack of any evidence or claim that Potter (or BIH) were allegedly competing between June 1, 2018 (the Closing Date) and July 2019, when Plaintiffs first learned about the C&H Conference. *Id.* at 534:25–535:18. Dr. Meyer assumes competition throughout the five-year Non-Compete Period, despite The Institutes (at a minimum) receiving 13 months where Potter was not purportedly competing.

- CLM facing "[h]uge competition" – other than BIH, allegedly – for events and sponsorship revenue, which was the majority of CLM's revenue for 2019. *Id.* at 173:5-17, 583:22-585:18, 692:15-693:1.

- Potter leaving the insurance industry for good in September 2019. *Id.* 569:24-570:19

All of the above impact Dr. Meyer's damages theory, should have been considered, but ultimately were not. Plaintiffs decided instead to rely solely on the Theoretical Adjustment contained in Meyer's Report. As such, Plaintiffs failed to offer any actual damages or a cognizable theoretical theory that could be supported in any way by the "benefit of the bargain" damages that they purport to claim.

### C. Plaintiffs are Not Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years.

The party seeking the extraordinary and drastic remedy of injunctive relief must prove their entitlement to one through record evidence supporting all *prima facie* elements, including proof of irreparable harm. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Plaintiffs did not offer any evidence of irreparable harm at trial. Moreover, any claim of irreparable harm is principally contradicted by Plaintiffs' simultaneous pursuit of

33

millions of contractual/expectation damages – the very purpose of which is to place the non-breaching party in the position it would have been but for the breach. *See Genencor Int'l, Inc.*, 766 A.2d at 11.

Plaintiffs' failure to seek injunctive relief – which could have been filed in the form of a motion for preliminary injunction at the time that they commenced this action in August 2019 – should be seen as an admission that Plaintiffs did not believe the C&H Conference violated the restrictive covenant, and that it did not warrant any form of injunctive relief. The fact that The Institutes waited four (4) years into a five (5) year restrictive covenant to move for such purported injunctive relief belies the absence of any immediate or irreparable harm. Accordingly, Plaintiffs are not entitled to injunctive relief.

**D. Plaintiffs are Not Entitled to Attorneys' Fees and Expert Witness Fees.**

"Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation." *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017). "An exception to this rule is found in contract litigation that involves a fee shifting provision." *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

Plaintiffs' argue they are entitled to attorneys' fees and expert witness fees pursuant to the APA's indemnity provisions. In Delaware, "indemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of

34

substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) (citing cases) (internal quotation marks omitted); *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Nov. 22, 2016); *TranSched Systems Ltd. v. Versyss Transit Solutions, LLC*, 2012 WL 1415466, at *2 (Del. Super. Mar. 29, 2012). Here, the APA's plain text does not contain the "clear and unequivocal" language necessary to overcome the presumption in Delaware that the APA's indemnification provisions are limited to third-party claims.

In sum, Plaintiffs failed to establish any causal connection between their allegations of breach by Defendants and any harm allegedly suffered by Plaintiffs. Indeed, the entirety of Plaintiffs' damages theory is based on a hypothetical analysis and pure speculation. The absence of any damages–much like the failure to establish any breach of the APA–warrants the entry of judgment in Potter's favor on the breach of contract claim and all accompanying requests for relief.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Adam Potter respectfully requests that the Court enter judgment in his favor and against Plaintiffs on their breach of contract claim (Count I) and all other claims and requests for relief.

*[Signature of Counsel on Next Page]*

35

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/ Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: July 29, 2022                    *Attorneys for Defendant Adam Potter*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendant Adam Potter's Brief

in Support of the Entry of Judgment in his Favor and in Opposition to Plaintiffs'

Post-Trial Brief was caused to be served on this date on all counsel of record for the

parties *via the Court's CM/ECF*:

/s/  Seth Niederman
SETH NIEDERMAN

Dated: July 29, 2022