Nos. 22-2967, 22-3025, and 22-3042

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES, LLC
*Plaintiffs-Appellants at 22-2967*
*Plaintiffs-Cross-Appellees at 22-3025 and*
*22-3042*

v.

ADAM POTTER,
*Defendant-Appellee at 22-2967*
*Defendant-Cross-Appellee at 22-3025*
*Defendant-Cross-Appellant at 22-3042*

and

BUSINESS INSURANCE HOLDINGS INC
*Defendant-Appellee at 22-296*
*Defendant-Cross-Appellant at 22-3025*
*Defendant-Cross-Appellee at 22-3042*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE, THE HONORABLE RICHARD G. ANDREWS
DISTRICT COURT NO. 1:19-CV-01600-RGA-JLH

**CORRECTED PRINCIPAL BRIEF OF PLAINTIFFS-
APPELLANTS/PLAINTIFFS-CROSS-APPELLEES**

D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 988-2700 (telephone)
(215) 988-2757 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

*Attorneys for Plaintiffs-Appellants/Plaintiffs-Cross-
Appellees The American Institute for Chartered
Property Casualty Underwriters and The Institutes, LLC*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant The American Institute for Chartered Property Casualty Underwriters is a Pennsylvania non-profit corporation that does not have a parent company, and no public company holds more than 10% of its stock.

Plaintiff-Appellant The Institutes, LLC is a Pennsylvania limited liability company and is a wholly owned subsidiary of The American Institute for Chartered Property Casualty Underwriters, which is its sole member and also a party to this appeal.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................3

STATEMENT OF THE CASE...................................................................3

    I.    FACTUAL BACKGROUND ................................................3

        A.    The Potter-Moxie Businesses. ....................................4

        B.    The Structure and Terms of the APA Were Carefully Crafted..............................................................7

            i.    The Restrictive Covenants................................10

            ii.    Structure of the Indemnification Clause.......................13

        C.    The Terms of the Transaction. ...................................14

        D.    Mr. Potter Sells Business Insurance Holdings, Inc. and Both Breach the Covenants with The Institutes. .....................15

    II.    PROCEDURAL HISTORY ................................................19

    III.    THE DISTRICT COURT'S OPINIONS .........................................20

        A.    Motion to Dismiss....................................................20

        B.    Summary Judgment. .................................................20

        C.    Attempts to Strike Plaintiffs' Expert. .......................24

        D.    Post-Trial.................................................................25

SUMMARY OF ARGUMENT .................................................................29

ARGUMENT ......................................................................................30

    I.    The District Court Did Not Provide The Institutes with the Benefit of its Bargain. ...........................................................30

        SCOPE AND STANDARD OF REVIEW .......................................30

        A.    Delaware is a Contractarian State..............................31

B.    The Injunction Entered by the Court Did Not Protect The Institutes' Contractual Interest. .................................................33

i.    Mr. Potter Should Have Been Enjoined. ........................35

ii.    The Institutes Could Not Have the Benefit of its Bargain Without Five Years Competition-Free. ............37

iii.    The District Court Did Not Apply Core Construction Principles When it Permitted Competition Beyond the Parties' Contemplation...........40

II.    The District Court Misapprehended Delaware's Standards for the Shifting of Attorneys' Fees In a Contractual Indemnification Provision. ....................................................47

SCOPE AND STANDARD OF REVIEW .........................................47

III.    Under Delaware Law, Damages are Found by the Court and the Court Had a Sufficient Basis to Calculate the Diminution in Purchase Price ........................................................................52

SCOPE AND STANDARD OF REVIEW .........................................52

CONCLUSION .......................................................................................58

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                    **Page(s)**

*Arwood v. AW Site Servs., LLC,*
    2022 WL 705841 (Del. Ch. Mar. 10, 2022) .......................................................31

*Arwood v. AW Site Servs., LLC,*
    2022 WL 973441 (Del. Ch. Mar. 31, 2022) ................................................45, 46

*Blue Cube Spinco LLC v. Dow Chem. Co.,*
    2021 WL 4453460 (Del. Super. Sept. 29, 2021) ................................................31

*BP Chems., Ltd. v. Formosa Chem. & Fibre Corp.,*
    229 F.3d 254 (3d Cir. 2000) ...................................................................................33

*C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' and Sanitation*
    *Emps.' Ret. Tr.,*
    107 A.3d 1049 (Del. 2014) ....................................................................................32

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,*
    2003 WL 21056809 (S.D.N.Y. May 8, 2003) ....................................................36

*Chamberlain v. Giampapa,*
    210 F.3d 154 (3d Cir. 2000) ..................................................................................52

*Chicago Bridge & Iron Co. v. Westinghouse Elec. Co.,*
    166 A.3d 912 (Del. 2017) ......................................................................................41

*CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.,*
    2021 WL 4430400 (3d Cir. Sept. 27, 2021) ......................................................30

*Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City,*
    383 F.3d 110 (3d Cir. 2004) ..................................................................................36

*Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am.,*
    724 F.2d 369 (3d Cir. 1983) ...................................................................30, 47, 52

*Concord Steel, Inc. v. Wilm. Steel Processing Co.,*
    2009 WL 3161643 (Del. Ch. Sept. 30, 2009), *aff'd*, 7 A.3d 486
    (Del. 2010) ..............................................................................................................33

*Cura Fin. Servs. N.V. v. Elec. Payment Exch*,
  2001 WL 1334188 (Del. Ch. Oct. 22, 2001) ................................................53, 54

*Deere & Company v. Exelon Generation Acquisitions, LLC*,
  2016 WL 6879525 (Del. Super. Nov. 22, 2016) ........................................*passim*

*Duncan v. Theratx, Inc.*,
  775 A.2d 1019 (Del. 2001) ...............................................................................38

*E.I. DuPont de Nemours & Co. v. Unifrax I LLC*,
  2017 WL 4004419 (D. Del. 2017) .....................................................................35

*Fortis Advisors LLC v. Shire US Holdings*,
  2017 WL 3420751 (Del. Ch. Aug. 9, 2017) .......................................................32

*In re G-I Holdings, Inc.*,
  755 F.3d 195 (3d Cir. 2014) ..............................................................................32

*Gasperini v. Ctr. for Humanities, Inc.*,
  518 U.S. 415 (1996)...........................................................................................52

*Genencor Int'l, Inc v. Novo Nordisk A/S*,
  766 A.2d 8 (Del. 2000) ......................................................................................29

*Hough Assocs. v. Hill*,
  2007 WL 148751 (Del. Ch. Jan. 17, 2007)....................................................*passim*

*IFC Interconsult, AG v. Safeguard Int'l Partners., LLC*,
  438 F.3d 298 (3d Cir. 2006) ..............................................................................47

*Kan-di-Ki, LLC v. Suer*,
  2015 WL 4503210 (Del. Ch. July 22, 2015) ...............................................33, 37

*Koehler v. NetSpend Holdings*,
  2013 WL 2181518 (Del. Ch. May 21, 2013)......................................................53

*Libeau v. Fox*,
  880 A.2d 1049 (Del. Ch. June 16, 2005)...........................................................37

*Manti Holdings v. Authentix Acquisition Co.*,
  261 A.3d 1199 (Del. 2021) ................................................................................41

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*,
    2021 WL 1592473 (Del. Ch. Apr. 23, 2021) .................................... 38, 55, 56, 57

*MBIA Ins. Corp. v. Royal Indem. Co.*,
    426 F.3d 204 (3d Cir. 2005) ................................................................. 31

*MicroStrategy Inc. v. Acacia Rsch. Corp.*,
    2010 WL 5550455 (Del. Ch. Dec. 30, 2010) ......................................... 32, 43, 46

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*,
    2019 WL 2536104 (Del. Ch. June 20, 2019) ........................................ 33

*NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*,
    948 A.2d 411 (Del. Ch. 2007) .............................................................. 49

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ................................................................... 31

*Ortiz v. Jordan*,
    562 U.S. 180 (2011) ............................................................................. 24

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) ................................................................... 31, 47

*Osborne v. U. of Del.*,
    815 F. App'x 682 (3d Cir. 2020) ......................................................... 24

*Revolution Retail Sys. v. Sentinel Techs.*,
    2015 WL 6611601 (Del. Ch. Oct. 30, 2015) ....................................... 42

*Schneider Nat'l Carriers, Inc. v. Kuntz*,
    2022 WL 1222738 (Del. Super. Apr. 25, 2022) ................................... 51, 52

*SIGA Techs, Inc. v. PharmAthene, Inc.*,
    132 A.3d 1108 (Del. 2015) ................................................................... 53, 57

*Swipe Acquisition Corp. v. Krauss*,
    2020 WL 5015863 (Del. Ch. Aug. 25, 2020) ...................................... 54

*Symbiont.io, Inc. v. Ipreo Holdings*,
    2021 WL 3575709 (Del. Ch. Aug. 13, 2021) ....................................... 37, 46, 53

*Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*,
   222 F.3d 132 (3d Cir. 2000) ..................................................36

*Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*,
   609 F.3d 143 (3d Cir. 2010) ..................................................24

*Tristate Courier and Carriage, Inc. v. Berryman*,
   2004 WL 835886 (Del. Ch. Apr. 15, 2004)............................32, 33, 37

*TV58 Ltd. P'ship v. Weigel Broad. Co.*,
   1993 WL 285850 (Del. Ch. July 22, 1993) ..............................56

*Veloric v. J.G. Wentworth, Inc.*,
   2014 WL 4639217 (Del. Ch. Sept. 18, 2014)..........................32

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) .....................................................58

*Westway Holdings Corp. v. Tate & Lyle PLC*,
   2011 WL 3490126 (D. Del. Aug. 10, 2011).............................54

*Williams v. Energy Transfer Equity, L.P.*,
   2016 WL 3576682 (Del. Ch. June 24, 2016).............................31

## Statutes & Rules

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1332(a) ...................................................................1

Federal Rule of Civil Procedure 52 ..........................................26

Federal Rule of Evidence 702....................................................24, 55

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(a). The District Court entered a final judgment following a bench trial and post-trial briefing on September 29, 2022, App.6. Appellants filed a timely notice of appeal on October 19, 2022. App.1. Business Insurance Holdings, Inc. ("BIH") filed a cross-appeal on October 27, 2022, App.3, and Mr. Adam Potter filed his on October 28, 2022. App.4. This Court has jurisdiction over these appeals under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Does a district court applying Delaware law and finding breaches of restrictive covenants err in not entering an injunction that reflects the intent of the contracting parties as to (a) the persons enjoined; (b) the duration of the injunction; and (c) the scope of the injunction?

*Suggested answer*: Yes as to each.

In accordance with LAR 28.1(a)(1):

*These issues were raised in the following*:

(a) Persons Enjoined: App.67-App.69; D.I.-312 pp.1, 5, 10; App.73; D.I.-237 pp.10-11; D.I.-239 pp.1-6, 14-15, 22-23; D.I.-276 pp.7, 10-11; D.I.-280 p.13; D.I.-289 p.2; App.1079-App.1081; App.921; App.927 n.1; App.932-App.934; App.949-App.952; App.1063; App.1065; App.1068-App.1069;

(b) Duration: App.67-App.68; App.73; D.I.-239 pp.1-4, 8-18, 22-23; App.277; D.I.-294 p.7; App.1084; App.921-App.922; App.949-App.952; App.1074;

(c) <u>Scope</u>:  App.67-App.69; App.73; D.I.-239 pp.1-4, 8-18, 22-23; D.I.-276 pp.4-5; D.I.-280 pp.9-13; D.I.-294 pp.2-7, 11; D.I.-312 pp.1-5, 9-10; App.800-App.801; App.802-App.813; App.1078-App.1086; App.921-App.922; App.927; App.928; App.937-App.942; App.949-App.952; App.1057; App.1061-App.1063; App.1073-App.1074.

*These issues were ruled on in the following*:

(a) <u>Persons Enjoined</u>:  App.103-App.103; App.615 n.1; App.1682-App.1683; App.11 n.1; App.27-App.28;

(b) <u>Duration</u>:  App.28;

(c) <u>Scope</u>:  App.618; App.797-App.798; App.829-App.830; App.1682-App.1683; App.12; App.13-App.19; App.29-App.30.

2.  Did the parties draft their indemnification provision to provide for attorneys' and expert fees upon breach of restrictive covenants?

*Suggested answer*:  Yes.

<u>In accordance with LAR 28.1(a)(1)</u>:

*These issues were raised in the following*:  App.67; App.73; D.I.-239 pp.1, 11; App.1128-App.1129; App.1084; App.922; App.952-App.953; App.1074-App.1076.

*These issues were ruled on in the following*:  App.30-App.31.

3.  If a district court determines that a plaintiff overpaid for assets, is it the district court's responsibility to review the record and calculate compensatory damages?

*Suggested answer*:  Yes.

<u>In accordance with LAR 28.1(a)(1)</u>:

*These issues were raised in the following*:  App.69; App.72-App.73; D.I.-239 pp.1, 11-14; D.I.-280 pp.12-13; D.I.-289 pp.1-4, 8-11, 16-17; D.I.-292 pp.2-4, 9-10, 14-15; App.1084-App.1086; App.921-App.922; App.942-App.949; App.922; App.1058; App.1066-App.1073.

*These issues were ruled on in the following*:  App.601; App.620-App.621; App.1564-App.1565; App.1567-App.1568; App.1648-App.1649; App.1652-App.1653; App.1660-App.1670; App.20-App.22; App.24; App.26-App.26; App.34-App.35.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

In accordance with LAR 28.1(a)(2), to counsel's knowledge, there are three related actions:  (1) *American Institute for Chartered Property Casualty Underwriters et al. v. Posner et al.*, 19-cv-5369 (E.D. Pa.) (Quiñones Alejandro, J.); (2) *Potter v. Beacon Intercontinental Group*, 20-cv-04599 (S.D.N.Y.) (Koeltl, J.); and (3) *Potter et al. v. Cozen O'Connor et al.*, 20-cv-1825 (E.D. Pa.) (Quiñones Alejandro, J.) & 21-2258 (3d Cir.).

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

The American Institute for Chartered Property Casualty Underwriters ("AICPCU"), is a Pennsylvania non-profit sole member of The Institutes, LLC (collectively, "The Institutes."). App.2139.  The Institutes provides resources, news, and education—including through publications it authors—and professional designations and certificates for persons interested in risk management and insurance, including through its affiliates, brands, and strategic alliance partners. App.1099-App.1100; App.1105-App.1106; App.1197.  It has been providing such

services for over one hundred years. App.1099. The Institutes' function and purpose expanded in 1942, when the Wharton School of the University of Pennsylvania created specialized professional education designations.[1] Now, The Institutes is the go-to source for professional education and development in the areas of insurance, risk management, underwriting, and claims. *Id.*

## A.    The Potter-Moxie Businesses.

Defendant/Appellee/Cross-Appellant Adam Potter was the managing member of Moxie HC, LLC ("Moxie"), and together they owned a suite of complementary businesses. Claims Pages, LLC, ("CP"), for example, provided reference information for insurance adjusters, while CLM Group, Inc. ("CLM") was a national trade association for the claims and litigation management industries. CLM had more than 45,000 Members and Fellows who participated in its programs. CLM's Fellows included risk managers; claims managers and adjusters; executives with broad responsibilities; third-party administrators; and service providers, and its Members included outside counsel representing or servicing the insurance industry, as well as other industry professionals. D.I.-239 p.3; App.1194; App.1240-App.1243; App.2187; App.1194-App.1195; App.1555. In addition to an Annual Conference, CLM's committees and communities

---

[1] https://global.theinstitutes.org/history (last accessed 1/9/23).

generated subject-specific conferences that the parties referred to as Specialty Conferences, as well as webinars, a Claims College, Litigation Management Institute, and license tracking, as well as other services. App.1236-App.1237; App.2187.  Its events were planned and contracted for through another Potter/Moxie company, C&E Management and Planning, Inc. ("C&E"). App.2187.  Through C&E, Mr. Potter owned what became PBIH, LLC, a news and information publisher focusing on risk management, risk transfer, and risk financing, in both hard-copy and electronic formats.  App.1328; App.2288.  Most notably, it published the widely circulated trade magazine, *Business Insurance*. App.2288.

As industry experts, The Institutes was very familiar with PBIH and its publications.  App.1113-App.1114.  The Institutes was also very familiar with CLM, and in 2018, when it learned that Mr. Potter and Moxie wanted to sell everything but PBIH, it saw a tremendous opportunity.  The Institutes believed there were synergies between its programs and CLM's.  App.924; App.1101; App.38-App.39.

While all of the offerings were attractive, CLM's events were particularly attractive because they fostered networking, dialogue, and information-sharing among professionals working in the insurance industry and related businesses, including claims, litigation, and risk management personnel.  App.1105-App.1107;

App.1255; App.924; App.1194; App.1241-App.1243; *see also* App.2187.  CLM hosted and produced conferences, seminars, and meetings throughout the year, featuring continuing professional education and networking opportunities.  D.I.-239 p.3; App.2187.  Indeed, the Asset Purchase Agreement enumerated several Specialty Conferences CLM had produced.  App.923; App.2187.  CLM also hosted webinars presented by its membership.  App.923.  Through the breadth and strength of these events, CLM had established itself as an educational and networking hub for the insurance industry.  App.1255.

The networking—even community—aspects of CLM's events were key to its industry preeminence.  Industry professionals flocked to CLM events in large part to interact with each other and the presenters.  As Anne Blume, former CEO of CLM, testified:  "You are speaking with other people, both before and after the session about not only the content … but other things as well.  You have the opportunity to engage in a dialogue with the other members."  *Id.*

The CLM conferences were also the economic heart of the business, serving as a primary funding source for CLM through registration fees and sponsorships by entities seeking to market to attendees.  App.1243-App.1244.  CLM's affiliate C&E generated commissions from booking venues and blocks of hotel rooms for conferences and events.  App.1690-App.1691; *see also* App.2187.  Further

synergies were created through CP, making the suite of businesses an apex resource for insurance industry professionals.

On June 1, 2018, Mr. Potter and Moxie entered into an APA with The Institutes that transferred the majority of the suite of businesses to The Institutes. The APA contained many terms to ensure that The Institutes received the full value of the name, reputation, and goodwill in those assets.  App.2136; App.924; D.I.-239 p.3.

**B.     The Structure and Terms of the APA Were Carefully Crafted.**

From the outset, The Institutes sought to protect against post-acquisition competition and poaching.  App.924-App.1122.  Founders and key personnel are uniquely situated to compete against an acquired entity because of their intimate knowledge of the business, their independent relationships with their company's customers, and their knowledge of future plans.  App.1573-App.1574.  That was especially true here.

Mr. Potter had founded and developed the suite of businesses, and they were strongly associated with him.  App.1101-App.1102; App.1115-App.1116; App.1301.  He was thus uniquely positioned to draw away business.  App.1115-App.1116.  For example, although PBIH had always been known for its publications, it had been attractive to Mr. Potter precisely because it enabled him to provide more to the critical customer base he was serving with his other entities.

App.1704-App.1705; App.1774.  Accordingly, The Institutes worried Mr. Potter would use his name, reputation, and the *Business Insurance* platform to expand back into the areas of business that he was selling to The Institutes.  App.1122. The APA addressed this concern.  First, Sellers agreed to change the remaining entity names to "a name that is not confusingly similar" to prior names without "any initials in any of Sellers' names."  App.2165.  As a result, the PBIH/*Business Insurance* portion of C&E—the part that remained with Mr. Potter—was re-named BIH shortly after Closing.  App.1328.

Second, the parties were clear that the APA was "to transfer to Buyer the control and enjoyment of the Sellers' Businesses and the Acquired Assets" and agreed not to take any action that would "obstruct[] or impair[] that assumption … ."  App.2166.  Mr. Potter agreed to provide transition services for six months (or 400 hours, whichever came first).  App.2163.  And, as a further incentive, Sellers were provided an earnout (Revenue Target) payment for the year following the sale.  App.2145-App.2147.

The broad confidentiality protections found in Section 6.11 were subject to a narrow carve-out:  "Moxie and Adam Potter are permitted to use, solely in connection with the Permitted Activities, such know-how included in the Confidential Information that is currently used by the Selling Parties outside of the Sellers' Businesses," App.2166.  Notably, "Selling Parties" was broader than

"Sellers." And "Selling Parties" was defined as including C&E, CP, CLM, Moxie, and Mr. Potter. App.2185; App.2139. Mr. Potter signed the APA on behalf of each Selling Party. App.2176.

Mr. Potter's deep experience and connections also required protection of the relationships that traveled with the assets, especially conference sponsors. Sponsorships comprised the majority of CLM's revenue. App.1248-App.1249. Even beyond direct revenues, attracting and retaining sponsors was a pillar of CLM's business model. App.1244. And of course, sponsors did not just fund events, they sent people to attend them and to network with other attendees. App.1233-App.1234. CLM's sponsors included a variety of businesses that served the insurance industry, among them accounting, expert witness, and law firms. App.1247-App.1248. Their participation significantly broadened event networking value and informational exchanges. App.1233-App.1234.

Because sponsors had annual budgets, what a sponsor spent on one event reduced—or eliminated—its ability to sponsor other events. App.1248-App.1249. Those reductions were not just to revenue but the value that participation contributed. *Id.* While decreases in direct revenues would be quantifiable, the indirect effects would only be visible over time, as people's dissatisfaction with a less robust conference led to lower attendance at the next and so on. Accordingly,

the parties agreed to express restrictive covenants in addition to the protections

throughout the APA.  App.12; App.1122; App.1140.

### i.    The Restrictive Covenants.

Section VI of the APA contained the restrictive covenants, and both the

representations and warranties in Section IV and the restrictive covenants in

Section VI applied to "Selling Parties."  App.2166.  Section 6.12 was entitled

"Non-Compete" and was comprised of six paragraphs.  Paragraph (a) focused on

non-competition by activities.  *Id.*  Paragraph (b) focused on non-solicitation of

customers and business relationships.  App.2166-App.2167.  Paragraph (c) focused

on non-solicitation of employees and independent contractors.  App.2167.  In

paragraph (d), the parties agreed the restrictive covenants were "reasonable and

necessary to protect the legitimate interests of Buyer and its investment in the

Acquired Assets," were independent and cumulative of other provisions, and a

breach would be remediable even "without proving actual damages … ."  *Id.*

Paragraph (e) covered severability, and paragraph (f) encapsulated the parties'

agreement that the covenants would be effective for five years, even if the dates

needed to be extended to account for a period of interim breach, and thus used a

specially defined term, "Non-Compete Period."  App.2166-App.2167.

The Selling Parties—on behalf of themselves and their affiliates—agreed not

to "conduct, manage, operate, engage in or have an ownership interest in any

business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date"—directly or indirectly—with the exception that they "may undertake the activities set forth on Schedule 6.12". App.2166.

To flesh out the terms of their agreement, the parties expressly incorporated schedules and exhibits into the APA. App.2174. The restrictive covenants relied on Schedule A to define "Sellers' Business" beyond the brief description in the Preamble to the APA, and Schedule 6.12 to elucidate the activities that the business remaining with Mr. Potter and Moxie could engage in. The Preamble described CLM, for example, as "engaged in the business of operating as a national trade association for the claims and litigation management industries, as more specifically set forth in <u>Schedule A</u>." App.2139. That was also the case for CP and C&E.

Schedule A described CLM's business broadly; first by describing the breadth of its membership and audience, and then setting forth a non-exclusive list of its business activities including its Annual Conference, webinars, and Specialty Conferences. App.2187. It described the Annual Conference's "educational sessions and networking." *Id.* The webinars included a range of topics, including "Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals." *Id.* The Specialty Conferences

were even broader, with an expressly non-exclusive list—"***including***" several titles of conferences. *Id.* (emphasis added). The diversity and dynamism aligned with the breadth and evolution of its audience. *See id.*; App.1231-App.1239.

There was significant contrast between the non-exclusive and expansive wording of Schedule A and the narrow wording of Schedule 6.12, which "specifically set forth" the list of Permitted Activities. App.2288. Each item was identified by title, except as to "[s]how daily publications" and "[s]ponsored content"—but the latter was further identified as "paid for partner content, e.g., Risk Perspective (in-depth article, one-on-one, or research topic with a sponsor perspective embedded)." *Id*.

To avoid any confusion, a second list on Schedule 6.12 pertained expressly to Business Insurance Holdings, Inc. and excluded activities from the already-narrow list of Permitted Activities. The other business interests that Mr. Potter retained were also set forth with certain permitted activities followed by exclusions. App.2288-App.2289. For example, Sync Meeting Management Corp. could manage and plan meetings, but not "in connection with meetings, conferences or other events for the insurance industry," and if someone acquired Mr. Potter's International Air Transport number, that person likewise could not "book or reserve hotel rooms and venues in connection with any meetings, conferences or other events for the insurance industry … ." App.2289.

Article IV contained extensive representations and warranties from the Selling Parties that dovetailed with the Article VI protections, including, *inter alia*, that "no shareholder, member, director, officer or manager of any Company, nor any of their respective spouses or immediate family members" was engaged in specified relationships with any Company, except as disclosed on Schedule 4.11(a). App.2158. On Schedule 4.13, there was an express acknowledgement that Business Insurance Holdings, LLC had participated in joint conferences with CLM, "all of which will no longer be co-branded effective as of the Closing Date." App.2281. This was particularly important given that in the list of Permitted Activities there is nothing remotely similar to "conferences of the type identified on Schedule 4.13." *See* App.2288-App.2289.

### ii.    Structure of the Indemnification Clause

The APA provided for the award of attorneys' fees and expert fees resulting from, among other things, a breach of the restrictive covenants by the Selling Parties. Articles IV, V, and VI were all expressly brought forward to the Indemnification provisions of the Agreement in Article IX. *See* App.2171. Section 9.2 provides:

> Indemnification of Buyer. The Selling Parties shall … defend, indemnify and hold harmless Buyer … from, against, for and in respect of and pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:

13

(a) any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement …

* * *

(f) the enforcement by any Buyer Indemnified Party of any of its rights under this <u>Section 9.2</u> or any other indemnification covenant contained in this Agreement.

App.2170 (underlining in original). "Losses" were defined in Section 9.7, to include "all reasonable attorneys', … and expert witness' fees incurred in connection therewith[.]" App.2172.

Sections 9.5 and 9.6 limited indemnification, in the first instance to values between $50,000 and the Purchase Price, and in the second to 24 months post-closing, but in both instances, there were exceptions for breaches of Article IV and Article VI. *See* App.2171 ("for any breaches of covenants in Article VI); *id.* ("claims relating to breaches of covenants, all of which may be asserted without limitation").

### C.    The Terms of the Transaction.

The Institutes engaged an accounting firm to perform an initial valuation of the assets, which valued the assets as of March 5, 2018, using various methods. App.1103; App.1107-App.1111; App.1567-App.1573. The valuation was based on the understanding that the businesses "would be in adjacent horizontal or vertical markets, e.g. other insurance oriented or event planning businesses."

App.2094.  The restrictive covenants were critically important to The Institutes in its valuation, which led to a Purchase Price of $17,329,028 at Closing plus subsequent payments, including an earnout payment based on revenues during the year after Closing, which turned out to be over $2.6 million.  App.1122; App.12, App.1111-App.1114; App.1567; App.2184.  The Institutes later learned that Mr. Potter spent at least the latter part of the earnout period planning to compete with what The Institutes had acquired.  *E.g.*, App.1317-App.1319; App.1123.

### D.   Mr. Potter Sells Business Insurance Holdings, Inc. and Both Breach the Covenants with The Institutes.

Mere months after Closing, Mr. Potter expanded BIH's offerings to include specialty conferences to compete with CLM's, and he asked his staff to identify potential topics for additional conferences, beginning with two conferences planned for October 2019, a cannabis and hemp ("C&H") conference and an intellectual property ("IP") conference.  App.1317-App.1318; D.I.-239 pp.7-8.  But they were advertised months before that, and BIH was soliciting sponsors in the Spring of 2019.  App.2322-App.2324; App.2325-App.2330; *see also* App.12; App.1325.  At the same time, Mr. Potter set up another of his companies, Waggy Group, Inc., to earn commissions by booking venues and hotel room blocks for the conferences, App.1322, the role that C&E had played within the suite of businesses.  App.2187.  In other words, within months after Closing, Mr. Potter had essentially replicated the business functions he had sold to The Institutes.

Mr. Potter and BIH promoted the C&H Conference as a "new conference centered on cannabis insurance and risk management" for insurance and cannabis industry professionals "grappling with complex coverage and liability issues," and the IP Conference as an exploration of "business exposure" relating to intellectual property.  D.I.-239 p.8.  They even promised a specific session dedicated to cannabis claims titled "Cannabis Claims: A Peek Down the Rabbit Hole."  *Id.*  The C&H Conference "encroach[ed] on CLM's educational content," App.1403, and it competed against CLM's "targeted marketing."  App.1404.  On July 29, 2019, upon seeing promotions for the conferences, The Institutes demanded that Mr. Potter cancel them by sending a cease and desist letter "to protect what we purchased[,]" App.1855.  Mr. Potter refused.  Plaintiffs repeated their demand on August 12, 2019.  Again, Mr. Potter refused.

Instead, while he was promoting the C&H and IP Conferences, Mr. Potter entered into negotiations with Steven Acunto of Beacon Intercontinental Group, Inc. ("Beacon") to sell BIH to Beacon, using the upcoming conferences as a primary attraction.  App.1342; App.1345-App.1347; App.1926-App.1928; App.1930; App.1940-App.1941; *see also* App.2290.

Mr. Potter informed Mr. Acunto of the letters that The Institutes sent but told him that the allegations were without basis and that the non-compete was specific to Mr. Potter and his ownership of BIH.  App.1347-App.1349; App.1928-

App.1930.  Mr. Acunto never asked to review either the restrictive covenants or The Institutes' letters.  App.1349-App.1350.

Beacon acquired BIH on September 1, 2019 but included an indemnification clause in the Stock Purchase Agreement that shifted the risk that Mr. Potter was wrong about the scope of the restrictive covenants back to Mr. Potter.  App.2299 (handwritten addition to SPA §8.01).  Beacon proceeded with the C&H Conference because cancelling it could harm BIH's reputation. App.1976-App.1982.

Mr. Potter's sister, Sydney Posner, had worked for CLM as a Chief Relationship Officer, but when she was terminated, Mr. Potter introduced her to Mr. Acunto, and together they helped her establish a business, ClaimsXchange, as a rival to CLM.  App.1993-App.1994; App.2331; App.2332; App.1379-App.1387. Mr. Potter intended it to be a joint venture.  App.1993-App.1994.  The District Court expressly found that the formation of ClaimsX breached the non-compete covenant of the APA.  App.21.

Mr. Acunto served as an officer and director of ClaimsX.  *Id.*  BIH gave free limited time subscriptions to new ClaimsX members and provided it with administrative services.  App.1298; App.1385-App.1387; App.2333-App.2334. BIH was advertised online as ClaimsX's strategic partner until at least August 4, 2021. App.1474; App.2319.  Even after Ms. Posner informed

17

Mr. Acunto that ClaimsX no longer needed BIH's administrative services, she

affirmed that ClaimsX would "continue a strategic partnership with BI" and

"continue to grow BI's subscriber base [and] advertise BI to new audiences

through [ClaimsX] events and communications." App.2333-App.2334.

Under Beacon, BIH continued to expand its specialty conference offerings.

App.1370-App.1371. During COVID-19, BIH offered virtual conferences and

webinars. App.1467-App.1468; App.1550-App.1552. The District Court found

four additional conferences violated the non-competition covenant. App.17-

App.19. As one example, in July 2021, BIH held a virtual Long-Term Care

Conference in partnership with the Wilson Elser law firm, a CLM sponsor and the

exclusive sponsor of the C&H Conference. App.1461-App.1462; App.23.

Sessions included slip and fall, abuse and neglect, and litigation trends and trial

experiences. App.18 (discussing App.1466-App.1467 and App.2317-App.2318).[2]

The Wilson Elser law firm developed a mailing list working with CLM,

which BIH used. App.1481; App.1516-App.1518. As the District Court found, at

least seven claims professionals attended the initial C&H Conference and were

marketed to for later events. App.19; *see also* App.1517. The District Court found

---

[2] The District Court precluded evidence of additional webinars and planned
conferences that had not yet occurred in granting a BIH Motion *in Limine* and
denied The Institutes' subsequent motion for clarification or reconsideration.
App.796-App.798; App.832.

BIH's solicitation of Wilson Elser violated the non-solicitation covenant of the APA, but found inadequate proof that its reduced spending on CLM was a result of the violation.  App.23-App.24.

## II.  PROCEDURAL HISTORY

The Institutes filed suit on August 28, 2019, and its amended complaint[3] sought injunctive, monetary, and declaratory relief for breach of contract, tortious interference, and unjust enrichment.  *See generally* App.36-App.74.  It also sought attorneys' fees under the APA's indemnity provisions.  *See generally* App.67-App.74.[4]

Following motion practice, The Institutes' breach of contract claim and BIH's cross-claim for negligent misrepresentation were tried in a non-jury trial.  App.11.  The District Court issued a memorandum opinion following post-trial briefing, and entered final judgment and the permanent injunction on September 29, 2022.  App.6; App.9.

---

[3] On March 27, 2020, The Institutes named BIH as a defendant and supplemented its claims to reflect BIH's ongoing and growing conference schedule.  *See generally* App.36-App.74.

[4] BIH filed cross-claims against Mr. Potter, including seeking indemnification under the SPA.  That claim was dismissed without prejudice by agreement for refiling in the Southern District of New York, where it remains pending.  *See supra* p.3.

The Institutes filed its notice of appeal on October 19, 2022. App.1. BIH and Mr. Potter filed cross-appeals on October 27, 2022 and October 28, 2022, respectively. App.3; App.4.

## III. THE DISTRICT COURT'S OPINIONS

### A. Motion to Dismiss.

BIH moved to dismiss The Institutes' claims against it on various grounds, including arguing BIH was not subject to the restrictive covenants. App.100-App.101. Initially, BIH contended that it was not a party to the APA. *Id.* But after The Institutes demonstrated that BIH was the same entity as C&E, BIH pivoted to assert that its obligations under the APA were extinguished by Beacon's acquisition, because Mr. Potter was no longer involved. App.101. The District Court rejected BIH's argument because the clear and unambiguous language of the APA provided that BIH was a Selling Party subject to the restrictive covenants. App.104.

### B. Summary Judgment.

At summary judgment, BIH argued that the C&H conference did not violate the APA's restrictive covenants because it "was not directed at the claims and litigation industry" and BIH's involvement with ClaimsX was not actionable because it did not harm The Institutes. D.I.-234 p.2. Mr. Potter moved against both The Institutes (on the grounds that he was permitted to plan the conference and solicit Wilson Elsner, was no longer in the business, and The Institutes was not

damaged if there were a breach, D.I. 241; App.614-App.624) and BIH (asserting that he could not be liable as an officer, that the alleged representations were not made or were supported only by conclusory and self-serving statements, and that BIH could not demonstrate reasonable reliance because it knew of The Institutes' claims before the acquisition but never examined the scope of the APA. App.263-App.265.) The Institutes moved for partial summary judgment against both Defendants, averring that Schedule A precluded the activities in which Mr. Potter and BIH engaged, the covenants were reasonable and enforceable, and Defendants' specialty conferences and webinars breached the APA. D.I. 239 at 14-22.

The District Court granted summary judgment to Mr. Potter on all of BIH's cross-claims except negligent misrepresentation. App.603-App.612. It ruled that only the breach of contract claim would proceed for The Institutes. App.617-App.623. Although it found that questions of fact precluded summary judgment, the District Court construed the restrictive covenants as a matter of law, looking to the definition of Sellers' Businesses. App.617-App.618 (construing Preamble, App.2139, and Schedule A, App.2187).

The District Court recognized that Schedule A identified CLM and its audience and further provided that "CLM offers specific 'products and services,' including an annual conference and specialty conferences," App.617-App.618 (quoting App.2187), but it did not analyze the remaining portions of Schedule A,

21

such as the non-exclusive enumeration of CLM's specialty conference and webinar offerings, or the fact that only the Annual Conference is defined by reference to claims and litigation management. *Compare* App.617-App.618 *with* App.2187.

The District Court then turned to the Permitted Activities exception to the restrictive covenants, Schedule 6.12. App.618; *see also* App.2288. But instead of focusing on the narrowness of the Permitted Activities, the District Court looked principally at three of the exclusions that followed the Permitted Activities. App.618 (quoting App.2289). The District Court did not mention the two additional exclusions. App.2289.

Seizing on the words "claims" and "litigation management" in the first sentence of Schedule A's definition of CLM's Business and in the first category of the Permitted Activities' exclusion, the District Court concluded that the scope of the restrictive covenants was "limited to the claims and litigation management industries, not the insurance industry generally." App.618. Once it had reached that conclusion, it further concluded that the covenants could only "prohibit[] Defendants from offering a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals." *Id.*

Mr. Potter moved for reconsideration, contending that the APA contemplated restricting only specific conferences that were being offered as of the

Closing Date.  App.626-App.629; D.I.-307.  In rejecting this argument, the District

Court recognized that its construction was one with which both Mr. Potter and The

Institutes disagreed.  App.829.  Indeed, the District Court recognized that ***both*** read

"claims and litigation management" as constraints on Permitted Activities and not

on Sellers' Businesses.  *Id*.  Accordingly, the District Court invited the parties to

brief the issue post-trial.  *Id*.  In addition, the District Court found that CLM's

Business was "not limited to the specific past product offerings of CLM" and that

"evidence that CLM did not offer any cannabis-related product before the Closing

Date does not necessarily prove that a cannabis conference is outside the scope of

the non-compete."  App.830.

   In response to a motion *in limine*, the District Court shifted its position

somewhat, explaining that it had determined that the language of the non-compete

was unambiguous, and that it would not entertain any parol evidence as to its

construction that Defendants were prohibited from "offering a specialty conference

that provides content related to claims and litigation management or that targets

claims and litigation management professionals."  App.797.  The District Court

said that it would entertain only evidence about industry custom regarding claims

and litigation management and claims and litigation management professionals.

App.798.

Because commercial context is a critical part of contract construction, The Institutes was concerned that the District Court would limit its consideration of the evidence at trial and asked for—and was granted—permission to file an offer of proof. App.799-App.813.

The Institutes noted that generally a party cannot appeal an order denying summary judgment when there is a subsequent trial on the merits and must rely on the trial record to establish its points. App.801-App.802 (*citing Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) and *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 167 n.32 (3d Cir. 2010). While some courts have made an exception for a ruling of law at summary judgment, App.802 (citing cases), this Court has not. *Osborne v. U. of Del.*, 815 F. App'x 682, 684 n.1 (3d Cir. 2020). The Institutes was especially concerned with the construction of "Sellers' Businesses" and "activities that are otherwise competitive", and explained that the trial would demonstrate, *inter alia*, "the broad range of individuals to whom the CLM's specialty conferences have been marketed." App.803; *see also* App.804 at n.1.

### C.    Attempts to Strike Plaintiffs' Expert.

Both BIH and Mr. Potter moved pretrial to preclude Plaintiffs' damages expert, Dr. Christine Meyer, under Federal Rule of Evidence 702. App.266; App.267. They contended Dr. Meyer lacked factual support for the premises that the APA provided that Defendants would not compete with CLM post-closing and

that The Institutes attributed value to the restrictive covenants.  App.599.  The District Court rejected these arguments based on the record.  *Id.*

The District Court also rejected BIH's argument that Dr. Meyer's model should be rejected because the offerings of The Institutes and Defendants were not homogeneous.  App.599-App.600.  While characterizing as unreliable the premise that lost revenues were caused by Defendants' breaches (seemingly due to the pandemic), the District Court rejected Mr. Potter's argument that Dr. Meyer was required to measure damages solely by lost profits, emphasizing that Delaware law clearly awards benefit-of-the-bargain damages for breaches of contract.  App.601.

Prior to and during trial, Defendants sought to discredit Dr. Meyer's testimony again, and then to have it stricken.  App.598-App.602; App.1682-App.1685; App.620-App.621.  They did not offer their own experts at trial.  The District Court rejected the attempts to preclude Dr. Meyer's testimony.  App.598-App.602; App.1682-App.1685; App.620-App.621; App.1682.

### D.    Post-Trial.

All three parties filed post-trial briefs.  The Institutes' briefing detailed the past, ongoing, and future breaches of the restrictive covenants by Defendants, the restrictive covenants themselves, and resulting harms.  App.916-App.954; *see also* App.1054-App.1076.  BIH argued that The Institutes failed to prove its damages, and urged the District Court to construe the covenants narrowly.  App.955-

App.993.  BIH also argued that, if liable, it was entitled to judgment against

Mr. Potter on its negligent misrepresentation cross-claim.  App.1035-App.1043.

Mr. Potter argued that BIH's reliance on his representation that the restrictive

covenants did not apply to BIH after the sale was not reasonable.  App.1044-

App.1053.  Mr. Potter urged a narrow construction of the APA and its covenants,

argued he had not committed any breach, and contended that The Institutes had

received the benefit of its bargain.  App.994-App.1034.

On September 15, 2022, the District Court issued findings of fact and

conclusions of law pursuant to Federal Rule of Civil Procedure 52.  App.11-

App.24.  It declined to revise its summary judgment construction of the scope of

the non-compete provision, App.14, despite the fact that both Mr. Potter and The

Institutes urged it to do so.  App.14-App.19.  Even under the overly narrow scope,

however, the District Court found that The Institutes had proven that Mr. Potter

and BIH had breached the restrictive covenants by promoting and hosting specialty

conferences, App.17-App.19, soliciting CLM sponsor Wilson Elser, App.23, and

through Defendants' involvement with ClaimsX.  App.21.  The District Court also

found that BIH planned to expand its conference offerings going forward.  App.27.

The District Court expressly found that Mr. Potter and BIH did not dispute

that the restrictive covenants were valid and enforceable.  App.12.  It also found

that the balance of the equities favored enforcement of the covenants.  App.27.
But the District Court did not enforce the APA's covenants as written.

First, the District Court declined to enjoin Potter at all, on the basis that "…
Potter is no longer in the insurance industry."  *Id.*  Second, although it had
recognized that the ***promotion*** of competing conferences and the solicitation of
Wilson Elser began in February 2019 and that the attendees at one conference were
solicited for later ones, it entered only a two-year injunction, stating that BIH
"began breaching in October 2019, approximately one year and seven months after
the Closing Date (June 2018)," and that it did not breach again until 2021, App.29,
both of which were legal conclusions that were inconsistent with the facts it had
found.

Taken together, the District Court entered a narrow and time-limited
injunction only as to BIH—limiting it (and it alone) only from "offering specialty
conferences that provide content related to claims and litigation management or
that target claims and litigation management professionals" for two years.  App.27-
App.29.

The District Court likewise reached a legal conclusion that was inconsistent
with its factual findings when it considered what money damages would
compensate The Institutes for overpaying, even though it had found expressly that
"Plaintiffs would not have entered into the APA, or would have paid a lower price

for the businesses, if Plaintiffs knew Defendants would compete with Plaintiffs." App.12, App.19-App.20. The District Court disagreed with Dr. Meyer's damages calculation, but rather than adjusting damages, the District Court awarded only nominal damages of $1 (with interest). App.24-App.27.

Moreover, while recognizing how critical the covenants were to the transaction, and even though the Indemnification Clause specifically exempted breaches of those covenants from otherwise applicable minimums and maximums or time limitations, App.2171, the District Court found that the parties were not explicit enough[5] in the APA to shift the cost of litigating Defendants' breaches to the Defendants. App.30. The District Court reached that determination by comparing language in the APA's indemnity provisions to language in the contract at issue in *Deere & Company v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Nov. 22, 2016). App.31.

The District Court also rejected BIH's claim against Mr. Potter for negligently misrepresenting the scope of the non-compete. The District Court found that Mr. Potter had misrepresented to Mr. Acunto that BIH would not be subject to the non-compete once it was sold to Beacon, but it also found that

---

[5] Indemnifiable "Losses" were defined in the APA to include "all reasonable costs and expenses of investigating any claim, lawsuit or arbitration and any appeal therefrom, all reasonable attorneys', accountants', investment bankers', and expert witness' fees incurred in connection therewith … ." App.2172.

because Mr. Acunto did not investigate, his reliance on Mr. Potter's

misrepresentations was unreasonable.  App.32-App.34.

## SUMMARY OF ARGUMENT

> It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching party the benefit of its bargain by putting that party in the position it would have been but for the breach.

*Genencor Int'l, Inc v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000).  In this case,

the District Court found multiple breaches of restrictive covenants that it likewise

found were essential to the APA.  As such, it found that The Institutes had

overpaid for the assets that they had received, which, under Delaware law, entitled

The Institutes to a combination of equitable and monetary relief that together

would give it the benefit of its bargain.

But the way the District Court construed the APA and Delaware law led it to

lose sight of the very purpose of the remedies, and instead to blue-pencil the

covenant protections under the APA, to refuse to enforce the fee-shifting provision

that the parties had agreed to, and to award only nominal damages.

Basic principles of Delaware law assure contracting parties that their

contracts will be enforced as written, and that holds true for equitable relief, fee-

shifting, and damages.  Had the District Court used the APA provisions as the

benchmark for its remedies, as it did in determining liability, its award would have

included an injunction against both Mr. Potter and BIH that gave The Institutes

five years of the full protection of their restrictive covenants.  Its award would have

compensated The Institutes for the cost of suit to establish the wrongdoing and

would have adjusted the purchase price to reflect the reduced value of what it paid

for.  The District Court properly found that the Defendants were the wrongdoers

here; it should thus not have made The Institutes bear the cost of Defendants'

wrongdoing.

## ARGUMENT

I.     **The District Court Did Not Provide The Institutes with the Benefit of its Bargain.**

### SCOPE AND STANDARD OF REVIEW

The injunction that the District Court entered was to remedy a breach of

covenants in the APA.  App.27-App.28 (applying Delaware law on injunctions but

not citing Delaware authority for not enjoining Mr. Potter or for the scope of the

injunction); App.29-App.31 (predicting Delaware would not award attorneys'

fees).  As a result, this Court's review is plenary.  *See Compagnie des Bauxites de

Guinee v. Ins. Co. of N. Am.*, 724 F.2d 369, 371 (3d Cir. 1983).  Moreover, because

the District Court was construing and applying the APA, this Court views the

"legal effect and consequences" of contractual provisions *de novo*, while reviewing

the District Court's factual findings as to the parties' language and intent for clear

error.  *CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*, 2021 WL 4430400, at *2 (3d

Cir. Sept. 27, 2021).

### A.   Delaware is a Contractarian State.

More than most states, Delaware law respects parties' rights to set the terms

of their transactions and hold them to their choices.  *Arwood v. AW Site Servs.,*

*LLC*, 2022 WL 705841 (Del. Ch. Mar. 10, 2022).  In that regard, Delaware

describes itself as "strongly contractarian."  *Williams v. Energy Transfer Equity,*

*L.P.*, 2016 WL 3576682, at *2 (Del. Ch. June 24, 2016); *accord Nemec v. Shrader*,

991 A.2d 1120, 1126 (Del. 2010).

In giving effect to contracting parties' choices, Delaware subscribes to an

"objective" standard of contract construction which measures language from the

viewpoint of an "objective, reasonable third party," *Osborn ex rel. Osborn v.*

*Kemp*, 991 A.2d 1153, 1159 (Del. 2010), and the Court relies on the language and

contract provisions taken as a whole to discern the intent of the parties.  *Id*.

Because courts are seeking to discern and fulfill parties' expectations at the time of

contracting, commercial context of the agreement is vital.  *Blue Cube Spinco LLC*

*v. Dow Chem. Co.*, 2021 WL 4453460, at *6 (Del. Super. Sept. 29, 2021).

This Court has aptly summed up Delaware law as considering "words, acts,

and context," rather than extrinsic evidence as the best evidence of the parties'

intent.  *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005).

Delaware reads contracts so as to give effect to all provisions.  Thus, a court will

not read a meaning from a portion that conflicts with the "overall scheme or plan"

of the contract, and it will look to specific language as qualifying more general provisions. *In re G-I Holdings, Inc.*, 755 F.3d 195, 205 (3d Cir. 2014). Likewise, it gives effect to parties' decision to use specific language in one place but not another. *See, e.g.*, *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010); *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *12 (Del. Ch. Sept. 18, 2014). The same principle that does not treat the parties' choice of language as superfluous also requires courts to refrain from "blue-pencil[ing]" parties' contracts. *Fortis Advisors LLC v. Shire US Holdings*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017). As the Delaware Supreme Court has explained, blue-pencilling is incompatible with the need for equitable authority to be "exercised with care and respect for the rights of litigants," and would be "a judicially-ordered infringement of [] contractual rights." *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' and Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1071 (Del. 2014).

The enforceability of a restrictive covenant requires an evaluation of four factors: whether contract requisites have been met; whether the covenant is reasonable; whether the economic interest of the party seeking enforcement is legitimate; and whether the balance of equities favors enforcement. *Tristate Courier and Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004). The analysis is strict for employment agreements but less so for

acquisitions. *See, e.g.*, *Kan-di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015). The District Court found the covenants reasonable and enforceable, App.12-App.13, but it did not enforce them as written, and thus did not award the benefit-of-the-bargain remedy that was warranted under the APA.

**B.     The Injunction Entered by the Court Did Not Protect The Institutes' Contractual Interest.**

In determining the proper scope of an injunction, Delaware gives great weight to the difficulty of calculating damages to remedy harms to intangible assets and goodwill—and to the covenants protecting them. *See BP Chems., Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (reputation); *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019) (goodwill, customer relationships); *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009) (competition impairment to purchased goodwill), *aff'd*, 7 A.3d 486 (Del. 2010); *Hough Assocs. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007) (non-compete); *Tristate*, 2004 WL 835886, at *10 (goodwill).

Because damages cannot fully account for the harm from the breach, it is critical to protect the contractual bargain through the scope of the injunction. *Mountain W.*, 2019 WL 2536104, at *20. "Much of the benefit of a non-compete derives from its ability to create before-the-fact (ex ante) alterations to parties' behavior based on the threat of after-the-fact (ex post) injunctive relief in the event

of breach." *Hough*, 2007 WL 148751, at *18. "Unless parties … realize that injunctive relief should be expected in the event of a clear breach, non-competition agreements will not produce their intended effect, breaches will proliferate, and complicated damage inquiries into the 'what might have been' world will ensue." *Id.* In other words, an injunction is employed by Delaware as the equitable means to remedy a breach of restrictive covenants by restoring the wronged party the benefit of its bargain.

For that reason, Delaware "permits parties to limit the importance of such counterfactual inquiries by agreeing that breaches of their contracts will create irreparable harm and should be remedied by injunctive relief." *Id.* This approach aligns with Delaware's "primary goal of contract interpretation," which "is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." *Id.* Respect for the right to contract is upheld by enforcing a contract according to its plain terms. *Id.* "No one has to sign a contract with such a provision, but when one does, he should not complain if the terms are given effect [as] that remedy was expressly contemplated by the Non-Competition Agreement… ." *Id.* (entering injunction). Instead, the District Court here "blue-penciled" the parties' agreement in three ways.

### i.    Mr. Potter Should Have Been Enjoined.

The APA defines "Selling Parties" as "the Companies, ***Adam Potter*** and Moxie." App.2185 (emphasis added).  No one questioned whether Mr. Potter was bound by all three restrictive covenants in Section VI.  App.2166-App.2167. Nonetheless, the District Court declined to extend the injunction to Mr. Potter, reasoning that he had testified that he was no longer competing.  App.27 (citing App.1686-App.1688 (Potter testifying that he was currently working in other areas and had no plans to go back into the insurance industry)).[6]

Delaware law is clear that the mere fact that a person testifies that he will not violate an injunction is not a basis for failing to include him in it.  *See Hough*, 2007 WL 148751, at *19 n.97 (enjoining party from violating non-compete despite his representation that his employment would soon be totally unrelated to the competition to be enjoined); *accord E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, 2017 WL 4004419, at *5 (D. Del. 2017) (granting permanent injunction for infringement in a two-supplier market; "Defendant notes that Defendant took the 3G11 product off the market and no longer offered it for sale as of May 19, 2017.

---

[6] Of course, Mr. Potter also testified that he did not solicit any customers, members, or business associates since June 2018, did not complete during that time, and did not violate his restrictive covenants, App.1687-App.1689—all of which the District Court found to be false.

This is not a persuasive reason to deny the request for an injunction." (citation

omitted)).[7]

The decision to disregard the plain language of the covenants was

particularly unwarranted in this case, where Mr. Potter had explained that he

entered into the APA in order to leave the business.  *See* App.2110 ("The seller

entered into the transaction in order to exit the businesses.").  In its note explaining

intangible assets that were considered but not valued, CLM said that "competition

would not only diminish the value of the existing equity, but be contrary to the

structure and goals of the acquisition," which used revenue target payments as

additional incentives for supporting the success of the transaction.  App.2115.

Mr. Potter himself testified that he retired from the business at the Closing of the

APA.  App.1686.

---

[7] *See also Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 134 (3d Cir. 2004) (vacating denial of injunctive relief and remanding with instructions to enter permanent injunction against trademark infringer); *Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 134 (3d Cir. 2000) (reversing and remanding denial of injunctive relief where district court erred in concluding harm was not ongoing).; *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809, at *6 (S.D.N.Y. May 8, 2003) ("[A] bare promise by a party in the course of litigation to discontinue past or ongoing misconduct does not justify denial of injunctive relief, since such unilateral action hardly suffices to ensure that the party will not, in the future, reverse course and resume its challenged activities." (alterations in original)).

Yet during the litigation, Defendants argued CLM had not valued the non-competition provision because it had no value.  App.599 n.1.  The lack of competition and solicitation were not valueless; instead the protection was intended to be superfluous given Mr. Potter's representations and the value that was placed on what non-competition and non-solicitation clauses protect—goodwill, confidential information, and customer relationships.  *See Kan-di-Ki*, 2015 WL 4503210, at *20; *Symbiont.io, Inc. v. Ipreo Holdings*, 2021 WL 3575709, at *31 (Del. Ch. Aug. 13, 2021); *see also* App.2110 (valuing intangible assets and goodwill).  The District Court should not have narrowed the injunction to exclude the person who signed the APA and orchestrated the breaches.

### ii.    The Institutes Could Not Have the Benefit of its Bargain Without Five Years Competition-Free.

The APA was express in the duration of the covenant and the consequence for its breach, and the District Court erred in not honoring what the parties contemplated.  Delaware courts recognize that a contractual non-compete "provides the most appropriate caliper for measuring and defining an appropriate remedy, including its duration."  *Tristate*, 2004 WL 835886, at *14 n.152 (entering injunction for breach of non-compete in stock purchase agreement).  That is because "it was the Covenant that delineated [the party's] reasonable expectations."  *Id.*; *see also Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. June 16, 2005) ("When parties have ordered their affairs voluntarily through a

binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.").  As a result, Delaware courts regularly enforce what the parties contemplated.

In this case, the APA spoke in two separate regards about the duration of the covenants.  First, as noted above, in Section 6.12(a), the Non-Compete Period was a specifically defined term that was to begin on the Closing Date and end on the fifth anniversary of the Closing Date.  App.2166.  That defined term was carried through each restrictive covenant.  *See* App.2166-App.2167.  Because of the breaches, The Institutes was deprived of the benefit of that bargain, and as a general contract law principle, should have had the benefit of its bargain as a remedy.  *E.g.*, *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001); *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473, at *1 (Del. Ch. Apr. 23, 2021).

Even more than that, however, the parties included a separate provision in Section VI, which provided that if any one of the restrictive covenants was violated, "the term of such covenant will be ***extended*** by the period of the duration of such breach."  App.2167 (emphasis added).  The APA was entered into as of June 1, 2018, App.2139, which meant that the five years would run until June 1, 2023, if there were no breach.  The District Court found that Defendants

"***began breaching*** in October 2019," (although the testimony at trial established that the solicitations for the conference—and thus the breach—began months earlier) but it did not explain how long it concluded that that breach lasted, and did not address the fact it had found that Defendants marketed to people who attended the first conference—which meant that the breaches were ongoing.  App.29. Instead, the District Court found that a second breach occurred in May 2021, again measuring the breach by the conference itself and not by the promotion and solicitation periods that preceded it or the marketing and other consequences that followed.  *Id*.  Without more, the District Court reasoned that a two-year injunction (as of the date of entry), would "appropriately provide Plaintiffs the benefit of their bargain." *Id*.

Implicit in the District Court's calculation was that The Institutes had a breach-free three-year period, a conclusion that cannot be squared with the District Court's own findings of fact, which showed solicitations as early as February 2019, App.23; App.2322-App.2324, found that persons who attended one conference were marketed for others, App.19, and found that even as of trial more conferences were being planned and promoted.  App.27.  Because the covenants were not breached simply at discrete moments when a conference occurred, the injunction should not have been crafted as though The Institutes had the benefit of its bargain during any of that period, let alone for three full years.

Moreover, even if the District Court had not erred in calculating the time of competition-and-solicitation-free performance, it still would have erred in not giving effect to the parties' express agreement that a breach of covenants *extends* the covenant period.  App.2167.  At the least, then, the District Court should have *added* two years to the time when the restrictive covenants should still be in effect and binding (through June 1, 2023)—i.e., until June 1, 2025.

### iii.    The District Court Did Not Apply Core Construction Principles When it Permitted Competition Beyond the Parties' Contemplation.

In its summary judgment opinion, the District Court had determined as a matter of law that the APA prohibited the Defendants only from "offering a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals." App.618.  As discussed above, it adhered to that position after a request for reconsideration—yet contemplated supplemental briefing post-trial—but it then hardened its position prior to trial.  *See supra* pp. 23-24.  Not surprisingly, then, in its post-trial opinion, the District Court said that nothing at trial had changed its mind.  App.14.  Perhaps the District Court was worried about using "parol evidence" to vary the terms of the APA or to create ambiguity from unambiguous terms.  But what the trial testimony provided instead was an elucidation of the APA that lets each term be read as consistent and congruent, which is not at all

prohibited parol evidence and which does not turn a question of law into a question of fact.

Delaware has explained the difference: the terms of a contract may well be "unambiguous when read in full and situated in the commercial context between the parties." *Chicago Bridge & Iron Co. v. Westinghouse Elec. Co.*, 166 A.3d 912, 926-27 (Del. 2017). But "[t]he basic business relationship between parties must be understood to give sensible life to any contract." *Id*. at 927. This appreciation for a full record is also why this Court refuses to look at a limited summary judgment record when it has a whole trial before it. *See supra*, p.24. In this case, the District Court had rejected at summary judgment both The Institutes' and Mr. Potter's explanations of the structure of the restrictive covenants, but rather than asking whether the commercial context that was fleshed out even further at trial demonstrated how and why the restrictive covenants were structured as they were, the District Court simply said that nothing had changed its mind. To be sure, The Institutes and Mr. Potter disagreed about the construction of the unambiguous terms, but disagreement does not make terms ambiguous, *Manti Holdings v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021), and the District Court did not find them to be. Within the commercial context, the unambiguous terms of the APA demonstrated that imposing a caveat of "claims and litigation management" narrowed The Institutes' protections unduly.

The restrictive covenants all used broad language in multiple regards.  First, each obligated Selling Parties and Affiliates to refrain from "direct[] and indirect[]" conduct.  *See* App.2166-App.2167; *see also, e.g.*, *Revolution Retail Sys. v. Sentinel Techs.*, 2015 WL 6611601, at *3-4 (Del. Ch. Oct. 30, 2015) (characterizing non-compete and non-solicitation covenants with direct and indirect restrictions as broad).

In addition, each Selling Party agreed affirmatively to "cause … Affiliates" not to compete, and defined competition as to "conduct, manage, operate, engage in or have an ownership interest in any business or enterprise ***engaged in any activities*** that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date"—subject to the exception for specifically enumerated "Permitted Activities"—a defined term that was set forth on Schedule 6.12.  App.2166.

Because there was necessarily an overlap in the ***audiences*** for the products of the respective entities, the parties focused their assessment of competition on BIH's ***conduct***; i.e., whether it "engaged in any ***activities*** that are otherwise competitive" with any of the Sellers' Businesses as conducted as of the Closing date, and, if so, whether those activities were nonetheless permitted because they were enumerated on Schedule 6.12 as Permitted ***Activities***.  Notably, Schedule 6.12 did not contain the "including" enlargement; it was solely a list of Permitted

Activities, which is precisely what one would expect from a narrow carve-out. *Compare* App.2187-App.2188 *with* App.2288-App.2289.

More, the description of the list at the beginning of Schedule 6.12 said that the permitted activities were "specifically set forth below," a further indication that the parties intended for the list to be constrained to the enumerated items. Delaware employs the commonsense contract construction principle that when parties use different language in different sections of the contract, it both shows they know how to use such language when they want to, and that the absence of such language is purposeful. *E.g.*, *MicroStrategy*, 2010 WL 5550455, at *7. Thus, the way the parties narrowed the restrictive covenants was by focusing on Permitted Activities, which reflected the lifeblood of BIH as a ***publisher***, both online and in print, as Mr. Acunto described BIH and its reputation in the insurance industry:

> [I]t had a—let me use the right word—had an audited circulation.  It's audited by a company called BPA, which is a clear indicator of the circulation.  That its revenues were based on three things:  One, subscription; two, advertisements placed in the publication; and three, revenues from a number of conferences and award—award ceremonies.

App.1344.  When asked about the conferences he referenced, he identified Women to Watch, Captive Conference, and Innovation Awards.  *Id.*

Notably, all three were expressly Permitted Activities on Schedule 6.12, but were characterized as awards and events within the context of Business Insurance

Holdings, LLC (later known as PBIH) as "a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services." App.2288. The Schedule identified nine publications or expressly defined categories of publications, two entities, and six "events and award programs". *See id*. (including the three identified by Mr. Acunto among the events and award programs). Notably, when Mr. Potter identified for Mr. Acunto the business that Beacon would be buying, he did not even use the term "specialty conference." App.1345. That is telling, because "specialty conference" is a specifically identified activity of CLM's business at the time of the APA, and there is no corollary on the list of Permitted Activities.

In contrast to the deep but narrow focus of BIH's business, CLM's business was broad in every sense of the word. The APA defined CLM's business first as "operating as a national trade association for the claims and litigation management industries, as more specifically set forth in Schedule A." App.2139. Schedule A then explained that the ***members*** of CLM are "in the claims resolutions and litigation management ***industries***." App.2187 (emphasis added). That is a definition of an audience, and it was followed by a series of benefits, including events, continuing education, and industry resources that CLM provided to those members.

Anne Blume, who was the CEO of CLM from late 2018 until sometime in 2021, App.1229, provided further clarity at trial, when she explained that approximately 20% of members are outside lawyers. App.1241. There were also arbitrators and mediators. App.1242. The balance of the members were "insurance company folks, TPAs, corporate, agents and brokers and service providers." App.1241. The corporate members (approximately 3000 of them) were companies such as Macy's, Nordstrom, Turner Construction, Home Depot, Comcast, and Marriott. App.1241-App.1243. Among specialty conference sponsors were Magna, expert witness firms, accounting firms, and TPAs. App.1247. Both the annual and the specialty conferences would present information in "tracks" so that everyone had education pertinent to them at each conference. *See* App.1236. Topics were a mix of cutting edge and member-driven, but always original, content. App.1235-App.1238.

Schedule A identified the annual conference and a list of specialty conferences among the activities in which CLM engaged, and it went further, specifically characterizing the specialty conferences as "***including*** Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI, and Chief Claims Officer Summit"—which means that the list was non-exhaustive. *See* App.2187 (emphasis added); *Arwood v. AW Site Servs., LLC,*

45

2022 WL 973441, at *2 (Del. Ch. Mar. 31, 2022) (observing Delaware courts "view 'including' as 'a term of enlargement, and not of limitation.'").  That is certainly to be expected from an organization dedicated to meeting the evolving needs of a diverse membership.

Post-trial, the District Court elaborated on its summary judgment reasoning by explaining that CLM's Business was "operating as a national trade association for the claims and litigation management industries", but, instead of focusing on the significance of the industries, it acknowledged that it skipped to language that was part of the exclusion from the Permitted Activities to limit the Business to "content related to claims and litigation management" and targeting "claims and litigation management professionals."  App.14.  This analysis is contrary to the parties' understandings and to Delaware law, where an exclusion is "irrelevant" unless the exception is first satisfied.  *See Ipreo*, 2021 WL 3575709, at *37.  As *Ipreo* points out, the base definition becomes surplusage if the exclusion from the exception is read as the definition itself.  *Id.* at *38.

Moreover, "claims and litigation management industries" is used, for example, to qualify the annual conference in Schedule A but not the specialty conferences and is used in certain exclusions but not all, making it improper to extrapolate the limitation to other categories.  *Compare* App.2187 *with* App.2289; *see also MicroStrategy*, 2010 WL 5550455, at *7.  What Defendants were

constrained from competing with, directly or indirectly, must be read so that each word is given effect and there is no surplusage. *E.g.*, *Osborn*, 991 A.2d at 1159. Read in this way, it is clear that the right that The Institutes acquired was a right to five years to establish conferences and other member services to meet the whole scope of its members' needs in an evolving insurance industry environment. It is equally clear that no such rights remained with the Defendants.

## II. The District Court Misapprehended Delaware's Standards for the Shifting of Attorneys' Fees In a Contractual Indemnification Provision.

### SCOPE AND STANDARD OF REVIEW

The scope of an indemnification provision is likewise a question of contract construction and interpretation which, under Delaware law, "presents a clear question of law subject to de novo review." *IFC Interconsult, AG v. Safeguard Int'l Partners., LLC*, 438 F.3d 298, 318 (3d Cir. 2006). Likewise, the District Court predicted that Delaware would not award attorneys' fees, App.29-App.31, which makes this Court's review plenary. *See Compagnie,* 724 F.2d at 371.

The District Court correctly recognized that because indemnification clauses were originally a mechanism to protect against third-party risks, Delaware requires an express demonstration of intent before using an indemnification clause to impose attorneys' (and expert) fees and costs upon a party to the contract. *See* App.29-App.30 (citing cases). But the District Court focused on what it thought were similar indemnification terms in *Deere*, 2016 WL 6879525, at *1 to hold that

the parties' intent was not sufficiently expressed in Section 9.7 of the APA to warrant the imposition of fees. In doing so, the District Court erred in two regards. First, the language in *Deere* was not inconsistent with a third-party indemnification limitation, and the language in this APA is. Second, as more recent Delaware cases confirm, there is no "magic language" that is needed—just language that clearly demonstrates the parties' intent. The APA here satisfies that requirement.

In *Deere*, the parties contemplated that Exelon would "*indemnify*, defend and hold harmless" as to losses that Deere incurred "by reason of, arising out of, resulting from or related to" *inter alia*, a "breach or nonperformance of any of the covenants or agreements" that Exelon had made. 2016 WL 6879525, at *1, quoted in App.30. Although *Deere* does not set them forth, standard covenants and agreements include obligations to third parties that a seller needs to satisfy, sometimes at a given point in time, and sometimes for a period time. The parties in *Deere* conceivably could have limited their indemnification obligations to such covenants. More importantly, however, the *Deere* court was looking to the whole of the agreement (and, without saying so, applying the basic contract construction principle that the specific controls the general), because the parties in *Deere* had two other provisions in which they set forth express fee-shifting provisions, with language that was wholly unlike the language in the indemnification clause. That tipped the balance for the court. 2016 WL 6879525, at *2.

In the APA, in contrast, there were four places where attorneys' or experts' fees and expenses were referenced. *First*, in Section 2.4, the parties set forth an elaborate process for the determination of net revenues post-closing and provided in ii(C) that if a dispute arose, the parties would identify an accounting expert, and "Buyers and Sellers each shall pay one-half of the fees and expenses of the Expert." App.2147. *Second*, in Section 9.4, the parties set forth the procedures for Third Party Claims and specified that the Indemnifying Party had to pay for counsel "reasonably acceptable to the Indemnified Party." App.2170-App.2171. *Third*, the definition of Losses **under the whole of Article IX** included, *inter alia*, "all reasonable attorneys', accountants', investment bankers', and expert witness' fees incurred in connection therewith." App.2172. *Finally*, Section 10.1 states:

> **Except as otherwise provided in this Agreement**, each Party will bear its own direct expenses incurred in connection with the negotiation and preparation of this Agreement **and the consummation and performance of the transactions contemplated hereb**y.

*Id*. (emphasis added). The fee-shifting provision regarding third-party claims in Section 9.4 is detailed, and if Section 9.7 were addressing only third-party claims, the fee-shifting provision applicable to all of Article IX would be redundant. "Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007). Thus, the very analysis that

demonstrated the parties' intent to limit fee-shifting to third-party claims in *Deere* leads to the ***opposite*** conclusion here.  This is further reinforced in Section 9.3, which contemplated an exception to the indemnification right as to claims "made by a third party" if a lack of notice materially prejudiced defending the claim. App.2170.

That analysis is further confirmed by the more inclusive language in Section 9.2, both by adding to "defend, indemnify and hold harmless" "and pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from …" and by not limiting "breach" to covenants or agreements but to representations and warranties as well ***and*** extending to the enforcement of rights to indemnification.  *Compare* App.2170 (APA §§ 9.2, 9.2(a), 9.2(f)) *with Deere*, 2016 WL 6879525, at *1.

Again consistent is Section 9.5, which limited indemnification to circumstances in which the range of Loss is between $50,000 and the Purchase Price, except for the breaches of certain sections if undertaken fraudulently or by means of intentional misrepresentation; for indemnifications under certain provisions of Article IX, ***or*** "***for any*** breaches of covenants in Article VI." App.2171 (emphasis added).  This action was brought by The Institutes for breaches of covenants in Article VI, and under the plain language of the APA, The Institutes is entitled to uncapped indemnification for Losses, including "all

reasonable attorneys', accountants, investment bankers' and expert witness' fees incurred in connection therewith." *Id.*

It is ironic that the District Court looked to specific language in *Deere*, when that case itself recognized that there is no "magic language" that parties must employ in order to demonstrate their intent to have inter-party litigation fees covered by an indemnification fee provision. 2016 WL 6879525, at *2 ("There is no specific language that must be used in order for an indemnity provision to provide for recovery in first-party actions.").

Applying this principle, the Delaware Superior Court (in an opinion by Vice Chancellor Fioravanti), enforced first-party fee indemnification by looking at (1) whether the indemnification provision expressly references matters that would not arise from a third-party claim; (2) whether there are distinctions between third-party and non-third-party claims; (3) whether the notice of claim provision has specific references to third-parties; and (4) whether the parties included express fee-shifting clauses elsewhere in the agreement. *Schneider Nat'l Carriers, Inc. v. Kuntz*, 2022 WL 1222738, at *30-31 (Del. Super. Apr. 25, 2022). Finding that each of those factors demonstrated the parties' intent to have first-party claims indemnified for attorneys' fees, the court held that the proof of breach of a covenant entitled the recovery of reasonable attorneys' fees and costs.

In the same way here, the APA's factors are consistent with the finding in *Schneider* and are distinctions from the cases that found otherwise. *See* App.2171, § 9.5(a) (expressly referencing Article VI, where the covenant not to compete would not run to third parties); App.2170, § 9.4 (specific procedures for third-party claims); App.2170, § 9.3 (notice of claim provision discusses third parties) and discussion at pages 49-51, *supra* (no other express fee-shifting clauses). Accordingly, the APA *did* provide for The Institutes to recover its legal and expert fees and costs, and the District Court erred in refusing them.

### III. Under Delaware Law, Damages are Found by the Court and the Court Had a Sufficient Basis to Calculate the Diminution in Purchase Price

#### SCOPE AND STANDARD OF REVIEW

When state law governs the claim for relief, it also "guide[s] the allowable damages." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996). The actual determination is reviewed for an abuse of discretion, *id*. at 438-439, but, as with the scope of the injunction as discussed above, whether the District Court properly understood Delaware law is a question over which this Court exercises plenary review. *Compagnie*, 724 F.2d 369 at 371; *see also Chamberlain v. Giampapa*, 210 F.3d 154, 160 n.5 (3d Cir. 2000) (determining that New Jersey's certificate of merit requirement applied in federal court and predicting that New Jersey courts would apply that requirement to informed consent claims).

The District Court here found that Defendants breached the APA's restrictive covenants, that the breaches caused damage, and that the damage took the form of overpaying for the assets purchased. As the District Court found, "if Plaintiffs knew Defendants would compete with Plaintiffs", they "would have paid a lower price for the businesses." App.12. The District Court amplified its analysis at pages 9-10 of its opinion. *See* App.19-App.20. Nonetheless, the District Court awarded only nominal damages, in part because it misapprehended The Institutes' expert's testimony, and in part because it did not agree with certain of the expert's conclusions.

Damages are not inconsistent with injunctive relief, because injunctive relief is appropriate in cases in which damages are especially difficult to calculate, and the benefit of the bargain may require both. *Koehler v. NetSpend Holdings*, 2013 WL 2181518, at *23 (Del. Ch. May 21, 2013). Here, where restrictive covenants are breached and the COVID-19 pandemic strikes a business that connects people through conferences and other events, damages are even more complicated to establish. *E.g.*, *Hough*, 2007 WL 148751, at *18. Nonetheless, having found the ***fact*** of damage, the District Court should have placed any difficulty in determining the ***extent*** of damage at the risk ***of the breaching party***. *See, e.g.*, *Ipreo*, 2021 WL 3575709, at *55 (quoting *SIGA Techs, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015)); *Cura Fin. Servs. N.V. v. Elec. Payment Exch*, 2001 WL

1334188, at \*20 (Del. Ch. Oct. 22, 2001).  Instead, the District Court shifted the risk to The Institutes.  That was contrary to Delaware law.

Delaware requires the harm from a breach of contract to be measured from an *ex ante* position, sometimes characterized as expectation damages—i.e., what is the difference between what one expected to get when it paid a certain amount for a contract and what it did get.  *E.g.*, *Hough*, 2007 WL 148751, at \*18.  In this case, the District Court recognized that the competition and solicitation deprived The Institutes of the full value of its purchase—and The Institutes may not have entered the APA without its non-compete and non-solicitation protections.  App.12.

Overpayment is an *ex ante* contractual damage theory.  *See, e.g.*, *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at \*7 (Del. Ch. Aug. 25, 2020) (denying a motion to dismiss because plaintiff was damaged by overpaying for a Company when a significant customer was leaving and that imminent departure was not disclosed).  In some jurisdictions, an *ex ante* price can be applied to post-acquisition sales.  *See Westway Holdings Corp. v. Tate & Lyle PLC*, 2011 WL 3490126, at \*4 (D. Del. Aug. 10, 2011) (determining under Illinois law that the "most reasonable selling price" but for breach of a non-compete covenant and applying it to sales).  But because of the COVID-19 pandemic, The Institutes' economic expert considered any attempt to do so to be speculative and instead sought to establish a basis for ascertaining the but-for price:  if a theoretical entity

had entered the APA without the protection of the restrictive covenants, what would it have paid?  *See, e.g.*, App.1627.  Such an analysis is very much like the analysis that the Court of Chancery conducted in *Maverick*, where it found that Millennium "reasonably expected" an investment worth $95.4 million when made but received a lesser value—and awarded the difference in damages.  2021 WL 1592473, at *13-14 (calculating expectation damages).

Dr. Meyer[8] opined that the other competition—none of it direct—that existed in the market ***after*** the sale was the same competition that had existed in the market ***before*** the sale, and thus the impact of vitiating the restrictive covenants was in essence a question of two players—one with history and reputation, the other with the assets and name—competing head-on, a scenario the model she used was designed for.  App.1577-App.1583.

For example, at trial Dr. Meyer explained that she understood the "broader market in which [CLM] competes, but my understanding is that CLM operates in a niche space" and Mr. Potter through BIH and later Beacon is "the closest competitor.  So, the right way to look at the competition is not within some other larger market, but rather as the niche space in which these two particular sets of entities or entities would compete."  App.1617.  Nonetheless, the District Court

---

[8] Although the Defendants retained experts of their own and used them in Federal Rule of Evidence 702(b) briefing, Dr. Meyer was the only expert to testify at trial.

rejected her use of the model because there were other competitors (at least at the edges) in the market so that the simple two-competitor model was not strictly applicable.  App.26.  The District Court rejected not only Dr. Meyer's proffered 50% reduction in value from an *ex ante* perspective but the entirety of her methodology.[9]  *Id*.

In Delaware, it is not the function of the expert to provide a "take-it-or-leave-it" damages report—and, indeed, Dr. Meyer proffered different valuations and damages ranges—but rather it is ***for the trial court*** to evaluate the data and the facts ***as it finds them*** to determine damages.  *See, e.g.*, *TV58 Ltd. P'ship v. Weigel Broad. Co.*, 1993 WL 285850 (Del. Ch. July 22, 1993) (weighing and determining reasonableness of each input of a discounted cash flow analysis for going concern valuation); *see also Maverick*, 2021 WL 1592473, at *1 (declining to wholly accept expert report from either party, but using portions of expert opinions to craft damages for reduced market share).

---

[9] The District Court also appeared to confuse *ex post* performance—which is an alternate method for demonstrating damages—with the *ex ante* question what a reasonable buyer would pay for the reduced benefit of an APA without effective restrictive covenants—knowing that the value of the restrictive covenants was significant enough to The Institutes itself that there likely would have been no sale at all.  App.1122.  *See* App.1576 ("[W]hat I'm looking at would be how a valuation would have been adjusted at the time of the acquisition.  So, it's—it's all what we call a forward-looking exercise from the standpoint of the time of the acquisition.").

By looking only at (a misapprehended) methodology, rather than recognizing that a significant portion of the value of the business was the goodwill and other tangible assets that the restrictive covenants were bargained to protect, the District Court turned the risk of uncertainty from the Defendants to their favor, despite finding that they are the wrongdoers.  Delaware law demands the opposite.

> When a party breaches a contract, that party often creates a course of events that is different from those that would have transpired absent the breach.  The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer.

*SIGA*, 132 A.3d 1108 at 1111.  The principle applies just as strongly when the measure of damages is the delta between the price that was paid and the price that should have been paid.  *See Maverick*, 2021 WL 1592473, at *10 (citing *SIGA*, 132 A.3d at 1111).

The District Court had before it all that it needed to calculate damages.  As Dr. Meyer testified, her analysis drew heavily on the valuation that CLM had provided to The Institutes as an aid in valuing the acquiring assets; she looked in particular at its discounted cash flow analysis, which she used as a basis for her calculations.  App.1583-App.1584; *see also* App.1567-App.1582; App.1585-App.1590.  Delaware has frequently used such data to calculate damages in the context of acquisitions:  absent some taint to the acquisition process, what value would the company (and derivatively, its shareholders) have received from a sale

of a company?  In that scenario, the Delaware Supreme Court determined in 1983

to abandon what it called "structured and mechanistic" calculations in favor of

"any techniques or methods which are generally considered acceptable in the

financial community and otherwise admissible in court … ."  *Weinberger v. UOP,*

*Inc.*, 457 A.2d 701, 712-13 (Del. 1983).  The APA without competitive protections

was, as the District Court found, worth less than the APA if the restrictive

covenants had been honored.  In determining how much less it was worth, the

District Court had significant latitude to choose among the various figures before it

to derive an appropriate value, but it could not place the burden of uncertainty on

The Institutes, which is what it did.

## CONCLUSION

For all the reasons set forth above, The Institutes asks this Court to reverse

the District Court's overly narrow remedies and order instead remedies that accord

with Delaware law.

Date:  January 13, 2023                          Respectfully Submitted,

/s/      *D. Alicia Hickok*
D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700 (telephone)
(215) 988-2857 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, D. Alicia

Hickok, am admitted as an attorney and counselor of the United States Court of

Appeals for the Third Circuit.

/s/    *D. Alicia Hickok*

D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700 (telephone)
(215) 988-2857 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

Date: January 13, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1.     This brief complies with this Court's order of June 10, 2022 because it contains 12,936 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3.     This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because CrowdStrike Windows Sensor version 6.49.16303.0 was run on the file containing the electronic version of this brief and no viruses were detected.

/s/     *D. Alicia Hickok*
D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700 (telephone)
(215) 988-2857 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

Date:  January 13, 2023

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the

appellate CM/ECF system on January 13, 2023.  All counsel of record are

registered CM/ECF users, and service will be accomplished by the CM/

ECF system.

/s/    *D. Alicia Hickok*
D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700 (telephone)
(215) 988-2857 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

Date: January 13, 2023

Nos. 22-2967, 22-3025, and 22-3042

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES, LLC
> *Plaintiffs-Appellants at 22-2967*
> *Plaintiffs-Cross-Appellees at 22-3025 and*
> *22-3042*

v.

ADAM POTTER,
> *Defendant-Appellee at 22-2967*
> *Defendant-Cross-Appellee at 22-3025*
> *Defendant-Cross-Appellant at 22-3042*

and

BUSINESS INSURANCE HOLDINGS INC
> *Defendant-Appellee at 22-296*
> *Defendant-Cross-Appellant at 22-3025*
> *Defendant-Cross-Appellee at 22-3042*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE, THE HONORABLE RICHARD G. ANDREWS
DISTRICT COURT NO. 1:19-CV-01600-RGA-JLH

---

**APPENDIX**
**VOLUME I OF VI (App.1-App.35)**

---

D. Alicia Hickok (PA ID 87604)
Renée M. Dudek (PA ID 325368)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
 (215) 988-2700 (telephone)
 (215) 988-2757 (facsimile)
alicia.hickok@faegredrinker.com
renee.dudek@faegredrinker.com

*Attorneys for Plaintiffs-Appellants/Plaintiffs-Cross-
Appellees The American Institute for Chartered
Property Casualty Underwriters and The Institutes, LLC*

# APPENDIX TABLE OF CONTENTS

## VOLUME I

Notice of Appeal of Plaintiffs, The American Institute for Chartered Property
Casualty Underwriters and The Institutes, LLC
October 19, 2022 ....................................................................................App.1

Defendant Business Insurance Holdings, Inc.'s Notice of Appeal
October 27, 2022 ....................................................................................App.3

Notice of Appeal of Defendant, Adam Potter
October 28, 2022 ....................................................................................App.4

Final Judgement
September 29, 2022 ................................................................................App.6

Permanent Injunction
September 29, 2022 ................................................................................App.8

Trial Opinion
September 15, 2022 ..............................................................................App.10

## VOLUME II

Amended and Supplemental Complaint
March 27, 2020 ....................................................................................App.36

Report and Recommendation
February 8, 2021 ..................................................................................App.75

Memorandum Order
March 26, 2021 ....................................................................................App.99

Order
March 26, 2021 ..................................................................................App.106

Adam Potter's Answer With Affirmative Defenses to Plaintiffs' Amended and
Supplemental Complaint
April 16, 2021 ....................................................................................App.109

Answer and Cross-Claim of Defendant Business Insurance Holdings, Inc.
April 16, 2021 ....................................................................................App.157

Stipulated Dismissal Without Prejudice of Cross-Claim No. 1
     December 7, 2021 .................................................................... App.215

Stipulated Dismissal Without Prejudice of Cross-Claim No. 1 [Entered]
     December 7, 2021 .................................................................... App.217

Memorandum Opinion
     January 4, 2022 ...................................................................... App.219

Order
     January 4, 2022 ...................................................................... App.225

Adam Potter's Answer With Affirmative Defenses to Business Insurance Holdings
     Inc.'s Cross-Claims
     January 18, 2022 .................................................................... App.226

Business Insurance Holdings, Inc.'s Concise Statement of Material Facts in
     Support of Summary Judgment Motion
     February 11, 2022 .................................................................. App.234

Plaintiffs' Motion for Partial Summary Judgment
     February 11, 2022 .................................................................. App.244

Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for
     Partial Summary Judgment
     February 11, 2022 .................................................................. App.248

Adam Potter's Motion for Summary Judgment on Plaintiffs' Amended and
     Supplemental Complaint
     February 11, 2022 .................................................................. App.259

Adam Potter's Motion for Summary Judgment on Business Insurance Holdings,
     Inc.'s Cross-Claims
     February 11, 2022 .................................................................. App.263

Motion to Exclude Testimony of Plaintiffs' Expert Under Federal Rule of Civil
     Procedure 702
     February 22, 2022 .................................................................. App.266

Defendant Adam Potter's Daubert Motion to Exclude Testimony and Report of
     Christine S. Meyer, Ph. D.
     February 22, 2022 .................................................................. App.267

Plaintiffs' Reponse to Bih's Statement of Undisputed Material Facts
March 4, 2022 .................................................................................App.269

Appendix of Exhibits to Plaintiffs' Reponse to Defendant Business Insurance
Holdings, Inc.'s Statement of Undisputed Material Facts
March 4, 2022 .................................................................................App.281

Plaintiffs' Reponse to Defendant Adam Potter's Statement of Undisputed Material
Facts
March 4, 2022 .................................................................................App.397

Appendix of Exhibits to Plaintiffs' Reponse to Defendant Adam Potters Statement
of Undisputed Material Facts
March 4, 2022 .................................................................................App.413

## VOLUME III

Adam Potter's Response to Plaintiffs' Statement of Facts Submitted in Support of
Their Motion for Partial Summary Judgment
March 4, 2022 .................................................................................App.535

Declaration of Counsel Submitted in Support of Adam Potter's Answering Brief in
Opposition to Plaintiffs' Motion for Partial Summary Judgment
March 4, 2022 .................................................................................App.562

Adam Potter's Response to Business Insurance Holdings, Inc.'s Counterstatement
of Facts Submitted in Opposition to Potter's Motion for Partial Summary
Judgment
March 18, 2022 ...............................................................................App.582

Supplemental Declaration of Counsel Submitted in Further Support of Adam
Potter's Motion for Summary Judgment on Business Insurance Holdings,
Inc.'s Cross-Claims
March 18, 2022 ...............................................................................App.592

Memorandum Order
May 6, 2022 ....................................................................................App.598

Memorandum
May 13, 2022 ..................................................................................App.603

Order
May 13, 2022 ..................................................................................App.613

3

Memorandum
        May 13, 2022 ......................................................................App.614

Order
        May 13, 2022 ......................................................................App.625

Adam Potter's Motion for Partial Reconsideration of The Court's May 13, 2022
        Order Granting in Part and Denying in Part Summary Judgment As to
        Plaintiffs' Amended and Supplemental Complaint
        May 23, 2022 ......................................................................App.626

[Proposed] Final Pretrial Order
        May 24, 2022 ......................................................................App.630

Order After Pretrial Conference
        June 2, 2022 .......................................................................App.794

Order After Pretrial Conference
        June 6, 2022 .......................................................................App.796

Offer of Proof of Plaintiffs The American Institutes for Chartered Casualty
        Property Underwriters and The Institutes LLC
        June 13, 2022 .....................................................................App.799

Plaintiffs' Motion for Clarification Or Partial Reconsideration on The Court's June
        6, 2022, Order Ruling on Business Insurance Holdings, Inc.'s Motion in
        Limine No . 1
        June 14, 2022 .....................................................................App.827

Order
        June 24, 2022 .....................................................................App.829

Order
        June 27, 2022 .....................................................................App.831

Pretrial Conference Transcript
        May 27, 202 .......................................................................App.833

Opening Post-Trial Brief of Plaintiffs The American Institute for Chartered
        Property Casualty Underwriters and The Institutes, LLC
        July 15, 2022 ......................................................................App.916

Answering Post-Trial Brief of Defendant Business Insurance Holdings, Inc.
　　July 29, 2022 ..................................................................... App.955

Defendant Adam Potter's Brief in Support of The Entry of Judgment in His Favor
　　and in Opposition to Plaintiffs' Post-Trial Brief
　　July 29, 2022 ..................................................................... App.994

## **VOLUME IV**

Business Insurance Holding Inc's Post-Trial Brief As to Its Cross-Claim Against
　　Adam Potter
　　July 29, 2022 ..................................................................... App.1035

Defendant Adam Potter's Brief in Support of The Entry of Judgment in His Favor
　　and in Opposition to Business Insurance Holdings, Inc.'s Post-Trial Brief
　　August 5, 2022 ................................................................... App.1044

Reply in Support of Post-Trial Brief of Plaintiffs The American Institute for
　　Chartered Property Casualty Underwriters and The Institutes, LLC
　　August 5, 2022 ................................................................... App.1054

Trial Transcript Volume I
　　June 27, 2022 .................................................................... App.1077

## **VOLUME V**

Trial Transcript Volume II
　　June 28, 2022 .................................................................... App.1451

Trial Transcript, Volume III
　　June 29, 2022 .................................................................... App.1765

## **VOLUME VI**

Plaintiff's Trial Exhibit 11 ............................................................ App.2091

Plaintiff's Trial Exhibit 12 ............................................................ App.2107

Plaintiff's Trial Exhibit 13 ............................................................ App.2136

Plaintiff's Trial Exhibit 14 ............................................................ App.2186

Plaintiff's Trial Exhibit 18 ............................................................ App.2290

Plaintiff's Trial Exhibit 26................................................................App.2317

Plaintiff's Trial Exhibit 27................................................................App.2319

Plaintiff's Trial Exhibit 45................................................................App.2322

Plaintiff's Trial Exhibit 52................................................................App.2325

Plaintiff's Trial Exhibit 86................................................................App.2331

Plaintiff's Trial Exhibit 90................................................................App.2332

Plaintiff's Trial Exhibit 102..............................................................App.2333

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Adam Potter and Business Insurance Holdings, Inc., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) )   Civ. A. No. 1:19-cv-01600-RGA |

## NOTICE OF APPEAL OF PLAINTIFFS, THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS AND THE INSTITUTES, LLC

Notice is hereby given that Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, hereby appeal to the United States Court of Appeals for the Third Circuit from the Final Judgment entered on September 29, 2022 [D.I. 340], the Permanent Injunction Order entered on September 29, 2022 [D.I. 341], and all prior rulings leading to that judgment and order.

Dated: October 19, 2022

[Signature on following page]

_/s/ Barry Klayman_____
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted Pro Hac Vice)
Matthew J. Siegel (Admitted Pro Hac Vice)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA  19103

App.2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS and THE INSTITUTES, LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>ADAM POTTER; PBIH, LLC, FKA Business Insurance Holdings LLC; and BUSINESS INSURANCE HOLDINGS, INC.,<br><br>    Defendants. | C.A. No. 19-1600-RGA |

<u>**DEFENDANT BUSINESS INSURANCE HOLDINGS, INC.'S NOTICE OF APPEAL**</u>

   PLEASE TAKE NOTICE that Defendant Business Insurance Holdings, Inc. ("BIH")

hereby appeals to the United States Court of Appeals for the Third Circuit from:

   1. The District Court's September 29, 2022 Final Judgment.  ECF No. 340; *see* ECF

No. 335 (Trial Opinion).

   2. The District Court's September 29, 2022 Permanent Injunction.  ECF No. 341.

Dated: October 27, 2022

**OF COUNSEL:**

Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131
305.423.8522
305.675.6366 (Fax)
chris.oprison@dlapiper.com

**DLA PIPER LLP (US)**

<u>*/s/ Matthew P. Denn*</u>
Matthew P. Denn (DE Bar No. 2985)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
302.468.5700
302.394.2341 (Fax)
matthew.denn@dlapiper.com

*Attorneys for Defendant Business Insurance Holdings, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) | |
| | ) | Civil Action No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc., | ) ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF APPEAL
### OF DEFENDANT, ADAM POTTER

Pursuant to Federal Rule of Appellate Procedure 4, notice is hereby given that Defendant, Adam Potter ("Potter"), files an appeal to the United States Court of Appeals for the Third Circuit with respect to the Final Judgment entered against Potter on September 29, 2022 (Dkt. 340) *only to the extent* that it entered a judgment in favor of Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, and against Potter on the breach of contract claim contained in Count I of the Amended and Supplemental Complaint ("Amended Complaint").  Potter further appeals that portion of the Court's May 13, 2022 Order (Dkt. 305) that denied summary judgment in Potter's favor on the breach of contract claim contained in Count I of the Amended Complaint, as well as the

Court's June 24, 2022 Order (Dkt. 320) that denied Potter's motion for partial reconsideration of the Court's May 13, 2022 Order referenced above.

**FOX ROTHSCHILD LLP**

*/s/ Seth A. Niederman*
Seth A. Niederman (#4588)
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: October 28, 2022            *Attorneys for Defendant Adam Potter*

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) |
| Defendants. | ) ) ) |

Civ. A. No. 1:19-cv-01600-RGA-JLH

## **FINAL JUDGMENT**

AND NOW, this 29th day of September, 2022, for the reasons set forth in this Court's September 15, 2022 Trial Opinion (D.I. 335), it is hereby ORDERED that:

1.      Judgment is entered in favor of Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("The Institutes"), and against Defendants, Adam Potter and Business Insurance Holdings, Inc. ("BIH"), upon Count I of the Amended and Supplemental Complaint in the amount of one dollar ($1.00), plus pre- and post-judgment interest, and equitable relief in the nature of a permanent injunction against BIH issued contemporaneously with the entry of this judgment;

2.     Judgment is entered in favor of Adam Potter and against BIH on

BIH's claim for negligent misrepresentation; and

3.     Any party claiming to be a prevailing party shall submit a bill of costs

within fourteen days.



United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

The American Institute for Chartered  )
Property Casualty Underwriters and  )
The Institutes, LLC,  )    Civ. A. No. 1:19-cv-01600-RGA-JLH
  )
Plaintiffs,  )
  )
v.  )
  )
Adam Potter and Business Insurance  )
Holdings, Inc.,  )
  )
Defendants.  )
  )

## PERMANENT INJUNCTION

Pursuant to the judgment entered in this matter in favor of Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("The Institutes"), and against Defendants, Adam Potter and Business Insurance Holdings, Inc. ("BIH"), upon Count I of the Amended and Supplemental Complaint in accordance with the Trial Opinion entered by the Court on September 15, 2022 (D.I. 335), and the Court determining that The Institutes is suffering irreparable harm and the balance of equities favors the entry of an injunction, it is hereby

ORDER AND DECREED:

That BIH and its present and future directors, officers, agents, servants, employees, attorneys and any other persons who are in active concert or

participation with any of the foregoing entities and who have knowledge of this

Order are enjoined, restrained and prohibited from promoting, marketing, offering,

or holding any conference, seminar, webinar, or any similar event that provides

any content related to claims and litigation management or that targets claims and

litigation management professionals, for a period of two years from the entry of

this injunction.

For purposes of this injunction, the term "content related to claims and

litigation management" includes content referring to the prevention, handling,

and/or defense of claims or litigation, including content referring to both pre-loss

and post-loss claims and litigation considerations.

For purposes of this injunction, the term "targets claims and litigation

management professionals" includes the use of any marketing list provided to BIH

by any law firm operating in the claims and litigation management industry, the

use of mailing lists that include claims and litigation management professionals, or

otherwise providing content at the conference, webinar, or event that refers to

claims and litigation management.

Entered and signed this 29th day of September, 2022.

United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

      Plaintiffs,

      v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

      Defendants.

Civil Action No. 19-1600-RGA

TRIAL OPINION

Barry M. Klayman, COZEN O'CONNOR, Wilmington, DE; Robert W. Hayes, Matthew J. Siegel, COZEN O'CONNOR, Philadelphia, PA,

      Attorneys for Plaintiffs.

Matthew P. Denn, DLA PIPER LLP, Wilmington, DE; Christopher Oprison, DLA PIPER LLP, Miami, FL,

      Attorneys for Defendant Business Insurance Holdings, Inc.

Seth Niederman, FOX ROTHSCHILD LLP, Wilmington, DE; Robert S. Tintner, Nathan M. Buchter, FOX ROTHSCHILDLLP, Philadelphia, PA,

      Attorneys for Defendant Adam Potter.

September 15 , 2022

ANDREWS, U.S. DISTRICT JUDGE:

On June 1, 2018, Plaintiffs The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC (together, "Plaintiffs") entered into an asset purchase agreement ("APA") with Claims Pages, LLC ("CP"), C&E MGMT and Planning, Inc. ("C&E"), CLM Group, Inc. ("CLM"), Adam Potter, and Moxie HC, LLC. (PTX 13). Pursuant to the APA, Plaintiffs acquired substantially all of the assets of CP, C&E, and CLM. (*Id.* at 4). The APA contains non-compete and non-solicitation provisions which generally prohibit "each Selling Party"[1] from competing with the "Sellers' Businesses." (*Id.* at 31, § 6.12(a)–(b)).

Plaintiffs brought this suit against Defendants Adam Potter and Business Insurance Holdings, Inc. ("BIH"), alleging that they breached the non-compete and non-solicitation provisions of the APA. (D.I. 48). BIH asserted five cross-claims against Potter. (D.I. 146 at 52–58). By trial, only BIH's cross-claim for negligent misrepresentation remained. (*See* D.I. 329). I held a three-day bench trial on Plaintiffs' breach of contract claim and BIH's negligent misrepresentation cross-claim. (D.I. 332–334).[2]

I have considered the parties' post-trial submissions. (D.I. 325, 327, 328, 329, 330, 331). Having considered the documentary evidence and testimony, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

---

[1] The APA defines the term "Selling Parties" as "the Companies, Adam Potter and Moxie." (PTX 13 at 50). The "Companies" are CP, C&E, and CLM. (*Id.* at 4). C&E changed its name to Business Insurance Holdings, Inc. ("BIH"). (Tr. at 252:4–6 (Potter)). Potter then sold BIH to Beacon Intercontinental Group, Inc. on September 1, 2019. (PTX 18). In rejecting BIH's motion to dismiss the contract claim, this Court held that the non-compete and non-solicitation provisions of the APA still apply to BIH despite its new ownership. (D.I. 137 at 5–6).

[2] I cite to the trial transcript as "Tr." The trial transcript is consecutively numbered.

1

## I.    PLAINTIFFS' BREACH OF CONTRACT CLAIM

### A.    Findings Of Fact

1.    "Claims and litigation management" is not limited to post-loss activities. "Content related to claims and litigation management" includes content related to the prevention, handling, and defense of claims or litigation.

2.    The Cannabis and Hemp ("C&H") Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar provided content related to claims and litigation management and targeted claims and litigation management professionals.

3.    Plaintiffs would not have entered into the APA, or would have paid a lower price for the businesses, if Plaintiffs knew Defendants would compete with Plaintiffs.

4.    When Potter introduced Mr. Acunto to his sister, Ms. Posner, Potter knew that Ms. Posner planned to discuss the formation of an entity that would compete with CLM.

5.    Mr. Acunto assisted in the formation of ClaimsX.   BIH had a strategic partnership with ClaimsX.

6.    Potter solicited Wilson Elser as a sponsor for BIH's C&H Conference.

### B.    Conclusions of Law

In order to prevail on their breach of contract claim, Plaintiffs must prove by a preponderance of the evidence: (1) the existence of a contract; (2) a breach of the contract; and (3) resulting damage to Plaintiffs.   *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013).

Plaintiffs allege three breaches of the APA by Potter and BIH.   First, Plaintiffs allege that Potter and BIH breached the non-compete provision by hosting and planning certain conferences.   Second, Plaintiffs allege that Potter and BIH breached the non-compete provision by assisting in the formation of ClaimsXchange ("ClaimsX").   Third, Plaintiffs allege that Potter and BIH breached the non-solicitation provision by soliciting Wilson Elser as a conference sponsor.   Potter and BIH do not dispute that the restrictive covenants in the APA are valid and

2

enforceable.  (*See* D.I. 327, 328).   They only dispute the second and third elements of

Plaintiffs' breach of contract claim.

### 1.   Conferences

Plaintiffs allege that Potter violated the non-compete provision of the APA by planning

and organizing the Cannabis and Hemp ("C&H") Conference in 2019.   Plaintiffs allege that BIH

violated the non-compete provision by hosting the C&H Conference, Long Term Care Webinar,

Long Term Care Conference, and Cyber Security Webinar.[3]

The non-compete provision of the APA provides:

> During the period beginning on the Closing Date and ending the fifth (5[th]) anniversary of
> the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees
> not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United
> States, conduct, manage, operate, engage in or have an ownership interest in any business
> or enterprise engaged in any activities that are otherwise competitive with any of the
> Sellers' Businesses as conducted as of the Closing Date, except that during the Non-
> Compete Period any Selling Party, or any other party listed on Schedule 6.12, may
> undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the
> "Permitted Activities").

(PTX 13 at 31, § 6.12(a)).

In ruling on the parties' cross-motions for summary judgment, I construed the non-

compete provision as prohibiting "Defendants from offering a specialty conference that provides

content related to claims and litigation management or that targets claims and litigation

management professionals."   (D.I. 304 at 5; D.I. 311 at 2 ("I determined that the APA's non-

compete provisions were unambiguous.")).   Plaintiffs and Potter both challenge this

construction in their post-trial briefing.   Plaintiffs argue that the non-compete prohibits all

specialty conferences related to the insurance industry generally.   (D.I. 325 at 18–23).   Potter

---

[3] Plaintiffs also presented evidence of BIH's cancelled Intellectual Property Conference.  (*See*
PTX 24).   But since this conference was never held, there is no basis for a resulting breach of
contract claim.

3

argues that the non-compete only prohibits the specific specialty conferences that CLM had

offered as of the closing date.   (D.I. 328 at 23–25).

Plaintiffs and Potter are simply rehashing arguments I have already rejected.   (*See* D.I.

304 at 5; D.I. 320 at 2).   The plain language of the APA makes clear that CLM's business is

limited to the claims and litigation management industry.   (*See* PTX 13 at 4 ("CLM is engaged

in the business of operating as a national trade association for the *claims and litigation*

*management industries*, as more specifically set forth in Schedule A . . . ." (emphasis added));

PTX 14 at 52 (Schedule A) (defining "CLM Business" as "A professional association in the

insurance industry with more than 45,000 professionals in the *claims resolutions and litigation*

*management industries*, offering different types of memberships, with local chapters across the

United States." (emphasis added))).   Further, the definition of "CLM Business" in the APA is

not limited to the specific past product offerings of CLM.   I therefore see no reason to

reconsider my previous construction.

I acknowledge that the specific language in my construction regarding "content related

to claims and litigation management" and "target[s] [] claims and litigation management

professionals" appears in Schedule 6.12 as an exception to the "Permitted Activities."   (PTX 14

at 154).   Potter contends that I therefore should only consider the content and target audience of

the accused activities when determining whether the accused activities are "Permitted

Activities."   (D.I. 328 at 15).   I disagree.   The contracting parties clearly viewed any activity

that provides claims and litigation management content or that targets claims professionals as

competitive with CLM's business, or they would not have included this as an exception to the

Permitted Activities.   Therefore, this contractual language informs the meaning of "activities

that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing

4

Date." (PTX 13 at 31, § 6.12(a)); *see N. Am. Leasing, Inc. v. NASDI Holdings, LLC*, 276 A.3d 463, 467 (Del. 2022) ("When interpreting a contract, this Court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." (citation and internal quotation marks omitted)).

The parties next dispute what constitutes "content related to claims and litigation management." Plaintiffs argue that claims and litigation management includes "pre-loss" and "post-loss" activities. (D.I. 325 at 16–17). Defendants argue that claims and litigation management includes only "post-loss" activities, i.e., activities after a claim has occurred. (D.I. 327 at 25–26; D.I. 328 at 20–23).

"Claims and litigation management" is not defined in the APA. Thus, I look to the trial evidence to determine its meaning. *See U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823, at *5 (Del. Ch. Oct. 22, 2021) ("When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence . . . includ[ing] 'overt statements and acts of the parties, the business context, prior dealings between the parties, business custom and usage in the industry.'" (citation omitted)).

Potter testified that there are "two main aspects" to the insurance industry: "pre-loss" and "post-loss." (Tr. at 577:1–3 (Potter)). "Pre-loss" involves assessing and analyzing risk, while "post-loss" involves responding to a claim after it occurs. (Tr. at 577:4–18 (Potter)). He testified that, while there is some overlap, there is a "faint line" between the two where "people are on one side or the other." (Tr. at 577:19–578:11 (Potter)). But it is unclear where I should draw this arbitrary "faint line."

The evidence at trial shows that there is considerable overlap between pre-loss and post-loss activities.   Tina Pernie, CLM's former Chief Operating Officer, testified that claims administration involves both pre-loss and post-loss considerations.   (Tr. at 315:9–18 (Pernie)). She also testified that "litigation management" includes both pre-loss and post-loss activities. "There's some litigation management that has to . . . occur pre-loss, because you have to know who your panel counsel are. You have to have established billing guidelines. You have to potentially have a system through which they're going to submit their bills once it becomes a loss."   (Tr. at 316:21–317:20 (Pernie)).   Peter Miller, CEO of The Institutes, similarly testified, "[P]art of claims litigation, claims in general is to say: How do I avoid them; right? So, in other words, if I get a claim, a rational question to me would be: Well, can I avoid this claim? So, that's a pre-loss sort of activity."   (Tr. at 30:17–21 (Miller)).

Even Steve Acunto, director and officer of BIH, testified, "[I]f I were a claims professional, let's just say, I would want to understand what a hemp producer did if I were going to be faced with defending a policy in three years . . . ."   (Tr. at 789:23–790:2 (Acunto)). Further, CLM's membership includes risk managers, not just professionals who handle claims post-loss.   (Tr. at 167:5–10 (Blume); Tr. at 318:12–25 (Acunto); Tr. at 578:12–579:3 (Potter); *see also* Tr. at 31:11–14 (Miller) (testifying that it is "very common" for "persons serving as risk managers" to also have "some responsibility for handling claims for their company")).

I therefore cannot say that "claims and litigation management" is limited only to post-loss activities.   While the trial testimony shows that claims and litigation management primarily involves handling claims after they occur (post-loss), it is clear that professionals in this space are also concerned with how to avoid these claims in the future (pre-loss).   Thus, I find that

"content related to claims and litigation management" includes content related to the prevention, handling, and defense of claims or litigation.    (*See* D.I. 325 at 16).[4]

I find that Plaintiffs have proven by a preponderance of the evidence that the C&H Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar provided content related to claims and litigation management and targeted claims and litigation management professionals.   One of the sessions at the C&H Conference was titled "Cannabis Exposure: A Peek Down the Rabbit Hole."   (PTX 23 at 6).   The session description provided:

> The cannabis exposure is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis professionals will attempt to shed light on the various cannabis exposures to date, and how these will involve [sic] in the future.

(*Id.*).   The slides from this session referenced "Fire Claims," "Theft Claims," "Product Liability," "CBD Claims," "Professional Liability," and "Civil RICO Litigation."   (*Id.* at 19–34; Tr. at 429:9–20 (Kett); *see also* Tr. at 409:12–15 (Kett) (testifying that the content in this session would appeal to claims and litigation management professionals)).   In an anonymous post-conference survey, one conference attendee noted, "I enjoyed the forms panel and the claims trends panel as that pertains to what I do."   (PTX 97 at 8).   Further, two of the panelists for this session were claims professionals.   One was a "claims manager" for Golden Bear Insurance, and another was a "claims supervisor" at Canopius US (a cannabis insurer).   (PTX 23 at 6; Tr. at

---

[4] Potter argues that if I interpret "content related to claims and litigation management" to include pre-loss activities, it would write out many of BIH's agreed-upon "Permitted Activities" in Schedule 6.12 of the APA.   (D.I. 328 at 21).   I do not think that is the case.   Relevant here, Schedule 6.12 provides that BIH is permitted to present "Events and Award Programs as follows" and lists six specific events.   (PTX 14 at 153–54).   My interpretation of "claims and litigation management" does not preclude BIH from presenting these events.

7

422:3–423:7 (Kett)).   Based on this, I find that the C&H Conference provided content related to claims and litigation management.

The same is true for the other conferences.   The 2021 Long Term Care Webinar "discussed claims arising in the long-term care setting," including "slips and falls."   (Tr. at 344:5–18 (Kenner); PTX 32 at 2–3).   One of the panelists was a litigation attorney at Wilson Elser.   (Tr. at 345:1–4 (Kenner); PTX 32 at 2–3; *see also* Tr. at 345:22–346:7 (Kenner) (agreeing that this panelist was a claims and litigation management professional)).

The 2021 virtual Long Term Care Conference "was marketed to address slips and falls, which are the number one injury claim, abuse and neglect, . . . and litigation trends and trial experiences."   (Tr. at 346:9–347:7 (Kenner); PTX 28 at 1; *see also* Tr. at 347:4–11 (Kenner) (agreeing that these topics would appeal to claims and litigation management professionals)). Keith Kenner, a publisher at BIH, agreed that many of the speakers at this conference were claims and litigation management professionals.   (Tr. at 347:12–348:20 (Kenner)).

The 2021 Cyber Security Webinar provided content on "how companies should respond if they are hit with a cyber attack or their system is compromised," a post-loss activity.   (Tr. at 349:6–22 (Kenner); PTX 26).   The panelists for this webinar included the co-chair of the "Insurance Recovery and Counseling Practice" at a law firm and the "Chiefs Claims Officer" at an insurance company.   (PTX 26; Tr. at 349:23–350:20 (Kenner) (agreeing that these panelists are claims and litigation management professionals)).

I also find that Plaintiffs have shown that these conferences targeted claims and litigation management professionals.   BIH sent out advertising for the C&H Conference to a marketing list provided by Wilson Elser, a law firm in the claims and litigation industry.   (Tr. at 364:1–25 (Kenner); Tr. at 399:19–401:7 (Kett); Tr. at 638:20–629:15 (Potter) (testifying that Wilson Elser

works with both "risk managers" and "claims people")).   Marketing the conference to claims and litigation management professionals certainly constitutes targeting them.   The disclaimer on the C&H Conference webpage stating, "This conference was not developed and is not intended for claims and litigation management professionals," does not change my conclusion.   (PTX 23 at 1).   BIH still reached out to these professionals to invite them to the conference.   In fact, Plaintiffs presented evidence that there were at least seven claims professionals that attended the C&H Conference, despite this disclaimer.   (Tr. at 352:15–355:3 (Kenner)).

Mr. Kenner testified that after a person attends a BIH event, they remain on BIH's mailing list for future events.   (Tr. at 355:4–10 (Kenner)).   Thus, these claims professionals who attended the C&H Conference were on the mailing list for future BIH events, including the Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar.   Given this, I find that these conferences targeted claims and litigation management professionals.

Therefore, Plaintiffs have proven that Potter and BIH breached the non-compete provision of the APA by hosting these conferences.

Defendants argue that Plaintiffs have failed to prove any resulting damage from this breach—the third element of the breach of contract claim.   "[W]hen a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty."   *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).   Plaintiffs assert that they lost the benefit of their bargain because they bought the assets at a higher price than they would have paid if they had known Defendants would compete.

Mr. Miller testified that The Institutes would not have proceeded with the transaction if they thought that Defendants would compete, or they "would have paid a substantially reduced price."   (Tr. at 46:6–20, 64:4–65:2 (Miller)).   In an email to the chair of The Institutes' board,

Mr. Miller recommended that The Institutes offer $20 million for the purchase of Potter's

businesses, identifying the non-compete as a key term of the transaction.   (Tr. at 35:14–39:11

(Miller); PTX 10).   The evidence proves that Plaintiffs would have paid a lower price for the

assets if they knew Defendants would compete—i.e., Plaintiffs were deprived the benefit of their

bargain.   Accordingly, I find that Plaintiffs have proven the fact of damages with reasonable

certainty. *See Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473,

at *10 (Del. Ch. Apr. 23, 2021) (finding that the plaintiff proved the fact of damages with

reasonable certainty because the evidence showed that the plaintiff would not have invested in

the company if the defendant had not misrepresented the extent to which it would compete).

I therefore find that Plaintiffs have proven their breach of contract claim with respect to

the conferences by a preponderance of the evidence.

### 2.    ClaimsX

Plaintiffs argue that Defendants violated the non-compete provision of the APA by

assisting in the formation of ClaimsX.   ClaimsX was formed by Potter's sister, Sydney Posner.

(Tr. at 49:2–6 (Miller); Tr. at 619:1–2, 622:14–17 (Potter)).   ClaimsX is a professional

association of claims and litigation management professionals that directly competes with CLM.

(Tr. at 48:21–49:1 (Miller); Tr. at 186:6–187:19 (Blume); Tr. at 304:8–305:2 (Acunto); Tr. at

369:13–370:2 (Campbell)).

Potter introduced Ms. Posner to Mr. Acunto.   (Tr. at 620:9–10 (Potter)).   He testified

that he made the introduction with the hope that Mr. Acunto would hire Ms. Posner, not because

he intended for them to form ClaimsX.   (Tr. at 620:12–621:5 (Potter)).   The evidence at trial,

however, shows that Potter knew Ms. Posner planned to discuss the formation of a joint venture.

On September 26, 2019, Mr. Acunto sent Potter an email "[r]ecapping" his earlier meeting with

Potter, with a bullet point stating "Sydney – 10:00 a.m. Tuesday here re: JV." (PTX 86; Tr. at 836:4–837:1 (Acunto) (stating that "JV" stands for "joint venture")). Potter responded to this email, "I can provide you with Sydney's contact info, but I can[not] be involved in any discussions." (PTX 86; *see also* Tr. at 849:23–850:5 (Acunto) ("We did discuss [Ms. Posner's plan to set up ClaimsX], he did introduce me to her, and he was aware of her intention, I believe.")). I find that when Potter introduced Mr. Acunto (and thus, BIH) to Ms. Posner, he knew she planned to create a competing entity. Thus, through this introduction, Potter assisted in the formation of an entity that directly competed with CLM. This is a breach of the non-compete provision.

Mr. Acunto and BIH were even more involved with ClaimsX. Mr. Acunto testified that he helped Ms. Posner form ClaimsX. (Tr. at 807:25–808:2, 810:4–6 (Acunto); *see also* PTX 93 at 1 (memorandum written by Acunto identifying ClaimX's purpose as "serving the best interests of the insuring public, insurers, claims professionals, and attorneys and other individuals participating in the fair resolution of insurance claims")). Mr. Acunto and his wife, Carole Acunto, served as officers and directors of the corporation. (Tr. at 810:7–14 (Acunto); PTX 20 at 2). ClaimsX and BIH had a "strategic partnership" which involved BIH offering free subscriptions to ClaimsX members in order to generate new memberships. (Tr. at 310:2–14 (Acunto)). ClaimsX listed BIH as its strategic partner on its website until at least August 4, 2021. (PTX 27; Tr. at 357:5–22 (Kenner)). Based on this evidence, I find that Plaintiffs have shown that BIH violated the non-compete provision based on its involvement with ClaimsX.

Plaintiffs, however, have failed to show any damage resulting from Defendants' involvement in the formation of ClaimsX. Ms. Pernie testified, "Anecdotally, through conversations that I have had with the sales team, I believe that there are a handful of sponsors

11

that [CLM] ha[s] lost business from that have decided to move over to ClaimsXchange."   (Tr. at
331:20–332:3 (Pernie)).   She specifically identified CoventBridge and SEA as entities that
moved over to ClaimsX.   (*Id.*).   Ms. Pernie's speculative testimony does not show by a
preponderance of the evidence that Plaintiffs suffered any resulting damages.   Although there is
evidence that CoventBridge and SEA reduced their spend with CLM from 2018 to 2021 (Tr. at
51:8–14 (Miller)), there is no evidence showing that any reduced support was due to ClaimsX.
In fact, Plaintiffs did not present any evidence showing that CoventBridge or SEA were even
sponsors of ClaimsX.   Further, Mr. Miller testified that he was not aware of any customers or
sponsors CLM lost to ClaimsX.   (Tr. at 100:4–19 (Miller); *see also* Tr. at 216:8–217:9
(Blume)).   Given this, I find that Plaintiffs have failed to show that they suffered any damages
resulting from Defendants' involvement in ClaimsX.[5]   I therefore find that Plaintiffs have failed
to prove that Potter and BIH breached the non-compete provision of the APA by assisting in the
formation of ClaimsX.

### 3.    Non-Solicitation Provision

Plaintiffs argue that Defendants violated the non-solicitation provision of the APA when
Potter, on behalf of BIH, contacted Wilson Elser to be a sponsor of the C&H Conference.   The
non-solicitation provision of the APA provides:

> With the exception of Permitted Activities, during the Non-Compete Period, each Selling
> Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or
> induce, or attempt to solicit or induce, any customer or other business relation of Buyer for
> the provision of products or services related to any of Sellers' Businesses or in any other
> manner that would otherwise interfere with the business relationship between Buyer and
> its customers and other business relations.

(PTX 13 at 31, § 6.12(b)).

---

[5] There was some evidence that board members left CLM for ClaimsX (Tr. at 699:17–22
(Horowitz)), but the parties have stipulated that Plaintiffs are not seeking damages for lost board
members.   (D.I. 196).

12

Defendants first argue that Wilson Elser was not a "customer or other business relation of Buyer," which the APA defines as "The Institutes." (D.I. 328 at 26–27; PTX 13 at 4). Defendants reason that, when the APA was signed, Wilson Elser was a sponsor of BIH and CLM, not The Institutes. (D.I. 328 at 26–27). The plain language of the non-solicitation provision, however, is not limited to customers of Buyer as of the closing date. Instead, it applies to the solicitation "any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses." (PTX 13 at 31, § 6.12(b)). Once the deal closed, CLM became part of The Institutes. (*See* Tr. at 251:16–252:2 (Potter)). Thus, CLM's sponsors and customers became The Institutes' sponsors and customers. I therefore find that Wilson Elser was a "customer or other business relation of Buyer" within the scope of the non-solicitation provision.

The evidence shows that Potter reached out to Ian Stewart at Wilson Elser to ask about the emerging cannabis industry in general and whether a conference would be successful. (Tr. at 248:3–12, 599:19–600:20 (Potter); *see* PTX 45). Mr. Stewart then suggested that Wilson Elser should sponsor the C&H Conference. (Tr. at 249:14–21, 600:21–601:3, 637:15–638:10 (Potter)). The fact that it was Mr. Stewart who suggested to Potter that Wilson Elser sponsor the conference, and not the other way around, makes no difference. Potter indirectly solicited Wilson Elser's involvement by calling Mr. Stewart and telling him that he was planning a new specialty conference on cannabis and by accepting Mr. Stewart's invitation to sponsor the conference. Thus, Plaintiffs have shown that Potter, acting on behalf of BIH, violated the non-solicitation provision.

Plaintiffs, however, have failed to prove that they suffered any resulting damage from this solicitation.   The evidence makes clear that Wilson Elser still sponsors CLM events.   (Tr. at 99:9–20 (Miller); Tr. at 191:8–15, 200:16–22, 207:21–24 (Blume)).   While Mr. Miller testified that Wilson Elser "diminished the amount that they spent in sponsorship" (Tr. at 99:6–8 (Miller)), there is no evidence that this reduced sponsorship is due to Potter's solicitation.

I therefore find that Plaintiffs have failed to prove their breach of contract claim with respect to the non-solicitation provision.

## II.    APPROPRIATE RELIEF

### 1.    Monetary Damages

Plaintiffs must "present a reasonable and factually supported basis for determining damages." *Medek v. Medek*, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009).   "Plaintiffs must prove their damages by a preponderance of the evidence." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).   "[W]hen acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." *Id.*

Plaintiffs' expert Dr. Christine Meyer testified that Plaintiffs suffered damages between $6.7 and $8.0 million because of Defendants' breach of the non-compete provision.   (Tr. at 473:7–13 (Meyer)).   To calculate Plaintiffs' benefit-of-the-bargain damages, Dr. Meyer determined the difference between the amount Plaintiffs paid for the CLM assets and the value of the CLM assets actually received by Plaintiffs (which is lower due to Defendants' competition).   (Tr. at 448:10–20 (Meyer)).

Plaintiffs based their purchase price on an initial valuation performed by Valuation Research Corporation ("VRC") on March 5, 2018.   (Tr. at 31:15–36:10 (Miller); PTX 11).

14

This initial valuation was based on CLM's "future expected earnings projections." (Tr. at 33:19–34:21 (Miller); Tr. at 452:5–12 (Meyer)). Jeffrey Scheidt, CFO of The Institutes, provided VRC with these income projections. (Tr. at 122:15–124:6 (Scheidt)). Mr. Scheidt testified that these projections were based on the assumption that Potter and his affiliates would not compete with CLM post-acquisition. (Tr. at 125:11–127:6, 146:15–147:15 (Scheidt)).

Dr. Meyer adjusted these revenue projections to estimate an alternative valuation assuming competition from Defendants. (Tr. at 456:16–461:3 (Meyer)). Specifically, Dr. Meyer applied the simple Cournot model, which assumes "that a next-closest competitor entering a niche space is expected to essentially take half" of the market. (Tr. at 461:4–467:22 (Meyer)). Accordingly, Dr. Meyer adjusted the VRC revenue projections assuming that CLM would lose 50% of its sales by December 31, 2022. (Tr. at 499:6–22 (Meyer)).

Dr. Meyer applied the simple Cournot model as described in "Industrial Organization" by Jeffrey Church and Roger Ware. (Tr. at 512:8–16 (Meyer)). This treatise states that the "rules/assumptions" of this simple Cournot model include: "Products are homogeneous. Firms choose output. Firms compete with each other just once and they make their production decisions simultaneously. There is no entry by other producers." (Tr. at 516:4–15 (Meyer)).

These required assumptions, however, are not present in this case. Dr. Meyer admitted that the conferences are not homogeneous and that Plaintiffs and Defendants competed more than once. (Tr. at 517:3–519:24 (Meyer)). Dr. Meyer explained that the Cournot model has since been expanded to include similar, non-homogeneous products and to account for multiple instances of competition, but Dr. Meyer did not apply these expanded versions of the Cournot model. (*Id.*). She applied the simple Cournot model described in the treatise. (*Id.*).

15

Further, CLM has multiple competitors, not just BIH.   (Tr. at 370:3–13, 370:25–371:15 (Campbell)).   But Dr. Meyer's 50-50 split assumes that there are only two competitors in the market.   For example, she testified that if a new competitor entered a two-player market, then the market would be split three ways.   (Tr. at 552:16–553:17 (Meyer)).   So, when the third party enters the market, the existing companies' market shares would go from 50% to 33% rather than from 100% to 50%.   (*Id.*).   Given that the trial evidence shows that CLM has multiple competitors, I do not think Dr. Meyer's assumption that Defendants' competition would result in CLM losing 50% of its business was reasonable.

Additionally, Dr. Meyer's analysis was based on the ability of Defendants to compete generally, not the actual competition by Defendants.   (Tr. at 535:5–536:16 (Meyer)).   On the surface, actual competition by Defendants had no effect on Plaintiffs.   (*See, e.g.*, Tr. at 212:14–17 (Blume) (testifying that CLM's financial trends were positive in 2019 and 2020 until the pandemic)).   Thus, Dr. Meyer offered no opinions about the actual effect of Defendants' competition.   Indeed, Dr. Meyer testified that the number of non-compete violations or the type of violation would not change her damages calculation.   (Tr. at 535:5–536:16 (Meyer)).   So, if Defendants only held one conference that included one session related to claims and litigation management, Dr. Meyer would still assert that Plaintiffs suffered up to $8 million in damages.   I find this incredible.

I find that Plaintiffs have failed to prove the amount of their damages with the required certainty.   Dr. Meyer's methodology was flawed as the basic assumptions of the simple Cournot model she applied did not fit the facts of this case.   Thus, I decline to award Plaintiffs compensatory damages.

16

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages." *Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC,* 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009). "Nominal damages are 'not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.'" *Id.* (citation omitted). Plaintiffs have proven that Defendants breached the non-compete provision of the APA by hosting certain conferences. I therefore grant nominal damages in the amount of one dollar against each Potter and BIH.

### 2.    Injunctive Relief

Plaintiffs request an injunction enforcing the restrictive covenants of the APA for another five years. (D.I. 325 at 30–33).

I decline to award injunctive relief against Potter. The evidence at trial shows that Potter is no longer in the insurance industry. (Tr. at 569:10–571:25 (Potter)). Thus, there is no competitive behavior to enjoin. Plaintiffs did present evidence that BIH plans to expand its conference offerings. (*See* Tr. at 285:7–287:6 (Acunto); Tr. at 342:12–25, 348:21–349:5, 350:21–351:11, 352:4–7, 358:3–13 (Kenner); PTX 32 at 1; PTX 74). Thus, injunctive relief against BIH may be appropriate.

To merit a permanent injunction, Plaintiffs "must demonstrate: (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of issuing the injunction." *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *25 (Del. Ch. July 22, 2015).

17

By proving that BIH breached the non-compete provision of the APA by hosting certain conferences, Plaintiffs have demonstrated actual success on the merits.   Plaintiffs have also demonstrated irreparable harm because Section 6.12(d) of the APA provides, "Each Selling Party shall not contest that Buyer's remedies at law for any breach . . . of this Section 6.12 will be inadequate, and that Buyer shall be entitled to seek an injunction."   (PTX 13 at 32, § 6.12(d)); *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *15 (Del. Ch. Mar. 16, 2011) ("In Delaware, a contractual stipulation to irreparable harm does not force the Court's hand but is sufficient to support injunctive relief.").   Further, as shown above, the extent of the harm suffered by Plaintiffs is difficult to quantify.   *See Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *13 n.147 (Del. Apr. 15, 2004) ("The harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable.").

As to the balance of equities, BIH argues, "Imposition of a five-year injunction based on two events that occurred soon after the APA was signed would violate basic principles of equity and fairness."   (D.I. 327 at 31).   The injunction, however, is not only based on two events. Plaintiffs showed that BIH violated the non-compete provision of the APA by hosting several conferences and that BIH plans to continue these conferences.   I find that the balance of hardships favors an injunction.   An injunction would advance Plaintiffs' economic interests, as it would give Plaintiffs the opportunity to exploit the assets it acquired through the APA without competition from BIH.   I do not think any harm BIH might suffer from an injunction would outweigh the harm to Plaintiffs if an injunction did not issue.

I therefore find that Plaintiffs are entitled to injunctive relief against BIH.

18

Next, I must determine the proper scope of the injunction. Plaintiffs generally argue that BIH should be enjoined from "engaging in competitive activities for five years." (D.I. 325 at 30–33). This directive is too broad. Instead, I will enjoin BIH from offering specialty conferences that provide content related to claims and litigation management or that target claims and litigation management professionals, consistent with the above discussion.

I will limit the length of this injunction to two years from its entry. Plaintiffs bargained for five years of compliance with the non-compete provision. (PTX 13 at 31, § 6.12(a)). BIH began breaching in October 2019, approximately one year and four months after the Closing Date (June 2018). The next alleged breach did not occur until May 2021, approximately one year and seven months later. (*See* PTX 32 at 2) Given this, Plaintiffs only received the benefit of the non-compete provision for roughly three years. Thus, I think an injunction for two years will appropriately provide Plaintiffs the benefit of their bargain.

### 3.   Attorneys' Fees

Delaware follows the American Rule, which provides that each party is responsible for paying its own litigation fees. *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007). "An exception to this rule is found in contract litigation that involves a fee shifting provision." *Id.* Plaintiffs argue that this exception applies in this case due to the APA's indemnity provisions. (D.I. 325 at 33–34). In Delaware, however, "indemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) (quoting *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC,*

19

2013 WL 1955012, at *44 (Del. Ch. May 13, 2013)), *aff'd sub nom. Herzog v. Great Hill Equity Partners IV, LP*, 269 A.3d 983 (Del. 2021).

Plaintiffs argue that Sections 9.2 and 9.7, read together, create a broad right to indemnify for attorneys' and expert witness fees resulting from any breach. (D.I. 325 at 33). Section 9.2 of the APA provides:

> Indemnification of Buyer. The Selling Parties shall, jointly and severally, from and after the Closing, defend, indemnify and hold harmless Buyer . . . from, against, for and in respect of and pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:
>
> (a) any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement . . . ;
> * * *
> (f) the enforcement by any Buyer Indemnified Party of any of its rights under this Section 9.2 or any other indemnification covenant contained in this Agreement.

(PTX 13 at 35, § 9.2). Section 9.7 defines "Losses" to include "all reasonable attorneys', . . . and expert witness' fees incurred in connection therewith[.]" (*Id.* at 37, § 9.7).

I do not think these provisions reflect a "clear and unequivocal" intent to shift fees in "first-party" actions, i.e., actions between the contracting parties. The APA's indemnity provisions include similar language to the indemnity provision in *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525 (Del. Super. Ct. Nov. 22, 2016). In *Deere*, the relevant provision of the Purchase Agreement provided:

> From and after the Closing, [Exelon] shall indemnify, defend and hold harmless [Deere] . . . from and against any and all Losses incurred by [Deere] by reason of, arising out of, resulting from or related to: . . . (ii) any breach or nonperformance of any of the covenants or agreements of [Exelon] contained in this Agreement.

*Id.* at *1 (alterations in original). The Court found that this language was insufficient to justify attorneys' fees because it did not show the requisite "intent to create a clear and unequivocal agreement to shift fees in first-party actions." *Id.* at *2; *see also Chase Manhattan Mortg. Corp.*

20

*v. Advanta Corp.*, 2005 WL 2234608, at *22 (D. Del. Sept. 8, 2005) (denying attorneys' fees based upon similar indemnification provision).

Plaintiffs argue that *Deere* is distinguishable, because the APA includes certain language not present in *Deere*. (D.I. 331 at 18–19). Specifically, Section 9.5 provides that the limitations on indemnification specified therein do not apply to "any breaches of covenants in Article VI." (PTX 13 at 36, § 9.5(a)). Plaintiffs reason that the parties would not have included this exemption if claims for breaches of Article VI were not subject to the indemnity obligations. (D.I. 331 at 19). I do not think this language shows a clear and unequivocal intent to extend the indemnity to first-party claims. The indemnity provision in *Deere* similarly provided indemnification for losses resulting from "any breach or nonperformance of any of the covenants." *Deere*, 2016 WL 6879525, at *1. Yet, the Court there still found that the indemnity provision did not extend to first-party actions. *Id.* at *2.

Therefore, Plaintiffs are not entitled to attorneys' fees or expert witness fees under Article IX of the APA.

### 4. Pre- and Post-Judgment Interest

Delaware law governs the determination of pre- and post-judgment interest as the breach of contract was governed by Delaware law. "Under Delaware law, a party is entitled to prejudgment interest when the amount of damage is calculable, and such interest has been awarded in breach of contract cases." *U.S. for Use of Endicott Enters. Inc. v. Star Brite Constr. Co.*, 848 F. Supp. 1161, 1169 (D. Del. 1994). Under DEL. CODE. ANN. tit. 6, § 2301(a), "Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve

21

discount rate including any surcharge as of the time from which interest is due." I therefore will award Plaintiffs pre-judgment interest at the aforementioned rate.[6]

Post-judgment interest is governed by 28 U.S.C. § 1961. Section 1961(a) provides, "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." I find that post-judgment interest is appropriate here and order it be paid at the aforementioned rate.

## III. BIH'S NEGLIGENT MISREPRESENTATION CROSS-CLAIM

### A. Findings of Fact

1. Potter told Mr. Acunto that BIH was not subject to the non-compete once it was sold to Beacon Intercontinental. Potter told Mr. Acunto that the C&H Conference would not violate the non-compete.

2. Mr. Acunto did not ask Potter for a copy of the non-compete or Plaintiffs' demand letters.

3. Mr. Acunto's reliance on Potter's statements when deciding to host the C&H Conference was not reasonable.

### B. Conclusions of Law

BIH asserts a cross-claim against Potter for negligent misrepresentation.[7] This claim is governed by Connecticut law. To establish liability for negligent misrepresentation, BIH must show by a preponderance of the evidence: "(1) that [Potter] made a misrepresentation of fact (2) that [Potter] knew or should have known was false, and (3) that [BIH] reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Stuart v. Freiberg*, 116 A.3d

---

[6] The appropriate date for determining the Federal Reserve discount rate is October 24, 2019, which is when Defendants first breached the APA.

[7] BIH voluntarily dismissed its cross-claim for fraud without prejudice. (Tr. at 845:7–14).

22

1195, 1204 (Conn. 2015) (citation omitted).   BIH asserts that Potter negligently misrepresented the scope of the non-compete provision by telling Mr. Acunto that BIH was not subject to the non-compete and that the C&H Conference did not breach the non-compete.   (D.I. 329 at 2).

Potter initially argues that BIH should be judicially estopped from asserting its cross-claim.   (D.I. 330 at 1–2).   Potter reasons that BIH has previously asserted that it is not subject to the non-compete, so it cannot now argue that Potter misrepresented the fact that BIH was not subject to the non-compete.   (*Id.*).   This argument makes no sense.   BIH has not taken inconsistent positions.   BIH raised arguments in defense of Plaintiffs' breach of contract claim. I have since rejected these arguments and have found liability.   BIH's arguments on its cross-claim are consistent with this finding of liability.   Thus, judicial estoppel is not appropriate here. *See G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) ("[I]n our Circuit judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position.").

I will thus address the merits of BIH's cross-claim.   Mr. Acunto's company Beacon Intercontinental acquired BIH from Potter on September 1, 2019.   (Tr. at 264:5–265:7 (Acunto); PTX 18 (Stock Purchase Agreement)).   Prior to this sale, Potter told Mr. Acunto that the non-compete provisions of the APA would not apply to BIH after the sale.   (Tr. at 272:2–10 (Acunto); PTX 18 at 25 (Schedule 3.09)).   Potter also told Mr. Acunto that he had received demand letters from Plaintiffs stating that the planned C&H Conference was in violation of the non-compete provisions.   (Tr. at 633:25–634:24 (Potter)).   But Potter told Mr. Acunto that these claims were not "meritorious," because "the conference, in fact, did not deal with claims." (Tr. at 847:20–848:6, 852:16–19 (Acunto); Tr. at 871:10–872:22 (Potter)).   Potter also told Mr. Acunto that he had made changes to the conference to avoid any violations.   (Tr. at 785:2–786:1

23

(Acunto)).   After the sale, but before the C&H Conference, Potter gave Mr. Acunto a copy of Plaintiffs' initial complaint in this case, which alleged that the C&H Conference violated the non-compete provisions.   (Tr. at 869:13–870:6 (Potter); D.I. 1).

Despite this, BIH still held the C&H Conference.   Mr. Acunto testified that he relied on Potter's representations that the C&H Conference did not violate the APA because Potter was a "responsible businessman with a great reputation" and extensive experience in the field.   (Tr. at 276:12–277:5, 849:7–13 (Acunto)).   He further testified that he relied on Potter because "he said he would indemnify us if anything resulted from it adverse to us."   (Tr. at 848:14–17 (Acunto); *see also* PTX 18 at 10 (indemnification provision in Stock Purchase Agreement); Tr. at 275:4–18 (Acunto)).

BIH has failed to show by a preponderance of the evidence that Mr. Acunto's reliance on Potter's representations was reasonable.   Mr. Acunto never asked Potter for a copy of the non-compete provisions or Plaintiffs' demand letters.   (Tr. at 272:17–20, 273:15–274:1, 848:21–23 (Acunto)).   Further, although Mr. Acunto was represented by counsel during the closing of the sale, he never raised Plaintiffs' demands with his lawyers.   (Tr. at 274:9–19, 860:10–862:12 (Acunto)).   I do not think it was reasonable for Mr. Acunto to rely solely on Potter's (a non-lawyer) legal interpretation of the APA.

I therefore find that BIH has failed to prove its negligent misrepresentation claim against Potter, because any reliance was not reasonable.

## IV.    CONCLUSION

Plaintiffs have proven by a preponderance of the evidence that Potter and BIH breached the non-compete provision of the APA by planning and hosting certain conferences.   The Court

24

App.34

grants nominal damages in the amount of one dollar against each Potter and BIH, in addition to pre- and post-judgment interest.   The Court grants injunctive relief against BIH.

BIH has failed to prove its negligent misrepresentation cross-claim against Potter by a preponderance of the evidence.

The parties shall jointly submit a final judgment consistent with this memorandum opinion within one week.   The parties shall also jointly submit a proposed injunction consistent with this memorandum opinion at the same time.

.

App.35